1    UNITED STATES DISTRICT COURT

2    NORTHERN DISTRICT OF MISSISSIPPI

3

4

5    UNITED STATES OF AMERICA,          )
                                        )
6            Plaintiff,                 )        CASE NO. 4:14CR141
                                        )
7            VS.                        )
                                        )
8    FRANK GEORGE OWENS, JR.,           )
     AND ERIC GLENN PARKER,             )
9                                       )
             Defendants.                )
10   _____

11

12

13              JURY TRIAL - DAY 4 - TESTIMONY
          BEFORE SENIOR DISTRICT JUDGE GLEN H. DAVIDSON
14          THURSDAY, APRIL 7, 2016; 9:05 A.M.
                     OXFORD, MISSISSIPPI
15

16

17
     FOR THE GOVERNMENT:
18

19        United States Attorney's Office
          SCOTT LEARY, Esquire
20        CLAY DABBS, Esquire
          900 Jefferson Avenue
21        Oxford, MS   38655

22
          U. S. Department of Justice
23        KELLY KATHLEEN PEARSON, Esquire
          1301 New York Avenue, NW
24        Suite 49
          Washington, D.C.   20005
25

FOR THE DEFENDANT FRANK GEORGE OWENS, JR.:


        WILLIAM ANDY SUMRALL, Esquire
        P.O. Box 1068
        Jackson, MS   39215-1068



FOR THE DEFENDANT ERIC GLENN PARKER:


        JOSHUA A. TURNER, Esquire
        103 North Lamar, Suite 205
        Oxford, MS   38655


        Proceedings recorded by mechanical stenography, transcript
produced by computer.

PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
FEDERAL OFFICIAL COURT REPORTER
301 WEST COMMERCE STREET, #13
ABERDEEN, MS   39730

1

# **TABLE OF CONTENTS**

2

PAGE

3    Style and Appearances    412

4    Table of Contents    414

5

WITNESSES FOR THE GOVERNMENT

6

   DUANE O'CLARE

7

      Direct Examination by Mr. Dabbs    416
8       Cross-Examination by Mr. Sumrall    420
      Cross-Examination by Mr. Turner    420

9

   CLAY McCOMBS

10

      Direct Examination by Mr. Dabbs    421
11      Cross-Examination by Mr. Sumrall    437
      Cross-Examination by Mr. Turner    438
12      Redirect Examination by Mr. Dabbs    438

13

   JAY HOPPENWASSER

14

      Direct Examination by Ms. Pearson    440
      Cross-Examination by Mr. Sumrall    454

15

   CHRIS GOODMAN

16

      Direct Examination by Mr. Dabbs    456
17      Cross-Examination by Mr. Sumrall    469
      Cross-Examination by Mr. Turner    470
18      Redirect Examination by Mr. Dabbs    471

19

   DAVID BEVIS

20

      Direct Examination by Mr. Dabbs    472

21

   CLAIRE CARLE PUTT

22

      Direct Examination by Ms. Pearson    479

23

   SCOTT HENLEY

24

      Direct Examination by Mr. Dabbs    496
      Cross-Examination by Mr. Sumrall    505

25

JAMES DEAN

    Direct Examination by Mr. Leary      506
    Cross-Examination by Mr. Sumrall    571
    Cross-Examination by Mr. Turner     583
    Redirect Examination by Mr. Leary   591

WALTER THOMAS BURRUS

    Direct Examination by Mr. Leary      592
    Cross-Examination by Mr. Sumrall    618
    Cross-Examination by Mr. Turner     623
    Redirect Examination by Mr. Leary   628

SONNY MAXWELL

    Direct Examination by Mr. Leary      630
    Cross-Examination by Mr. Sumrall    646
    Cross-Examination by Mr. Turner     647

EXHIBITS

| EXHIBITS | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| G-37 | DEA Evidence Box Containing Open Hominy Cans | | 430 |
| G-38A and G-38B | Two DEA Evidence Boxes Containing Bags of Meth | 435 | 454 |
| G-39 | Lab Report of Jay Hoppenwasser, Forensic Chemist | 445 | 453 |
| G-40 | Seven Photos Taken During 11/16/13 Arrest Made by Chris Goodman | | 464 |
| G-41 | Box Containing Meth | 478 | 494 |
| G-42 | Lab Report of Claire Carle Putt | | 493 |
| G-43 | Photo of Frankie Owens, AB Tattoos | 523 | |
| G-44 | Photo of Michael "Skip" Hudson | 534 | 538 |

Court Reporter's Certificate     651

1     (CALL TO ORDER OF THE COURT.)

2     (JURY IN.)

3          **THE COURT:**  Okay.  You may be seated.  The United

4     States may call your next witness.

5          **MR. DABBS:**  Thank you, Your Honor.  The government

6     calls Duane O'Clare.

7          **THE COURT:**  Very well.

8     (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

9          **COURTROOM DEPUTY:**  Please take a seat in the witness

10    stand.  State your name for the record.

11         **THE WITNESS:**  Duane O'Clare.

12         **COURT REPORTER:**  Would you spell your last name,

13    please.

14         **THE WITNESS:**  O-c-l-a-r-e.

15         **MR. DABBS:**  Your Honor, may I proceed?

16         **THE COURT:**  Yes, sir.

17         **MR. DABBS:**  Thank you, Your HOnor.

18    **DUANE O'CLARE, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

19              **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

20                        <u>**DIRECT EXAMINATION**</u>

21    <u>**BY MR. DABBS:**</u>

22    **Q.**   Mr. O'Clare, where do you live?

23    **A.**   In West Memphis, Arkansas.

24    **Q.**   And where is that?

25    **A.**   Just right across the bridge from Memphis.

1  **Q.**  Okay.

2  **A.**  Tennessee.

3  **Q.**  Right across from Memphis, and that's in Arkansas?

4  **A.**  Yes, sir, it is.

5  **Q.**  Have you ever been a police officer?

6  **A.**  Yes, sir, I was.

7  **Q.**  Where did you work?

8  **A.**  At West Memphis Police Department.

9  **Q.**  And were you ever a narcotics officer there?

10  **A.**  Yes, sir, I was.

11  **Q.**  So how long did you work in the police department?

12  **A.**  I was with the police department for seven years.

13  **Q.**  For seven years?

14  **A.**  Yes, sir.

15  **Q.**  Okay.  And how long were you a narcotics officer?

16  **A.**  For two years.

17  **Q.**  Okay.  I want to take you back to August of 2010.  In

18  August of 2010, were you a narcotics officer at that time?

19  **A.**  I was.

20  **Q.**  Okay.  Did you ever have an encounter in a traffic stop

21  with a man named Eric Parker?

22  **A.**  I did.

23  **Q.**  Okay.  And what were you doing before you executed that

24  traffic stop?

25          **MR. TURNER:**  Your Honor, may we have a sidebar,

1   please?

2           **THE COURT:**  Yes.

3       (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

4           **MR. TURNER:**  Your Honor, I've asked -- I filed a

5   motion to have Mr. Parker's prior convictions excluded.  I

6   filed a motion to have them excluded.  It's my understanding

7   from this traffic stop that it ended up being a misdemeanor for

8   Mr. Parker.  I only find that this is more prejudicial than

9   probative at this time.

10          **MR. DABBS:**  Your Honor, I expect him to testify -- I'm

11  not going to ask him about the conviction.  Eric Parker and

12  Frank Owens were together in Arkansas buying pseudoephedrine

13  and going back to Hattiesburg, Mississippi.

14          **THE COURT:**  Okay.  The objection is overruled.

15          **MR. SUMRALL:**  Because he mentioned Mr. Owens is also

16  in the traffic stop, I would like to join in the objection too.

17          **THE COURT:**  Okay.  Go ahead and repeat what you said.

18          **MR. SUMRALL:**  After the prosecutor said that Mr. Owens

19  was with him at the same time, I would like to join in the

20  objection also.

21          **THE COURT:**  Very well.  The objection is overruled.

22      (END OF BENCH CONFERENCE.)

23          **THE COURT:**  Okay.  You may proceed, Mr. Dabbs.

24          **MR. DABBS:**  Thank you, Your Honor.

25  **BY MR. DABBS:**

1    **Q.**    Mr. O'Clare, did you engage in a traffic stop with Eric

2    Parker in August of 2010?

3    **A.**    I did.

4    **Q.**    Was that August 13th of 2010?

5    **A.**    I can't remember the exact date.

6    **Q.**    Okay.  But it was 2010?

7    **A.**    Yes, sir.

8    **Q.**    Okay.  What were you doing before you made the traffic

9    stop?

10    **A.**    We were working an undercover operation at the Wal-Mart

11    there in West Memphis.

12    **Q.**    And what were you investigating?

13    **A.**    The purchase of pseudoephedrine.

14    **Q.**    And you executed a traffic stop.  Who did you identify as

15    the driver?

16    **A.**    Mr. Parker.

17    **Q.**    And do you remember what he was driving?

18    **A.**    I believe a white F-150.

19    **Q.**    Was there another man in the car with him?

20    **A.**    Yes, sir.  I believe it was Frank Owens.

21    **Q.**    Okay.  So was there anybody else in the car?

22    **A.**    It was a female also.

23    **Q.**    Did Mr. Parker agree to talk to you?

24    **A.**    Yes, sir, he did.

25    **Q.**    And what did he say about why they were in West Memphis?

**A.**    They advised that they were in West Memphis to purchase pseudoephedrine to bring back to Mississippi to sell to cooks.

**Q.**    Okay.  And at the time in Arkansas, as you're -- in your position as a narcotics officer, are you aware of whether you needed a prescription to buy over-the-counter pseudoephedrine?

**A.**    Not in the state of Arkansas at the time.

**Q.**    And, again, where is West Memphis?

**A.**    In West Memphis, Arkansas.  It's right across the bridge from downtown Memphis.

**Q.**    Okay.

         **MR. DABBS:**  That's all I have, Your Honor.

         **THE COURT:**  Okay.  Mr. Sumrall, on behalf of Defendant Owens, you may cross-examine this witness.

<u>CROSS-EXAMINATION</u>

<u>BY MR. SUMRALL:</u>

**Q.**    Mr. O'Clare, I believe you stated that at the time that this incident happened that it was not against the law to buy pseudoephedrine, is that correct, in Arkansas?

**A.**    You didn't need a prescription, no, sir.

         **MR. SUMRALL:**  Okay.  Nothing further, Your Honor.

         **THE COURT:**  Mr. Turner.

<u>CROSS-EXAMINATION</u>

<u>BY MR. TURNER:</u>

**Q.**    Mr. O'Clare, my name is Joshua Turner.  I represent Eric Parker.  You said that this occurred in West Memphis, Arkansas?

1  **A.**  Yes, sir, it did.

2  **Q.**  All right.  You didn't witness Mr. Parker in any other

3  state, did you?

4  **A.**  No, sir, I didn't.

5  **Q.**  Okay.  Thank you.

6        **MR. TURNER:**  That's all I have, Your Honor.

7        **THE COURT:**  Any redirect, Mr. Dabbs?

8        **MR. DABBS:**  No, Your Honor.

9        **THE COURT:**  Very well.  You may stand down,

10  Mr. O'Clare.  Thank you for coming.  You're fully and finally

11  discharged.

12        You may call your next witness.

13        **MR. DABBS:**  The government calls Clay McCombs.

14        **THE COURT:**  Very well.

15     (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

16        **COURTROOM DEPUTY:**  Please take a seat in the witness

17  stand and state your name for the record.

18        **THE WITNESS:**  Yes, ma'am.  My name is Clay, C-l-a-y,

19  McCombs, M-c-C-o-m-b-s.

20        **THE COURT:**  You may proceed.

21        **MR. DABBS:**  Thank you, Your Honor.

22  **CLAY McCOMBS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN, WAS**

23              **EXAMINED AND TESTIFIED AS FOLLOWS:**

24                  **DIRECT EXAMINATION**

25  **BY MR. DABBS:**

**Q.**    Mr. McCombs, what do you do for a living?

**A.**    I am an investigator for the Leake, L-e-a-k-e, County Sheriff's Office here in Mississippi.  In addition to that, I am also assigned to the Mississippi Bureau of Narcotics as a contract agent.

**Q.**    Where is Leake County?

**A.**    Approximately two and a half hours south of here.  We're just outside of Jackson about 45 miles.

**Q.**    What is a -- what did you do when you worked as -- working for MBN?

**A.**    My job at the sheriff's office, narcotics investigator, and then at the Bureau of Narcotics as an agent.  The job overlays.  It's the exact same thing.  My responsibility is narcotics sales, possessions, really anything to do with any type of narcotics movement.

**Q.**    And how long have you been with the sheriff's office?

**A.**    I've been with the sheriff's office since May of 2004.

**Q.**    How long have you worked with MBN?

**A.**    Since November of 2004.

**Q.**    Have you worked methamphetamine investigations?

**A.**    Yes, sir, I have.

**Q.**    How many you think you've worked?

**A.**    Hundreds.

**Q.**    Are you familiar with the methods typically used with drug traffickers?

1  **A.**    Yes, sir.

2  **Q.**    And in particular, with methamphetamine traffickers?

3  **A.**    Yes, sir.

4  **Q.**    Okay.  I want to take you back to 2013.  Did you have a

5  methamphetamine investigation in the spring of 2013?

6  **A.**    Yes, sir, I did.

7  **Q.**    And at the time, who were the targets of that

8  investigation?

9  **A.**    A guy named Stephen Ochoa and Michael McClemore as well

10  as a couple other guys there.  One named Rodney Henderson out

11  of Central Mississippi.

12  **Q.**    Now, based on your knowledge of this investigation, are

13  you aware as to whether Michael McClemore has a street name?

14  **A.**    Yes, sir, I am.

15  **Q.**    And what is that?

16  **A.**    Dog.

17  **Q.**    Okay.  And how did you build your case on Mr. McClemore?

18  **A.**    I first built my case on Mr. McClemore by calling Stephen

19  Ochoa on the cell phone.  Myself and a confidential informant,

20  we would call Stephen Ochoa and arrange purchases of

21  methamphetamine, and Mr. McClemore would actually meet us and

22  sell us the methamphetamine.

23  **Q.**    And would that be -- what would be commonly referred to

24  as an undercover buy or a controlled purchase?

25  **A.**    Yes, sir.  Controlled purchase is what we label it as.

1  **Q.**    As you continue to build your case through 2013, did

2  you -- did that eventually lead to arrests and seizures?

3  **A.**    Yes, sir, toward the end of 2013.

4  **Q.**    When did those seizures occur?

5  **A.**    In September of 2013.

6  **Q.**    Okay.  So, again, when did your investigation really get

7  going on Mr. McClemore?

8  **A.**    In September of 2013, I realized it was a much larger

9  investigation on Mr. McClemore than originally when I was just

10 buying a couple hundred dollars' worth of methamphetamine from

11 him, because in September of '13, I was able to seize multiple

12 pounds of methamphetamine that was related to Mr. McClemore.

13 **Q.**    And did you personally participate in these seizures?

14 **A.**    Yes, sir, I did.

15 **Q.**    And you were present for the searches and seizures of

16 this methamphetamine?

17 **A.**    Yes, sir, I was.

18 **Q.**    How was the methamphetamine packaged?

19 **A.**    When we recovered the methamphetamine, it was concealed

20 inside of hominy cans.  These hominy cans had red labels on

21 them.  Once we were able to open the hominy cans, we found

22 approximately two pounds per can of methamphetamine.

23 **Q.**    And how many cans did you find?

24 **A.**    At one time, at one location, I believe there were -- I

25 cannot remember if there were eight or nine cans at one given

1  time.

2  **Q.**  And you said approximately two pounds in each can?

3  **A.**  Yes, sir.

4  **Q.**  Was that the only location where you seized

5  methamphetamine?

6  **A.**  No, sir.  The day before, we were able to recover

7  other -- we recovered methamphetamine in Rankin County as well.

8  The seizure I just referred to about the meth in the hominy

9  cans took place in Scott County, Mississippi.

10  **Q.**  And where is Scott County?

11  **A.**  The county seat would be Forest, the county that adjoins

12  mine.  It's about 20 miles from Carthage.

13  **Q.**  20 miles from Carthage?

14  **A.**  Yes, sir.

15  **Q.**  So where -- these hominy cans, tell the jury where they

16  were located.

17  **A.**  We were able to receive information that the cans were

18  located in a Ford pickup truck that was behind a residence.  We

19  obtained a search warrant to search that residence and that

20  vehicle.  And there inside of a single-cab Ford pickup truck

21  behind the seat under a blanket were these hominy cans.  We

22  took the hominy cans from there to my sheriff's office in Leake

23  County where we opened them.

24  **Q.**  And what part of Scott County was this residence in?

25  **A.**  It would have been on the northern side.  It was probably

1     on the -- where I recovered them was probably about

2     eight miles -- six miles into Scott County probably.

3     **Q.**    Okay.  And if you saw those hominy cans, would you

4     recognize them?

5     **A.**    Yes, sir.

6     **Q.**    Now, you said you had done hundreds of investigations?

7     **A.**    That probably should have been cases.

8     **Q.**    Cases.

9     **A.**    Not necessarily major investigations, but I've been

10    involved in several hundred methamphetamine cases.

11    **Q.**    In terms of amounts of methamphetamine seized, was this a

12    large seizure?

13    **A.**    This was the largest one I've ever been involved with,

14    yes, sir.

15    **Q.**    And based on your knowledge of this investigation, who

16    did that meth -- those hominy cans, who did that belong to when

17    you seized it?

18    **A.**    The three people that had picked it up prior.  Michael

19    McClemore and Stephen Ochoa is who I believed it belonged to.

20    I do know there was a man named Charlie Carroll there when it

21    was originally picked up as well too.

22    **Q.**    Charlie Carroll?

23    **A.**    Yes, sir.

24    **Q.**    Now, are you aware as to whether he has a street name?

25    **A.**    Yes, sir, I am.

1  **Q.**   What's his street name?

2  **A.**   CC.

3  **Q.**   How was CC involved in your investigation?

4  **A.**   During my investigation, I learned that Mr. Carroll

5  purchased anywhere from quarter pounds to half pounds of

6  methamphetamine from Michael McClemore and then distributed it

7  throughout other parts of Mississippi.

8  **Q.**   And Mr. McClemore, you said that was Dog?

9  **A.**   Yes, sir.

10 **Q.**   Okay.  And so Dog was selling methamphetamine to CC?

11 **A.**   Yes, sir.

12 **Q.**   All right.  Based on your knowledge of the investigation,

13 where else was large quantities of this meth going to?

14 **A.**   There were some parts sold there in Central Mississippi,

15 but then there were also two-pound shipments, at least ten, so

16 at least 20 pounds, that was sent to North Mississippi.

17 **Q.**   Do you know how it got to North Mississippi?

18 **A.**   Yes, sir, one of two ways.  One, Mr. McClemore would

19 utilize a guy by the name of Kenneth Wagner to drive it to

20 North Mississippi to meet certain people or the other -- some

21 of the people from the North Mississippi organization would

22 drive to the casino there in Philadelphia, Mississippi, which

23 is in Neshoba County, a county adjoining me, and pick up

24 amounts of methamphetamine from one to two pounds.

25 **Q.**   Are you familiar with the Aryan Brotherhood?

1    **A.**    Somewhat.

2    **Q.**    Are you aware whether the Aryan Brotherhood -- or members

3    of the Aryan Brotherhood, I should say, were getting any of

4    this methamphetamine?

5              **MR. SUMRALL:**  Object to the leading, Your Honor.

6              **THE COURT:**  Okay.  Objection sustained.  You may

7    rephrase your question.

8              **MR. DABBS:**  Thank you, Your Honor.

9    **BY MR. DABBS:**

10   **Q.**    In North Mississippi -- are you aware who was getting the

11   methamphetamine in North Mississippi?

12   **A.**    Yes, sir, I am.  Mr. -- I was -- Mr. McClemore stated who

13   was getting the methamphetamine and did state that they were

14   members of the Aryan Brotherhood.

15   **Q.**    Okay.  Thank you.

16             **MR. DABBS:**  Your Honor, may I approach the witness?

17             **THE COURT:**  Yes, sir.

18   **BY MR. DABBS:**

19   **Q.**    I'm going to hand you a box.  I want you to look inside.

20   First of all, do you recognize this box?

21   **A.**    Yes, sir.

22   **Q.**    Okay.  And is -- describe for the jury, what kind of box

23   is this?

24             **THE WITNESS:**  May I stand, sir?

25             **THE COURT:**  Yes, sir.  Sure.

1 **THE WITNESS:** Thank you.

2 **A.** This is an evidence box that we use -- I guess I didn't

3 state one of my other -- also throughout my career, through

4 different times, I've been a task force agent with the Drug

5 Enforcement Administration. During this, I was a task force

6 agent with the Drug Enforcement Administration.

7 This was a box that we at DEA package our stuff in to

8 send to the crime lab. This box in particular is one that we

9 packed the cans in to send, myself and Agent Trey Curtis.

10 **BY MR. DABBS:**

11 **Q.** So is there a label on the top of that box?

12 **A.** Yes, sir, it is. I was looking at it to see who I was

13 with when we packaged the box.

14 **Q.** And is your name on that label?

15 **A.** Yes, sir, it is.

16 **Q.** Okay. So open the box and look inside the box. Do you

17 recognize what's inside the box?

18 **A.** Yes, sir, I do.

19 **Q.** What is that?

20 **A.** These are the hominy cans that I seized in Scott County

21 and took back to my office where I opened them, labeled them

22 each as I opened them, and then later they were packaged and

23 sent to the crime lab.

24 **Q.** And what did you find inside those cans?

25 **A.** Inside of each of these cans was a white bag containing

1    large amounts of methamphetamine.  Approximately two pounds or

2    so in each can.

3         **MR. DABBS:**  Your Honor, at this time, the government

4    would ask that the -- this box with the -- containing the

5    hominy cans be admitted as the government's next numbered

6    exhibit.

7         **MR. TURNER:**  We'd only object to relevance, Your

8    Honor, as to Mr. Parker.

9         **MR. SUMRALL:**  No objection, Your Honor.

10        **THE COURT:**  Okay.  I believe Mr. Parker has a

11   continuing objection as to relevancy?

12        **MR. TURNER:**  Yes, sir.

13        **THE COURT:**  Okay.  That's -- the objection is

14   overruled.  The exhibits are admitted into evidence as the next

15   numbered government's exhibit.

16        **MR. DABBS:**  Thank you, Your Honor.

17      (EXHIBIT NO. G-37 ADMITTED INTO EVIDENCE.)

18        **MR. DABBS:**  May I ask what the next number is?

19        **COURTROOM DEPUTY:**  G-37.

20        **MR. DABBS:**  Okay.

21        **THE COURT:**  G-37.  G-37.

22   **BY MR. DABBS:**

23   **Q.**   Now, Mr. McCombs, can you see this?  Do I need to hand

24   you one of these?

25   **A.**   I can see it, sir.

1   **Q.**   Okay.  I tell you what, I'm going to give you one of
2   these so you can look at it.
3   **A.**   Yes, sir.
4   **Q.**   I want to ask you about those cans.  So what is hominy?
5   **A.**   It's a corn product that would taste similar to corn.
6   Best way I know how to describe it.
7   **Q.**   So when you found these cans, were they actually sealed?
8   **A.**   Yes, sir, they were completely sealed.  I had to use a
9   can opener to open each one of these cans.
10  **Q.**   And so sealed like you would find a can in the grocery
11  store; is that right?
12  **A.**   That's exactly what it looked like.
13  **Q.**   Okay.  And what is this label?  Are you familiar with
14  this label?
15  **A.**   Yes, sir.  That is an actual company that makes hominy.
16  The day before when I was in Rankin County, I ran across some
17  cans similar to this except they had yellow labels.  And you
18  could shake those, and you could hear the liquid inside and the
19  stuff shaking around.  You could feel it.  And we opened some
20  of those yellow cans, and they contained hominy.
21         But these cans were a different color.  They were red
22  here instead of yellow.  And when I took them up and shook
23  them, I could tell there was something heavy inside of them,
24  but there was no liquid, and it was -- it had a whole different
25  feel and sound when you shook it than the yellow labeled cans.

1  **Q.**  And so, again, where did you find these cans?

2  **A.**  They were in a Ford truck -- I don't remember the name of

3  the road -- in Scott County, Mississippi.

4  **Q.**  And they were associated with Michael McClemore?

5  **A.**  Yes, sir.  The truck was actually registered to his wife,

6  the tag that was on the truck that day.

7  **Q.**  Okay.  And what did you say you found inside the cans?

8  **A.**  A clear plastic bag containing -- this one right here

9  (indicating).  It was just over two pounds of methamphetamine.

10  **Q.**  And that's actually written on the top of the can?

11  **A.**  Yes, sir.  We took out of -- when I would take the bag

12  out of each can, I would lay it on a set of scales, and then I

13  would label what came out of each can.

14  **Q.**  Okay.  And you were present when these cans were seized

15  and opened, and you saw what was inside them?

16  **A.**  Yes, sir.

17  **Q.**  Okay.  Now, what's standard procedure -- when you find

18  something you suspect to be narcotics, what is standard

19  procedure at that point?

20  **A.**  We photographed it.  We locked it inside of a vault.  By

21  then, it was kind of getting late in the day, late at night.

22  We had been working all day.  We secured it inside of a vault.

23  The next morning, myself and another agent transported it

24  to Jackson where it was immediately -- well, we field-tested it

25  that night, and then the next morning, we drove it to Jackson

1    where we packed it up at our DEA office out of Jackson,

2    Mississippi, and mailed it to Texas to be tested.

3    **Q.**   So you did mail it to be tested?

4    **A.**   Yes, sir.

5    **Q.**   Okay.  And what typically happens -- after a substance is

6    sent to the lab and its tested, what typically happens to it at

7    that point?

8    **A.**   It usually -- in my case, I usually deal with the state

9    crime lab, and they maintain custody.  Our evidence people go

10   pick it up.  But they'll send us a lab result back notifying us

11   of what the lab results were.  On a federal lab result, they

12   will give the purity level as well as the weight of the

13   substance and tell you what type of substance it is.

14   **Q.**   And do they maintain custody through the lab and through

15   the agents connected with the case constantly?

16   **A.**   Yes, sir.

17   **Q.**   Okay.  I'm going to show you two more boxes.  If you

18   would look over that box and see if you --

19             **THE WITNESS:**  May I stand?

20             **THE COURT:**  Yes, sir.

21   **BY MR. DABBS:**

22   **Q.**   -- recognize it?  Again, is that an evidence box similar

23   to the one that had the hominy cans in it?

24   **A.**   Yes, sir.

25   **Q.**   Does it also have a label on top?

1  **A.**   Yes, sir, it does.

2  **Q.**   When you look at that label, is your name on that label?

3  **A.**   Yes, sir, it is.

4  **Q.**   Okay.  And so what is -- when you -- what does it say

5  relative to you on that label?

6  **A.**   Well, first, it has my case number, which is G, as in

7  George, M, as in Mary, dash 13 dash 0022, which lets me know

8  this is the case number that I was working.  Then it has an

9  exhibit number, and then it has my name, because I was the

10  agent that acquired this methamphetamine.

11  **Q.**   So it has a case number and exhibit number.  Is that the

12  same case number relative to these hominy cans?

13  **A.**   Yes, sir, it is.

14  **Q.**   Okay.  Look inside the box.  Do you recognize the

15  contents of that box?

16  **A.**   Yes, sir, I recognize the contents of both boxes.

17  **Q.**   Now, is this exactly the way you found it?

18  **A.**   No, sir.

19  **Q.**   The contents of that box, is that what came out of the

20  hominy cans?

21  **A.**   Yes, sir, it is.

22  **Q.**   Okay.  Why does it not look exactly the way it looked

23  when you pulled it out of the hominy cans?

24  **A.**   For two reasons.  One, once we got all of these bags, we

25  had to put them in larger bags and heat-seal them so that

1  evidence didn't just get everywhere.  And then we bulk it

2  together, and then it was shipped to the lab.

3       And then whatever they may do at the lab -- they'll --

4  they'll have to cut the bags open to test it, and they'll put

5  it back together, seal it up, and document what all they've

6  done, and then maintain custody of it.

7  **Q.**   And whoever unseals it to test it, that's all documented;

8  is that right?

9  **A.**   Yes, sir.

10  **Q.**   Okay.  So the contents of those two boxes, where did that

11  come from?

12  **A.**   The contents of these two boxes was the methamphetamine

13  that I took out of the multiple hominy cans that I seized in

14  Scott County on September of 2013.

15       **MR. DABBS:**  Your Honor, at this time, I would ask that

16  these two boxes be marked for identification only as

17  Exhibits 38A and 38B.

18       **THE COURT:**  Very well.

19     (EXHIBIT NOS. G-38A AND G-38B MARKED FOR IDENTIFICATION.)

20  **BY MR. DABBS:**

21  **Q.**   And, Mr. McCombs, is this -- did you actually find more

22  meth in this case?

23  **A.**   Yes, sir.

24  **Q.**   And that's not -- actually not here; is that right?

25  **A.**   No, sir.

1   **Q**.   And how much did you find total?

2       **MR. SUMRALL**: Objection, Your Honor. He doesn't know

3   exactly how much it was. That's something that the lab would

4   have to tell you.

5       **THE COURT**: Well, let's see if he can answer. Did you

6   weigh it?

7       **THE WITNESS**: Yes, sir. It would be a rough estimate,

8   yes, sir.

9   **A**.   The day before, I seized approximately one pound myself.

10   I was present when another pound was taken, and then there was

11   another pound that was seized in Rankin County. There was --

12   let me restate where I don't confuse anyone.

13       I, myself, seized another pound in Neshoba County. I was

14   with another agent that seized a pound in Rankin County. And

15   then on the same date, another pound was seized in Rankin

16   County that I later helped take custody of to take to DEA. So

17   I can testify to approximately three other pounds that I was --

18   had a part of.

19   **BY MR. DABBS**:

20   **Q**.   And all of the drugs that you just described, were those

21   related to Michael McClemore?

22   **A**.   Yes, sir. That was some of the drugs that had been

23   opened and came out of the hominy cans before I was able to

24   actually seize the remaining hominy cans.

25   **Q**.   And, again, in your career as a narcotics officer, what's

1     the largest meth seizure that you've participated in?

2     **A.**   This case.  That's approximately 18 pounds, 19 pounds

3     total.  This was the most I've ever ran across.

4           **MR. DABBS:**  That's all the questions I have, Your

5     Honor.

6           **THE COURT:**  Mr. Sumrall, you may cross-examine this

7     witness on behalf of Defendant Owens.

8                   **CROSS-EXAMINATION**

9     **BY MR. SUMRALL:**

10     **Q.**   Mr. McCombs, good morning to you.

11     **A.**   Good morning, Mr. Sumrall.

12     **Q.**   Leake County is in the Southern District of Mississippi,

13     is it not, as far as the districts?

14     **A.**   Yes, sir, it is.

15     **Q.**   Scott County is in the Southern District of Mississippi,

16     is it not?

17     **A.**   Yes, sir, it is.

18     **Q.**   Rankin County is in the Southern District of Mississippi,

19     is it not?

20     **A.**   Yes, sir.

21     **Q.**   So none of this took place in the Northern District; is

22     that correct?

23     **A.**   Of my seizures, sir?

24     **Q.**   Yes, sir.

25     **A.**   No, sir.  None of those took place in the Northern

1  District.

2  **Q.** Okay. And I believe you said that this belonged to

3  Michael McClemore and Stephen Ochoa and then Charlie Carroll;

4  is that correct?

5  **A.** Yes, sir.

6  **MR. SUMRALL:** Nothing further, Your Honor.

7  **THE COURT:** Mr. Turner.

8  **CROSS-EXAMINATION**

9  **BY MR. TURNER:**

10  **Q.** Morning, Agent.

11  **A.** Morning, sir.

12  **Q.** Of this large quantity of what your testimony was came to

13  be methamphetamine, did any of that belong to Mr. Eric Parker?

14  **A.** I did not take it from him, no, sir.

15  **Q.** Thank you.

16  **MR. TURNER:** That's all I have, Your Honor.

17  **THE COURT:** Any redirect, Mr. Dabbs?

18  **MR. DABBS:** Just briefly, Your Honor.

19  **REDIRECT EXAMINATION**

20  **BY MR. DABBS:**

21  **Q.** You were asked as to whether any of this meth was seized

22  in North Mississippi, and you testified that it was all seized

23  in South Mississippi; is that right?

24  **A.** Yes, sir.

25  **Q.** But based on your investigation and your knowledge of

1　this case and this Michael McClemore, Dog, are you aware as to

2　whether this meth had connections to North Mississippi?

3　　　　　MR. SUMRALL:  Objection, Your Honor.  It's not proper

4　redirect.

5　　　　　THE COURT:  Okay.  Overruled.

6　A.　Yes, sir.  Through our investigation, I believe that a

7　minimum of at least --

8　　　　　MR. SUMRALL:  Your Honor, I object to what he

9　believes.

10　　　　　THE COURT:  Okay.  Sustained.  What do you know?  Tell

11　us what you know.

12　　　　　THE WITNESS:  Yes, sir.

13　A.　Through my investigation, I learned that at least

14　20 pounds of methamphetamine that came through Michael

15　McClemore and Stephen Ochoa was sent to North Mississippi to be

16　distributed.

17　BY MR. DABBS:

18　Q.　Thank you.

19　　　　　MR. DABBS:  That's all I have, Your Honor.

20　　　　　THE COURT:  Officer, you're fully and finally

21　discharged.  You may go.

22　　　　　THE WITNESS:  Yes, sir.  Thank you.

23　　　　　THE COURT:  You may call your next witness.

24　　　　　MS. PEARSON:  Your Honor, the government would call

25　Jay Hoppenwasser.

1    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

2        **COURTROOM DEPUTY:**  Please take a seat in the witness

3    stand and state your name for the record.

4        **THE WITNESS:**  My name is Jay Hoppenwasser,

5    H-o-p-p-e-n-w-a-s-s-e-r.

6    **JAY HOPPENWASSER, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

7            **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

8                  **DIRECT EXAMINATION**

9    **BY MS. PEARSON:**

10   **Q.**   Good morning.

11   **A.**   Good morning.

12   **Q.**   You've already introduced yourself.  Where are you

13   employed?

14   **A.**   With the DEA South Central Laboratory.

15   **Q.**   Okay.  I want to just talk to you a little bit about your

16   education.  What, if any, bachelor's degree do you hold?

17   **A.**   I got a Bachelor of Science in biology from Texas A & M

18   University.

19   **Q.**   Do you have a higher degree than that?

20   **A.**   Yes.  I got a Master of Science from Sam Houston State

21   University in forensic science.

22   **Q.**   And can you tell the ladies and gentlemen of the jury

23   what your first professional employment was in relation to the

24   two degrees you hold currently?

25   **A.**   I worked for one year at the Harris County Medical

1  Examiner's Office in Houston, Texas.

2  **Q.**   Okay.  Can you briefly tell the jury the duties and
3  responsibilities you had there?

4  **A.**   I worked in toxicology.  We analyzed blood and urine
5  samples from postmortem tissues from the deceased bodies.

6  **Q.**   And was there another position you held after that, sir?
7  **A.**   Yes.  I moved up to New York City, and I worked two years
8  in the New York City Police Department Crime Lab in their drug
9  analysis section.

