<pre>
 1                 UNITED STATES DISTRICT COURT

 2                NORTHERN DISTRICT OF MISSISSIPPI

 3

 4

 5    UNITED STATES OF AMERICA,      )
                                     )
 6              Plaintiff,           )      CASE NO. 4:14CR141
                                     )
 7              VS.                  )
                                     )
 8    FRANK GEORGE OWENS, JR.,       )
      AND ERIC GLENN PARKER,         )
 9                                   )
                Defendants.          )
10    _____)

11

12

13              JURY TRIAL - DAY 5 - TESTIMONY
          BEFORE SENIOR DISTRICT JUDGE GLEN H. DAVIDSON
14             FRIDAY, APRIL 8, 2016; 9:00 A.M.
                    OXFORD, MISSISSIPPI
15

16

17
      FOR THE GOVERNMENT:
18

19         United States Attorney's Office
           SCOTT LEARY, Esquire
20         CLAY DABBS, Esquire
           900 Jefferson Avenue
21         Oxford, MS  38655

22
           U. S. Department of Justice
23         KELLY KATHLEEN PEARSON, Esquire
           1301 New York Avenue, NW
24         Suite 49
           Washington, D.C.  20005
25
</pre>

1    FOR THE DEFENDANT FRANK GEORGE OWENS, JR.:

2

3         WILLIAM ANDY SUMRALL, Esquire
          P.O. Box 1068
          Jackson, MS  39215-1068
4

5
     FOR THE DEFENDANT ERIC GLENN PARKER:
6

7         JOSHUA A. TURNER, Esquire
          103 North Lamar, Suite 205
8         Oxford, MS  38655

9

10

11

12

13

14

15
          Proceedings recorded by mechanical stenography, transcript
16   produced by computer.

17
                    PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
18                    FEDERAL OFFICIAL COURT REPORTER
                      301 WEST COMMERCE STREET, #13
19                        ABERDEEN, MS   39730

20

21

22

23

24

25

# TABLE OF CONTENTS

PAGE

Style and Appearances     652

Table of Contents     654

### WITNESSES FOR THE GOVERNMENT

#### MITCHELL VALENTINE

| | PAGE |
|---|---|
| Direct Examination by Mr. Leary | 655 |
| Cross-Examination by Mr. Sumrall | 698 |
| Cross-Examination by Mr. Turner | 704 |
| Redirect Examination by Mr. Leary | 708 |

#### BRANDON CREEL

| | PAGE |
|---|---|
| Direct Examination by Mr. Leary | 710 |
| Cross-Examination by Mr. Sumrall | 758 |
| Cross-Examination by Mr. Turner | 767 |
| Redirect Examination by Mr. Leary | 775 |

## EXHIBITS

| EXHIBITS | DESCRIPTION | MARKED | ADMITTED |
|---|---|---|---|
| G-45 | Photo of Wendell Eaves' Trailer | 678 | 679 |
| G-46 | Photo of Eric Parker's Trailer | 690 | 691 |
| G-47 | Aryan Brotherhood Constitution Seized from Brandon Creel | 727 | 729 |
| G-48 | Photos Taken of Brandon Creel, Eric Parker and Others | 730 | 734 |

Court Reporter's Certificate     779

1    (CALL TO ORDER OF THE COURT.)

2        **THE COURT:** Okay. You may be seated. Let's have the

3  jury, Mr. Marshal.

4    (JURY IN.)

5        **THE COURT:** Okay. The government may call your next

6  witness.

7        **MR. LEARY:** Thank you, Your Honor. The government

8  would call Mitchell Valentine.

9        **THE COURT:** Very well.

10    (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

11        **COURTROOM DEPUTY**: Please state your name for the

12  record.

13        **THE WITNESS:** Mitchell Valentine.

14        **THE COURT:** Talk a little louder. Talk into that

15  mike, please, sir.

16        **THE WITNESS:** Mitchell Valentine.

17        **MR. SUMRALL:** Your Honor, we still cannot hear him

18  over here.

19        **THE COURT:** Talk a little louder, please, sir.

20        **THE WITNESS:** Mitchell Valentine.

21    **MITCHELL VALENTINE, GOVERNMENT'S WITNESS, AFTER BEING DULY**

22        **SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

23            **DIRECT EXAMINATION**

24  **BY MR. LEARY:**

25  **Q.** Good morning, Mr. Valentine.

1  **A.**    Morning.

2  **Q.**    How are you doing?

3  **A.**    I'm all right.

4  **Q.**    Are you ready?

5  **A.**    I guess so.

6  **Q.**    You and I are going to talk.  I've got some questions for

7  you, okay?

8  **A.**    Okay.

9  **Q.**    You're going to have to speak up, though.  They're going

10 to remind you.  Scoot up to the mike.  Also, that -- be careful

11 of that head nod.  We tell people that.  The court reporter

12 cannot get a head nod.  It's got be to be a yes or a no, okay?

13        Tell me again your full name.

14 **A.**    Mitchell Valentine.

15 **Q.**    Where are you from, Mr. Valentine?

16        **MR. TURNER:**  Your Honor, we're still having trouble

17 hearing him.

18        **THE COURT:**  Talk a little louder, Mr. Valentine.

19        **COURTROOM DEPUTY:**  See if you can move the mike up

20 closer to his mouth.

21 **A.**    Mitchell Valentine.

22 **BY MR. LEARY:**

23 **Q.**    Where are you from, Mr. Valentine?

24 **A.**    Jackson County, Mississippi.

25 **Q.**    Is that in the southern part of the state?

1    **A.**    Yes, sir.

2    **Q.**    Where were you raised, Mr. Valentine?

3    **A.**    Moss Point.

4    **Q.**    Okay.  Did you have a mother and a father growing up?

5    **A.**    No father.

6    **Q.**    No father?

7    **A.**    (Shakes head from side to side.)

8    **Q.**    You were raised by your mother?

9    **A.**    Yes, sir.

10   **Q.**    How much education did you get, Mr. Valentine?

11   **A.**    A high school diploma.

12   **Q.**    Okay.  Go to any college?

13   **A.**    No, sir.

14   **Q.**    Have you been involved in meth, Mr. Valentine?

15   **A.**    Yes, sir.

16   **Q.**    When did you get involved the first time?

17   **A.**    About 17 -- 16, 17.

18   **Q.**    Has it been a problem since then?

19   **A.**    Yes, sir, on and off.

20   **Q.**    Have you been convicted, Mr. Valentine?

21   **A.**    Yes, sir.

22   **Q.**    2001, you're convicted of --

23   **A.**    Precursors.

24   **Q.**    Right.  Now, precursors are used to manufacture what?

25   **A.**    Methamphetamine.

1   **Q.**   So were you involved in manufacturing some?

2   **A.**   Yes, sir.

3   **Q.**   How old are you?

4   **A.**   35.

5   **Q.**   35. I mean, so in 2001, you were young. About how old

6   are you? Do you remember?

7   **A.**   I was 21.

8   **Q.**   21. And then, in 2002, the same thing?

9   **A.**   Yes, sir.

10   **Q.**   And then 2009, same thing?

11   **A.**   Yes, sir.

12   **Q.**   So it seems like it's -- criminal history revolves around

13   methamphetamine pretty much?

14   **A.**   Yes, sir.

15   **Q.**   Now, Mr. Valentine, you pled guilty in this case?

16   **A.**   Yes, sir.

17   **Q.**   And what did you plead guilty to?

18   **A.**   Conspiracy, racketeering.

19   **Q.**   Okay. Involving the kidnapping of who?

20   **A.**   Michael Hudson.

21   **Q.**   And his -- his nickname was?

22   **A.**   Skip.

23   **Q.**   Now, have you been sentenced in this case, Mr. Valentine?

24   **A.**   Yes, sir.

25   **Q.**   How long were you sentenced to?

1    **A.**    235 months.

2    **Q.**    Okay.  That's almost 20 years?

3    **A.**    Yes, sir.

4    **Q.**    240 months is 20 years.

5    **A.**    Yes, sir.

6    **Q.**    So you're right up there at 20 years?

7    **A.**    Yes, sir.

8    **Q.**    Your involvement with the Aryan Brotherhood has cost you

9    how much?

10   **A.**    235 months.

11   **Q.**    How old are you right now?

12   **A.**    35.

13   **Q.**    45, 55?

14   **A.**    Yes, sir.

15   **Q.**    Did you plead guilty because you are guilty?

16   **A.**    Yes, sir.

17   **Q.**    Now, today, you're cooperating with the government.  Is

18   that true?

19   **A.**    Yes, sir.

20   **Q.**    You would hope to receive some benefit for your

21   cooperation.  Is that true?

22   **A.**    If the judge considers it, you know.

23   **Q.**    And what do you have to do to get that benefit?

24   **A.**    Cooperate.

25   **Q.**    Tell the truth or not?

1   **MR. SUMRALL:**  Object to the leading, Your Honor.

2   **THE COURT:**  Okay.  Yes.  Let the testimony come from

3   the witness, not the attorney.

4   **BY MR. LEARY:**

5   **Q.**   What do you have to do?

6   **A.**   Cooperate.

7   **Q.**   And do what when you cooperate?

8   **A.**   Tell the truth.

9   **Q.**   Is that why you're here today?

10  **A.**   Yes, sir.

11  **Q.**   Do you hope to receive witness protection in this case?

12  **A.**   Yes, sir.

13  **Q.**   Are you familiar with the Aryan Brotherhood of

14  Mississippi constitution?

15  **A.**   Somewhat.

16  **Q.**   How long have you been an Aryan Brotherhood member?

17  **A.**   Since February 2007.

18  **Q.**   Is that when you joined up?

19  **A.**   Yes, sir.

20  **Q.**   And when you join up, what do you receive?

21  **A.**   A brand.

22  **Q.**   And did you receive a brand?

23  **A.**   Yes, sir.

24  **Q.**   Do you still have it?

25  **A.**   Yes, sir.

1   **Q.**   Do you plan on covering it up, or do you plan on keeping
2   it?
3   **A.**   Covering it up.
4   **Q.**   What did you rise to the rank of, Mr. Valentine?
5   **A.**   I was a lieutenant on the street.
6   **Q.**   Okay.  Did you ever get any rank while you were in
7   prison?
8   **A.**   I held a position on the compound.
9   **Q.**   Okay.  On the compound?
10          **THE COURT:**  You're just going to have to speak up,
11   closer to the mike, please, sir.  Speak up.  See, these people
12   over here have to hear you.  Please talk a little louder.
13   **BY MR. LEARY:**
14   **Q.**   You -- you rose to what rank on the compound,
15   Mr. Valentine?
16   **A.**   Captain.
17   **Q.**   Now, when were you released from prison the last time,
18   Mr. Valentine?
19   **A.**   September the 4th of '15.
20   **Q.**   2015?
21   **A.**   Yes, sir.
22   **Q.**   And the time before that, when were you released from
23   prison?
24   **A.**   June the 18th, 2010.
25   **Q.**   After you got out the last time, did you make contact

1  with AB members?

2  **A.**   In 2010?

3  **Q.**   Uh-huh.

4  **A.**   Yes, sir.

5  **Q.**   Who were you living with in 2010?

6  **A.**   I got a place on my own to begin with.

7  **Q.**   Who moved in with you?

8  **A.**   Frankie.

9  **Q.**   Frankie Owens?

10  **A.**   Yes, sir.

11  **Q.**   Do you see him over there, Mr. Valentine?

12  **A.**   Yes, sir.

13  **Q.**   Would you please tell me what color he's wearing -- what

14  color shirt he's got?

15  **A.**   Blue shirt.

16  **Q.**   Stripes?

17  **A.**   Yes, sir.

18  **Q.**   And do you know Eric Parker?

19  **A.**   Yes, sir.

20  **Q.**   Do you see him over there?

21  **A.**   Yes, sir.

22  **Q.**   What color shirt is he wearing?

23  **A.**   White -- white shirt with stripes.

24  **Q.**   Okay.  Blue stripes?

25  **A.**   Yes, sir.

1           **MR. LEARY:**  Your Honor, we'd like the record to

2  reflect that Mr. Valentine identified both defendants.

3           **THE COURT:**  So reflect.

4  **BY MR. LEARY:**

5  **Q.**   Now, when you got out of prison, who were the AB members

6  at that time?

7  **A.**   As far as the --

8  **Q.**   I'm sorry.  AB leaders.

9  **A.**   Brandon Creel, Baron Goff, and Sneed, I believe.

10  **Q.**   It's Sneed?

11  **A.**   Sneed, I think.

12  **Q.**   You think those are the wheels?

13  **A.**   Yes, sir.

14  **Q.**   Now, was -- Brandon Creel, was he free world wheel or

15  incarcerated wheel?

16  **A.**   Free world.

17  **Q.**   And Baron Goff, he incarcerated or free world?

18  **A.**   Incarcerated.

19  **Q.**   And what about Sneed?

20  **A.**   Incarcerated.

21  **Q.**   Do you know who Perry Mask is?

22  **A.**   Yes, sir.

23  **Q.**   Was he an incarcerated wheel or a free world?

24  **A.**   Incarcerated.

25  **Q.**   Mr. Valentine, while you were out, did you ever become

1  familiar with Aryan Brotherhood attempts at unification?

2  **A.**   As far as the different states?

3  **Q.**   Yeah.

4  **A.**   Not when I was out.

5  **Q.**   Not when you were out?  Well, when did you find out about

6  that?

7  **A.**   When I was incarcerated.

8  **Q.**   When you were incarcerated?  Who was the Aryan

9  Brotherhood of Mississippi seeking to unify with?

10 **A.**   California.

11 **Q.**   What would it require of Aryan Brotherhood members if

12 they were to unify with California?

13 **A.**   Open more opportunities, you know.

14 **Q.**   Opportunities of what, Mr. Valentine?  Talking about --

15 **A.**   Drug trade maybe.

16 **Q.**   Drug trade?  What else?

17        **MR. SUMRALL:**  Your Honor, I'm going to object.  This

18 is calling for speculation on his part.  He has no independent

19 knowledge.

20        **THE COURT:**  Okay.  Let him testify as to his personal

21 knowledge.  Tell us what you know, Mr. Valentine.

22 **BY MR. LEARY:**

23 **Q.**   What do you know about the benefits of unification?

24 **A.**   That it was basically just -- had -- you know, opened the

25 door on drug trade, you know.

**Q.**   Did you ever talk to Frankie Owens about it?

**A.**   Just over the phone.

**Q.**   Was he in favor of unification or against it?

**A.**   In favor of it.

**Q.**   Mr. Valentine, why did you become a member of the Aryan Brotherhood?

**A.**   At the time, I was in the county jail, and there was a couple AB members that I -- that I liked hanging with, and I just -- something that happened, you know.

**Q.**   Joined up?

**A.**   Yes, sir.

**Q.**   Do you consider yourself a racist, Mr. Valentine?

**A.**   Not a racist but -- I mean, maybe a little racist.  I don't know, man.  Maybe a little bit.

**Q.**   Uh-huh.  Now, have you ever assaulted people on behalf of the Aryan Brotherhood, Mr. Valentine?

**A.**   Yes, sir.

**Q.**   Did you ever kill anybody?

**A.**   No, sir.

**Q.**   Is the Aryan Brotherhood involved in criminal activity?

**A.**   Yes, sir.

**Q.**   What type criminal activity, Mr. Valentine?

           **MR. SUMRALL:**  Objection, Your Honor --

           **MR. TURNER:**  Objection, Your Honor.

           **MR. SUMRALL:**  -- unless he has specific knowledge of

1    specific acts and can give us those dates.

2            **THE COURT:** Well, we'll let him testify if you know of

3    your personal knowledge what you observed.

4    **BY MR. LEARY:**

5    **Q.**    Yeah.  Do you have personal knowledge of Aryan

6    Brotherhood members being involved in criminal activity?

7    **A.**    Yes, sir.

8    **Q.**    Yeah.  Just briefly tell the ladies and gentlemen of the

9    jury what that is.

10   **A.**    Drugs, violence.

11   **Q.**    Mr. Valentine, describe for the ladies and gentlemen of

12   the jury how the Aryan Brotherhood of Mississippi is divided

13   into regions.

14   **A.**    You've got the southern district, the central district,

15   and the --

16           **MR. SUMRALL:** Your Honor, I'm sorry.  I cannot hear

17   him.

18   **A.**    The southern district, the central district, and the

19   northern district.

20   **BY MR. LEARY:**

21   **Q.**    Now, is the Aryan Brotherhood one entity within

22   Mississippi?

23   **A.**    Yes, sir.

24   **Q.**    And if a wheel is located in the northern part of the

25   state, what part of the state does he have authority over?

1   **A.**    The whole state.

2   **Q.**    Now, when an Aryan Brotherhood member joins the

3   organization, is that for life or a specific period of time?

4   **A.**    For life.

5   **Q.**    If an Aryan Brotherhood member gets out of the

6   organization, is he able to maintain his tattoo?

7   **A.**    No, sir.

8   **Q.**    I want to go back to 2010, Mr. Parker, summer of 2010.

9   What was Frankie Owens' rank?

10  **A.**    OIC.

11  **Q.**    OIC.  What does that mean?

12  **A.**    Officer in charge.

13  **Q.**    And what was Eric Parker's rank?

14  **A.**    Same thing.

15  **Q.**    Of?

16  **A.**    Central district.

17  **Q.**    Central district.  And Mr. Owens is OIC in what district?

18  **A.**    Southern.

19  **Q.**    Now, in 2010, do you recall where you were working that

20  summer?

21  **A.**    Trinity Yachts.

22  **Q.**    Okay.  Who moved in with you?

23  **A.**    Frankie.

24  **Q.**    What was -- Frankie, where was he working?

25  **A.**    Chevron.

1   **Q.**   Okay.  How long was Frankie able to maintain work at

2   Chevron?

3   **A.**   He worked a few months down there.

4   **Q.**   And what did he do after that?

5   **A.**   He was in between jobs, you know.

6   **Q.**   Talk loud.

7   **A.**   He was in between jobs, you know.

8   **Q.**   And where did he live?

9   **A.**   With me.

10   **Q.**   Now, Mr. Valentine, in 2010, do you have personal

11   knowledge of Frankie Owens obtaining methamphetamine?

12   **A.**   Yes, sir.

13   **Q.**   Who was he obtaining methamphetamine from?

14   **A.**   Maybe Creel.

15   **Q.**   Okay.  Now, do you know Brandon Creel?

16   **A.**   Yeah, Creel.

17   **Q.**   What was he doing with it?  Was he reselling it?

18   **A.**   Yes, sir.

19   **Q.**   Did Frankie Owens ever obtain meth from Eric Parker?

20   **A.**   Yes, sir.

21   **Q.**   Did you ever obtain meth, Mr. Valentine, from Eric

22   Parker?

23   **A.**   Not that I can recall.

24   **Q.**   Who did you get meth from?