10  **Q.**   Okay.  Can you briefly tell the jury some of the duties
11  and responsibilities you had in that section?

12  **A.**   I analyzed evidence for the presence and absence of
13  controlled substances.

14  **Q.**   And did that lead you to your current assignment?
15  **A.**   Yes.

16  **Q.**   And how long have you been with the DEA laboratory in
17  Texas?

18  **A.**   Ten years.

19  **Q.**   Okay.  And can you tell the jury what, if any,
20  training -- professional training did the laboratory mandate
21  you undergo before taking on your current position?

22  **A.**   I did one month up at Quantico, Virginia, where we
23  learned the ins-and-outs of the DEA organization.  And then I
24  spent six months at my laboratory learning the instrumentation,
25  law, courtroom testimony, field assistance, and other ancillary

1    duties.

2    **Q.**    Okay.  Did you pass?

3    **A.**    Yes.

4    **Q.**    With respect to the laboratory you're at right now, what,

5    if any, ongoing training do you have to do in addition to that

6    seven months that you did at the beginning of your career?

7    **A.**    Every year we have to do a minimum of 20 hours of

8    training related to our day-to-day work and analysis and

9    courtroom and all of that sort of related duties.

10   **Q.**    Okay.  And have you kept up-to-date with your training,

11   sir?

12   **A.**    Yes.

13   **Q.**    And with respect to the DEA laboratory in Texas, what, if

14   any, independent certifications does the laboratory hold?

15   **A.**    We are ASCLD accredited.

16   **Q.**    And can you just tell the jury what that means?

17   **A.**    An outside forensic body comes in and assesses our

18   laboratory to make sure that we are up to speed with everything

19   in regards to what we should be doing as a forensic laboratory.

20   **Q.**    And do you know insofar as your employment with the

21   laboratory how long the laboratory has had that accreditation?

22   **A.**    It has been accredited as long as I've been there and

23   well before I've been there.

24   **Q.**    Okay.  And I don't know if I've asked you that.  What's

25   your title currently at the laboratory?

1 **A.** I am a senior forensic chemist.

2 **Q.** Okay. And can you tell the jury briefly some of the
3 duties and responsibilities associated with your current
4 position?

5 **A.** Well, I analyze evidence for the presence or absence of
6 controlled substances. I assist law enforcement out in the
7 field on clandestine laboratory investigations, trace analysis.
8 I provide expert testimony in court when needed. I will also
9 provide training to local law enforcement and also some of our
10 schools.

11 **Q.** And in addition to all of the things that you just
12 referenced, what, if any, publications have you written in your
13 field of expertise?

14 **A.** I published a paper on the postmortem distribution of a
15 drug called Quetiapine, an antipsychotic drug, when I worked in
16 the Harris County Medical Examiner's Office.

17 **Q.** And have you testified in court before?

18 **A.** Yes.

19 **Q.** Would it be safe to say you've testified multiple times,
20 sir?

21 **A.** Yes.

22 **Q.** And have other federal courts recognized you as an expert
23 in chemistry?

24 **A.** Yes.

25 **Q.** Okay.

1    **MS. PEARSON:**  Your Honor, at this point in time, the

2    government would offer Mr. Hoppenwasser as an expert in

3    chemistry.

4    **MR. SUMRALL:**  Your Honor, the defense would accept

5    Mr. Hoppenwasser as an expert.

6    **MR. TURNER:**  Agreed, Your Honor.

7    **THE COURT:**  Very well.  He may so testify.

8    **BY MS. PEARSON:**

9    **Q.**  Mr. Hoppenwasser, I want to discuss some -- a report you

10   wrote that brings you to court today.

11   **MS. PEARSON:**  Your Honor, may I approach the witness?

12   **THE COURT:**  Yes, ma'am.

13   **BY MS. PEARSON:**

14   **Q.**  I'm going to show you a document.  I'm going to ask you

15   if you recognize that document.

16   **A.**  Yes, I do.

17   **Q.**  What is it?

18   **A.**  It is a lab report that I did.

19   **Q.**  When you say you did, did you author it?

20   **A.**  Yes.

21   **Q.**  And what, if any, peer review does your report go --

22   undergo at the laboratory?

23   **A.**  It goes through a technical and an administrator review

24   by my senior management.

25   **Q.**  Okay.  And with respect to the review of this particular

1    document, was that -- was your report accepted by those

2    reviewers?

3    **A.**    Yes.

4    **Q.**    Okay.  Other than the contents of the document, what, if

5    any, information do you have about this case?

6    **A.**    I'm sorry?

7    **Q.**    Other than the contents of this document, what, if any,

8    information do you have about this case?

9    **A.**    None.

10    **Q.**    Okay.

11            **MS. PEARSON:**  Your Honor, may I approach the witness

12    with some exhibits?

13            **THE COURT:**  Yes, ma'am.

14            **MR. DABBS:**  Your Honor, may I help with boxes if

15    needed?

16            **THE COURT:**  Yes.

17            **MS. PEARSON:**  Your Honor, may I approach your clerk

18    and have a document marked for identification only at this

19    point in time?

20            **THE COURT:**  Yes, ma'am.

21            **COURTROOM DEPUTY:**  G-39.

22        (EXHIBIT NO. G-39 MARKED FOR IDENTIFICATION.)

23            **MS. PEARSON:**  Your Honor, I've already given copies to

24    the defense before court.

25    **BY MS. PEARSON:**

1  **Q.**   Sir, I'm going to ask you to look at the two exhibits,

2  and there should be an orange sticker on them.

3  **A.**   Yes.

4  **Q.**   And what sticker are you looking at?  What exhibit

5  number?

6  **A.**   I am looking at 38B.

7  **Q.**   Okay.  I'm going to ask you to take a look at that box

8  and see if you see any handwriting that you recognize.

9  **A.**   Yes.

10 **Q.**   Okay.  Which handwriting do you recognize?  And just tell

11 the jury why you recognize it.

12 **A.**   I recognize my -- my writing right here and also on the

13 interior contents.

14 **Q.**   Okay.  And what is that -- what's the significance of you

15 putting your handwriting on that as it relates to the document

16 which is now G39?

17 **A.**   That I had analyzed this evidence.

18 **Q.**   Okay.  Can you look at the other box and just read off

19 the exhibit number for the Court?

20 **A.**   38A.

21 **Q.**   And what, if any, handwriting do you recognize on that

22 box?

23 **A.**   I recognize my handwriting on the box labeled here and

24 also on the interior contents.

25 **Q.**   Okay.  What is -- what significance does that have to

1   G39, the report we talked about?

2   **A.**   That I had an analyzed this evidence and sealed it.

3   **Q.**   And can you tell the jury if you recall how that evidence

4   arrived?  Was it in that same condition, or did it look a

5   little bit different?

6   **A.**   It actually arrived in one box, and inside that box there

7   was eight -- was one large bag that contained each -- excuse

8   me -- eight smaller bags.

9   **Q.**   Okay.  And what's different about it today?

10  **A.**   It has been previous opened in an earlier case.

11  **Q.**   Okay.  Were you involved in that earlier case?

12  **A.**   Yes.

13  **Q.**   All right.  And the eight bags that you just referenced,

14  what, if anything, did you do when you received this evidence

15  with respect to those eight bags?

16  **A.**   When I first got this, I had opened those bags to get a

17  weight of the contents of the bags, and then I proceeded with

18  my analysis.

19  **Q.**   Okay.  And when you first received both of the -- or that

20  one box with all of the contents in it, what, if any, evidence

21  of tampering, opened bags did you observe prior to your

22  analysis?

23  **A.**   There was none.  It was in tact.

24  **Q.**   And would you have proceeded with your analysis had you

25  noticed any open bags, evidence spilling out, et cetera?

1   **A.** No. I would have contacted the agent of the case.

2   **Q.** Okay. With respect to the contents of the bag, can you

3   just tell the jury what kind of analysis you performed?

4   **A.** I performed a series of analyses. I first did a screen

5   of all eight bags using a Marquis color test and an instrument

6   technique called a gas chromatograph/mass spectrometer.

7   And after those eight screens, I performed a composite,

8   which is representative samples of all eight bags, and did

9   further analysis with gas chromatograph/mass spectrometry, gas

10   chromatography, and FTIR or infrared spectroscopy. And also I

11   did a purity determination with liquid chromatography.

12   **Q.** And all of those things that you just referenced, which

13   I'm going to call FTIR, GC/mass spec, and the third thing that

14   you referenced, were those all instruments that the laboratory

15   uses in this type of analysis on a regular basis?

16   **A.** Yes.

17   **Q.** Okay. Let me ask you this. Could you pull out from

18   either of those boxes the eight bags that the evidence

19   originally came in just to show the jury what you're speaking

20   of?

21   **A.** Okay.

22   **Q.** Okay. And whose packaging is that that the eight bags

23   are now contained in?

24   **A.** That's my packaging. It has my initials right here.

25   **Q.** Okay. And then with respect to the actual substance that

1    you conducted your testing on, is that contained in those two

2    boxes?

3    **A.**    Yes.  In the other box, yes.

4    **Q.**    Can you pull that out for me, please?  Thank you.

5                **MS. PEARSON:**  Your Honor, may I approach the witness?

6                **THE COURT:**  Yes, ma'am.

7                **MS. PEARSON:**  You can just lay it there.

8    **BY MS. PEARSON:**

9    **Q.**    Now, you testified that you took essentially eight

10    samples from the eight bags that we just referenced?

11    **A.**    Yes.

12    **Q.**    Why did you do that?

13    **A.**    I had to screen all eight bags and take representative

14    samples.

15    **Q.**    And when you say "representative," what do you mean by

16    that?

17    **A.**    Just samples that represent the -- each of the contents

18    of each of the bags.

19    **Q.**    Okay.  Why don't you test all of that?

20    **A.**    Well, two reasons.  I mean, that would be cumbersome, but

21    also, our instruments are very sensitive that it's not

22    necessary to analyze the full contents.  We just need a small

23    sample from each of them.

24    **Q.**    And when you say you just need a small sample, with

25    respect to the opinion that you may form, why is a small sample

1  in your scientific community okay versus testing all of that?

2  **A.**    It's just been -- I mean, it's -- a lot of scientific

3  testing has been done to show that -- that a small proper

4  sampling is going to be sufficient to represent the exhibit as

5  a whole.

6  **Q.**    Okay.  And all of the instruments that you referenced

7  earlier in your testimony, what were you looking for, the

8  presence of narcotics?

9  **A.**    Just the presence of the contents, whatever the active

10 ingredient is.

11 **Q.**    In addition to doing that, was there, what I'm going to

12 call, a purity testing or a quantitative testing that you did

13 with respect to all eight samples?

14 **A.**    Yes.

15 **Q.**    Okay.  Can you tell the jury what you did with respect to

16 that part of your testing?

17 **A.**    Basically, I took the composite and -- I took a sample of

18 that, and I ran it on the liquid chromatograph and compared it

19 to known standards of methamphetamine and compared those

20 values, and I was able to come up with a purity of the

21 substance in the exhibit.

22 **Q.**    Okay.  Let's start with the first part of your analysis.

23 Based on all of the testing that you just referenced with all

24 of those instruments, were you able to form an opinion as to

25 what's contained in now what is three bags of white substance?

1  **A.**  Yes.

2  **Q.**  Okay.  What was that opinion?

3  **A.**  That it contained methamphetamine hydrochloride and a

4  cutting agent called dimethyl sulfone.

5  **Q.**  Okay.  And are you familiar with the cutting agent you

6  just referenced?

7  **A.**  Yes.

8  **Q.**  Okay.  What's a cutting agent?

9  **A.**  It's -- in this case, it is a substance that was added to

10  it to add volume and somewhat mimic the -- the effects of the

11  main ingredient, ephedrine.

12  **Q.**  Okay.  So when you say "add volume" -- with respect to

13  the actual methamphetamine, it's essentially a nonnarcotic,

14  correct?

15  **A.**  Correct.

16  **Q.**  When you say "add volume," it makes it a bigger amount.

17  Is that accurate?

18  **A.**  That is correct.

19  **Q.**  Okay.  Now, with respect to the second -- what I'm going

20  to call the second part of your testing, the purity of the

21  substance --

22  **A.**  Yes.

23  **Q.**  -- were you able to form an opinion insofar as all the

24  substance methamphetamine contained in those three bags?

25  **A.**  Yes.

1  **Q.**    What was it?

2  **A.**    That this exhibit contained 97.0 percent methamphetamine

3  hydrochloride.

4  **Q.**    Okay.  And is there any -- and I'm going to use a

5  layman's term.  Is there any rate of error or plus or minus

6  associated with that 97 percent?

7  **A.**    There's a level of uncertainty.

8  **Q.**    Okay.  Can you explain to the jury what you mean by --

9  what's an uncertainty and what it was in this case?

10 **A.**    We are trying to compare this to an unknown value, so we

11 have a level of uncertainty with all of our measurements, and

12 so we apply a range around our measurements.  And in this case,

13 it was for the purity 97.0 percent plus or minus, I believe,

14 3.5 percent purity.

15 **Q.**    Okay.  Now, 3.5 percent, if you plussed it, would bring

16 it over 100 percent?

17 **A.**    Yes.

18 **Q.**    Why is that okay?

19 **A.**    It's just what it is.  We -- we don't alter what the

20 uncertainty is.  It's plus or minus, so --

21 **Q.**    Okay.

22 **A.**    But 100 percent would be the max.

23 **Q.**    100 percent would be the max.  Would -- would I be safe

24 to qualify that uncertainty as something accepted in your

25 scientific community based on perhaps a formula you utilized to

1   come up with that purity?

2   **A.**   Yes.

3   **Q.**   Okay.

4        **MS. PEARSON:**  Your Honor, at this point in time, the

5   government would offer G-39 into evidence, the report of this

6   forensic chemist.

7        **THE COURT:**  Any objection?

8        **MR. SUMRALL:**  No objection to the report, Your Honor.

9        **MR. TURNER:**  No objection, Your Honor.

10        **THE COURT:**  Okay.  The exhibit will be admitted.

11      (EXHIBIT NO. G-39 ADMITTED INTO EVIDENCE.)

12        **MS. PEARSON:**  And, Your Honor, I would, at this point

13   in time, offer G-37 and G-38, which would be the contents of

14   the boxes into evidence as well.

15        **MR. SUMRALL:**  To which we object, Your Honor.  Proper

16   predicate has not been laid.  And there's no chain of custody

17   been established for this material.  We object.

18        **THE COURT:**  Okay.  There's an objection to chain of

19   custody.

20        I believe you said your writing was on there, didn't

21   you?  You identified it by your writing?

22        **THE WITNESS:**  Yes.

23        **THE COURT:**  Okay.  The objection is overruled.

24        **MR. TURNER:**  I just have --

25        **THE COURT:**  Same objection?  Defendant Parker joins in

1   the objection.  It's overruled.

2        MR. TURNER:  I was going to object to relevance to my

3   client, Your Honor.

4        THE COURT:  Okay.  Your continuing objection as to

5   relevance is noted.

6        MR. TURNER:  Thank you.

7        MS. PEARSON:  Your Honor, may I just correct the

8   record?  It's actually Government's Exhibits 38A and 38B.

9        THE COURT:  Yes.

10        MS. PEARSON:  Thank you.

11     (EXHIBIT NOS. G-38A AND G-38B ADMITTED INTO EVIDENCE.)

12        MS. PEARSON:  Your Honor, those are all of the

13   questions I have for this witness.  I tender to the defense.

14        THE COURT:  Very well.  Mr. Sumrall, you may

15   cross-examine this toxicologist.

16                        <u>CROSS-EXAMINATION</u>

17   <u>BY MR. SUMRALL:</u>

18   **Q.**   I'm not going to try to pronounce your name because I'm

19   scared I'd butcher it, so I'm just going to simply ask you my

20   one question.  You don't know where this material came from

21   other than it was sent to your lab, do you?

22   **A.**   That is correct.

23        MR. SUMRALL:  No further questions, Your Honor.

24        MR. TURNER:  Your Honor, we have no questions of this

25   witness.

1      **THE COURT:**  Very well.  Let's gather these exhibits

2  and put them on the table in front of the clerk there, please.

3  If you can, put them back in the boxes.

4      Sir, you're fully and finally discharged.  You may go.

5      **THE WITNESS:**  Thank you, Your Honor.

6      **THE COURT:**  Let's go ahead and take a 15-minute

7  recess, ladies and gentlemen, while we -- we won't break the

8  witness's testimony.  Have your next witness ready to go in 15

9  minutes.  Court is in recess for 15 minutes.

10  (JURY OUT.)

11  (RECESS TAKEN AT 9:58 A.M. UNTIL 10:16 A.M.)

12  (JURY IN.)

13      **THE COURT:**  Okay.  The United States may call your

14  next witness.

15      **MR. DABBS:**  The government calls Chris Goodman.

16      **THE COURT:**  Very well.

17  (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

18      **COURTROOM DEPUTY:**  Please take a seat in the witness

19  stand.  State your name for the record.

20      **THE WITNESS:**  Chris Goodman, G-o-o-d-m-a-n.

21      **MR. DABBS:**  Your Honor, may I proceed?

22      **THE COURT:**  Yes, sir.

23      **MR. DABBS:**  Thank you, Your Honor.

24  **CHRIS GOODMAN, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

25      **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

## DIRECT EXAMINATION

**BY MR. DABBS:**

**Q.**    Mr. Goodman, what do you do for a living?

**A.**    I'm an Arkansas state trooper.

**Q.**    How long have you done that?

**A.**    Almost 13 years now.

**Q.**    What are your duties as an Arkansas state trooper?

**A.**    I'm assigned to highway patrol, which is in a marked patrol unit.  I'm also on what's called the Interstate Criminal Patrol Team, which means one of my -- I guess I kind of specialize in finding and arresting criminals, which means just basically making traffic stops and kind of investigating those a little more than a normal -- somebody that just issues a speeding ticket or whatever would do.

**Q.**    What -- is there an interstate in Arkansas that you work often?

**A.**    Yes, sir.  Interstate 40.

**Q.**    And describe for the jury, how does Interstate 40 cross Arkansas?

**A.**    Interstate 40 is an east/west interstate.  It crosses at Fort Smith, Arkansas, which is at the Oklahoma border, and goes all the way to Memphis basically across the bridge.

**Q.**    What does interdiction mean?

**A.**    Interdiction is basically, like, intercepting.  It's stopping something before it gets in -- to its intended

1  destination, which it commonly is drugs, or it can be guns or

2  stolen property.  So anything like -- or just a criminal trying

3  to get out of town.  You're intercepting that person or

4  contraband before it gets to its intended destination.

5  **Q.**   Have you participated in traffic stops related to

6  interdicting narcotics?

7  **A.**   Yes, sir.

8  **Q.**   How many do you think?

9  **A.**   Probably close to -- as far as significant seizures, we

10  would call, like, where the -- the main purpose for the trip

11  for -- was to get a significant amount of narcotics, probably

12  4 to 500.

13  **Q.**   I-40 keep you pretty busy?

14  **A.**   Yes, sir.

15  **Q.**   I want to take you back to November of 2013.  Did you get

16  a call from the DEA?

17  **A.**   Yes, sir.

18  **Q.**   And what did they call you about?

19  **A.**   They called me and advised that they had developed -- or

20  that the -- I guess the Oxford DEA office had developed

21  probable cause to stop and search the occupants of a minivan,

22  which they stated were Mr. Timothy Deshazier, Michael Smith,

23  and they didn't know who the third person was going to be, but

24  that it was supposed to have approximately 5 pounds of

25  methamphetamine.  They weren't sure if it would have any guns

1    in it.  And they gave me the license plate, which was

2    Mississippi HQQ 955, and described it as a Kia Sedona minivan.

3    **Q.**    After you got that call, did you prepare to make a stop

4    on that van?

5    **A.**    Yes, sir.

6    **Q.**    And how did -- how did law enforcement -- not just you,

7    but how did law enforcement prepare to stop the van?

8    **A.**    Well, the DEA followed the van.  They got behind the van

9    at some point, I think around the Oklahoma/Arkansas line, and

10   then they followed it and were surveilling it the whole time,

11   which is -- that point is about 70 something miles west of

12   where I was.  So they followed it for about an hour before it

13   got to me.

14          And what I did in the meantime is, I had a drug task

15   force officer riding with me for backup purposes obviously, and

16   then another trooper was in the area to provide support also.

17   **Q.**    Now, was this a situation where, if you found it, you

18   would think about stopping it if you saw a traffic violation,

19   or were you going to stop this van regardless?

20   **A.**    I was going to stop the van regardless.

21   **Q.**    Okay.  And it was tailed from the Arkansas state line

22   down I-40?

23   **A.**    Yes, sir.

24   **Q.**    Is that going towards Memphis?

25   **A.**    Yes, sir.

1  **Q.**   Okay.  And, again, about how far from the

2  Arkansas/Oklahoma line were you where you were situated?

3  **A.**   I was a little over 71 miles.  I was at our -- I'm

4  assigned to Pope County.  I was sitting at our county line,

5  which is around, like, the 71 1/2 mile marker.

6  **Q.**   Did you eventually see the van?

7  **A.**   Yes, sir.

8  **Q.**   Okay.  What did you do at that point?

9  **A.**   I got behind it and made a traffic stop about a mile and

10  a half or two miles later when I could catch up to it.

11  **Q.**   Was it -- who was with you in the car?

12  **A.**   David Bevis.

13  **Q.**   And so after you stopped the van, what happened after

14  that?

15  **A.**   I made contact with the occupants.  I identified the

16  driver as Mr. Timothy Deshazier.  The front passenger was

17  Michael McPhearson, and the back passenger was Michael Smith.

18  I talked to them.  Mr. Deshazier provided a rental contract

19  showing that he rented the vehicle.  He did not have a driver's

20  license on hand.  He provided some kind of Social Security

21  card, I believe.

22         I had -- I'm trying to think who I got out of the car.  I

23  had Mr. Deshazier exit and spoke to him.  That's right.  Their

24  stories didn't really match up, which all of that was just kind

25  of going through the motions, because I knew that I was going

1  to search the van from what I had been told anyways.

2  So I questioned them a little bit.  Mr. Deshazier stated
3  they went to California.  Just a pretty vague statement
4  about -- or Mr. McPhearson -- I'm sorry -- about somebody being
5  sick and it was close to Thanksgiving or something.  It didn't
6  really make much sense.

7  They were all extremely nervous.  Mr. Deshazier was -- I
8  could barely understand some of what he was saying he was so
9  nervous.  And he was talking about he went to Los Angeles --
10  then he said San Diego -- to look for a friend or something and
11  mentioned somebody may have been sick, but, again, he didn't
12  make much sense either.

13  So I mentioned -- I -- again, going through the motions,
14  I asked them if they had any guns in the vehicle or anything
15  like that.  He goes, "Oh, no, no, no."  I asked him if I could
16  search the van for guns.  He gave me permission to search the
17  van for guns, and so I conducted a search.

18  When I -- as I was conducting that search, I located a
19  Sprite can in the floorboard between the -- on the -- kind of
20  in the middle behind the front seats and in front of the back
21  seats.  And when I picked the Sprite can up, it just didn't
22  feel right.  And it was one of the Sprite cans you can take the
23  top off.  It's got a little false compartment inside of it, and
24  inside that, there was a little small amount of
25  methamphetamine.

1    I placed them in handcuffs to conduct the rest of my

2    search, because I knew there was supposed to be about

3    five pounds of methamphetamine, and this was maybe a gram or

4    something like that.  So I placed them in handcuffs and in our

5    vehicles, I believe, at that point and then proceeded to search

6    the rest of the van.

7    They had four large tires in the back of the van.  I took

8    those tires out to where I could get to the side panels,

9    because it's real common with people carrying -- couriering

10   drugs to be -- to hide the drugs obviously.  And so one of the

11   areas that are common in a minivan like that is the rear

12   quarter panels, what they call those.

13   And so I couldn't get to those with those big tires in

14   the way, so I took the tires out and got on the right side

15   quarter panel.  Behind that panel, there was the large bundle

16   of methamphetamine.

17   **Q.**   So you found that bundle of methamphetamine.  What did it

18   look like?

19   **A.**   It was wrapped in black -- it was wrapped in

20   vacuum-sealed packages, several layers, and then some kind of a

21   black wrapping, and then there was a pillowcase and carbon

22   paper all over it and stuff.  But it was one -- the actual

23   bundle itself was a large vacuum-sealed bundle with some black

24   wrapping inside of that.

25   **Q.**   At that point, did you arrest the three occupants of the

1  vehicle?

2  **A.**  Yes, sir.

3  **Q.**  Okay.  And what's standard procedure as far as processing

4  what you suspect to be narcotics?  If you find it on the side

5  of the road, what do you do?

6  **A.**  I turn it over to the drug task force.

7  **Q.**  And who did you turn it over to?

8  **A.**  Agent Bevis.

9       **COURT REPORTER:**  Would you spell that, please.

10      **THE WITNESS:**  Bevis is B-e-v-i-s.

11  **BY MR. DABBS:**

12  **Q.**  What about the three -- the three men in the car?  Did

13  you -- what did you do with them?

14  **A.**  I placed -- I took two of them, which I'm trying to

15  remember which two I took.  I transported McPhearson and

16  Deshazier, and then the other trooper that pulled up behind us

17  took Mr. Smith.  And we placed them in our jail locally and put

18  them on felony holds for the DEA to deal with at a later time.

19  **Q.**  Did you deal with the drugs?  Did you send the drugs to

20  the lab?

21  **A.**  No, sir.

22  **Q.**  Okay.  Who did that?

23  **A.**  Agent Bevis.

24  **Q.**  Okay.  During the course of this stop and these arrests,

25  did you take -- were photos taken?

1  **A.**   Yes, sir.

2  **Q.**   Photos of the van, photos of things you found, and photos

3  of the men in the van?

4  **A.**   Yes, sir.

5  **Q.**   Would you recognize those photos if you saw them?

6  **A.**   Yes, sir.

7          **MR. DABBS:**  Your Honor, may I approach?

8          **THE COURT:**  Yes, sir.

9  BY MR. DABBS:

10 **Q.**   I'm going to show you a series of photos.  I'd like for

11 you to just flip through them and see if you recognize those

12 pictures.

13 **A.**   Okay.  (Reviews photographs).  Yes, sir.

14 **Q.**   Okay.  What are those pictures of?

15 **A.**   These are pictures of the three suspects from that night,

16 Mr. Deshazier, McPhearson, and Smith, and then of the Sprite

17 can and its contents, the bundle of methamphetamine, and then

18 the -- the area of the minivan where the bundle of

19 methamphetamine was located, the larger bundle.

20 **Q.**   And those pictures accurately reflect the van and the

21 occupants of the van?

22 **A.**   Yes, sir.

23 **Q.**   Okay.

24          **MR. DABBS:**  Your Honor, at this time, we'd offer these

25 pictures as one cumulative exhibit, the next numbered --

1    government's numbered exhibit.

2            **THE COURT:**  Okay.  What date did you say this was?

3            **THE WITNESS:**  November the 16th of 2013.

4            **THE COURT:**  Very well.  Any objection?

5            **MR. TURNER:**  As to relevance, Your Honor.

6            **MR. SUMRALL:**  Objection to relevance, Your Honor.

7            **THE COURT:**  Okay.  The continuing objection as to

8    relevance is noted.  The objection is overruled, and the

9    exhibits are received into evidence as the next numbered

10   government's exhibit.

11           **MR. DABBS:**  I believe it's 40.

12           **COURTROOM DEPUTY:**  G-40, yes, sir.

13           **THE COURT:**  Be G-40.  And how many photographs do you

14   have?

15           **MR. DABBS:**  Seven photographs.

16           **THE COURT:**  Okay.  G-40, one through seven, is

17   admitted into evidence.

18           **MR. DABBS:**  Thank you, Your Honor.

19      (EXHIBIT NO. G-40 ADMITTED INTO EVIDENCE.)

20           **MR. DABBS:**  Your Honor, may I flip through these

21   photos and show them to the jury?

22           **THE COURT:**  Yes.  Yes, please.

23   **BY MR. DABBS:**

24   **Q.**   Trooper Goodman, who is that?

25   **A.**   That's Timothy Deshazier.

1  **Q.**   Okay.  And was he driving the van?

2  **A.**   Yes, sir.

3  **Q.**   Okay.  When you pulled it over?

4  **A.**   Yes, sir.

5  **Q.**   This photo was taken after he's arrested?

6  **A.**   Yes, sir.

7  **Q.**   Who is this?

8  **A.**   Michael McPhearson.

9  **Q.**   Was he also in the van?

10  **A.**   Yes, sir.  He was the front passenger.

11  **Q.**   Was he the one that you didn't know who it was when you

12  pulled them over?

13  **A.**   That's correct.  Yes, sir.

14  **Q.**   Okay.  And, again, this is after he's arrested?

15  **A.**   Yes, sir.

16  **Q.**   Okay.  And who is this?

17  **A.**   That's Michael Smith.

18  **Q.**   And he was also in the van?

19  **A.**   Yes, sir.  He was the rear passenger.

20  **Q.**   Okay.  What is this picture?

21  **A.**   That's the Sprite can with the twist-off cap with the

22  compartment inside it and the small bag of methamphetamine that

23  was inside.

24  **Q.**   Now, a can like this, is this something that is homemade

25  or is this something you just can buy?

1  **A.**   They -- you can buy them at the little head shops and

2  the -- I call them the little weird stores that you can get

3  stuff, just trinkets like that.

4  **Q.**   Okay.  And so the top of that can just screws off, and

5  when it's screwed on, it looks like a regular Sprite can?

6  **A.**   That's correct.  Yes, sir.

7  **Q.**   And whatever is in this -- this white substance here

8  (indicating), that was inside the Sprite can?

9  **A.**   Yes, sir.

10  **Q.**   Okay.  What is this photo?

11  **A.**   That's a picture of that -- the right rear quarter panel.

12  And there's one in the -- you can see one of the tires that was

13  still in there.  That -- in the bottom of that, underneath that

14  black thing that's bolted to the side of the van, that's where

15  the bundle of methamphetamine was located.

16      But that panel right there (indicating) that I'm pulling

17  back, that's what I would refer to as the quarter panel.  And

18  that's the taillight that you can see on the right side.

19  **Q.**   So this is the back compartment of the van, and these

20  tires you're talking about, this is not like a spare tire?

21  **A.**   No, sir.

22  **Q.**   These are tires that are stacked in the back of the van?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  And so if you pull that panel off, is that where

25  you found the package?

1  **A.**  Yes, sir.

2  **Q.**  What about this picture?

3  **A.**  That's a picture of the large bundle of methamphetamine.

4  **Q.**  And, again, where did you find that?

5  **A.**  That was in that quarter panel in the previous picture.

6  **Q.**  Okay.  Do you recognize that picture?

7  **A.**  Yes, sir.

8  **Q.**  What is that a picture of?

9  **A.**  That's the bundle of methamphetamine that's been placed

10  in another package with Agent Bevis' initials and case number

11  and date on that.

12  **Q.**  Okay.  How many -- how many -- how many stops involving

13  narcotics have you executed with the assistance of Mr. Bevis?

14  **A.**  Probably close to a hundred or more.

15  **Q.**  Are you familiar with his initials?

16  **A.**  Yes, sir.

17  **Q.**  And those are his initials?

18  **A.**  Yes, sir.

19  **Q.**  And what's the date on here?

20  **A.**  11/16.  November 16th of 2013.

21  **Q.**  Does that mean that's when the stop happened?

22  **A.**  Yes, sir.

23  **Q.**  Okay.  And what about this number you mentioned earlier?

24  What is that number?

25  **A.**  That's the drug task force case number that he pulls --

1  he pulls a case number on each piece of evidence or for each

2  incident where he pulls -- or collects evidence.

3  **Q.**    Is that case number then used to track the evidence if it

4  needs to go to a lab or go to court or wherever?

5  **A.**    Yes, sir.

6  **Q.**    Okay.  When you were preparing to make this stop, were

7  you -- were there safety concerns related to this stop?

8  **A.**    Yes, sir.

9  **Q.**    Why's that?

10  **A.**    Because we had been informed that there was -- that this

11  was a violent group, that they possibly had firearms in the

12  vehicle with them, and that they were also trafficking a large

13  amount of methamphetamine.

14  **Q.**    You didn't find anything else?

15  **A.**    No, sir.

16  **Q.**    And was there any violence in the stop?

17  **A.**    No, sir.

18  **Q.**    Okay.

19         **MR. DABBS:**  Your Honor, may I briefly confer with my

20  co-counsel?

21         **THE COURT:**  Yes.

22      (CONFERRING OFF THE RECORD.)

23         **MR. DABBS:**  That's all I have for this witness, Your

24  Honor.

25         **THE COURT:**  Officer, what town in Arkansas -- where

1  are you stationed?  Where do you live?

2          **THE WITNESS:**  I live in Russellville, which is --

3          **THE COURT:**  Russellville.

4          **THE WITNESS:**  -- halfway between Fort Smith and Little

5  Rock.

6          **THE COURT:**  Yes, sir.  And you testified your primary

7  work is on I-40?

8          **THE WITNESS:**  Yes, sir.

9          **THE COURT:**  Very well.  Okay.  Thank you.

10          **THE WITNESS:**  Yes, sir.

11          **THE COURT:**  Mr. Sumrall, you may cross-examine on

12  behalf of Defendant Owens.

13                          **CROSS-EXAMINATION**

14  **BY MR. SUMRALL:**

15  **Q.**    Trooper Goodman, good morning.

16  **A.**    Morning.

17  **Q.**    You said this happened November 13th, 2013; is that

18  correct?

19  **A.**    November 16th.

20  **Q.**    16th?

21  **A.**    Yes, sir, of 2013.

22  **Q.**    Thank you.

23  **A.**    Yes, sir.

24  **Q.**    This happened in the state of Arkansas, did it not?

25  **A.**    Yes, sir.

1  **Q.** Didn't happen in the Northern District of Mississippi?

2  **A.** No, sir.

3  **Q.** Okay. And I believe you stated that you were going to

4  stop them no matter what; is that correct?

5  **A.** Yes, sir.

6  **Q.** You did not have any -- you did not see any probable

7  cause to stop them prior to you stopping them, did you?

8  **A.** I actually did see a reason -- probable cause to stop.

9  They committed a traffic violation, but it wouldn't have

10 mattered.

11 **Q.** It wouldn't have mattered?

12 **A.** Yes, sir.

13 **Q.** But this was in the state of Arkansas; is that correct?

14 **A.** Yes, sir.

15     **MR. SUMRALL:** No further questions, Your Honor.

16     **THE COURT:** Mr. Turner on behalf of the defendant,

17 Parker.

18                    CROSS-EXAMINATION

19 BY MR. TURNER:

20 **Q.** Trooper Goodman, the evidence that you seized that day,

21 it does not belong to my client, Eric Parker, correct?

22 **A.** I have no idea, sir.

23 **Q.** Do you know who Eric Parker is?

24 **A.** No, sir.

25     **MR. TURNER:** Thank you, Your Honor. That's all I've

got.