25   **A.**   Normally, if I had it, I made it.

**Q.**   You were a cook?

**A.**   Yes, sir.

**Q.**   How much could you make out of a cook?

**A.**   Just depends on how much ingredients you had, you know,
Sudafed.

**Q.**   Okay.  Sudafed a base ingredient?

**A.**   Yes, sir.

**Q.**   Do you know what drug Sudafed has in it which goes
through a chemical reaction to become methamphetamine?

**A.**   Yes, sir.

**Q.**   What is that drug called?

**A.**   Ephedrine.

**Q.**   In 2010, did Frankie Owens owe money to Eric Parker for
methamphetamine?

**A.**   Yes, sir.

**Q.**   About how much did he owe him?

**A.**   Maybe a thousand bucks.

**Q.**   Something like that?

**A.**   Something like that.

**Q.**   How much was an ounce worth back then?

**A.**   Anywhere from a thousand to $1,200.

**Q.**   How do you know that Frankie Owens owed Eric Parker that
thousand bucks for meth?

**A.**   Because I -- I mean, it was just he owed him.  I mean, he
lived with me, and I knew, you know.

1 **Q.** At the time of Hudson's kidnapping, did Eric Parker still

2 have a debt with Frankie Owens?

3 **A.** I believe so.

4 **Q.** Who is Michael Hudson?

5 **A.** He was a brother, and they called him Skip, you know.

6 **Q.** Mr. Valentine, I'm handing you what's been previously

7 entered into evidence as Government's Exhibit 44. Can you

8 identify that person?

9 **A.** Yes, sir. That's Michael Hudson.

10 **Q.** Now, Mr. Valentine, did Michael Hudson ever owe Eric

11 Parker money for meth?

12 **MR. TURNER:** I'm going to object to the leading, Your

13 Honor.

14 **A.** Yes, sir.

15 **THE COURT:** Wait. Okay. You can rephrase it.

16 **MR. LEARY:** Thank you, Your Honor.

17 **BY MR. LEARY:**

18 **Q.** Did Eric -- did Michael Hudson owe -- explain the debt

19 that Michael Hudson owed to Eric Parker.

20 **A.** Well, he had went and got some dope from him on a front.

21 **Q.** Now, explain to the ladies and gentlemen of the jury what

22 a *front* is.

23 **A.** It's when you get it on credit.

24 **Q.** Okay. And after you sell it, what are you supposed to do

25 with it?

1   **A.**   Pay your debt.

2   **Q.**   And if there's any left over, who gets to keep it?

3   **A.**   You do.

4   **Q.**   Uh-huh.  Now, what does *cut meth* mean?

5   **A.**   Meth that somebody has put something to make more of it

6   to stretch it.

7   **Q.**   Explain whether or not it dilutes the potency of the

8   meth.

9   **A.**   Yes.

10  **Q.**   Did Michael Hudson pay back Eric Parker for the drug

11  debt?

12          **MR. TURNER:**  Objection, Your Honor.  Personal

13  knowledge hasn't been established.

14          **THE COURT:**  Yeah.  Okay.  You can testify as to what

15  you know, Mr. Valentine, your personal knowledge.

16  **BY MR. LEARY:**

17  **Q.**   Explain to me this.  Did the drug debt between Eric

18  Parker and Michael Hudson become an issue within the Aryan

19  Brotherhood members in South Mississippi?

20  **A.**   Yes, sir.

21  **Q.**   Why did it become an issue, Mr. Valentine?

22  **A.**   We -- Eric lived in the central part, and we was in the

23  southern part, and that's where Skip was from.  And when he

24  couldn't -- Eric couldn't get Skip on the phone, he was dodging

25  his calls, he'd call us, you know, and made it -- wanting us to

1    try to hunt him down or run down the money for him, you know.

2    **Q.**    Eric Parker was asking you to do that?

3    **A.**    Yes, sir.

4    **Q.**    Did you attempt to do that?

5    **A.**    We made phone calls and stuff, you know.  And he

6    supposedly -- when we did run him down, he was going to correct

7    it, you know, fix it.

8    **Q.**    What reason did Michael Hudson give for not paying the

9    debt?

10   **A.**    That it was cut.  The dope wasn't no good.

11   **Q.**    Okay.  And during this time frame, did Michael Hudson

12   repay Eric Parker for the debt?

13   **A.**    Not that I know of.

14   **Q.**    What's a *violation*, Mr. Valentine?

15   **A.**    It's a disciplinary action.

16   **Q.**    What are *minutes*?

17   **A.**    When two brothers -- two brand holders, one has a problem

18   with the other, he can -- if he wants a one-on-one fight, he

19   can call minutes.

20   **Q.**    What was ordered to happen between Eric Parker and

21   Michael Hudson?

22   **A.**    Parker wanted minutes with Skip for owing the debt.

23   **Q.**    Was that ever authorized?

24   **A.**    It was authorized, but we never could get Skip on the

25   same page, you know, to line it up.

1   **Q.**   Did Skip respond to the authorization to fight Eric
2   Parker?
3   **A.**   Skip?
4   **Q.**   Skip.  Did Skip fight Eric Parker?
5   **A.**   No, sir.
6   **Q.**   Explain whether or not Skip was running from Eric Parker.
7   **A.**   Well, he just couldn't get him on the phone, and whenever
8   he'd tell him he was going to do something, he wouldn't do it,
9   you know.
10   **Q.**   Now, who were you living with during this time?
11   **A.**   Me and Frankie.
12   **Q.**   What was Frankie Owens' response to Michael Hudson
13   refusing to show up for the violation?
14   **A.**   Well, it went from a minute thing with Parker to a
15   violation in the family, you know.
16   **Q.**   Explain how going from -- refusing to go minutes with
17   Eric Parker can increase to a violation with the family.
18   **A.**   Well, he -- whenever -- he wouldn't -- he was, you know,
19   beating around the bush about, you know, ever getting it --
20   getting it taken care of, and it went from him not paying the
21   debt and doing the minutes to a violation.
22   **Q.**   And what's a violation?
23   **A.**   That's when a couple -- you have to fight a couple
24   brothers.
25   **Q.**   What was Frankie's rank at this time in the southern

1  region of the AB?

2  **A.**   OIC.

3  **Q.**   About when was Hudson kidnapped, Mr. Valentine?

4  **A.**   December -- beginning of December.

5  **Q.**   2010?

6  **A.**   Yes, sir.

7  **Q.**   Were you present?

8  **A.**   Yes, sir.

9  **Q.**   Why was he kidnapped, Mr. Hudson -- I mean,

10 Mr. Valentine?

11 **A.**   Because he wouldn't take care of his business or go to

12 Parker to take care of his business, so --

13 **Q.**   What was initially ordered to happen to Michael Hudson?

14 **A.**   We were -- we were going to violate him.

15 **Q.**   Who's Sonny Maxwell?

16 **A.**   Another brother.

17 **Q.**   Was he a brother at that time?

18 **A.**   He was a prospect.

19 **Q.**   What's a blood-in mission?

20 **A.**   It's when you go on a mission to earn your brand.

21 **Q.**   And what was Sonny Maxwell's blood-in mission?

22 **A.**   Skip.

23 **Q.**   To do what to Skip?

24 **A.**   Smash him out.

25 **Q.**   Who authorized Sonny Maxwell to get his brand for

1  smashing out Skip?

2  **A.**  Creel.

3  **Q.**  Is that who ultimately would be for responsible for it?

4  **A.**  Yes.

5  **Q.**  Now, for the violation, what did Frankie Owens say about

6  the need to take Michael Hudson's brand?

7  **A.**  About when it happened?

8  **Q.**  Uh-huh.  Did Frankie want to take his brand or not?

9  **A.**  Yeah.

10  **Q.**  What did Frankie Owens say about taking Michael Hudson to

11  Eric Parker's house?

12  **A.**  That he just wanted to make sure that he got there, I

13  mean, that he had to face Parker about his business.

14  **Q.**  Where did the violation of Michael Hudson first occur,

15  Mr. Maxwell?

16  **A.**  Wendell Eaves'.

17  **Q.**  Who chose the location of Wendell Eaves' house?

18  **A.**  Frankie.

19  **Q.**  How was Hudson lured to Eaves' house?

20  **A.**  Blue and James Dean told him -- asked him if he wanted to

21  go over there and help them cook some dope.

22  **Q.**  Who told Blue and James Dean to pick up Michael Hudson?

23  **A.**  Frankie.

24  **Q.**  Now, how did you get to Wendell Eaves' house on or about

25  December 3rd -- December 2nd, December 3rd, 2010?

1  A.  T-Bone picked me and Frankie up in his car.

2  Q.  What kind of car was T-Bone driving?

3  A.  A Cobalt.

4  Q.  What color was it?

5  A.  Red.

6  Q.  And T-Bone's real name is?

7  A.  Walter Burrus.

8  Q.  About what time of the evening did he pick you up, if you

9  recall, Mr. Valentine?

10  A.  Around dark.

11  Q.  Describe whether or not any wire was taken with you.

12  A.  Yes.

13  Q.  Who got the wire?

14  A.  Frankie did.

15  Q.  Why did Frankie get the wire?

16  A.  To tie him up.

17  Q.  Tie who up?

18  A.  Skip.

19  Q.  When you got to Eaves' house, who cut the wire up?

20  A.  Frankie.

21  Q.  About how long of strips did he cut the wire to?

22  A.  Five foot.

23  Q.  Five foot?

24  A.  Yes, sir.

25  Q.  After you left your house -- where was your house

1  located?

2  **A.** On Three Rivers Road in Gulfport.

3  **Q.** Where did you drive to?

4  **A.** Wendell's.

5  **Q.** Did y'all make any stops on the way to Wendell's?

6  **A.** No, sir.

7  **Q.** What did Owens say about Michael Hudson coming home that

8  night?

9  **A.** That he wouldn't be coming home.

10  **Q.** He wouldn't be coming home?

11  **A.** No.

12  **Q.** Why didn't you just stop it right there, Mitchell?

13  **A.** That could have put me in the same predicament, you know.

14  **Q.** Who was present at Eaves' house when you, Frankie Owens,

15  and Walter Burrus arrived?

16  **A.** Wendell.

17  **Q.** Wendell was there?

18  **A.** Yes.

19  **Q.** Had James Dean and Sonny Maxwell arrived yet with

20  Mr. Hudson?

21  **A.** No, sir.

22  **Q.** Where did you, Frankie, and Walter Burrus go after that?

23  **A.** In Walter's room -- I mean, Wendell -- Wendell's room.

24  **Q.** Do you recall what Wendell Eaves' trailer looked like

25  during that time?

1   **A**.   Yes, sir.

2   **Q**.   Can you picture it in your head?

3   **A**.   Yes, sir.

4       **MR. LEARY:**  Your Honor, the government would like to

5   have the next numbered exhibit marked for identification

6   purposes.

7       **THE COURT:**  Very well.

8       **MR. SUMRALL:**  May we see it, Your Honor?

9       **COURTROOM DEPUTY**:  Exhibit Number 45.

10       **MR. LEARY:**  I'm going to let you see it.

11    (EXHIBIT NO. G-45 MARKED FOR IDENTIFICATION.)

12   **BY MR. LEARY:**

13   **Q**.   Without saying what it is, tell me if you recognize that

14   picture.

15   **A**.   Yes, sir.

16   **Q**.   Now, does that picture represent a true and accurate

17   representation of Wendell Eaves' house on or about December of

18   2010?

19   **A**.   Yes, sir.

20       **MR. LEARY:**  Your Honor, at this time, the government

21   would move to have Exhibit 45 entered into evidence.

22       **THE COURT:**  Any objection?

23       **MR. TURNER:**  No, Your Honor.

24       **MR. SUMRALL:**  No objection.

25       **THE COURT:**  No objection.  It's admitted.

1    (EXHIBIT NO. G-45 ADMITTED INTO EVIDENCE.)

2         **MR. LEARY:**  May I publish it, Your Honor?

3         **THE COURT:**  Yes, sir.  Mr. Valentine, if you'll look

4    on your screen there.

5    **BY MR. LEARY:**

6    **Q.**    Now, after you, Mr. Owens, and Walter Burrus arrived,

7    about how much later did James Dean and Sonny Maxwell arrive

8    with Mr. Hudson?

9    **A.**    Maybe 10 or 15 minutes.

10   **Q.**    Okay.  Where were you, Mr. Owens, and Mr. Burrus waiting

11   for them?  Where were you located?

12   **A.**    In Wendell's bedroom.

13   **Q.**    Okay.  When Mr. Hudson arrived with Maxwell and Dean,

14   where did they go?

15   **A.**    To the back bedroom.

16   **Q.**    Do you remember the back bedroom?

17   **A.**    Yes, sir.

18   **Q.**    Describe it for the ladies and gentlemen of the jury.

19   **A.**    What it looked like on the inside?

20   **Q.**    Yeah.  Was there anything in it?

21   **A.**    No, sir.

22   **Q.**    What happened when Mr. Hudson -- were you waiting for him

23   in the back bedroom?

24   **A.**    We was in Wendell's bedroom.

25   **Q.**    Okay.  So when Mr. Hudson went to the back bedroom, how

1   much later -- how long did it take for you, Mr. Owens, and

2   Walter Burrus to get to the room?

3   **A.**   Just, say, 30 seconds or so.

4   **Q.**   Okay.  Tell the ladies and gentlemen of the jury what

5   happened when you and Frankie Owens and Walter Burrus walked

6   into that room.

7   **A.**   We went in there and beat him up.

8   **Q.**   Who hit him first?

9   **A.**   I did.

10  **Q.**   You hit him first?

11  **A.**   Yeah.

12  **Q.**   Why did you hit him first?

13  **A.**   Just -- I was participating, you know.

14  **Q.**   Now, the first time you talked to the government, you

15  said, "I didn't hit him," and now you're saying you did.

16  **A.**   Yes, sir.

17  **Q.**   Why did you tell us you didn't hit him the first time you

18  interviewed with us?

19  **A.**   Because, at the time, I was trying to minimize my role.

20  **Q.**   It's obviously worse if you tell us you hit him, right?

21  **A.**   Yes, sir.

22  **Q.**   Are you minimizing your role now?

23  **A.**   No, sir.

24  **Q.**   After you hit him, Mr. Valentine, describe what happened.

25  **A.**   Just -- just took him down on the ground and, you know,

1    he's on his belly.

2    **Q.**   Did the beating occur?  Did it continue?

3    **A.**   Not long, you know.  It didn't -- I mean --

4    **Q.**   How long did it take to more or less incapacitate him?

5    **A.**   Maybe 30 seconds to a minute.

6    **Q.**   What did Frankie Owens do with his club?

7    **A.**   Hit him in the back of the head.

8    **Q.**   What color was his club, Mr. Valentine?

9    **A.**   Black.

10   **Q.**   About how long was it?

11   **A.**   Maybe -- a foot or maybe a little more.

12   **Q.**   What did Mr. Owens call his club?

13   **A.**   Blackie.

14   **Q.**   Blackie?  Who ordered Hudson be tied up?

15   **A.**   Frankie.

16   **Q.**   And explain how Michael Hudson was tied up.

17   **A.**   His feet -- his hands was tied behind his back to his

18   feet.

19   **Q.**   Like hog-tied?

20   **A.**   Yes, sir.

21   **Q.**   What did -- what did Michael Hudson do after Frankie hit

22   him in the head with the club?

23   **A.**   Knocked him out.

24   **Q.**   Where was he bleeding?

25   **A.**   In the floor.

1 **Q.** Where on his body?

2 **A.** Oh. On the back of his head.

3 **Q.** What did Frankie Owens do with Michael Hudson's cell

4 phone after the beating?

5 **A.** Took the battery out of it.

6 **Q.** What vehicle was Michael Hudson put into?

7 **A.** T-Bone's car.

8 **Q.** And where was he put in T-Bone's car?

9 **A.** In the trunk.

10 **Q.** Who put him in the trunk of the car?

11 **A.** Me and T-Bone.

12 **Q.** Did you get him back there?

13 **A.** Yeah.

14 **Q.** Now, after you loaded him up in the trunk -- well, before

15 you loaded him up, was there anything in the bottom of the

16 trunk?

17 **A.** Put a tarp in there.

18 **Q.** Who left with Walter Burrus?

19 **A.** Me, Frankie.

20 **Q.** Who was driving?

21 **A.** T-Bone.

22 **Q.** Where were you sitting?

23 **A.** In the passenger front seat.

24 **Q.** And where was Frankie sitting?

25 **A.** In the back seat.

1   **Q.**   Was Frankie able to communicate with Hudson, I guess,
2   when he came to in the trunk?
3   **A.**   Yeah, somewhat through the seat, you know.
4   **Q.**   What was Frankie telling Hudson while you were driving
5   north?
6   **A.**   To shut up.
7   **Q.**   What did Frankie say he was going to do to Hudson if he
8   didn't shut up?
9           **MR. SUMRALL:**   Objection to leading, Your Honor.
10          **THE COURT:**   Yes, sir.  Just ask him what was said,
11  what was done, what he observed.
12  **BY MR. LEARY:**
13  **Q.**   What did Frankie say after that?
14          **THE COURT:**   No, that's not what I said.  What did
15  anybody say?
16  **BY MR. LEARY:**
17  **Q.**   What did anybody say after that?
18  **A.**   Frankie told him to shut up or we're going to pull over
19  and he's going to poke a hole in his lung.
20  **Q.**   Poke a hole in his what?
21  **A.**   His lung.
22  **Q.**   Now, where were you driving to after you left Wendell
23  Eaves' house?
24  **A.**   To Parker's.
25  **Q.**   Where was Parker's camper?

1    **A.**   Forrest County.

2    **Q.**   About how far north was that from Gautier where Wendell

3    Eaves lived?

4    **A.**   Maybe an hour and 15 minutes.

5    **Q.**   Did Maxwell and Dean follow?

6    **A.**   No, sir.

7    **Q.**   Do you know where they went back to?

8    **A.**   No, sir.

9    **Q.**   Why was there a tarp in the trunk, Mr. Valentine?

10    **A.**   Just to make sure nothing got in the trunk.

11    **Q.**   Were any phone calls made on the way up to Parker's house

12    in Petal, Mississippi?

13    **A.**   Yes, sir.

14    **Q.**   Who made the phone calls?

15    **A.**   Frankie.

16    **Q.**   Whose telephone was Frankie using?

17    **A.**   Mine.

18    **Q.**   Why wasn't Frankie using his own phone?

19    **A.**   I guess he didn't have minutes on it.

20    **Q.**   Who was Frankie calling on the way up to Parker's?

21    **A.**   I'm not sure of all calls, but I know he talked to Parker

22    at least one time.

23    **Q.**   One time?  What did he tell Parker?

24    **A.**   That he had him a present.

25    **Q.**   About what time -- just estimate for me.  About what time

1    you, Owens, and Burrus arrived at Petal?