    **THE COURT:** Any redirect?

    **MR. DABBS:** Just briefly, Your Honor.

       **REDIRECT EXAMINATION**

**BY MR. DABBS:**

**Q.** You were asked about the location of the stop that was made in Arkansas; is that right?

**A.** Yes, sir.

**Q.** Where did the call from DEA originate from?

**A.** From Mississippi.

**Q.** Okay.

    **MR. DABBS:** That's all I have, Your Honor.

    **THE COURT:** Very well. Officer, you are fully and finally discharged. You may go.

    **THE WITNESS:** Thank you, sir.

    **THE COURT:** You may call your next witness for the government.

    **MR. DABBS:** The government calls David Bevis.

    **THE COURT:** Very well.

  (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

    **COURTROOM DEPUTY:** Please take a seat in the witness stand, then state your name for the record.

    **THE WITNESS:** My name is David Bevis.

    **MR. DABBS:** Your Honor, may I proceed?

    **THE COURT:** Yes, sir.

1       MR. DABBS:  Thank you.

2  DAVID BEVIS, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN, WAS

3           EXAMINED AND TESTIFIED AS FOLLOWS:

4                   DIRECT EXAMINATION

5  BY MR. DABBS:

6  Q.     Mr. Bevis, what do you do for a living?

7  A.     Right now, currently, I'm a sergeant with the

8  Russellville Police Department in charge of patrol division.

9  Q.     How long have you done that?

10 A.     Just over 14 years.

11 Q.     Back in 2013, what was your position?

12 A.     I was an agent assigned to the Drug Task Force, Fifth

13 Judicial District.

14 Q.     What does that mean?

15 A.     Basically, I was loaned from the police department over

16 to the Fifth Judicial Drug Task Force to help them in

17 monitoring drug activity in the area.  We were comprised of

18 three different jurisdictions as far as three different

19 counties that we worked under, and we did drug investigations.

20        We helped with other agencies, such as state police.

21 When they had drug seizures, we would take their evidence.  We

22 would process their evidence, field-test their evidence,

23 package their evidence, send it to the crime lab, things like

24 that, as well as make controlled buys of narcotics in our area.

25 Q.     Did you work drug seizures related to traffic stops?

1  **A.**    Yes.

2  **Q.**    Are you familiar with Chris Goodman?

3  **A.**    Yes, sir.

4  **Q.**    Who is Chris Goodman?

5  **A.**    State trooper with the Arkansas State Police.

6  **Q.**    Did you work with him a lot?

7  **A.**    Yes, quite a bit.

8  **Q.**    In November 2013, do you remember a traffic stop with

9  Mr. Goodman related to a call from Mississippi DEA?

10  **A.**    Yes, sir.

11  **Q.**    Okay.  Were you actually in the car with Trooper Goodman?

12  **A.**    Yes, sir.

13  **Q.**    And you were there during the stop?

14  **A.**    Yes.

15  **Q.**    Did you -- were you present when the items were seized

16  out of the van?

17  **A.**    Yes.

18  **Q.**    And in that situation, when you're with Mr. Goodman, if

19  narcotics or something suspected to be narcotics are found,

20  what's going to be your job?

21  **A.**    Well, I was the agent on call.  That's why I went with

22  Trooper Goodman that day.  And I take the evidence that is

23  found.  It's brought to me, or if I -- in this case, I was on

24  scene.  I take the evidence, and I take it to the Fifth

25  Judicial District Drug Task Office where I weigh it, field-test

1    it, label it, secure it, and send it to the crime lab.

2    **Q.**   And is this something that's common in your line of work,

3    traffic stops and drugs?

4    **A.**   Yes, sir.

5    **Q.**   And this is standard procedure to label the evidence,

6    initial it, maintain custody of it?

7    **A.**   Yes, sir.

8    **Q.**   Okay.  I want to show you a picture.  It will pop up on

9    your screen.  This is part of Exhibit 40.  Do you recognize

10   that picture?

11   **A.**   Yes, sir.

12   **Q.**   Whose handwriting is that on that label?

13   **A.**   That's mine.

14   **Q.**   Okay.  What does the date mean?

15   **A.**   That's the date of the seizure.

16   **Q.**   And what does the number underneath -- are those your

17   initials?

18   **A.**   Yes.

19   **Q.**   What's the number under the initials?

20   **A.**   That is our -- the Fifth Judicial Drug Task Force, that's

21   our case number.

22   **Q.**   So where was -- this package I'm looking at, where was

23   that seized?

24   **A.**   From the back quarter panel of the van at the traffic

25   stop that Trooper Goodman made.

**Q.**     Okay.

          **MR. DABBS:**  Your Honor, may I approach?

          **THE COURT:**  Yes, sir.

**BY MR. DABBS:**

**Q.**     I'm going to show you a box.  Do you recognize this box?

**A.**     Yes, sir.

**Q.**     I'm going to ask you to open the box and look inside.  Do you recognize the contents of that box?

**A.**     Yes, sir.

**Q.**     Okay.  How do you recognize it?

**A.**     The black casing here that was -- is what the methamphetamine was wrapped in, and that's the way -- what you saw in the picture, that is what I saw.

          And I field-tested by cutting into the package, taking some of the white substance out, putting it into a test kit. Tested positive for methamphetamine.

          And then labeled everything and put it in a box, secured it, and send it -- or put it in my evidence locker and -- until it's sent to the crime lab.

**Q.**     Okay.  Is there -- are there -- are there -- is there a case number on that paperwork?

**A.**     Yes, sir.

**Q.**     What is the case number?

**A.**     218P.

**Q.**     Okay.  And what about -- are there suspects on the

1   paperwork?

2   **A.**   Yes, sir.

3   **Q.**   And who are they?

4   **A.**   Timothy Deshazier, Michael McPhearson, and Michael Smith.

5   **Q.**   Okay.  So the contents of that box, where were they

6   seized?

7   **A.**   On the traffic stop April -- or I'm sorry --

8   November 13th.

9   **Q.**   And that's Tim Deshazier, that traffic stop?

10  **A.**   Yes.

11  **Q.**   Okay.

12  **A.**   He's the driver.

13  **Q.**   Is that what you sent to the lab?

14  **A.**   Yes.

15  **Q.**   And you maintained custody of that from the time it was

16  seized on the side of the road till the time it was sent to the

17  lab?

18  **A.**   Correct.  Until I took it to the Arkansas State Crime

19  Lab.

20           **MR. DABBS:**  That's all the questions I have.

21           **THE COURT:**  What lab did you send it to, Officer?

22           **THE WITNESS:**  The Arkansas State Laboratory Crime Lab.

23           **THE COURT:**  In Little Rock?

24           **THE WITNESS:**  In Little Rock, yes, sir.

25           **THE COURT:**  Okay.  So how did you go about sending it?

1   Did you mail it or personally deliver it?

2          **THE WITNESS**:  No.  We personally deliver all articles

3   of evidence.  What we do is, at a certain time when we have

4   evidence to take, we take it, and one or two agents will go.

5   In this case, I went and put everything in our DTF, our drug

6   task force vehicle.  I personally drive it down to Little Rock

7   office, take it in, sign it in to them.

8          At that time, if they have any evidence that needs to

9   come back to the office that's been processed already, I

10  sign -- that evidence is signed over to me, and I drive that

11  back to our office in Russellville.

12         **THE COURT**:  Okay.  Now, was that box sealed with your

13  initials on it?  I see your name written on the side there.

14         **THE WITNESS**:  Yes, sir.  What I do is, I -- this is

15  actually affixed to the outside of the box where this is

16  still -- and I put it in here, wrap everything, initial it, put

17  the evidence sticker that's on top of the box, have my initials

18  around all areas that could be broken, the seal, and then affix

19  this to the side of the box where it's on the outside for the

20  crime lab to be able to see.

21         **THE COURT**:  Very well.

22         **MR. DABBS**:  Your Honor, I would ask that that be

23  marked for identification purposes only as Government

24  Exhibit 41, I believe is the next number.

25         **THE COURT**:  Okay.  The exhibit -- the entire exhibit,

1   the box and its contents, are marked as Government's Exhibit

2   Number 41 for identification.

3       (EXHIBIT NO. G-41 MARKED FOR IDENTIFICATION.)

4           **MR. DABBS:**  That's all I have, Your Honor.

5           **THE COURT:**  Okay.  Mr. Sumrall, you may cross-examine

6   this witness.

7           **MR. SUMRALL:**  No questions, Your Honor.

8           **THE COURT:**  Mr. Turner?

9           **MR. TURNER:**  Your Honor, we don't have any questions

10  of this witness.

11          **THE COURT:**  Okay.  There are no questions.  Officer

12  Bevis, you're fully and finally discharged.  You may go.

13          **THE WITNESS:**  Thank you, sir.

14          **THE COURT:**  You may call your next witness for the

15  government.

16          **MR. DABBS:**  Your Honor, the government will call

17  Claire Putt.

18          **THE COURT:**  Very well.

19      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

20          **COURTROOM DEPUTY:**  Please take a seat in the witness

21  stand.  Please state your name for the record.

22          **THE WITNESS:**  My name is Claire Carle Putt.

23          **COURTROOM DEPUTY:**  Please spell that.

24          **THE WITNESS:**  Claire, C-l-a-i-r-e.  Carle, C-a-r-l-e.

25  Putt, P-u-t-t.

1    **MS. PEARSON:** Your Honor, may I proceed?

2    **THE COURT:** Yes.

3    **CLAIRE CARLE PUTT, GOVERNMENT'S WITNESS, AFTER BEING DULY**

4    **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

5    <u>DIRECT EXAMINATION</u>

6    <u>BY MS. PEARSON:</u>

7    **Q.** Good morning.

8    **A.** Good morning.

9    **Q.** Could you please tell the ladies and gentlemen where you

10   work?

11   **A.** I am employed with the Arkansas State Crime Laboratory.

12   **Q.** Okay. And I want to talk to you a little bit about your

13   position there and some education you have.

14   **A.** Okay.

15   **Q.** What, if any, bachelor's degree do you have?

16   **A.** I have a degree in chemistry.

17   **Q.** Okay. Where did you get that?

18   **A.** At Hendrix College.

19   **Q.** And do you have a higher degree, ma'am?

20   **A.** No, I do not.

21   **Q.** Okay. And after you got your degree in chemistry, what

22   was the first professional employment you had related to that

23   degree?

24   **A.** The first professional employment I had was as a research

25   technologist with the University of Arkansas for Medical

1  Sciences at the Children's Hospital Research Institute.

2  **Q.**   And how long were you in that position, ma'am?

3  **A.**   For about two and a half years.

4  **Q.**   And can you just briefly tell the jury some of the duties

5  and responsibilities you had in that position?

6  **A.**   It was a carotid artery research facility.  It was for

7  investigating the SIDS research.  I performed microscopic

8  and -- microscopic dissection of animals and performed calcium

9  imaging testing.

10  **Q.**   And was there another position you held after that

11  position, ma'am?

12  **A.**   As a research technologist two --

13  **Q.**   Okay.

14  **A.**   -- with the same --

15  **Q.**   At the same facility?

16  **A.**   Yes.

17  **Q.**   Okay.  And how long did you have that position?

18  **A.**   Including with the research technologist one, it was over

19  two and a half years together.

20  **Q.**   Okay.  And did you have some of the similar duties and

21  responsibilities with that position?

22  **A.**   Yes.  Yes, I did.  And also became the safety officer for

23  that laboratory.

24  **Q.**   And does that deal -- being a safety officer, does that

25  deal with overseeing some -- perhaps some of the standard

1    operating procedures of the laboratory?

2    **A.**    In a safety manner, making sure all of the analysts and

3    other members of the laboratory are safe and follow protocol.

4    **Q.**    Okay.  Was there another position that you held after

5    those two positions?

6    **A.**    Yes.  I was briefly a risk assessor for the Arkansas

7    Department of Environmental Quality.

8    **Q.**    And how long were you in that position?

9    **A.**    For about -- about a month and a half.

10   **Q.**    Okay.  And where did you go after that?

11   **A.**    I went to the Arkansas State Crime Laboratory.

12   **Q.**    Okay.  And how long have you been with the state crime

13   laboratory?

14   **A.**    I've been with the lab for 11 years now.

15   **Q.**    And have you always been a forensic chemist there, or did

16   you hold another position?

17   **A.**    I've always been a forensic chemist.

18   **Q.**    And what, if any, training did the laboratory mandate

19   that you undergo to maintain the current title you have?

20   **A.**    Before working case work, we go through three months'

21   in-house training, and we take a written exam, a proficiency

22   test.  And after we become qualified as a chemist, we also go

23   to training yearly.

24   **Q.**    And did you pass that initial training?

25   **A.**    Yes, I did.

1  **Q.**    Okay.  And the yearly training, is that something
2  mandated by the laboratory?

3  **A.**    Yes, it is.

4  **Q.**    Okay.  And have you complied with that mandatory
5  requirement of laboratory since you've been employed there?

6  **A.**    Yes, ma'am, I have.

7  **Q.**    Okay.  What, if any, independent certifications does the
8  laboratory hold?

9  **A.**    The laboratory is ISO accredited.  And I'm also an ABC,
10 which is American Board of Criminalists, drug -- fellow.

11 **Q.**    Okay.  Starting with the first accreditation that you
12 referenced, can you just tell the jury what kind of body that
13 is that certified the laboratory?

14 **A.**    It is the ASCLD lab, which is an accrediting body.
15 Pardon me.  I'm so used to the acronyms.  It gets a little
16 confusing to actually spell everything out.  But it's the
17 American -- let's see.  Pardon me -- American Society of
18 Criminal Laboratory Directors.  And the lab part is their
19 laboratory accrediting body, and they are the ones -- that is
20 the area that qualifies us as being ISO accredited.

21 **Q.**    Okay.  Is that an independent body, ma'am?

22 **A.**    Yes, it is.

23 **Q.**    Okay.  And you referenced something that you perhaps hold
24 as a chemist?

25 **A.**    Yes.

1  **Q.**   Can you tell the jury what that certification or

2  accreditation is?

3  **A.**   That is the American Board of Criminalists.  It is an

4  accrediting body that independent chemists can hold that

5  position.  There's extra required training and certification

6  that you have to have for that position.

7  **Q.**   And how long have you had that certification, ma'am?

8  **A.**   For a little over three years now.

9  **Q.**   And have you testified in court as an expert in chemistry

10 before?

11 **A.**   Yes, I have.

12 **Q.**   Have you testified in federal court?

13 **A.**   Yes, I have.

14 **Q.**   And specifically this court, have you ever been to the

15 Northern District of Mississippi yet?

16 **A.**   No, I have not.

17 **Q.**   And have you testified more than once in federal court?

18 **A.**   Yes, I have.

19        **MS. PEARSON:**  Your Honor, at this point in time, the

20 government would offer Ms. Putt as an expert in chemistry.

21        **THE COURT:**  Does the defense wish to do any

22 questioning, any *voir dire*?

23        **MR. SUMRALL:**  I do, Your Honor.

24        **THE COURT:**  Yes.  Okay.

25        **MR. SUMRALL:**  If it please the Court.

1           **THE COURT:** You may proceed.

2                  <u>**VOIR DIRE EXAMINATION**</u>

3 <u>BY MR. SUMRALL:</u>

4 **Q.** Ms. Putt, good morning.

5 **A.** Good morning.

6 **Q.** I believe you stated that you had graduated from college

7 with a degree in chemistry; is that correct?

8 **A.** Yes, sir, I did.

9 **Q.** But you received no further degrees; is that right?

10 **A.** I also received an English degree.

11 **Q.** An English degree. Okay. Have you got any other

12 training other than that training that was provided to you by

13 the lab --

14 **A.** No, I do not.

15 **Q.** -- as far as research and chemistry?

16 **A.** No, sir.

17 **Q.** Okay. And you said you've had your American Board of

18 Criminologist certificate for about three years; is that

19 correct?

20 **A.** Yes, sir, it's coming up on three years.

21 **Q.** Okay. Could you give us the specific date?

22 **A.** I received it in the summer of, I believe, 20 -- 2012 or

23 2013. Sorry.

24 **Q.** And did you have any special training with them?

25 **A.** No, it is -- the training for that is a lot of reading

1  and research, and you take a test for that.

2  **Q.**  Okay.  So there's no class or -- that you take?

3  **A.**  No, other than independent study.

4  **Q.**  Okay.

5          **MR. SUMRALL:**  No further questions, Your Honor.

6          **THE COURT:**  Okay.  Mr. Turner, do you wish to

7  *voir dire* this witness as to her qualifications?

8          **MR. TURNER:**  No, Your Honor.  Thank you.

9          **MR. SUMRALL:**  Your Honor, we would object to this

10  witness being allowed to testify as an expert.  We do not

11  believe her qualifications meet the standards that are

12  necessary to be qualified as an expert.  We would object

13  therefore.

14          **THE COURT:**  Okay.  The objection is overruled.  She

15  may testify.  You may proceed.

16          **MS. PEARSON:**  Thank you, Your Honor.  Your Honor, may

17  I approach the witness?

18          **THE COURT:**  Yes.

19                    **DIRECT EXAMINATION**

20  **BY MS. PEARSON:  (Continuing)**

21  **Q.**  I'm going to show you a document and ask you if you

22  recognize it.

23  **A.**  Yes, I do.

24  **Q.**  What is it?

25  **A.**  It is the report I generated for laboratory 2013-025699.

**Q.**    And when you say you generated this report, are you the author of the report?

**A.**    Yes.

**Q.**    What, if any, technical or peer review does the report undergo at your laboratory?

**A.**    After completing the case, another chemist reviews the data, visually reviews the notes and makes sure everything is compliant with our standard operating procedures.

**Q.**    Okay.  And in that case, did this happen?

**A.**    Yes.

**Q.**    Okay.  And were they in accordance with the opinions that you articulate in your report?

**A.**    Yes, ma'am.

**Q.**    Okay.  Other than the information contained in this report, what, if any, knowledge do you have about the criminal trial happening today?

**A.**    None.

**Q.**    Okay.

        **MS. PEARSON:**  Your Honor, may I approach the exhibits, please?

        **THE COURT:**  Yes.

        **MS. PEARSON:**  Thank you.  Your Honor, may I approach the witness?

**BY MS. PEARSON:**

**Q.**    I'm going to show you what's been marked as Government's

1    Exhibit 41.

2    **A.**    Okay.

3    **Q.**    And I'm going to ask you to take a look all over this box

4    and see if you recognize any of the handwriting on the box.

5    **A.**    Yes, ma'am, I do.

6    **Q.**    Okay.  Can you show the jury which handwriting you

7    recognize, ma'am?

8    **A.**    Along the white tape seal, you will see our laboratory

9    case number, my initials, and the date.

10   **Q.**    Okay.  Whose handwriting is that?

11   **A.**    That is mine.

12   **Q.**    Okay.  And why do you do that?

13   **A.**    To ensure the integrity of the evidence.  Once it leaves

14   my possession, whenever I come to court, anytime I testify, I

15   can recognize that I have worked this case and whether or not

16   the seal has been tampered with or not.

17   **Q.**    Okay.  And let me ask you that -- let me ask you this.

18   It looks a bit different today in court, correct?

19   **A.**    Yes.

20   **Q.**    Okay.  When you received Government's Exhibit 41 at the

21   laboratory, was it sealed or unsealed?

22   **A.**    It was sealed.

23   **Q.**    Okay.  And had it been unsealed or things excreting from

24   it, what would you have done?

25   **A.**    We do make the notation depending on the condition of the

1  evidence. As long as everything is in accordance with the

2  submission sheet that the officer submits, we generally do go

3  ahead and work the case. If there's anything that is not in

4  accordance with the submission sheet, we will make contact with

5  the officer.

6  **Q.** And in this particular case, what, if anything, did you

7  notice that was unusual, unsealed, or anything outside the

8  laboratory standard operating procedure?

9  **A.** No, I did not.

10  **Q.** Can I ask you to open -- go ahead and open that box,

11  ma'am? Okay. And there was a submission form that you were

12  talking about. What, if any, relevance does that piece of

13  paper have?

14  **A.** This describes the items. It has the investigating

15  officer's name, their contact information, and it has an area

16  for what kind of analysis that they're looking for. It has a

17  time/date stamp of whenever it comes into the lab and signed by

18  the technician that receives the evidence.

19  **Q.** Okay. And with respect to the items associated with your

20  analysis, how many items were you requested to analyze in this

21  particular case?

22  **A.** Two items were sent in to the lab. Per our SOP, I

23  analyzed one item.

24  **Q.** Okay. And could you go ahead and look at that box and

25  see if you can find that one item you analyzed?

1  **A.**    This is the item (indicating).

2  **Q.**    Okay.  And how do you recognize it as the item that is

3  the subject of your analysis?

4  **A.**    It is in a bag that I provided, and it is sealed with the

5  agency case number, my initials, and the item number.

6  **Q.**    Okay.  And you talked about an item that perhaps you

7  didn't analyze pursuant to the SOP at the laboratory.  Is that

8  contained in that box?

9  **A.**    Yes, it is.

10  **Q.**    Okay.  And just -- if you could just tell the jury why

11  you didn't analyze it.

12  **A.**    We base our analysis per the minimum charges for

13  prosecution as a weight requirement.  And because of the item's

14  weight, it did not meet the requirements for testing.

15  **Q.**    Okay.  You can put it -- thank you.  The item that you

16  did test that you have seated right there, what kind of

17  analysis were you requested to perform on that item?

18  **A.**    We do an initial visual analysis.  We weigh the item.  I

19  perform color testing.  Then there are chromatography testing,

20  gas chromatography/mass spectrometry testing, infrared

21  spectroscopy, and quantitative analysis.

22  **Q.**    Okay.  Now, you mentioned a visual inspection and a

23  weight of that item?

24  **A.**    Yes.

25  **Q.**    Was that something that you conducted specifically, the

1 weight of the item?

2 **A.** Ma'am?

3 **Q.** Specifically, the weight of the item, were you able to

4 determine that?

5 **A.** Yes.

6 **Q.** Okay. What was it?

7 **A.** 2,245.8 grams.

8 **Q.** Okay. Now, let me ask you that. All of the instruments

9 and the techniques that you just described, did you test the

10 entirety of that item?

11 **A.** I weighed the entirety of the item. For testing, we

12 grind, crush, and combine all and take a representative sample

13 for testing.

14 **Q.** When you say "representative sample," are you talking

15 about a homogeneous sample?

16 **A.** Yes.

17 **Q.** Okay. And why do you do that as opposed to testing the

18 entirety of the item?

19 **A.** Because the entirety of the item of -- we cannot

20 completely dissolve into solvents and actually put on our

21 instruments.

22 **Q.** Okay. And under your scientific community and accepted

23 scientific principles and methodology, is it accepted to test

24 only a representative sample of something as large as that?

25 **A.** Yes.

1  **Q.**   And without -- I don't need you to run through the

2  results of each of those tests.  Were you able to form an

3  opinion as to what that item is?

4  **A.**   Yes.

5  **Q.**   What is it?

6  **A.**   This is methamphetamine hydrochloride with a percentage

7  of 95. -- or 95 percent plus or minus 4.8 percent.

8  **Q.**   Now, the methamphetamine hydrochloride with the plus or

9  minus you just referenced, is that the quantitative portion of

10  your analysis?

11  **A.**   Yes.

12  **Q.**   Okay.  And can you tell the jury what you mean by

13  quantitative?  What does that 95 percent represent?

14  **A.**   The 95 represents that it is 95 percent pure

15  methamphetamine.

16  **Q.**   The hydrochloride portion of your analysis --

17  **A.**   Yes, ma'am.

18  **Q.**   -- is that methamphetamine or something else?

19  **A.**   That is part of the methamphetamine.  That is the salt

20  form of the methamphetamine.

21  **Q.**   Okay.  Now, you referenced a plus or minus 4.8 percent?

22  **A.**   Yes.

23  **Q.**   Can you just tell the jury why that you include that

24  number as part of your opinion?

25  **A.**   We are required to have a measurement of uncertainty on

1   all measurements that we take in the lab, and that is just an

2   uncertainty error that it could be 4.8 percent less than 95 or

3   4.8 percent higher than 95.

4   **Q.**   And do you use some kind of logarithm or mathematical

5   equation that's accepted in your scientific community to arrive

6   at that plus or minus 4.8 percent?

7   **A.**   Yes, we do have an equation that we use for that.

8   **Q.**   And with respect to the number plus or minus 4.8, does

9   that fall within accepted ranges for your analysis in this

10   case?

11   **A.**   Yes, ma'am.

12         **MS. PEARSON:**  Your Honor, may I approach your clerk

13   for an exhibit?

14         **THE COURT:**  Yes, ma'am.

15         **COURTROOM DEPUTY:**  This will be G-42.

16         **MS. PEARSON:**  Your Honor, at this point in time, the

17   government would offer into evidence G-42, which is the report

18   associated with Ms. Putt's analysis of Government's Exhibit 41,

19   I believe.

20         **MR. SUMRALL:**  Object as to relevance, Your Honor.

21         **MR. TURNER:**  Same objection, Your Honor.

22         **THE COURT:**  Okay.  The defendants, Owens and Parker,

23   object on grounds of relevance, and they have a continuing

24   objection to this traffic stop and the result of the traffic

25   stop in Arkansas.

1          The Court notes the objection, and, again, given the

2   parameters of the allegations in Count 1 of the indictment, the

3   RICO conspiracy count, the Court overrules those objections,

4   but they are noted for the record in this case.

5          You may proceed.

6          **MS. PEARSON:**  Thank you.  And, Your Honor, the

7   government would offer into evidence at this point in time

8   Government's Exhibit -- I believe it's 41 collectively into

9   evidence at this point in time.

10          **THE COURT:**  Okay.  Let's have her identify the

11   exhibit.  If you would hand her the actual document, the lab

12   report.

13          **MS. PEARSON:**  Oh, gosh.  I'm sorry.

14   **BY MS. PEARSON:**

15   **Q.**   Ma'am, with respect to now what has been marked as

16   Government Exhibit 42, is that the report that you generated

17   that you and I talked about earlier?

18   **A.**   Yes, it is.

19          **THE COURT:**  Very well.  It's admitted.

20      (EXHIBIT NO. G-42 ADMITTED INTO EVIDENCE.)

21          **MS. PEARSON:**  Your Honor, at this point, the

22   government would offer Government's Exhibit 41 collectively

23   into evidence.

24          **THE COURT:**  Same objection?

25          **MR. SUMRALL:**  Yes, Your Honor.

1        **MR. TURNER:**  Yes, Your Honor.

2        **THE COURT:**  Be the same ruling from the Court.

3    Government's Exhibit 41 is admitted into evidence as is

4    Government's Exhibit 42.

5        (EXHIBIT NO. G-41 ADMITTED INTO EVIDENCE.)

6        **MS. PEARSON:**  Your Honor, at this point in time, I

7    have no more questions for this witness.  I would tender her to

8    the defense.

9        **THE COURT:**  Very well.  Mr. Sumrall, do you wish to

10   cross?

11       **MR. SUMRALL:**  No questions, Your Honor.

12       **THE COURT:**  Mr. Turner?

13       **MR. TURNER:**  No, Your Honor.

14       **THE COURT:**  Very well.  You may stand down.  You are

15   fully and finally discharged.

16       **THE WITNESS:**  Thank you.

17       **THE COURT:**  Thank you.

18       The government may call your next witness.

19       **MR. DABBS:**  The government calls Scott Henley.

20       **THE COURT:**  I tell you, while we're waiting on this

21   witness, Mr. Dabbs, let me tell you this.  I believe Juror

22   Number 177 -- Alternate Juror 177, your -- you warned us that

23   this might happen, but your wife's grandmother has passed away?

24       **JUROR:**  Yes, sir.

25       **THE COURT:**  And you don't know for sure when the

1    funeral is.  Probably be tomorrow?

2        **JUROR:**  Yes, sir.  I don't know yet.  They were going

3    to make those arrangements this morning.

4        **THE COURT:**  Okay.  Well, let me tell you -- all of you

5    people who are participants in this trial, ordinarily on Friday

6    in these lengthy trials, we'll not take a noon recess.  We'll

7    stay in session until approximately 1:00 and then, at that

8    time, recess for the weekend.

9        So I don't know how that will accommodate you.  So I

10   suppose the question is:  Will the funeral be in the morning or

11   the afternoon?  If it's in the afternoon, we'll be in recess,

12   but you let us know that after lunch --

13       **JUROR:**  I will.

14       **THE COURT:**  -- today.

15       Okay.  With that said, you may call your next witness.

16       **MR. DABBS:**  The government calls Scott Henley.

17    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

18       **COURTROOM DEPUTY:**  Please take a seat in the witness

19   stand, then state your name for the record.

20       **THE WITNESS:**  My name is Scott Henley.

21       **MR. DABBS:**  Your Honor, may I proceed?

22       **THE COURT:**  Yes, sir.

23       **MR. DABBS:**  Thank you.

24   **SCOTT HENLEY, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN, WAS**

25              **EXAMINED AND TESTIFIED AS FOLLOWS:**

## DIRECT EXAMINATION

**BY MR. DABBS:**

**Q.**   Mr. Henley, what do you do for a living?

**A.**   I'm a trooper with the Mississippi Highway Patrol.

**Q.**   How long have you been with the highway patrol?

**A.**   Fifteen and a half years.

**Q.**   Where do you live?

**A.**   I live just outside of Jackson, Mississippi.

**Q.**   And do you have a particular area that you work?

**A.**   Yes, sir.  I work usually between Jackson and Vicksburg.

**Q.**   What are your duties with the highway patrol?

**A.**   The normal functions of an everyday trooper.  I write speeding tickets, work wrecks, but I also inspect commercial vehicles as part of the Motor Carrier Division.

**Q.**   Back in 2013, were you a highway patrolman?

**A.**   Yes, sir, I was.

**Q.**   I want to take you back to September of 2013.  Did you participate in a high-speed chase with William Carroll?

**A.**   Yes, sir, I did.

**Q.**   Are you aware if Mr. Carroll has a street name or a nickname?

**A.**   From what I understand, his street name is CC.

**Q.**   Okay.  Tell the jury how you got involved with this chase with CC.

**A.**   On this particular day in question, I was actually on

1   patrol at I-20 around Edwards area, and the dispatch put out a

2   BOLO that the Hinds County Sheriff's Department was in a

3   vehicle pursuit with a Toyota pickup truck that Mr. Carroll was

4   driving.

5       My first encounter was when I -- I actually got to

6   Edwards before they did.  I actually set up stop sticks to

7   deploy them, to slow them down.

8   Q.   Now, what are stop sticks?

9   A.   It's just a -- it's a group of sticks that we pull across

10  the road in front of a car, and it deflates the tires so that

11  they can't drive too fast.

12  Q.   What happened when you tried to put out the stop sticks?

13  A.   When I tried to put out the stop sticks, I was actually

14  standing on the shoulder.  Mr. Carroll apparently realized that

15  I was about to pull some stop sticks in front of him, and he

16  actually came towards me on the shoulder of the road where I

17  had to abandon trying to deploy the stop sticks to keep from

18  getting struck by his vehicle by jumping the guardrail.

19  Q.   Jumped the guardrail?  One of these guardrails by the

20  highway?

21  A.   Yes, sir.  At this particular area, we were right at an

22  off-ramp, so it's actually the two lanes of traffic and then

23  the off-ramp.  And there was a guardrail on this particular

24  off-ramp, and I was just -- I stationed myself there on purpose

25  so that I could get some safety if I needed to.

**Q.** And you had to jump the guardrail to get out of the way of the car?

**A.** Yes, sir.

**Q.** Was the car driving fast?

**A.** Yes, sir. I would probably say over a hundred miles an hour.

**Q.** After you jumped the guardrail and the car goes by, did he hit the stop sticks?

**A.** No, he did not, because, like I say, I abandoned trying to pull them across the roadway in order to protect myself and to make sure I didn't get struck.

**Q.** What did you do -- after you jumped over the guardrail, what did you do then?

**A.** At that particular time, I returned back to my patrol car, and then I began to catch up with the pursuit where -- just a couple miles down the road, I actually did catch up with the pursuit and took over from Hinds County because we were running into Warren County.

**Q.** So are you the only one chasing the car at this point?

**A.** No, sir. Actually, at this particular point, I still got a couple of Hinds County deputies behind me in a patrol car, but as we continued on down the roadway, they slowed down a little bit, especially when we exited the interstate, because they were not familiar with the area.

**Q.** All right. What happened when you exited the interstate?

1 **A**.     We got off at Exit 15 and actually crossed back over the

2 top of the interstate, and we turned on to a little gravel road

3 in the county that's called Bradston Road, if I'm not mistaken.

4 This road is very hilly, so I slowed down a little bit.

5          We're going down through the gravel, and Mr. Carroll is

6 still traveling probably a hundred plus miles an hour on a

7 gravel road.  When he topped the hill, he realized that there

8 was an -- an oak tree had fallen across -- completely across

9 the roadway.  He struck -- his vehicle collided with that tree

10 in the roadway, and then I stopped right behind him.

11          As I exited my vehicle to try to get him in custody and

12 everything, as I was approaching his vehicle, the two deputies

13 are now coming up behind me because they're just a little ways

14 behind me.  Well, they're not familiar with the area.  When

15 they come over the top of the hill -- we're right on the other

16 side of the crest of that hill -- they actually struck the tree

17 next to Mr. Carroll at the same time.

18          At this particular time, I moved back in position to try

19 to figure out what was going on with Mr. Carroll.

20 **Q**.     Let me stop you right there.

21 **A**.     Okay.

22 **Q**.     Are you the closest car to CC's car?

23 **A**.     I was.

24 **Q**.     Okay.  But there are cars behind you?

25 **A**.     Yes, sir, a little ways.

1  **Q.**  And you turned down a gravel road?

2  **A.**  Yes, sir.

3  **Q.**  And, at that point, you said you had to slow down?

4  **A.**  I slowed down because I knew what was coming.  I knew the

5  terrain, and I knew just another mile up the road there's a

6  90-degree turn that nobody's going to make if they're going

7  more than about 30 miles an hour.

8  **Q.**  Okay.  But the people behind you, are they from that

9  area?

10  **A.**  No, they're not.

11  **Q.**  So they're not from -- what county are we in?

12  **A.**  They were from -- we're in Warren County now, and they're

13  from Hinds County.

14  **Q.**  So they don't know this gravel road?

15  **A.**  They don't know this gravel road.

16  **Q.**  And they're behind you?

17  **A.**  Yes, sir.

18  **Q.**  Okay.  So when you -- when you came up on CC's car, what

19  had happened to his car?

20  **A.**  He had struck the tree that was across the roadway.

21  **Q.**  All right.  And you got out of the car, and then the

22  deputy behind you -- came up behind you?

23  **A.**  Yes, sir.  As I'm out just to the left of my vehicle and

24  Mr. Carroll's vehicle, the deputies actually came over the hill

25  to the left of me, and I actually had to move back in between

1  my vehicle to keep from getting struck by them because they

2  couldn't stop on the gravel going as fast as they were.

3  **Q.**  And they crashed into the tree?

4  **A.**  Yes, sir.  That's correct.

5  **Q.**  Okay.  So after they crashed into the tree, what did you

6  do?

7  **A.**  After they crashed into the tree, I went back to focusing

8  on Mr. Carroll, trying to get him in custody or figure out

9  exactly what's going on, his status after the accident.

10  As I was approaching the vehicle, I realized that

11  Mr. Carroll has already positioned himself in the vehicle

12  turned -- and, at this point, I've still got my weapon drawn

13  because I'm not sure exactly what's going on with him.  He's

14  actually turned and positioned himself to the point that I see

15  a gun, and I actually go to actually start squeezing the

16  trigger when I realize that he's got a gun stuck in his mouth.