2    **A.**    Maybe 9:00, 9:30.

3    **Q.**    What was done with Michael Hudson when you arrived at

4    Petal?

5    **A.**    Me and T-Bone took him out of the trunk and put him --

6    sat him up in the front door of the trailer.

7    **Q.**    Did you talk to him?

8    **A.**    No.

9    **Q.**    Was he conscious?

10   **A.**    Yes.

11   **Q.**    Did he smoke a cigarette?

12   **A.**    I'm not sure.

13   **Q.**    How were you feeling at this time?

14   **A.**    Shocked.

15   **Q.**    Did you ever see Mr. Owens' billy club, "Blackie," when

16   he was at Eric Parker's?

17   **A.**    We was there just long enough to get him out of the

18   trunk.

19   **Q.**    Did you notice if he had it then?

20   **A.**    I know he had it with him.

21   **Q.**    What did you do after you got him out of the trunk?

22   **A.**    Me and T-Bone got back in the car and left.

23   **Q.**    Who told you to leave?

24   **A.**    Frankie.

25   **Q.**    Where did you drive to?

1 **A.** To my house.

2 **Q.** What did you do on the way back?

3 **A.** Stopped and got the tarp out of the trunk.

4 **Q.** Where did you put the tarp?

5 **A.** In a ditch.

6 **Q.** Why did you do that?

7 **A.** Get rid of it.

8 **Q.** How long did it take you to get back to the coast?

9 **A.** Maybe an hour.

10 **Q.** Where did you drive to, Mr. Valentine?

11 **A.** My house.

12 **Q.** What did you and Walter Burrus do when you arrived at

13 your house?

14 **A.** Clean the trunk out.

15 **Q.** Why did you clean the trunk out?

16 **A.** Make sure there was nothing in there, you know.

17 **Q.** Why were you scared something could be in the trunk?

18 **A.** I mean, hair, blood, or anything, you know.

19 **Q.** Did you know for sure what had happened to Hudson at this

20 time?

21 **A.** No.

22 **Q.** Did you have a bad feeling or a good feeling?

23 **A.** A bad feeling.

24 **Q.** What did you do the next morning, Mr. Valentine?

25 **A.** I went to work.

1  **Q.**  Where did you go to work?

2  **A.**  Trinity Yachts.

3  **Q.**  Okay.  I'm going to ask you just to speak up a little bit

4  more.  Where was that?

5  **A.**  Trinity Yachts.

6  **Q.**  And about what time did you head in?  Do you remember?

7  **A.**  From work?

8  **Q.**  To work.

9  **A.**  Normal time.

10  **Q.**  Who was in your house when you left for work?

11  **A.**  My girlfriend.

12  **Q.**  Your girlfriend?  Was Frankie there?

13  **A.**  No, sir.

14  **Q.**  About what time the next day did you call Eric Parker?

15  **A.**  I called him that morning, I think, on my morning break.

16  **Q.**  What did Parker say he was doing?

17  **A.**  They were finishing -- finishing up some business.

18  　　　　　**MR. SUMRALL:**  I'm sorry, Your Honor.  I cannot hear

19  him.

20  **A.**  They were finishing up some business.

21  **BY MR. LEARY:**

22  **Q.**  Did Parker ever mention Eric Creel -- I mean, Brandon

23  Creel?

24  **A.**  Yeah.  He said he was ahead of him.  You know, we talked

25  just for a minute.

1   **Q.**   Tell me what he said about Brandon Creel.

2   **A.**   He was driving ahead of him.

3   **Q.**   Driving ahead of him?

4   **A.**   Yes, sir.

5   **Q.**   When you got home from work, was Frankie in your house?

6   **A.**   No, sir.

7   **Q.**   Did you ever talk to him again?

8   **A.**   Yes, sir.

9   **Q.**   What did he ask you to do?

10   **A.**   Come get him.

11   **Q.**   What did you do in response to his request?

12   **A.**   Got in the truck and drove to Forrest County.

13   **Q.**   Where did you drive to?

14   **A.**   Parker's.

15   **Q.**   Did you go to the trailer?

16   **A.**   Yes, sir.

17   **Q.**   What did the trailer -- did you go inside the trailer?

18   **A.**   Yes, sir.

19   **Q.**   What did it look like inside?

20   **A.**   It was clean.

21   **Q.**   Describe the cleanliness of the inside of the trailer.

22   **A.**   It just smelled real clean in there, you know.

23   **Q.**   What do you mean when you say "smelled clean"?  What did

24   it smell like?

25   **A.**   Maybe shampoo, cleaning, chemicals.

1 | **Q.** That kind of stuff?

2 | **A.** Yes, sir.

3 | **Q.** Who was at the trailer when you arrived?

4 | **A.** Frankie and Parker.

5 | **Q.** Where was Hudson?

6 | **A.** I don't know.

7 | **Q.** How long did you stay there?

8 | **A.** Maybe 15, 20 minutes.

9 | **Q.** And then what did you do?

10 | **A.** We left.

11 | **Q.** Did you talk to Eric Parker when you were at the trailer?

12 | **A.** Briefly.

13 | **Q.** Did you talk to him about what happened?

14 | **A.** No, sir.

15 | **Q.** What was his disposition? What did he look like?

16 | **A.** He was just being quiet, you know.

17 | **MR. LEARY:** Your Honor, may I speak to my co-counsel

18 | just for a second?

19 | **THE COURT:** Yes, sir.

20 | (CONFERRING OFF THE RECORD.)

21 | **BY MR. LEARY:**

22 | **Q.** Mr. Valentine, do you recall what Eric Parker's trailer

23 | looked like in 2010?

24 | **MR. TURNER:** Object to the leading.

25 | **THE COURT:** Okay. Overruled.

BY MR. LEARY:

Q.    Do you recall what Eric Parker's trailer looked like in 2010?

A.    Yes, sir.

Q.    Can you picture it in your mind?

A.    Yes, sir.

        MR. LEARY:  Your Honor, at this time, the government would move to have the next exhibit marked for identification purposes.

        THE COURT:  That's fine.

        COURTROOM DEPUTY:  46.

        MR. LEARY:  46?

        THE COURT:  Show it to counsel opposite.

    (EXHIBIT NO. G-46 MARKED FOR IDENTIFICATION.)

BY MR. LEARY:

Q.    Mr. Valentine, without saying what this object is, tell the ladies and gentlemen of the jury whether or not you can identify that.

A.    Yes, sir.

Q.    And is that a true and accurate representation of Eric Parker's trailer in 2010?

A.    Yes, sir.

        MR. LEARY:  Your Honor, at this time, the government would move to have Government's Exhibit 46 entered into evidence.

1          **THE COURT:**  Any objection?

2          **MR. TURNER:**  No objection, Your Honor.

3          **MR. SUMRALL:**  No objection, Your Honor.

4          **THE COURT:**  Okay.  It's admitted.

5       (EXHIBIT NO. G-46 ADMITTED INTO EVIDENCE.)

6    BY MR. LEARY:

7    **Q.**   Now, how long did you stay at Eric Parker's trailer the

8    next day?

9    **A.**   15, 20 minutes.

10   **Q.**   And what did you do after that?

11   **A.**   Come home.

12   **Q.**   And who did you come home with?

13   **A.**   Frankie.

14   **Q.**   What did Frankie say about Hudson on the way back?

15   **A.**   That we wouldn't have to worry about him no more.

16   **Q.**   Don't have to worry about him no more?

17   **A.**   Huh-uh.

18   **Q.**   What did he say about Blackie?

19   **A.**   That -- I don't know.

20   **Q.**   What did he say about finding Hudson's body?

21          **MR. SUMRALL:**  Objection, Your Honor.  Leading.

22   BY MR. LEARY:

23   **Q.**   What did he say next?

24   **A.**   They wouldn't never find him.

25   **Q.**   Wouldn't never find him?  What did you say in response,

1  Mr. Valentine?

2  **A.**    I don't guess I did.

3  **Q.**    Do you recall anything else that Frankie Owens said to

4  you on the way back concerning Mr. Hudson or the cleanup or

5  anything like that?

6  **A.**    No, I don't guess.

7  **Q.**    Tell the ladies and gentlemen of the jury whether or not

8  Frankie Owens was wearing the same clothes the next day.

9  **A.**    No, he wasn't.

10  **Q.**    Tell the ladies and gentlemen of the jury whether his

11  boots were the same.

12  **A.**    No, sir.

13  **Q.**    Did you see the billy club at that time?

14  **A.**    No, sir.

15  **Q.**    Did you ever see it again?

16  **A.**    No, sir.

17  **Q.**    When was the next meeting at your house, Mr. Valentine?

18  **A.**    Maybe a few days.

19  **Q.**    A few days later?

20  **A.**    A few days later.

21  **Q.**    I'm going to have to ask you to -- I know that this is --

22  you don't like doing this.  Just talk up.

23  **A.**    A few days later.

24  **Q.**    About how long?

25  **A.**    Maybe a few days.

1   **Q.**   Who was at the meeting, Mr. Valentine?

2   **A.**   James Dean, T-Bone, me, and Frankie.

3   **Q.**   Frankie Owens there?

4   **A.**   Yes, sir.

5   **Q.**   Was Eric Parker there?

6   **A.**   No, sir.

7   **Q.**   Who called the meeting?

8   **A.**   Frankie.

9   **Q.**   Tell the ladies and gentlemen of the jury what Frankie

10  said about the Hudson situation.

11  **A.**   That it don't ever need to be brought up again.

12  **Q.**   What did he say about the body?

13          **MR. SUMRALL:**  Objection to leading, Your Honor.

14          **THE COURT:**  Okay.  Just what did he say there at that

15  meeting?

16  **A.**   Just not to be talked about, you know.

17  **BY MR. LEARY:**

18  **Q.**   When did the police start calling, Mr. Valentine?

19  **A.**   A detective called after we had done moved to Grand Bay.

20  **Q.**   Talk louder, please.

21  **A.**   After we had done moved from over there.

22  **Q.**   Okay.

23  **A.**   It was several months later.

24  **Q.**   A detective called?

25  **A.**   A detective called.

1  **Q.**   Do you recall a detective calling earlier than that?

2  **A.**   No, sir.

3  **Q.**   What about -- what about Frankie?  Are you familiar with

4  a detective calling Frankie -- not you, but Frankie?

5  **A.**   Right.

6  **Q.**   About how long after was Frankie called?

7  **A.**   Maybe five, six months.

8  **Q.**   Okay.

9  **A.**   Four or five months.

10 **Q.**   Were you present when he was called?

11 **A.**   We was in the truck.

12 **Q.**   How did Frankie respond to being called by the police?

13 **A.**   It was shocking, you know.  I mean, caught him -- caught

14 him by surprise, you know.

15 **Q.**   Explain what happened at the meeting at Thomas Parker's

16 house, Mr. Valentine.

17 **A.**   The church meeting?

18 **Q.**   Uh-huh.

19 **A.**   A few of us went in the back room.

20 **Q.**   Okay.  So tell the ladies and gentlemen of the jury again

21 briefly, now, what type meeting was this?

22 **A.**   A church meeting.

23 **Q.**   Okay.  And about how many ABs showed up?

24 **A.**   Maybe 10 to 15.

25 **Q.**   Now, was this --

1  **A.**    Maybe a few more.

2  **Q.**    Was -- the Hudson issue, was that brought up in front of

3  everybody?

4  **A.**    No, sir.

5  **Q.**    So where did you go to talk about it?

6  **A.**    In Thomas Parker's back bedroom.

7  **Q.**    Okay.  And Thomas Parker's rank about this time was what?

8  **A.**    Captain.

9  **Q.**    Do you recall when he got out of prison?

10 **A.**    It was around -- it was right after the first of the

11 year.

12 **Q.**    Okay.  So Thomas Parker got out of prison after the

13 Michael Hudson situation?

14 **A.**    Yes, sir.

15 **Q.**    And there was a church meeting at whose house?

16 **A.**    Thomas Parker's house.

17 **Q.**    Okay.  Who went to the back bedroom to talk about this?

18 **A.**    Me, James Dean, T-Bone, Thomas Parker.

19 **Q.**    Uh-huh.

20 **A.**    Frankie, Creel, Wendell Eaves.

21 **Q.**    What did Frankie say at that meeting?

22 **A.**    That everybody just needs to keep their mouth shut.

23 **Q.**    Explain whether or not there was doubt about the ability

24 of ABs to keep their mouth shut at this time.

25            **MR. SUMRALL:**  Objection.  Calls for a conclusion, Your

1 Honor.

2      **THE COURT:** Yeah. This -- the way you asked the

3 question, you ask what's going on in other people's minds.

4 That's not a good question.

5      What discussions, if any, took place, and what was

6 stated about this subject, Mr. Valentine?

7 **A.** Creel had said that Eric Parker had snapped out and told

8 everything, you know, and that -- said that the MBI knew up

9 there in Forrest County, and there was fixing to be some, you

10 know, people going to get picked up on it, you know.

11 **BY MR. LEARY:**

12 **Q.** How did the MBI find out about it?

13 **A.** Eric Parker.

14 **Q.** What was Frankie's response to this?

15 **A.** That he was a liability, you know.

16 **Q.** What did Frankie want to do about it?

17 **A.** He said that Parker needed to be next.

18 **Q.** Said that Parker needed to be next?

19 **A.** Yes, sir.

20 **Q.** When did you go back to jail?

21 **A.** January 30th of '12.

22 **Q.** January 30th --

23 **A.** Of 2012.

24 **Q.** -- 2012? After you were incarcerated, did you ever see

25 Eric Parker again?

1  **A.**   No, sir.

2  **Q.**   When were you released from prison?

3  **A.**   September the 4th of '15.

4  **Q.**   Did you get picked up by us?

5  **A.**   Yes, sir -- no, I turned myself in.

6  **Q.**   Turned yourself in.  Now, is what you said today the

7  truth?

8  **A.**   Yes, sir.

9  **Q.**   Now, what about prior statements you made to us, for

10  instance, when you denied hitting Michael Hudson, things like

11  that?  Tell the ladies and gentlemen of the jury again why

12  that -- why your story is what it is now.

13  **A.**   Because, at the time, I was still trying to stick to my

14  guns.  And then when they did -- it did come out -- I tried to

15  minimize my role in the situation when it did come out.

16  **Q.**   Now, you got bars on your neck?

17  **A.**   Yes, sir.

18  **Q.**   Yeah.  Go ahead and just pull your shirt down and show

19  the ladies and gentlemen of the jury.

20  **A.**   (Demonstrating.)

21  **Q.**   Mr. Maxwell (sic), when do you think you're getting out

22  of trial -- getting out of jail?

23  **A.**   I got 235 months.

24  **Q.**   Why did you plead guilty to kidnapping Michael Hudson?

25  **A.**   Because -- because I was guilty, and it wasn't no way to

1    beat it.

2           **MR. LEARY:** Brief moment with co-counsel, Your Honor.

3      (CONFERRING OFF THE RECORD.)

4           **MR. LEARY:** Your Honor, we tender the witness.

5           **THE COURT:** Mr. Sumrall, you may cross-examine this

6    witness on behalf of your client, Mr. Owens.

7           **MR. SUMRALL:** If it please the Court.

8           **THE COURT:** Yes, sir.

9                    **CROSS-EXAMINATION**

10   **BY MR. SUMRALL:**

11   **Q.**   Mr. Valentine, I believe you said you became an ABM

12   member in 2007; is that correct?

13   **A.**   Yes, sir.

14   **Q.**   Where were you when you -- when that happened?

15   **A.**   Jackson County Adult Detention Center.

16   **Q.**   Okay. And I believe you said you were familiar with the

17   constitution, did you not?

18   **A.**   Somewhat.

19   **Q.**   Okay. And you know that all orders have to come down

20   from the wheel; is that correct?

21   **A.**   Yes, sir.

22   **Q.**   And it comes down through the state captain, to the zone

23   captain, to the area captain?

24   **A.**   Exactly.

25   **Q.**   Is that correct?

1  A.    Yes, sir.

2  Q.    Okay.  And it is a strict code, is it not, that has to be

3  followed?

4  A.    Yes, sir.

5  Q.    And any violation -- not following orders that come down

6  from the wheel is a violation; is that correct?

7  A.    Yes, sir.

8  Q.    Okay.  Now, when you originally talked to law enforcement

9  in regards to the Michael Hudson thing, you told them you were

10  high on drugs, right?

11  A.    Yes, sir.

12  Q.    Matter of fact, you told them you were asleep?

13  A.    Yes, sir.

14  Q.    And that you didn't hear anything until you woke up and

15  they was already fighting.  Isn't that what you originally told

16  them?

17  A.    Yes, sir.

18  Q.    Okay.  But now you're telling us that's not the truth?

19  A.    Yes, sir.

20  Q.    Did they put you under oath when you made a statement to

21  them prior?

22  A.    I'm not sure.

23  Q.    You're not sure?  Okay.  Put you under oath -- when you

24  joined the Aryan Brotherhood, didn't you -- you took an oath,

25  didn't you?

1    **A.**    Yes, sir.

2    **Q.**    Okay.  And you took an oath again here today, did you

3    not?

4    **A.**    Yes, sir.

5    **Q.**    But now you're telling this jury that you were not high

6    on that December morning, correct --

7    **A.**    Yes, sir.

8    **Q.**    -- or that evening?  Okay.  So you got there with Walter

9    Burrus and Frankie Owens; is that correct?

10   **A.**    Yes, sir.

11   **Q.**    And were you with Frankie Owens when he received the

12   phone call from James Dean saying that they had Michael Hudson?

13   **A.**    Yes, sir.

14   **Q.**    Okay.  So you knew what was going on, didn't you?

15   **A.**    Yes, sir.

16   **Q.**    You originally told them you had nothing to do with the

17   smash-down, right?

18   **A.**    I guess, if that's what's on the record.

19   **Q.**    Okay.  But, in fact, you said you hit him first now,

20   right?

21   **A.**    Yes, sir.

22   **Q.**    Okay.  And that happened at Walter Eaves' house --

23   **A.**    Yes, sir.

24   **Q.**    -- or Eaves' house?

25   **A.**    Wendell Eaves.

1 Q.    Wendell Eaves.  Excuse me.  Wendell Eaves.  And did James

2 Dean hit him?

3 A.    We all hit him.

4 Q.    You all hit him.  And how many people had billy clubs?

5 A.    Just one.

6 Q.    So if somebody said they had more than one, it wouldn't

7 be right, right?

8 A.    Wouldn't be right.

9 Q.    Okay.  And he didn't -- Frankie Owens -- you said Frankie

10 Owens hit him in the back of the head, correct?

11 A.    Yes, sir.

12 Q.    Not the front of the head?

13 A.    Right.

14 Q.    Okay.  And then I believe you say that you and T-Bone

15 took him out and put him in the car?