17  The barrel was actually stuck in his mouth.

18  And then I got concerned that a shotgun -- that I was at

19  a very bad disadvantage, and I was going to have to -- I was

20  going to take a round to the face if I continued to stay there.

21  I was also concerned that I did not want to get into a gunfight

22  with two injured deputies right there next to me and get caught

23  in the cross fire.  So I backed off -- I retreated until some

24  other folks got up there to help me.

25  During this time, before anybody else gets there,

1   Mr. Carroll actually jumps out of his vehicle and runs off into

2   the woods.  And I lose sight of him as he's going up the ridge

3   line into the tree line.  And, of course, at this point, it's

4   completely dark and everything.  And, at that point, backup's

5   starting to arrive, and I'm trying to check on the two

6   deputies.

7           **MR. TURNER:**  Object to relevance as to Mr. Parker at

8   this stage.

9           **THE COURT:**  Okay.  The objection as to relevance is

10  noted.

11          I assume, Mr. Dabbs, you can connect this up with this

12  conspiracy?

13          **MR. DABBS:**  Yes, Your Honor.  We've had a good amount

14  of testimony regarding a traffic stop with CC.

15          **THE COURT:**  Okay.  Given the allegation in Count 1 of

16  the indictment, the objection is noted and is overruled, but

17  the government is under an obligation to connect this up.

18          You may proceed.

19  **BY MR. DABBS:**

20  **Q.**   After he went into the woods, what did you do?

21  **A.**   At that point, I rendered aid, and some other officers

22  were getting on scene trying to set up a perimeter to keep him

23  contained to that particular area.

24          Also, I went up to the vehicle to clear it at that point

25  during that whole process and actually observed a firearm

1  laying in the floorboard, which was a pistol revolver that I

2  think is referred to as "The Judge" or something along those

3  lines.

4  **Q.**   What kind of pistol was it?  You said it was "The Judge."

5  What -- do you know what --

6  **A.**   It takes a large caliber -- seems like it was, like, a

7  .410 round.  It takes -- it's got a really long, slender -- a

8  long barrel on it.  It takes a much larger round than a little

9  pistol round.

10      **THE COURT:**  Will that gun shoot both a .45-caliber

11  pistol round and a .410 shotgun shell?

12      **THE WITNESS:**  No, sir, not this gun.  The first gun

13  that Mr. Carroll had actually was the .45-caliber.  The second

14  one laying in the floorboard was the -- the handgun that shot

15  the .410 round.

16  **BY MR. DABBS:**

17  **Q.**   Are you aware of any narcotics being seized out of the

18  truck?

19  **A.**   Yes, sir.

20  **Q.**   What was seized out of the truck?

21  **A.**   To my knowledge, it was methamphetamines that was seized

22  or what appeared to be methamphetamines at that time.

23      **MR. SUMRALL:**  Your Honor, we would object unless he

24  has actual knowledge, either saw it or was there when they took

25  it into possession.

1        **THE COURT:**  Yeah.  You can tell us what you saw.  The

2  Court realizes that he's not a toxicologist.  Tell us what you

3  saw, Officer.

4  **A.**    They removed -- some other officers removed

5  methamphetamines -- a couple different bags, bagged in

6  different manners, of methamphetamines from the vehicle.

7  **BY MR. DABBS:**

8  **Q.**    Okay.  And the date of this stop -- do you know the date

9  of the stop?

10  **A.**    Not without looking back at the reports.

11  **Q.**    Okay.  So is there something that would refresh your

12  recollection?

13  **A.**    Yes, sir, the -- my actual offense report from that date.

14        **MR. DABBS:**  Okay.  Your Honor, may I approach?

15        **THE COURT:**  Yes.

16  **BY MR. DABBS:**

17  **Q.**    Okay.  Without reading this out loud, would you review

18  that report and see if it refreshes your recollection on the

19  actual date?

20  **A.**    It was September 24th, 2013.

21  **Q.**    And, again, what's the name of the man that's driving

22  this car?

23  **A.**    It's William Charles Carroll.

24  **Q.**    And what's his street name?

25  **A.**    CC.

1    **Q.**    Okay.

2            **MR. DABBS:**   That's all I have, Your Honor.

3            **THE COURT:**   Mr. Sumrall, you may cross-examine this

4    witness.

5            **MR. SUMRALL:**   May I approach the witness, Your Honor?

6            **THE COURT:**   Yes, sir.

7                        **CROSS-EXAMINATION**

8    **BY MR. SUMRALL:**

9    **Q.**    Mr. Henley, do you still have that report with you?

10   **A.**    Yes, sir.

11   **Q.**    May I see that, please, sir?  Okay.  Officer Henley, I

12   think the report just basically says what you just said, does

13   it not?

14   **A.**    Yes, sir.

15   **Q.**    Okay.  And all of this took place in Hinds and Warren

16   County; is that correct?

17   **A.**    Yes, sir.  That's correct.

18   **Q.**    And this was on September 24th of 2013?

19   **A.**    Yes, sir.  That's correct.

20   **Q.**    And that's all in the Southern District of Mississippi,

21   is it not?

22   **A.**    Yes, sir.  That's correct.

23           **MR. SUMRALL:**   No further questions, Your Honor.

24           **THE COURT:**   Mr. Turner, you may cross-examine this

25   witness.

1      **MR. TURNER:**  Your Honor, I have no questions of this

2  witness.

3      **THE COURT:**  Okay.  There are no questions.  Any

4  redirect, Mr. Dabbs?

5      **MR. DABBS:**  No, Your Honor.

6      **THE COURT:**  Very well.  Officer, you are fully and

7  finally discharged.  You may go.

8      **THE WITNESS:**  Yes, sir.

9      **THE COURT:**  Okay.  You may call your next witness for

10  the government.

11      **MR. LEARY:**  Your Honor, at this time, the government

12  would call James Dean.

13      **THE COURT:**  Very well.

14      **MR. LEARY:**  I believe he's in custody, Your Honor.

15  They're just going to have to go get him.

16      **THE COURT:**  Okay.  Well, let's have these witnesses

17  ready.

18      (PAUSE IN PROCEEDINGS.)

19      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

20      **COURTROOM DEPUTY:**  Please take a seat in the witness

21  stand and state your name for the record.

22      **THE WITNESS:**  My name is James Dean.

23  **JAMES DEAN, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN, WAS**

24  **EXAMINED AND TESTIFIED AS FOLLOWS:**

25  **DIRECT EXAMINATION**

1   **BY MR. LEARY:**

2   **Q.**   Good morning, Mr. Dean.

3   **A.**   Good morning.

4   **Q.**   Do you have a street name?

5   **A.**   They call me JD.

6   **Q.**   JD?  Is that common within the Aryan Brotherhood, street

7   names?

8   **A.**   Yes, sir.

9   **Q.**   How old are you, Mr. Dean?

10  **A.**   Forty-two.

11  **Q.**   Where were you born?

12  **A.**   Gulfport, Mississippi.

13  **Q.**   What county is that?

14  **A.**   Harrison.

15  **Q.**   That's all the way in the southern part of the state,

16  isn't it?

17  **A.**   Yes, sir.

18  **Q.**   Do you have a mother?

19  **A.**   She's deceased.

20  **Q.**   When did she die?

21  **A.**   When I was 11 months old.

22  **Q.**   You were a baby?

23  **A.**   Yes, sir.

24  **Q.**   What about a father?

25  **A.**   He was around.

1  **Q.**   Did he raise you?

2  **A.**   No, sir.

3  **Q.**   How were you raised?

4  **A.**   My grandparents until I was about 12.

5  **Q.**   What happened after that?

6  **A.**   I hit the streets.

7  **Q.**   You got any sisters, Mr. Dean?

8  **A.**   I have three sisters.

9  **Q.**   Where were you raised?  What part of the state were you

10 raised?

11 **A.**   Down on the coast.

12 **Q.**   Now, Mr. Dean, have you been convicted of a crime?

13 **A.**   Yes, sir.

14 **Q.**   And let's just go through this.  About 1997ish, you were

15 convicted of what, Mr. Dean?

16 **A.**   Aggravated robbery.

17 **Q.**   And thereafter, 2003, you were charged and convicted of

18 what?

19 **A.**   Burglary.

20 **Q.**   And then is it again 2006 burglary?

21 **A.**   Burglary.

22 **Q.**   And 2011, possession of a firearm by a convicted felon?

23 **A.**   Yes, sir.

24 **Q.**   And then 2012?

25 **A.**   Operation of a clandestine lab.

1  **Q.**   Meth lab?

2  **A.**   Yes, sir.

3  **Q.**   Have you been convicted in this case?

4  **A.**   Yes, sir.

5  **Q.**   And what were you convicted of in this case?

6  **A.**   Conspiracy for racketeering.

7  **Q.**   Conspiracy for racketeering?

8  **A.**   Yes, sir.

9  **Q.**   Pursuant to that charge, you pled guilty to kidnapping

10  Michael Hudson?

11  **A.**   Yes, sir.

12  **Q.**   Did you plead guilty to kidnapping Michael Hudson because

13  you did it?

14  **A.**   Yes, sir.

15  **Q.**   How many years that cost you?

16  **A.**   20.

17  **Q.**   20 years?

18  **A.**   Yes, sir.

19  **Q.**   You cooperated with the government?

20  **A.**   Yes, sir.

21  **Q.**   You ever talk to me before?

22  **A.**   Yes, sir.

23  **Q.**   Talk to law enforcement agents?

24  **A.**   Yes, sir.

25  **Q.**   Did you agree to talk to us without an attorney?

1  **A.**  Yes, sir.

2  **Q.**  Why did you agree to talk to us so early?

3  **A.**  Conscience.

4  **Q.**  Conscience?

5  **A.**  Yes, sir.

6  **Q.**  Now, when you pled guilty in this case, did I make a

7  recommendation that your sentence be capped at something?

8  **A.**  At 22 years.

9  **Q.**  22 years.  And have you already been sentenced in this

10 case?

11 **A.**  Yes, sir.

12 **Q.**  And what were you sentenced to?

13 **A.**  20 years.

14 **Q.**  22 years?

15 **A.**  20.

16 **Q.**  So right now, you're 42 years old?

17 **A.**  Yes, sir.

18 **Q.**  With that sentence -- there's no parole in the federal

19 system, so you're looking at getting out about when?

20 **A.**  50 something.

21 **Q.**  Uh-huh.  Maybe even 60 something?

22 **A.**  Could be.

23 **Q.**  Is that right?

24 **A.**  Yes, sir.

25 **Q.**  Now, pursuant to your testimony today, you could receive

1  a motion from the government for a downward departure; is that

2  correct?

3  **A.**   That's what I understand.

4  **Q.**   Is that what you're hoping to receive?

5  **A.**   I'm not hoping for nothing.

6  **Q.**   What are the terms and conditions of you receiving any

7  kind of recommendation from the government?

8  **A.**   Refrain from illegal activities, be truthful, and --

9  **Q.**   You here to tell the truth today?

10  **A.**   Yes, sir.

11  **Q.**   Who sentences you?  Do I sentence you?

12  **A.**   No, sir.

13  **Q.**   Who sentences you?

14  **A.**   The judge.

15  **Q.**   Now, Mr. Dean, when did you become an Aryan Brotherhood

16  member?

17  **A.**   2005.

18  **Q.**   Where were you located when you became an Aryan

19  Brotherhood member?

20  **A.**   Parchman.

21  **Q.**   Okay.  Why did you join the Aryan Brotherhood?

22  **A.**   To look out for my fellow kind.

23  **Q.**   To look out for your fellow kind?

24  **A.**   Yes, sir.

25  **Q.**   Do you consider yourself a racist, Mr. Dean?

1 **A.** No, sir.

2 **Q.** What do you -- what do you consider yourself, anything as

3 far as racism goes?

4 **A.** I'm supreme, yes.

5 **Q.** Okay.  Do you consider yourself a racist?

6 **A.** I don't hate people.

7 **Q.** Okay.

8 **A.** I'm just -- I'm white.  If I were black, I'd be a

9 Panther.

10 **Q.** Okay.  Now, what do you mean by "Panther"?

11 **A.** The Black Panthers.

12 **Q.** The Black Panthers.  Are the inmates incarcerated in

13 Mississippi divided into gangs?

14 **A.** Pretty much.

15 **Q.** Now, based on your experience, about how -- what

16 percentage of the inmates are members of gangs, just from what

17 you've seen?

18 **A.** I'd say about 70, 80 percent.

19 **Q.** 70, 80 percent.  Now, are those gangs divided along

20 racial lines?

21 **A.** Most of them.

22 **Q.** Okay.  And if you were a Mexican, generally, you would be

23 involved in what gang if you were going to be involved in a

24 gang?

25 **A.** The Mexican gang.

1    **Q.**   Okay.  And what's the name for the Mexican gang?

2    **A.**   MS-13.

3    **Q.**   Okay.  If you were African-American, what gang would you

4    be a member of?

5    **A.**   Crips or Bloods.

6    **Q.**   Crips or Bloods.  If you're a white guy, what gang you

7    going to be a member of?

8    **A.**   Aryan Brotherhood.

9    **Q.**   Okay.  And what are Simon City Royals?

10    **A.**   Wannabes.

11    **Q.**   Okay.  You view them as inferior to Aryan Brotherhood?

12    **A.**   Yeah.

13    **Q.**   What was your -- so you joined in about 2005.  Your rank

14    at that time was what, Mr. Dean?

15    **A.**   In 2005, I had no ranking.

16    **Q.**   You had no -- so you were a soldier?

17    **A.**   At that time, yes.

18    **Q.**   Did you ever raise to a rank after that?

19    **A.**   Yes, sir.

20    **Q.**   What rank was that?

21    **A.**   Sergeant-at-arms and lieutenant.

22    **Q.**   Okay.  Sergeant-at-arms and a lieutenant?

23    **A.**   Yes, sir.

24    **Q.**   Do you recall the name of the captain, who the captain

25    was while you were a lieutenant?

1   **A.**     T-Bone.

2   **Q.**     T-Bone.  And T-Bone's real name is?

3   **A.**     Arthur Burrus, I believe.

4   **Q.**     Walter Burrus?

5   **A.**     Yeah, Walter Burrus.

6   **Q.**     What's a recruiter, Mr. Dean?

7   **A.**     Somebody that puts other members down in the brotherhood.

8   **Q.**     Did you ever recruit anybody?

9   **A.**     Just one person.

10   **Q.**     Just one person.  Who's that?

11   **A.**     Sonny Maxwell.

12   **Q.**     And Sonny Maxwell's street name was?

13   **A.**     Blue.

14   **Q.**     Were you present when Sonny Maxwell received his first

15   brand?

16   **A.**     Yes, sir.

17   **Q.**     And he received his first brand for participating in

18   what?

19   **A.**     Kidnapping Michael Hudson.

20   **Q.**     Now, you were released from prison in 2009?

21   **A.**     Yes, sir.

22   **Q.**     How long did it take you to hook back up with the Aryan

23   Brotherhood after you were released in 2009?

24   **A.**     A year.

25   **Q.**     How did you hook back up with them?

1  **A.**  One of the brothers met me down at the river.

2  **Q.**  Where were you living at this time in the free world?

3  **A.**  Gulfport.

4  **Q.**  And then you were convicted again in 2012; is that

5  correct?

6  **A.**  Yes, sir.

7  **Q.**  Is that the possession of a firearm charge?

8  **A.**  No.  It was operation and creation of clandestine lab.

9  **Q.**  Oh, that's the meth lab?  Were you a meth cook?

10  **A.**  Yes, sir.

11  **Q.**  Let me talk about methamphetamine a little bit.  At any

12  time, have you been a meth addict in your life?

13  **A.**  Yes, sir.

14  **Q.**  Mr. Dean, when did you start using meth?

15  **A.**  The first time I ever done it was in 2011.

16  **Q.**  2011.  And thereafter, did it get ahold of you?

17  **A.**  What do you mean?

18  **Q.**  The methamphetamine, did you become an addict?

19  **A.**  No, sir.

20  **Q.**  No, sir?

21  **A.**  No, sir.

22  **Q.**  Did you ever cook meth?

23  **A.**  Yes, sir.

24  **Q.**  Explain how pseudoephedrine pills are used when cooking

25  meth.

1    **A.**    Well, you crush it up and put it in it.  I mean, it's --

2    crush it up.

3    **Q.**    Okay.  What type pills are pseudoephedrine pills?  Give

4    me an example.

5    **A.**    Claritin, Claritin-D 12-Hour, Sudafed.  You know, just

6    all kind of different ones.  I used Claritin-D and Sudafed.

7    **Q.**    Are -- in Mississippi, are Sudafed pills behind the

8    counter or over the counter -- I mean, behind the counter or in

9    the general part of the store?

10    **A.**    In Mississippi, you've got to have a prescription.

11    **Q.**    Okay.  So to get prescription drugs, would you have to

12    drive outside of Mississippi?

13    **A.**    In Alabama, Louisiana.

14    **Q.**    Okay.  Did you ever go to Arkansas?

15    **A.**    No, sir.

16    **Q.**    What's a church meeting, Mr. Dean?

17    **A.**    It's where all of the brothers get together.

18    **Q.**    Okay.  You may have to talk up a little bit.  Can

19    everybody hear him?

20    **A.**    That's when the brothers just get together every -- once

21    a month.

22    **Q.**    Is that a rule that -- or is the church meeting a rule?

23    Does a church meeting have to occur?

24    **A.**    Yes, we have to attend.

25    **Q.**    And what are dues, Mr. Dean?

1    **A.**    Well, it was $20 a month that we paid the brotherhood.

2    **Q.**    Who collected the dues payment?

3    **A.**    The treasurer.

4    **Q.**    If a brother borrowed money from the treasury for

5    drugs -- to purchase drugs, how much would he owe back to the

6    treasury?

7            **MR. TURNER:**  Object to speculation, Your Honor.

8            **THE COURT:**  Okay.  If you know, Mr. Dean.

9    **BY MR. LEARY:**

10   **Q.**    Do you know that?

11   **A.**    I never -- I never borrowed money.  I don't know.

12   **Q.**    Are you familiar with the -- with what interest rate

13   somebody would have to pay?  Do you know that?

14           **MR. TURNER:**  Object to the leading.

15           **THE COURT:**  Okay.  Overruled.

16   **BY MR. LEARY:**

17   **Q.**    Do you know what interest rate a person would have to

18   pay?

19   **A.**    In prison, it was 25 percent.

20   **Q.**    Okay.  Do you know what the rate was in the free world?

21   **A.**    No, sir.

22   **Q.**    Okay.  Now, Mr. Dean, have you ever assaulted anybody on

23   behalf of the Aryan Brotherhood?

24   **A.**    Yes, sir.

25   **Q.**    Did you ever kill anybody?

1  **A.**    No, sir.

2  **Q.**    Did you ever stab anybody?

3  **A.**    No, sir.

4  **Q.**    Did you ever take a brand?

5  **A.**    Yes, sir.

6  **Q.**    Did you ever take it by cutting it off with a knife?

7  **A.**    No, sir.

8  **Q.**    Did you ever participate in burning it off?

9  **A.**    Yes, sir.

10  **Q.**    What type criminal activities were the Aryan Brotherhood

11  involved in?

12  **A.**    What was that again?

13  **Q.**    What type criminal activities were members of the Aryan

14  Brotherhood involved in?

15        **MR. TURNER:**  Your Honor, I'm going to object at this

16  time unless he's got something specific he's asking about and

17  pertains to somebody that's on this side of the table as far as

18  the defendant goes.  It's not relevant.

19        **THE COURT:**  Yeah.  If we can -- ask your question

20  relative to persons named in this indictment or at least the

21  Aryan Brotherhood of Mississippi.  Kind of confine this, if he

22  knows.

23        **MR. LEARY:**  Okay.

24  BY MR. LEARY:

25  **Q.**    Are you a member of the Aryan Brotherhood of Mississippi?

1   **A.**   Yes, sir.

2   **Q.**   And you've been a member of the Aryan Brotherhood of

3   Mississippi for how long?

4   **A.**   Eleven years now.

5   **Q.**   Are you familiar -- did you participate in criminal

6   activities with members of the Aryan Brotherhood?

7   **A.**   Yes, sir.

8   **Q.**   And that would be Aryan Brotherhood of Mississippi?

9   **A.**   Yes, sir.

10  **Q.**   What type criminal activity did you participate in with

11  members of the Aryan Brotherhood of Mississippi?

12  **A.**   Burglaries, robberies, drug sales.

13  **Q.**   How many spokes are in Mississippi?

14  **A.**   Three.

15  **Q.**   Now, explain to the ladies and gentlemen of the jury what

16  role the spoke played in the Aryan Brotherhood hierarchy.

17  **A.**   The spoke is a wheel.  All of the orders was passed down

18  from the wheel, everything that -- violations.  Everything was

19  ordered by the wheel.

20  **Q.**   And who in the hierarchy was below the spoke?

21  **A.**   That would be the state captain.

22  **Q.**   And who was below the state captain in the free world?

23  **A.**   It was split up in three divisions, north, central, and

24  south, and each one of them had a captain.

25  **Q.**   Okay.  So we had spoke, state captain, and then we had

1  north, central, and southern captain; is that correct?

2  **A.**   Yes, sir.

3  **Q.**   And who's below that?

4  **A.**   It would be the lieutenants.

5  **Q.**   And then who were below the lieutenants?

6  **A.**   Sergeant -- sergeant-at-arms.

7  **Q.**   And then what role did the treasurers play?

8  **A.**   I don't know.

9  **Q.**   Okay.  Were you ever a treasurer?

10  **A.**   No, sir.

11  **Q.**   Okay.  Now, tell the ladies and gentlemen of the jury

12  what a thunder warrior is.

13  **A.**   A thunder warrior is a brother that has lightning bolts

14  on -- supposed to be on the side of his neck.  It's two ways to

15  get it.  You get it from representing yourself in battle or

16  stabbing an opposing gang member and such.

17  **Q.**   Do you know Eric Parker?

18  **A.**   Yes, sir.

19  **Q.**   Do you see him here?  You can stand up if you need to.

20  **A.**   Yes, sir.

21  **Q.**   You don't see Eric Parker in the room?

22  **A.**   Yes, sir, over there in the white shirt.

23  **Q.**   In the white shirt?

24  **A.**   Yes, sir.

25          **MR. LEARY:**  Your Honor, would the record reflect that

1   Mr. Dean has identified Eric Parker?

2           **THE COURT:**  Very well.  It will so reflect.

3   **BY MR. LEARY:**

4   **Q.**   Do you know Frankie Owens?

5   **A.**   Yes, sir.

6   **Q.**   Do you see him in the courtroom?

7   **A.**   Yes, sir.

8   **Q.**   What's he wearing?

9   **A.**   A blue plaid shirt.

10          **MR. LEARY:**  Your Honor, let the record reflect that

11  Mr. Dean has identified Frankie Owens.

12          **THE COURT:**  So reflect.

13  **BY MR. LEARY:**

14  **Q.**   Now, is Eric Parker a thunder warrior?

15  **A.**   I'm not for sure.

16  **Q.**   Okay.  What about Frankie Owens is he a thunder warrior?

17  **A.**   Yes, sir.

18  **Q.**   And in order to identify a thunder warrior, they have

19  what type of insignia?

20  **A.**   It was lightning bolts.

21  **Q.**   Where?

22  **A.**   Most of them be on the right side of their neck.

23  **Q.**   Are you familiar with the Mississippi brand?

24  **A.**   Yes, sir.

25  **Q.**   AB brand?

1  **A.**   Yes, sir.

2  **Q.**   And briefly describe the Mississippi Aryan Brotherhood

3  brand.

4  **A.**   It was 13 things involved with it.  It had a swastika,

5  had 13, had the branch division.  It had a battle ax, three

6  notches for the three spokes of the wheel.  It had an arrow

7  leading down with the downfall of enemies.  Had a knife blade

8  for death before dishonor.

9  **Q.**   What does the 13 stand for?

10  **A.**   It was -- one 13 was for the State of Mississippi.

11  **Q.**   Okay.  And the 13 means Mississippi by -- for what

12  reason?

13  **A.**   The thirteenth letter.

14  **Q.**   The thirteenth letter in the alphabet.  And what does 13

15  also stand for?

16  **A.**   It was thunder warrior.

17  **Q.**   Thunder warrior?

18     (CONFERRING OFF THE RECORD.)

19  **BY MR. LEARY:**

20  **Q.**   Would you please identify the picture that I just gave

21  you.

22        **MR. SUMRALL:**  Your Honor, I'm going to object to any

23  testimony from this picture that's being produced.  It's not

24  been authenticated in any form or fashion.  We don't know what

25  it is, and we -- until that's done, we object.

1          **THE COURT:**  Okay.  Mark it for identification.  It's

2    marked for identification only, and --

3          **MR. LEARY:**  Thank you, Your Honor.

4          **THE COURT:**  Well, wait a minute.  Yes, mark it for

5    identification.  Okay.  What's the next number?

6          **COURTROOM DEPUTY:**  43.

7          **THE COURT:**  Marked for identification only.

8      (EXHIBIT NO. G-43 MARKED FOR IDENTIFICATION.)

9          **THE COURT:**  Hand it to the witness.  Ask your

10   question.

11   **BY MR. LEARY:**

12   **Q.**    Mr. Dean, do you know the person in that picture?

13   **A.**    It's Frankie Owens.

14   **Q.**    And on that picture of Frankie Owens --

15         **MR. SUMRALL:**  Your Honor, I'm going to object to any

16   testimony from that until it's admitted into evidence.  It has

17   not been admitted into evidence, only IDed.  And he's taking

18   testimony from a document that's not in evidence, and I object

19   to it.

20         **THE COURT:**  Okay.  It's overruled.  If you can answer

21   these questions, Mr. --

22   **A.**    This is Frankie Owens.

23   **BY MR. LEARY:**

24   **Q.**    On the picture of Frankie Owens, do you see an Aryan

25   Brotherhood brand?

1  **A.**    Yes, sir.

2  **Q.**    Do you see an SS lightning bolts insignia?

3  **A.**    Yes, sir.

4      **MR. LEARY:**  At this time, the government would move to

5  have the picture of Frankie Owens entered into evidence as

6  Government's Exhibit 43.

7      **THE COURT:**  Okay.  The objection is sustained until we

8  have the person who took the picture and can identify it and so

9  forth.

10      **MR. LEARY:**  Thank you, Your Honor.

11      **THE COURT:**  It's marked for identification at this

12  point.

13  **BY MR. LEARY:**

14  **Q.**    Mr. Dean, you stated earlier that you knew Eric Parker?

15  **A.**    Yes, sir.

16  **Q.**    Now, how long did you know Eric Parker?

17  **A.**    I met him -- I think it was around about June or July of

18  2010.

19  **Q.**    And what gang affiliation did Eric Parker have?

20  **A.**    He was an Aryan Brotherhood.

21  **Q.**    What was his rank?

22  **A.**    I believe he was a captain.

23  **Q.**    And how long have you known Frankie Owens?

24  **A.**    Since 2008.

25  **Q.**    And he was a member of what organization?

1    **A.**    At that time, he wasn't nothing.

2    **Q.**    Say again.

3    **A.**    At that time, he wasn't nothing.

4    **Q.**    In 2010, do you know what his rank was?

5    **A.**    In 2010, he was a captain.

6    **Q.**    A captain?  Who appoints captains?

7    **A.**    I guess it comes from the wheel.

8    **Q.**    What's a direct order, Mr. Dean?

9    **A.**    Exactly what it says.  It's an order that's direct.

10   **Q.**    Who issues direct orders?

11   **A.**    The wheel.

12   **Q.**    And explain whether or not a soldier has the ability --

13   excuse me -- has the -- is allowed to ignore a direct order

14   from the wheel?

15   **A.**    I wouldn't recommend that he does.

16   **Q.**    Would there be ramifications?

17   **A.**    Yes, sir.

18          **THE COURT:**  Let's stop right there, and we'll continue

19   this examination after lunch.  I'm going to take the lunch

20   recess now, and we'll have the marshals transport the -- or

21   just put him in your custody during this recess.

22          And, ladies and gentlemen, we're going to recess for

23   lunch.  We'll be in recess until 15 minutes after 1:00.  All of

24   my previous instructions and precautions apply.

25          And, Juror 177, if you can find out a little more

about your funeral arrangements.

**JUROR:** Will do.

**THE COURT:** If it's in the afternoon, we have no conflict, but we'll see about that.

Okay. Court is in recess until 1:15.

(JURY OUT.)

(LUNCH RECESS TAKEN AT 11:40 A.M. UNTIL 1:20 P.M.)

**THE COURT:** Let's see. Mr. Turner, you wanted to open without the jury?

**MR. TURNER:** Yes, sir, there's something I wanted to address with the Court.

**THE COURT:** Let's come up to sidebar.

**MR. TURNER:** Yes, sir.

(BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

**MR. TURNER:** Your Honor, when we had a status conference back around March the 10th, I believe it was, the Court indicated and brought up *sua sponte* the issue of co-conspirators' statements and that the Court would be reserving ruling regarding co-conspirator statements.

We have heard lots of testimony right now that involves the -- as Mr. Leary said in his opening, the northern part of the state, and we're now -- I anticipate some of the testimony thus far has moved to the southern part of the state. There's absolutely no proof that has been introduced as to Mr. Parker being involved in a conspiracy in the Northern

1   District of Mississippi.

2         I am moving now *in limine* to have any hearsay

3   statements by any of these witnesses that are about to come in

4   involving the Southern District involving the cases --

5   involving the counts that he is charged with excluded on those

6   hearsay grounds because there's a lack of conspiracy.

7         And I went and read the *Bourjaily* case that the Court

8   addressed.  It relies heavily on *Ohio versus Roberts*, which was

9   abrogated by *Crawford versus Washington*.  It's an issue of

10  first impression.  It has not been brought in.  Indicia of

11  reliability is required now.

12        I'm asking the Court to exclude any kind of hearsay

13  statements that might apply to any other witnesses and to

14  Mr. Owens because I'm not going to have the opportunity to

15  cross-examine him and I will not be able to test the

16  reliability of the statements that any of these witnesses are

17  producing.

18        **THE COURT:**  Right.  Okay.  Now, the *Bourjaily* case and

19  the other cases that you mentioned require that the Court make

20  specific findings:  One, that a conspiracy existed; number two,

21  that the defendant and the declarant were members of the

22  conspiracy; number three, that the statements were made in

23  furtherance of the conspiracy.  Those are findings that the

24  Court must make by a preponderance of the evidence.

25        And as I stated, there's more recent cases that permit

1    the Court to hear the government's proof and to address those

2    rulings at the conclusion of the government's case.  And, of

3    course, if the Court rules that one of those elements does not

4    exist, then the Court must instruct the jury to -- that that

5    evidence is excluded and be disregarded.  Then, of course, you

6    know, it looks close to being a mistrial at that time,

7    depending on how the Court rules at the conclusion of the

8    government's case.

9         Your motion to exclude the co-conspirator's statement

10   at this juncture in the trial is overruled.  The Court will

11   hold that matter under advisement to make a later ruling.

12        **MR. TURNER:**  Yes, Your Honor.  For the purposes of my

13   record, I don't want to presume anything.  That applies to the

14   co-defendant, Mr. Owens' statements as well?

15        **THE COURT:**  Yes.  Yes.

16        **MR. TURNER:**  I'm just preserving my record.  Yes, sir.

17        **THE COURT:**  And so am I.

18        **MR. TURNER:**  Yes, sir.

19        **THE COURT:**  Wait just a minute.  The government --

20        **MR. LEARY:**  I was tracking everything defense counsel

21   said except one thing.  Now, when an admission is made by a

22   party defendant, that's defined as hearsay because that's an

23   admission?

24        **THE COURT:**  Yes, sir.

25        **MR. LEARY:**  Okay.  Thank you.

1        **MR. TURNER:** It would be hearsay to me as my --

2        **THE COURT:** Okay. An admission is something --

3 particularly any sort of confession is something where the

4 other rules become involved, and maybe we'll have to have

5 further bench conferences at some point, but that's the ruling

6 of the Court at this time.

7        **MR. LEARY:** Thank you, Your Honor.

8        **THE COURT:** Let me mention one other real important

9 matter to you. This Juror Number 177 lives over at Batesville.

10 His wife's grandmother passed away yesterday. The funeral is

11 tomorrow at 10:00 in the morning, but that juror tells us that

12 he would prefer to stay at this trial and let the trial not be

13 delayed, and that if I recess at 1:00, he can go over and be

14 with the family tomorrow afternoon.

15        And my usual schedule in this sort of case is to not

16 have a noon recess, to go until about 1:00, and then recess for

17 the weekend.

18        **MR. TURNER:** Yes, sir. I think we would all greatly

19 appreciate it.

20        **THE COURT:** Unless you object?

21        **MR. TURNER:** No, sir.

22        **MR. LEARY:** Thank you.

23    (END OF BENCH CONFERENCE.)

24        **THE COURT:** Okay. Are we ready for the jury? Let's

25 have the jury, Mr. Marshal.

1       (JURY IN.)

2              **THE COURT:**  Okay.  Everybody can take your seat.

3              Mr. Leary, you may continue your examination of this

4       witness.

5              **MR. LEARY:**  Thank you, Your Honor.

6              **THE COURT:**  Sir, I remind you that you are still under

7       oath.

8              **THE WITNESS:**  Yes, sir.

9       **BY MR. LEARY:**

10      **Q.**    Good afternoon, Mr. Dean.

11      **A.**    Good afternoon.

12      **Q.**    Are you scooted up?

13      **A.**    Yes, sir.

14      **Q.**    Okay.  Yeah.  You and I are going to talk.  I'm going to

15      ask you some questions, all right?

16      **A.**    Yes, sir.

17      **Q.**    The Aryan Brotherhood of Mississippi governing document

18      is called a what?

19      **A.**    The oath.

20      **Q.**    Oath?  Tell me what a constitution is.

21      **A.**    It's the constitution.

22      **Q.**    Uh-huh.  Tell me the importance of the constitution

23      within the Aryan Brotherhood.

24      **A.**    That's what we live by.

25      **Q.**    Mr. Dean, if an Aryan Brotherhood member testifies in

1   court against another Aryan Brotherhood member, what is the

2   penalty for that?

3   **A.**   Death.

4   **Q.**   Do you fear for your life right now?

5   **A.**   Yes, sir.

6   **Q.**   I believe you previously identified Frankie Owens; is

7   that correct?

8   **A.**   Yes, sir.

9   **Q.**   In 2010, Frankie Owens was living with who, Mr. Dean?

10   **A.**   Mitchell Valentine.

11   **Q.**   Do you have personal knowledge, Mr. Dean, of Frankie

12   Owens obtaining methamphetamine?

13   **A.**   Yes, sir.

14   **Q.**   Who did Frankie Owens obtain methamphetamine from?

15   **A.**   Brandon Creel.

16   **Q.**   How do you know this?

17   **A.**   I rode with him to go get it.

18   **Q.**   How much meth did Mr. Owens obtain when he purchased it

19   from Brandon Creel?

20   **A.**   I'm not really for sure, but it was probably about an

21   ounce probably.

22   **Q.**   How many times?

23   **A.**   I think it was either two or three times.  I'm not for

24   sure.

25   **Q.**   Were you present?

1  **A.**   Yes, sir.