16 A.    Yes, sir.

17 Q.    Now, I believe you also stated that during the drive from

18 the coast to Petal, Mississippi, that Michael Hudson was

19 talking or hollering out of the trunk, right?

20 A.    A little, somewhat.

21 Q.    And Frankie Owens told him to shut up?

22 A.    Yes, sir.

23 Q.    So he was alive at that time, was he not?

24 A.    Yes, sir.

25 Q.    And he was alive when y'all got to Eric Parker's house,

1   was he not?

2   **A.**   Yes, sir.

3   **Q.**   And he was alive when you left, was he not?

4   **A.**   Yes, sir.

5   **Q.**   Now, the next morning, you said Frankie Owens was not at

6   your house, right?

7   **A.**   No, sir.

8   **Q.**   So Sonny Maxwell could not have come to your house to see

9   Frank Owens to get his patch, could he?

10  **A.**   No, sir.

11  **Q.**   Okay.  That didn't happen?

12  **A.**   Him coming to my house?

13  **Q.**   Yes, sir.

14  **A.**   Sonny?

15  **Q.**   Yes, sir.

16  **A.**   I don't remember it.  Frankie wasn't there.

17  **Q.**   Okay.  At the time -- the early part of December 2010,

18  who were the wheels?

19  **A.**   Creel, Baron Goff, and either -- it was Larry Sneed, and

20  it wasn't long after that Perry -- it was somewhere in that

21  time.  It was either Perry or Larry Sneed.

22  **Q.**   Okay.  At that time, Frank Owens was not a wheel, was he?

23  **A.**   No, sir.

24  **Q.**   And the only person -- the only people who could

25  authorize a smash or a KOS were the wheels; is that correct?

1    **A.**    Yes, sir.

2    **Q.**    Now, the government asked you whether or not -- that you

3    were testifying -- that you expected them to ask for what's

4    called a Rule 35 downward departure for your substantial

5    assistance; is that correct?

6    **A.**    Yes, sir.

7    **Q.**    And you're hoping that the judge agrees with that, are

8    you not?

9    **A.**    Yes, sir.

10   **Q.**    And that's why you're here today testifying, right?

11   **A.**    Yes, sir.

12   **Q.**    Now, you said that sometime after this incident with

13   Michael Hudson that you were riding with Frankie when he got a

14   phone call from law enforcement, correct?

15   **A.**    Yes, sir.

16   **Q.**    And you said he acted shocked?

17   **A.**    I believe it was a message on his phone.

18   **Q.**    Okay.  And isn't it true that he immediately called them

19   back?

20   **A.**    Yes, sir.

21   **Q.**    Okay.  Are you still a member of the Aryan Brotherhood?

22   **A.**    No, sir.

23   **Q.**    Have you been smashed out?

24   **A.**    No, sir.

25   **Q.**    Have you been covered up?

1  **A.**   Trying to.

2         **MR. SUMRALL:**  Court's indulgence.

3         **THE COURT:**  Yes, sir.

4      (CONFERRING OFF THE RECORD.)

5         **MR. SUMRALL:**  No further questions, Your Honor.

6         **THE COURT:**  Mr. Turner, you may cross-examine this

7  witness on behalf of your client, Mr. Parker.

8         **MR. TURNER:**  Thank you, Your Honor.  May I proceed?

9         **THE COURT:**  Yes, sir.

10                    <u>CROSS-EXAMINATION</u>

11 <u>BY MR. TURNER:</u>

12 **Q.**   Mr. Valentine, my name is Joshua Turner.  I represent

13 Eric Parker.  In your statement -- you gave a statement to Don

14 Douglas.  Do you remember that?

15 **A.**   No, sir.

16 **Q.**   Okay.  Do you remember giving a statement to an agent

17 talking about you had taken Xanax bars and been drinking vodka

18 on the day that you kidnapped Michael Hudson?

19 **A.**   At first when I come in, maybe so.

20 **Q.**   Okay.  So were you lying then, or are you lying now?

21 **A.**   I was trying to -- I was lying, trying to minimize it --

22 like I said, minimize my role, you know, in what was happening.

23 **Q.**   What substances had you taken that day?

24 **A.**   I had been at work all day.

25 **Q.**   Okay.  Was that during a time when you were using

1    methamphetamines regularly?

2    **A.**    That's when I was -- a time when I was going to work

3    every day.

4    **Q.**    Okay.

5    **A.**    And you can -- I mean, so I was -- whatever I was doing,

6    I was keeping a grip on it.

7    **Q.**    All right.  Well, you said that you had trouble with

8    methamphetamines off and on since you were 15, correct?

9    **A.**    No, sir, I didn't say that.

10   **Q.**    All right.  How old were you?

11   **A.**    17.

12   **Q.**    17.  Excuse me.  How often were you using

13   methamphetamines in December of 2010?

14   **A.**    Here and there.  Maybe on the weekends or something, you

15   know.

16   **Q.**    Okay.  How often were you smoking marijuana during that

17   time?

18   **A.**    I was on probation, so I couldn't smoke marijuana.

19   **Q.**    Methamphetamines don't show up?

20   **A.**    I could do that on the weekend, and it would be gone out

21   of my system in a couple of days.

22   **Q.**    Would you agree with me that it affects your memory?

23   **A.**    Marijuana -- or methamphetamine?

24   **Q.**    Yes, sir.

25   **A.**    Maybe somewhat.

**Q.**     There's extreme fatigue that comes after you crash, isn't there?

**A.**     Talking about sleepiness?

**Q.**     Yes, sir.

**A.**     Yes, sir.

**Q.**     In your statement, you said that "James Dean is straight trash and garbage as they come."  Do you not like James Dean?

            **MR. LEARY:**  Your Honor, I'm going to object and ask to approach.

      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

            **MR. LEARY:**  Your Honor, defense counsel cannot quote a police report and ask this defendant because he has not adopted that report.  It's not his report.  It's the impressions of the police officer.

            The Jencks Act law is clear, as well as the cases, asserting that you cannot cross-examine specifically on what a police reports says.

            **MR. TURNER:**  This is directly from his audio that was given to us.  It's not from a report.  It's his own statements from -- I'm asking him if he said these things.

            **THE COURT:**  Okay.  I'll allow some latitude on cross-examination.  The objection is overruled.

            **MR. TURNER:**  Okay.

      (END OF BENCH CONFERENCE.)

**BY MR. TURNER:**

1  **Q.**   Mr. Valentine, I'm going to ask you that question again.

2  You said in your statement that James Dean was garbage.  And I

3  asked:  Do you not like James Dean?

4  **A.**   You know, he's done some -- maybe some stuff I didn't

5  agree with.

6  **Q.**   Okay.  Do you think he's a liar?

7  **A.**   No, I ain't saying he's a liar.

8  **Q.**   Do you trust him?

9  **A.**   I mean, he might be trustworthy to some people, but I

10 just don't -- I mean, I wouldn't trust him with my life.

11 **Q.**   Okay.  What about Brandon Creel, do you trust him?

12 **A.**   He ain't never give me any reason not to.

13 **Q.**   Okay.  You all took oaths that Mr. Sumrall was talking

14 about to be in the Aryan Brotherhood, correct?

15 **A.**   Yes, sir.

16 **Q.**   Okay.  And y'all have all broken those oaths now,

17 correct?

18 **A.**   Yes, sir.

19 **Q.**   When's the last time you saw Eric Parker at anything that

20 was related to Aryan Brotherhood?

21 **A.**   I only seen him one time after that night, I believe, and

22 that was him and a female come by my house on the way to the

23 casino or something.

24        **MR. TURNER:**  Your Honor, may I have a minute with my

25 client, please?

1          **THE COURT:**  Yes, sir.

2          **MR. TURNER:**  Thank you.

3      (CONFERRING OFF THE RECORD.)

4   **BY MR. TURNER:**

5   **Q.**    Did Brandon Creel ever tell you that he had been to

6   prison when he had not?

7   **A.**    Yes, sir.

8   **Q.**    Okay.  Did you later find out that to be a lie?

9   **A.**    Yes, sir.

10  **Q.**    Okay.

11         **MR. TURNER:**  That's all I have, Your Honor.

12         **THE COURT:**  Okay.  Redirect?

13         **MR. LEARY:**  Thank you, Your Honor.

14                  **REDIRECT EXAMINATION**

15  **BY MR. LEARY:**

16  **Q.**    Defense counsels asked you a question about an oath to

17  the Aryan Brotherhood.  Do you recall that question?

18  **A.**    Yes, sir.

19  **Q.**    Did you make an oath to the Aryan Brotherhood?

20  **A.**    Yes, sir.

21  **Q.**    Now, did you violate that oath by talking today?

22  **A.**    Very much so.

23  **Q.**    So you broke an oath to an organization that will do what

24  to you?

25  **A.**    Kill me.

1    **Q.**    Is that a fine organization?

2    **A.**    No, sir.

3    **Q.**    You doing right today?

4    **A.**    I think so.

5    **Q.**    Have you ever seen Michael Hudson again after that night?

6    **A.**    No, sir.

7          **MR. SUMRALL:**  Objection, Your Honor.  He's going into

8    what's --

9          **THE COURT:**  Okay.  I'll permit it.

10   **BY MR. LEARY:**

11   **Q.**    Did you ever see him again?

12   **A.**    No, sir.

13         **MR. LEARY:**  No further questions, Your Honor.

14         **THE COURT:**  Okay.  Mr. Valentine, you're finished with

15   your testimony.  You're fully and finally discharged.  You're

16   remanded to the custody of the United States Marshal.

17         Okay.  Ladies and gentlemen of the jury, we'll take

18   our morning recess.  The Court will be in recess until 10:30.

19   All of my earlier instructions apply.

20   (JURY OUT.)

21   (RECESS TAKEN AT 10:12 A.M. UNTIL 10:37 A.M.)

22   (JURY IN.)

23         **THE COURT:**  Okay.  The United States may call your

24   next witness.

25         **MR. LEARY:**  Your Honor, the United States would call

1    Brandon Creel.

2              **THE COURT:**  Very well.

3              Mr. Creel, if you'll stand and be sworn, please, sir.

4         (OATH WAS ADMINISTERED BY THE COURTROOM DEPUTY.)

5              **COURTROOM DEPUTY**:  Please state your name for the

6    record.

7              **THE WITNESS:**  Brandon Creel.

8              **COURTROOM DEPUTY:**  You may have a seat.

9              **THE COURT:**  Mr. Creel, we can all hear you.  That's

10   good.

11             **THE WITNESS:**  Yes, sir.

12     **BRANDON CREEL, GOVERNMENT'S WITNESS, AFTER BEING DULY SWORN,**

13                **WAS EXAMINED AND TESTIFIED AS FOLLOWS:**

14                        **DIRECT EXAMINATION**

15   **BY MR. LEARY:**

16   **Q.**   Good afternoon -- good morning, Mr. Creel.  How are you?

17   **A.**   Good morning.

18   **Q.**   I'm going to ask you some questions.  You and I are going

19   to talk.  Mr. Creel, how old are you?

20   **A.**   48.

21   **Q.**   What do people call you?

22   **A.**   Oak.

23   **Q.**   Where were you born?

24   **A.**   Ogden, Utah.

25   **Q.**   How long did you live there?

1   **A.**    I was just born there. We were visiting my aunt.

2   **Q.**    When did you move to Mississippi?

3   **A.**    About two days after I was born.

4   **Q.**    Okay. And where -- where did you grow up?

5   **A.**    Ellisville, Mississippi.

6   **Q.**    Did you have a mother and father?

7   **A.**    Yes, sir, a very good family.

8   **Q.**    Did you go to college?

9   **A.**    Yes, sir.

10   **Q.**    Did you work after college?

11   **A.**    Yes, sir.

12   **Q.**    Where did you work?

13   **A.**    Offshore welder/diver.

14   **Q.**    When was the first time you were convicted of a felony?

15   **A.**    2000 -- latter part of either 2012 or the early part of

16 2013.

17         **THE COURT:** Let me interrupt a minute. Who did you

18 play football for?

19         **THE WITNESS:** University of Southern Miss.

20         **THE COURT:** Very well. Go ahead, Mr. Leary.

21 BY MR. LEARY:

22   **Q.**    Where do you -- where do you currently reside? Where are

23 you living right now?

24   **A.**    I'm housed at Panola County Detention Facility.

25   **Q.**    Did you plead guilty in this case?

1  **A.**     Yes, sir, I did.

2  **Q.**     What did you plead guilty to doing, Mr. Creel?

3  **A.**     I pled guilty to conspiracy to commit racketeering.

4  **Q.**     Okay.  Specifically, you have pled guilty to doing what?

5  Just specifically.

6  **A.**     The RICO.

7  **Q.**     The RICO?

8  **A.**     Organized crime.

9  **Q.**     When were you laid off, Mr. Creel, from -- okay.  I just

10 want to go back to where you worked.  So you graduate from

11 college, and you're working where?

12 **A.**     I was working for Bisso Marine at the time.

13 **Q.**     Okay.

14 **A.**     Then I got laid off.

15 **Q.**     And what kind of -- about what time did you get laid off?

16 **A.**     They had a bad oil explosion in 2010.  An oil well blew

17 out and killed about 13 people.  During that time, they laid

18 all of us off.

19 **Q.**     Okay.  Before 2010, were you a meth user?

20 **A.**     Yes, sir, I was.  Recreationally, maybe once a month,

21 maybe every two or three months.

22 **Q.**     Uh-huh.

23 **A.**     With my job, we got -- we got drug-screened pretty

24 regular.

25 **Q.**     Okay.  After -- well, before 2010, were you a meth

1    dealer?

2    **A.**    No, sir.

3    **Q.**    After 2010, when you were laid off, what did you start

4    doing?

5    **A.**    Full-blown.

6    **Q.**    Full-blown?

7    **A.**    Meth dealer.

8    **Q.**    Okay.  Were you against meth trafficking before -- while

9    you were working?

10   **A.**    While I was working, I stayed on the brothers about

11   getting a job and doing the right thing, and the sad thing

12   about it is, I had become the very thing I despised at one

13   time.

14   **Q.**    Meth lead to your downfall, Mr. Creel?

15   **A.**    Very much so.

16   **Q.**    Have you been convicted in this case?

17   **A.**    Yes, sir.

18   **Q.**    Sentenced to how long?

19   **A.**    Twenty-five years.

20   **Q.**    And how old are you?

21   **A.**    Forty-eight.

22   **Q.**    Fifty-eight, sixty-eight.  You're up seventy?

23   **A.**    Yes, sir.

24   **Q.**    Now, you're here today.  Would you like to receive credit

25   for testifying today?

1  **A.**    I'd very much like to receive credit -- to receive credit

2  for that, but I wasn't guaranteed anything.  I'm not here to

3  convict anybody.  I'm just here to tell the truth.

4  **Q.**    Am I going to be the one that sentences you -- gives you

5  any credit?

6  **A.**    No, sir.

7  **Q.**    Who's it going to be?

8  **A.**    From my understanding, it's -- it will be the judge,

9  Judge Davidson.

10  **Q.**    Who did you burn in this case?

11  **A.**    Skip.

12  **Q.**    Who were you affiliated with when that happened?

13  **A.**    I was a shot caller with the Aryan Brotherhood.

14  **Q.**    What's a shot caller?

15  **A.**    I was responsible for all of the free world activities.

16  **Q.**    Okay.  And the rank is also known as what?

17  **A.**    A wheel member, general.

18  **Q.**    You made mistakes in your life?

19  **A.**    Yes, sir, a bunch of them.

20  **Q.**    Are you hear to tell the truth?

21  **A.**    Sir?

22  **Q.**    Are you hear to tell the truth?

23  **A.**    Yes, sir.

24  **Q.**    Have investigators talked to you about your involvement

25  in the Aryan Brotherhood, Mr. Creel?

1  **A.**   Yes, sir.

2  **Q.**   Have I talked to you about it?

3  **A.**   Yes, sir, you sure have.

4  **Q.**   How did you learn of the Aryan Brotherhood, Mr. Creel?

5  **A.**   A friend of mine that -- a good friend of mine that was a

6  member of the Aryan Brotherhood.

7  **Q.**   When did you join up?

8  **A.**   1993.

9  **Q.**   Why did you join up?

10 **A.**   I was very much interested in the ideals, and the

11 literature of the Aryan Brotherhood very much appealed to me.

12 **Q.**   Are you a racist?

13 **A.**   No.  That would be arguable.  I'm a separatist for sure.

14 I believe in staying with my own.  I don't mix outside my race.

15 So there's argument there whether it would be considered

16 racist.

17 **Q.**   Would some people consider that racist?

18 **A.**   Very much so.

19 **Q.**   What's the purpose of the Aryan Brotherhood, Mr. Creel?

20 **A.**   Our paperwork states that it's a criminal organization.

21 It was founded on violence, and it's pretty much run by

22 violence.  I had the -- the idea in my mind that I would create

23 something that was unfixable.  I set up something where we

24 would have something -- a brotherhood where we could count on

25 one another.

1       It's extremely hard when these brothers get out of -- out

2  of incarceration to find jobs.  They're basically flat on their

3  back.  We started a treasury.  We had -- we had get-togethers

4  where we -- we functioned as a brotherhood.

5       If somebody couldn't pay a power bill, if a brother's

6  wife was -- couldn't pay her power bill, couldn't buy formula,

7  couldn't take her kid to the doctor, we would -- we would pay

8  that.  It's the ideal of my involvement --

9  **Q.**  Did it --

10 **A.**  -- in the earlier years.

11 **Q.**  Did it end up being what you wanted it to be?

12 **A.**  No, it didn't.  Like I say, I -- the very thing I

13 despised and had used a lot of violence to get rid of, I'd

14 become the very thing that I -- I despised at one time.

15 **Q.**  Are you a thunder warrior?

16 **A.**  Yes, sir.

17 **Q.**  Got the -- got the bolts?

18 **A.**  Yes, sir.

19 **Q.**  Show the ladies and gentlemen of the jury.

20 **A.**  (Demonstrating.)  Let me reiterate that.  I was a thunder

21 warrior.

22 **Q.**  Okay.  Are you an Aryan Brotherhood member now?

23 **A.**  No, sir.  I've verified, dropped out through the BOP,

24 Federal Bureau of Prisons.  I've made it very clear from day

25 one that that was not my intentions anymore.

1   **Q.**   Did you inform any members of the Aryan Brotherhood of
2   your intention to drop out?
3   **A.**   Yes, sir, I did.
4   **Q.**   Who did you tell?
5   **A.**   I told the -- the recognized wheel at the time.  We were
6   all staged, I would call it, at Greene County.
7   **Q.**   Who was that?
8   **A.**   Frankie Owens, Steve Hubanks.  Perry Mask had been moved.
9   He had had some type of RVR, and they moved him before I got
10  there.
11  **Q.**   The three people that you just named, what were their
12  roles?
13  **A.**   Wheel members.
14  **Q.**   Do you see Frankie Owens in this courtroom?
15  **A.**   Yes, sir, I sure do.
16  **Q.**   Can you please identify him, sir?
17  **A.**   To the left.
18  **Q.**   What color shirt is he wearing?
19  **A.**   Looks like a green.
20  **Q.**   Okay.  Is it striped up and down or not?
21  **A.**   No, sir.
22  **Q.**   I don't know if you got -- kind of just point -- stand up
23  and point to him.  Is he on the far left or --
24  **A.**   Far left.
25  **Q.**   Okay.  Do you see Eric Parker --

1      **THE COURT:**  Okay.  There are two men over there.  One

2   has got gray hair and one has no hair.  Which one is it?