2  **Q.**   Have you ever taken methamphetamine?

3  **A.**   Yes, sir.

4  **Q.**   About how long would an ounce of meth last a person?

5  **A.**   It would probably last me about six months.

6  **Q.**   Okay.  Is that personal use amounts based on your

7  experience, or is that amounts that are large enough to sell?

8       **MR. SUMRALL:**  Object to -- calls for a conclusion,

9  Your Honor.

10       **MR. TURNER:**  He's leading him at this point.

11       **THE COURT:**  Yeah.  Okay.

12  **BY MR. LEARY:**

13  **Q.**   Is that a large or small amount of methamphetamine,

14  Mr. Dean?

15  **A.**   It would be a large amount.

16       **THE COURT:**  Okay.  The attorney rephrased his

17  question, and I'll permit it as rephrased.

18       Okay.  Go ahead, Mr. Leary.

19       **MR. LEARY:**  Thank you, Your Honor.

20  **BY MR. LEARY:**

21  **Q.**   Now, when were you released from prison, Mr. Dean, in the

22  late 2000s?

23  **A.**   2009, June 19th.

24  **Q.**   2009?

25  **A.**   Yes, sir.

**Q.**   Where did you begin living after you were released?

**A.**   Gulfport.  I can't remember the exact address.

**Q.**   During that time frame, Mr. Dean, did you ever have the opportunity to cooperate with the Federal Bureau of Investigation?

**A.**   Yes, sir.

**Q.**   Now, did that cooperation involve this case at all?

**A.**   No, sir.

**Q.**   Now, Mr. Dean, tell the ladies and gentlemen of the jury who Michael Hudson was.

**A.**   Michael Hudson was a brother.  I call him by the name of Skip.  He was -- I met him in November or December of 2006.  He was my cellmate in Harrison County Jail.

**Q.**   Do you have personal knowledge of whether or not Mr. Hudson was a meth user?

**A.**   Yes, sir.

**Q.**   Was he?

**A.**   Yes, sir.

         **MR. TURNER:**  Your Honor, I'm having trouble hearing the witness.  I'm sorry.

         **THE COURT:**  Could you speak a little louder, please, sir?

         **THE WITNESS:**  Yes, sir.

         **THE COURT:**  Yeah, that's better.

         **MR. LEARY:**  Your Honor, the government would like to

1    have this next item identified for evidence.

2         **THE COURT:**  Very well.

3         **COURTROOM DEPUTY:**  44.

4         **THE COURT:**  It will be Government's Exhibit Number 44

5    for identification.

6      (EXHIBIT NO. G-44 MARKED FOR IDENTIFICATION.)

7    **BY MR. LEARY:**

8    **Q.**    Mr. Dean, I hand you what's been previously marked for

9    identification as Government's Exhibit 44.  Can you identify

10   that picture for me, please?

11   **A.**    That's Skip, Michael Hudson.

12        **MR. LEARY:**  Your Honor, at this time, the government

13   would move to have Exhibit Number 44 entered into evidence as

14   the next numbered government exhibit.

15        **THE COURT:**  Any objection?

16        **MR. SUMRALL:**  Objection, Your Honor.  It's not been

17   authenticated in any way.  We don't know where it came from,

18   where the picture was, so we object.

19        **MR. TURNER:**  No objection.

20        **THE COURT:**  Okay.  There's no objection from

21   Mr. Turner on behalf of his client, but Mr. Sumrall does object

22   because it's not been authenticated?

23        **MR. SUMRALL:**  Correct, Your Honor.  We don't know who

24   took the picture, where it was, when it was, or --

25        **THE COURT:**  Yeah.  What about when?  I mean, do we

1    have any idea when that photograph was taken?

2    **BY MR. LEARY:**

3    **Q.**    When was the last time you saw Mr. Hudson?

4    **A.**    I think it was December of 2000 -- oh, the last time I

5    seen him?

6    **Q.**    Uh-huh.

7    **A.**    In the trunk of the car.

8    **Q.**    Okay.  The last time you saw his live body was about

9    when?

10        **MR. TURNER:**  Objection, Your Honor.  May we approach,

11   please?

12        **THE COURT:**  Okay.  Come up.

13      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

14        **MR. TURNER:**  Your Honor, it's prejudicial.  He's

15   insinuating that Mr. Hudson is not alive, and there is no proof

16   of that at this time.  We have already discussed the --

17        **THE COURT:**  Rephrase the question.  You know, when was

18   the last time you saw Hudson and -- does the photograph appear

19   to accurately reflect Hudson as of the last time you saw him

20   and so forth.  And we need to know when this photograph was

21   taken.

22        **MR. LEARY:**  I think I'm grabbing DL photos.

23        **THE COURT:**  Pardon?

24        **MR. LEARY:**  These are driver's license photos.  What

25   I'm trying to prove, this is what he looked like the last

1　time --

2　　　　**MR. SUMRALL:**　I would like to object to any form of

3　question along this line.　It seems they are getting into a

4　crime that was committed in the Southern District, which was

5　not in the Northern District, and I'm going to object on the

6　grounds of venue.

7　　　　**THE COURT:**　Okay.　Counsel for both defendants have

8　made objections relative to venue, that the specific act did

9　not occur in the Northern District.　However, the conspiracy

10　count and the proof is that some of the overt acts did, in

11　fact, occur in the Northern District in Coldwater, Mississippi,

12　pawnshop; the Corinth, Mississippi, pawnshop; and some of these

13　other acts in the Northern District.

14　　　　The Court is of the opinion that in this conspiracy

15　case, conspiracy charge, that if any part of the crime took

16　place in this district, that this is the appropriate venue.

17　The objection is overruled and noted for the record.

18　　　　**MR. SUMRALL:**　May we have a continuing objection?

19　　　　**THE COURT:**　Yes.　Apparently have a continuing

20　objection as to venue and relevancy, primarily from Mr. Turner,

21　relevancy, but also you made some, Mr. Sumrall.

22　　　　**MR. SUMRALL:**　Yes, sir.

23　　　　**THE COURT:**　Those continuing objections are noted.

24　　　　**MR. SUMRALL:**　Thank you, Your Honor.

25　　　　**MR. TURNER:**　Thank you, Your Honor.

1    (END OF BENCH CONFERENCE.)

2        **THE COURT:**  Okay.  You may continue, Mr. Leary.

3        **MR. LEARY:**  Thank you, Your Honor.

4    **BY MR. LEARY:**

5    **Q.**    Mr. Dean, not including when you look at a photo of Skip

6    Hudson, but the last time you just saw him was about what year?

7    **A.**    The last time I seen him was about December 1st or 2nd of

8    2010.

9    **Q.**    And the picture that I just showed you, Government's

10   Exhibit Number 44, is that a true and accurate representation

11   of what Mr. Hudson looked like at that time?

12   **A.**    It looks like his MDOC picture.

13   **Q.**    Okay.  Is that what he looked like the last time you saw

14   him?

15   **A.**    Minus the blood.

16   **Q.**    Okay.  Thank you.

17       **MR. LEARY:**  Your Honor, at this time, the government

18   would move to have Government's Exhibit 44 entered into

19   evidence.

20       **MR. SUMRALL:**  To which we still object on the fact

21   that it still has not been authenticated, Your Honor.

22       **THE COURT:**  Okay.  The Court is going to admit this

23   exhibit.  The Court notes that Mr. Sumrall, on behalf of

24   Defendant Owens, will be permitted to cross-examine on this

25   exhibit.

1    (EXHIBIT NO. G-44 ADMITTED INTO EVIDENCE.)

2         **THE COURT:**  You may proceed, Mr. Leary.

3         **MR. LEARY:**  Thank you, Your Honor.  Permission to

4    publish the picture?

5         **THE COURT:**  Yes, sir.

6    **BY MR. LEARY:**

7    **Q.**  Mr. Dean, in the summer of 2010, would you tell the

8    ladies and gentlemen of the jury the first time that a problem

9    concerning Michael Hudson was brought up.

10   **A.**  I believe it was at a church meeting in September of --

11        **MR. TURNER:**  Object to what he believes, Your Honor.

12        **THE WITNESS:**  Say what?

13        **THE COURT:**  I couldn't -- didn't --

14        **MR. TURNER:**  I said -- I'm sorry, Your Honor.  I said

15   I object to what he believes.  If he's got personal knowledge

16   of it, that's one thing, but if it's something he heard, I

17   object to it.

18   **A.**  It was September 2010.

19   **BY MR. LEARY:**

20   **Q.**  Okay.  September of 2010, there was a church meeting

21   where, Mr. Dean?

22   **A.**  At Mitchell Valentine's house.

23   **Q.**  Tell me, where was Mitchell Valentine's house located?

24   **A.**  Off of Three Rivers Road in Gulfport.

25   **Q.**  And tell the ladies and gentlemen of the jury who was

1    present at that meeting.

2    **A**.    Myself, Sonny Maxwell, Thomas Burrus, Mitchell Valentine,

3    Frankie Owens, Creel.  I can't remember everybody's name.  It

4    was probably about 25 brothers.

5    **Q**.    Twenty-five brothers?

6    **A**.    Yes, sir.

7    **Q**.    Was Frankie Owens present at that meeting?

8    **A**.    Yes, sir.

9    **Q**.    Now, tell me, what did Frankie Owens say concerning

10   Michael Hudson?

11   **A**.    At that time, there was an issue about drug debt that was

12   got to be talked about.

13          **MR. TURNER**:  Your Honor, I'm going to renew my

14   objection that I had at the bench earlier.

15          **THE COURT**:  Okay.  The objection is overruled -- noted

16   and overruled.

17   **BY MR. LEARY**:

18   **Q**.    You may answer the question, Mr. Dean.

19   **A**.    There was a situation about drug debt that was owed to

20   Parker, and I can't remember if Parker was there or not.  But a

21   couple of days later, they had another meeting, and there was

22   only a few of us there present, and we talked to Parker by way

23   of telephone.

24   **Q**.    Okay.  I want to ask you about the first meeting when

25   Frankie Owens was present.

1   **A.**    Yes, sir.

2   **Q.**    Frankie Owens said that the problem with Michael Hudson

3   concerned what, Mr. Dean?

4   **A.**    A drug debt.

5   **Q.**    Okay. And the drug debt was owed to who?

6   **A.**    Thomas -- Parker.

7   **Q.**    Okay. Eric Parker?

8   **A.**    Eric Parker.

9   **Q.**    And then several days later, there was another meeting?

10   **A.**    Yes, sir.

11   **Q.**    And tell the ladies and gentlemen of the jury what

12   happened at that meeting, Mr. Dean.

13   **A.**    We had a conversation on the telephone.

14   **Q.**    Okay.

15   **A.**    People present was myself, Frankie Owens, Skip, Mitchell

16   Valentine, Thomas Burrus, Blue. Might have been a couple other

17   brothers. I can't remember exactly.

18   **Q.**    Mr. Dean, when you say "brothers," you're talking about

19   fellow Aryan Brotherhood members?

20   **A.**    Yes, sir.

21   **Q.**    Okay. And who was on the speakerphone?

22   **A.**    Eric Parker.

23   **Q.**    And what did Frankie Owens say concerning the situation

24   with Michael Hudson?

25   **A.**    He was to pay the debt. I think it was like $600. I

1    ain't for sure.  I believe that -- or I heard that Skip had

2    paid a little bit of it.

3           **MR. TURNER:**  Object to the hearsay separately from my

4    prior objections, Your Honor.

5           **THE COURT:**  Okay.  The objection is overruled.  You

6    have a continuing objection to co-conspirator statement.

7    That's noted for the record.  It won't be necessary for you to

8    jump up every word that's asked here.

9           Yes, sir.  You may proceed, Mr. Leary.

10          **MR. LEARY:**  Thank you, Your Honor.

11   **BY MR. LEARY:**

12   **Q.**   Now, during the course of this second meeting, Frankie

13   Owens was present.  Where was Eric Parker?

14   **A.**   He was on the telephone.

15   **Q.**   Okay.  So I'm going to ask you what Eric Parker said, and

16   I'm going to ask you what you remember Frankie Owens saying.

17   Now, the issue at hand concerned a drug debt between who?

18   **A.**   Eric Parker and Skip.

19   **Q.**   Okay.  Eric Parker and Skip.  Now, who owed money to who?

20   **A.**   Skip owed it to Eric.

21   **Q.**   Skip owed the money to Eric Parker?

22   **A.**   Yes, sir.  That's my understanding.

23   **Q.**   Okay.  For what?  What did the debt come from?

24   **A.**   From methamphetamines.

25   **Q.**   Okay.  Now, why was there a dispute?

1   **A.**    Skip said that the stuff wasn't no good.

2   **Q.**    Okay.  And what did Eric Parker say?

3   **A.**    He said it was good, and they agreed to pay -- that he

4  would have to pay half of it.

5   **Q.**    Okay.  And so half of it was about how much money?

6   **A.**    I'm not -- I'm not for sure.

7   **Q.**    Okay.  You don't have to answer if you're not for sure.

8   **A.**    I'm not for sure.

9   **Q.**    Okay.

10  **A.**    I believe they gave him two weeks to pay it.

11  **Q.**    They gave --

12  **A.**    Skip.

13  **Q.**    -- Skip Hudson two weeks to pay who?

14  **A.**    Eric Parker.

15  **Q.**    For the debt?

16  **A.**    Yes, sir.

17  **Q.**    Now, where was Mitchell Valentine living at this time?

18  **A.**    On Three Rivers Road.

19  **Q.**    Okay.  Who was living with him?

20  **A.**    Frankie Owens.

21  **Q.**    Now, tell the ladies and gentlemen of the jury what

22  happened during the third meeting.  Was there a meeting at

23  Valentine's trailer?

24  **A.**    Yes -- yes, sir.  That was -- that was after the

25  kidnapping.

1  **Q.**   Okay.  Well, let me ask you this.  In talking with

2  Mr. Owens, did Skip pay Eric Parker for his debt?

3  **A.**   No, sir.

4  **Q.**   What was issued on Skip?

5  **A.**   He was going to be violated, and he was going to have to

6  accept the violation, and I was supposed to meet Skip at the

7  gas station and pick him up so I could bring him to the

8  brothers to be violated.

9  **Q.**   Okay.  I'm going to stop you right there.  Tell the

10 ladies and gentlemen of the jury what a violation is.

11 **A.**   There was several forms of violation, extending anywhere

12 from serving two to three minutes with three brothers.  And

13 three minutes with three brothers is physical contact, a smash,

14 you know.

15 **Q.**   Who ordered the violation on Michael Hudson?

16 **A.**   I would suggest it came from the wheel.

17 **Q.**   Okay.  And did Michael Hudson show up for the violation?

18 **A.**   I was in contact with him on the telephone, and he told

19 me he was coming.  He said, "I'm right around the corner.  I'll

20 be there in about ten minutes."

21      I sat at the gas station about a half hour.  We talked

22 several times on the phone.  And then all of a sudden, the

23 phone went silent and never heard from him.  And I sat there

24 probably another 20 minutes, and I called Frankie and told him

25 it's a no-show, and I left.

1   Q.   Okay.  So you were supposed to meet Michael Hudson where?

2   A.   At the gas station on Lamar Boulevard.

3   Q.   Okay.  And the purpose of that meeting was for what to

4   happen to Michael Hudson?

5   A.   I was going to go take him to be violated.

6   Q.   Now, did Michael Hudson show up for that meeting?

7   A.   No, sir.

8   Q.   Did you talk to him about the meeting, Michael Hudson?

9   A.   About the violation?

10   Q.   Yes.

11   A.   Yes, he was aware.

12   Q.   Now, after Michael Hudson refused to show up for the

13   violation, who did you notify of his failure to show up?

14   A.   Frankie Owens.

15   Q.   Tell the ladies and gentlemen of the jury what happened

16   at the Walgreen's in Slidell, Louisiana.

17   A.   Me and Sonny Maxwell went there to pick up some Sudafed

18   so we could cook some dope and --

19   Q.   Okay.  I'm going to stop you right now.  Who were you at

20   the Walgreen's in Slidell with?

21   A.   Sonny Maxwell, Blue.

22   Q.   Okay.  And you and Sonny Maxwell were at the Walgreen's

23   to do what?

24   A.   To buy Sudafed.

25   Q.   Okay.  Now, did this occur after Michael Hudson failed to

1    show up for the violation?

2    **A.**    Yes, sir.

3    **Q.**    Was there still an active --

4    **A.**    Smash on sight.

5    **Q.**    On who?

6    **A.**    Michael Hudson.

7    **Q.**    So when you saw Michael Hudson, what were you supposed to

8    do?

9    **A.**    Smash him.

10   **Q.**    And you saw him where?

11   **A.**    At the Walgreen's.

12   **Q.**    Now, Mr. Dean, about what time of year -- what part of

13   2010 was this?

14   **A.**    Probably about November.

15   **Q.**    Okay.  November of 2010?

16   **A.**    Yes, sir.

17   **Q.**    Now, when you saw Michael Hudson at the Walgreen's in

18   Slidell, Louisiana, why didn't you just smash him as soon as

19   you saw him?

20   **A.**    Because to me it's not justified.

21   **Q.**    Why wasn't it justified?

22   **A.**    Because it was for dirty dope.  He owed a debt for dirty

23   dope.

24   **Q.**    He owed a debt for dirty what?

25   **A.**    Dope.  Meth.

1   **Q.**   Why do you think that a debt for dirty dope is not

2   justified?

3   **A.**   Because I wouldn't pay the shit.

4   **Q.**   What did you say to Michael Hudson when you saw him?

5   **A.**   I said, "The brothers want to kill you," and I said,

6   "We're supposed to call in and stuff." I said, "Here's my

7   phone number. You call me, and I'll keep you informed of

8   what's going on."

9   **Q.**   Did you warn him?

10   **A.**   Yes, sir.

11   **Q.**   Now, who was with you at the Walgreen's?

12   **A.**   Sonny Maxwell.

13   **Q.**   Now, explain to the ladies and gentlemen of the jury what

14   Sonny Maxwell's position was in the Aryan Brotherhood of

15   Mississippi at this time.

16   **A.**   He was a prospect.

17   **Q.**   And who was his recruiter?

18   **A.**   I was.

19   **Q.**   After seeing Michael Hudson at the Walgreen's, did you

20   report back to Frankie Owens?

21   **A.**   I did not.

22   **Q.**   What are bolts within the words of the Aryan Brotherhood?

23   What do bolts mean?

24   **A.**   The thunder warrior bolts is from representing yourself

25   in battle or stabbing somebody, drawing blood.

1    **Q.**    Do you have your bolts on the side of your neck?

2    **A.**    No, sir.

3    **Q.**    Did Frankie Owens ever offer you bolts?

4    **A.**    Yes, sir.

5    **Q.**    Why did Frankie Owens offer you bolts?

6    **A.**    To stab Michael Hudson -- well, I don't know if he wanted

7    me to stab him.  He asked me did I want to earn them on him.

8    **Q.**    Asked you if you wanted to earn your bolts on who?

9    **A.**    Michael Hudson.

10   **Q.**    What did you take that to mean?

11   **A.**    Well, I knew what his intentions was, and I didn't want

12   to have no part of it.

13   **Q.**    Did you accept Frankie Owens' offer, or did you reject

14   it?

15   **A.**    I rejected it.

16   **Q.**    Why did you reject Frankie Owens' offer of earning your

17   bolts on smashing Michael Hudson?

18   **A.**    In my belief, that -- you ain't going to earn your bolts

19   on a brother.

20   **Q.**    What was the next thing that happened in this ordeal

21   dealing with Michael Hudson?

22   **A.**    We kidnapped him.

23   **Q.**    Who ordered the kidnapping of Michael Hudson?

24   **A.**    Frankie Owens is where I got it from.

25   **Q.**    Now, about what time of the year did Frankie Owens

1  contact you about kidnapping Michael Hudson?

2  A.  The last of November, first part of December.

3  Q.  Who is Wendell Eaves, Mr. Dean?

4  A.  That's whose house we took him to.

5  Q.  Where did he live?

6  A.  In Gautier.

7  Q.  And where is that?

8  A.  Jackson County.

9  Q.  Okay.  Is that on the coast too?

10 A.  Yes, sir.

11 Q.  Where did Frankie Owens want Michael Hudson delivered to?

12 A.  He told me he was going to gift wrap him and give him to

13 Eric Parker.

14 Q.  Okay.  He told -- Frankie Owens told you that he was

15 going to gift wrap who?

16 A.  Michael Hudson.

17 Q.  And give him to who?

18 A.  Eric Parker.

19 Q.  Was Michael Hudson subsequently kidnapped?

20 A.  Yes, sir.

21 Q.  Okay.  On his initial kidnapping, about when did that

22 take place, Mr. Dean?

23 A.  Probably about 8:00 at night.

24 Q.  8:00 at night?

25 A.  Yes, sir.

1  **Q.**  And about what time of year?  What month was it?

2  **A.**  It was December.

3  **Q.**  Early or late December?

4  **A.**  It was early.

5  **Q.**  Do you remember the day?

6  **A.**  The indictment says the 2nd, but I'm -- I'm not for sure

7  what day it was.

8  **Q.**  Do you dispute that?

9  **A.**  No, sir.

10  **Q.**  Who picked Michael Hudson up?

11  **A.**  Me and Sonny Maxwell.

12  **Q.**  Where did Frankie Owens want you to take Michael Hudson?

13  **A.**  To Wendell Eaves' house.

14  **Q.**  How was the pickup of Michael Hudson orchestrated?  What

15  was he told?

16  **A.**  Blue contacted him because Skip and Blue had cooked dope

17  before, and Blue told Skip that he needed him to help him cook

18  some dope.

19  **Q.**  Blue -- Blue is who?

20  **A.**  Sonny Maxwell.

21  **Q.**  And Sonny Maxwell told Skip they needed to do what?

22  **A.**  Go cook some dope.

23  **Q.**  And where were they going to go cook dope?

24  **A.**  At Wendell's house.

25  **Q.**  Okay.  Were you with Sonny Maxwell when he picked -- when

1    Michael Hudson was picked up?

2    **A.**    Yes, sir.

3    **Q.**    Now, at this time, was Sonny Maxwell a made member of the

4    Aryan Brotherhood?

5    **A.**    No, sir.

6    **Q.**    So what's in it for him?  Why was he involved in this?

7    **A.**    He was going to earn his brand.

8    **Q.**    What's a blood-in mission?

9    **A.**    You've got to bleed somebody in to get into the

10   brotherhood.

11   **Q.**    What was Sonny Maxwell's blood-in mission?

12   **A.**    Kidnap and assault Michael Hudson.

13   **Q.**    Was it his blood-in mission?

14   **A.**    Yes, sir.

15   **Q.**    Did Sonny Maxwell receive his brand after Michael Hudson

16   was kidnapped?

17   **A.**    Yes, sir.

18   **Q.**    Who tattooed the Aryan Brotherhood brand on Sonny Maxwell

19   for kidnapping Michael Hudson?

20   **A.**    I did.

21   **Q.**    Who gave you authority to brand Sonny Maxwell in after

22   the kidnapping of Michael Hudson?

23   **A.**    Frankie Owens.

24   **Q.**    What type vehicle did you and Sonny Maxwell pick up

25   Michael Hudson in?

1  **A.**  It was in Sonny's truck.

2  **Q.**  Who was driving the truck?

3  **A.**  Sonny.

4  **Q.**  Where was Michael Hudson sitting?

5  **A.**  In the center.

6  **Q.**  And where were you sitting?

7  **A.**  Next to the door, passenger side.

8  **Q.**  And where did you drive to?

9  **A.**  Jackson County, Wendell's house.

10  **Q.**  And why did you -- who told you to drive to Wendell

11  Eaves' house?

12  **A.**  Frankie Owens.

13  **Q.**  What happened when you arrived at Wendell Eaves' house?

14  **A.**  I was on the -- I was on the phone with -- with Frankie,

15  and I told him that we picked up -- I told him that we had

16  picked him up.  And he told me to call him when we get to the

17  street.

18  So when I got to Wendell's street, I called him.  I told

19  him I was pulling on the street.  He said, "All right.  We're

20  ready for him."  And I pulled into the driveway, knocked on the

21  door, and Wendell opened the door, and he escorted us to the

22  back bedroom.

23  **Q.**  Wendell Eaves did?

24  **A.**  Yes, sir.

25  **Q.**  What did the bedroom look like?

1  **A.**    It was a single trailer bedroom, about a ten by ten,

2  maybe twelve by twelve.  Everything was removed out of the

3  bedroom except the box springs and mattress was leaned up

4  against the wall.

5  **Q.**    What happened next?

6  **A.**    Skip went and stood by the window.  Blue went and stood

7  by the little cubbyhole area.  Looked like a built-in dresser

8  drawer or something.  And I leaned up against the box spring

9  mattress.

10 **Q.**    Who came into the room next?

11 **A.**    Wendell -- Wendell went out and said, "I'll be right

12 back."  He shut the door.  About a minute later, the door flew

13 open.  Wendell, Mitchell Valentine, Frankie Owens, and Walter

14 Burrus come in with billy clubs.

15 **Q.**    Now, Frankie Owens' street name is what?

16 **A.**    I just call him Frankie.

17 **Q.**    You just call him Frankie.  Do you know what Walter

18 Burrus' street name is?

19 **A.**    T-Bone.

20 **Q.**    After -- I want to get this setting right.  Who brought

21 Skip into the back bedroom?

22 **A.**    He was walking.

23 **Q.**    He was walking?  And who escorted him into the back

24 bedroom?

25 **A.**    Wendell -- Wendell was in front of me, and I was -- I was

1  walking behind Wendell, and I don't know who exactly was behind

2  me.  It was either Skip or Blue.  I ain't got eyes in the back

3  of my head.  I don't know.

4  **Q.**   Okay.  And who came into the room after you, Hudson, and

5  Sonny Maxwell arrive?

6  **A.**   It was Wendell, T-Bone, Mitchell Valentine, and Frankie

7  Owens.

8  **Q.**   And what happened after Frankie, Mitchell, and T-Bone

9  came into the room?

10  **A.**   Blue ran up to Skip and hit him and threw him on the

11  floor, and everybody else started hitting him with billy clubs.

12  **Q.**   How long was he beaten?

13  **A.**   Just a brief moment.  Two minutes maybe.

14  **Q.**   Did you ever see Frankie Owens carry a billy club?

15  **A.**   Yes, sir.

16  **Q.**   Describe it for the ladies and gentlemen of the jury.

17  **A.**   It's about -- about as long as -- about the size of this

18  mike right here (indicating), and it's some kind of black

19  synthetic -- I've seen the same thing on woodworking shows

20  where they use it for chisels.

21  **Q.**   What did Frankie Owens do with that billy club?

22  **A.**   He hit Skip in the middle of the forehead and busted

23  his -- right here (indicating).

24  **Q.**   Describe what happened to Skip's forehead after Frankie

25  Owens hit him with the billy club.

1   **A.**   It split open, and it started leaking blood.

2   **Q.**   Say that again louder, please.

3   **A.**   It split open, and it started leaking blood.

4   **Q.**   What did Michael Hudson do after Frankie hit him in the

5   head with a billy club?

6   **A.**   He hollered.

7   **Q.**   Was he standing at this point or down?

8   **A.**   He was down.  He was kind of -- he was sitting down kind

9   of.  He did like this right here (indicating).  It was just

10  leaking.

11  **Q.**   What did Owens say to Hudson at this point?

12  **A.**   I'm not for sure.

13  **Q.**   Okay.

14  **A.**   He said something, but I --

15  **Q.**   That's fine.  That's fine.  Describe Michael Hudson's

16  physical condition at this point.

17  **A.**   He was dazed and confused.  Right after that, T-Bone

18  said, "Step out" -- he said, "Follow me," and I walked out of

19  the room.

20  **Q.**   You walked out of the room at that point?

21  **A.**   Yes, sir.

22  **Q.**   Now, you walked out of the room to get what?

23  **A.**   I didn't know.

24  **Q.**   Okay.

25  **A.**   T-Bone said, "Follow me," and I followed him.  We went

1  out the bedroom door, and right out -- to the left was the back

2  door to the trailer.  I stepped outside, and T-Bone's car was

3  backed up.  And he said --

4  **Q.**  Tell the ladies and gentlemen of the jury what T-Bone's

5  car looked like.

6  **A.**  It was a red Chevy Cobalt.

7  **Q.**  Okay.  Is that a small car or a large car?

8  **A.**  I'd say it was a small one.

9  **Q.**  Okay.  What happened next?

10  **A.**  He told me, he said, "Grab that trunk."  He opened the

11  door to pop the trunk.  I opened the trunk.  And he said, "Grab

12  that tarp right there."  And I grabbed the tarp -- but it

13  wasn't a tarp.  It was a tent -- and I threw it in the back of

14  the trunk.

15  And as I was spreading it out, I heard somebody say

16  "Watch out, watch out," and I jumped out of the way, and they

17  was carrying Skip and threw him in the trunk.

18  **Q.**  Now, was Skip bound or not?

19  **A.**  I don't see how.  It was -- it happened so fast, I --

20  that -- I don't know how they could have tied him up that fast.

21  **Q.**  Okay.  So you don't know?

22  **A.**  No, sir.

23  **Q.**  Where was Michael Hudson placed?

24  **A.**  In the trunk of the car.

25  **Q.**  Who got into T-Bone or Walter Burrus' car?

**A.**     Walter Burrus -- well, Skip was in the trunk -- Mitchell
Valentine, and Frankie Owens.

**Q.**     Where -- what did Frankie Owens tell you previously that
he was going to do with Michael Hudson?

**A.**     Gift wrap him.

**Q.**     Give him to who?

**A.**     Eric Parker.

**Q.**     After Michael Hudson was put in the trunk, Walter Burrus,
Mitchell Valentine, and Frankie Owens got into the red Cobalt?

**A.**     Yes, sir.

**Q.**     What did you and Sonny Maxwell do?

**A.**     We got back in Sonny's truck.

**Q.**     Did you follow Frankie Owens and the others in the red
Cobalt?

**A.**     We followed them a ways.

**Q.**     And then did you follow them all the way to Eric Parker's
house?

**A.**     I'm not for certain -- no, we didn't follow them out
there.  I'm not for sure where we -- we separated at.

**Q.**     Right.

**A.**     But Frankie called me and asked me if we were going to
follow them, and I told him we didn't have gas.

**Q.**     Okay.  Was that a true statement or not?

**A.**     No.

**Q.**     Why didn't you want to follow them?

1  **A.**  I didn't want to be a witness to a murder.

2  **Q.**  Now, you had previously dealt with the FBI, didn't you?

3  **A.**  Yes, sir.

4  **Q.**  Mr. Dean, why didn't you just pick up the phone and call

5  the FBI at that moment and stop this?

6  **A.**  I had the text wrote out on my phone, and I was going to

7  send it to them, but I was scared it would be me in the trunk

8  next so I didn't send it.

9  **Q.**  That decision has cost you how many years?

10  **A.**  Twenty.

11  **Q.**  Where did you and Sonny Maxwell return to after Hudson

12  was beaten?

13  **A.**  To my house across from the IP Casino.

14  **Q.**  And what did you do to Sonny Maxwell at that time?

15  **A.**  Tattooed his brand.

16  **Q.**  Who told you that you could tattoo Sonny Maxwell after he

17  did this mission?

18  **A.**  Frankie Owens.

19  **Q.**  After that -- Michael Hudson was kidnapped and beaten,

20  did you ever see him again?

21  **A.**  No, sir.

22  **Q.**  Tell the ladies and gentlemen of the jury when the next

23  Aryan Brotherhood meeting occurred about this event.

24  **A.**  About two or three days after the kidnapping, Frankie

25  called a meeting at Mitchell Valentine's house.

1   **Q.**   Stop.  Who called the meeting?

2   **A.**   Frankie Owens.

3   **Q.**   And where was the meeting to be held?

4   **A.**   Mitchell Valentine's house.

5   **Q.**   And where was Frankie Owens living at this time?

6   **A.**   At Mitchell Valentine's house.

7   **Q.**   Okay.  What happened?

8   **A.**   All of us that was involved showed up, and we went to

9   Frankie's bedroom, and he told us that Skip wasn't coming back

10   and we're not to ever discuss this again.

11   **Q.**   Okay.  Stop right there.  Frankie Owens told you what

12   about Skip?

13   **A.**   That he wasn't coming back.

14   **Q.**   And then what did he tell you?

15   **A.**   Don't ever discuss it again.

16   **Q.**   Was Eric Parker at this meeting?

17   **A.**   I don't believe so.

18   **Q.**   Do you know whether or not he was ever arrested after

19   this?

20   **A.**   I saw that he was in the *Jailhouse Times*.

21   **Q.**   Okay.  But you don't know personally?

22   **A.**   No, sir.

23   **Q.**   About when was the next meeting concerning this,

24   Mr. Dean?

25   **A.**   I'm not for sure what month it was.  I'm going to say

1  later on in December.  Maybe January.  Maybe --

2  **Q.**    Okay.

3  **A.**    Yeah, it was January, because Blue went to jail in

4  January.  So it was probably -- yeah, had to be January.

5  **Q.**    Had to be January.  Now, who is Thomas Parker?

6  **A.**    That's another brother.  He was the state captain at the

7  time.

8  **Q.**    He's the state captain?

9  **A.**    Yes, sir.

10  **Q.**    Now, Thomas Parker is not Eric Parker?

11  **A.**    No, sir.

12  **Q.**    Okay.  Where was the next meeting held?

13  **A.**    It was at Thomas Parker's house.

14  **Q.**    And do you recall who was at that meeting?

15  **A.**    Thomas Parker, Frankie Owens, myself, Walter Burrus,

16  Mitchell Valentine, and Wendell Eaves.  And I think Creel was

17  there, but I'm not for sure.

18  **Q.**    Tell the ladies and gentlemen of the jury what Frankie

19  Owens said at that meeting.

20  **A.**    He said that he was contacted by Dale Cartworth from

21  Harrison County Sheriff's Department.  He was questioned about

22  the kidnapping.  And he said that -- that he took care of that.

23  We ain't going to have no more problems out of that and that we

24  should never talk about it again.

25  **Q.**    Did he say anything about holding up for this?

1    **A.**    He -- he said that --

2         **MR. SUMRALL:**  Object to the leading, Your Honor.

3    **A.**    -- he took care of it.

4         **THE COURT:**  Okay.  Rephrase your question, Mr. --

5         **MR. LEARY:**  I'll just withdraw it, Your Honor.

6         **THE COURT:**  Yes, sir.

7    **BY MR. LEARY:**

8    **Q.**    Are you aware of any other assaults on Aryan Brotherhood

9    members that occurred in 2010?

10   **A.**    Yes, sir.

11        **MR. SUMRALL:**  Objection, Your Honor.  Relevance.

12        **MR. TURNER:**  Objection, Your Honor.

13        **THE COURT:**  Okay.  Unless it's in this indictment, the

14   objection is sustained.

15        **MR. LEARY:**  Yes, Your Honor, it's in the indictment.

16        **THE COURT:**  Okay.

17   **BY MR. LEARY:**

18   **Q.**    Who is Joe Green?

19   **A.**    He was a brother that I met at Rankin County.

20   **Q.**    About what year did you meet Joe Green?

21   **A.**    2007.

22   **Q.**    Is he an ABM member?

23   **A.**    At the time, he wasn't.  Then he became one.  Now he's

24   not again.