3      **THE WITNESS:**  He's the baldheaded one, Your Honor.

4      **THE COURT:**  Very well.

5      **MR. SUMRALL:**  Thank you, Your Honor.

6      **THE COURT:**  The record will reflect that this witness

7   identified Mr. Owens.

8      **MR. LEARY:**  Thank you, Your Honor.

9   **BY MR. LEARY:**

10  **Q.**   Do you see Eric Parker?

11  **A.**   Yes, sir, I sure do.

12  **Q.**   Would you please identify where he's sitting at the

13  table?

14  **A.**   He's sitting midway with a white shirt and brown hair.

15  **Q.**   And what color shirt does he have on?

16  **A.**   A white shirt, I believe, or dark -- light blue maybe.

17  **Q.**   Dark or light blue?  So there are two guys sitting on the

18  end of that table.  One has got extremely short hair, and one

19  has got fuller hair, brown hair.  Which one is it?

20  **A.**   To the right, the brown-headed one.

21  **Q.**   Okay.

22      **MR. LEARY:**  Your Honor, we'd like the Court (sic) to

23  reflect that Mr. Creel just identified Eric Parker.

24      **THE COURT:**  So reflect.

25  **BY MR. LEARY:**

1    **Q.**    What was your first rank, Mr. Creel?

2    **A.**    Just a foot solder.

3    **Q.**    And then explain how you went through the ranks in the

4    '90s.

5    **A.**    Well, in the '90s, there really wasn't any structure in

6    the free world.  You would run into brothers here and there.

7    About 2000, I was contacted by -- well, actually, 2002 -- end

8    of 2002, early 2003, I was contacted by the -- the recognized

9    wheel at the time, incarcerated wheel, and --

10   **Q.**    Who was that?

11   **A.**    That was -- at the time, it was Baron Goff and Steve May.

12   **Q.**    Okay.

13   **A.**    I was contacted by Steve May, and it had been made --

14   they had been made aware of my dedication and -- as we would

15   call it, in the Aryan Brotherhood, righteousness of a brother,

16   and was given the responsibility to clean the family up and

17   develop a structure, a command -- a command and a structure

18   within the free world.

19   **Q.**    Did you ever recruit anybody into the Aryan Brotherhood?

20   **A.**    I recruited one person.

21   **Q.**    Who was that?

22   **A.**    It was Eric Parker.

23   **Q.**    Explain your relationship with Eric Parker.

24   **A.**    Eric Parker was my brother before -- before that in the

25   Aryan Brotherhood.

1  **Q.** Y'all close?

2  **A.** He's like -- he's like my son. He's my little brother.

3  **Q.** It's hard for you to be here today?

4  **A.** Very much. For both of them.

5  **Q.** Mr. Creel, have you ever assaulted anybody on behalf of

6  the Aryan Brotherhood?

7  **A.** Yes, sir.

8  **Q.** You ever killed anybody?

9  **A.** No, sir.

10 **Q.** What part of Mississippi does the Aryan Brotherhood

11 operate?

12 **A.** From the tip to the -- to the butt.

13 **Q.** Top to bottom?

14 **A.** Yes, sir.

15 **Q.** As a free-world wheel, did you ever travel to North

16 Mississippi?

17 **A.** Yes, sir.

18 **Q.** Why did you travel to North Mississippi?

19 **A.** I set up a command structure. I set up the chain of

20 command. I set up a treasury. I appointed officers in these

21 different locations. Sometimes I would have to travel to these

22 locations when things had went awry and got out of hand.

23 **Q.** Who were some of the North Mississippi Aryan Brotherhood

24 members that you dealt with?

25 **A.** One of them was Gary Sneed.

1   **Q.**   Uh-huh.

2   **A.**   Rambo.

3   **Q.**   Uh-huh.

4   **A.**   Wes Bowers.

5   **Q.**   Uh-huh.

6   **A.**   Youngster, which was Gary Sneed's son.  That's --

7   **Q.**   But what wheels did you talk to during that time?

8   **A.**   The active wheel at the time was me, Steve May, and Baron

9   Goff.

10  **Q.**   Okay.  When, if ever, did you talk to Perry Mask?

11  **A.**   I didn't talk to Perry Mask until the latter part of

12  either 2011 or '12 on my way out the door.

13  **Q.**   Okay.  When did you leave as a wheel?

14  **A.**   I was incarcerated the latter part of 2012, which, at the

15  time, I appointed our state -- the free-world state captain.

16  Well, right after that, he got locked up.  So during my

17  incarceration, I have no idea who was running it, if anybody

18  was, for that matter.

19  **Q.**   Now, when did you meet Frankie Owens?

20  **A.**   I'm going to say maybe latter part of 2006, maybe early

21  2007.

22  **Q.**   How did you meet him?

23  **A.**   Through Eric Parker.

24  **Q.**   You met Frankie Owens through who?

25  **A.**   Eric Parker.  Eric brought him to my house.

1 **Q.** What was Frankie Owens' rank in 2010, Mr. Creel?

2 **A.** I want to say I had give Frankie the captain's position

3 on the Gulf Coast.

4 **Q.** What was --

5 **A.** The central part of the -- of that zone.

6 **Q.** Okay.

7 **A.** The central part of that area. Excuse me.

8 **Q.** So the southern region was divided into areas?

9 **A.** No. The southern area was divided into three zones. You

10 had an east and a central and a western.

11 **Q.** Okay. And Frankie's rank was the middle -- that middle

12 zone?

13 **A.** I believe so.

14 **Q.** And who -- who put him in that rank?

15 **A.** I did.

16 **Q.** Now, when did you meet Eric Parker, Mr. Creel?

17 **A.** That was -- if I -- if I said 2000, I think that's a

18 little early, but it was -- it wasn't much -- within two or

19 three years of 2000 towards the climb on it.

20 **Q.** How did you meet him?

21 **A.** Through another associate of ours that had started a

22 motorcycle -- I helped get them off the ground with a

23 motorcycle club.

24 **Q.** And who recruited Eric Parker?

25 **A.** I did.

**Q.**   How long was he a prospect?

**A.**   I made Eric Parker prospect for over two years.

**Q.**   Why did you do that?

**A.**   I didn't -- I didn't want him in the Aryan Brotherhood.

**Q.**   Why not?

**A.**   He was -- he wasn't cut out for that.

**Q.**   What's an ABM mission?

**A.**   That's anything that the wheel or a rank holder deems necessary to -- I would say for the advancement of the Aryan Brotherhood -- not necessarily the advancement, but anything they deemed necessary.

**Q.**   What's a thunder warrior?

**A.**   A thunder warrior is the elite of the -- of the Aryan Brotherhood.  They're --

**Q.**   And how -- I'm sorry.

**A.**   -- the executioners or the security within the family.

**Q.**   How is a thunder warrior designated, Mr. Creel?

**A.**   He is sent on three missions confirmed of a violent nature.

**Q.**   And how are they designated within the brotherhood?  How do you know if someone is a thunder warrior?

**A.**   By the bolts, the SS bolts on the -- on the neck.

**Q.**   Does Frankie Owens have the SS bolts on his neck?

**A.**   Yes, sir, he does.

**Q.**   Does Eric Parker have the SS bolts on his neck?

1   **A.**   Yes, sir, they do.  Yes, sir, he does.  I issued them.

2   **Q.**   Who did you issue the SS bolts to?

3   **A.**   Eric Parker.

4   **Q.**   And about when was that?

5   **A.**   I would be lying if I said.  I --

6   **Q.**   Okay.  Do you think you issued them to him before Michael

7   Hudson?

8   **A.**   Yes, sir.

9   **Q.**   Mr. Creel, how many years did you give the Aryan

10  Brotherhood?

11  **A.**   Twenty.

12  **Q.**   What's ABM unification, Mr. Creel?  What is that concept?

13  **A.**   Well, there was an idea that had started right at the end

14  of my rank as a shot caller.  The wheel at the time was wanting

15  to get sanctioned through the West Coast.

16  **Q.**   And what would have been the advantages of unifying with

17  the West Coast?

18  **A.**   With the particular group that they were trying to get

19  sanctioned with, there wouldn't have been any, other than maybe

20  the -- the drug -- the drug trade, but that's -- I can't

21  honestly -- I wasn't in the loop with it at the time, so it

22  would be speculation for me to say.

23  **Q.**   Did you talk to Frankie Owens about unification?

24  **A.**   Yes, we spoke on it several times.  And the people

25  that -- that they were talking to, after several discussions

1  with them, I was -- I wasn't -- I wasn't interested in anything
2  they had to say.

3  **Q.**   Was Frankie Owens in favor of unification or against it?
4  **A.**   Yes, sir, he was.

5      **MR. SUMRALL:**  Objection, Your Honor.  It calls for a
6  conclusion.

7      **THE COURT:**  Well, did he -- what, if anything, did
8  Frankie Owens tell you about the California organization?

9      **THE WITNESS:**  Well, it was -- they were very much
10  interested in unifying through -- through this particular group
11  of people, but I was very -- had a very good relationship with
12  the Aryan Brotherhood of Texas, so we were already unified,
13  recognized through -- through Texas.

14  **BY MR. LEARY:**

15  **Q.**   Do you recall anybody that was -- you talked to in
16  California about unification?

17  **A.**   I spoke with a guy named -- that was calling hisself
18  Rich.  Now, a last name, or even if that was his real name, I
19  would -- I couldn't say.

20  **Q.**   You ever sold meth, Mr. Creel?
21  **A.**   Yes, sir.

22  **Q.**   When is the first time you started selling meth?
23  **A.**   When I got laid off in the early or mid-part of 2010.

24  **Q.**   How did you get into selling meth?
25  **A.**   At the time, Parker was -- was selling meth, and we kind

1   of teamed up.

2   **Q.**   You and who?

3   **A.**   Eric.

4   **Q.**   Eric Parker?

5   **A.**   Yes, sir.

6   **Q.**   About how long were y'all teamed up?

7   **A.**   Well, 2010 to latter part of 2012.

8   **Q.**   Jointly, you and Mr. Parker?

9   **A.**   Well, I mean, yeah, we were -- we were -- we were close.

10  Now, I'm not saying that I didn't have things going on on my

11  own and he had things going on on his own, because we did, but

12  usually when there was a move made, we were -- we were

13  together.

14  **Q.**   How much meth did you move jointly with Eric Parker?

15  **A.**   This would strictly be a guess.  Over those two or

16  three years, 10 to 20 pounds.  That's strictly a guess now.

17  **Q.**   No, that's fine.  Who did you supply meth to?

18  **A.**   Anybody that wanted it other than, you know, a kid.

19  **Q.**   Would you ever sell meth to kids?

20  **A.**   No, sir.

21  **Q.**   What, if any, meth did you sell to Frankie?

22  **A.**   Sir?

23  **Q.**   What, if any, meth did you sell to Frankie Owens?

24  **A.**   I did sell Frankie 6, 8 -- 6 to 8 ounces would be maybe

25  high, maybe low.  It's not high.  It's not high, but no more

1    than 8.

2    **Q.**    What did Frankie Owens, in turn, do with the meth?

3            **MR. SUMRALL:**  Objection, Your Honor.  That calls for

4    knowledge he has no knowledge of.

5    **A.**    I couldn't say what he done with it.

6            **THE COURT:**  Okay.  He says he can't say what he did

7    with it.  Objection sustained.

8            **MR. LEARY:**  Thank you, Your Honor.

9    **BY MR. LEARY:**

10   **Q.**    Do you recall a search warrant being conducted at your

11   house?

12   **A.**    Yes, sir.

13       (CONFERRING OFF THE RECORD.)

14           **MR. LEARY:**  Your Honor, at this time, the government

15   would seek to mark an exhibit for identification purposes only.

16           **COURTROOM DEPUTY:**  G-47.

17       (EXHIBIT NO. G-47 MARKED FOR IDENTIFICATION.)

18   **BY MR. LEARY:**

19   **Q.**    Without telling me what it is, Mr. Creel, would you tell

20   me whether or not you can identify that document right there?

21   **A.**    Yes, sir, I can.

22   **Q.**    You can look through it a little bit if you want to.

23   **A.**    I don't have to look through it.  I know my work.

24   **Q.**    Do you know what it is?

25   **A.**    Yes, sir, I sure do.

1  **Q.**   Now, where were you living at the time the search warrant
2  was conducted in your house?
3  **A.**   In Ellisville, Mississippi.
4  **Q.**   Okay.  And at that time, had you been working on Aryan
5  Brotherhood documents?
6  **A.**   Yes, sir, I sure had.  Well, I hadn't -- I wasn't working
7  on them at the time, because I had finished what had -- it took
8  me a year -- a little over a year to complete that.
9  **Q.**   Okay.  And what is that?
10 **A.**   That's the Aryan Brotherhood Constitution or Bible, we
11 call it.
12 **Q.**   Explain if that -- whether or not that document was
13 distributed in Mississippi.
14 **A.**   Yes, sir, it sure was.
15 **Q.**   Throughout Mississippi?
16 **A.**   I -- it was distributed to anyone that held rank.
17 **Q.**   In what parts of the state?
18 **A.**   Through the northern, central, and the southern parts.
19 **Q.**   Okay.
20          **MR. LEARY:**  Your Honor, at this time, the government
21 would move to have the Aryan Brotherhood Constitution seized
22 from Mr. Brandon Creel entered into evidence as the next
23 numbered government's exhibit, that being 47.
24          **MR. SUMRALL:**  Your Honor, we object on the grounds
25 that it's cumulative.  It's already been introduced twice.

1          **MR. TURNER:**  We join in that.

2          **MR. LEARY:**  Your Honor, I'm about to show that the

3    Aryan Brotherhood --

4          **THE COURT:**  Okay.  The objection is overruled.

5          **MR. LEARY:**  Thank you, Your Honor.

6          **THE COURT:**  It came from a different source, a

7    different location.  It will be admitted.

8          **MR. LEARY:**  Thank you.

9          **MR. SUMRALL:**  What number was that, Scott?

10          **MR. LEARY:**  47.

11          **MR. SUMRALL:**  Thank you.

12        (EXHIBIT NO. G-47 ADMITTED INTO EVIDENCE.)

13    **BY MR. LEARY:**

14    **Q.**    Mr. Creel, I am handing you what was previously entered

15    into evidence as Government's Exhibit 47.  I'm turning to

16    page -- Bates stamp page 24115.  That page is entitled "Oath."

17    Would you please look at that page, Mr. Creel.

18    **A.**    (Reviews document.)

19    **Q.**    Mr. Creel, I'm also handing you what's been previously

20    entered into evidence as Government's Exhibit 21.  I'm turning

21    to page -- Bates stamp page 79.  In looking at Article 2,

22    Section 2, "Mississippi Blood Oath" --

23    **A.**    Yes.

24    **Q.**    -- would you please compare Exhibit 21's oath to

25    Exhibit 47's oath.

1   **A.**    (Reviews documents.)  Yes.

2   **Q.**    I'm going to ask you, is the font different on those two

3   constitutions?

4   **A.**    Yes.

5   **Q.**    And is the oath section of both constitutions

6   substantially the same?

7   **A.**    Yes, they are.

8   **Q.**    Thank you.  Mr. Creel, during the search warrant of your

9   house, were any photographs seized?

10  **A.**    Yes, sir.

11          **MR. LEARY:**  Your Honor, at this time, the government

12  would move to have the next exhibit marked for identification.

13          **COURTROOM DEPUTY:**  48.

14     (EXHIBIT NO. G-48 MARKED FOR IDENTIFICATION.)

15  **BY MR. LEARY:**

16  **Q.**    Mr. Creel, I'm handing you what's been previously marked

17  for identification as Government's Exhibit 48.  Without telling

18  me what that is, please tell me whether or not you can

19  recognize it.

20  **A.**    Yes, I can.

21  **Q.**    Okay.  Now, were those photographs taken before Michael

22  Hudson's event or after?

23  **A.**    Before.

24  **Q.**    And could you please identify -- excuse me.  The two

25  photographs taken, do you remember where they were taken?

1   **A.**   Yes, I remember where the top one was taken.  The bottom

2   one, I'm not sure.

3   **Q.**   Okay.  Do you recall both of them occurring before

4   Mr. Hudson?

5   **A.**   Yes, sir.

6   **Q.**   Are they two true and accurate representations of what

7   they purport to represent, that being photographs of you, Eric

8   Parker, and others in social events?

9   **A.**   Yes, sir.

10          **MR. LEARY:**  Your Honor, at this time, the government

11  would move to have Government Exhibit 48 entered into evidence.

12          **THE COURT:**  Okay.  Hand it back to the witness,

13  please, sir.

14          Mr. Creel, approximately when was that photograph

15  taken?  What year?

16          **THE WITNESS:**  Your Honor, I just -- I don't know if

17  the date's right on the photograph, but it says 2009.

18          **THE COURT:**  Well, those people there, would that be a

19  logical time for them to be gathered?

20          **THE WITNESS:**  No, sir.  The reason that I say this is

21  that one of the -- one of the brothers in this top photograph

22  had caught a drug charge and was locked up, I believe, prior to

23  2009.  So the only reason I -- that I'm thinking that the date

24  is wrong on it is because this brother to the far right had

25  caught a fed charge on a -- on a drug conspiracy and was locked

1    up at the time.

2          **THE COURT:**  What's his name?

3          **THE WITNESS:**  Shane Eaton.

4          **THE COURT:**  Other than him, can you identify the

5    people in the photograph?

6          **THE WITNESS:**  Yes, sir.

7          **THE COURT:**  Okay.

8          **MR. TURNER:**  Your Honor --

9          **THE WITNESS:**  I believe this bottom photograph, Your

10   Honor, was taken at my birthday party.  Now, that -- the date

11   on it -- no, sir, that's not --

12         **MR. TURNER:**  Your Honor, may I approach?

13         **THE WITNESS:**  That would be wrong too, because my

14   birthday is in January.  So these dates on them would -- that

15   would be a guess, Your Honor.  I know it's prior to the Hudson

16   incident, because --

17         **THE COURT:**  Is Michael Hudson in those photographs?

18         **THE WITNESS:**  No, sir.

19         **THE COURT:**  Okay.  Come on up.

20         **MR. TURNER:**  Thank you, Your Honor.