25   **Q.**    Were you present when he was assaulted in 2010?

1  **A.**    Yes, sir.

2  **Q.**    Where was he assaulted?

3  **A.**    At Luke's house.

4  **Q.**    Where is that located?

5  **A.**    Picayune, Mississippi.

6  **Q.**    What -- what kind of meeting was taking place when he was

7  assaulted?

8  **A.**    It was a church meeting.

9  **Q.**    And tell the ladies and gentlemen of the jury what --

10 again briefly what a church meeting is.

11 **A.**    Church is a meeting that we have once a month every month

12 where all of the brothers get together and pay dues.

13 **Q.**    What did Owens order at the Picayune church meeting?

14 **A.**    To assault Joe Green.

15 **Q.**    Do you recall why Owens ordered the assault on Joe Green?

16 **A.**    It was something to do with the treasury getting screwed

17 up or something.

18 **Q.**    Did the assault occur?

19 **A.**    Yes, sir.

20 **Q.**    How many Aryan Brotherhood members assaulted Joe Green?

21 **A.**    Everyone that could get to him.

22 **Q.**    Why does everybody have to participate in the assault?

23 **A.**    I think they just enjoy it.

24 **Q.**    What happened after the initial assault of Joe Green?

25 **A.**    They dragged him over there behind the trailer somewhere.

And I didn't see what happened, but --

**Q.** Who dragged Joe Green behind the trailer?

**A.** I'm not for sure who all it was.

**Q.** Did you see them? If you don't -- if you can't recall, that's fine.

**A.** Yeah. It was about five or six of them carried him over there.

**Q.** Okay. Do you recall anybody that was involved, any of those five or six people that carried him over?

**A.** I wasn't really paying attention.

**Q.** That's fine.

**A.** I can tell you what Joe told me.

     **MR. SUMRALL:** Objection.

**BY MR. LEARY:**

**Q.** Don't tell me what Joe told me -- told you.

     **MR. LEARY:** Permission to speak with co-counsel briefly, Your Honor.

     **THE COURT:** Yes, sir.

    (CONFERRING OFF THE RECORD.)

**BY MR. LEARY:**

**Q.** Was Eric Parker present at the Joe Green assault?

**A.** I'm not for sure.

**Q.** Was Frankie Owens present?

**A.** Yes, sir.

     **MR. LEARY:** No further questions, Your Honor.

1        **THE COURT:**  Mr. Sumrall, are you ready to

2  cross-examine, or do you need a few minutes?

3        **MR. SUMRALL:**  If I may have a sidebar, Your Honor.

4        **THE COURT:**  Yes, sir.

5    (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

6        **MR. SUMRALL:**  Your Honor, in regards to Mr. Green, I

7  do not recall anything being in the indictment about Mr. Green.

8  Therefore, I object to the testimony that was introduced and

9  ask the Court to instruct the jury.

10        **MR. TURNER:**  I join in the objection.

11        **THE COURT:**  Where is Mr. Green named in this

12  indictment?

13        **MS. PEARSON:**  I can look at the overt acts.

14        **MR. TURNER:**  His name is not listed in here, Your

15  Honor.

16        **MS. PEARSON:**  He's -- his name is not in the

17  indictment, but he's -- copies of the indictment can be --

18  Overt Act (d).

19        **THE COURT:**  Okay.  Overt Act (d) says:  "On or about

20  July 11th, 2010, Frank George Owens, Jr., a/k/a State Raised,

21  and Eric Glenn Parker, and others known and unknown to the

22  grand jury, lured and maimed a subordinate gang member whom the

23  Aryan Brotherhood of Mississippi believed to have violated gang

24  rules."

25        Okay.  Green is not named.

1          **MS. PEARSON:**  No, Your Honor.

2          **MR. SUMRALL:**  We have no way --

3          **MR. TURNER:**  That's why we objected to it, Your Honor.

4          **MR. SUMRALL:**  That was not in the indictment.

5    Therefore, that testimony is --

6          **THE COURT:**  Well, what -- what about in your

7    production?  Is there anything about the assault on Green in

8    the material you produced and made available to the defendants?

9          **MS. PEARSON:**  Yes, Your Honor.  We produced -- and I

10   can go get the production, but we produced the police report

11   from Ms. Rhonda Poche, who responded to the hospital to take a

12   report from Mr. Green.  We produced statements by Mr. Green

13   regarding the assault, a video by Mr. Green.

14         **THE COURT:**  Okay.  Let me see what you produced.

15         (END OF BENCH CONFERENCE.)

16         **THE COURT:**  Ladies and gentlemen of the jury, take a

17   break and go to the jury room.  All of my previous instructions

18   and precautions apply.

19         (JURY OUT.)

20         (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

21         **THE COURT:**  Okay.  Tell me what documents you

22   produced.

23         **MS. PEARSON:**  Your Honor, what I can do for the Court,

24   I can list the documents -- and if you give me about three

25   minutes, I'll provide the Court the Bates stamped numbers

1    associated with each document.

2           I provided a video of an interview done with Joe Green

3    by local law enforcement, including Jason Price via phone.

4           I produced a police report -- we being the government,

5    not just me -- by Ms. Rhonda Poche documenting a visit to the

6    hospital where Joe Green was being treated.

7           I produced documents from -- I believe it was Forrest

8    County Hospital.  That was specific to a Dr. Abida Butler who

9    treated Mr. Green for the injuries he sustained during this

10   assault.

11          We produced a 302 or ATF equivalent of a report of an

12   interview with Mr. Green by ATF Agent Scott Meadows, FBI Agent

13   Jeremy Burchfield.

14          In addition to those things, we produced -- I believe

15   it was in the *Jencks* production.  I'll get the numbers --

16   statements by co-conspirators, including defendants in this

17   case, who participated in the assault of Mr. Green.

18          I would just need a few minutes to get the rest of the

19   Bates numbers and tell the Court what date and what production

20   those numbers were in.

21          **THE COURT:**  Do the defendants have any recollection of

22   this production?

23          **MR. SUMRALL:**  No, Your Honor, I do not independently,

24   but I will say this.  In all honesty, there was so much

25   produced, and we -- I looked at everything that I could --

1    possibly had time to look at.  I do not recall production to
2    that, but I'm not going to tell the Court unequivocally it was
3    not in there.

4        **MR. TURNER:**  I agree with that.  I'm going to say I
5    did look at everything *Jencks,* and I do not recall it being in
6    *Jencks*.

7        **MS. PEARSON:**  Then it would have been -- despite the
8    *Jencks* nature of it, we would have produced it then far earlier
9    than the *Jencks* production.  I just need a few minutes to get
10   Bates numbers.

11       **THE COURT:**  Let's do that.  We'll take about a
12   ten-minute break.

13       (END OF BENCH CONFERENCE.)

14       **THE COURT:**  Court is in recess for ten minutes.

15       (RECESS TAKEN AT 2:15 P.M. UNTIL 2:28 P.M.)

16       **THE COURT:**  Okay.  Can we have a little more
17   information about what was produced to the defendants relative
18   to Joe Green?

19       **MS. PEARSON:**  Yes, Your Honor.

20       Your Honor, with respect to the video that I
21   referenced of his interview with ATF Agent Price via the phone
22   and local law enforcement, that was produced on July 27, 2015.
23   The USA Bates number was 3350553.

24       With respect to the ATF report I referenced with Agent
25   Meadows and FBI Burchfield interviewing Mr. Green, that was in

1  our *Jencks* production on February 24th, 2016. The *Jencks*
2  number is 00401845.

3      With respect to the hospital records I spoke of, that
4  was in our discovery too, again on July 27, 2015. That's USA
5  number 00306293, and they proceed on to 00306406.

6      With respect to the police report that I referenced
7  from Officer Rhonda Poche, that was in our discovery too on
8  July 27, 2015. That's Bates number USA 351311 through USA
9  351318.

10      With respect to an interview conducted of Brandon
11  Creel, who references this assault, that was in our *Jencks*
12  production on February 24th, 2016, with a Bates number of
13  JEN 00401795.

14      With respect to the witness that is currently on the
15  stand and his -- a report of his interview, that was in our
16  *Jencks* production on February 24th, 2016, Bates number
17  JEN 00402100.

18      With respect to an interview of Walter Burrus, that
19  was in our *Jencks* production on February 24th, 2016, Bates
20  number JEN 00403644.

21      So those are the documents I can recall.

22      **THE COURT:** Okay. Do all of those documents reflect
23  the name Joe Green?

24      **MS. PEARSON:** They all do with -- yes, they all -- all
25  of the documents I have referenced reflect the name Joe Green.

1    **THE COURT:**  An assault on July the 11th, 2010?

2    **MS. PEARSON:**  I believe some of the -- some of the

3    interviews of, for example, this individual and Brandon Creel

4    may ballpark that date, but with respect to the ATF report, the

5    hospital records, the police report, and the video, those would

6    all reference that date.

7    **THE COURT:**  Why was the name not included in the

8    indictment under Overt Acts?

9    **MS. PEARSON:**  To be honest, I cannot recall.

10   **THE COURT:**  Okay.  Thank you.  What says the

11   defendant?

12   **MR. TURNER:**  Your Honor, we, on behalf of Mr. Parker,

13   renew our objection.  I listened -- I'm not splitting hairs

14   here, but I've listened to Mr. Dean's audio recording that was

15   given to us in *Jencks*.  I don't recall Joe Green's name being

16   mentioned in that.

17   And I don't -- I'm just telling you what I recall.

18   I'm not saying it's not there, because we've had a phenomenal

19   amount of information to digest, as the Court knows.  And I

20   don't remember Mr. Green's name being mentioned in Mr. Creel's

21   audio statement that was given to us.

22   And because it's not in the indictment, we would stand

23   on our previous objection.

24   **THE COURT:**  Okay.  What do you say, Mr. Sumrall?

25   **MR. SUMRALL:**  Your Honor, I just say that I do not

1  recall knowing of Mr. Green's name or seeing that.  I'm not
2  going to dispute that it was -- may have been produced, but,
3  like we said, it was so voluminous that there's just -- was no
4  way for us to know everything.

5          **THE COURT**:  Very well.  The Court takes all of the
6  statements and arguments -- you may have a seat, please,
7  ma'am -- into account in addressing this matter.

8          The Court notes that Overt Act (d) on page 15 of the
9  indictment reads as follows:  "On or about July 11th, 2010,
10  Frank George Owens, Jr., also known as State Raised, and Eric
11  Glenn Parker, and others known and unknown to the grand jury,
12  lured and maimed a subordinate gang member whom the ABM
13  believed had violated gang rules."

14          And then the next numbered overt act:  "From at least
15  in or about October 2010 through on or about December 3, 2010,
16  Frank George Owens, Jr., also known as State Raised, and others
17  known and unknown to the grand jury, ordered a KOS against
18  Michael Hudson, a subordinate gang member whom the ABM believed
19  had violated gang rules and failed to pay a debt owed to Eric
20  Glenn Parker."

21          Now, the Court considers and takes into account
22  everything that's been stated relative to the defendant's
23  objection.  The Court, in reading paragraphs (d) and (e) of the
24  overt act, sees how the defendants could read paragraph (d) and
25  then (e) and be of the opinion that it all pertained to the --

1  Michael Hudson.

2  The Court feels that perhaps in this voluminous

3  indictment that the defendants could very easily be confused

4  and misled.  And, really, there's no logical reason the Court

5  can ascertain why the name Joe Green was not included in

6  paragraph (d) of this indictment.

7  Accordingly, in order to avoid confusion,

8  misunderstanding, and so forth, particularly in regard to the

9  pleading and discovery matters produced in this case, the Court

10  is going to sustain the objection and instruct the jury to

11  disregard any testimony concerning Joe Green.

12  And, thus, the government spells out 31 -- I believe

13  31 overt acts, and this will exclude one.

14  If we could have the jury, please.

15  (JURY IN.)

16  **THE COURT:**  Okay.  Everybody in the courtroom may be

17  seated.

18  Ladies and gentlemen of the jury, after you were

19  excused from the courtroom, the Court took up a matter of an

20  objection made by the defendants relative to certain testimony

21  concerning an alleged assault on a man named Joe Green.

22  The Court has reviewed the indictment, the pleadings

23  in the case, and certain evidentiary matters that were produced

24  to the defendant.  The Court is of the opinion, in order to

25  avoid confusion and misunderstanding, that the jury should

1    disregard any testimony concerning an assault on a man named

2    Joe Green.  That's the ruling of the Court.  Disregard that

3    testimony.

4         Now, the Defendant Owens through Attorney Sumrall may

5    proceed with cross-examination of this witness.

6                          **CROSS-EXAMINATION**

7    **BY MR. SUMRALL:**

8    **Q.**    Good afternoon, Mr. Dean.

9    **A.**    Good afternoon.

10   **Q.**    You became a member of the Aryan Brotherhood, I believe

11   you said, in 2005; is that correct?

12   **A.**    Yes, sir.

13   **Q.**    And that was when you were in Parchman?

14   **A.**    Yes, sir.

15   **Q.**    Now, according to the constitution of the Aryan

16   Brotherhood, you have three wheel members or spokes; is that

17   correct?

18   **A.**    Yes, sir.

19   **Q.**    And they're over everybody in the state, right?

20   **A.**    Yes, sir.

21   **Q.**    And then, under that, you have a state captain?

22   **A.**    Yes, sir.

23   **Q.**    He's over the State of Mississippi, right?

24   **A.**    Yes, sir.

25   **Q.**    And under him, you have your area captains.  North area,

1  central area, and south area, right?

2  **A.**    Yes, sir.

3  **Q.**    Three different divisions?

4  **A.**    Yes, sir.

5  **Q.**    Okay.  And under that, you have your zone captains for

6  each one of the areas; is that right?

7  **A.**    Yes, sir.

8  **Q.**    Okay.  Now, in 2010, Eric Parker was an area captain, was

9  he not?

10 **A.**    Yes, sir.

11 **Q.**    And that would be right under the state captain, right?

12 **A.**    I believe so.

13 **Q.**    Okay.  And then, at that time, Frankie Owens was a zone

14 captain, was he not?

15 **A.**    Yes, sir.

16 **Q.**    All right.  So there's a distinction between Eric

17 Parker's captaincy and Frankie Owens' captaincy, right?

18 **A.**    Yes, sir.

19 **Q.**    Okay.  And then I believe under that you said there was a

20 lieutenant, right?

21 **A.**    First lieutenant, second lieutenant, and so forth.

22 **Q.**    Okay.  And then a sergeant-at-arms; is that correct?

23 **A.**    Yes, sir.

24 **Q.**    And you -- in the latter part of 2010, you were the

25 sergeant-at-arms for the southern district, were you not?

1    **A.**    Yes, sir.

2    **Q.**    Now, I believe you also said that any order of any kind

3    of punishment had to come down from the wheels; is that

4    correct?

5    **A.**    That's my understanding.

6    **Q.**    Okay.  So that's what you lived by at that time; is that

7    right?

8    **A.**    Yes, sir.

9    **Q.**    And there was never a KOS issued on Michael Hudson, was

10   there?

11   **A.**    I believe there was.

12   **Q.**    Wasn't it an SOS, smash on sight?

13   **A.**    That's what it originally started out with.

14   **Q.**    Okay.

15   **A.**    First, it started out as a violation.

16   **Q.**    Started out as a violation?

17   **A.**    Yes, sir.

18   **Q.**    And then I believe you said that you tried to get him to

19   meet with you one time and he wouldn't show up, right?

20   **A.**    Yes, sir.

21   **Q.**    And, at that time, it was an SOS, was it not?

22   **A.**    Yes, sir.

23   **Q.**    Okay.  And, at that time, shortly thereafter, you saw him

24   in Louisiana, right?

25   **A.**    Yes, sir.

1  **Q.**  And you didn't do anything at that time, right?

2  **A.**  No, sir.

3  **Q.**  According to the constitution, you were supposed to smash

4  him as soon as you saw him, weren't you?

5  **A.**  Yes, sir.

6  **Q.**  So you were in violation, were you not?

7  **A.**  Yes, sir.

8  **Q.**  As sergeant-at-arms, that was your job, was to violate --

9  do the smashing, was it not?

10  **A.**  Yes, sir.

11  **Q.**  Okay.  Now, in December of 2010, when you got with

12  Michael Hudson, you and, I believe you said --

13  **A.**  Sonny Maxwell.

14  **Q.**  -- Sonny Maxwell, when -- you got him and told him he was

15  cooking dope, and that was what you lured him with?

16  **A.**  Yes, sir.

17  **Q.**  Okay.  Now, you told this jury a minute ago that you

18  didn't think it was right, right?

19  **A.**  No, sir.

20  **Q.**  Okay.  But you still participated in it the second time,

21  did you not?

22  **A.**  Yes, sir.

23  **Q.**  And you took him to Wendell Eaves' house, did you not?

24  **A.**  Yes, sir.

25  **Q.**  Now, you were familiar with Wendell Eaves' house, weren't

1   you?

2   **A.**   Yes, sir.

3   **Q.**   Matter of fact, you had had minutes with another member,

4   had you not?

5   **A.**   Yes, sir.

6   **Q.**   I believe that guy was Jimmy Dale, was it not?

7   **A.**   Jimmy something or other.

8   **Q.**   And what do you mean by "having minutes with"?

9   **A.**   Going two minutes.

10  **Q.**   Okay.  What does that mean?

11  **A.**   I beat his ass.

12  **Q.**   Okay.  And you did that, did you not, as

13  sergeant-at-arms?

14  **A.**   Yes, sir.

15  **Q.**   Right?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  Now, who was the wheel in 2000 -- who were the

18  wheels in 2010?

19  **A.**   Brandon Creel.  I'm not for sure who the other two

20  members were.

21  **Q.**   Well, Brandon Creel was basically over the southern

22  region?

23  **A.**   Yes, sir.

24  **Q.**   Okay.  Are you familiar with him?

25  **A.**   I know him.

1   **Q.**   Okay.  Do you know him to be a liar?

2   **A.**   I believe everybody is a liar.

3   **Q.**   But I'm asking you specifically about Mr. Creel.

4   **A.**   I believe he's a liar.

5   **Q.**   Okay.  Matter of fact, he told y'all a lot of things that

6   weren't true, didn't he?

7   **A.**   I have no idea.

8   **Q.**   You don't know?

9   **A.**   No.

10   **Q.**   Okay.  All right.  Let's go back to the night that you

11   say you took Michael Hudson to Mr. Eaves' house.  When you

12   picked him up, you were in Maxwell's truck, right?

13   **A.**   Yes, sir.

14   **Q.**   You put him in the middle?

15   **A.**   Yes, sir.  Well, I got out, and he got in.

16   **Q.**   All right.  He got in the middle.  There's no way he

17   could have gotten out then at that point, was there?

18   **A.**   I mean, he could have tried.

19   **Q.**   But he wasn't going to be successful, was he?

20   **A.**   I don't know.

21   **Q.**   But the purpose of putting him in the middle is so he

22   couldn't get out, wasn't it?

23   **A.**   No.  I just like riding in the window seat.

24   **Q.**   Now, at this time, was Skip a meth head?

25   **A.**   He used.

1  **Q.**   Okay.  Did you use at this time?

2  **A.**   Occasionally.

3  **Q.**   Occasionally.  Now, who was the state captain at this

4  time?

5  **A.**   I didn't meet him -- I didn't meet him until after -- I

6  didn't meet him until January.

7  **Q.**   Okay.  Who was -- who was the state captain in --

8  **A.**   In January, it was Thomas -- Thomas Parker.

9  **Q.**   Okay.  And that's whose house you met -- went to in

10  January?

11  **A.**   Yes, sir.

12  **Q.**   Okay.  Did you ever have any dealings with Eric Parker

13  prior to this?

14  **A.**   I seen him -- I've only seen Eric, like, three times.

15  **Q.**   Okay.  But you knew he was captain of the southern area?

16  **A.**   Yes, sir.

17  **Q.**   And you knew any order that came down had to come through

18  him, to Frank Owens, to you, is that correct, from the wheels?

19  **A.**   No.  Eric Parker and Frankie Owens, they -- they was

20  captains.  They was equal rank.  Their orders would come down

21  from the state captain, not one from the other.

22  **Q.**   Well, wasn't Parker southern captain?

23  **A.**   In the southern district, you had -- you had that side,

24  that side.  You had, like, Picayune and Hancock County.  Then

25  you got, like, Jackson County and Harrison County.  It was,

1   like, two different areas at the time.

2   **Q.**   Okay.  But wasn't Eric Parker head of the whole southern

3   district, the captain of the southern district?

4   **A.**   No.

5   **Q.**   He was not?

6   **A.**   Not at the time.

7   **Q.**   No, he wasn't?  Who was?

8   **A.**   There was two captains.

9   **Q.**   Two captains?

10  **A.**   Yeah.  They separated sometime.  I don't know when.

11  **Q.**   Okay.  Well --

12  **A.**   It used to be two captains.  Then it become one captain.

13  I -- I don't know.  Some kind of political shit.

14  **Q.**   Okay.  So you're saying that there was only -- there was

15  no southern district captain; is that right?

16  **A.**   There was two of them, but it wasn't -- I don't

17  understand it.  I'm not political.  It was -- you got the

18  north, south, and central.  And then the south was broke up

19  into two, I guess, units, I guess you'd call it.  You got --

20  you got six counties in the south, and it was broke up equally.

21  **Q.**   But you don't know really, do you?

22  **A.**   No, I don't.

23  **Q.**   You are just kind of guessing, aren't you?

24  **A.**   No, I'm not guessing.  I'm just telling you what I know.

25  **Q.**   All right.  At this time in 2010, you were the

1    sergeant-at-arms, were you not?

2    **A.**    Yes, sir.

3    **Q.**    And that basically is the enforcer of the rules, is it

4    not?

5    **A.**    Yes, sir.

6    **Q.**    So you brought Michael Hudson to Wendell Eaves' house,

7    right?

8    **A.**    Yes, sir.

9    **Q.**    And then you took him inside the house.  I believe you

10   said he was right behind you when you walked in?

11   **A.**    He was behind me, yes, sir.

12   **Q.**    Okay.  And then you went into the room -- the bedroom in

13   the back of the house?

14   **A.**    Yes, sir.

15   **Q.**    And it was you and Maxwell and Michael Hudson; is that

16   correct?

17   **A.**    Yes, sir.

18   **Q.**    And then you would lead this jury to believe that when

19   Frankie Owens and the others came in, that you just sat there

20   and watched?  Is that what you're telling the jury?

21   **A.**    That's what my job was.

22   **Q.**    That was your job, to watch?

23   **A.**    To observe.

24   **Q.**    I thought your job was to enforce?

25   **A.**    To observe.

1   **Q.**   The sergeant-at-arms wasn't supposed to enforce the
2   rules?
3   **A.**   That is enforcing the rules.  Appoint a brother to carry
4   out the --
5   **Q.**   So you -- who did you appoint to carry something out?
6   **A.**   I didn't.
7   **Q.**   But you just said that was your job?
8   **A.**   Yeah.  That's why we're here today.
9   **Q.**   So you want this jury to believe that you just stood by
10  and watched?
11  **A.**   Technically, I -- I ain't trying to get nobody to believe
12  nothing.  I'm telling you the facts of what happened.
13  **Q.**   You're telling me the facts the way you remember them
14  that best suits your predicament, right?
15  **A.**   I'm doing 20 years.  I ain't suiting myself for nothing.
16  **Q.**   20 years is better than a life sentence, though, isn't
17  it?
18  **A.**   Not really.
19  **Q.**   Not really.  So, at this time, you sat there and watched.
20  You said Frankie Owens and all of the others had clubs; is that
21  correct?
22  **A.**   Yes, sir.
23  **Q.**   Okay.  So how many people had clubs?
24  **A.**   Frankie Owens, Wendell, and Thomas Burrus.
25  **Q.**   Okay.  And you say all of them hit him -- hit Michael

1  Hudson; is that correct?

2  **A.**  I'm pretty sure they did.

3  **Q.**  Huh?

4  **A.**  I'm pretty sure they did.

5  **Q.**  Pretty sure they did.  Now, Sonny Maxwell at that time

6  was your prospect, was he not?

7  **A.**  Yes, sir.

8  **Q.**  And that's the way he was supposed to earn his patch, was

9  it not, was the SOS?

10  **A.**  Pick -- pick up -- Skip up and carry him to Wendell's

11  house, assault him, yes.

12  **Q.**  Now, I believe you stated that all orders came down from

13  the wheels; is that correct?

14  **A.**  That was my understanding.

15  **Q.**  Okay.  So if it was an order to kidnap Michael Hudson, it

16  came down from a wheel, correct?

17  **A.**  That's what I was led to believe.

18  **Q.**  And if there was an order for an SOS, it came down from a

19  wheel, did it not?

20  **A.**  Yes, sir.

21  **Q.**  And if there was any other type of order to carry out on

22  Michael Hudson, it came from a wheel, right?

23  **A.**  Yes, sir.

24  **Q.**  Now, I believe you stated that in 2009 you were

25  cooperating with the FBI; is that correct?

1   **A.**   Yes, sir.

2   **Q.**   And that was in violation of the rules, was it not --

3   **A.**   Yes, sir.

4   **Q.**   -- of the Aryan Brotherhood?

5   **A.**   Yes, sir.

6   **Q.**   So you were basically going to be a marked man if anybody

7   found out about that, weren't you?

8   **A.**   That's why I was trying to get out of the brotherhood.

9   **Q.**   Okay.  But yet, you were still in it in 2010, weren't

10   you?

11   **A.**   Yes, sir.

12   **Q.**   And when all of this started happening, you didn't go to

13   the FBI with this, did you?

14   **A.**   No, sir.

15   **Q.**   Now, when you joined the brotherhood in 2005, you took an

16   oath, didn't you?

17   **A.**   Yes, sir.

18   **Q.**   The same oath you took today, didn't you?

19   **A.**   No, it's different.

20   **Q.**   Different?

21   **A.**   Yeah.

22   **Q.**   What's the difference with an oath?  Tell me what the

23   difference in that oath and this oath today is.

24   **A.**   Because one's on a Bible and one ain't shit.

25   **Q.**   And which is which?

1  **A.**   You know exactly which one is which.

2  **Q.**   Well, I want you to tell this jury which one you --

3  **A.**   I'm a Christian.  That's why I didn't kill the man.

4         **MR. SUMRALL:**  Court's indulgence.

5      (CONFERRING OFF THE RECORD.)

6         **MR. SUMRALL:**  No further questions, Your Honor.

7         **THE COURT:**  Okay.  Mr. Turner, on behalf of Defendant

8  Parker, you may cross-examine.

9                    <u>**CROSS-EXAMINATION**</u>

10 <u>**BY MR. TURNER:**</u>

11 **Q.**   Mr. Dean, my name is Joshua Turner.

12 **A.**   How are you doing?

13 **Q.**   When Mr. Leary was asking you some questions at the

14 outset, you said something about one of your convictions had to

15 do with some kind of robbery, and I couldn't hear you.  It's

16 probably my fault.  What was that?

17 **A.**   Aggravated robbery.

18 **Q.**   Aggravated robbery.  What happened in that case?

19 **A.**   I kicked a dope house door in.

20 **Q.**   You kicked what door in?

21 **A.**   A dope house.

22 **Q.**   A dope house?

23 **A.**   I robbed a dope man.

24 **Q.**   Were you trying to get drugs?

25 **A.**   No, I was wanting money.  I didn't think he'd call the

1   police.

2   **Q.**   And then a burglary in 2003.  What happened in that case?

3   **A.**   I stole a bunch of guns.

4   **Q.**   How many?

5   **A.**   As many as I could fit in the van.  I don't know.

6   **Q.**   More than ten?

7   **A.**   Yes, sir.  Probably around about 60.

8   **Q.**   There was a burglary in 2006.  Who did you burglarize

9   then?

10  **A.**   I was innocent.

11  **Q.**   Were you found not guilty?

12  **A.**   No, I just pled guilty.

13  **Q.**   Who were you accused of -- well, if you pled guilty, what

14  were you accused of?

15          **MR. LEARY:**  Your Honor, I object.  Can we approach for

16  a moment?

17          **THE COURT:**  Okay.  Come up.

18      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

19          **MR. LEARY:**  Your Honor, defense counsel is allowed to

20  go into his prior criminal convictions.  He's not allowed to go

21  into the underlying facts and circumstances of all of the prior

22  convictions.

23          **THE COURT:**  Yes, that's correct.  You ask him about

24  his prior convictions.

25          **MR. TURNER:**  Yes, Your Honor.  He said he was a good

1  Christian man.  I wanted to know how Christian he was.  I think

2  I'm entitled to inquire about his credibility.

3          **THE COURT:**  Ask him about his prior convictions.

4          **MR. TURNER:**  Yes, sir.

5      (END OF BENCH CONFERENCE.)

6          **MR. TURNER:**  May I proceed, Your Honor?

7          **THE COURT:**  Yes, sir.

8  **BY MR. TURNER:**

9  **Q.**   Aggravated robbery in '97, burglary 2003, burglary 2006,

10  possession of firearm by a felon in 2011, and then -- again,

11  it's my fault for not hearing you correctly -- something about

12  a meth lab in 2012.  What was that?

13  **A.**   It was -- it was just a box of Sudafed.  It's called

14  operation and creation of clandestine lab.

15  **Q.**   Okay.  Were you cooking methamphetamines at the time?

16  **A.**   I was going to.

17  **Q.**   Okay.  Did you frequently cook methamphetamines in 2012?

18  **A.**   Probably -- from February of 2011 to February 2012, I

19  probably cooked, like, every other night.

20  **Q.**   Every other night?

21  **A.**   Yes, sir.

22  **Q.**   How many ounces of methamphetamines did you create?

23  **A.**   I was probably getting 10 grams a night.

24  **Q.**   Now, I'm going last here, so I'm not going to have to ask

25  you as many questions, but how frequently did you use

1  methamphetamine?

2  **A.**    I didn't even like it.  I mean, I just -- I don't know.

3  I don't know.  Not much.

4  **Q.**    I mean, have you used it more than ten times?

5  **A.**    Yeah.

6  **Q.**    More than fifty times?

7  **A.**    Probably not.

8  **Q.**    Okay.  Have you used any other drugs?

9  **A.**    I'm a pothead.

10  **Q.**    You like to smoke pot?

11  **A.**    Yes, sir.

12  **Q.**    How frequently?

13  **A.**    I'd smoke one right now if you had it.

14  **Q.**    I understand.

15  **A.**    Every chance I get.

16  **Q.**    Any other drugs?

17  **A.**    No, sir.

18  **Q.**    Would you agree with me that methamphetamine has some

19  effect on your judgment?

20  **A.**    No, I wouldn't say that.

21  **Q.**    Would you agree that marijuana has some effects on your

22  judgment?

23  **A.**    I wouldn't say that neither.

24  **Q.**    Were you using or had you used either of those on the day

25  that you kidnapped Skip?

1    **A.**    I might have smoked a joint, but I didn't use meth, I

2    know.

3    **Q.**    This is your second time to cooperate with the

4    government, is it not?

5    **A.**    Yes, sir.

6    **Q.**    The first time, why did you cooperate?

7    **A.**    It was somebody offered to pay me to kill somebody.

8    **Q.**    Somebody offered to pay you to kill somebody?

9    **A.**    Yes, sir.

10   **Q.**    Did you go to the government with that information?

11   **A.**    I went to the FBI.

12   **Q.**    They didn't come to you?

13   **A.**    No, sir.

14   **Q.**    In this case, you didn't go to the government, did you?

15   **A.**    Yes, I did.

16   **Q.**    You did?

17   **A.**    Yes, sir.

18   **Q.**    Okay.  So you're a professional cooperating witness; is

19   that right?

20   **A.**    I wouldn't call it professional.

21   **Q.**    Well, you're doing this to help yourself out to some

22   extent, correct?

23   **A.**    The first time I did it to help myself.  The second time

24   I did it because it was righteous.

25   **Q.**    Okay.  Well, would you say somebody with -- you've had a

1  long criminal history, correct?

2  **A.**   Yes, sir.

3  **Q.**   When you said something about being a good Christian

4  earlier, you'd have to agree with me that that's not

5  necessarily being a good Christian, right?

6  **A.**   Well, we're all sinners.

7  **Q.**   We are.  We are.  Some of those sins are different,

8  though, aren't they?

9  **A.**   Not in the eyes of the Lord.

10  **Q.**   Okay.

11  **A.**   They're all the same.

12  **Q.**   So you can -- excuse me.  You have cooperated with the

13  federal government two times, right?

14  **A.**   (Nods head up and down.)

15  **Q.**   Have you ever -- I'm sorry.  I can't --

16  **A.**   Yes, sir.

17  **Q.**   Okay.  The court reporter will get upset with us if we

18  don't speak out loud.

19  **A.**   Yes, sir.

20  **Q.**   Have you ever cooperated with the state government?

21  **A.**   If one of them asks me questions, I answer them.

22  **Q.**   Okay.  Have you ever cut what I -- this is a plea deal

23  that you have with the government for your testimony today,

24  correct?

25          **THE COURT**:  Okay.  Ask questions.  The testimony is to

1   come from the witness, please, sir.

2           MR. TURNER:  Yes, Your Honor.

3   BY MR. TURNER:

4   Q.   You lured Skip, Michael Hudson, to Wendell Eaves' house,

5   correct?

6   A.   Yes, sir.

7   Q.   With the intent that -- at least you told him you were

8   going to cook meth there, correct?

9   A.   Blue told him that.  I never talked to him.

10  Q.   You said you went with Mr. Owens to Mr. Creel's once and

11  purchased methamphetamines there, correct?

12  A.   I rode with him to pick some up, yes.  We actually went

13  with T-Bone.

14  Q.   Okay.  There's been a lot of talk of tattoos in this

15  case.  Do you have tattoos on your body?

16  A.   Yes, sir.

17  Q.   Forgive me if I'm asking a question that the government

18  asked, but do you have anything on your body currently showing

19  that you are an Aryan Brotherhood member?

20  A.   I covered them all up.

21  Q.   Okay.  Are they on your arms?

22  A.   Yes, sir.

23  Q.   I noticed that you are wearing a long-sleeved shirt.  Is

24  that to cover up --

25  A.   They're right there (indicating).  I covered them up.

1  Q.    Okay.  When did you do that?

2  A.    2014.

3          MR. TURNER:  Court's indulgence, Your Honor.

4          THE COURT:  Yes, sir.

5       (CONFERRING OFF THE RECORD.)

6          MR. TURNER:  Just a few more questions, Your Honor.

7  May I proceed?

8          THE COURT:  Yes, sir.

9  BY MR. TURNER:

10 Q.    Mr. Dean, you said you've only -- well, let me ask you

11 this question.  How many times did you see Eric Parker in 2011?

12 A.    In 2011?

13 Q.    Yes, sir.

14 A.    I didn't.

15 Q.    I'm sorry?

16 A.    I didn't see him in 2011.

17 Q.    Okay.  How many times did you see Eric Parker in 2012?

18 A.    I didn't.

19 Q.    How many times did you see Eric Parker in 2013?

20 A.    I didn't.

21 Q.    How many times did you see Eric Parker in 2014?

22 A.    I didn't.

23 Q.    How many times did you see Eric Parker in 2015?

24 A.    Once.

25 Q.    Thank you very much.

1          **MR. TURNER:**  That's all I have, Your Honor.