21      (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

22         **MR. TURNER:**  Your Honor, at this time, I would object

23   to this being entered.  The witness can't identify the time in

24   which it was taken.  He's having to guess.  Additionally, it's

25   not the original document.

1    And for those reasons, we would object to -- and also,

2    it's prejudicial for the reason that -- I cannot imagine why

3    Mr. Leary would want to show it -- Eric Parker is raising his

4    hand in the Nazi manner.

5    **MR. LEARY:**  Your Honor, I would move to have it

6    admitted for several reasons.  First of all, duplicates are

7    admissible as an original document according to 902.

8    Secondly, it shows the relationship between the Aryan

9    Brotherhood members, specifically Brandon Creel and Eric

10   Parker.

11   Third, specific date is not required for entry of a

12   photograph into evidence.  It's just not.  It was -- it was

13   identified before Michael Hudson died.

14   And, fourth, Your Honor, I would respectfully assert

15   that Rule 403 does not apply here.  That's not a -- Rule 403 is

16   not a sanitation device.  It's not to sanitize evidence.  It

17   just is what it is in the Aryan Brotherhood.

18   **THE COURT:**  I'm going to admit this given his

19   testimony about the birthday party and so forth.  I'm going to

20   permit the defendants to have broad latitude in cross-examining

21   him relative to this document.

22   Now, Mr. Leary, while I've got you up here, you've got

23   a document marked for identification, a photograph of Frankie

24   Owens.  I don't know if it was taken ten years ago,

25   twenty years ago, two weeks ago.

1    **MR. LEARY:**  Yes, sir.  I was going to -- plan to put

2    that in with my last witness to cover that.

3            **THE COURT:**  The photograph marked Government's

4    Exhibit 48 is admitted into evidence.  The defendants will be

5    permitted latitude in cross-examination concerning it.

6            **MR. LEARY:**  Thank you, Your Honor.

7       (EXHIBIT NO. G-48 ADMITTED INTO EVIDENCE.)

8       (END OF BENCH CONFERENCE.)

9            **MR. LEARY:**  Permission to publish, Your Honor --

10           **THE COURT:**  Yes, sir.

11           **MR. LEARY:**  -- Government's Exhibit 48?

12           **THE COURT:**  Yes, sir.

13   **BY MR. LEARY:**

14   **Q.**   I'm looking at the top picture, Mr. Creel.  Do you see

15   what I'm talking about?

16   **A.**   Yes, sir.

17   **Q.**   Who is that person right there (indicating)?

18   **A.**   That's me.

19   **Q.**   Who is that person right there (indicating)?

20   **A.**   That's Eric Parker.

21   **Q.**   Mr. Creel, the second picture that's been entered into

22   evidence is Government's Exhibit 48.  Who is that person that

23   I've just circled right there (indicating)?

24   **A.**   That's myself.

25   **Q.**   And who is the second person that I just circled

1  (indicating)?

2  **A.**    That's Eric Parker.

3  **Q.**    You stated these pictures were taken prior to the Michael

4  Hudson incident?

5  **A.**    Yes, sir.

6  **Q.**    Describe your relationship with Eric Parker at that time.

7  **A.**    At this time those pictures were taken?

8  **Q.**    At the time the pictures were taken.

9         **MR. TURNER:**  For the record, Your Honor, he hasn't

10  identified when in time that is.

11         **THE COURT:**  Okay.

12  **BY MR. LEARY:**

13  **Q.**    About what time frame were those pictures taken?

14  Estimate.

15  **A.**    2007 to '10.

16  **Q.**    Were you both members of the Aryan Brotherhood during

17  those time frames?

18  **A.**    Yes, sir.

19  **Q.**    Describe your relationship with Mr. Parker during that

20  time frame.

21  **A.**    Eric Parker was my -- my little brother.

22         **THE COURT:**  Okay.  Now, these -- this photo -- these

23  two photographs, as I understand, were in your residence --

24         **THE WITNESS:**  Yes, sir, they was at --

25         **THE COURT:**  -- seized by officers as a result of a

1  search warrant?

2  **THE WITNESS:**  I think one of them was -- yes, sir, one

3  of them was in an album, and the other one was on the wall.

4  **THE COURT:**  Very well.

5  **BY MR. LEARY:**

6  **Q.**  What was Eric Parker's highest rank, Mr. Creel?

7  **A.**  Captain.

8  **Q.**  Did Eric Parker ever tell you who he sold methamphetamine

9  to?

10 **A.**  No, sir.  I didn't ask.

11 **Q.**  Explain to the ladies and gentlemen of the jury the

12 dispute that you're personally aware of as an Aryan Brotherhood

13 wheel that arose between Eric Parker and Michael Hudson.

14 **A.**  I was -- it was brought to my attention that Eric had had

15 some business dealings -- methamphetamine dealings with a

16 Mr. Hudson and that Mr. Hudson had refused to pay him -- this

17 was an ongoing chain of events -- that he was stringing

18 Mr. Parker along.

19        He would tell Eric to come to the coast to get his money,

20 and Eric would get down there and couldn't find him.  Eric

21 brought it to my attention and was asking minutes with

22 Mr. Hudson.

23 **Q.**  Tell the ladies and gentlemen of the jury what minutes

24 are, Mr. Creel.

25 **A.**  The situation at hand was a personal issue between

1  Mr. Hudson and Mr. Parker. Any personal issue is a personal

2  issue between those two individuals. The Aryan Brotherhood had

3  no, if you want to call it this, dog in that fight.

4      Mr. Parker requested minutes with Mr. Hudson because of

5  his lack to -- of obligation in the business that they had.

6  Minutes was -- depending on what they -- you know, Mr. Parker

7  decided he wanted, would be a, you know, one-on-one get out

8  there and get busy, a fistfight.

9      That's the way that we settle disputes within the family

10  if there was, you know, some peaceful resolve could be reached,

11  which there very seldom ever was a peaceful resolve between us.

12  **Q.**   Now, based on your position as a wheel, are you aware of

13  anybody else owing money to Eric Parker at that time for drug

14  debts?

15          **MR. TURNER:**  Object to the leading, Your Honor.

16          **THE COURT:**  Okay. Overruled.

17  **BY MR. LEARY:**

18  **Q.**   Based on your position as a wheel, are you aware of

19  anyone else owing money to Eric -- I mean, to Eric Parker for

20  drugs at that time?

21  **A.**   I was told -- I don't know this for a fact -- that --

22          **MR. TURNER:**  Object to the hearsay, Your Honor.

23          **THE COURT:**  Speculation. The objection is sustained.

24  Not so much as to hearsay. It's just -- he says he doesn't

25  know. Conjecture. The objection is sustained.

**BY MR. LEARY:**

**Q.** Now, after the dispute arose between Eric Parker and Michael Hudson, as a wheel, did you order minutes?

**A.** Yes, sir, I sure did.

**Q.** When were the minutes to be had?

**A.** Sir?

**Q.** When was the fight to occur?

**A.** I was given a phone number to contact Mr. Hudson and was unable to -- to contact Skip.

**Q.** So if an Aryan Brotherhood member refuses to respond to an order, be that to have minutes, what's the ramification of that?

**A.** Then there's a sanction. He's in violation of a direct order.

**Q.** Explain whether or not that happened.

**A.** I hadn't issued a direct order on it. I wouldn't have to issue one on it. A captain would be -- would be very well in his scope of -- of authority to issue that.

**Q.** Okay. So what did you order?

**A.** I ordered Skip Hudson to -- to -- obligation to Eric Parker requesting minutes. Where Skip got in trouble or -- or received a sanction was for not following the order.

**Q.** Explain to the ladies and gentlemen of the jury, when does a wheel have to issue a sanction, and when is a captain allowed to issue a sanction? What's that difference?

1  **A.**    The difference between whether or not I issue it or he
2  issues it is usually the severity of the -- of the sanction.

3      As I explained earlier, it would be very much in a
4  captain's scope to issue a severe to minor sanction on another
5  brother without getting my permission.  The only time that a
6  captain or anyone of -- holding rank would have to get my
7  permission is if it was an SOS or a KOS.

8  **Q.**    Okay.  Explain what an SOS is.

9  **A.**    A smash on -- a smash on sight.  That's when a brother
10 has been deemed unrighteous and has done something that the
11 Aryan Brotherhood and the -- the other three wheel members
12 would have to vote on it and all be in favor of the smash that
13 we had considered unrighteous of an Aryan Brotherhood member.

14 **Q.**    What's the result of a smash?

15 **A.**    Depending on the severity of the smash would be -- on a
16 very minor severity, he would be allowed to cover up.  Severely
17 would be -- he would be dealt -- beat, and it would either be
18 cut off or burned off.

19 **Q.**    What would be?

20 **A.**    The brand.

21 **Q.**    Now, explain how an SOS or a smash differs than just an
22 order -- a violation.

23 **A.**    Well, the different -- like I said, the difference would
24 be -- the severity of the offense would determine the severity
25 of the sanction.

1  **Q.**   Did you order a smash on Michael Hudson?

2  **A.**   No, I didn't.

3  **Q.**   Would you have ordered a smash on Michael Hudson for

4  violating your order?

5  **A.**   I would have ordered a severe sanction, which would have

6  probably been a thunder dome.

7  **Q.**   Okay.  And a thunder dome is what?

8  **A.**   That's five brothers for three minutes or sometimes up to

9  five minutes, but no one ever lasts that long.

10 **Q.**   Would a captain have been authorized to issue a violation

11 order?

12 **A.**   Yes, he would.

13 **Q.**   Did you ever issue a KOS on Michael Hudson?

14 **A.**   No, I did not.  As I explained earlier, that was a

15 personal issue between Mr. Parker and Skip and was not Aryan

16 Brotherhood business.

17 **Q.**   How much money did Michael Hudson owe Eric Parker?

18 **A.**   This is strictly hearsay.

19 **Q.**   Don't tell me then.

20         **THE COURT:**  Okay.  Objection sustained.

21         **MR. TURNER:**  Thank you, Your Honor.

22 BY MR. LEARY:

23 **Q.**   About when was Hudson killed?

24         **MR. TURNER:**  Objection, Your Honor.  May we approach?

25         **THE COURT:**  Okay.  Yeah, that --

1    (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

2    **MR. TURNER:** Your Honor, at this time, there's no

3    proof that Mr. Hudson has been killed. Mr. Leary has used the

4    word *murdered*. At this time, I would move for --

5    **THE COURT:** Objection sustained.

6    **MR. TURNER:** -- move for a mistrial based on those

7    things.

8    **MR. LEARY:** I would like to respond. He has personal

9    knowledge of him being killed.

10   **MR. TURNER:** There's no predicate that's been laid at

11   this time.

12   **THE COURT:** Just ask him. You don't have to use those

13   terms *killed* or *murdered.* Just ask him. He knows -- wait just

14   a minute. Motion for mistrial is denied. No counts were

15   directed to -- rephrase your question, and don't use the terms

16   *murdered* and *killed.* Just ask the witness what happened.

17   **MR. LEARY:** Thank you, Judge.

18   **THE COURT:** Mistrial motion is denied.

19   (END OF BENCH CONFERENCE.)

20   **BY MR. LEARY:**

21   **Q.** Mr. Creel, about when did the Hudson event occur?

22   **A.** It was mid-December 2010, I believe.

23   **Q.** Did you ever order the kidnapping of Michael Hudson?

24   **A.** No, sir.

25   **Q.** Do you know who James Dean and Sonny Maxwell were?

**A.**     Yes, sir, I sure do.

**Q.**     Explain your involvement in ordering them to do anything to Michael Hudson.

**A.**     There was none.

**Q.**     Did anybody ask your permission to kidnap Michael Hudson?

**A.**     No, sir.

**Q.**     Did anybody ask your permission to smash Michael Hudson?

**A.**     No, sir.

**Q.**     When did you first hear -- when did you first become involved in the Hudson incident?

**A.**     2:00 or 3:00 the -- the morning that it happened.

**Q.**     Explain to the jury how you became involved in the Hudson incident.

**A.**     I had been to -- to dinner.  Had ate dinner at my girlfriend's, and I turned my phone on silent, because it was hard for me to actually enjoy, you know, any time -- quiet time because of the brotherhood.  You know, it was basically my life at the time.

So I would turn my phone on silent to -- you know, to get some quiet time.  So I went to bed -- I don't know -- 10:00 or 11:00, and I fell asleep on the couch.  And I got up to go to the restroom, and I seen where Eric had called about 40 times while I was on the couch.

**Q.**     So what did you do after you saw that Eric had called you that many times?

1    **A.**    I -- I went out -- stepped away from my girlfriend and

2    called Eric.

3    **Q.**    What did Eric Parker tell you at that time?

4    **A.**    He said that -- that there had been a situation and that

5    he needed me.

6    **Q.**    So what did you do?

7    **A.**    I got up and put my clothes on and went to his trailer.

8    **Q.**    Describe Eric Parker's mental state when you talked to

9    him.

10       **MR. SUMRALL:**  Objection, Your Honor.  Calls for a

11   conclusion.

12       **THE COURT:**  Okay.  You can tell us what Mr. Parker

13   said, what you heard him say.

14   **A.**    He told me that there had been a situation and he needed

15   me now.

16   **BY MR. LEARY:**

17   **Q.**    And what did you do in response?

18   **A.**    I got up and put my clothes on and went to his residence.

19   **Q.**    How long did it take you to get to his residence?

20   **A.**    Not -- not very long, not from where my girlfriend was

21   living to where he lives, in the same location -- area.

22   **Q.**    And what type vehicle did you utilize to get to his --

23   **A.**    I was on a -- on a motorcycle.

24   **Q.**    Now, what happened when you arrived at Eric Parker's

25   camper?

1  **A.**   When I pulled up, Eric was -- Eric was all to pieces.

2  **Q.**   Was he outside or inside?

3  **A.**   They were both outside.  The motorcycle I had was real

4  loud, so they heard me coming, and I guess they -- they stepped

5  out of the camper.

6  **Q.**   Did you visually observe how Eric Parker was acting?

7  **A.**   Yeah, he was a -- he was a wreck.

8  **Q.**   How was Frankie Owens acting?

9  **A.**   Frankie was -- was, you know, white as a sheep, but he

10  was -- he was calm.

11  **Q.**   What did Eric Parker tell you?

12  **A.**   He said that the situation had got out of hand and -- and

13  that he needed -- that he needed my help, that I needed to come

14  in the trailer.

15  **Q.**   Frankie Owens say anything to you at that time?

16  **A.**   No, sir, other than we hugged necks and shook hands.

17  **Q.**   Did you go inside Eric Parker's camper?

18  **A.**   Yes, sir.  Yes, I did.

19  **Q.**   Who followed you inside the camper?

20  **A.**   I'm not sure how the order went, how we got in.

21  **Q.**   What happened when you got inside Eric Parker's camper?

22  **A.**   A strong odor of cleaning detergents and death.

23  **Q.**   What did Eric Parker tell you what happened -- what did

24  he tell you that had happened?

25  **A.**   He said that the situation had got out of hand with Skip.

1   **Q.**   What did he ask your help to do?

2   **A.**   Well, to -- to get rid of the body.

3   **Q.**   What was Skip wrapped up in?

4   **A.**   I'm not -- I'm not real sure.  The carpet -- seem like

5   the carpet had been tore out of the trailer.  I never actually

6   seen the body.

7   **Q.**   You never actually saw it?

8   **A.**   No, sir.

9   **Q.**   Where was the carpet rolled up at that time?

10  **A.**   The carpet was out behind the trailer.

11  **Q.**   What did you agree to do for Eric Parker and Frankie

12  Owens?

13  **A.**   To dispose of the body.

14  **Q.**   Now, whose plan was it particularly on how to dispose of

15  the body?

16  **A.**   Well, me.  We -- we discussed it, but I take full

17  responsibility for, you know, what -- how -- how it occurred.

18  **Q.**   Your plan was to do what with the body?

19  **A.**   Burn it.

20  **Q.**   Burn it?  Now, how did you decide to get the body to the

21  burn site, Mr. Creel?

22  **A.**   Well, I was on a motorcycle.  At the time, Mr. Parker

23  was -- didn't have anything, but he was driving his

24  girlfriend's car.

25  **Q.**   Let me stop you right there.  Who was his girlfriend?

1  **A.**   Kaitlyn Henderson.  We called her -- we called her Legs.

2  **Q.**   Okay.  And so Eric Parker had access to what?

3  **A.**   Her vehicle.

4  **Q.**   Okay.  So what was your plan to do?

5  **A.**   At the time that the -- that this had went on, it was

6  early morning, and we had decided that we needed to get the

7  body from Mr. Parker's camper to my -- to my residence where I

8  could dispose of it.

9        So we -- an individual that lived up the street from

10  Mr. Parker that was a mutual friend of ours that was a meth

11  user -- I couldn't ride ahead of them on the motorcycle and let

12  them know what was ahead because of -- you know, obviously, I

13  couldn't call them and me on the motorcycle.

14        So we decided to --

15  **Q.**   Why couldn't you call them on a motorcycle?  I know it's

16  obvious, but just tell me.

17  **A.**   I mean, if I come up on a roadblock or something, then

18  I -- you know, I've got to pull over, pull my helmet off, and,

19  you know, jump to my phone, which didn't seem -- wasn't

20  feasible.

21  **Q.**   Okay.

22  **A.**   So we -- we -- I called -- we called Donovan -- I called

23  Donovan, and -- and we come up with a lie that we had just got

24  a big shipment of meth and I needed him to give me a ride home

25  and ride ahead of Parker and Frankie to -- in case we run up on

1    a roadblock.

2    **Q.**    Okay.  So where were you driving to?

3    **A.**    To my -- to my house.

4    **Q.**    And where was your house?

5    **A.**    In Ellisville.

6    **Q.**    How far was Ellisville from Petal?

7    **A.**    17 miles.

8    **Q.**    And who led the way?

9    **A.**    Me and Donovan.

10   **Q.**    And who followed you?

11   **A.**    Frankie and Eric.

12   **Q.**    And what vehicle were they driving?

13   **A.**    They went and borrowed a truck of a mutual friend of

14   ours.

15   **Q.**    And what was in the back of the truck?

16   **A.**    A drum.

17   **Q.**    A drum.  Now, how did you and Frankie and Eric meet up to

18   where he could follow you?

19   **A.**    They went -- they took Eric's girlfriend's car and went

20   and borrowed the truck, and on the way -- I don't remember if

21   they dropped me off at Donovan's or if I rode my motorcycle to

22   Donovan's, but I stayed at Donovan's till they got back with

23   the truck and had the -- had the drum loaded.

24        And they stopped out in front of Donovan's.  And when

25   they stopped, we got in the car and then pulled out ahead of

1  them.

2  **Q.**   And about how long did it take you to get your house in

3  Ellisville, Mr. Creel?

4  **A.**   I don't -- 15, 20 minutes maybe --

5  **Q.**   And --

6  **A.**   -- tops.