2          **THE COURT:**  Redirect.

3                          **REDIRECT EXAMINATION**

4    **BY MR. LEARY:**

5    **Q.**    Mr. Dean, you were released from jail in 2009?

6    **A.**    June 19th.

7    **Q.**    When did you go back?

8    **A.**    I went to Louisiana.  It was March the 9th, 2012.

9    **Q.**    March 9th, 2012?

10   **A.**    Yes, sir.

11   **Q.**    And where were you?

12   **A.**    St. Tammany Parish.

13   **Q.**    Louisiana?

14   **A.**    Yes, sir.

15   **Q.**    If you were going to see Eric Parker, where would he have

16   had to been?

17   **A.**    He would have had to been in jail, I guess.

18          **MR. LEARY:**  No further questions.

19          **THE COURT:**  Okay.  This witness is excused.

20          **MR. LEARY:**  Yes, Your Honor.

21          **THE COURT:**  He's remanded to the custody of the United

22   States Marshal.

23          **THE WITNESS:**  Thank you, sir.

24          **THE COURT:**  Yes, sir.

25          Okay.  Your next witness, Mr. Leary?

1      **MR. LEARY:** Walter Burrus, Your Honor.

2      **THE COURT:** Very well. Is he in custody?

3      **MR. LEARY:** Yes, Your Honor.

4      **THE COURT:** Okay. Wait a minute, Mr. Burrus.

5      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

6      **COURTROOM DEPUTY:** Please take a seat in the witness

7      stand and state your name for the record.

8      **THE WITNESS:** My name is Walter Thomas Burrus.

9      **WALTER THOMAS BURRUS, GOVERNMENT'S WITNESS, AFTER BEING DULY**

10     **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

11     <u>DIRECT EXAMINATION</u>

12     <u>BY MR. LEARY:</u>

13     **Q.**    Scoot up. You and I are going to talk here. I'm going

14     to ask you some questions, Mr. Burrus, okay?

15     **A.**    (Nods head up and down.)

16     **Q.**    I'm probably going to ask you to say yes or no when I ask

17     you questions. Nodding, the court reporter can't get it. Does

18     that make sense?

19     **A.**    Yes, sir.

20     **Q.**    Mr. Burrus, how old are you?

21     **A.**    I'm 46.

22     **Q.**    Do you have a street name?

23     **A.**    Street name, I'm T-Bone.

24     **Q.**    Where are you from, Mr. Burrus? Where were you born?

25     **A.**    Gulfport, Mississippi.

1    **Q.**   And where were you raised?

2    **A.**   Gulfport.

3    **Q.**   And tell me about your family.  How were you raised, your

4    mother and father?

5    **A.**   Yeah, I had a mother and father.  Eight siblings.

6    **Q.**   Eight children.  You were one of eight?

7    **A.**   I'm one of eight.

8    **Q.**   How much education did you get, Mr. Burrus?

9    **A.**   Eighth grade.

10   **Q.**   And what did you do after eighth grade?

11   **A.**   I went into roofing, doing construction work.

12   **Q.**   Okay.  And did you continue that work most of your life?

13   **A.**   Yes, sir.

14   **Q.**   Now, Mr. Burrus, do you have a criminal history?

15   **A.**   Yes, I do.

16   **Q.**   And how many felonies do you have?

17   **A.**   I have one prior.

18   **Q.**   One prior felony?

19   **A.**   (Nods head up and down.)

20   **Q.**   And about when was that?

21   **A.**   2002.

22   **Q.**   And when were you convicted, or when did you go to jail?

23   **A.**   2005.

24   **Q.**   And what was that felony for?

25   **A.**   Methamphetamine and cocaine.

1   **Q.**   Okay.  When did you start using methamphetamine,

2   Mr. Burrus?

3   **A.**   Around 19, 20.

4   **Q.**   Okay.  And you continued using methamphetamine through --

5   **A.**   2014.

6   **Q.**   Until you were arrested in this case?

7   **A.**   Yes, sir.

8   **Q.**   Methamphetamine play a bad role in your life?

9   **A.**   Yes, sir.  Yeah.  It --

10   **Q.**   Before you went to jail -- in what year, 2005 --

11   **A.**   Yes, sir.

12   **Q.**   -- had you served any significant time in prison before?

13   **A.**   No, sir.

14   **Q.**   Were you familiar with what prison life would be like?

15   **A.**   No, sir.

16   **Q.**   Was prison life what you expected it to be?

17   **A.**   Not really.

18   **Q.**   When did you join the Aryan Brotherhood, Mr. Burrus?

19   **A.**   In 2005.

20   **Q.**   Why did you join the Aryan Brotherhood?

21   **A.**   I was -- basically for protection.

22   **Q.**   Were you scared in prison?

23   **A.**   I was 30 -- my early 30s and didn't know what prison was

24   like or what it was about or nothing, and I was informed that

25   if you wasn't affiliated, you know, then you get pretty much

1    walked on and treated any ole way, you know.  So that's why I

2    joined.

3    **Q.**    Are you a big man?

4    **A.**    No, sir.

5    **Q.**    How tall are you?

6    **A.**    5'4''.

7    **Q.**    Did joining the Aryan Brotherhood provide protection for

8    you?

9    **A.**    Pretty much, but it really wasn't like I needed it --

10   **Q.**    Okay.

11   **A.**    -- once I got there.  It wasn't -- it wasn't like I

12   needed no protection.

13   **Q.**    So it wasn't as bad as you thought it would be?

14   **A.**    No, sir.

15   **Q.**    Well, just frankly speaking, when you were incarcerated

16   with your Aryan Brotherhood brothers, did -- was it a violent

17   organization or not?

18   **A.**    When I was incarcerated, it wasn't.

19   **Q.**    What was it like in the free world?

20   **A.**    It was pretty rough, pretty violent.

21   **Q.**    Did you actually create friendships with the Aryan

22   Brotherhood members while you were incarcerated?

23   **A.**    Oh, yes, sir.

24   **Q.**    Did you have any health issues while you were

25   incarcerated?

1   **A.**    Yeah, I had a triple bypass, open heart surgery.

2   **Q.**    Where does that -- while you're incarcerated, where does

3   that take place?

4   **A.**    They took me to a free world hospital, Forrest General,

5   in Hattiesburg.

6   **Q.**    And after your open heart surgery, what did they do with

7   you?

8   **A.**    Put me right back in population four days later.

9   **Q.**    Who took care of you after you got back to general

10  population?

11  **A.**    One of my Aryan Brotherhood brothers.

12  **Q.**    Was that just a little bit of help or extensive help?

13  **A.**    I call it extensive help.  The man washed my clothes for

14  me.  He helped me get dressed every day.  He helped me put my

15  shoes on.  He pushed me back and forth in a wheelchair to the

16  chow hall.

17        **MR. TURNER:**  Your Honor, I object to the relevance of

18  this at this time.

19        **MR. LEARY:**  I'll move on, Your Honor.

20  **BY MR. LEARY:**

21  **Q.**    Now, Mr. Burrus, have you pled guilty in this case?

22  **A.**    Yes, I did.

23  **Q.**    And what did you plead guilty to?

24  **A.**    Kidnapping.

25  **Q.**    Did you do it?

1   A.   Yeah.

2   Q.   Who did you kidnap?

3   A.   That's why I pled guilty.

4   Q.   That's right.  Who did you kidnap?

5   A.   Michael Hudson.

6   Q.   Have you pled guilty in this case?

7   A.   Did I plead guilty?

8   Q.   Uh-huh.

9   A.   Yes, sir.

10  Q.   How much time did you get?

11  A.   210 months.  That's 17 1/2 years.

12  Q.   So that decision you made kidnapping Michael Hudson cost

13  you how much time?

14  A.   17 1/2 years.

15  Q.   Now, in this particular case, have you cooperated with

16  the government?

17  A.   Yeah.

18  Q.   Well, let me ask you, do you remember the first time

19  law -- federal law enforcement officers came to talk to you?

20  A.   Yes, I do.

21  Q.   Where were you?

22  A.   At my house on my front porch.

23  Q.   Is that where they talked to you?

24  A.   Yes, sir.

25  Q.   On your front porch?

1  **A.**    Yes, sir.

2  **Q.**    Did you agree to talk to them?

3  **A.**    I served them Kool-Aid.

4  **Q.**    You served them Kool-Aid?

5  **A.**    Yes, sir.

6  **Q.**    Did you agree to talk to them?

7  **A.**    Yeah.

8  **Q.**    Did you tell them what happened?

9  **A.**    Yes, sir.

10  **Q.**    Did you have a lawyer at that point?

11  **A.**    No, sir.

12  **Q.**    Why did you talk to them if you didn't even have a

13  lawyer, Mr. Burrus?

14  **A.**    Well, I felt like that I did wrong, you know.  Somebody

15  got really hurt really bad.  And for their -- I don't know --

16  I'd say for the family's sake that, you know, I wanted it to

17  come on out and be over and done with so I wouldn't have to

18  look over my shoulder no more and feel bad.

19  **Q.**    Had you been looking over your shoulder?

20  **A.**    Yes, sir.

21  **Q.**    Why?

22  **A.**    Because I thought I would be next on the Aryan

23  Brotherhood's hit list.

24  **Q.**    Do you hope to receive some benefit for your cooperation,

25  Mr. Burrus?

1  **A.**   If the judge goes like it's -- yes, sir.  Yes, I do.

2  **Q.**   What do you got to do to receive any benefit?

3  **A.**   Tell the truth.

4  **Q.**   You signed up for witness protection?

5  **A.**   Yes, I did.

6  **Q.**   Okay.  Let's go back.  In 2005, you first joined the

7  what, Mr. Burrus?

8  **A.**   The Aryan Brotherhood of Mississippi.

9  **Q.**   Did you ever raise -- did you ever rise to any rank?

10  **A.**   No, sir, just soldier.

11  **Q.**   Just soldier.  Did you ever -- were you ever any -- a

12  captain or anything for a short period of time or anything like

13  that?

14  **A.**   Yeah, I was appointed captain for a few weeks while we --

15  another captain got brought down or he got -- I believe he was

16  in prison.  He got out.  So I was waiting on him to get out.

17  **Q.**   When you went into jail 2005, when did you get out,

18  Mr. Burrus?

19  **A.**   November the 4th, 2008.

20  **Q.**   2008.  Why did you affiliate back with the Aryan

21  Brotherhood in 2008 when you got in the free world?

22  **A.**   Well, I took and -- I received a phone call from the guy

23  who took care of me while I was in -- after I got out of

24  surgery.  And he told me a few brothers are getting together,

25  you know, just for -- you know, have a good time.  In other

words, just shoot -- shoot the day off, you know.  So I told
him I'll come over.

So I went over there.  When I got over there, it was a
meeting, what we call church.  And they said they needed to
pull a violation on another brother.  Wanted to know if I knew
of anywhere we can go.

**Q.**    Let's don't talk about that right now, but that's what
happened at the church meeting?

**A.**    Yes, sir.

**Q.**    From that point forward, were you active in the free
world with the ABs?

**A.**    Yes, I was.

**Q.**    Did you continue to work, or did you --

**A.**    Yeah, I worked.

**Q.**    And what did you do?

**A.**    I did roofing work, construction, remodel.

**Q.**    Okay.  Was this after you got out of jail?

**A.**    Yes.

**Q.**    Do you know Frankie Owens?

**A.**    Yes, I do.

**Q.**    Do you know who Eric Parker is?

**A.**    Yes, I do.

**Q.**    Do you see him in the courtroom?

**A.**    Yes, I do.

**Q.**    Tell me who Frankie Owens is.

1    **A.**    The gentleman sitting over here on the corner wearing

2    glasses.  He's bald-headed.

3    **Q.**    Okay.  And can you show me who Eric Parker is?

4    **A.**    The dark-headed gentleman.

5    **Q.**    And what color is Eric Parker's shirt?

6    **A.**    It's black -- I can't see his shirt.

7    **Q.**    Stand up.

8            **THE COURT:**  Stand up.

9    **A.**    White.

10            **MR. LEARY:**  Okay.  Your Honor, I'd like the record to

11   reflect that Mr. Burrus has identified Mr. Parker and

12   Mr. Owens.

13            **THE COURT:**  So reflect.

14   **BY MR. LEARY:**

15   **Q.**    In 2010, Mr. Burrus, what was Frankie Owens' rank?

16   **A.**    He was an area captain.

17   **Q.**    And who was Frankie Owens living with?

18   **A.**    Mitchell Valentine.

19   **Q.**    Do you have personal knowledge of Frankie Owens obtaining

20   methamphetamine during this time frame?

21   **A.**    Yes, I do.

22   **Q.**    Okay.  Tell me about it.

23   **A.**    Well, I gave him a few rides.  I picked up some

24   methamphetamines a few times.  I've done some --

25   **Q.**    Okay.  Who was he picking them up for?

1  **A.**    -- done some with him.

2  **Q.**    I'm sorry.

3  **A.**    I done -- I said I done some meth with him.

4  **Q.**    Okay.  Where did you take him to obtain methamphetamine?

5  **A.**    Brandon Creel's.

6  **Q.**    Okay.  What about Eric Parker, did you ever have any

7  dealings with Eric Parker?

8         **MR. TURNER:**  Object to the leading, Your Honor.

9         **THE COURT:**  Okay.  Overruled.  What, if any,

10  experience did you have with Mr. Parker?

11  **BY MR. LEARY:**

12  **Q.**    What, if any, experience did you have with Eric Parker?

13  **A.**    I was going out of town one time, and I got some

14  methamphetamines from a brother who -- he was selling

15  methamphetamines for Eric Parker.

16  **Q.**    And was the methamphetamine good or was it bad?

17  **A.**    No, it was bad.

18  **Q.**    What does *bad methamphetamine* mean?

19  **A.**    It means it was stepped on, cut up with some other stuff

20  that wasn't methamphetamines.

21  **Q.**    And how did you feel about that?

22  **A.**    I was angry.

23  **Q.**    Did you -- and who did you make contact with when you got

24  back?

25  **A.**    Eric Parker.

1  **Q.**  And what did you tell Eric Parker?

2  **A.**  That I wanted my money back or either some good

3  methamphetamine.

4  **Q.**  What did Eric Parker agree to do for you?

5  **A.**  Make it right.

6  **Q.**  And what did he do?

7  **A.**  Well, when I got back, I met him out at the casino and --

8        **MR. TURNER:**  Objection, Your Honor.  May we approach?

9     (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

10        **MR. TURNER:**  Your Honor, just as in this incident with

11  Joe Green, this is not one of the overt acts listed.  He's not

12  charged with distribution of methamphetamines in the Northern

13  District of Mississippi.

14        **MR. LEARY:**  Your Honor, I just don't know what to say.

15  It's a RICO indictment.  It's a conspiracy.

16        **THE COURT:**  Okay.  The objection is overruled.

17     (END OF BENCH CONFERENCE.)

18        **MR. LEARY:**  May I proceed, Your Honor?

19        **THE COURT:**  Yes, sir.

20  **BY MR. LEARY:**

21  **Q.**  After you obtained the stepped-on meth from Eric Parker,

22  where did you meet with him next time?

23  **A.**  I got the meth from -- from JD --

24  **Q.**  Okay.

25  **A.**  -- right outside of Petal.

1  **Q.**    Okay.

2  **A.**    And then I met Eric Parker to get the good meth in

3  Biloxi, Mississippi, at the casino.

4  **Q.**    Okay.  And did he replace the bad meth with the good

5  meth?

6  **A.**    Yes, he did.

7  **Q.**    In the summer of 2010, Mr. Burrus, would you please tell

8  the ladies and gentlemen of the jury when the first church

9  meeting was where Eric -- where Michael Hudson's problems were

10  discussed?

11  **A.**    Mitchell Valentine's house.

12  **Q.**    Okay.  And about when was this meeting held?

13  **A.**    I'm going to say probably mid-summer -- beginning of the

14  summer, mid-summer 2010.

15  **Q.**    Who was at that church meeting?

16  **A.**    Frankie Owens, Mitchell Valentine, myself, James Dean, a

17  prospect that we call Blue, which was Sonny Maxwell, and

18  probably four or five others.

19  **Q.**    What did Frankie Owens say about Michael Hudson's drug

20  debt?

21  **A.**    He said he was going to have to pay it and make it right

22  one way or the other.

23  **Q.**    Who did Michael Hudson owe drug debt to?

24  **A.**    Eric Parker.

25  **Q.**    Did Hudson pay the drug debt to Eric Parker?

1   **A.**    Not that I'm aware of.

2   **Q.**    What's a violation?

3   **A.**    A violation is punishment that you'll get for doing wrong

4   or going against the rules.

5   **Q.**    What was decided should happen to Michael Hudson for not

6   paying the drug debt to Eric Parker?

7   **A.**    That he was going to give him the option of two to the

8   chest or -- I mean, 13 to the chest or two minutes with two

9   brothers.

10   **Q.**    Okay. Tell the ladies and gentlemen of the jury what 13

11   to the chest is.

12   **A.**    That's where you take and you back up against the wall or

13   a tree or something, and you hold your salute up, and you get

14   13 licks, 13 punches to the chest.

15   **Q.**    What happens if you drop your salute?

16   **A.**    Then everybody jumps on you.

17   **Q.**    And what's two for two?

18   **A.**    That's where you fight two other brothers for two

19   minutes, and if you fall on the ground or drop down on your

20   knee, then it stops, and then it -- until they can get back up,

21   and then it starts over, and it carries on for two full minutes

22   standing up.

23   **Q.**    That's what was decided to happen to Michael Hudson?

24   **A.**    Yeah. Well, he said -- Frankie said he was going to let

25   him decide on his -- on his own which one -- which he wanted to

1  do.

2  **Q.**   Who said that?

3  **A.**   Frankie Owens.

4  **Q.**   Did Michael Hudson ever show up for his violation?

5  **A.**   Not that I'm aware of.

6  **Q.**   How did Frankie Owens respond to Michael Hudson not

7  showing up for his violation?

8  **A.**   He was mad.  He was mad because he felt like he was lied

9  to.

10  **Q.**   What happened in early December of 2010 as it pertains to

11  Mr. Hudson?

12  **A.**   Excuse me?

13  **Q.**   What happened in early 2010 with Mr. Hudson?

14          **THE COURT:**  Wait a minute now.  It wasn't early 2010.

15  Your question was early December 2010.

16          **MR. LEARY:**  Oh, I'm sorry.  Yes, Your Honor.  Thank

17  you.

18          **THE COURT:**  Yes.  Okay.

19  **BY MR. LEARY:**

20  **Q.**   What happened in early December of 2010?

21  **A.**   The violation was -- was brought -- brought upon him, and

22  he was -- he was violated, and he was kidnapped.

23  **Q.**   Why was he kidnapped?

24  **A.**   Because Frankie decided to take him up to Eric Parker's

25  and let them two just finish out the violation.

1  **Q.**  Frankie decided to take him where, Mr. Burrus?

2  **A.**  To Eric Parker's in Petal.

3  **Q.**  Now, who is Sonny Maxwell?

4  **A.**  Sonny Maxwell was a prospect with the Aryan Brotherhood.

5  **Q.**  What's a blood-in mission, Mr. Burrus?

6  **A.**  That's where you draw blood upon somebody else to --

7  well, your blood.  You draw blood in battle.

8  **Q.**  What was Sonny Maxwell's blood-in mission?

9  **A.**  That would be to -- to assault Michael Hudson.

10  **Q.**  Did he get his brand after that?

11  **A.**  Yes, he did.

12  **Q.**  Do you recall the day that Michael Hudson was kidnapped?

13  **A.**  Yes, sir.

14  **Q.**  Where were you on the afternoon of December 3rd, 2010?

15  **A.**  I was at my house.

16  **Q.**  And where were you instructed to go?

17  **A.**  To Mitchell Valentine's.

18  **Q.**  Who told you to go to Mitchell Valentine's house?

19  **A.**  Frankie Owens.

20  **Q.**  Why did Frankie Owens tell you to go to Mitchell

21  Valentine's house?

22  **A.**  Because him and Mitchell needed a ride to go pull a

23  violation on Michael Hudson.

24  **Q.**  Is that how you got involved in this?

25  **A.**  Yes, sir.

1   **Q.**    What kind of car did you have?

2   **A.**    I was driving my girlfriend's Cobalt -- Chevy Cobalt.  A

3   2004, I believe.

4   **Q.**    Who did you go pick up?  Who did you go pick up?

5   **A.**    Frankie Owens and Mitchell Valentine.

6   **Q.**    And where did you drive them to?

7   **A.**    Wendell Eaves' house in Jackson County, Mississippi.

8   **Q.**    Why did you take Frankie Owens and Mitchell Valentine to

9   Wendell Eaves' house?

10   **A.**    To pull a violation on Michael Hudson.

11   **Q.**    Which Aryan Brotherhood member was responsible for

12   coordinating this attack on Michael Hudson?

13   **A.**    Frankie Owens.

14   **Q.**    What happened when you arrived at Wendell Eaves' trailer?

15   **A.**    Wendell Eaves' trailer?

16   **Q.**    Yes, sir.  What happened?

17   **A.**    We went in and said hey to him.  And Frankie Owens,

18   Mitchell Valentine, and myself, we went into one of the

19   bedrooms.  That's when I was informed on what we was going to

20   actually do by Frankie Owens.

21   **Q.**    Is that when you found out what was going to happen?

22   **A.**    Yes, it was.

23   **Q.**    Tell the ladies and gentlemen of the jury, when you walk

24   in the front door of Wendell Eaves' trailer, where was the

25   bedroom located?

1  **A.**   The bedroom where the violation took place?

2  **Q.**   Yes, sir.

3  **A.**   It was to the left all the way down to the very end of
4  the hall.

5  **Q.**   So you walk in and take a left?

6  **A.**   Yeah.

7  **Q.**   And you go all the way to the end of the hall?

8  **A.**   Yes, sir.

9  **Q.**   What did the bedroom look like?

10 **A.**   When you walked in, there was -- it's just a square small
11 room.  The bed was tilted up, leaned against the wall, and
12 there was a dresser over to one side.  The rest of the room was
13 cleared out, empty.

14 **Q.**   And who was in the room?

15 **A.**   When I went in the room, I was the last person in the
16 room.  And that would be Frankie Owens, Mitchell Valentine,
17 Sonny Maxwell, James Dean, myself, and Michael Hudson.

18 **Q.**   And Michael Hudson.  Was Michael Hudson assaulted?

19 **A.**   Yes, he was.

20 **Q.**   Tell the ladies and gentlemen of the jury what you saw.

21 **A.**   Like I said, I was last in the room, and when I came in
22 the room, everybody was already on the attack, going after
23 Michael Hudson.  He was in one far corner of the room, and
24 everybody just jumped on him and started beating him up.

25 **Q.**   Did you have a bat or club or anything?

1   **A.**   No, I did not.

2   **Q.**   What did Frankie Owens have?

3   **A.**   He had a billy club, small billy club.

4   **Q.**   What color was it?

5   **A.**   It was black.

6   **Q.**   Now, had you talked to Frankie Owens about this before,

7   about what was going to happen to Michael Hudson?

8   **A.**   Yes, sir, five minutes before it happened when I was

9   informed on what was going to take place.

10  **Q.**   Where did Frankie Owens tell you he was going to take

11  Michael Hudson?

12  **A.**   He said he was going to -- we're going to take him up to

13  Eric Parker's.

14  **Q.**   About how long was he beaten?

15  **A.**   It probably lasted about five minutes.  It didn't last

16  long before he was bound up and put in the trunk of the car.

17  **Q.**   Now, where did you go after he was beaten?

18  **A.**   After he was beaten --

19  **Q.**   Yeah.

20  **A.**   -- and put in the car?

21  **Q.**   Uh-huh.  Did you go outside?

22  **A.**   Yeah, I went out -- that's what I was going to say.  I

23  went out and opened the trunk of the car.  Frankie told me to

24  go open the trunk.  So I went out the back door.

25          When you walk out of the bedroom, the door to exit the

1   house was right there.  And I went -- my car was backed up

2   right there.  That's where I was instructed to park the car.

3       So when I went out the back door, it was right there.  I

4   reached in the door and popped the trunk.  When I turned around

5   to go back inside, they were already bringing him out to put

6   him in the trunk.

7   **Q.**   Okay.  Describe whether or not he was bound.

8   **A.**   He was bound.  He had his feet tied and his hands tied

9   like this (indicating).  They were completely behind his back.

10   **Q.**   His hands were bound behind his back?

11   **A.**   Yes, sir.

12   **Q.**   And his feet were bound?

13   **A.**   Yes, sir.

14   **Q.**   Who was carrying him out?

15   **A.**   Sonny Maxwell, Frankie Owens, and Mitchell Valentine.

16   **Q.**   Where did they throw his body?

17   **A.**   In the trunk of my car.

18   **Q.**   Now, after they threw Michael Hudson's body into the

19   trunk of your car, who got in your car?

20   **A.**   I got in the driver's seat.  Mitchell Valentine got in

21   the front passenger seat.  And Frankie Owens got in the rear

22   passenger seat.

23   **Q.**   Where did James Dean and Sonny Maxwell go?

24   **A.**   I believe they got in their truck -- Sonny Maxwell's

25   truck and followed us out a little ways, and then Frankie got a

1    phone call.  And I heard Frankie tell him, "Well, y'all just go

2    ahead.  If y'all ain't got the gas, you know, just go ahead on

3    home."  So they were following us to start with.

4    **Q.**    Where did you proceed to drive to at this point,

5    Mr. Burrus?

6    **A.**    Eric Parker's house.

7    **Q.**    Did you know how to get to Eric Parker's house?

8    **A.**    No, sir, I didn't.  I was only there one other time

9    before that.  And I got directions from Mitchell Valentine.

10   **Q.**    Where did Eric Parker live?

11   **A.**    In Petal, Mississippi.

12   **Q.**    About how long of a drive was that from Gautier,

13   Mississippi, where he was beaten to Petal?

14   **A.**    About 45 minutes.

15   **Q.**    And where was Michael Hudson during this entire time?

16   **A.**    In the trunk.

17   **Q.**    Was there discussion on the way up about the severity of

18   the beating?

19        **MR. TURNER:**  Object to the leading, Your Honor.

20   **A.**    Just -- just --

21        **THE COURT:**  Okay.  What discussions, if any, were --

22   took place on the way up?

23   **A.**    Just one -- one really between Mitchell Valentine and

24   Frankie Owens.  He told him, he said -- he said, "Boy, you

25   could have killed him with that club."  And Frankie said, "He's

1  glad I didn't -- he better be glad I didn't."

2  　　　But there was a lot of discussion between Frankie Owens

3  and Michael Hudson cussing and hollering back and forth, you

4  know.

5  **BY MR. LEARY:**

6  **Q.**　Where was Hudson?

7  **A.**　In the trunk.

8  **Q.**　Could you understand what Hudson was saying while he was

9  in the trunk?

10  **A.**　Not really.

11  **Q.**　What was Frankie saying from his side?

12  **A.**　He was just saying like, "I told you I'd get you, and,

13  you know, now you're going to go up here and face Eric."

14  **Q.**　About what time of the evening did this beating take

15  place at Wendell Eaves' house?　You can estimate if you need

16  to.

17  **A.**　Somewhere around 8:00, 8:30 in the evening.

18  **Q.**　So is it light or dark outside?

19  **A.**　It was dark.

20  **Q.**　And you left, and you drove to what town?

21  **A.**　When I left?

22  **Q.**　When you left Gautier, you drove where?

23  **A.**　To Petal, Mississippi.

24  **Q.**　And who, if anyone, did Owens talk to on the way up on

25  the cell phone?

1   **A.**    He called Eric Parker.

2   **Q.**    And what did he say?

3   **A.**    He said, "I'm bringing you a gift."

4   **Q.**    Was Eric there when you arrived?

5   **A.**    No, he wasn't.

6   **Q.**    How long later -- I mean, how much -- what time lapse was

7   it between when you arrived and then when Eric arrived?

8   **A.**    About five minutes.

9   **Q.**    Had y'all already taken his body out of the trunk?

10   **A.**    Yes.

11   **Q.**    Was he conscious or unconscious?

12   **A.**    No, he was conscious.

13   **Q.**    How do you know he was conscious besides the obvious?

14   **A.**    He was standing up talking, you know.  Matter of fact,

15   he -- Mitchell Valentine even had a cigarette in his mouth, and

16   he said, "Let me get some."  He put it in -- he took it out of

17   his hands and put it in his mouth for him.

18   **Q.**    After Eric Parker arrived, where did you and Mitchell

19   Valentine go?

20   **A.**    Frankie Owens told us we can -- we can leave and go home.

21   **Q.**    Who told you that?

22   **A.**    Frankie Owens.

23   **Q.**    So what did you and Mitchell Valentine do?

24   **A.**    We turned around and got in the car and left.

25   **Q.**    What did you do on the way back to the coast?

1 **A.** We rode in silence for a little bit, and then Mitchell

2 told me, he said, "Pull over. We need to get rid of this tarp"

3 or some kind of plastic or something that was in the trunk that

4 they put the body on." So I pulled over on the side of the

5 road and popped the trunk, and Mitchell Valentine got out and

6 threw it in the woods.

7 **Q.** Where did you take Mr. Valentine?

8 **A.** Back to his trailer. Back to his house.

9 **Q.** What did you and Mr. Valentine do after you arrived at

10 his trailer?

11 **A.** We looked in the trunk of my car to make sure there

12 wasn't no blood or nothing like that in there. We cleaned it

13 out a little bit with some Windex and stuff.

14 **Q.** When was the next meeting where this Michael Hudson

15 situation was discussed?

16 **A.** I believe it was three or four days later.

17 **Q.** Where was the meeting?

18 **A.** At Mitchell Valentine's.

19 **Q.** Who called the meeting?

20 **A.** Frankie Owens.

21 **Q.** Who was at the meeting?

22 **A.** Frankie Owens, Mitchell Valentine, Sonny Maxwell, James

23 Dean, and myself.

24 **Q.** What did Frankie Owens tell those present at the meeting?

25 **A.** He said that we wouldn't have to worry about Michael

1  Hudson coming back.  James Dean had asked him, "Well, what

2  happened?"  He said, "Let's just say we ain't got to worry

3  about him coming back no more.  We ain't going to have to deal

4  with him."

5  **Q.**    Was there another meeting after that, Mr. Burrus?

6  **A.**    Yes, there was.

7  **Q.**    And where was this next meeting?

8  **A.**    It was at Eric -- Thomas Parker's.

9  **Q.**    Thomas Parker is different than Eric Parker, correct?

10 **A.**    Yes, it is.

11 **Q.**    Do you know what Thomas Parker's rank happened to be?

12 **A.**    No, I do not.

13 **Q.**    Okay.  Who was at Thomas Parker's meeting that -- the

14 meeting at Thomas Parker's?

15 **A.**    That was Thomas Parker, Frankie Owens, Brandon Creel,

16 Wendell Eaves, Sonny Maxwell, myself, Mitchell Valentine, and

17 James Dean.

18 **Q.**    And what part of the house did you go to?

19 **A.**    We went to the master bathroom.

20 **Q.**    And what did Frankie Owens tell you when you were in the

21 master bathroom at that meeting?

22 **A.**    He said that -- for everybody just to stay quiet about

23 it, and if anybody -- anything come up with the police about it

24 or anything like that, that he was going to take the -- take

25 all of the wrap for it, take the heat for it.

1  **Q.**    Has he taken the heat for it?

2  **A.**    No, sir.

3  **Q.**    When did you get your honorable discharge from the AB?

4  **A.**    About two weeks after that meeting.

5  **Q.**    Who called you and told you you were discharged?

6  **A.**    Thomas Parker.

7  **Q.**    What's happened to you since then?

8  **A.**    Since then?  Well, right after I got my discharge, I was

9  kind of scared, because I figured that, you know, I'd be the

10  next one in the trunk because then I wouldn't be able to

11  testify to start with.  And that's how I lived my life for

12  about two years.

13        And then, you know, I started just going about my

14  everyday routine, you know, and working every day.  And I still

15  did methamphetamines, but I've been doing drugs all my life.

16  So I went on about my life, and, you know, I -- I had a loving

17  wife and two kids and, you know, just --

18  **Q.**    Has this cost --

19  **A.**    -- tried to prosper.

20  **Q.**    Has this cost you?

21  **A.**    Dearly.

22  **Q.**    What did it cost you?

23  **A.**    It cost me my wife, my kids, everything I own, my family,

24  my mother and them.

25        **MR. LEARY:**  A brief talk with co-counsel.

1       **THE COURT:**  Yes.  Yes.  You may confer with counsel.

2       (CONFERRING OFF THE RECORD.)

3       **MR. LEARY:**  No further questions, Your Honor.  We

4    tender the witness.

5       **THE COURT:**  Okay.  Mr. Sumrall, you may cross-examine

6    this witness.

7                        <u>**CROSS-EXAMINATION**</u>

8    <u>**BY MR. SUMRALL:**</u>

9    **Q.**   Good afternoon, Mr. Burrus.

10   **A.**   Good afternoon.

11   **Q.**   Now, you stated just a moment ago that you had an

12   honorable discharge from the Aryan Brotherhood?

13   **A.**   Yes, sir.

14   **Q.**   That's not in the constitution, is it?

15   **A.**   No, sir, it's not.

16   **Q.**   It's supposed to be blood out, is it not?

17   **A.**   Yes, sir.

18   **Q.**   But that's not happened with you?

19   **A.**   No, sir.

20   **Q.**   Okay.  You joined the Aryan Brotherhood in 2005, correct?

21   **A.**   Yes, sir.

22   **Q.**   And in 2010, you were a lieutenant, were you not?

23   **A.**   Yes, sir, I believe I was.

24   **Q.**   Okay.  Under Frank Owens, right?

25   **A.**   Yes, sir, I was.

1  **Q.**   Okay.  And Frank was a zone captain, was he not?

2  **A.**   A zone captain or area captain, yes.

3  **Q.**   And then Eric Parker was the South Mississippi captain,

4  was he not?

5  **A.**   I don't recall.

6  **Q.**   You don't recall?

7  **A.**   No, sir, I don't.

8  **Q.**   Okay.  But you were active at that time, were you not?

9  **A.**   Yes, sir.

10  **Q.**   Okay.  And you had been with Frank Owens on several

11  occasions and other times with other brothers; is that right?

12  **A.**   Yes, sir.

13  **Q.**   Okay.  Now, isn't it true that -- in the Aryan

14  Brotherhood that when there's an SOS issued, as there was on

15  Michael Hudson, that all of the brothers are aware of that?

16  **A.**   Yes, sir.

17  **Q.**   So you were aware of that, were you not?

18  **A.**   Yes, sir.

19  **Q.**   Okay.  So you were aware that when they brought Michael

20  Hudson to Mr. Eaves' house that there was an SOS out on Michael

21  Hudson, correct?

22  **A.**   Yes, sir.

23  **Q.**   And that's simply a smash on sight, right?

24  **A.**   Yes, sir.

25  **Q.**   Okay.  And I believe you stated that when you got in the

1    room, James Dean and Sonny Maxwell and Michael Hudson were

2    already there, correct?

3    **A.**    When we went into the back bedroom, yes, sir.

4    **Q.**    Okay.  And you went in with Frank Owens and who?

5    **A.**    Frankie Owens, Mitchell Valentine, and myself.

6    **Q.**    Okay.  And, at that time, you hit Michael Hudson with a

7    black club, didn't you?