7  **Q.**   Excuse me.

8  **A.**   15 to 20 minutes tops.

9  **Q.**   Okay.  And what happened when you arrived at your house

10  in Ellisville?

11  **A.**   We pulled up in the yard, and then Eric and them pulled

12  around to the back of the house.  I give -- I give Donovan a

13  gram of dope, and he left.  At the -- during this time, another

14  brother of ours had pulled up wanting to purchase some dope,

15  and I run him off.

16  **Q.**   So to be honest, right now, you're in charge; is that

17  right?

18  **A.**   Yes, sir.

19  **Q.**   Where did you send Frankie and Eric?

20  **A.**   They -- they pulled around to the back of my house.

21  **Q.**   Okay.  What did you tell them to do with that barrel?

22  **A.**   The barrel was set behind the house, and I showed them

23  where a Sawzall was at and some paint, another drum.  My idea

24  was to camouflage the -- the drum like a deer feeder and --

25  **Q.**   That was whose idea?

1   **A.**   That was -- that was my idea.

2   **Q.**   Now, what were they going to do with the other drum?  I

3   want to get a visual of this.

4   **A.**   Well, we took -- I had some other drums, and I took --

5   they took the Sawzall, and we cut about two foot off of that

6   drum and stuck it down on the top of the drum that they had in

7   the back of the truck.

8   **Q.**   Okay.  So you got -- you took one drum, and you capped

9   the other drum with it?

10  **A.**   Yes, and secured the cap with sheet metal screws and then

11  took some paint that -- that I had there.  And while -- while

12  they were doing that, I went in and changed into a hunting --

13  you know, my hunting clothes.

14  **Q.**   Okay.  Who riveted the top drum on top of the bottom

15  drum?

16  **A.**   Frankie and Eric.

17  **Q.**   Who painted the drum?

18  **A.**   We all did.

19  **Q.**   And your story in the event you got pulled over was what?

20  **A.**   That I was going to put up a deer feeder.

21  **Q.**   Explain to the ladies and gentlemen of the jury what

22  happened to the drum next.

23  **A.**   I put it in the -- on a little utility trailer -- or we

24  set it on a little utility trailer and strapped it on.  I

25  loaded a chain saw and some wood and gas and a bunch of

1    tires -- a few tires on the -- on the trailer.

2    **Q.**    Explain where you got the metal roofing.

3    **A.**    I had remodeled my house, and I had several remnants or,

4    you know, extra drops from where I had put the roof on my house

5    is where the tin come from.  I put four sheets of tin adjacent

6    to the wood and the tires and the chain saw and gas.

7    **Q.**    Where did Frankie Owens and Eric Parker go after the

8    trailer was loaded?

9    **A.**    They went to -- back to Eric's camper.

10   **Q.**    To do what?

11   **A.**    To clean up.

12   **Q.**    And what did you do with the barrel and the tin and the

13   wood and the tires and the gas that were on that trailer?  What

14   did you do with them?

15   **A.**    At the time, during the correlation of the events, we had

16   decided -- a mutual friend of me and Eric's that Eric had dated

17   his daughter at one time had a camp that was in a secluded area

18   that he was seldom at.  We -- we contacted him and asked him if

19   it would be okay if I come and burn some -- burn some things --

20   some stuff.

21   **Q.**    And what did he say?

22   **A.**    He said that would be fine.  He -- he let me know where

23   the key to the tractor was.  And I -- I was familiar with the

24   location, so --

25   **Q.**    What was his name?

1  **A.**    I've drawn a blank.

2  **Q.**    If you remember it, just tell me.  Now, whose car drove

3  the trailer?

4  **A.**    My truck.

5  **Q.**    Your truck?  And what kind of truck did you have?

6  **A.**    Tahoe.

7  **Q.**    Tahoe?  And how long was it to go out to the farm?

8  **A.**    It's probably 25 miles.

9  **Q.**    Did you get stopped along the way?

10  **A.**    No, sir.

11  **Q.**    And when you got to the farm, what did you do?

12  **A.**    I -- I got the tractor, pulled the tractor around there.

13  It had a front-end loader on it, which is a bucket that, you

14  know, you can haul stuff in.  And I loaded the bucket and --

15  rolled the bucket up where I could slide the drum or roll the

16  drum over into the bucket.  I loaded the chain saw and the wood

17  and tires and gas in the bucket.

18  **Q.**    And where did you put it all?

19  **A.**    In the bucket of the -- of the tractor.

20  **Q.**    Okay.  Then where did you drive to?

21  **A.**    I drove to a burn pile that was below the camp.

22  **Q.**    And what did you do when you arrived there?

23  **A.**    I unloaded the chain saw and the gas, and I rolled the

24  bucket forward and roll dumped the drum out and the wood.  Dug

25  a -- dug a little pit with the -- with the front-end loader.

1  **Q.**   What did you line the pit with?

2  **A.**   I went back to the trailer and got the four pieces of tin

3  that I had brought with me and lined the bottom of the pit.

4  **Q.**   And then what did you put in the pit with the tin?

5  **A.**   I put some -- some wood, a couple of tires, and then I

6  rolled the -- rolled the drum over into the pit.

7  **Q.**   And then what did you do?

8  **A.**   I threwed more wood, a couple more tires on top of the

9  drum.  I poured gas all over it, poured me a trail, and then

10  lit it up.

11  **Q.**   How did you keep from blowing yourself up with gas?

12  **A.**   Well, I grew up in the country, and it's -- you know, you

13  pour it, and then you, in essence, make you a fuse with a --

14  with a stream of gas.  Then you take your can way off, and

15  then, you know, you light your fuse and then get out of the

16  way.

17  **Q.**   Do you regret what you did?

18  **A.**   Every day.

19  **Q.**   How much time has it cost you?

20  **A.**   It's cost me my life, 25 years.  If it would have been

21  anybody but Eric Parker, they'd have been on their own.

22  **Q.**   Somebody else that called you for help, would you have

23  responded this way?

24  **A.**   No.  No, I wouldn't have.  If it would have been anybody

25  but them two.

1  **Q.**   How long did you burn the body?

2  **A.**   Four to five days.

3  **Q.**   And explain to the ladies and gentlemen of the jury how
4  you did that.

5  **A.**   I would take extra wood and tires with me.  Every day --
6  every morning I'd go add new tires and wheels -- I mean, wood
7  and make -- you know, kept it -- kept it burning.

8  **Q.**   When you decided it was enough time, explain what you did
9  with the tin, what you did there.

10  **A.**   Well, I didn't want to really -- to see what I'd
11  actually -- actually done, so I took the tin and rolled it down
12  and concealed everything that I had burned in the pit and
13  folded it all over and slid it out of the pit up on -- into the
14  bucket of the front-end loader.

15  **Q.**   What did you do with that -- I don't know -- that tin
16  package there?

17  **A.**   I put it in the front-end loader.

18  **Q.**   And then what did you do with it after that?

19  **A.**   I took it and slid it onto the -- onto my trailer.

20  **Q.**   And then where did you take it?

21  **A.**   To a creek, a river.

22  **Q.**   Do you remember what river it was?

23  **A.**   No, I don't remember.  It would have to be Tallahala,
24  Tallahoma.

25  **Q.**   And then what did you do when you got there?

1  **A.**   Stopped at -- on the bridge and throwed it over -- over

2  the bridge.

3  **Q.**   Now, did you go back to the burn site?

4  **A.**   No, sir.

5  **Q.**   Explain how you -- after you got the tin up and moved

6  out, explain how you sifted out the rest --

7          **MR. SUMRALL:**  Objection to leading, Your Honor.

8          **THE COURT:**  Yeah.  Okay.  Just ask him what he did.

9  **BY MR. LEARY:**

10  **Q.**   What did you do?  How did you move that tin out?

11  **A.**   After I got the tin into the bed of the front-end loader,

12  I took a -- the remainder of the barrel that we used to make

13  the -- the rest of the -- the fake feeder and an old screen,

14  and I sifted the area around where I had burnt the -- burnt the

15  drum to make sure that I didn't drop anything.

16  **Q.**   How many days after the Hudson event did Eric Parker come

17  by your house?

18  **A.**   Maybe the -- the sixth.  It was sixth, maybe fifth --

19  sixth or seventh day.

20  **Q.**   And what did Eric say happened to Skip?

21  **A.**   I asked -- I asked Eric what the hell happened.  And he

22  said that it got out of hand.  And he took a -- he took a

23  little bat and choked Mr. Hudson to death.  He started crying,

24  and I was crying.  So I just -- there never was anything else

25  other than that day discussed about it.

1   **Q.**   How did Mr. Parker say he killed Hudson?

2   **A.**   Well, he said that Mr. Hudson was in pretty bad shape

3   when he got there, but he said that -- that it got out of hand

4   in the camper, and he had took some type of bat and choked

5   Mr. Hudson to death.

6   **Q.**   Do you know how something like that got authorized

7   without your permission?

8   **A.**   No, sir, I didn't -- I don't have any idea.  I don't

9   think there was ever an authorization.  I think it was a

10   situation that got way out of hand, and something tragic

11   happened.

12   **Q.**   Who's Thomas Parker, Mr. Creel?

13   **A.**   Thomas Parker was my state captain.

14   **Q.**   Do you recall when he got out of jail about?

15   **A.**   Which time?

16   **Q.**   About the time of the Hudson incident.

17   **A.**   No, sir.  I'm not -- I think Thomas got out around

18   2009 --

19   **Q.**   Uh-huh.

20   **A.**   -- latter part.  Maybe the early part of 2009.

21   **Q.**   And Thomas Parker's rank was what?

22   **A.**   He was my state captain.

23   **Q.**   Okay.  Explain what happened at Thomas Parker's house

24   concerning this event.

25   **A.**   Well, there was a -- Mr. Owens had been contacted by some

1  detective in -- on the coast concerning any knowledge of where

2  Mr. -- where Skip may be.  I was -- I was notified of this.

3      During the time that I was notified of this, it was

4  right -- maybe a day prior to our monthly church meeting.  And

5  we had our -- our monthly church meeting, and then all that was

6  involved -- that were involved in the -- in the Skip situation

7  was called to the back of the trailer.

8  Q.   And what was discussed in the back of the trailer?

9  A.   Well, the first thing I did was, I decommissioned all of

10  the -- the brothers that was involved in the -- in the

11  situation.

12  Q.   Why did you do that?

13  A.   Well, there was -- the situation had -- there had begun

14  talk between the brothers of what had happened, speculating on

15  what had happened.  And I told the brothers to -- that was

16  involved in it that they were, you know, to not attend any type

17  of family brother functions; that they were, you know,

18  dismissed from any active service.

19  Q.   What else did you say?

20  A.   I told them that -- that this was never to be spoke --

21  spoke on again.

22  Q.   What, if anything, did Frankie Owens say?

23  A.   Frankie explained what the -- the detective had discussed

24  or asked him.  He said that if anything ever -- ever become of

25  this that he would -- that he would hold up for it.

1  **Q.**    Did he hold up for it?

2          **MR. SUMRALL:**  Objection, Your Honor.  It calls for

3  knowledge he has no knowledge of.

4          **THE COURT:**  Okay.  Overruled.

5  **BY MR. LEARY:**

6  **Q.**    Did he hold up for it?

7  **A.**    No.

8  **Q.**    Did you ever talk about Hudson's death with Owens after

9  that?

10 **A.**    No.  Me and Frankie never discussed any of that.

11 **Q.**    Did you ever discuss with any Aryan Brotherhood --

12 without telling me what you discussed, did you ever discuss

13 with any Aryan Brotherhood member whether -- the aspects of the

14 criminal investigation and whether or not they were going to

15 find witnesses?

16 **A.**    Restate the question again.

17 **Q.**    Did you ever -- without telling me what, did you ever

18 discuss with any Aryan Brotherhood -- with any Aryan

19 Brotherhood members whether there were any weaknesses in the

20 brotherhood as far as talking to law enforcement?

21          **MR. SUMRALL:**  Objection to his leading, Your Honor.

22      (QUESTION READ BACK BY THE COURT.)

23          **THE WITNESS:**  Was it weaknesses or witnesses?

24          **THE COURT:**  Any witnesses in the brotherhood.  I'm

25 just reading the real time.  I don't know.  I'm not --

1    **MR. LEARY:**  I'll withdraw the question, Your Honor.

2    **THE COURT:**  Okay.

3    (CONFERRING OFF THE RECORD.)

4    **MR. LEARY:**  No further questions.  We tender the

5    witness, Your Honor.

6    **THE COURT:**  Okay.  Mr. Sumrall, on behalf of your

7    client, Mr. Owens, you may cross-examine Mr. Creel.

8    **MR. SUMRALL:**  Your Honor, may we approach?

9    **THE COURT:**  Yes, sir.

10   (BENCH CONFERENCE OUT OF HEARING OF THE JURY.)

11   **MR. SUMRALL:**  Like the juror the other day, I need to

12   go to the restroom real bad.  If I may have just a moment.

13   **THE COURT:**  The highest of priorities.

14   (END OF BENCH CONFERENCE.)

15   **THE COURT:**  Ladies and gentlemen, we'll be in recess,

16   let's say, until a quarter past 12:00, fifteen minutes.

17   (JURY OUT.)

18   (RECESS TAKEN AT 11:56 A.M. UNTIL 12:14 P.M.)

19   (JURY IN.)

20   **THE COURT:**  Okay.  Mr. Sumrall, yes, sir, you may

21   proceed with your cross-examination.

22   **MR. SUMRALL:**  Thank you, Your Honor.  If it please the

23   Court.

24                          **CROSS-EXAMINATION**

25   **BY MR. SUMRALL:**

1  **Q.**   Mr. Creel, good afternoon.  I believe it is afternoon
2  yet.
3  **A.**   Yes, sir.
4  **Q.**   Now, I believe you stated you became an Aryan Brotherhood
5  member in 1993; is that correct?
6  **A.**   Yes, sir.
7  **Q.**   Where were you when that happened?
8  **A.**   I was in the free world.
9  **Q.**   In the free world?
10  **A.**   Yes, sir.
11  **Q.**   Was that down in Ellisville, Mississippi?
12  **A.**   Yes, sir.
13  **Q.**   Okay.  Now, you rose to the rank of wheel; is that
14  correct?
15  **A.**   Yes, sir.
16  **Q.**   And the Aryan Brotherhood has a very strict constitution,
17  correct?
18  **A.**   That's -- yes, sir.
19  **Q.**   And I believe you called it -- you were the shot caller,
20  right?
21  **A.**   Yes, sir.
22  **Q.**   So everything that basically was supposed to happen was
23  supposed to happen under your authority, right?
24  **A.**   Yes, it should have come through me.  Yes, that's
25  correct.

1  **Q.**  Okay.  Now, when you were in the Aryan Brotherhood and

2  rising up to the rank of wheel, you told the brotherhood that

3  you had been in prison, hadn't you?

4  **A.**  I had to -- well, I didn't deny it.  I didn't -- I didn't

5  say I hadn't.  I didn't say I had.

6  **Q.**  But you led them to believe that you had, didn't you?

7  **A.**  I led them to believe whatever they wanted.

8  **Q.**  Whatever it was to benefit you, right?

9  **A.**  No, not -- not at all.

10  **Q.**  But I believe you stated you were never convicted until

11  2012; is that correct?

12  **A.**  Yes, sir.

13  **Q.**  And I believe you said you never really used meth much

14  until 2010?

15  **A.**  Yes, sir.

16  **Q.**  Okay.  Now, as a wheel -- only a wheel could order an

17  SOS; is that not correct?

18  **A.**  No, sir -- yes, sir.  Yes, sir.  An SOS, that is correct.

19  **Q.**  Okay.  So any SOS that happened through the brotherhood

20  was supposed to come from the wheel, correct?

21  **A.**  Yes.  That's correct.

22  **Q.**  Yet, you're saying that there was never an SOS issued on

23  Michael Hudson?

24  **A.**  No, there wasn't.  I didn't issue one.

25  **Q.**  You're distancing yourself as far as you can from it,

1  aren't you?

2  **A.**   No, sir, I'm not.  I'm saying that there's three other

3  wheel members that -- that could do this, and I'm saying that I

4  didn't issue it.  I'm not saying that there was never an SOS

5  issued.  All I'm stating is that I didn't issue it.

6  **Q.**   Isn't it a fact that an SOS is supposed to be agreed

7  between all of the wheel members?

8  **A.**   Yes, sir, it is.

9  **Q.**   Okay.

10  **A.**   That doesn't necessarily mean that it happened that way,

11  if you'll allow me to explain the wheel.  The reason being,

12  there's certain situations where the incarcerated wheel member

13  may not be able to be -- get in touch with him.

14  **Q.**   Okay.  But that's an exception, isn't it?

15  **A.**   That's very rarely, but, yes, that is an exception.

16  **Q.**   Okay.  And in December of 2010, you were a wheel?

17  **A.**   Yes, sir, I was.

18  **Q.**   Okay.  As a wheel, did you ever order SOSes?

19  **A.**   Yes, sir, I have.

20  **Q.**   Numerous times; isn't that correct?

21  **A.**   Numerous.

22  **Q.**   More than 20?

23  **A.**   Yes.

24  **Q.**   If a lower-ranking member committed -- or did an SOS

25  without authority of the wheel, that would be a violation,

1  would it not?

2  **A.**   Yes, it would.

3  **Q.**   Was anybody violated for the Michael Hudson affair?

4  **A.**   No, sir, and the reason being is, we already have one

5  death.  By our constitution and laws, the answer to a death

6  is -- is you pay it with blood.  I've already got one -- one

7  individual dead, and the answer to that would be killing six

8  more individuals.  Where's the reason to the madness in that?

9         There's already -- already a bad situation happened.

10  There's nothing that can be done about that bad situation.  So

11  I deemed it unnecessary to -- to violate anybody involved in

12  that because of the fact that it wouldn't solve anything.  It

13  would just compound the problem.

14  **Q.**   Okay.  Now, I believe the government asked you that part

15  of your oath was to protect the Aryan Brotherhood, is it not,

16  when you take the oath?

17  **A.**   That is correct.

18  **Q.**   And that was in both of your constitutions that he showed

19  you; is that not correct?

20  **A.**   That's correct.

21  **Q.**   And you've violated that oath, haven't you?

22  **A.**   I have -- I have swore a lot of things over 20 years'

23  involvement in the Aryan Brotherhood, yes.

24  **Q.**   Now, let's go to the December -- early part of December.

25  You said Eric Parker called you approximately 40 times; is that

1    correct?

2    **A.**    It's -- I didn't count them, but, yes, I had numerous

3    missed calls.

4    **Q.**    Okay.  And you -- finally, I believe you said, when you

5    woke up and saw it, you called him back?

6    **A.**    No -- yeah.  When I looked at my -- I picked my phone up

7    and looked at it, I returned the call, yes.

8    **Q.**    And then I believe you told this jury that you rode your

9    motorcycle to Eric Parker's; is that correct?