8    **A.**    No, sir.

9    **Q.**    You didn't have a black club, did you?

10   **A.**    No, sir.

11   **Q.**    Who else had a black club?

12   **A.**    Frankie Owens had a black club.

13   **Q.**    Who?

14   **A.**    Frankie Owens.

15   **Q.**    He's the only one?

16   **A.**    Yes, sir.

17   **Q.**    So if somebody said everybody else had a black club, that

18   wouldn't be true, would it?

19   **A.**    Not to my knowledge.

20   **Q.**    Okay.  How many times did you hit Michael Hudson?

21   **A.**    I don't recall.

22   **Q.**    But you did hit him?

23   **A.**    I suppose I did.

24   **Q.**    Okay.  And you knew what was going on at that time,

25   right?

1    **A.**    As far as?

2    **Q.**    A smash --

3    **A.**    The violation?

4    **Q.**    -- SOS.

5    **A.**    Yes, sir.

6    **Q.**    Or a violation?

7    **A.**    Yes, sir.

8    **Q.**    Okay.  Now, after the smash, you went outside; is that

9    correct?

10   **A.**    I was told to go outside and pop the trunk of my car,

11   yes, sir.

12   **Q.**    Okay.  And you did, didn't you?

13   **A.**    Yes, sir, I did.

14   **Q.**    James Dean did not, did he?

15   **A.**    Go out and pop the trunk on the car?  No, sir, he did

16   not.

17   **Q.**    You did that?

18   **A.**    Yes, sir.

19   **Q.**    And who brought Michael Hudson to the car?

20   **A.**    Frankie Owens, Mitchell Valentine, and Sonny Maxwell.

21   **Q.**    Okay.  And put him in the trunk?

22   **A.**    Uh-huh.

23   **Q.**    You said he was bound at that time?

24   **A.**    Yes, sir.

25   **Q.**    But all the way up to Petal, Mississippi, you could hear

1   him hollering at Frankie Owens, and they were hollering back

2   and forth; is that correct?

3   **A.**   That's correct.

4   **Q.**   Okay.  And when you got to Petal, you said he got out,

5   stood up, and actually smoked a cigar -- took a puff off a

6   cigarette?

7   **A.**   I said he was helped out, yes, sir.

8   **Q.**   Okay.  But he was still talking?

9   **A.**   Yes, sir.

10  **Q.**   And when you left, he was still talking?

11  **A.**   Yes, sir.

12  **Q.**   Now, this first meeting that was had, I believe you said,

13  at Mitchell Valentine's, how long after this incident was this

14  meeting?

15  **A.**   I'm -- I'm guessing two to three days, maybe four at the

16  most.

17  **Q.**   Okay.  And the second meeting that took place at Thomas

18  Parker, now, who all was there?

19  **A.**   Thomas Parker, Frankie Owens, Brandon Creel, myself,

20  Sonny Maxwell, Mitchell Valentine, and Eric Parker.

21  **Q.**   All right.  Now, Brandon Creel, what was his position at

22  that time?

23  **A.**   He was state captain.

24  **Q.**   He was state captain.  So he was over all of y'all; is

25  that correct?

1    **A.**    That is correct.

2    **Q.**    And any SOS would have had to come down through him to

3    y'all?

4    **A.**    It was supposed to have been, yes, sir.

5    **Q.**    Okay.  Now, how well did you know Brandon Creel?

6    **A.**    I met him four or five times.

7    **Q.**    Okay.  Did you know him to be a liar?

8    **A.**    No, sir.

9    **Q.**    You didn't know that?

10   **A.**    Not at all.

11   **Q.**    You didn't know anything about him?  Well, wasn't the

12   purpose that y'all took Michael Hudson up to Eric Parker is

13   Eric Parker wanted to burn his patch off?

14   **A.**    I was not aware of that.

15   **Q.**    You were not aware of that?

16          **MR. SUMRALL:**  Court's indulgence.

17      (CONFERRING OFF THE RECORD.)

18          **MR. SUMRALL:**  No further questions, Your Honor.

19          **THE COURT:**  Mr. Turner, on behalf of your client,

20   Mr. Parker, you may cross-examine this witness.

21                    <u>**CROSS-EXAMINATION**</u>

22   <u>BY MR. TURNER:</u>

23   **Q.**    Mr. Burrus, my name is Joshua Turner.

24          **MR. TURNER:**  May I proceed, Your Honor?

25          **THE COURT:**  Yes.

**BY MR. TURNER:**

**Q.** When Mr. Leary was asking you questions about this third meeting that occurred at Thomas Parker's house --

**A.** The third meeting?

**Q.** Do you remember talking about three different meetings?

**A.** No, sir. Two different meetings.

**Q.** All right. How many meetings occurred at Thomas Parker's house?

**A.** Just one.

**Q.** Okay. Do you remember when Mr. Leary asked you who was there earlier?

**A.** Yes, sir.

**Q.** All right. You said -- you did not name Eric Parker.

**A.** I did not name Eric Parker. You're right.

**Q.** Okay. Now, when Mr. Sumrall asked you, you did name Eric Parker.

**A.** Yes, sir.

**Q.** Isn't it true that Eric Parker was not there?

**A.** No, sir.

**Q.** He was there?

**A.** He was there.

**Q.** Okay. Do you remember the date of that?

**A.** No, sir, I do not.

**Q.** What are some of the side effects of using methamphetamines?

1 **A.** Some side effects?

2 **Q.** Yes, sir.

3 **A.** Sleep deposition (sic).

4 **Q.** Yes, sir.

5 **A.** High blood pressure.

6 **Q.** Yes, sir.

7 **A.** Heart problems.

8 **Q.** What about memory loss?

9 **A.** I don't -- I'm not sure.  I'm not a doctor, but maybe.

10 **Q.** Have you experienced any problems with your memory after

11 using methamphetamines?

12 **A.** I'm not for sure.  Maybe.

13 **Q.** Okay.  Did you use methamphetamines on the day that you

14 assaulted Michael Hudson?

15 **A.** Yes, I did.

16 **Q.** How much?

17 **A.** I'm not sure.

18 **Q.** Have you used other drugs?

19 **A.** Yes, I have.

20 **Q.** Okay.  Did you use any other drugs the day you assaulted

21 Michael Hudson?

22 **A.** No, sir.  From the time I got out in 2008, that's the

23 only drug I did.  Maybe smoked a little bit of weed here and

24 there, but methamphetamine was my drug of choice.

25 **Q.** Okay.  How many times would you say that you've seen Eric

1  Parker in your life?

2  **A.**   In my life?

3  **Q.**   Yes, sir.

4  **A.**   Ten or fifteen times.

5  **Q.**   How many times did you see him in 2011?

6  **A.**   In 2011?  Maybe once or twice.

7  **Q.**   Okay.  How many times in 2012?

8  **A.**   None.

9  **Q.**   How about 2013?

10 **A.**   None.

11 **Q.**   How about 2014?

12 **A.**   None.

13 **Q.**   You have cut a deal with the government, have you not,

14 for -- in exchange for your testimony today?

15 **A.**   No, sir, I have not.

16 **Q.**   The government did not promise you that -- a cap on what

17 they would ask for for your pleading guilty here today?

18 **A.**   Oh, yes, sir.  They gave me a 22-year cap.

19 **Q.**   Okay.

20 **A.**   And my guidelines come in a little under that, and I got

21 210 months instead of 264.

22 **Q.**   Okay.  And they said that they would help you out in the

23 future if you gave truthful testimony here today, didn't they?

24 **A.**   No, they did not.

25          **MR. TURNER:**  Court's indulgence, Your Honor.

1      **THE COURT:**  Yes, sir.

2      **MR. TURNER:**  I just need a minute with my client.

3      **THE COURT:**  Yes, sir.

4      (CONFERRING OFF THE RECORD.)

5  **BY MR. TURNER:**

6  **Q.**    Mr. Burrus, when you're at Wendell Eaves' house and

7  you're assaulting Michael Hudson --

8  **A.**    Yes, sir.

9  **Q.**    -- did everyone who was there assault Michael Hudson?

10 **A.**    Yes, sir, I believe they did.

11 **Q.**    Frank --

12 **A.**    The exclusion from Wendell Eaves because I don't believe

13 he was back there.

14 **Q.**    Okay.  But Frank Owens?

15 **A.**    Yes, sir.

16 **Q.**    Mitchell Valentine?

17 **A.**    Yes, sir.

18 **Q.**    Yourself?

19 **A.**    Yes, sir.

20 **Q.**    Sonny Maxwell?

21 **A.**    Yes, sir.

22 **Q.**    James Dean?

23 **A.**    Yes, sir.

24 **Q.**    Okay.

25     **MR. TURNER:**  Thank you.  That's all I have, Your

1    Honor.

2              **THE COURT:**  Any redirect from the government?

3              **MR. LEARY:**  Yes.  Short redirect, Your Honor.

4                        <u>**REDIRECT EXAMINATION**</u>

5    **BY MR. LEARY:**

6    **Q.**    Mr. Burrus, when was Michael Hudson kidnapped?  What

7    year?

8              **MR. SUMRALL:**  Your Honor, that's not proper redirect.

9    He was asked on cross -- on direct examination and not gone

10   into --

11             **THE COURT:**  Wait.  Wait.  Okay.  Overruled.  This was

12   gone into by the defense counsel.  Go ahead.

13   **BY MR. LEARY:**

14   **Q.**    How long has it been since this happened to Michael

15   Hudson?  About how many years?

16   **A.**    2010, '11, '12 -- almost six years.

17   **Q.**    Are you doing your best here testifying today?

18   **A.**    I'm doing my best.

19             **MR. TURNER:**  Objection, Your Honor.  May we approach?

20             **THE COURT:**  No.  Let's --

21             **MR. TURNER:**  I feel like --

22             **THE COURT:**  Disregard that last question.  Let's --

23   **BY MR. LEARY:**

24   **Q.**    Are you confused about what happened to Michael Hudson?

25   **A.**    No, sir.

**Q.**   When were you discharged from the Aryan Brotherhood?

**A.**   Let me see.  Sometime in 2011 maybe.

**Q.**   After you were discharged from the Aryan Brotherhood --

**A.**   Uh-huh.

**Q.**   -- were you active in the Aryan Brotherhood?

**A.**   No, sir.

**Q.**   Were you active at anytime after 2011 in the Aryan Brotherhood?

**A.**   No, sir.  I never even had contact with any of them.

**Q.**   So why would you have seen Eric Parker if you were not active in the Aryan Brotherhood?

**A.**   I didn't see Eric Parker.

**Q.**   Have you seen Michael Hudson since this has happened?

**A.**   No, sir.

        **MR. LEARY:**  No further questions, Your Honor.

        **THE COURT:**  Very well.  This witness is fully and finally discharged.  You may go.

        **THE WITNESS:**  Thank you, Your Honor.

        **THE COURT:**  You can go all the way to that -- three steps to where that U.S. Marshal is standing.

        Okay.  Do you have a further witness, Mr. Leary?

        **MR. LEARY:**  Yes, Your Honor.  Sonny Maxwell.

        **THE COURT:**  Well, why don't -- let's take about a ten-minute break.  That previous recess we had was pretty short.  Take a ten-minute recess.

1      Get your witness ready now, Mr. Leary.

2      (JURY OUT.)

3      (RECESS TAKEN AT 3:46 P.M. UNTIL 3:58 P.M.)

4      (JURY IN.)

5      **THE COURT:**  Okay.  We've got the next witness in the

6      box.  Madam clerk, if you would swear him, please.

7      (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

8      **COURTROOM DEPUTY:**  Please take a seat and state your

9      name for the record.

10     **THE WITNESS:**  Sonny Maxwell.

11     **SONNY MAXWELL, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

12     **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

13     **DIRECT EXAMINATION**

14     **BY MR. LEARY:**

15     **Q.**    Good afternoon, Mr. Maxwell.

16     **A.**    How are you doing?

17     **Q.**    You and I are going to talk.  I'm going to ask you some

18     questions.  How old are you?

19     **A.**    Thirty-nine.

20     **Q.**    Where were you born?

21     **A.**    Hattiesburg, Mississippi.

22     **Q.**    How much education did you get, Mr. Maxwell?

23     **A.**    Twelfth grade.

24     **Q.**    Raised by a mother and father?

25     **A.**    Yes, sir.

1 **Q.** When did you first start using drugs?

2 **A.** About 15.

3 **Q.** When did you start using meth?

4 **A.** Say around 17.

5 **Q.** Have you used it continually since that day?

6 **A.** Yes, sir.

7 **Q.** When did you stop, Mr. Maxwell?

8 **A.** It was off and on.

9 **Q.** Has that been a detriment to you?

10 **A.** Yes, sir.

11 **Q.** When were you first convicted of a felony, Mr. Maxwell?

12 **A.** 2010.

13 **Q.** So how old were you in 2010?

14 **A.** About 35.

15 **Q.** When were you incarcerated in 2010?  I mean, when were

16 you incarcerated after that?

17 **A.** Done some county time and got probation.

18 **Q.** Okay.  When did you get out?

19 **A.** August -- I think it was around end of August of 2011.

20 **Q.** Have you pled guilty in this case?

21 **A.** Yes, sir.

22 **Q.** What did you plead guilty to?

23 **A.** Racketeering.

24 **Q.** Who did you kidnap?

25 **A.** Michael Hudson.

1  **Q.**   What was your sentence?

2  **A.**   156 months.

3  **Q.**   Are you hoping to receive some benefit for your testimony

4  today?

5  **A.**   No, sir.

6  **Q.**   Can I ask the judge to give you a downward departure?

7  **A.**   Yes, sir.

8  **Q.**   What do you have to do?

9  **A.**   Tell the truth.

10  **Q.**   Are you here today to do that?

11  **A.**   Yes, sir.

12  **Q.**   Have I talked to you before?

13  **A.**   Yes, sir.

14  **Q.**   Agents talked to you before?

15  **A.**   Sir?

16  **Q.**   Have federal agents also talked to you?

17  **A.**   Yes, sir.

18  **Q.**   Mr. Maxwell, when did you become an AB prospect?

19  **A.**   2010.

20  **Q.**   Who was your recruiter?

21  **A.**   James Dean.

22  **Q.**   Why were you interested in becoming an AB?

23  **A.**   I have no idea to be honest with you.

24  **Q.**   Was it a mistake?

25  **A.**   Yes, sir.

1  **Q.**  Are you a racist?

2  **A.**  No, sir.

3  **Q.**  How long were you an AB?

4  **A.**  I got prospect 2010.  Got my patch end of 2010.  And I

5  got out in 2011, and I ain't messed with them since.

6  **Q.**  You ever -- haven't looked back?

7  **A.**  No, sir.

8  **Q.**  What is a blood-in mission?

9  **A.**  Had to beat somebody up.

10  **Q.**  And what was your blood-in mission?

11  **A.**  Beat up ole Skip.

12  **Q.**  And ole Skip is who?

13  **A.**  Michael Hudson.

14  **Q.**  Did you do it?

15  **A.**  Yes, sir.

16  **Q.**  Did you get your patch for it?

17  **A.**  Yes, sir.

18  **Q.**  Do you still have it?

19  **A.**  No, sir.

20  **Q.**  Did you cover it up?

21  **A.**  Yes, sir.

22  **Q.**  When did you cover it up?

23  **A.**  The end of 2011.

24  **Q.**  Beating up Smith -- I mean, beating up Michael Hudson,

25  how much time did that cost you?

1   **A.**   156 months.

2   **Q.**   What are church meetings, Mr. Maxwell?

3   **A.**   That's when everybody -- ABs get together.

4   **Q.**   How often are they held?

5   **A.**   Once a month.

6   **Q.**   Do you recall your first church meeting?

7   **A.**   Yes, sir.

8   **Q.**   About when was it?

9   **A.**   I'd say around April of 2010.

10  **Q.**   Were you a prospect at that time or already a member?

11  **A.**   No, sir, I become a prospect.

12  **Q.**   Were you allowed to participate in the business aspect of

13  the church meeting?

14  **A.**   I just held security.

15  **Q.**   About how many ABs were present at the meeting?

16  **A.**   I can't recall.

17  **Q.**   Was Frankie Owens present at the meeting?

18  **A.**   Yes, sir.

19  **Q.**   Do you see him in the courtroom?

20  **A.**   Yes, sir.

21  **Q.**   Would you identify him, please?

22  **A.**   He's right over there (indicating).

23  **Q.**   What shirt is he wearing?

24  **A.**   Looks like a blue and plaid shirt, like a striped shirt.

25  **Q.**   You ever have any dealings with Eric Parker?

1   **A.**    No, sir.

2   **Q.**    Never seen him before?

3   **A.**    (Shakes head from side to side.)

4   **Q.**    Couldn't identify him?

5   **A.**    (Shakes head from side to side.)

6   **Q.**    Okay.  I want to go back to your dealings in 2010.  When

7   was the Michael Hudson problem first brought to your attention?

8   **A.**    I can't recall an exact date.

9   **Q.**    You don't have to give me an exact date.  Just give me a

10   time frame.

11   **A.**    In the summer.

12   **Q.**    In the summer?

13   **A.**    Yes, sir.  End of summer.

14   **Q.**    Did you ever talk to Frankie Owens about it?

15   **A.**    No, sir, not offhand.  I can't -- I really can't recall.

16   **Q.**    Okay.  Well, tell me what the problem was with Michael

17   Hudson.

18         **MR. SUMRALL:**  I'm going to object unless he's got

19   personal knowledge.  Object to what he's heard.

20         **THE COURT:**  Okay.  Well, if one of these defendants

21   told him, you can testify.  What -- okay.  Ask the question

22   again, Mr. Leary.

23         **MR. LEARY:**  Thank you, Your Honor.

24   **BY MR. LEARY:**

25   **Q.**    Did you talk to James Dean about the problems that

1  Michael Hudson was having?

2  **A.**   JD told me a little bit about it.

3  **Q.**   What did he say?

4       **MR. SUMRALL:**  Objection to --

5       **THE COURT:**  Okay.  This will fall within the ambit of

6  *Bourjaily*.  You may answer, Mr. --

7       **MR. LEARY:**  Thank you.

8  **A.**   Said something about he's supposed to owe somebody some

9  money or something.

10 **BY MR. LEARY:**

11 **Q.**   Was Michael Hudson an Aryan Brotherhood member?

12 **A.**   Yes, sir.

13 **Q.**   Was James Dean an Aryan Brotherhood member?

14 **A.**   Yes, sir.

15 **Q.**   And what was your position?

16 **A.**   I was just a prospect.

17 **Q.**   Okay.  What was Mitchell Valentine's position in the

18 Aryan Brotherhood?

19 **A.**   He was an AB member.

20 **Q.**   Okay.  Now, did you ever talk to Frankie Owens about

21 earning your brand?

22 **A.**   Frankie come up and asked me did I want to earn my patch.

23 And I said yeah.  He told me to get Michael Hudson, take him to

24 Wendell Eaves' house.

25 **Q.**   Now, and he told you to take Michael Hudson to Wendell

1  Eaves' house so you could do what?

2  **A.**   Earn my patch.

3  **Q.**   So what did you do?

4  **A.**   I called Skip up -- I mean, Michael Hudson up and asked

5  him if he wanted to cook some dope.  He said yeah.  And we went

6  and took him over at Wendell Eaves' house.

7  **Q.**   Okay.  Let me back up in time.  Had you seen Skip,

8  Michael Hudson, prior to that day when you picked him up and

9  took him to Wendell Eaves' house?

10 **A.**   Yes, sir.

11 **Q.**   Tell me what happened at the Walgreen's in Louisiana.

12 **A.**   I seen him in Louisiana at Walgreen's.  We was buying

13 some Sudafed, some pills.  And I got his number, exchanged

14 numbers, and we went on our separate ways.

15 **Q.**   Now, why were you obtaining Sudafed at a Walgreen's in

16 Louisiana?

17 **A.**   Cook some dope.

18 **Q.**   Cook dope?

19 **A.**   Yes, sir.

20 **Q.**   Now, were you aware that an SOS was issued on Michael

21 Hudson at that time?

22 **A.**   Yes, sir.

23 **Q.**   Well, why didn't you just smash him right when you saw

24 him at the Walgreen's?

25 **A.**   Because I was doing some illegal stuff.  I didn't want to

1    get the police called to me.

2    **Q.**   And what was the illegal stuff you were doing?

3    **A.**   Buying Sudafed.

4    **Q.**   What did you get from him?

5    **A.**   His phone number.

6    **Q.**   What else did you say to him?  Anything?

7    **A.**   No, sir.

8    **Q.**   Who were you there with at the Walgreen's?

9    **A.**   James Dean.

10   **Q.**   Now, after that is when Frankie Owens approached you; is

11   that right?

12   **A.**   I don't know -- been a few -- about a month later or

13   something like that.

14   **Q.**   Okay.  And Frank Owens told you that you could earn what?

15   **A.**   Earn my patch -- if I wanted to earn my patch.

16   **Q.**   Did you do what Frankie Owens told you to do?

17   **A.**   Yes, sir.

18   **Q.**   And what was it that he told you to do?

19   **A.**   Get Michael Hudson and take him to Wendell Eaves' house.

20   **Q.**   Tell me how it was you were able to lure Michael Hudson

21   to Wendell Eaves' house.

22   **A.**   I called him up and asked him if he wanted to cook some

23   dope, and he said yeah.  And I went and picked -- he told me

24   where to pick him up at, and I went and picked him up.

25   **Q.**   Where did you pick him up?

1 **A.** Off Highway 15.

2 **Q.** And what county was that in?

3 **A.** Harrison County.

4 **Q.** Who was with you when you picked up Michael Hudson?

5 **A.** James Dean.

6 **Q.** Who was driving the vehicle?

7 **A.** I was.

8 **Q.** Where was Michael Hudson sitting when he got in the

9 vehicle?

10 **A.** Passenger side.

11 **Q.** Okay.  Where was James Dean sitting?

12 **A.** In the middle.

13 **Q.** You remember that?

14 **A.** Yes, sir.

15 **Q.** Where did y'all take him?

16 **A.** To Gautier to Wendell Eaves' house.

17 **Q.** Who was there when you arrived in Gautier?

18 **A.** Wendell Eaves, Walter Burrus, Mitchell Valentine, and

19 Frankie Owens.

20 **Q.** Okay.  Where did you take Michael Hudson when you arrived

21 at Wendell Eaves' house?

22 **A.** We walked to the back room of Wendell's house, empty

23 room.

24 **Q.** Empty room?  Who was in the room when you got there?

25 **A.** There was nobody in the room.  I walked in first.  It was

1  JD, then Michael Hudson, Wendell.  Then it was Frankie,

2  Valentine, and Walter Burrus come in later.

3  **Q.**  About how much later did Frankie Owens and them come in?

4  I mean, are we talking about an hour later or a few minutes?

5  **A.**  No, a few seconds -- maybe a minute or two.

6  **Q.**  Tell the ladies and gentlemen of the jury what happened

7  when Frankie Owens, Mitchell Valentine, and Walter Burrus

8  walked back to the back bedroom.

9  **A.**  We all grabbed him and tied him up.

10 **Q.**  Did y'all beat him?

11 **A.**  Yes, sir.

12 **Q.**  Did you lay hands on him?

13 **A.**  Yes, sir.

14 **Q.**  Who else laid hands on him?

15 **A.**  Everybody.

16 **Q.**  About how long did the beating last, Mr. Maxwell?

17 **A.**  Not long.  Ten, fifteen minutes tops.

18 **Q.**  Tops?  That's a long time to beat somebody.

19 **A.**  It wasn't really all beating.  We just tied -- tied him

20 up and stand around and talked for a second and --

21 **Q.**  What did you tie him up with?

22 **A.**  Some wire.

23 **Q.**  Who had the wire?  Do you remember?

24 **A.**  No, sir, I do not.

25 **Q.**  Do you remember whether or not Frankie Owens had a billy

1  club?

2  **A.**   No, sir, I do not.

3  **Q.**   Do you recall whether or not most of the people there --

4  all of the people hit him, or was it chaotic?  Just describe

5  it.

6  **A.**   It was chaotic.  Everything happened at once.

7  **Q.**   Was anything said to Michael Hudson during the beating?

8  **A.**   I cannot recall.

9  **Q.**   You recall Frankie Owens said anything to Michael Hudson

10  during the beating?

11  **A.**   No, sir.

12  **Q.**   Why did you stop beating him?

13  **A.**   Somebody said something.  I don't remember who it was.

14  **Q.**   What happened after Michael Hudson was bound?

15  **A.**   They put him in Walter Burrus' car.

16  **Q.**   How did he get out to the car?

17  **A.**   They drug him, toted him out.

18  **Q.**   Toted him out?  Where was the car parked?

19  **A.**   In the back.

20  **Q.**   Do you remember what his car looked like?

21  **A.**   A little red car.

22  **Q.**   Okay.  Now, but you were there in what vehicle?

23  **A.**   My truck.

24  **Q.**   Now, what type truck did you have?

25  **A.**   '92 Chevrolet truck.

1  **Q.**  Where was Michael Hudson placed?

2  **A.**  In the trunk.

3  **Q.**  Do you recall who placed him in the trunk?

4  **A.**  JD had him and I think Valentine -- Mitchell Valentine

5  had him and put him in the trunk.

6  **Q.**  Who got in the red car with Walter Burrus?

7  **A.**  Frankie Owens and Mitchell Valentine.

8  **Q.**  What car did you get into?

9  **A.**  My truck.

10 **Q.**  Who was in your truck with you?

11 **A.**  James Dean.

12 **Q.**  Now, who left first, and what did you do?

13 **A.**  Walter Burrus left, and I left behind him.

14 **Q.**  Were you following them?

15 **A.**  I followed them all the way to 67.  They went north.  I

16 went south.

17 **Q.**  Why didn't you just keep following them north?

18 **A.**  My truck wasn't working.  Messing up.

19 **Q.**  Where were they taking him?

20 **A.**  I have no idea.

21 **Q.**  This is all you know?

22 **A.**  Yes, sir.

23 **Q.**  What did you do after the beating took place?

24 **A.**  I went back to James Dean's house and put my brand on.

25 **Q.**  That night?

1 **A.** Yes, sir.

2 **Q.** Where did they put it on you?

3 **A.** My forearm.

4 **Q.** Can you show me?

5 **A.** Right there (indicating).

6 **Q.** Is that where you covered it up?

7 **A.** Yes, sir.

8 **Q.** Just a black splotch now?

9 **A.** Yes, sir.

10 **Q.** What forearm is that? Is that on your right forearm?

11 **A.** Yes, sir.

12 **Q.** Did Owens at anytime tell you where they were taking

13 Michael Hudson?

14 **A.** No, sir.

15 **Q.** Was there a meeting concerning what happened that night

16 after Michael Hudson was kidnapped?

17 **A.** The next morning, Frankie called me. I went and did --

18 did some paperwork.

19 **Q.** Okay. What type paperwork did you do with Frankie Owens?

20 **A.** Just my -- like, my laws and stuff, my patch -- about my

21 patch and stuff.

22 **Q.** And you officially joined what the next morning?

23 **A.** Aryan Brotherhood.

24 **Q.** What did Frankie Owens tell you about joining the Aryan

25 Brotherhood?

1   **A.**   I cannot recall.  That's been --

2   **Q.**   Six years ago?

3   **A.**   Yes, sir.

4   **Q.**   Was it the next day that he met with you?

5   **A.**   Yes, sir, the next morning.

6   **Q.**   The next morning?  Who called that meeting?

7   **A.**   Frankie called me.

8   **Q.**   Who inspected your brand?

9   **A.**   Frankie and Valentine -- I mean, Walter Burrus.

10   **Q.**   Do you remember what you signed as far as ABM paperwork?

11   **A.**   It was the laws and stuff like that.

12   **Q.**   Constitution?

13   **A.**   Yes, sir.

14   **Q.**   Who was your recruiter?

15   **A.**   James Dean.

16   **Q.**   Describe how blood was involved in you signing up with

17   the Aryan Brotherhood.

18   **A.**   I cut my finger and put a swastika on paper.

19   **Q.**   In blood?

20   **A.**   Yes, sir.

21   **Q.**   Did you get a constitution that day?

22   **A.**   Yes, sir.

23   **Q.**   Who gave you the constitution?

24   **A.**   Frankie did.

25   **Q.**   About how long after this happened were you arrested?

1 **A.** About four days.

2 **Q.** So you were -- you were an Aryan Brotherhood in the free

3 world for about how long?

4 **A.** About a week.

5 **Q.** What were you arrested for?

6 **A.** Two counts of grand larceny.

7 **Q.** How long were you incarcerated after that?

8 **A.** Almost a year.

9 **Q.** Where were you incarcerated?

10 **A.** Harrison County.

11 **Q.** Were you active in the ABs when you were incarcerated?

12 **A.** No, sir.

13 **Q.** Were you active in the Aryan Brotherhood after you

14 were -- when you got out from incarceration?

15 **A.** No, sir.

16 **Q.** So about when did you cover up?

17 **A.** I'll say about a month after I got out.

18 **Q.** How long were you active in the Aryan Brotherhood?

19 **A.** Three or four -- maybe a week tops.

20 **Q.** And I asked you before.  That activity in that week cost

21 you how much?

22 **A.** 156 months.

23 **Q.** Did you ever see Michael Hudson again after December of

24 2010?

25 **A.** No, sir.

1          **MR. LEARY:**  May I approach co-counsel, Your Honor?

2          **THE COURT:**  Yes, sir.

3      (CONFERRING OFF THE RECORD.)

4          **MR. LEARY:**  Your Honor, we tender the witness.

5          **THE COURT:**  Very well.  Mr. Sumrall, you may

6  cross-examine this witness on behalf of your client, Mr. Owens.

7                    **<u>CROSS-EXAMINATION</u>**

8  **<u>BY MR. SUMRALL:</u>**

9  **Q.**    Mr. Maxwell, that night in December, you and James Dean

10  picked up Michael Hudson, did you not?

11  **A.**    Yes, sir.

12  **Q.**    And he was alive at that time, was he not?

13  **A.**    Yes, sir.

14  **Q.**    And then you took him to Mr. Eaves' place; is that

15  correct?

16  **A.**    Yes, sir.

17  **Q.**    And how many of y'all had batons or bats in that room?

18  **A.**    I didn't see none of them.

19  **Q.**    And you saw James Dean assault also, did you not?

20  **A.**    Yes, sir.

21  **Q.**    Mr. Burrus assault?

22  **A.**    Yes, sir.

23  **Q.**    Everybody else did too; is that correct?

24  **A.**    Yes, sir.

25  **Q.**    All right.  And then I believe you said y'all bound him,

1  correct?

2  **A.**   Yes, sir.

3  **Q.**   And took him and put him in the trunk?

4  **A.**   Yes, sir.

5  **Q.**   And he was alive when you put him in the trunk, was he

6  not?

7  **A.**   Yes, sir.

8  **Q.**   That's the last time you saw him, that night; is that

9  correct?

10  **A.**   Yes, sir, that was the last time I saw him.

11            **MR. SUMRALL:**  Nothing further, Your Honor.

12            **THE COURT:**  Mr. Turner, you may cross-examine this

13  witness.

14                    **CROSS-EXAMINATION**

15  **BY MR. TURNER:**

16  **Q.**   Mr. Maxwell --

17  **A.**   Yes, sir.

18  **Q.**   -- I've only got one question for you.  When Mr. Leary

19  asked you did you know Eric Parker and you shook your head,

20  that was a no, correct?

21  **A.**   No, I do not know him.

22  **Q.**   Okay.  Thank you very much.

23  **A.**   Yes, sir.

24            **MR. TURNER:**  That's all I have, Your Honor.

25            **THE COURT:**  Any redirect?

1    **MR. LEARY:**  No, Your Honor.

2    **THE COURT:**  Okay.  This witness is fully and finally

3  discharged.  You're remanded to the custody of the United

4  States Marshal.

5    Do you have a further witness?

6    **MR. LEARY:**  I could, Your Honor.  It's going to be a

7  little bit of time, but we --

8    **THE COURT:**  Okay.  Well, in other words, fairly long?

9    **MR. LEARY:**  It will be a fairly long witness.

10    **THE COURT:**  Okay.  Well, why don't we just -- we'll

11  recess for the day and start again at 9:00 in the morning.

12    **MR. LEARY:**  Thank you, Your Honor.

13    **THE COURT:**  Now, let me talk with this jury a little.

14    Mr. 177, this is going to misplace you a bit.  I

15  understand that it's your wife's grandmother?

16    **JUROR:**  Yes, sir.

17    **THE COURT:**  And the funeral is at 10:00 in the

18  morning?

19    **JUROR:**  Yes, sir.

20    **THE COURT:**  Now, what's this going to do to you if we

21  require you to be back here and recess at 1:00?

22    **JUROR:**  That will be fine.

23    **THE COURT:**  You'll be able to meet with the family

24  tonight --

25    **JUROR:**  Yes, sir.

1    **THE COURT:**  -- and then after we recess here?

2    **JUROR:**  Yes, sir.  That will be fine.

3    **THE COURT:**  Okay.  We appreciate your interest and so

4    forth in accommodating this trial.  As I said, it's one of the

5    highest callings that a citizen is ever called upon to meet in

6    this country.

7    Now, let's see.  Juror Number 67, what about your car?

8    Have you gotten your car attended to?

9    **JUROR:**  It's being worked on now.

10   **THE COURT:**  Being worked on now.  And the court

11   security people will take him to his car?

12   **COURT SECURITY OFFICER:**  I'll take care of it, Your

13   Honor.

14   **THE COURT:**  We had some other problems this morning I

15   didn't go into with counsel, but anytime you've got 14 people

16   in a schedule you're going to have little problems.

17   Ladies and gentlemen, remember, do not discuss the

18   case among yourselves.  Do not discuss it with anybody else.

19   Now, as I told you previously, my Friday schedule in

20   these lengthy trials is we'll start at 9:00, we'll go until

21   1:00, and rather than have a noon recess, I'll just recess for

22   the weekend at 1:00.  So what that means is, eat breakfast in

23   the morning.  You'll be awful hungry if you don't eat a bite of

24   breakfast.

25   With that said, the ladies and gentlemen of the jury

1    are excused until 9:00 in the morning.

2        (JURY OUT.)

3            **THE COURT:**  Okay.  Mr. Leary, I hope that we've been

4    able to cut down some on your estimate of your trial time.

5            **MR. LEARY:**  We really have, Your Honor.

6            **THE COURT:**  You've put on a lot of witnesses.  Let's

7    try to move this thing along.

8            **MR. LEARY:**  Yes, Your Honor.

9            **THE COURT:**  And if you can, avoid repetition with your

10   witnesses if you've already covered points.  Just give that

11   some thought --

12           **MR. LEARY:**  Yes, sir.

13           **THE COURT:**  -- to avoid repetition.

14           **MR. LEARY:**  I will.

15           **THE COURT:**  Okay.  With that said, court is in recess

16   until 9:00 in the morning.

17       (RECESSED AT 4:25 P.M.)

18

19

20

21

22

23

24

25

# CERTIFICATE

I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, Official Court Reporter for the United States District Court, Northern District of Mississippi, was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, have caused said stenographic notes to be transcribed via computer, and that the foregoing pages, 412-650, are a true and accurate transcription to the best of my ability.

Witness my hand, this 31st day of August, 2016.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Official Court Reporter