10   **A.**    Yes.  That's correct.

11   **Q.**    Now, in 2010, you didn't tell law enforcement -- or

12   2012 -- excuse me -- you did not tell law enforcement you rode

13   your motorcycle, did you?

14   **A.**    I wasn't sure how I got there, sir.  I wasn't.

15   **Q.**    Oh, but you are now?

16   **A.**    Yes, sir.

17   **Q.**    You told them in 2012 that you rode your -- took your

18   Yukon, right?

19   **A.**    Exact -- yes, sir, I did.

20   **Q.**    And then on another occasion you told them you took your

21   Yukon and then went and got a trailer; is that not correct?

22   **A.**    Yes, sir.

23   **Q.**    And then another time you told them you went and borrowed

24   a truck; is that not correct?

25   **A.**    No, sir.

1  **Q.**    Isn't it a fact that you told them that you went and got
2  a truck and came back and got the barrel?
3  **A.**    No, sir.
4  **Q.**    You didn't tell them that?
5  **A.**    No, sir.
6  **Q.**    Why did you tell them you went -- you took a truck --
7  your truck, your Yukon, over there when you rode your
8  motorcycle?
9  **A.**    I was -- it was -- it was not to mislead anybody in any
10  way.  When it came to my understanding of why I was on the
11  motorcycle is -- the question was brought to me is:  If I had a
12  vehicle there, why would I involve someone else in the
13  situation?  If I'd have had my vehicle, there would have been
14  no reason to involve another individual in the situation that
15  we had.
16       Over a period of time, I recall why I -- we actually had
17  to involve Donovan in the -- in the particular situation, and
18  it was because I was on my motorcycle.  Yes, I did, in fact,
19  tell them that I was in the Yukon, but that was -- that was
20  not -- that was not factual.
21  **Q.**    All right.  Let me clear up one other thing too.  In 2009
22  when Frankie Owens got out of prison -- do you remember that?
23  **A.**    Mr. Owens had been locked up a couple of times.  I'm
24  not -- I'm not -- I can't say, yes, I remember that
25  particular -- that time.

**Q.**   Well, let -- if he did get out in 2009, do you remember him coming to you to say he had earned his lightning bolts in prison?

**A.**   No, sir, I don't.  I don't recall that conversation.

**Q.**   You don't remember calling Baron Goff and asking him?

**A.**   Yes.  Yes.  Yes, I did.  Yes, that is true.

**Q.**   Okay.  So this was prior to the Michael Hudson thing?

**A.**   Yes, it was.

**Q.**   Okay.

**A.**   Yes, I do remember that conversation.

**Q.**   Thank you, sir.  Now, you said that this barrel -- now, wait a minute.  You said that you saw the rug, right, out back?

**A.**   I saw -- well, rug -- I don't know what it -- it was -- might have been plastic, but the carpet had been torn out of the -- out of the camper.  So I -- you know, I didn't go per se look at it, but I just -- I just --

**Q.**   I believe you stated just a little while ago that you never saw a body; is that correct?

**A.**   No, I did not.

**Q.**   Okay.  You did not say it, or you did not -- did not see it?

**A.**   No, I did not see it.

**Q.**   Okay.  And you told law enforcement back in 2012 that you did not see a body?

**A.**   That is correct.

1   **Q.**   And you told law enforcement in 2014 when you talked to

2   them that you did not see a body?

3   **A.**   That is correct.

4   **Q.**   So the truth is, you have not seen a body?

5   **A.**   I have not seen a body.

6   **Q.**   So you're assuming that there was a body in there; is

7   that correct?

8   **A.**   That is correct.

9   **Q.**   Thank you.  Now, you're saying that the meeting at Thomas

10  Parker's, that was a regular meeting, a regular --

11  **A.**   Yes, sir.

12  **Q.**   -- church meeting?  It was not called by Frankie Owens;

13  is that correct?

14  **A.**   No, sir.  We -- I think the chain of events just fell

15  into place.  I don't think that Mr. Owens called no special

16  meeting.  I know we was having our monthly church.  If it was,

17  it just fell like that.  I don't recall Frankie ever, you know,

18  asking to hold a special meeting, no.

19  **Q.**   Okay.  One of the Aryan Brotherhood creeds is "Brothers

20  before others," is it not?

21  **A.**   That is correct.

22  **Q.**   And you've put yourself before your brothers, haven't

23  you?

24  **A.**   No, sir, I haven't.

25  **Q.**   You're here trying to help yourself today, aren't you?

1 **A.** I'm trying to make the best out of the situation. Yes, I
2 am.

3 **Q.** Now, Mr. Creel, you lied to your brotherhood about being
4 out of prison before, did you not?

5 **A.** I did -- well, no, I didn't lie. I just --

6 **Q.** You led them to believe that?

7 **A.** -- let them believe what they will.

8 **Q.** You led them to believe that?

9 **A.** That was discussed -- I come out and stood before the
10 whole brotherhood statewide and come clean on that. Yes, I
11 did.

12 **Q.** And also, you lied to law enforcement, did you not?

13 **A.** I have lied to law enforcement. Yes, I have.

14 **Q.** Okay. And how do we know you're not lying here today?

15 **A.** You don't.

16 **MR. SUMRALL:** Court's indulgence.

17 **THE COURT:** Yes, sir.

18 (CONFERRING OFF THE RECORD.)

19 **MR. SUMRALL:** No further questions, Your Honor.

20 **THE COURT:** Mr. Turner, on behalf of your client,
21 Mr. Parker, you may cross-examine Mr. Creel.

22 **MR. TURNER:** Thank you, Your Honor.

23 **CROSS-EXAMINATION**

24 **BY MR. TURNER:**

25 **Q.** Mr. Creel, isn't it true that in 2012 you did not tell

1    law enforcement that Eric Parker choked Michael Hudson?

2    **A.**    In 2012?

3    **Q.**    Yes, sir.

4    **A.**    No, sir, that's not true.

5    **Q.**    Okay.  When's the first time you told them?

6    **A.**    I told Ricky Lott the situation when Mr. Parker had --

7    Mr. Lott had informed me that Mr. Parker had cooperated and

8    come clean with the -- with him when I was questioned by

9    Mr. Lott at the Mississippi Bureau of Investigation.

10   **Q.**    Okay.  Let's try this then.  You say you gave many SOS

11   orders, right?

12   **A.**    Yes, I have.

13   **Q.**    How many KOS orders have you given?

14   **A.**    None.

15   **Q.**    Okay.  And you also said something about you

16   decommissioned everyone that was involved in this?

17   **A.**    Yes, I did.

18   **Q.**    What does that mean?

19   **A.**    That means that they are -- they're not -- they're not

20   active.  There was -- like I stated earlier, there was a lot

21   of -- a lot of talk within the family about what had happened.

22   And in order to -- to keep the situation that happened

23   contained to the best of my knowledge, I instructed these

24   brothers to -- to not come to any functions or have any -- any

25   involvement with any of the rest of the brotherhood.

1  **Q.**  So, basically, they weren't brothers anymore, right?

2  **A.**  No, they were -- no, they were still brothers, but they

3  were -- they were not active brothers.

4  **Q.**  Okay.  In 2011, did Eric Parker attend any Aryan

5  Brotherhood functions?  He didn't, did he?

6  **A.**  If I said either way, I would be -- I'm not sure.

7  **Q.**  Okay.  All right.  Would you agree with me in 2012 that

8  he didn't attend any Aryan Brotherhood functions?

9  **A.**  I would -- I would definitely agree with that.

10 **Q.**  Would you agree with me in 2013 he did not?

11 **A.**  I would definitely agree with that.

12 **Q.**  And in 2014, he did not?

13 **A.**  He did not.

14 **Q.**  He removed himself from the Aryan Brotherhood, didn't he?

15 **A.**  I -- well, I told Eric the same thing I told them.  Eric

16 had --

17 **Q.**  I'm sorry.  Will you answer me yes or no?  And then you

18 can explain.

19 **A.**  Yes.

20 **Q.**  Okay.  Thank you.

21      **THE COURT:**  Now, let him --

22      **MR. LEARY:**  Your Honor, I object to --

23      **THE COURT:**  Wait just a minute.  Have a seat.  Explain

24 your answer.

25      **THE WITNESS:**  Eric had had -- was having a lot of

1  problems with the situation that happened.  I done the best of

2  my knowledge to protect Eric.

3  **BY MR. TURNER:**

4  **Q.**   Okay.  Were you using a lot of methamphetamines in 2010?

5  **A.**   Quite a -- yes, quite a bit.

6  **Q.**   How frequently?

7  **A.**   Two or three times a week.  Sometimes once a day, twice a

8  day.  It would just depend.

9  **Q.**   Yes, sir.  Does that go for December of 2010 also?

10 **A.**   Yes, sir.  Yes, sir.

11 **Q.**   Okay.  You said on direct that this event happened in the

12 middle of December of 2010?

13 **A.**   Yes, it -- mid-part -- I know it wasn't far -- too many

14 days from Christmas.

15 **Q.**   Okay.  So it was close to Christmas?

16 **A.**   Yeah.  Well, I mean, within a week -- two weeks of

17 Christmas, yes.

18 **Q.**   Okay.  And did you do any other drugs during that --

19 **A.**   No, I've never done any other drugs.

20 **Q.**   I understand.  The -- how many times in December of 2010

21 do you think you did methamphetamine?

22 **A.**   Up until December the 10th or the whole month of

23 December?

24 **Q.**   Well, tell me how many times in December total you

25 remember.

1    **A.**    I would be -- I don't -- I couldn't honestly say.

2    **Q.**    Daily?

3    **A.**    Not daily.  For sure weekly.

4    **Q.**    All right.  Did you do any methamphetamine the night of

5    this incident that you're referring to?

6    **A.**    Not prior to Mr. Parker calling me.

7    **Q.**    All right.  Did you -- at anytime during the events that

8    you've explained to the jury, did you do any methamphetamines?

9    **A.**    The -- of what events?

10    **Q.**    When you were burning the body that you claim --

11    **A.**    Yes.

12    **Q.**    -- this body that you never saw, right?

13    **A.**    Exactly.

14    **Q.**    Okay.  You did methamphetamine while you were doing that?

15    **A.**    One time -- twice, yes, I did, during the process of the

16    three or four days.

17    **Q.**    Do you agree with me that methamphetamine can alter your

18    mind?

19    **A.**    I'm not a physician, but it can give you a false sense of

20    superiority or security, yes.

21    **Q.**    It can also affect your memory, can't it?

22    **A.**    I couldn't honestly say.

23    **Q.**    Has it ever affected your memory?

24    **A.**    Not that I -- if it has, I'm not aware of it.

25    **Q.**    All right.  Well, let's back up for a second, because in

1    2012, you told investigators that you were going to get your --

2    you were in your Tahoe --

3    **A.**    I understand, yes.

4    **Q.**    -- and that you needed to go get a trailer.  Do you

5    recall that?

6    **A.**    Yes, I did.

7    **Q.**    That's not true, is it?

8    **A.**    As I explained earlier, it was in no way to lie to the --

9    to the authorities.  I just wasn't sure.  And when the

10   situation was presented to me, well, why would I go to

11   Donovan's and involve him in the situation, then I remembered

12   that I was not actually in my Tahoe.

13       I was on -- that was the purpose in me having to get

14   Donovan involved in it, because of me being on the motorcycle.

15   It was not in any way, shape, form, or fashion to try to slide

16   anything by the authorities, no.

17   **Q.**    Well, you'll agree with me it wasn't true, correct?

18   **A.**    I will agree with that.  Yes, I will.

19   **Q.**    All right.  What else in your statements are not true?

20   **A.**    Nothing.

21   **Q.**    That's the only inconsistency that you're telling me that

22   existed back -- that you gave to law enforcement --

23   **A.**    Yes, sir.  With the --

24   **Q.**    -- then and your trial testimony now?

25   **A.**    -- with the transportation issue, yes.

1  **Q.**   Now, back in 2012, it was your testimony that after you

2  burned the body, you sifted the parts of whatever was left

3  down, this body that we don't know if you even saw, right?

4  **A.**   I didn't see a body.  No, I didn't.

5  **Q.**   Your statement back then says you dropped it off in two

6  different places, does it not?

7  **A.**   Yes, two -- the folded up tin and all of that stuff, I

8  dropped it in one creek.  And where I had sifted the

9  surrounding area, I put in the drum that I had cut off -- that

10 we had cut off to make the -- the feeder -- the fake feeder, I

11 dumped it in another creek, yes.  That is correct.

12 **Q.**   Well, that's not what you said on direct, though, right?

13 You said you put --

14 **A.**   That wasn't -- that wasn't the question that I was asked.

15 **Q.**   Okay.

16 **A.**   The question I was asked is what did I do with the tin

17 that come out of the -- I was never asked what happened to the

18 other drum.

19 **Q.**   Okay.  You said several times that whatever dispute

20 existed between Mr. Parker and Mr. Hudson, that was as a

21 personal nature?

22 **A.**   That's correct.

23 **Q.**   It didn't have anything to do with the Aryan Brotherhood,

24 did it?

25 **A.**   No, sir, because --

1    **THE WITNESS:**  Am I allowed to explain this?

2    **THE COURT:**  Yes, sir.

3  **A.**    The reason being, was that the drug debt that was owed to

4  Eric Parker was on a personal -- a personal gain.  It was

5  not -- the Aryan Brotherhood treasury did not see one dime of

6  any proceeds that Eric Parker made from his drug sales; so,

7  therefore, it was a personal issue between two brothers.

8  **BY MR. TURNER:**

9  **Q.**    I understand.  Thank you.  And that's what I was getting

10  at.

11  **A.**    Yes, sir.

12  **Q.**    Eric -- whatever -- any drug sales that you made, that

13  went in your pocket, right?

14  **A.**    Yes, sir.

15  **Q.**    Okay.  That didn't have anything to do with the Aryan

16  Brotherhood, right?

17  **A.**    No, sir, it didn't.

18  **Q.**    Okay.

19  **A.**    The Aryan Brotherhood, while I was calling the shots in

20  the free world, had no involvement as a whole as drug

21  distributioners (sic), drug sellers, or drug buyers.  That was

22  strictly on a personal -- personal, you know, venue.

23  **Q.**    Yes, sir.

24    **MR. TURNER:**  Your Honor, may I have a second with my

25  client, please?

| | |
|---|---|
| 1 | **THE COURT:** Yes, sir. |
| 2 | **MR. TURNER:** Thank you. |
| 3 | (CONFERRING OFF THE RECORD.) |
| 4 | **BY MR. TURNER:** |
| 5 | **Q.** Mr. Creel, a meeting was mentioned at Thomas Parker's -- |
| 6 | **A.** Yes, sir. |
| 7 | **Q.** -- that -- I've already brought up that you said you |
| 8 | decommissioned people. |
| 9 | **A.** Yes, sir. |
| 10 | **Q.** Who was in attendance when you said that, and who were |
| 11 | you -- excuse me. Let me try again. Who were you referring |
| 12 | to? |
| 13 | **A.** The ones that was involved with the Mr. Hudson incident. |
| 14 | Wendell -- I'm not sure what Wendell's name -- last name is -- |
| 15 | Sonny Todd Maxwell; James Dean; T-bone, Burrus; Mitchell |
| 16 | Valentine; and Mr. Owens, Frankie, State Raised. |
| 17 | **Q.** Thank you. |
| 18 | **MR. TURNER:** Your Honor, that's all the questions I |
| 19 | have for Mr. Creel. |
| 20 | **THE COURT:** Redirect? |
| 21 | **MR. LEARY:** Just a few questions, Your Honor. |
| 22 | **REDIRECT EXAMINATION** |
| 23 | **BY MR. LEARY:** |
| 24 | **Q.** Mr. Creel, 2012 when you talked to law enforcement -- |
| 25 | **A.** Yes, sir. |

1   **Q.**   -- did you admit to burning the body?

2   **A.**   Yes, sir, I did.

3   **Q.**   Did you plead guilty to burning trash?

4   **A.**   No, sir.

5   **Q.**   How long did you get for your crime, Mr. Creel?

6   **A.**   25 years.

7   **Q.**   Now, you testified earlier that Frankie Owens had his

8   bolts before the Michael Hudson incident?

9   **A.**   Yes, sir.

10  **Q.**   Do you remember 2010, Mr. Creel?

11  **A.**   Yes, sir.

12          **MR. LEARY:**   No further questions, Your Honor.

13          **THE COURT:**   Okay.  Mr. Creel, I think this concludes

14  your testimony.  You'll be fully and finally discharged.

15  You're remanded to the custody of the United States Marshal.

16  You may go.

17          Ladies and gentlemen of the jury, we're going to

18  recess for the weekend.  Remember, do not discuss what you've

19  heard here in this courtroom among yourselves.  Do not discuss

20  it with anyone else.  We'll be -- let's start at 9:30, 9:30

21  Monday.  And, hopefully, you'll get home in time to do some

22  banking, whatever you need to do during business hours.

23          Drive safely.  The notepads that you have, leave them

24  in the jury room.  They'll be locked up and be safe over the

25  weekend.  I told you it was an important function you're

1    discharging.  I think you've heard some things you've never

2    heard before in your life.

3             Okay.  The jury is excused until Monday morning at

4    9:30.  Counsel, we'll stand in recess until 9:30 Monday

5    morning.

6             **MR. LEARY:**  Your Honor, could I bring one thing up to

7    the Court?  Could we approach?

8             **THE COURT:**  Wait until the jury is completely out.

9             **MR. LEARY:**  Thank you, Your Honor.

10        (JURY OUT.)

11            **THE COURT:**  Okay.

12            **MR. LEARY:**  Your Honor, there's been continual

13   reference to the body that nobody saw, and I'm -- I understand

14   our burden, but I also understand truth.  And when defense

15   counsel is saying that, he knows exactly where the body is and

16   who saw the body.  And I just -- I feel like that, as our

17   obligation of triers of fact, it can't be to espouse an untruth

18   to the jury.

19            And excuse me for bringing that up again, but I just

20   feel obligated to, because it's not the body that nobody saw.

21   It's the body that this man admitted to killing.

22            **THE COURT:**  Well -- okay.  Thank you.

23            **MR. LEARY:**  Thank you.

24            **THE COURT:**  Court is in recess until 9:30 Monday

25   morning.

1        (RECESSED AT 12:45 P.M.)

## CERTIFICATE

I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, Official Court Reporter for the United States District Court, Northern District of Mississippi, was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I, Phyllis K. McLarty, RMR, FCRR, CCR #1235, have caused said stenographic notes to be transcribed via computer, and that the foregoing pages, 652-778, are a true and accurate transcription to the best of my ability.

Witness my hand, this 31st day of August, 2016.

/s/ Phyllis K. McLarty
PHYLLIS K. McLARTY, RMR, FCRR, CCR #1235
Official Court Reporter