1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF MISSISSIPPI

3

4

5   UNITED STATES OF AMERICA,        )
                                     )
6            Plaintiff,              )        CASE NO. 4:14CR141
                                     )
7            vs.                     )
                                     )
8   FRANK GEORGE OWENS, JR.,         )
    AND ERIC GLENN PARKER,           )
9                                    )
             Defendants.             )
10  _____

11

12

13                JURY TRIAL - DAY 2 - TESTIMONY
          BEFORE SENIOR DISTRICT JUDGE GLEN H. DAVIDSON
14             TUESDAY, APRIL 5, 2016; 9:20 A.M.
                    OXFORD, MISSISSIPPI

15

16

17  FOR THE GOVERNMENT:

18

         United States Attorney's Office
19       SCOTT LEARY, ESQ.
         CLAY DABBS, ESQ.
20       900 Jefferson Avenue
         Oxford, Mississippi  38655-3608

21

22       U.S. Department of Justice
         KELLY KATHLEEN PEARSON, ESQ.
23       1301 New York Avenue, NW
         Suite 49
24       Washington, DC  20005

25

1 **FOR THE DEFENDANT FRANK GEORGE OWENS, JR.:**

2

      Attorney at Law
3       WILLIAM ANDY SUMRALL, ESQ.
      Post Office Box 1068
4       Jackson, Mississippi 39215-1068

5

6

  **FOR THE DEFENDANT ERIC GLENN PARKER:**
7

8       Attorney at Law
      JOSHUA A. TURNER, ESQ.
9       103 North Lamar, Suite 205
      Oxford, Mississippi 38655
10

11

12

13

14

15      Proceedings recorded by mechanical stenography, transcript
produced by computer.
16

17         **RITA DAVIS YOUNG, FCRR, RPR, CSR #1626**
          FEDERAL OFFICIAL COURT REPORTER
18         911 JACKSON AVENUE EAST, SUITE 369
          OXFORD, MISSISSIPPI 38655
19

20

21

22

23

24

25

1                    <u>TABLE OF CONTENTS</u>

2    Style and Appearances....................................1

3    Table of Contents........................................3

4    <u>WITNESSES FOR GOVERNMENT</u>

5    DWAYNE SMITH
             Direct Examination by Mr. Leary.................7
6            Cross-Examination by Mr. Sumrall..............47
             Cross-Examination by Mr. Turner...............47
7
     STEPHEN HUBANKS
8            Direct Examination by Mr. Leary................49
             Cross-Examination by Mr. Sumrall.............146
9            Cross-Examination by Mr. Turner..............160
             Redirect Examination by Mr. Leary............161
10
     DON DOUGLAS
11           Direct Examination by Mr. Leary..............162
             Cross-Examination by Mr. Sumrall.............189
12           Cross-Examination by Mr. Turner..............190

13
                        <u>EXHIBITS</u>
14
     <u>EXHIBITS</u>          <u>DESCRIPTION</u>          <u>MARKED</u>    <u>RECEIVED</u>
15
     G-1     Order Authorizing Interception of   19          19
16           Wire and Electronic
             Communications #1 * Witness #1
17
     G-2     Order Authorizing Interception of   20          20
18           Wire and Electronic
             Communications #2 * Witness #1
19
     G-3     Disc TIII All Calls Line One        20          45
20           662-507-0385 * Witness #1

21   G-4     Disc TIII All Calls Line Two        21          45
             731-439-5169 * Witness #1
22
     G-5     Cumulative Exhibit - Unredacted     31
23           Calls Number 1-233, 1-235, 1-347,
             1-597, 1-748, 1-1070, 1-1565,
24           1-1642, 1-1741, 2-452, and 2-596
             * Witness #1
25

| | | | | |
|---|---|---|---|---|
| 1 | G-6A | Un-redacted Disc of Call 1-233 * Witness #1 | 34 | 34 |
| 2 | | | | |
| | G-6B | Transcript of Call 1-233 * Witness #1 | 35 | |
| 3 | | | | |
| 4 | G-7A | Un-redacted Disc of Call 1-235 * Witness #1 | 35 | 35 |
| 5 | | | | |
| | G-7B | Transcript of Call 1-237 * Witness #1 | 35 | |
| 6 | | | | |
| 7 | G-8A | Un-redacted Disc of Call 1-347 * Witness #1 | 36 | 36 |
| 8 | | | | |
| | G-8B | Transcript of Call 1-347 * Witness #1 | 36 | |
| 9 | | | | |
| 10 | G-9A | Un-redacted Disc of Call 1-597 * Witness #1 | 37 | 37 |
| 11 | | | | |
| | G-9B | Transcript of Call 1-597 * Witness #1 | 37 | |
| 12 | | | | |
| 13 | G-10A | Un-redacted Disc of Call 1-748 * Witness #1 | 38 | 38 |
| 14 | | | | |
| | G-10B | Transcript of Call 1-748 * Witness #1 | 38 | |
| 15 | | | | |
| 16 | G-11A | Un-redacted Disc of Call 1-1070 * Witness #1 | 39 | 39 |
| 17 | | | | |
| | G-11B | Transcript of Call 1-1070 * Witness #1 | 39 | |
| 18 | | | | |
| 19 | G-12A | Un-redacted Disc of Call 1-1565 * Witness #1 | 40 | 40 |
| 20 | | | | |
| | G-12B | Transcript of Call 1-1565 * Witness #1 | 40 | |
| 21 | | | | |
| 22 | G-13A | Un-redacted Disc of Call 1-1642 * Witness #1 | 41 | 41 |
| 23 | | | | |
| | G-13B | Transcript of Call 1-1642 * Witness #1 | 41 | |
| 24 | | | | |
| 25 | G-14A | Un-redacted Disc of Call 1-1741 * Witness #1 | 42 | 42 |

| 1 | G-14B | Transcript of Call 1-1741 * Witness #1 | 42 | |
| 2 | | | | |
| | G-15A | Un-redacted Disc of Call 2-452 * Witness #1 | 43 | 43 |
| 3 | | | | |
| 4 | G-15B | Transcript of Call 2-452 * Witness #1 | 43 | |
| 5 | | | | |
| | G-16A | Un-redacted Disc of Call 2-596 * Witness #1 | 45 | 45 |
| 6 | | | | |
| 7 | G-16B | Transcript of Call 2-596 * Witness #1 | 45 | |
| 8 | | | | |
| | G-17 | Hubanks Plea Agreement * Witness #2 | 54 | 54 |
| 9 | | | | |
| 10 | G-18 | Hubanks Plea Supplement * Witness #2 | 54 | 54 |
| 11 | | | | |
| | G-19 | Hubanks Proffer Agreement * Witness #2 | 55 | 55 |
| 12 | | | | |
| 13 | G-20 | Study Schedule Written by Hubanks for AB Brothers * Witness #2 | 105 | 105 |
| 14 | | | | |
| | G-21 | Aryan Brotherhood Constitution Seized from Hubanks and a Copy * Witness #2 | 107 | 107 |
| 15 | | | | |
| 16 | | | | |
| | G-22 | Constitution Seized from David Willis and a Copy * Witness #3 | 174 | 174 |
| 17 | | | | |
| 18 | G-23 | 2nd Constitution Seized from David Willis and a Copy * Witness #3 | 176 | 176 |
| 19 | | | | |
| 20 | G-24 | 2 Photos of David Willis and AB Brand * Witness #3 | 178 | 178 |
| 21 | | | | |
| 22 | | | | |
| 23 | THE COURT: Recessed Overnight...............................193 | | | |
| 24 | | | | |
| 25 | Court Reporter's Certificate................................194 | | | |

```
 1        (JURY IN AT 8:55 a.m.)

 2        (CALL TO ORDER OF THE COURT)

 3            THE COURT:  Ladies and gentlemen of the jury, I want

 4   to give you brief instructions relative to your taking of notes

 5   if you elect to take notes during this trial.  If you would

 6   like to take notes during the trial, you may do so.

 7        On the other hand, you are not required to take notes if

 8   you prefer not to do so.  Each of you should make your own

 9   decision about this.  If you do decide to take notes, be

10   careful not to get so involved in your note taking that you

11   become distracted from the ongoing proceedings.

12        Your notes should be used only as memory aids.  You should

13   not give your notes precedent over your independent

14   recollection of the evidence.  If you do not take notes, you

15   should rely upon your own independent recollection of the

16   proceedings; and you should not be unduly influenced by the

17   notes taken by other jurors.

18        Notes are not entitled to any greater weight than the

19   memory or impressions of each juror as to what the testimony

20   may have been.  Whether you take notes or not, each of you must

21   form or express your own opinions as to the facts of the case.

22        You will note that we do have an official court reporter

23   taking a record of the trial.  However, we will not have

24   typewritten transcripts of this record available for your use

25   in reaching any decision in this case.
```

1        Now, with that said, is the Government ready to call your

2 first witness?

3              MR. LEARY:  The Government's ready, Your Honor.  It

4 would call Dwayne Smith.

5              (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

6              THE COURTROOM DEPUTY:  Please take a seat in the jury

7 box, then state your name for the record.

8              THE WITNESS:  Good morning.  My name is Dwayne Smith,

9 D-w-a-y-n-e.

10                   DWAYNE SMITH, GOVERNMENT'S WITNESS, SWORN

11                          DIRECT EXAMINATION

12 BY MR. LEARY:

13 Q.   Mr. Smith, where are you currently employed?

14 A.   I'm currently employed for the Drug Enforcement

15 Administration.

16 Q.   And how long have you worked for the Drug Enforcement

17 Administration?

18 A.   More than 25 years.

19 Q.   Okay.  Where are you currently working?

20 A.   I am currently assigned to the operations division of DEA

21 in Washington, DC.

22 Q.   And when did you move to Washington, DC?

23 A.   Four months ago.

24 Q.   Okay.  Now, before working in Washington, DC, where did

25 you work?

1  A.    I was in Oxford, Mississippi.  I worked for DEA down here.

2  Q.    Okay.  Tell the ladies and gentlemen of the jury what your

3  rank was with the DEA.

4  A.    Sure.  Absolutely.  I was a supervisor for DEA.  I was the

5  resident agent in charge of the Oxford, Mississippi, drug

6  enforcement.

7  Q.    Okay.  Is that called the RAC?

8  A.    Yes, sir.  It's called the RAC for short.

9  Q.    Okay.  Now, as far as your duties as RAC of the DEA, where

10  was your jurisdiction?  What part of the state of Mississippi

11  did you investigate?

12  A.    The northern half of Mississippi, which encompasses 37

13  counties, basically all of north Mississippi if you can think

14  from Greenville to Columbus, all the way up.

15  Q.    Okay.  And explain to the ladies and gentlemen of the jury

16  whether the Southern District of Mississippi also has a RAC?

17  A.    The Southern District, yes, sir, they do, down in

18  Gulfport.

19  Q.    Okay.  And their jurisdiction, as far as investigating, is

20  where?

21  A.    In south Mississippi.

22  Q.    Okay.  Briefly explain to the ladies and gentlemen of the

23  jury any specialized training that you have received in the

24  field of narcotics investigation.

25  A.    Sure.  In 1991, I attending the DEA Basic Training

1  Academy.  I think it was about 16 weeks.  Upon graduation, I

2  was assigned to the field.  And, since 1991, I have received

3  specialized training at various times anywhere from conspiracy

4  investigations, financial money laundering investigations,

5  clandestine labs; you name it.  It's just a whole litany for 25

6  years.

7  Q.    I'm sorry, Mr. Smith.  Have you participated in narcotics

8  investigations during your career?

9  A.    Yes, sir, I have.

10  Q.    Actual investigations?

11  A.    Yes, sir.

12  Q.    About how many?

13  A.    A lot.

14  Q.    In what capacity?

15  A.    Sir?

16  Q.    In what capacity?

17  A.    In an undercover capacity, as a case agent in charge of a

18  case, and as a supervisor.

19  Q.    Were you ever involved in investigating money laundering?

20  A.    Yes, sir.

21  Q.    Criminal gangs?

22  A.    Yes, sir.

23  Q.    Gun trafficking?

24  A.    Yes, sir.

25  Q.    Meth trafficking?

SMITH -- DIRECT                                           10

1  A.    Yes, sir.

2  Q.    About how many witnesses have you debriefed pursuant to

3  your employment with the Drug Enforcement Administration?

4  A.    Numerous, too many to count.

5  Q.    Tell the ladies and gentlemen of the jury what a Title III

6  investigation is.

7  A.    Basically, I'm just going to sum this up in one word, all

8  right?  A Title III investigation is a wiretap.

9  Q.    Okay.

10 A.    That's all it is.

11 Q.    So, when I say intercepted communications, what am I

12 talking about?

13 A.    An intercepted communication basically, to simplify this,

14 it just means a recorded conversation.

15 Q.    Now, during the course of your employment with DEA,

16 estimate how many Title III investigations you've been involved

17 in.

18 A.    Oh, man, hundreds, hundreds.

19 Q.    And, again, in what capacity?

20 A.    Again, as case agent and as supervisor.

21 Q.    Have you ever been a part of an investigation where the

22 targets were utilizing cell phones inside a prison facility?

23 A.    One time.

24 Q.    And what was that one time?

25 A.    This case here, the investigation of the Aryan

1  Brotherhood.

2  Q.    Now, is that unique in your experience?

3  A.    Yes, sir.  It was very unique.  It's the first time, in

4  25 years, that I've ever experienced this.

5  Q.    Okay.  And the investigation you're talking about concerns

6  the investigation of what criminal organization?

7  A.    The Aryan Brotherhood of Mississippi.

8  Q.    And the Aryan Brotherhood of Mississippi, based on your

9  investigation, was involved in what type crimes?

10  A.    Anywhere from drugs, money laundering, guns, acts of

11  violence; you name it.

12  Q.    Based on your experience and training Mr. Smith, are you

13  familiar with the techniques utilized by drug traffickers to

14  import drugs into north Mississippi?

15  A.    Yes, sir, I am.

16  Q.    Based on your experience and training, Mr. Smith, are you

17  familiar with the tools of the trade utilized by traffickers to

18  distribute methamphetamine in north Mississippi?

19  A.    Yes, sir, I am.

20  Q.    Are you familiar with the language and terminology used by

21  drug traffickers when discussing the importation of illegal

22  drugs into the Northern District of Mississippi?

23  A.    Yes, sir, I am.

24  Q.    Based on your experience and training, are you familiar

25  with the codes and the slang utilized by narcotics traffickers?

1  A.    Yes, sir.

2  Q.    A court-authorized wire -- excuse me.  A court-authorized

3  wire intercept.

4  A.    Uh-huh.

5  Q.    Explain the significance of wire intercept.

6  A.    Basically, a wire intercept is the intersection of

7  communications, voice.

8  Q.    Okay.  And talk about the difference between a wire

9  intercept and an electronic intercept.

10 A.    An electronic intercept is the intercept of text messages.

11 Q.    Okay.  And a wire intercept is an interception of?

12 A.    A wire interception could encompass both.  It could be

13 audio as well as text too.

14 Q.    So, if somebody's talking on the phone, just talking, and

15 that's intercepted, that would be a?

16 A.    Wire intercept.

17 Q.    Now, explain the significance of the term *court*

18 *authorized*?

19 A.    Court authorized means that a district court judge has

20 signed an order authorizing DEA to intercept communications of

21 a cell phone.

22 Q.    Can the Drug Enforcement Administration just decide to

23 intercept communications without court approval?

24 A.    No, sir.

25 Q.    What would happen if you did that?

1  A.    I'd probably be sitting over there.

2  Q.    Okay.  Have you ever actually monitored communications

3  pursuant to a court-authorized wire intercept?

4  A.    Yes, sir, I have.

5  Q.    How many times?

6  A.    Mr. Leary, I can't count.

7  Q.    Too many to count?

8  A.    Too many to count.  No, sir, I can't put a number on it.

9  It's a lot.

10  Q.    In order to obtain a court-authorized wire intercept,

11  explain to the ladies and gentlemen of the jury what type

12  documents are required.

13  A.    Basically, it's three documents.  It's what's called an

14  application, which is a document that the United States

15  Attorney's Office drafts.  There's an affidavit, which is

16  nothing more than a written statement of facts by an agent or a

17  task force officer; and then there's the court order from the

18  judge.  The judge signs a court order authorizing the intercept

19  of communications.

20  Q.    Now, explain to the ladies and gentlemen of the jury how

21  the calls in the Northern District of Mississippi are actually

22  intercepted.

23  A.    Yes, sir.  Basically, what happens, once we get a court

24  order from the district court judge, okay, we get with our

25  technical people at our main DEA office in Metaire and New

1  Orleans, Louisiana.  All right?

2       This document is sent to the phone company, which, I

3  believe, in this case, was AT&T.  All right.  It goes to their

4  legal department.  Their legal department looks at it.  All

5  right.  And then a technician from the phone company will

6  actually route the intercept to the DEA office in New Orleans,

7  okay, where it's recorded.

8       And it's also simultaneously routed to the DEA office here

9  in Oxford.  We have a machine.  It's called a T2-S2 that we use

10 to listen and to minimize.  And Mr. Leary will get into that in

11 a little bit.  But, basically, this is what we monitor.  It's

12 monitored in Oxford, and it is recorded in New Orleans.

13 Q.    So the DEA is required by court order to minimize calls?

14 A.    Yes, sir.

15 Q.    And minimization actually takes place where?

16 A.    It takes place here in Oxford.

17 Q.    In Oxford?  And minimization occurs by agents listening to

18 the calls and turning the calls off when what happens?

19 A.    When, basically, it gets to general conversation, whether

20 they're talking about the weather or something.  But there's

21 also stipulations if he's -- the target is talking to a lawyer,

22 if he's talking to a priest, a spouse, of that nature, then we

23 would minimize.  We'll cut the calls off; and then we'll come

24 back, you know, and spot check.

25 Q.    Were minimization procedures followed in this case?

SMITH -- DIRECT

1  A.    Yes, sir, they were.

2  Q.    Were the court-authorized wire intercepts effective in

3  this case?

4  A.    Yes, sir.

5  Q.    Okay.  How long was the court orders authorizing the

6  intercepts?

7  A.    Thirty days.

8  Q.    Okay.  And did the intercepts ever actually last 30 days?

9  A.    No, sir, they did not.

10  Q.    So, in this particular case, how many intercept orders

11  were there?

12  A.    There were two.

13  Q.    Okay.  And the first one was for how many days?

14  A.    Well, the first -- the order was for 30 days, and we were

15  actually up listening to the line for ten days.

16  Q.    Okay.  And then -- and then what happened?

17  A.    The target, Perry Mask, dropped the phone.  He got rid of

18  it and got another phone.

19  Q.    Okay.  So what did DEA do in response to that?

20  A.    We discovered his new phone number and pursued it and got

21  another wiretap on that phone.

22  Q.    Okay.  And how long were we actually up listening to that

23  second wiretap?

24  A.    I believe it was seven days.

25  Q.    Okay.  So total interception period, including both taps,

1   included about how many days?

2   A.    About 17 days.

3   Q.    Are you telling the ladies and gentlemen of the jury that

4   you got every phone call that ever took place between Perry

5   Mask and Frankie Owens?

6   A.    Yes, sir.

7   Q.    Okay.  Between -- well, between that time period?

8   A.    Between -- the first wire -- let me get my dates right --

9   was October 22nd to October 31st, which was ten days.  That was

10  the first wire.  The second one was November the 12th to

11  November the 19th, 2013, which was seven days.

12  Q.    If they talked before the court order was signed, we

13  didn't get that?

14  A.    Oh, no, sir.

15  Q.    If they talked in between the first and second order, did

16  we get those?

17  A.    No, sir.

18  Q.    Okay.  Now, the investigation at hand that the jury is

19  listening to right now concerned what organization?

20  A.    The Aryan Brotherhood of Mississippi.

21  Q.    And what type gang is the Aryan Brotherhood?

22  A.    It's a white-based prison gang.

23  Q.    About when did this investigation begin, Mr. Smith?

24  A.    It started around the middle of 2013, as I recall.

25  Q.    And how did this investigation originate, if you recall?

1  A.    It just -- like any other case, it originated with

2  information that our office received; and we pursued it and

3  identified a drug-trafficking organization operating in the

4  Northern District of Mississippi.

5  Q.    What law enforcement agencies were involved in this

6  investigation?

7  A.    As I recall, it was FBI, ATF; of course, DEA; the

8  Mississippi Bureau of Narcotics; and several state and local

9  law enforcement agencies.

10 Q.    Was the investigation successful?

11 A.    Oh, yes, sir.

12 Q.    About how much methamphetamine was seized in this case?

13 A.    More than 20 pounds of methamphetamine.

14 Q.    Is that a significant amount?

15 A.    Yes, sir, very.

16 Q.    About how much money was seized?

17 A.    Approximately $130,000.

18 Q.    Were wire intercepts obtained in this case?

19 A.    Yes, sir, they were.

20        MR. LEARY:  Your Honor, may I receive permission to

21 approach the defendant?

22        THE COURT:  Yes, sir.  Except he's a witness, not a

23 defendant.

24        MR. LEARY:  Oh, I'm sorry.

25        THE COURT:  Okay.

1          MR. LEARY:  I'm going to turn right around, though,

2     if it pleases the Court, and give the defendants copies of the

3     information.

4          THE COURT:  Very well.

5     BY MR. LEARY:

6     Q.   Mr. Smith, would you please identify the document that I

7     just handed to you?

8     A.   Yes, sir.  Where's my glasses?  This is an order

9     authorizing the interception of wire and electronic

10    communications on a phone used by Perry Mask.

11    Q.   Okay.  And that particular order was signed on what date?

12    A.   October 21st of 2013.  This would be Wiretap No. 1.

13    Q.   Okay.  And that wiretap lasted for approximately how many

14    days?

15    A.   Ten days.

16    Q.   And the wiretap was ordered -- it was authorized for how

17    long?

18    A.   Thirty days.

19    Q.   Okay.  And it was actually up for approximately ten days?

20    A.   Yes, sir.

21         MR. LEARY:  Your Honor, at this time, the Government

22    would move to have the wire intercept order for Wiretap No. 1

23    entered into evidence as the first Government exhibit in this

24    case.

25         THE COURT:  Your exhibit number will be No. 1?

1                   MR. LEARY:  Number 1.

2                   THE COURT:  G-1.  Okay.  Any objection?

3                   MR. SUMRALL:  No objection, Your Honor.

4                   MR. TURNER:  No, Your Honor.

5                   THE COURT:  Okay.  The Government's Exhibit No. 1 is

6    admitted into evidence.

7                   (EXHIBIT NO. G-1 WAS RECEIVED INTO EVIDENCE)

8    BY MR. LEARY:

9    Q.   Mr. Smith, would you please identify the document I just

10   handed you.

11   A.   Okay.  This is an order authorizing the interception of

12   wire and electronic communications, again, on Perry Mask.  It

13   is dated November 12th of 2013.

14   Q.   Okay.  Now, that was the second court-authorized intercept

15   of Perry Mask?

16   A.   Yes, sir.  This would be Wiretap No. 2.

17   Q.   And how many days was it authorized for?

18   A.   Thirty days.

19   Q.   And how long was it actually up?

20   A.   Seven days.

21   Q.   Okay.

22                   MR. LEARY:  Your Honor, at this time, the Government

23   would move to have the second court-authorized intercept order

24   entered into evidence as Government's Exhibit No. 2.

25                   THE COURT:  Any objection?

```
1               MR. SUMRALL:  No, Your Honor.

2               MR. TURNER:  No, Your Honor.

3               THE COURT:  Okay.  G-2 is admitted into evidence.

4          (EXHIBIT NO. G-2 WAS RECEIVED INTO EVIDENCE)

5  BY MR. LEARY:

6  Q.   Now, Mr. Smith, were calls intercepted pursuant to court

7  order No. 1?

8  A.   Yes, sir.

9  Q.   Mr. Smith, would you please identify what I've just handed

10 you?

11 A.   This is a disk containing Title III, which is wiretap,

12 calls on Wiretap No. 1 of Perry Mask.  It is what is called an

13 "all-calls disk."  Every recorded call from Wiretap No. 1 is on

14 this disk.

15 Q.   Okay.  Now, have you initialled that disk?

16 A.   Yes, sir, I have.

17              MR. LEARY:  Okay.  I would like to mark this for

18 identification as Government's Exhibit No. 3.

19              THE COURT:  Very well.

20         (EXHIBIT NO. G-3 WAS MARKED FOR IDENTIFICATION)

21 BY MR. LEARY:

22 Q.   Now, Mr. Smith, would you please identify what I just

23 handed you?

24 A.   Yes, sir.  Again, this is another disk containing all

25 wiretap-related calls from Wiretap No. 2 on Perry Mask.
```

1  Q.    Now, do you see your initials on that diskette?

2  A.    Yes, sir, I do.

3         MR. LEARY:  Your Honor, at this time, the Government

4  would move that the all-calls diskette for court order No. 2 be

5  identified in evidence as Government's Exhibit No. 4.

6         THE COURT:  Very well.

7         MR. SUMRALL:  Your Honor, is he moving for identity

8  or introduction?

9         MR. LEARY:  Both.

10        THE COURT:  He asked it to be marked for

11  identification.

12     (EXHIBIT NO. G-4 WAS MARKED FOR IDENTIFICATION)

13  BY MR. LEARY:

14  Q.    Now, Mr. Smith, the calls that were intercepted on Wire

15  No. 1 and Wire No. 2, have specific calls been pulled from

16  those recordings to be played at trial today?

17  A.    Yes, sir, they have.

18  Q.    About how many of them are there?

19  A.    There should be 11.

20  Q.    Now, have you listened to those 11 calls?

21  A.    Oh, yes, sir, I have.

22  Q.    Have there -- have transcripts been presented -- excuse

23  me -- developed for each of those 11 calls?

24  A.    Yes, sir, they have.

25  Q.    While listening to the individual 11 calls, did you

1  compare those calls to what was just identified from the

2  all-calls disk?

3  A.    Yes, sir, I did.

4  Q.    Was the individual call that you listened to identical to

5  the recording on the all-calls disk?

6  A.    Yes, sir.

7  Q.    When you listened to the recording, did you read the

8  transcript?

9  A.    Yes, sir, I did.

10  Q.    Did the transcript accurately reflect the words spoken on

11  the recordings?

12  A.    Yes, sir, it did.

13  Q.    Now, Mr. Smith, the recordings in this case, were they

14  long or short?

15  A.    Oh, they were long.

16  Q.    Very long?

17  A.    Some of them almost two hours, close to it.

18  Q.    Okay.  Explain the difference between a redacted call and,

19  an unredacted call.

20  A.    Okay.  Basically, an unredacted call is the call in its

21  entirety, from beginning to end, which includes everything they

22  talk about.  A redacted call is when certain portions of the

23  calls are taken out.  All right?  Stuff that that -- that was

24  not deemed important at the time.  It's just general

25  conversation was taken out.  And it reduced the call

1  significantly.

2  Q.    Did it reduce the length of the call?

3  A.    Yes, sir.  In some instances, it did.

4  Q.    The redacted calls, did they include what you believed to

5  be pertinent information contained in the calls?

6  A.    Yes, sir.  There was pertinent information.

7  Q.    And the impertinent information, was it left off the

8  redacted calls?

9  A.    Yes, sir.  It was left off, absolutely.

10  Q.    Now, in this case, do we have both the redacted calls and

11  the unredacted calls?

12  A.    Yes, sir, we have both.

13  Q.    Okay.  If these calls are entered into evidence, can

14  defense counsel play the whole call if they choose to?

15  A.    Yes, sir, they could.

16  Q.    Okay.  Now, Mr. Smith, would you please identify the

17  document I just handed to you?

18  A.    Okay.  You have handed me a disk containing recorded

19  conversation as well as an accompanied transcript of said call.

20  Q.    Okay.  And that call number is what?

21  A.    It's Call No. 233.

22  Q.    And it was on what date?

23  A.    October 22nd of 2013.

24  Q.    Between which parties?

25  A.    Between Frankie Owens, Perry Mask, Jenkins, and Parker.

1  Q.    Okay.

2  A.    Eric Parker.

3  Q.    Did you listen to that call?

4  A.    Yes, sir, I did.

5  Q.    Have you initialled that diskette?

6  A.    Yes, sir, I have.  Right here.

7  Q.    Is that diskette a true and accurate recording of the

8  diskette from the all-calls disk?

9  A.    Yes, sir, it is.

10          MR. TURNER:  I'm sorry, Your Honor.  I didn't hear

11  the witness on something.  Did he say Eric Parker?

12          THE WITNESS:  I did.

13  BY MR. LEARY:

14  Q.    That's the unredacted calls; is that correct?

15  A.    Yes, sir, it should be.

16  Q.    Thank you.  Now, we just identified Call No. 233.

17          MR. LEARY:  Your Honor, what I would like to do, if

18  it pleases the Court, is identify these calls -- these

19  unredacted calls and mark them for identification cumulatively.

20  I don't plan on playing those.  If defense counsel would like

21  to, they can move them into evidence and mark them

22  individually.

23          THE COURT:  Very well.

24  BY MR. LEARY:

25  Q.    Now, I'm going to be careful walking over here.  I'm going

1  to set these notebooks on your railing right here.

2  A.    Yes, sir.

3  Q.    And I'm going to ask you questions about the calls in

4  there.  Now, you just identified Call No. 233.  Is that

5  correct?

6  A.    Yes, sir, that is correct.

7  Q.    And that was an unredacted call; is that correct?

8  A.    That is correct, unredacted.

9  Q.    Now, what I would like for you to do is to identify the

10  ten other calls that are to be played at this trial.  And would

11  you please identify the next number?

12  A.    The next corresponding number is Call No. 235.

13  Q.    And that was recorded on what date?

14  A.    October 22nd of 2013.

15  Q.    And was that call intercepted pursuant to the court orders

16  that have been previously entered into evidence in this case?

17  A.    Yes, sir, it was.

18  Q.    Okay.  The next call, please?

19  A.    Okay.  Hang on.  The next call is Call No. 347.

20  Q.    Have you listened to that call?

21  A.    Gosh -- yes, sir, I have.

22  Q.    Is that call a true and accurate recording of the call on

23  the all-calls disk?

24  A.    Yes, sir, it is.

25  Q.    Call No. 347 was recorded on what date?

1  A.    October 23rd of 2013.

2  Q.    Is that an unredacted recording of Call No. 347?

3  A.    That is correct, yes, sir.

4  Q.    Thank you.  Was that call intercepted pursuant to court

5  order?

6  A.    Yes, sir, it was.

7  Q.    Okay.  Please pull out the next call.

8  A.    The next call is Call No. 597, recorded on October 23rd of

9  2013.

10  Q.    Have you listened to that call?

11  A.    Yes, sir, I have.

12  Q.    Did you compare that call to the recording on the

13  all-calls disk?

14  A.    Yes, sir, I did.

15  Q.    Are they identical?

16  A.    Yes, sir, they are.

17  Q.    Was that call intercepted pursuant to court order?

18  A.    Yes, sir, it was.

19  Q.    Would you please identify the next call.

20  A.    Yes, sir.  Standby.  Okay.  The next call is No. 748

21  recorded on October 25th of 2013.

22  Q.    Was that call intercepted pursuant to court order?

23  A.    Yes, sir, it was.

24  Q.    Who was identified on that call?

25  A.    Perry Mask, Frankie Owens, Johnny Phife, Pugh, and

1   Jenkins, on October 25th, 2013.

2   Q.   Have you listened to that call?

3   A.   Yes, sir, I have.

4   Q.   Did you compare the content of that call to the actual

5   recording on the all-calls disk?

6   A.   Yes, sir, I did.

7   Q.   Are they identical?

8   A.   Yes, sir, they are.

9   Q.   Was Call 748 intercepted pursuant to court order?

10  A.   Yes, sir, it was.

11  Q.   What's the next call?

12  A.   The next call is Call No. 1070; 1,070.

13  Q.   And what date was that made?

14  A.   October 26th of 2013.

15  Q.   And the participants in the call are who?

16  A.   Perry Mask, Frankie Owens, and William Carroll.

17  Q.   And was that call intercepted pursuant to court order?

18  A.   Yes, sir, it was.

19  Q.   Did you listen to the call?

20  A.   Yes, sir, I did.

21  Q.   Did you compare the content of the call to the recording

22  on the all-calls disk?

23  A.   Yes, sir, I did.

24  Q.   Are they identical?

25  A.   Yes, sir.

1  Q.    For each of the calls that we are identifying right now,

2  has a transcript been produced?

3  A.    Yes, sir, it has.

4  Q.    Did you read the transcript while listening to the

5  recordings?

6  A.    Yes, sir, I did.

7  Q.    Do the words on the transcript actually reflect the words

8  spoken on the DVD?

9  A.    Yes, sir.

10  Q.    What's the next --

11  A.    The next call is 1565.

12  Q.    What date?

13  A.    October 29th of 2013.

14  Q.    Participants?

15  A.    Perry Mask and William Carroll.

16  Q.    Now, was that call intercepted pursuant to court order?

17  A.    Yes, sir, it was.

18  Q.    Have you listened to the call?

19  A.    Yes, sir, I have.

20  Q.    Have you compared the call to the call that was recorded

21  on the all-calls disk?

22  A.    That is correct.

23  Q.    And are they identical?

24  A.    Yes, sir.

25  Q.    Is that call intercepted pursuant to court order?

1  A.    Yes, sir.

2  Q.    Please identify the next call.

3  A.    Yes, sir.  Call No. 1642.

4  Q.    1642 was recorded on what date?

5  A.    October 29th.

6  Q.    Who are the participants?

7  A.    Frankie Owens, Perry Mask, Steve Hubanks, and Pugh on

8  October 29th, 2013.

9  Q.    Was that call intercepted pursuant to court order?

10  A.    Yes, sir, it was.

11  Q.    Have you listened to that call?

12  A.    Yes, sir, I have.

13  Q.    Have you compared that call to the original recording on

14  the all-calls disk?

15  A.    I have.

16  Q.    Are they identical?

17  A.    Yes, sir.

18  Q.    Is that call intercepted pursuant to court order?

19  A.    That is correct.

20  Q.    What's the next call number, please?

21  A.    The next call number is 1741.

22  Q.    And that call was intercepted on what day?

23  A.    October 30th of 2013.

24  Q.    And who are the participants in the call?

25  A.    Mask, Owens, and William Carroll.

SMITH  --  DIRECT                                      30

1  Q.    And have you listened to that call?

2  A.    Yes, sir, I have.

3  Q.    And when I say listened to that call and all these

4  unredacted recordings we're reviewing right now, you identified

5  that you've listened to them by the initial on the actual DVD?

6  A.    Yes, sir.

7  Q.    And what call are we talking about right now?

8  A.    Call No. 1741 from Wiretap No. 1.

9  Q.    Was that call intercepted pursuant to court order?

10  A.    It was.

11  Q.    What's the next recording?

12  A.    It's from Wiretap No. 2.  It is 2-452.

13  Q.    Have you listened to that call?

14  A.    Yes, sir, I have.

15  Q.    Did you compare that call to the original all-calls

16  diskette?

17  A.    Yes, sir, I did.

18  Q.    Is it identical?

19  A.    Yes, sir.

20  Q.    Have you listened to it?

21  A.    Yes, sir, I have.

22  Q.    Is the transcript accurate?

23  A.    Yes, sir, it is.

24  Q.    Was that call intercepted pursuant to court order?

25  A.    Yes, sir, it was.

1  Q.   And what's the final?

2  A.   The final one is from Wiretap No. 2.  It is 2-596 between

3  Perry Mask, Smith, and Tim Deshazier.

4  Q.   Did you listen to that call?

5  A.   Yes, sir, I did.

6  Q.   Did you compare that call to the original recording on the

7  all-calls disk?

8  A.   Yes, sir, I did.

9  Q.   Were they identical?

10  A.   Yes, sir.

11  Q.   Was Call No. 2-596 intercepted pursuant to court order?

12  A.   Yes, sir, it was.  I think I need to make a correction on

13  Call No. 233.  I think I said Mr. Parker was intercepted.  I

14  don't believe he was intercepted on that first call.

15  Q.   Okay.  All right.  So noted.

16            MR. TURNER:  Thank you.

17            MR. LEARY:  Your Honor, at this time, the Government

18  would move to have the 11 calls that were just referenced by

19  Mr. Smith identified in evidence just for identification as

20  cumulative Exhibit 5.

21            THE COURT:  Very well.

22      (EXHIBIT NO. G-5 WAS MARKED FOR IDENTIFICATION)

23  BY MR. LEARY:

24  Q.   Now, Mr. Smith, the 11 calls you just identified were

25  unredacted; is that correct?

1  A.   That's correct.

2  Q.   Now, have you listened to redacted calls in this case?

3  A.   Yes, sir, I have.

4  Q.   Were the redacted calls that you listened to the same

5  calls that were just identified into evidence?

6  A.   That is correct.

7  Q.   How many of them were there?

8  A.   There were 11.

9  Q.   For each of the 11 redacted calls, did you listen to them?

10 A.   Yes, sir, I did.

11 Q.   Did you read the transcript of the redacted calls?

12 A.   Yes, sir, I did.

13 Q.   Did the transcript actually reflect the words spoken on

14 all 11 redacted calls?

15 A.   Yes, sir.

16 Q.   For the 11 redacted calls, did you compare the redacted

17 calls to the unredacted calls?

18 A.   Yes, sir, I did.

19 Q.   Were the words spoken on the redacted calls identical to

20 those portions recorded on the unredacted calls?

21 A.   Yes, sir.

22 Q.   Now, did you compare them to the all-calls diskette?

23 A.   Yes, sir, I sure did.

24 Q.   And are they -- the words spoken identical from the

25 original all-calls diskette?

1  A.    Yes, sir.

2  Q.    I hand you what's been -- no.  Would you please identify

3  what I'm handing you right now?

4  A.    Yes, sir.  It's Call No. 233 in its redacted form recorded

5  on October 22nd of 2013, a conversation between Perry Mask,

6  Frankie Owens, and Steve Hubanks.

7  Q.    Was that -- was that call intercepted pursuant to court

8  order?

9  A.    Yes, sir, it was.

10 Q.    And is it an identical recording except for the redacted

11 portions of the original intercepts on the all-calls disk?

12 A.    Yes, sir.

13        MR. LEARY:  Your Honor, at this time, the Government

14 would move to have Call No. 233 entered into evidence as

15 Government's Exhibit 6A.

16        THE COURT:  It's 233?

17        MR. LEARY:  Yes, Your Honor.

18        THE COURT:  Okay.  Any objection?

19        MR. SUMRALL:  Yes, Your Honor.  May we have a

20 sidebar, please, sir?

21        THE COURT:  Okay.

22   (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

23        MR. SUMRALL:  Your Honor, the defense, on behalf of

24 Mr. Owens, would object to the introduction into evidence of

25 any of these phone calls on the basis that they were taps on

1    Perry Wayne Mask's phone, who is no longer a defendant in this

2    case, Your Honor.  And, therefore, he gets out from under the

3    court order.

4        The court order said for Perry Wayne Mask's phone calls,

5    and he's no longer a defendant; therefore, these, in my

6    opinion, are not admissible.  And I ask the Court to strike all

7    these phone calls.

8            MR. LEARY:  Your Honor, I'd just respectfully assert

9    that Mr. Owens was intercepted on Perry Wayne Mask's calls that

10   were authorized by the Court.  So, therefore, the intercept

11   itself is authorized.

12           THE COURT:  Okay.  The objection's overruled.

13           MR. SUMRALL:  One more.  May we have a continuing

14   objection?

15           THE COURT:  Yes, sir.  Your objection's overruled.

16       (END OF SIDEBAR)

17           MR. LEARY:  Your Honor, if I may just back up, I

18   would respectfully request that the diskette be entered into

19   evidence as Government's Exhibit 6A and the transcript be

20   marked for identification as Government's Exhibit 6B.

21           THE COURT:  Very well.  The disk is received in

22   evidence as 6A, and the transcript is only marked for

23   identification.  And I have a limiting instruction relative to

24   those transcripts when we get to that point.

25               (EXHIBIT NO. G-6A WAS RECEIVED INTO EVIDENCE)

SMITH -- DIRECT                                      35

1            (EXHIBIT NO. G-6B WAS MARKED FOR IDENTIFICATION)

2  BY MR. LEARY:

3  Q.   Mr. Smith, would you please identify what I just handed

4  you.

5  A.   It's a disk containing Call No. 235 in its redacted form

6  recorded on October 22nd, 2013, between Perry Mask, Frankie

7  Owens, and Steve Hubanks.

8  Q.   Have you listened to that call?

9  A.   Yes, sir, I have.

10 Q.   Did you compare it to the original all-calls disk?

11 A.   Yes, sir, I did.

12 Q.   Are they identical except for the redacted portions?

13 A.   That is correct, yes, sir.

14          MR. LEARY:  Your Honor, at this time, the Government

15 would move to enter into evidence Call No. 235, with its

16 transcript marked for identification.

17          THE COURT:  Okay.  Mr. Sumrall, your objection's

18 noted; and the objection's overruled.  The disk is admitted

19 into evidence.  The transcript is marked for identification.

20          MR. LEARY:  Your Honor, I believe the disk will be 7A

21 and the transcript will be 7B.

22          (EXHIBIT NO. G-7A WAS RECEIVED INTO EVIDENCE)

23          (EXHIBIT NO. G-7B WAS MARKED FOR IDENTIFICATION)

24 BY MR. LEARY:

25 Q.   Would you please identify the DVD that I just handed you?

1  A.    Yes, sir.  Again, it's a disk containing Call No. 347 in

2  its redacted form recorded on October 23rd, 2013, between Perry

3  Mask and Frankie Owens.

4  Q.    And did you listen to that call?

5  A.    Yes, sir, I did.

6  Q.    Did you compare that call to the original all-calls disk?

7  A.    Yes, sir, I did.

8  Q.    Is it true and accurate -- is it identical to the original

9  except for the redacted portions?

10  A.    That is correct, yes, sir.

11          MR. LEARY:  Your Honor, at this time, the Government

12  would move to have Call No. 347 entered into evidence as

13  Government's Exhibit 8A and call -- and the transcript of 347

14  marked for identification purposes only as 8B.

15          THE COURT:  Very well.  The disk is admitted as

16  Government's Exhibit 8A.  The transcript is marked for

17  identification as 8B.  The objection of Mr. Owens is noted.

18          (EXHIBIT NO. G-8A WAS RECEIVED INTO EVIDENCE)

19          (EXHIBIT NO. G-8B WAS MARKED FOR IDENTIFICATION)

20  BY MR. LEARY:

21  Q.    Would you please identify the disk that I just handed you,

22  sir?

23  A.    Yes, sir.  It's a disk containing Call No. 597 in its

24  redacted form, recorded on October 24th, 2013, between Perry

25  Mask, Frankie Owens, and Steve Hubanks.

1  Q.    And have you listened to that call?

2  A.    Yes, sir, I have.

3  Q.    Did you compare that call to the original on the all-calls

4  disk?

5  A.    Yes, sir, I did.

6  Q.    Is that call an identical to the original, except for the

7  redacted portions?

8  A.    That is correct, yes, sir.

9  Q.    Thank you.

10          MR. LEARY:  Your Honor, at this time, the Government

11  would move to have Call No. 597 entered into evidence as the

12  next Government exhibit, being 9A; and its transcript marked

13  for identification purposes only as 9B.

14          THE COURT:  Very well.  The same ruling, the disk is

15  received into evidence; the transcript is marked for

16  identification; and the objection as to the defendant Owens is

17  noted.

18          (EXHIBIT NO. G-9A WAS RECEIVED INTO EVIDENCE)

19          (EXHIBIT NO. G-9B WAS MARKED FOR IDENTIFICATION)

20  BY MR. LEARY:

21  Q.    Mr. Smith, would you please identify the disk that I just

22  handed you?

23  A.    A disk containing Call No. 748 in its redacted form,

24  recorded on October 25th, 2013, between Perry Mask, Frankie

25  Owens, and Tony Bone.

SMITH -- DIRECT                                              38

1  Q.    Now, Mr. Smith, did you listen to that call?

2  A.    Yes, sir, I did.

3  Q.    Did you compare that call to the original on the all-calls

4  disk?

5  A.    Yes, sir, I did.

6  Q.    Was it identical except for the redacted portions?

7  A.    That is correct, yes, sir.

8          MR. LEARY:  Your Honor, at this time, the Government

9  would move to have Call No. 748 entered into evidence as the

10  next numbered Government exhibit, being 10A; and its transcript

11  marked for identification as 10B.

12          THE COURT:  Very well, 10A is admitted into evidence;

13  10B, the transcript's marked for identification.  The

14  continuing objection of Defendant Owens is noted for the record

15  and is overruled.

16          (EXHIBIT NO. G-10A WAS RECEIVED INTO EVIDENCE)

17          (EXHIBIT NO. G-10B WAS MARKED FOR IDENTIFICATION)

18  BY MR. LEARY:

19  Q.    Mr. Smith, would you please identify the disk that I just

20  handed you?

21  A.    A disk containing Call No. 1070 in its redacted form,

22  recorded on October 22nd, 2013, between Perry Mask, Frankie

23  Owens, and William Carroll.

24  Q.    Have you listened to that recording?

25  A.    Yes, sir, I have.

SMITH -- DIRECT                                    39

1  Q.    Does the recording on that disk -- is it identical to the

2  original all-calls recording?

3  A.    Yes, sir, it is.

4  Q.    Thank you.

5        MR. LEARY:  Your Honor, at this time, the Government

6  would move to have Call No. 1070 entered into evidence as the

7  next numbered Government exhibit, that being 11A; and its

8  transcript marked for identification as 11B.

9        THE COURT:  Okay.  The same rulings, the disk is

10  admitted as Exhibit 11A, the transcript marked as 11B,

11  continuing objection noted.

12        (EXHIBIT NO. G-11A WAS RECEIVED INTO EVIDENCE)

13        (EXHIBIT NO. G-11B WAS MARKED FOR IDENTIFICATION)

14  BY MR. LEARY:

15  Q.    Mr. Smith, would you please identify the disk that I just

16  handed you?

17  A.    A disk containing Call No. 1565 in its redacted form,

18  recorded on October 29th, 2013, between Perry Mask and William

19  Carroll.

20  Q.    And what's that call number, again?

21  A.    The call number is 1565, 1565.

22  Q.    Have you listened to that recording?

23  A.    Yes, sir, I have.

24  Q.    Have you compared that recording to the original all-calls

25  diskette?

SMITH -- DIRECT                                          40

1  A.    Yes, sir, I have.

2  Q.    Is that recording identical except for the redacted

3  portions?

4  A.    That is correct, yes, sir.

5  Q.    On all the calls, Mr. Smith, that we are identifying right

6  now, is the transcript attached to them a true and correct

7  record of the words spoken on the tape?

8  A.    Yes, sir, it is.

9  Q.    Thank you.

10        MR. LEARY:  Your Honor, at this time, the Government

11  would move to have Call No. 1565, its disk, entered into

12  evidence as the next numbered Government exhibit.  That would

13  be 12A; and its transcript marked for identification purposes

14  only as 12B.

15        THE COURT:  Very well.  The exhibit is admitted.  The

16  transcript's marked for identification.  The objection --

17  continuing objection is noted.

18        (EXHIBIT NO. G-12A WAS RECEIVED INTO EVIDENCE)

19        (EXHIBIT NO. G-12B WAS MARKED FOR IDENTIFICATION)

20  BY MR. LEARY:

21  Q.    Mr. Smith, would you please identify the diskette that I

22  just handed you?

23  A.    It's a disk containing Call No. 1642, 1-6-4-2, in its

24  redacted form, recorded on October 29th, 2013, between Mask,

25  Owens, and Pugh.

1  Q.    Now, did you listen to that recording?

2  A.    Yes, sir, I did.

3  Q.    Did you compare it to the original all-calls disk?

4  A.    Yes, sir, I did.

5  Q.    Except for the redacted portions, is that recording

6  identical to the original recordings on the all-calls disk?

7  A.    Yes, sir, it is.

8  Q.    Did you read the transcripts?

9  A.    Yes, sir, I did.

10  Q.    Is it a true and accurate representation of the words

11  spoken in the redacted text?

12  A.    Yes, sir, it is.

13  Q.    Thank you.

14         MR. LEARY:  At this time, Your Honor, the Government

15  would move to have Call No. 1642 entered into evidence as the

16  next numbered Government's exhibit, being 13A; and its

17  transcript marked for identification purposes as 13B.

18         THE COURT:  Very well.  The Exhibit 13A is admitted

19  into evidence.  The transcript, 13B, is marked for

20  identification.  The continuing objection from Mr. Owens is

21  noted.

22         (EXHIBIT NO. G-13A WAS RECEIVED INTO EVIDENCE)

23         (EXHIBIT NO. G-13B WAS MARKED FOR IDENTIFICATION)

24  BY MR. LEARY:

25  Q.    Mr. Smith, would you please identify the diskette that I

1  just handed you?

2  A.    Certainly.  It's a disk containing Call No. 1741, 1-7-4-1,

3  in its redacted form recorded on October 30th, 2013, between

4  Mask, Owens, and Carroll.

5  Q.    Now, Mr. Smith, did you listen to that recording?

6  A.    Yes, sir, I did.

7  Q.    Is it identical to the original recording on the all-calls

8  disk except for the redacted portions?

9  A.    That is correct.

10  Q.    Does the transcript truly and accurately reflect the words

11  spoken on the redacted tape?

12  A.    Yes, sir it does.

13         MR. LEARY:  Your Honor, at this time, the Government

14  would move to have Call No. 1741 entered into evidence as the

15  next numbered Government's exhibit, that being 14A; and its

16  transcript marked for identification purposes only as 14B.

17         THE COURT:  Government's Exhibit 14A is admitted into

18  evidence.  The transcript, 14B, is marked for identification.

19  A continuing objection from Defendant Owens is noted.

20         (EXHIBIT NO. G-14A WAS RECEIVED INTO EVIDENCE)

21         (EXHIBIT NO. G-14B WAS MARKED FOR IDENTIFICATION)

22  BY MR. LEARY:

23  Q.    Mr. Smith, would you please identify the disk that I just

24  handed you?

25  A.    Yes, sir.  It's a disk containing Call No. 2-452, which is

SMITH -- DIRECT                                                      43

1  from Wiretap No. 2, in its redacted form, recorded on

2  November 13th, 2013, between Mask, Bass, and Deshazier, Tim

3  Deshazier.

4  Q.    Have you listened to that recording?

5  A.    Yes, sir, I have.

6  Q.    Was it intercepted pursuant to court order?

7  A.    Yes, sir, it was.

8  Q.    Is it true and accurate -- in fact, is it identical to the

9  all-calls recording?

10  A.    Yes, sir, it is.

11  Q.    Did you read the transcript?

12  A.    I certainly did, yes, sir.

13  Q.    Does the transcript accurately reflect the words spoken on

14  the redacted call?

15  A.    Yes, sir, it does.

16          MR. LEARY:   At this time, Your Honor, the Government

17  would move to have Call No. 2-452 entered into evidence as the

18  next numbered Government exhibit, that being 15A; and its

19  transcript marked for identification purposes only as 15B.

20          THE COURT:   15A is admitted into evidence; 15B, the

21  transcript, is marked for identification; a continuing

22  objection from Defendant Owens is noted.

23          (EXHIBIT NO. G-15A WAS RECEIVED INTO EVIDENCE)

24          (EXHIBIT NO. G-15B WAS MARKED FOR IDENTIFICATION)

25  BY MR. LEARY:

1  Q.    Mr. Smith, would you please identify the disk that I just

2  handed you?

3  A.    Okay.  It's a disk containing Call No. 2-596, which is

4  from Wiretap No. 2, recorded on November 13th, of 2013, between

5  Mask, Smith, and Deshazier.

6  Q.    Thank you.  Have you listened to that call?

7  A.    Yes, sir, I have.

8  Q.    Did you compare that call to the original all-calls disk?

9  A.    Yes, sir, I did.

10  Q.    Is it identical except for the redacted portions?

11  A.    Yes, sir.

12  Q.    Was it intercepted pursuant to court order?

13  A.    Yes, sir, it was.

14  Q.    Did you read the transcript?

15  A.    Yes, sir, I did.

16  Q.    Does the transcript accurately reflect the words of the

17  redacted call?

18  A.    Yes, sir, it does.

19         MR. LEARY:  Your Honor, at this time, the Government

20  would move to have Call No. 2-596 entered into evidence as the

21  next numbered Government exhibit, that being 16A; and its

22  transcript marked for identification purposes only as 16B.

23         THE COURT:  Very well.  16A is admitted into

24  evidence; 16B is marked for identification; a continuing

25  objection from Defendant Owens is noted.

1              (EXHIBIT NO. G-16A WAS RECEIVED INTO EVIDENCE)

2              (EXHIBIT NO. G-16B WAS MARKED FOR IDENTIFICATION)

3              MR. LEARY:  Your Honor, at this time, the Government

4    would move to have the all-calls disk entered into evidence.

5    The all-calls disk for the Wire Intercept No. One, I believe,

6    was marked for identification purposes as Government's Exhibit

7    No. 3.

8         And the Government would also move to have the all-calls

9    disk for Wire No. 2 entered into evidence.  I believe it was

10   marked for identification as Government's Exhibit 4.

11             THE COURT:  Same objection, Mr. Sumrall?

12             MR. SUMRALL:  Yes, sir.

13             THE COURT:  The Government's exhibit, the all-calls

14   disk, two of them, Exhibit No. 4 and Exhibit No. 5, are

15   admitted into evidence.  A continuing objection made by

16   Defendant Owens is noted and overruled.

17             THE COURTROOM DEPUTY:  Exhibits 3 and 4?

18             THE COURT:  Oh, I'm sorry.  I said -- it should be

19   Exhibits 3 and 4 of the all-calls.

20             THE COURTROOM DEPUTY:  Mr. Leary?

21             THE COURT:  Let's check our numbers.  Is it 3 and 4?

22             MR. LEARY:  Yes, Your Honor.

23             THE COURT:  Okay.  Three and four are admitted into

24   evidence.

25             (EXHIBIT NOS. 3 AND 4 WERE RECEIVED INTO EVIDENCE)

1  BY MR. LEARY:

2  Q.    Now, Mr. Smith, did you listen to these calls and read the

3  transcripts via the Sanctions program?

4  A.    Yes, sir, I did.

5  Q.    Tell the ladies and gentlemen of the jury what the

6  Sanctions program is briefly.

7  A.    Okay.  Basically, at some point at trial, you're going to

8  be able to hear the recorded calls.  And there's a program

9  called Sanctions that will allow you, as a juror, to read the

10  transcript on a screen as the call is being played.

11  Q.    Did you listen to the calls while reading the transcript

12  on Sanctions?

13  A.    Yes, sir, I did.

14  Q.    Did the transcript reflect, on Sanctions -- true and

15  accurately reflect the words spoken on the recorded calls?

16  A.    Yes, sir, it did.

17        MR. LEARY:  Your Honor, may I approach co-counsel?

18        THE COURT:  Yes, sir.

19        MR. LEARY:  Your Honor, no further questions of

20  Mr. Smith.

21        THE WITNESS:  Thank you.

22        THE COURT:  Okay.  Defendant Owens, Mr. Sumrall, may

23  cross-examine this witness.

24                        CROSS-EXAMINATION

25  BY MR. SUMRALL:

1   Q.    Good morning, Mr. Smith.

2   A.    Good morning, sir.

3   Q.    These court orders that were entered into evidence that

4   you obtained, they were for the phone calls from Perry Wayne

5   Mask; is that correct?

6   A.    From Perry Mask, yes, sir.

7   Q.    Okay.  Both of them were directed at Perry Wayne Mask; is

8   that correct?

9   A.    He was the target of the wire intercept.

10  Q.    Okay.  And he was the target of the investigation; was he

11  not?

12  A.    He and others, yes, sir.

13        MR. SUMRALL:  No further questions.

14        THE COURT:  Mr. Turner on behalf of Defendant Parker.

15                    CROSS-EXAMINATION

16  BY MR. TURNER:

17  Q.    Agent Smith, you've been -- given a phenomenal amount of

18  information in questioning.  Does any of that information

19  pertain to Eric Parker?

20  A.    Any of the information?

21  Q.    That has just been admitted into evidence.

22  A.    Yeah.  I recall an intercepted telephone call where your

23  client, Mr. Parker, was mentioned.

24  Q.    Okay.  Could you be confused, and it possibly be Thomas

25  Parker down in the Southern District of Mississippi?

1  A.    I mean, I'd have to rely on my agents to verify that.   But

2  I remember Mr. Parker's name being mentioned in a recorded

3  call.

4  Q.    Okay.   Do you recall which Mr. Parker at this time?

5  A.    No, sir, I don't.

6  Q.    Okay.

7  A.    I just know it was a Parker.

8  Q.    Are you aware that there is a Thomas Parker that was under

9  investigation also?

10  A.    No, sir, I don't.

11  Q.    Okay.   Would you agree with me that none of the recordings

12  that you listened to contained the voice of Eric Parker?

13  A.    That is correct, yes, sir.

14  Q.    Thank you.

15          MR. TURNER:   That's all I have, Your Honor.

16          THE COURT:   Okay.   Any redirect, Mr. Leary?

17          MR. LEARY:   No, Your Honor.

18          THE COURT:   Okay.   Are you finished with this

19  witness?

20          MR. LEARY:   Yes, Your Honor.

21          THE COURT:   Okay, Agent, you are fully and finally

22  discharged; you may go.

23          THE WITNESS:   Yes, Your Honor.   Thank you.

24          THE COURT:   The Government may call your next

25  witness.

 1              MR. LEARY:  Your Honor, the Government would call

 2  Stephen Hubanks to the stand.

 3              THE COURT:  Very well.

 4        What -- Mr. Leary, what's the problem?

 5              MR. LEARY:  Oh, I believe he's incarcerated; and

 6  they're bringing him down right now.

 7              THE COURT:  Very well.

 8        (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

 9              THE COURTROOM DEPUTY:  Please state your name for the

10  record.

11              THE WITNESS:  Stephen Hubanks.

12              THE COURTROOM DEPUTY:  Have a seat in the witness

13  stand.

14              STEPHEN HUBANKS, GOVERNMENT'S WITNESS, SWORN

15                        DIRECT EXAMINATION

16  BY MR. LEARY:

17  Q.   Good morning.

18  A.   Good morning.

19  Q.   State your name for the ladies and gentlemen of the jury.

20  A.   Stephen Hubanks.

21  Q.   Mr. Hubanks, what do people call you?  Do you have a

22  street name at all?

23  A.   "Booger."

24  Q.   Are nicknames common in the Aryan Brotherhood?

25  A.   Yes, sir.

```
 1   Q.    How old are you?

 2   A.    I'm 46.

 3   Q.    Where were you born, Mr. Hubanks?

 4   A.    McNairy County, Tennessee.

 5   Q.    And is that Selmer County?

 6   A.    Selmer, Tennessee.

 7   Q.    Selmer, Tennessee?  And you were raised where,

 8   Mr. Hubanks?

 9   A.    In Selmer, Tennessee.

10   Q.    Did you have any siblings when you were growing up?

11   A.    Yes.

12   Q.    Who was that?

13   A.    I have a half brother and a half sister -- well, an

14   adopted sister.

15   Q.    Who raised you, Mr. Hubanks?

16   A.    My mother.

17   Q.    Did you have much of a father figure in your life?

18   A.    No, sir.

19   Q.    Did you graduate from high school?

20   A.    No, sir.  I have a GED.

21   Q.    Have you been convicted of crimes before?

22   A.    Yes, sir.

23   Q.    How did you get involved in crime, Mr. Hubanks?

24   A.    Started out at a young age, drug use, just running with

25   the wrong crowd.
```

1  Q.    Went on from there?

2  A.    Yes, sir.

3  Q.    Now, you were first convicted in 1988; is that correct?

4  A.    Yes, sir.

5  Q.    Is that a burglary charge?

6  A.    Yes, sir.

7  Q.    About how old were you then?

8  A.    Eighteen.

9  Q.    And, therefore, in '89, you were convicted in Tennessee of

10 what?

11 A.    Burglary.

12 Q.    And then you were convicted again in Mississippi in 2002;

13 is that correct?

14 A.    Yes, sir.

15 Q.    What were you convicted of?

16 A.    Armed robbery, burglary.

17 Q.    And how many years were you sentenced?

18 A.    Eighteen.

19 Q.    And, so, when's your release date, approximately?

20 A.    January the 6th, 2020.

21 Q.    Okay.  So, during the course of the events in this

22 particular case, you were incarcerated; is that correct?

23 A.    Yes, sir.

24 Q.    And you're looking at a possible release date from state

25 charges in 2020?

1  A.    Yes, sir.

2  Q.    Have you cooperated with the Government in this case,

3  Mr. Hubanks?

4  A.    Yes, I have.

5  Q.    What did the Government say about responding truthfully

6  and completely?

7  A.    That I must respond truthfully and completely.

8  Q.    What happens if you lie?

9  A.    It's a breach of my contract and my plea agreement.

10  Q.    Have investigators talked to you in this case?

11  A.    Yes, sir.

12  Q.    Have I talked to you in this case?

13  A.    Yes, sir.

14  Q.    We talked about this case?

15  A.    Yes, sir.

16  Q.    Who sentences you in this case, Mr. Hubanks?

17  A.    Judge Davidson.

18  Q.    Do I sentence you?

19  A.    No, sir.

20  Q.    Now, was there a recommended sentence for you in this

21  case?

22  A.    Yes, sir.  A 20-year cap.

23  Q.    A 20-year cap.  So, if you were capped out in this case

24  and it was run consecutive to your state charges, you'd be

25  looking at getting out about 2040?

1  A.    Something like that.

2  Q.    Sound correct?  You signed up for witness protection?

3  A.    Yes, sir.

4  Q.    Did you sign a plea agreement with the Government,

5  Mr. Hubanks?

6  A.    Yes, sir, I did.

7  Q.    Please identify what I just handed you.

8  A.    It's a plea agreement between me and the Government.

9  Q.    Look on the last page, Mr. Hubanks.  You see your

10  signature?

11  A.    Yes, sir.

12  Q.    Is that a true and correct copy of your plea agreement

13  with the Government?

14  A.    Yes, sir.

15  Q.    Thank you.

16          MR. LEARY:  Your Honor, at this time, the Government

17  would move to have the plea agreement with Mr. Hubanks entered

18  into evidence as the next numbered Government exhibit.  I

19  believe it's No. 17.

20          THE COURTROOM DEPUTY:  Yes.

21          THE COURT:  Okay.  Any objection?

22          MR. SUMRALL:  No objection, Your Honor.

23          MR. TURNER:  No, Your Honor.

24          THE COURT:  Okay.  It's admitted into evidence.

25  What's the number, 17?

1            MR. LEARY:  Seventeen, Your Honor.

2            (EXHIBIT NO. G-17 WAS RECEIVED INTO EVIDENCE)

3  BY MR. LEARY:

4  Q.    Now, did you enter into a plea supplement with the

5  Government as well?

6  A.    Yes, sir, I did.

7  Q.    Would you please identify the document that I just handed

8  to you?

9  A.    It's a copy of the plea supplement between me and the

10  Government.

11  Q.    Is that a true and correct copy of the plea agreement

12  between you and the Government?

13  A.    Yes.

14            MR. LEARY:  Your Honor, at this time, the Government

15  would move to have the plea supplement entered into evidence as

16  the next numbered Government's exhibit, that being 18.

17            THE COURT:  Very well.  It's admitted without

18  objection.

19            MR. SUMRALL:  No objection, Your Honor.

20            (EXHIBIT NO. G-18 WAS RECEIVED INTO EVIDENCE)

21  BY MR. LEARY:

22  Q.    Did you enter into a proffer agreement with the

23  Government, Mr. Hubanks?

24  A.    Yes, sir.

25  Q.    Would you please identify what I just handed you,

1  Mr. Hubanks?

2  A.    This is a letter of proffer between me and the Government.

3  Q.    Is that a true and correct copy of that proffer agreement?

4  A.    Yes.

5  Q.    Okay.  Thank you.

6          MR. LEARY:  The Government would move to have the

7  proffer agreement entered into evidence as the next numbered

8  government exhibit.

9          MR. SUMRALL:  No objection.

10         MR. TURNER:  No objection.

11         THE COURT:  With no objection, it's admitted into

12  evidence.

13         (EXHIBIT NO. G-19 WAS RECEIVED INTO EVIDENCE)

14  BY MR. LEARY:

15  Q.    When were you arrested in this case, Mr. Hubanks?

16  A.    I was indicted and served the indictment November the 20th

17  of 2014.

18  Q.    Do you recall when you were first arrested, approached by

19  law enforcement?

20  A.    May the 6th of 2014 at Greene County, and then I was

21  brought here to Oxford the next day on May the 7th.

22  Q.    Okay.  So you were housed where when you were first

23  approached by law enforcement?

24  A.    Greene County Correctional Facility, South Mississippi

25  Correctional Facility.

HUBANKS    --    DIRECT                                            56

1    Q.    Okay.  So that's in south Mississippi.

2    A.    Yes.

3    Q.    Now, prior to your arrest, what was your rank in the Aryan

4    Brotherhood?

5    A.    I was a "wheel" member.

6    Q.    Okay.  A "wheel" member or a "spoke"?  Is that fair?

7    A.    Yes, sir.

8    Q.    Could another analogous term be "general"?

9    A.    Yes, sir.

10   Q.    Now, as far as the Aryan Brotherhood goes, what part of

11   Mississippi did it have jurisdiction over?

12   A.    All Mississippi.

13   Q.    Top to bottom?

14   A.    Yes, sir.

15   Q.    North to south?

16   A.    Yes, sir.

17   Q.    If you entered an order as a wheel member in north

18   Mississippi to someone in south Mississippi, explain whether or

19   not it would have to be carried out.

20   A.    Yes, sir, it'd have to be carried out.

21   Q.    When law enforcement officers first came to talk to you in

22   Greene County, did you have a lawyer?

23   A.    No, sir.

24   Q.    Did you agree to talk to law enforcement officers?

25   A.    Yes, sir.

HUBANKS  --  DIRECT                          57

1  Q.    Did you waive your rights?

2  A.    Yes, sir.

3  Q.    Why did you agree to talk to law enforcement without even

4  having a lawyer?

5  A.    Because I wanted to come forward and do what I could do to

6  try to help myself to get away from the brotherhood and to

7  distance myself.

8  Q.    You decided to distance yourself from the brotherhood?

9  A.    Yes, sir.

10  Q.   Why is that?

11  A.   Well, I just -- things that went on, I didn't know about

12  at the time; and things was going on that I didn't agree with,

13  and I didn't want to be a part of.

14  Q.   When did you first become involved in the Aryan

15  Brotherhood, Mr. Hubanks?

16  A.   2005.

17  Q.   Why did you join the Aryan Brotherhood?

18  A.   I guess a number of different reasons.  I was fresh in on

19  an 18-year-mandatory sentence, and all my appeals had just been

20  denied; and I felt like I didn't have nothing to lose by

21  becoming a part of it.

22       And it was a way of being a part of something in prison.

23  80 percent of the prison population is affiliated in some way

24  or another, and I chose to become a part of the Aryan

25  Brotherhood.

HUBANKS  --  DIRECT                    58

1  Q.    When you say 80 percent of the prison population's

2  affiliated one way or another, what do you mean by that?

3  A.    In one form of gang or another.

4  Q.    The gangs -- I mean, the prisons in Mississippi, are they

5  strongly influenced by gangs?

6  A.    Yes, sir.

7  Q.    Now, if you are a Hispanic person, what type gang would

8  you join if you were in prison?

9  A.    Latin Kings.

10  Q.    Okay.  If you were a Hispanic person, could you join a

11  gang, generally, outside your race?

12  A.    No.  Pretty much, no.

13  Q.    Okay.  If you were an African-American and you were

14  incarcerated, what gang would you join?

15  A.    Gangsters or Vice Lords, Bloods, Crips.

16  Q.    And, if you were white and you were incarcerated in

17  Mississippi, and you were going to join a gang, what gang would

18  you join?

19  A.    The Aryan Brotherhood or Simon City Royals.

20  Q.    What's the highest rank you obtained in the Aryan

21  Brotherhood?

22  A.    A wheel member.

23  Q.    When did you become a spoke?

24  A.    September 23rd, 2013.

25  Q.    Now, how many spokes were there in Mississippi?

1  A.    Three.

2  Q.    Okay.  Were they all incarcerated?

3  A.    Yes, sir.

4  Q.    Prior to the time that you became a spoke, was there ever

5  a time when there was a free world spoke?

6  A.    Yes, sir.

7  Q.    Okay.  So, during that time frame, it would have increased

8  the number of spokes to what?

9  A.    Four.

10  Q.    But, while you were a spoke, there were only how many?

11  A.    Three.

12  Q.    Now, tell the ladies and gentlemen of the jury when did

13  you become a spoke?

14  A.    September the 23rd, 2013.

15  Q.    Okay.  Prior to September 23rd, 2013, what was your rank?

16  A.    I was a state captain.

17  Q.    Okay.  When did you become a captain, Mr. Owens --

18  Mr. Hubanks; I'm sorry.

19  A.    January the 23rd of 2013.

20  Q.    Where were you incarcerated when you became a captain?

21  A.    Walnut Grove Correctional Facility.

22  Q.    Now, in the prisons in Mississippi, based on your

23  experience as a state captain and a spoke, explain whether or

24  not there's Aryan Brotherhood presence in most of those

25  facilities?

1 A.     Yes.  I don't really know exactly what you're wanting, as

2 far as the presence.  When I become state captain, it was my

3 job to establish communication and a roster throughout the

4 state for different facilities and to keep up with who was

5 where and when one moved from one place to another.  So --

6 Q.     Was the Aryan Brotherhood keeping track of its members

7 throughout the prison system, or at least attempting to?

8 A.     Yes, sir, I was.

9 Q.     And who would you report back to with that information?

10 A.     The wheel.

11 Q.     And when you say "wheel," you're speaking of how many

12 people?

13 A.     Three wheel members.

14 Q.     And one of your duties as captain was to produce that

15 roster that you just explained?

16 A.     Yes, sir.

17 Q.     What were your other duties?

18 A.     I was to -- all -- all facilities had captains or OICs,

19 and they were to report to me weekly and give me a weekly

20 report on what was going on in their area and -- as far as any

21 violations, any concerns or problems with other gangs, any dues

22 owed; any business pertaining to what went on at their facility

23 would be reported to me.  And then I would, in return, report

24 to the wheel.

25 Q.     Okay.  Now, while you were a spoke, beginning in September

1  of 2013, who were the other spokes with you?

2  A.     Perry Mask and Frank Owens.

3  Q.     You see Frankie Owens in this courtroom?

4  A.     Yes, sir.

5  Q.     Would you identify what color shirt he's wearing?

6  A.     Turquoise.

7  Q.     Okay.

8           MR. LEARY:  Your Honor, we'd like the record to

9  reflect that Mr. Hubanks has identified Frankie Owens.

10          THE COURT:  It'll so reflect.

11 BY MR. LEARY:

12 Q.     Explain to the ladies and gentlemen of the jury,

13 Mr. Hubanks, whether or not the spokes had specific roles to

14 play within the organization.

15 A.     As a whole, the wheel had -- all of us had the same

16 authority as far as the rank structure goes.  But we -- it

17 wasn't a, per se, rule; we just had an area that each one of us

18 dealt with pretty much specifically.

19 Q.     Okay.  What did Perry Mask -- what area did he deal with

20 mostly?

21 A.     Free world and his business were the drugs.

22 Q.     Free world and drugs?  And Frankie Owens, what was his

23 role?

24 A.     Frankie pretty much communicated with south Mississippi

25 pretty much.

1  Q.   Did he communicate with south Mississippi while he was

2  located where?

3  A.   At which point?

4  Q.   When you were a spoke.

5  A.   When we were a spoke, he was at Marshall County and then

6  Greene County.

7  Q.   Okay.  Was he communicating with south Mississippi while

8  he was a spoke?

9  A.   Yes, sir.

10  Q.   What was your role?

11  A.   I pretty much communicated with the north part of the

12  state and the prison system.

13  Q.   Now, what was Perry Mask's affiliation?

14  A.   Sir?

15  Q.   Perry Mask, he was a member of what gang?

16  A.   Aryan Brotherhood.

17  Q.   And, while you were a spoke, was he one also?

18  A.   Yes, sir.

19  Q.   Was he a spoke before you?

20  A.   Yes, sir.

21  Q.   Whose place did you take on the wheel?  Do you remember?

22  A.   Yes, sir.

23  Q.   Who was that?

24  A.   Barron Goff.

25  Q.   Barron Goff.  Do you know the names of prior wheel

HUBANKS -- DIRECT                                               63

1  members?

2  A.    Some of them.

3  Q.    Do you know who Larry Sneed was?

4  A.    Yes, sir.

5  Q.    And what was his rank?

6  A.    He was a wheel member.

7  Q.    What about Chris May?

8  A.    Yes, sir.  Mackie May.

9  Q.    Okay.  Was he a prior wheel member?

10 A.    Yes, sir.

11 Q.    Now, while you were a wheel member, where were you

12 located, Mr. Hubanks?

13 A.    I was at Alcorn County Regional Correctional Facility.

14 Q.    All right.  Is that in, obviously, what county?

15 A.    Alcorn, Corinth.

16 Q.    And where was Frankie Owens located while you were a

17 wheel?

18 A.    Marshall County.

19 Q.    And that's located in?

20 A.    Holly Springs.

21 Q.    Now, if you were located in Alcorn County and Frankie

22 Owens was located in Marshall County, how would you

23 communicate?

24 A.    By cell phone.

25 Q.    Were cell phones legal within the prison?

1  A.    No, sir.

2  Q.    They were contraband?

3  A.    Yes, sir.

4  Q.    How would you get the cell phones into prison?

5  A.    Different ways.  Buy them.  Some was throwed (sic) over

6  the fence; some was brought in by officers.  Some were brought

7  through visitation.

8  Q.    While you were a wheel, where was Perry Mask located?

9  A.    He was at Parchman.

10  Q.    Okay.  And when was he moved to Parchman?

11  A.    Around August of 2013.

12  Q.    Prior to being moved to Parchman, where was Perry Mask

13  located?

14  A.    Marshall County.

15  Q.    After Perry Mask was moved to Parchman, the three wheels

16  were located in what three prisons?

17  A.    Parchman, Marshall County, and Alcorn.

18  Q.    And how often did the spokes communicate with each other?

19  A.    We tried to twice a week.  We tried to at least twice a

20  week, sometimes daily.

21  Q.    Now, Frank Owens' rank while you were a spoke was what?

22  A.    He was a wheel member.

23  Q.    With you?

24  A.    Yes.

25  Q.    Mr. Hubanks, the Aryan Brotherhood of Mississippi is a

1  race-based organization.  Are you a racist?

2  A.    No, sir.

3  Q.    Okay.  Let's explain that.  If you're a member of the

4  Aryan Brotherhood, how can you not be a racist?

5  A.    You got some that's racist, and some who's not.  Some are

6  separatists, and some are racists.

7  Q.    Okay.  Explain the difference, as you see it.

8  A.    A separatist would be someone who believes that the races

9  should be kept separate, that they shouldn't be interracial

10  relationships.  A racist would be someone who hates a black

11  person or any person of color because of the color of their

12  skin.

13  Q.    Okay.  Now, how would you consider yourself?

14  A.    I consider myself a separatist.

15  Q.    But not a racist?

16  A.    Right.

17  Q.    You understand that some people would just view that whole

18  thing as just racist?

19  A.    Yes, sir.

20  Q.    You draw a distinction there?

21  A.    Yes, sir.

22  Q.    What crimes were the Aryan Brotherhood of Mississippi

23  involved in?

24        MR. SUMRALL:  Your Honor, I'm going to object to this

25  until he's got actual knowledge of the crime and them

1  happening.

2            THE COURT:  If he knows of his personal knowledge,

3  he'll be permitted to answer.

4  BY MR. LEARY:

5  Q.   Do you have personal knowledge of the crimes that the

6  Aryan Brotherhood was involved in?

7  A.   Yes, sir.  As far as some drugs, conspiracies as far as

8  assaults.

9  Q.   As a wheel member, did you participate in criminal

10 conspiracies?

11 A.   Yes, sir.

12 Q.   Now, explain to the ladies and gentlemen of the jury what

13 a direct order is.

14 A.   Well, a direct order is given to someone -- say I wanted

15 someone to do something, and I give them a direct order as a

16 wheel member to do whatever the order was; and they had to do

17 it.

18 Q.   Okay.  Did a subordinate have the authority to tell you,

19 no, I'm not doing that?

20 A.   No, sir.

21 Q.   Now, if a decision was made to stab somebody, would that

22 decision have to come from the wheel; or should that decision

23 come from a lower-ranking member?

24 A.   No.  It would come from the wheel.

25 Q.   Okay.  Do all three wheels have to agree on it, or can one

1  wheel issue the order?

2  A.    It's supposed to be a unanimous vote.

3  Q.    From the three wheel members?

4  A.    Yes, sir.

5  Q.    Does that mean two out of three?

6  A.    Yes, sir.

7  Q.    What type drugs do the Aryan Brotherhood deal in most?

8  A.    Methamphetamine.

9  Q.    Now, explain whether or not methamphetamine was trafficked

10  inside the prison facilities?

11  A.    Yes, sir.

12  Q.    Could money be made from transacting drugs inside prison

13  facilities?

14  A.    Yes, sir.

15  Q.    Explain to the ladies and gentlemen of the jury how drug

16  proceeds were transferred within the prison system.

17  A.    Well, you could use by -- transfer of money by Western

18  Union, MoneyGram, or by Green Dot MoneyPaks, which you could

19  buy at Walgreens, Rite Aid, Wal-Mart; just about anywhere we

20  could buy a Green Dot MoneyPak for a prepaid debit card.

21  Q.    Okay.  So did you ever buy drugs yourself?

22  A.    Yes, sir.

23  Q.    Okay.  How did you -- we'll use this as a specific

24  example.  Who did you buy drugs from?

25  A.    Perry.

1  Q.    Now, when you paid for the drugs, how did you pay for

2  them?

3  A.    In Green Dots.

4  Q.    Okay.  Explain to the ladies and gentlemen of the jury how

5  the prepaid Green Dot cards were used.

6  A.    You have a card like -- you could use a Wal-Mart MoneyCard

7  at the time, just to give you an example, which was a Visa

8  card.  Then you could buy any kind of Green Dot MoneyPak

9  anywhere for it.  And scratch off the back of the Green Dot

10 MoneyPak; there's a 14-digit number on there.

11      You can call 1-800-Green-Dot; and then it'll ask for your

12 account number.  You dial in the 16-digit account number off of

13 your actual debit card, and then put in the 14-digit number off

14 of the MoneyPak; and the money will go straight on your card.

15 Q.    Okay.  Explain to the ladies and gentlemen of the jury

16 whether or not this was a common practice by members of the

17 Aryan Brotherhood?

18 A.    Yes, sir.

19 Q.    And explain to the ladies and gentlemen of the jury

20 whether or not drug proceeds were distributed by members of the

21 Aryan Brotherhood using the Green Dot card methodism that

22 you've just described?

23 A.    Yes, sir.

24 Q.    Where did the Aryan Brotherhood originate?

25 A.    California.

1   Q.    About what year, Mr. Hubanks?

2   A.    1967.

3   Q.    Where does the AB operate today?

4   A.    Throughout the United States.

5   Q.    And where are the primary recruiting locations for the

6   Aryan Brotherhood?

7   A.    In prison.

8   Q.    Does the Aryan Brotherhood exist in the free world?

9   A.    Yes, sir.

10  Q.    Describe what you mean by "free world" to the ladies and

11  gentlemen of the jury.

12  A.    The outside world, outside of prison.

13  Q.    Now, the Aryan Brotherhood in Mississippi was established

14  approximately when?

15  A.    1984.

16  Q.    Okay.  And it was modeled after what states, if you know?

17  A.    California and Texas.

18  Q.    Now, when you were identifying individuals who were spokes

19  before you -- let me see.  Who was it, Larry Sneed?

20  A.    Yes, sir.

21  Q.    Chris May?

22  A.    Mackie May.

23  Q.    Mackie May?  What about Chris Craft?

24  A.    Yes.

25  Q.    Barron Goff?

1  A.    Yes.

2  Q.    Are you familiar with the governing documents of the Aryan

3  Brotherhood?

4  A.    Yes, sir.

5  Q.    And those governing documents are contained within what,

6  Mr. Hubanks?

7  A.    The constitution.

8  Q.    Have you read the constitution?

9  A.    Yes, sir.

10 Q.    Well, I'm just going to ask you, briefly tell the ladies

11 and gentlemen of the jury what the constitution contains in it.

12 A.    It's -- it's two articles.  It's like a set of bylaws.

13 It's got, more or less, the rules that -- the code of honor,

14 the code of ethics, the chain of command, the creed, the patch,

15 the meaning, the colors, dues, meetings.

16 Q.    Is it an extensive document?

17 A.    It's just a -- it's a bylaw of what the rules and

18 regulations are of the organization.

19 Q.    Are members of the Aryan Brotherhood required to follow

20 the constitution?

21 A.    Yes, sir.

22 Q.    What if they refuse to follow the constitution after they

23 become members?

24 A.    They're in violation.

25 Q.    Okay.  Now, let me go through some terms here.  When you

1  say "violation," what do you mean?

2  A.    They're in violation if they violate the rules of the

3  constitution.  They're in violation, meaning they could --

4  they're in violation.  It can be dealt with, and there's three

5  different options.  There's a minor violation, serious

6  violation, and major violations.

7  Q.    Okay.  A minor violation can include what?

8  A.    Anything -- I mean, as far as punishment for the

9  violation?

10 Q.    Yeah.  Could there be a fine?

11 A.    Yeah.  Fine, writing paperwork.

12 Q.    A serious violation included what type punishment?

13 A.    It could be the same thing; or it could be a physical

14 violation involved, which means going minutes with a brother,

15 licks to the chest, or fine and, you know, 2 or 3 different

16 combinations of things.

17 Q.    Tell the ladies and gentlemen of the jury what "going

18 minutes with a brother" means.

19 A.    Having to fight.  You're ordered to go 2 minutes with two

20 brothers for a violation, and you have to fight two brothers

21 for two minutes.

22 Q.    Okay.  So two for two would refer to fighting two brothers

23 for two minutes?

24 A.    Yeah.

25 Q.    Now, if you're ordered minutes with a brother, what

1  happens if you refuse to follow that order?

2  A.    You'll be smashed out.

3  Q.    Okay.  Now, I'm going to ask you to explain to the ladies

4  and gentlemen of the jury what being smashed out is.

5  A.    It means you're going to be physically assaulted and no

6  longer a member of the brotherhood, and your patch will be

7  covered or removed.

8  Q.    Now, how do they take -- or explain the methods by which a

9  patch is covered or removed.

10  A.    It'd either be tattooed over or physically removed.

11  Q.    Okay.  If you're going to physically remove a tattoo from

12  somebody, what does that entail?

13  A.    It could be burnt off, cut off, whatever it took to get

14  the brand off.

15  Q.    And that's what a smash is?

16  A.    Yes, sir.

17  Q.    What does SOS mean?

18  A.    Smash on sight.

19  Q.    So does an SOS refer to what you just talked about?  Are

20  you familiar with smashes ever being ordered within the Aryan

21  Brotherhood?

22  A.    Yes, sir.

23  Q.    Now, what's a KOS?

24  A.    Kill on sight.

25  Q.    And is that what it sounds like it is?

1  A.    Yes.

2  Q.    That being, if an AB has a serious violation and a

3  kill-on-sight order is issued, what does that mean?

4  A.    That means he's to be terminated.

5  Q.    Now, concerning the ABM hierarchy, ABM members refer to

6  each other as what?

7  A.    Brothers.

8  Q.    Brothers?  Is it a family type -- or at least trying to be

9  a family-type organization from that standpoint?

10  A.    Yes.

11  Q.    It's directed by a three member what?

12  A.    Wheel.

13  Q.    Now, under the wheel, what's the -- I want you just to

14  sort of explain the hierarchy down below the wheel.

15  A.    All right.  You have a wheel member -- three wheel

16  members.  Then you have two state captains.  One is the inside

17  state captain; one is the outside state captain.  Then you'll

18  have, like -- in the free world, you'll have a northern

19  captain, a central captain, and a southern captain.

20        And then, if there's enough brothers in those areas and

21  they need somebody under them, then they can be a lieutenant

22  under the captain of each area, a sergeant of arms.  In the

23  prison system, it's basically the same way at every facility;

24  you either have a captain or an OIC; they call officer in

25  charge.  And you can have a lieutenant, sergeant of arms as

1  well under them.

2  Q.    Now, the state of Mississippi, you said, was divided into

3  three regions.  Tell the ladies and gentlemen of the jury what

4  those three regions are.

5  A.    North, central, and southern.

6  Q.    Each region had a captain?

7  A.    Yes, sir.

8  Q.    What's a treasurer?

9  A.    It's someone who takes care of the books, the money.

10  Q.    Okay.  And the dues and the money come from where?

11  A.    From the brothers.

12  Q.    Okay.  What are AB associates?

13  A.    That could be anybody associated, friends, girlfriends,

14  wives, anybody who's a friend or associate.

15  Q.    What's a featherwood?

16  A.    That's -- she's considered a sister by brothers.

17  Q.    Now, how does one join the Aryan Brotherhood if someone

18  desires to do so?

19  A.    Well, first, have to approach someone and express a desire

20  to join.  Then, if there's a recruiter around that they can --

21  has to be a recruiter.  Then they can get with a recruiter, and

22  they have to fill out a prospect compact and questionnaire.

23  Q.    Explain what a prospect compact and questionnaire is.

24  A.    It's a questionnaire.  It's a group of questions you have

25  to answer, and then it's a prospect compact that they have to

HUBANKS  --  DIRECT                          75

 1  fill out signing a code of silence.

 2  Q.    Okay.  Explain what the code of silence is.

 3  A.    It's saying that anything that they read or see in the

 4  paperwork -- that they agree not to ever disclose it to anyone,

 5  whether they're a gang membership or not.

 6  Q.    Okay.  If you violate that code of secrecy, what are you

 7  subject to?

 8  A.    KOS.

 9  Q.    Well, let me ask you this.  You're up here testifying in

10  this court today.  What are you subject to?

11  A.    I already have a KOS on me.

12  Q.    If you were put back in general population, what would

13  happen to you?

14  A.    There'd be an attempt on my life.

15  Q.    What's a direct order?

16  A.    It's a -- an order that's given for another subordinate

17  member to do something.

18  Q.    And a direct order could be a violation or what else?

19  A.    SOS, KOS, anything.

20  Q.    What are "church" meetings?

21  A.    It's a meeting where they get together to discuss any

22  business and to pay dues.

23  Q.    Now, the church meetings, do they occur in the free world

24  or in prison?

25  A.    Both.

HUBANKS  --  DIRECT                                          76

1  Q.    About how often do free world church meetings occur?

2  A.    They're supposed to be once a month; but, you know,

3  whether they happen that often or not, I don't know.

4  Q.    How often do church meetings occur in prison?

5  A.    They happen like they're supposed to, once a month at

6  least, sometimes weekly on the yards, just depending on where

7  you were at.

8  Q.    Based on your experience, were church meetings followed,

9  the scheduled followed within the prison system?

10  A.    Yes.

11  Q.    What type AB matters were discussed during church

12  meetings?

13  A.    Whatever's going on.

14  Q.    Were violations ever conducted during church meetings?

15  A.    They have been, yes.

16  Q.    Explain the importance of the Aryan Brotherhood patch.

17  A.    The importance of it?

18  Q.    Yeah.  What I mean by that is, will any old tattoo do?

19  A.    No.  It has to be -- it's a certain tattoo that has to be

20  put on.  If you're a fully-made member, you have to put -- you

21  have to put the tattoo on your body.

22  Q.    Okay.  And is that a requirement?

23  A.    Yes, sir.

24  Q.    If you say "I don't want the AB brand," is that going to

25  work?

1  A.   No.

2  Q.   Now, are all the AB brands supposed to be the same?

3  A.   Yes, sir.

4  Q.   Is that for the state of Mississippi?

5  A.   Yes, sir.

6  Q.   Now, explain the significance, for instance of the number

7  13 on the AB tattoo.

8  A.   It stands for the 13th letter of the alphabet, which is an

9  M for Mississippi.

10  Q.   What's the significance of the Nazi symbol, the swastika?

11  A.   What's the purpose of it?

12  Q.   Is there a purpose for it?

13  A.   It's like the -- yeah.  It's -- it represents, like, the

14  circle of life.

15  Q.   What's the significance of the SS bolts?

16  A.   On the patch itself?

17  Q.   Yeah.

18  A.   It stands for white power.

19  Q.   Now, let me ask you about these SS bolts.  Did they have

20  significance other than what's on the patch?

21  A.   Yes.

22  Q.   Okay.  Explain the significance of the SS bolts other than

23  what's on the tattoo.

24  A.   They stand for thunder warrior status.

25  Q.   Is the thunder warrior status -- is that a rank within the

1  Aryan Brotherhood?

2  A.    Yes.

3  Q.    Can non-Aryan Brotherhood members get a thunder warrior

4  status?

5  A.    No, sir.

6  Q.    Only Aryan Brotherhood members can be thunder warriors?

7  A.    Only ones who have earned thunder warrior can wear bolts.

8  Q.    Okay.  Only people who have earned thunder warrior status

9  can wear the bolts?

10  A.    Every brother can't wear bolts.

11  Q.    Okay.  So, if you're not a thunder warrior, can you put

12  the bolts on?

13  A.    No, sir.

14  Q.    Where are the bolts usually located?

15  A.    On the neck.

16  Q.    All right.  What do you have to do to be a thunder

17  warrior?

18  A.    You have to either commit at least three confirmed

19  missions or either one act of extreme violence.

20  Q.    All right.  Is Frankie Owens a thunder warrior?

21  A.    Yes, sir.

22          THE COURT:  I tell you, Mr. Leary, we're past

23  mid-morning.

24          MR. LEARY:  Okay.

25          THE COURT:  I don't know if this would be an

1   appropriate time to take a recess; but I think we need to take

2   a recess.  Ladies and gentlemen of the jury, we'll be in recess

3   until -- let's recess until eleven o'clock.

4          Your rest rooms are in the jury room.  Your water fountain

5   and so forth.  Remember, do not discuss the case among

6   yourselves; do not permit anyone to discuss it with you.  The

7   jury's in recess until eleven o'clock.

8                          (JURY OUT AT 10:36 a.m.)

9          THE COURT:  Okay.  Everyone else is in recess until

10  eleven o'clock.  We'll reconvene at eleven.

11                   (Recess at 10:37 a.m. until 11:00 a.m.)

12                          (JURY IN AT 11:03 a.m.)

13  (CALL TO ORDER OF THE COURT)

14          THE COURT:  The Government may continue with your

15  examination of this witness.

16          MR. LEARY:  Thank you, Your Honor.

17  BY MR. LEARY:

18  Q.   Now, Mr. Hubanks, you said you joined the Aryan

19  Brotherhood in what year?

20  A.   Started prospecting in 2005.  Became a member in 2006.

21  Q.   When did you attain your first rank?

22  A.   2013.

23  Q.   Okay.  While you were a member, was the -- you joined in

24  2005/2006 -- was the Aryan Brotherhood in operation during that

25  time frame?

1  A.    Yes, sir.

2  Q.    Throughout the state of Mississippi?

3  A.    Yes, sir.

4  Q.    What happens if a non-Aryan Brotherhood member puts on the

5  brand?

6  A.    He'd be -- it'd be removed.

7  Q.    Would that be tolerated?

8  A.    No, sir.

9  Q.    Can an Aryan Brotherhood member quit the ABM?

10  A.    No, sir.

11  Q.    What happens if an Aryan Brotherhood member removes his

12  brand without permission?

13  A.    He's marked.

14  Q.    Okay.  That's a term, a "mark."  What is a "mark,"

15  Mr. Hubanks?

16  A.    It means he's marked for assault or SOS or KOS, whichever

17  one the wheel deems --

18  Q.    Decides?

19  A.    Yes, sir.

20  Q.    Now, a mark is a target?

21  A.    Yes, sir.

22  Q.    Have you removed your own brand?

23  A.    Yes, sir.

24  Q.    Did you get permission to do that?

25  A.    No, sir.

HUBANKS  --  DIRECT

1  Q.    Are you a mark?

2  A.    Yes.

3  Q.    What's the ABM mailbox?

4  A.    It's a P.O. box for our communications for facilities

5  where they don't have cell phones or no other way to

6  communicate.

7  Q.    Does it say Aryan Brotherhood, P.O. Box.

8  A.    No, sir.

9  Q.    How is it identified?

10 A.    It's a name on it.  I'm not sure exactly what it is.  I

11 can't remember.  But it's a P.O. Box.  Albert-something.  I

12 can't remember the last --

13 Q.    Albert-something?

14 A.    Yes.

15 Q.    Did the A stand for anything, the first letter?

16 A.    It could be for Aryan.

17 Q.    Yeah.

18 A.    I can't remember what the last was.

19 Q.    That's fine.  That's fine.  Mr. Hubanks, explain how the

20 Aryan Brotherhood's incarcerated members communicated with

21 those in the free world.

22 A.    By cell phone or writing.

23 Q.    Okay.  Was it common to use cell phones to do that?

24 A.    Yes, sir.

25 Q.    Explain how MoneyCards or Green Dot cards were utilized

1 from the outside world to the incarcerated world.

2 A.    As far as them having a card in the free world?

3 Q.    Yes.

4 A.    Somebody could have a card out on the street, and you

5 didn't -- we didn't have to have the card.  You could just have

6 the number off the card.  Somebody else could be holding the

7 card.

8        And then, as you took the Green Dot MoneyPak numbers,

9 which is the 14 digits, scratch off on the back of the

10 MoneyPak, you could then transfer it to the Green Dot card.

11 All you'd have to have would be the number off the card.  You

12 wouldn't have to have the actual card itself.

13 Q.    Were incarcerated Aryan Brotherhood members ever able to

14 transact or transfer proceeds using that mechanism?

15 A.    Yes, sir.

16 Q.    Were they able to transact or transfer drug proceeds using

17 that mechanism?

18 A.    Yes, sir.

19 Q.    Does the AB have a special handshake?

20 A.    Yes, sir.

21 Q.    And what does the phrase "man to man, brother to brother,

22 together in battle for the cause," -- what does that mean?

23 A.    That's -- that's part of the greeting and the handshake.

24 Q.    Does ABM have colors?

25 A.    Yes, sir.

1  Q.    And just explain some of the colors to the ladies and

2  gentlemen of the jury.

3  A.    Black and gold, blue and red, black.  Each one of them

4  represents a different thing.

5  Q.    Okay.  Now, when an Aryan Brotherhood member is released

6  from prison, explain what he's supposed to do after he enters

7  the free world.

8  A.    Contact whoever's in his area by plugging in.

9  Q.    Okay.  "Plugging in" means what?

10 A.    Get in contact with whoever's in charge of the area on the

11 street.

12 Q.    Okay.  And that would be the Aryan Brotherhood in the free

13 world, he's supposed to report to?

14 A.    Yes, sir.

15 Q.    What are free world ABM members asked to do on behalf of

16 the organization?  Give some examples.

17 A.    Whatever they're called on to do.

18 Q.    Recruit new members?

19 A.    Yes, sir.

20 Q.    Carry out orders?

21         MR. SUMRALL:  Object to leading, Your Honor.

22         THE WITNESS:  Whatever you're asked --

23         THE COURT:  The objection's sustained.  Let the

24 testimony come from the witness.

25         THE WITNESS:  Whatever they're asked to do by a wheel

HUBANKS -- DIRECT

1  member or anything, any order that's passed down by the wheel,

2  they don't have no choice whether to carry out the order or

3  not.

4  BY MR. LEARY:

5  Q.    When a recruit is recruited, how long is his prospect

6  term?

7  A.    How long is it?

8  Q.    Uh-huh.

9  A.    It's supposed to be six months.

10  Q.    What is a prospect to do during that six-month period?

11  A.    You're supposed to study the paperwork and learn the

12  paperwork and be under the direct supervision of brothers and

13  whatever else they ask him to do during that prospect time.

14  Q.    Explain whether or not he's entitled to brotherhood

15  benefits during that time.

16  A.    He's treated the same as a brother.

17  Q.    What's a blood-in mission, Mr. Hubanks?

18  A.    That means where you have to go on a mission.  That's to

19  earn your patch.  You got to -- they have you to go assault

20  somebody, or whatever the order may be; either you got to shed

21  blood or draw blood.

22  Q.    And that's blood in?

23  A.    Yes, sir.

24  Q.    Explain what blood out means.

25  A.    That means to be taken out of the organization.  If you're

1  smashed out, or however they deem for you to be took out; and

2  you've got to bleed.

3  Q.   Coming into the Aryan Brotherhood, explain how blood plays

4  a role in that.

5  A.   Blood in means you're going to take care of some business

6  on behalf of the brotherhood.  You're either going to draw

7  blood or shed blood.

8  Q.   And explain how blood is involved if you ever want to

9  leave the Aryan Brotherhood.

10  A.   You got to shed blood.

11  Q.   During your involvement with the Aryan Brotherhood in

12  Marshall County, Mississippi, tell the ladies and gentlemen of

13  the jury about the Aryan Brotherhood unification attempt that

14  was taking place.

15  A.   I wasn't at Marshall County.

16  Q.   Yeah, you were at Marshall County.  Oh, I'm sorry.  You

17  were at --

18  A.   I was at Walnut Grove.

19  Q.   Okay.  And explain what the AB unification attempt was.

20  A.   I first heard about it in the end of 2012.  I guess it was

21  around September or October 2012.  I was contacted by Perry

22  Mask, who was a sitting wheel member at the time.  And him and

23  Barron Goff both then explained to me that they were going

24  through the process of trying to unify with California; and

25  that there was going to be a new constitution and a new patch

1  coming in.

2       And that they was offering a time free there for whoever

3  didn't want to take the new brand or be a part of the

4  unification, that they could cover up their old patch and walk

5  away with no retaliation.  And then that process continued on,

6  I guess.

7       Around the end of 2012, I talked to Frank Owens on the

8  phone at the first time.  And, at that time, he was sitting on

9  the wheel on behalf of Larry Sneed, who was out of

10  communication at the time.  And they had had a vacant position

11  on the state captain spot, and they talked to me about filling

12  the position.  They had had some problems at Parchman a couple

13  of weeks before that.

14      I had just left from there and went to Walnut Grove, and

15  they didn't none of them have no numbers or nothing at Parchman

16  to know who to contact with the other gangs that were involved

17  to try to come to an understanding.  So they called me and ask

18  me did I have any numbers there, did I know anybody I could

19  call; and I did help them with that situation.

20      And then, just a couple of weeks after that, they

21  contacted me again, said a new constitution was coming in

22  effect in January 2013 and asked me would I be interested in

23  taking the state captain's position; that they needed somebody

24  that they could depend on who could communicate and knowed

25  (sic) who to contact in the other organizations inside the

1    prison system to keep down problems and to communicate with the

2    other gangs.

3    Q.    Now, who was it that contacted you in December of 2012?

4    A.    I talked to Perry and Barron before, but I talked to

5    Frankie the first time in December.

6    Q.    And what did Frankie say to you?

7    A.    Frankie actually called me, to begin with, about the

8    situation at Parchman.  There was some Simon City Royals down

9    there that had jumped on some brothers at Parchman.  They

10   didn't have any numbers down there or know who to contact.

11   Q.    Let me stop you right there.  Simon City Royals, who are

12   they?

13   A.    They're another white organization that's affiliated with

14   the gangsters.

15   Q.    And Frankie Owens calls you concerning what?

16   A.    They had some problems at Parchman with some Simon City

17   Royals had jumped on some brothers down there.

18   Q.    And what do you mean by "we didn't have numbers"?

19   A.    Didn't have no contacts down there and know who to contact

20   at 29.  I had just been down there for 2 years on C custody and

21   had just left from down there.  And, at the time, Perry -- me

22   and Frankie didn't know one another.  Perry and Barron had told

23   Frankie to call me, you know; I might know somebody to contact.

24   So that's when Frankie called me.  I guess that's about the

25   first time we talked.

1  Q.    What was Frankie's position on unification?

2  A.    As far as the process of it?

3  Q.    Uh-huh.  Was he in favor of it or against it?

4  A.    Yes, he was in favor of it.

5  Q.    And unification was with what other state?

6  A.    Well, it was -- it was supposed to be unification with

7  California and the other United States of the Aryan

8  Brotherhood.

9  Q.    What benefit would unification mean for the state of

10  Mississippi?

11  A.    It'd just give us a brand that was recognized by the other

12  unified states.

13  Q.    Okay.  Was there ever any talk of methamphetamine

14  trafficking?

15  A.    At that time?

16  Q.    Uh-huh.

17  A.    Not at that particular time, no.

18  Q.    Was there any methamphetamine discussion thereafter?

19  A.    Yes, sir.

20  Q.    And explain the significance of the methamphetamine

21  discussion as it pertained to unification.

22  A.    Well, just by us plugging in with them and, you know, with

23  California and out west, we'd have access to bigger and better

24  things.

25  Q.    All right.  And you stated that Frankie Owens was in favor

HUBANKS  --  DIRECT

1  or against unification?

2  A.    In favor.  And I say we all were at the time.

3  Q.    At that time, everybody was?

4  A.    Well, I meant the ones that were sitting on the wheel at

5  the time.

6  Q.    Yes, sir.

7  A.    And then, as I become state captain, naturally, I would

8  have had to been too at the time.

9  Q.    When -- unification, you stated, required a new patch.

10  Explain that again, please.

11  A.    It's -- it was a brand to be recognized by the other

12  unified states.  Prior to that, our brand wasn't recognized by

13  anybody outside of Mississippi.

14  Q.    Okay.  In addition to increased recognition, you stated

15  something about a new constitution.  Would you please explain

16  that to the ladies and gentlemen of the jury.

17  A.    That's Article I and Article II of the constitution that I

18  described earlier, which is a set of bylaws and rules and

19  regulations for the organization.

20  Q.    Now, the Aryan Brotherhood was involved in what part of

21  Mississippi?

22  A.    All Mississippi.

23  Q.    And is that true since your joining the organization?

24  A.    Yes.

25  Q.    Explain how members of the Aryan Brotherhood were able to

1  utilize conference calls while in prison.  Just give a brief

2  description of how you were able to conference call each other.

3  A.    We have a set time to do a conference call.  A lot of

4  times, it'd be me.  Sometimes it'd be Frankie.  One or the

5  other of us would call the other one.  And then everybody would

6  call -- you know, like, they might call my phone.  Frankie

7  might call me, and then I might turn around and call Perry, and

8  then call Barron or whoever and us all tie in on one call and

9  all of us be on the line at one time.

10  Q.    Okay.  In late 2013, where were you located when

11  conference calls were taking place?

12  A.    Alcorn.

13  Q.    And, in late 2013, where was Perry Mask located when

14  conference calls took place?

15  A.    Parchman.

16  Q.    And, in late 2013, where was Frankie Owens located when

17  conference calls took place?

18  A.    Marshall County Correctional.

19  Q.    Are all those in north Mississippi?

20  A.    Yes, sir.

21  Q.    Explain how cell phones were utilized in drug trafficking,

22  Mr. Hubanks.

23  A.    As a means to communicate.  I mean --

24  Q.    And you stated earlier that you'd purchased

25  methamphetamine from Perry Mask?

1  A.    Yes, sir.

2  Q.    On how many occasions?

3  A.    One time.

4  Q.    How much did you get?

5  A.    Fourteen grams.

6  Q.    That's about half of what?

7  A.    Half an ounce.

8  Q.    Okay.  So an ounce would be about how many grams?

9  A.    Twenty-eight.

10  Q.    How much did you pay for half an ounce?

11  A.    $900.

12  Q.    How did you pay Mask for it?

13  A.    Money -- Green Dot MoneyPaks.

14  Q.    Where were you located when you got the methamphetamine?

15  A.    Alcorn.

16  Q.    Where was Mask when he sold it to you?

17  A.    Parchman.

18  Q.    How did he get it to you?

19  A.    It was transferred from the street.

20  Q.    How did they get it inside the prison?

21  A.    It was smuggled in inside tobacco.

22  Q.    What are the different techniques the Aryan Brotherhood

23 utilized to get methamphetamine inside a prison?

24  A.    A lot of it is throwed (sic) over the fence.  You have

25 brothers out on the street that was being used to go throw

1  packages over fences at different facilities.  A lot of corrupt

2  officers being paid off to bring it in.  A lot being brought in

3  through visitation.  It's just however we could get it.

4  Q.  Drug trafficking in prison lucrative?

5  A.  Yes, sir.

6  Q.  Frankie Owens ever utilize Green Dot cards?

7  A.  Yes, sir.

8  Q.  Who's William Carroll?

9  A.  CC.

10  Q.  Uh-huh.  That's his street name?

11  A.  CC, Charlie Carroll.

12  Q.  Where's he from?

13  A.  I believe he's from around Vicksburg.

14  Q.  And what -- the state of Mississippi is divided into

15  regions.  What region would that be?

16  A.  Central.

17  Q.  What was his role in the AB?

18  A.  He was a central area captain.

19  Q.  Did you ever talk to him?

20  A.  Yes, sir.

21  Q.  Was he arrested during the course of this investigation?

22  A.  Yes, sir.

23  Q.  Did you actually talk to him while he was being arrested?

24  A.  Yes, sir.  While he was being chased.

25  Q.  What was he arrested with?

1  A.    I think 4 ounces of meth, a handgun and a rifle; and I

2  forget exactly -- $3,600; something like that.

3  Q.    Who's the most dangerous wheel member?

4           MR. SUMRALL:  Objection, Your Honor.  It calls for an

5  opinion.

6  BY MR. LEARY:

7  Q.    Do you have personal knowledge --

8           THE COURT:  Wait --

9           MR. LEARY:  I'm sorry.

10          THE COURT:  See if you can qualify that a bit.

11 BY MR. LEARY:

12 Q.    In late 2013, did you have personal contact with all --

13 the other two wheels?

14 A.    In 2013, yes.

15 Q.    Extensive contact?

16 A.    Yes.

17 Q.    Based on your extensive contact with the other two wheels,

18 do you know which one was the most dangerous?

19          THE COURT:  Okay.  I'm going to permit the witness to

20 answer that question based on his observations.

21          THE WITNESS:  In my personal opinion, I'd say

22 Frankie.

23 BY MR. LEARY:

24 Q.    Is Frankie a thunder warrior?

25 A.    Yes.

HUBANKS -- DIRECT

1  Q.    Were you ever housed with Frankie Owens?

2  A.    Yes, sir.

3  Q.    Where?

4  A.    Greene County in Tower 5.  We were placed on

5  administrative segregation on this investigation in November of

6  2013.

7  Q.    Okay.  So I'm going to back up a little bit.  In November

8  of '13, you were moved where?

9  A.    From Alcorn to Greene County.

10 Q.    Okay.  Who else was moved to Greene County?

11 A.    Myself, Frankie, Terry Kelly, Perry Mask, and Barron Goff.

12 Q.    And the reason for that movement was what?

13 A.    A federal investigation.

14 Q.    Did you talk to Frankie Owens while he was in Greene

15 County?

16 A.    Yes, sir.

17 Q.    Who is Barron Goff?

18 A.    He's a -- I took his spot on the wheel.

19 Q.    So his role in the Aryan Brotherhood, before you took his

20 spot, was what?

21 A.    He was a wheel member.

22 Q.    Identify wheel members before you became a wheel member,

23 as best you can remember.

24 A.    Before I became a wheel member?

25 Q.    Yes.

1  A.    Perry, Frankie -- Perry Mask, Frankie Owens, and Barron

2  Goff.

3  Q.    Okay.

4  A.    Prior to that, would have been Perry Mask, Larry Sneed,

5  Chris Craft, Brandon Creel.

6  Q.    Okay.  Was Brandon Creel a free world wheel?

7  A.    Yes, sir.  And sometime in between -- before -- I mean,

8  yeah, before Chris Craft, would have been Mackie May.

9  Q.    While you were incarcerated with Frankie Owens, in your

10  presence, what did Frankie Owens yell at Barron Goff?

11  A.    Are you speaking about when Barron was wanting to get out,

12  wanting out --

13  Q.    Yeah.

14  A.    Well, Barron had made a comment, after we got to Greene

15  County -- they had been -- you know, obviously, there was some

16  fallout by him stepping down off the wheel in September anyway.

17  And then, once we got to Greene County, Barron had made a

18  comment that he couldn't follow this wheel anymore.  And he

19  didn't want to be a part of it; he just wanted to step back.

20      And him and Frankie, up to that point, was pretty tight.

21  And Frankie took it personal that Barron wanted to step down

22  and made the comment that now that the Feds had come in the

23  picture he wanted to jump ship, and he was the reason that

24  Frankie was looking at the death penalty.

25  Q.    Okay.  So Barron Goff -- Frank Owens -- you see him in

1 this courtroom?

2 A.    Yes, sir.

3 Q.    Frankie Owens said that Barron Goff was the reason he was

4 looking at what?

5 A.    The death penalty.  Or maybe -- maybe he didn't say death;

6 maybe said lethal injection.  I don't know, but something along

7 those lines.

8 Q.    Who's Jeremy Bailey?

9 A.    He was a brother.

10 Q.    Where was he housed?

11 A.    At Marshall County.

12 Q.    What happened to him?

13 A.    He got stabbed.

14 Q.    Who were the spokes when Jeremy Bailey was stabbed?

15 A.    Barron, Frankie, and Perry.

16 Q.    Barron Goff; is that correct?

17 A.    Yes.

18 Q.    You said Frankie; is that Frankie Owens?

19 A.    Yes, sir.

20 Q.    You said Perry; is that Perry Mask?

21 A.    Yes, sir.

22 Q.    Who issued the order on Jeremy Bailey?

23 A.    You want me to go through this and explain this whole

24 situation?

25 Q.    Yes, please.

1 A.    When this first took place, it was supposed to -- Bailey

2 had supposed to been texting this girl, sending this girl some

3 obscene text messages concerning what he was going to do to her

4 and her daughter when he got out of prison.  And that's one

5 thing that we didn't tolerate, is any acts of violence against

6 women or children.

7 Q.    Is that a code of the Aryan Brotherhood?

8 A.    Yes, sir.  Yes, sir.

9 Q.    Okay.

10 A.    And, anyway, somehow or another, this girl's daddy

11 supposedly got ahold of the phone and seen the text messages.

12 And he contacted -- I think he contacted Frankie.  I'm not sure

13 if it's Frankie or Perry, but I think it's Frankie that called

14 me.

15     Somehow, he got the numbers from somebody to contact us

16 instead of going to law enforcement about the text messages.

17 And, in turn, Frankie contacted me as state captain at the

18 time, telling me that he had talked to the girl's daddy; and

19 that -- wanted me to start a -- start an investigation on --

20 you know, on the incident with Bailey.

21     And the first thing I said was, you know, well, how do we

22 know this?  We can't take his word over a brother because

23 that's part of the constitution too, brothers before others.

24 Q.    Right.

25 A.    Unless you can prove that -- you know, it's their word.

1   We can't take someone else's word over yours.  So, at that

2   time, Frankie said, well, the guy had took pictures of the text

3   messages; and it had Bailey's phone number on there, you know,

4   where it come from his phone.

5        And Frankie forwarded me the messages from the phone, and

6   I seen the messages; I read the messages.  And, at that point,

7   I asked him, "Well, what's there to investigate?  If it come

8   from his phone, what do y'all want me to do?  You know, only

9   thing I can do is call him and talk to him.  Has anybody said

10  anything to him?"

11       Said, "No, hasn't nobody said nothing to him."  They

12  didn't want me to say anything to him.  So we went and got on a

13  conference call.  The wheel was on the line; I was on the line.

14  Q.   Were you a wheel at this time?

15  A.   No.  I was state captain.

16  Q.   Okay.  When you say the wheel was on the line --

17  A.   That would have been Barron Goff, Frankie Owens, and Perry

18  Mask.

19  Q.   Okay.  What happened next?

20  A.   They discussed the situation with the text messages and

21  with Bailey.  Also, Bailey had just been violated just a short

22  time before this for other unbecoming-a-brother conduct.  The

23  long and short of the story, at that particular time, it was

24  voted on that Bailey was going to be stabbed.

25  Q.   Were you in favor of that or against it?

1 A.    I didn't have a vote in it either way.  I was a state

2 captain.

3 Q.    What was your personal feeling on it?

4 A.    At the time, my personal feeling, if he had -- if he was

5 guilty of it, I guess he deserved what he got.

6 Q.    Uh-huh.  Who did you talk to about it next?

7 A.    But they voted on it, to stab Bailey.  Well, after we got

8 off the phone -- and I got to thinking about it, and I called

9 Perry back first.  And I talked to Perry because I knew Perry

10 had been at Marshall County for a long time, and he had a lot

11 going on up there.  And he had a lot to lose if something

12 happened, and he got moved from there.

13      So I called him back, and I told him, you know, Perry, you

14 know, I stayed up there for 6 years in Marshall County; and I

15 know Steve Gurley, who was the CID director up there.  And I

16 said, you know, "If y'all do that, everything you got going up

17 there is over with.  They're going to pack every one of you up

18 and move you."

19      And he said, "Well, what do you think?  You know, what do

20 you think if we just whoop him?"  I said, "Well, my personal

21 experience with Steve Gurley while I was up there, if you just

22 beat him up, he's going to call you out and want to know what

23 the problem is; and you tell him exactly what the deal is, why

24 it happened.  And he's going to want to know is it over with;

25 and, if it's over with, he's going to let him back out on the

1 compound where he can get his patch and stuff covered up."

2        So, after I talked with Perry about it, I called Barron

3 and talked with Barron about it. I'm not sure if I talked to

4 Frankie about it or not before they had the next conference

5 call. But, whenever they got on the conference call again,

6 they agreed to not stab him; that they were just going to beat

7 him up.

8 Q.   Okay. So the order on Jeremy Bailey was reduced from what

9 to what?

10 A.   From stabbing him to just beating him up.

11 Q.   Okay. And, so, what happened after that?

12 A.   The night that he was supposed to get beat up, he got

13 stabbed.

14 Q.   Who ordered the stabbing of Jeremy Bailey?

15        MR. SUMRALL: Objection, Your Honor, unless he has

16 personal knowledge.

17        THE COURT: If you know.

18 BY MR. LEARY:

19 Q.   Do you have personal knowledge who ordered the stabbing of

20 Jeremy Bailey?

21 A.   Not other than Frankie committing it.

22 Q.   Okay. So who ordered the stabbing on Jeremy Bailey?

23 A.   Frankie.

24        MR. SUMRALL: Objection, Your Honor. He has no

25 personal knowledge.

1          THE COURT:  I thought he said Frankie told him.

2          THE WITNESS:  Frankie admitted to it.

3          THE COURT:  Okay.  Objection overruled.

4   BY MR. LEARY:

5   Q.   Frankie Owens admitted to you that he did what?

6   A.   At one point in time, me and Perry both -- Barron, none of

7   us knowed (sic) it was going to happen until after it happened.

8   Perry was actually in the zone.  They went to the zone, got

9   him, took him, and locked him down.  Moved Perry the next day.

10      I actually had got a brother to get a phone up there to

11  Frankie in the hole where I could talk to him and try to find

12  out what happened and why it happened.  I talked to Frankie

13  while he was in the hole.

14      He said "Scissorhands" had talked to CID and told them

15  that it was a personal thing, and that it didn't have anything

16  to do with the brotherhood and signed a statement to that; and

17  that they were releasing him back out to population.

18      At a later date, when me and him and Perry was on the

19  phone, something else was said about doing something; and Perry

20  made the comment to him about, "Yeah, and that -- we know what

21  that'll do too, how that'll end up, just like it did when you

22  got me moved to Parchman."  And, at that time, Frankie spoke

23  and said, "Well, yeah, you know, brother to brother, I been

24  meaning to apologize to y'all for that."

25  Q.   Now, who stabbed Jeremy Bailey?

HUBANKS -- DIRECT

102

```
 1  A.   Ricky Jenkins.

 2  Q.   What's his street name?

 3  A.   "Scissorhands."

 4  Q.   Is he an ABM member?

 5  A.   Yeah.

 6  Q.   Now, what did Frankie tell you that Scissorhands earned?

 7  A.   He earned his bolts.

 8  Q.   So Frankie told you that Scissorhands earned his what?

 9  A.   Bolts.

10  Q.   By doing what?

11  A.   Stabbing Bailey.

12  Q.   Now, tell me what bolts are.

13  A.   The thunder warrior.

14  Q.   And bolts are signified by what?

15  A.   By an extremely violent mission or three confirmed

16  missions.

17  Q.   And how is it represented on your body?

18  A.   On your neck.

19  Q.   By what?

20  A.   Bolts.

21  Q.   What's tattooed on your neck?

22  A.   Bolts.

23  Q.   It's like SS?

24  A.   Yes.

25  Q.   Frankie Owens apologized for it?
```

1  A.    I guess you could call it an apology.  When Perry said

2  something about it, he said, "Yeah, I been meaning to apologize

3  to y'all for that."

4  Q.    Who is Preston Godwin or Goodwin?

5  A.    He was a brother.

6  Q.    Where was he located?

7  A.    At one point, he was at Marshall County.  He ended up at

8  Walnut Grove.

9  Q.    And who is Joseph Gardner?

10 A.    He was a brother too.

11 Q.    What's his street name?

12 A.    "Schitzo."

13 Q.    "Schitzo"?

14 A.    Yeah.

15 Q.    Both of them were affiliated with who?

16 A.    With the brotherhood.

17 Q.    While you were a wheel, was an SOS ordered on Preston

18 Godwin?

19 A.    Yes.

20 Q.    For what?

21 A.    Been a number of things with Preston in the past.  Mostly

22 it was dealing with him shooting dope and running up dope

23 bills.

24 Q.    Who was supposed to assault Preston Godwin?

25 A.    Schitzo.

1  Q.    How was he supposed to assault him?

2  A.    Stab him.

3  Q.    Was your bunk ever searched in this case?

4  A.    Yes, sir.

5  Q.    Items taken from your bunk?

6  A.    Yes, sir.

7  Q.    Okay.  Mr. Hubanks, I ask if you can identify that

8  document I just gave you?

9  A.    Yes.  It's a -- it's a study schedule that I had drawed

10 (sic) up for brothers at Alcorn County.

11 Q.    Okay.  Did that pertain to the Aryan Brotherhood of

12 Mississippi?

13 A.    Yes, sir.

14            MR. LEARY:  Your Honor, the Government would move to

15 have the study schedule for Aryan Brotherhood members entered

16 into evidence as the next Government exhibit.  I believe it's

17 20.

18            THE COURTROOM DEPUTY:  Yes, sir.

19            MR. SUMRALL:  No objection.

20            MR. TURNER:  Object to the relevance, Your Honor.

21            THE COURT:  Okay.  There's an objection as to

22 relevance.  What do you say to that, Mr. Leary?

23            MR. LEARY:  Your Honor, Rule 401 says that relevant

24 evidence is that evidence that has any tendency to make a fact

25 or consequence more or less probable.  And I would respectfully

1  assert that what this particular evidence does is it shows the

2  extent of the Aryan Brotherhood activities in writing out

3  training schedules, as well as this man's membership in the

4  Aryan Brotherhood.

5           THE COURT:  Okay.  The objection's overruled.  Let's

6  admit it.  But we need to connect it with these two defendants.

7           MR. LEARY:  Okay.  Thank you, Your Honor.

8           THE COURT:  The document will be admitted.

9       (EXHIBIT NO. G-20 WAS RECEIVED INTO EVIDENCE)

10  BY MR. LEARY:

11  Q.   Now, concerning the Aryan Brotherhood of Mississippi,

12  explain what you -- what a training schedule is.

13  A.   In respect to that?

14  Q.   Yes.

15  A.   That was a study schedule that I drawed (sic) up.  It's

16  pertaining to the new constitution, Article I and Article II of

17  the new constitution that came into effect in January.  Through

18  the whole year of 2013 leading up to November when we were

19  moved to Greene County and locked down, we were trying to

20  contact all brothers inside and outside that didn't have a copy

21  of the new paperwork and the new patch, getting everybody to

22  put the new brand on and learn the new paperwork.

23       And this particular schedule is one that I drawed up

24  myself personally where I was housed at Alcorn County.  This

25  was a schedule that I was having the brothers at the facility

1  with me learn.

2           THE COURT:  Okay.  Just a moment.  Stop.  Okay,

3  Mr. Turner?

4           MR. TURNER:  I'd just like to renew my objection,

5  Your Honor.  This doesn't have anything to do --

6           THE COURT:  I think we can move along here.  The

7  objection was on relevancy, and I think you've established that

8  they have such a document; that they try to study and learn

9  their constitution.

10          MR. LEARY:  Okay.  Thank you.

11  BY MR. LEARY:

12  Q.   Mr. Hubanks, would you please identify the documents that

13  I just handed you?

14  A.   This is -- it's Article I, Article II.

15  Q.   Of the what?

16  A.   Of the new constitution of the Aryan Brotherhood.

17  Q.   Was that seized from your bunk?

18  A.   Yes, sir.

19  Q.   Now, attached to that, there's a copy of the constitution.

20  Review those and tell the ladies and gentlemen of the jury

21  whether or not they are the same document.

22  A.   (Perusing document).  Yes, sir.

23  Q.   Now, this was the new constitution that was being drafted

24  pursuant to what?

25  A.   To the unification.

1  Q.    And you stated previously that Frankie was in favor or

2  against unification?

3  A.    Favor.

4          MR. LEARY:  Your Honor, at this time, the Government

5  would move to have the Aryan Brotherhood constitution entered

6  into evidence as the next numbered Government exhibit.  I

7  believe it's 21.

8          MR. TURNER:  I object to relevance again, Your Honor.

9  I don't know how that pertains to my client at this time.  He

10 doesn't have a copy with his signature on it, so I would just

11 object to the relevance.

12         MR. SUMRALL:  Your Honor, we would object on the

13 grounds of authenticity.  We don't know who drew this up, where

14 it came from.  And it's not been properly introduced; and we

15 object to it being introduced, not setting the proper predicate

16 for it.

17         THE COURT:  Okay.  The objection's overruled given

18 the broad scope of Count 1 of this indictment.  The objection's

19 overruled.

20       (EXHIBIT NO. G-21 WAS RECEIVED INTO EVIDENCE)

21         MR. LEARY:  Your Honor, what I just moved to have

22 entered was a cumulative exhibit containing the original

23 constitution that was seized from Mr. Hubanks, as well as a

24 copy of that constitution that was produced to defense counsel.

25 BY MR. LEARY:

1  Q.   I'm going to ask you some questions about this Aryan

2  Brotherhood constitution.

3          MR. TURNER:  Your Honor, may we have a sidebar?

4          THE COURT:  Yes, sir.

5  (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

6          MR. TURNER:  Your Honor, I know I've objected to

7  relevance.  But, at this time, I'd like a continuing objection

8  on all of this because I could understand if Mr. Leary was

9  producing a signed document to this effect.  And if he just

10 wants to talk about the Aryan Brotherhood, the Aryan

11 Brotherhood is not on trial here; Mr. Parker is.

12      And I know it -- he can go through it all, and maybe

13 Mr. Hubanks signed it and maybe he created it; but I don't,

14 right now, know that the predicate has been laid as to how it

15 applies to Mr. Parker.  And that's my objection.

16         MR. SUMRALL:  Or to Mr. Owens either, Your Honor; we

17 join in that.

18         THE COURT:  Okay.  Well, the predicate acts of the

19 enterprise and so forth, as defined in Count 1 of the

20 indictment, directing to membership in the Aryan Brotherhood, I

21 think, in the opinion of the Court, given the scope of the

22 allegations in Count 1 of the indictment being a conspiracy

23 charge, that this is relevant.

24      And, if the man identifies it as the constitution of the

25 organization, I'm going to permit its introduction into

1  evidence.  The objection of both defendants is noted and made

2  continuing.

3           MR. TURNER:  Could I ask that a limiting instruction

4  be given at some point that this is what it was from a certain

5  time period forward?  Because I believe that --

6           THE COURT:  Is that -- unification was in the fall of

7  2013?

8           MR. LEARY:  It was, Your Honor.

9           MR. TURNER:  That would be the only additional, and

10  I'd like a continuing objection as to the questions.

11           THE COURT:  Well, you can bring that out in your

12  testimony.  It's effective only after -- I believe it was

13  October of 2013.

14           MR. LEARY:  I'll ask him questions.  I believe it was

15  drafted in January of 2013, but I'll clear that up with some

16  questions.

17           MR. TURNER:  Thank you.

18           THE COURT:  Very well.  All of the objections are

19  noted for the record.

20           MR. TURNER:  Thank you.

21      (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY).

22  BY MR. LEARY:

23  Q.   Mr. Hubanks, what you have in front of you is an Aryan

24  Brotherhood constitution.  Now, again, tell the ladies and

25  gentlemen of the jury -- that constitution deals with what?

HUBANKS -- DIRECT                110

1  A.    It's a -- it's a set of rules and the bylaws, code of

2  silence; tells you about the history, the chain of command

3  structure, your colors, all your meanings, code of ethics, code

4  of honor, a list of violations, about church meetings.  It's

5  just a -- it's, like, a handbook.

6  Q.    Did you read the constitution of the Aryan Brotherhood

7  prior to 2013?

8  A.    This one?

9  Q.    No.  Just the Aryan Brotherhood constitution.  Had you

10 ever seen a copy of it prior to 2013?

11 A.    Yeah.  I wouldn't -- I don't know if it was as extensive

12 as this; but, yeah, we had paperwork.

13 Q.    That was the constitution?

14 A.    Yeah.

15 Q.    And is part of that paperwork included in this?

16 A.    Yes, sir.

17 Q.    Okay.  Are Aryan Brotherhood members charged with abiding

18 by the terms of the constitution?

19 A.    Yes, sir.

20 Q.    If you would, Mr. Hubanks, turn to page 1 of the

21 constitution.

22 A.    Article I?

23 Q.    Article I, page 69.

24 A.    All right.

25 Q.    On page 69, under subparagraph 6 -- read subparagraph 6

1  under Article I, Section 1.

2  A.    Question 6?  "Do you believe in death before dishonor?"

3  Q.    Now, what exactly are these questions referring to?

4  A.    Well, this is a questionnaire for a prospect.

5  Q.    Number 12 in the questionnaire question, would you please

6  read that one?

7  A.    "Could you use terrorist tactics to teach someone a lesson

8  or to prove a principle?"

9  Q.    Line Item 13, what does that say?

10  A.    "Do you believe that a Government ran by the minority

11  would be better or worse than the present world?"

12  Q.    Turn the next page to page 70.  Read subsection 13.

13  A.    Which one?

14  Q.    I'm sorry.  Subparagraph 19.

15  A.    It says "We are extremely prejudiced against certain

16  racial groups.  What's your opinion on this statement?"

17  Q.    Now, that question concerns racial views against what race

18  in particular?

19  A.    Sir?

20  Q.    That -- that question right there concerns racial views

21  against what race?

22  A.    Any other race.

23  Q.    Other than?

24  A.    The Aryan race.

25  Q.    And subparagraph -- subparagraph 30, what is that?

1 A.    "If, after you're released, you are ordered to terminate

2 another person, could you do so without any explanation or

3 hesitation?"

4 Q.    Page 71, Section 2, "Prospect Compact."  What is that,

5 Mr. Hubanks?

6 A.    That's a prospect compact that has to be signed by a

7 prospect and by a recruiter, and then it's got a place there

8 for three brothers to witness it.

9 Q.    And the first paragraph under "dear prospect -- what does

10 that first sentence say, Mr. Hubanks?

11 A.    "You stand forewarned of the increasing risk to you."

12 Q.    And the second paragraph, read that for me, please.

13 A.    "Should you not be selected to be promoted to brother

14 status, you shall remain under an oath of secrecy upon penalty

15 of death if you ever reveal any of your knowledge to anyone.

16 If acceptance is not -- if acceptance is not given to you,

17 don't lose heart; keep the faith in white supremacy in the

18 future of the Aryan cause.

19     "The Aryan cause goes deeper than you can imagine or what

20 you shall learn in the short time given.  If you read with the

21 right heart, your whole existence can be changed from one of

22 knowing many to one of the elite few who are preparing for the

23 end of time as we know it.

24     "To be one of the single, pure, and supreme nation of the

25 elite few, we must be careful who is chosen to be accepted and

1  given the esteemed honor of becoming a brother.  We must be

2  sure that those chosen will all follow Aryan heritage and have

3  a pure and sincere heart.

4      "Therefore, ask yourself with honesty and sincerity, Am I

5  ready and willing to make this lifelong commitment and pledge?

6  Am I Aryan material and worthy of such?  Is my heart pure,

7  strong and honorable?  And do I accept and agree with the

8  beliefs of white supremacy, and will I die for that belief?

9      "If after asking yourself these questions and being

10  confident of your questions and you wish to continue to try to

11  become one of the chosen few, then proceed beyond this point

12  with the blessing of the family --

13  Q.    I think that's good.  Turn to page 72, Mr. Hubanks.

14  Article I, Section 5, entitled "History."  The third sentence

15  begins with "they are the most violent of all white

16  organizations."  Read that sentence for me.

17  A.    "They are the most violent of all white organizations,

18  having potential members murder, or act as an accomplice to

19  murder, as a prerequisite of membership into the organization."

20  Q.    Are we talking about the Aryan Brotherhood?

21  A.    Yes.

22  Q.    Please turn to page 73.  The top half of the page -- I'd

23  like for you to read the last part of the top half of the page.

24  It begins with the word "most."  I just circled it.  Would you

25  begin right there and read to the end of that section, please?

1  A.    All right.  It says "Most members who have proven

2 themselves in a violent cause for the organization are awarding

3 lightening bolts and can be tattooed on their necks as a symbol

4 of their strength and respect within the organization.

5      "These members are called thunder warriors and usually

6 hold upper ranks.  If the tattoos using the Aryan Brotherhood

7 name are not legitimate, they either kill the person or at

8 least remove the tattoo.  The Aryan Brotherhood opted to avoid

9 future conspiracy charges that may arise by ceasing the

10 practice of murder."

11  Q.    Frankie Owens a thunder warrior?

12  A.    Yes, sir.

13  Q.    Turn to page 75.  I'm just going to page through this.

14 Page 75 -- are you there, Mr. Hubanks?

15  A.    Yes, sir.

16  Q.    Do you see Section 8?  Can you please identify what that

17 section's titled?

18  A.    "Meanings of the Brand."

19  Q.    And then go to Section 9.  What is that section entitled?

20  A.    "Chain of Command."

21  Q.    And, under "Chain of Command," do you see, centered, the

22 word *wheel*?

23  A.    Yes.

24  Q.    Please turn the page to 76.  Centered, do you see the

25 word -- what at the top?

1  A.    "State captain."

2  Q.    And right there?

3  A.    "Captains."

4  Q.    And then under that?

5  A.    "Lieutenants."

6  Q.    And on the next page?

7  A.    "Sergeant of arms."

8  Q.    And then turn to page 78.  Article II, Section 1 is

9  entitled what?

10 A.    The "Constitution of the Brotherhood."

11 Q.    And then right here where I put that dot, there's a

12 sentence that begins right above it.  "The Aryan Brotherhood

13 will always -- the Aryan Brotherhood has, and will always,

14 fashion itself under Sinn Fein.  What does that mean?

15 A.    Ourselves alone.

16 Q.    And, on the next page, page 79, right where I put that

17 dot, Mr. Hubanks, it begins "this constitution is to assure."

18 Would you please read that section?

19 A.    "This constitution is to assure all brothers of their

20 responsibilities to the Aryan Brotherhood, what it's expected

21 to represent, stand proud for; and, under no circumstances, is

22 it to be neglected, disrespected, or used in slander by anyone

23 for any insults certain of immediate death."

24 Q.    And then under that -- well, let me go back.  What the

25 constitution says is that if it's disrespected or slandered for

1  any insult is certain and immediate death.  Is that what it

2  says?

3  A.    Yes.

4  Q.    Under Article II, Section 2, what is that section

5  entitled?

6  A.    "The Blood Oath."

7  Q.    And what is this section entitled?

8  A.    "Brotherhood Creed."

9  Q.    And what is this section entitled?

10  A.    "The Aryan Warrior Motto."

11  Q.    And briefly tell me what that motto says right there at

12  the end.

13  A.    "Where Aryan boots tread, there will be respect or

14  bloodshed."

15  Q.    On the next page, 80, Article II, Section 5 is entitled

16  what?

17  A.    "Swastika."

18  Q.    Swastika?  And then, under that, Article II, Section 6 is

19  entitled what?

20  A.    "Four Principles of Brotherhood."

21  Q.    Then the next page, on page 81, Article II Section 7 is

22  entitled?

23  A.    "Brotherhood Lockbox."

24  Q.    Please turn to page 85, Mr. Hubanks.  The top section,

25  Subsection (e) at the top of page 85, would you please read

1  what that says?

2  A.   "Prospects can only earn membership in one of two ways,

3  either by blood in mission or standing in battle with a member

4  or members.  There are no exceptions, period."

5  Q.   Please turn to page 86.  Article II, Section 17, what does

6  that concern?

7  A.   Article II, 17?

8  Q.   Yes, sir.

9  A.   "Free World Communications."

10 Q.   And just read that first sentence, please, sir.

11 A.   "All brothers who are paroled or released are to report to

12 his area or zone captain within five days after his release."

13 Q.   What does that pertain to, Mr. Hubanks?

14 A.   That's pertaining to brothers that's being released to

15 society.

16 Q.   And Section 18 under that, what does that concern?

17 A.   It's -- free world meetings are called *church*.

18 Q.   Thank you, Mr. Hubanks.

19           THE COURT:  How much longer do you anticipate you'll

20 have this witness, Mr. Leary?

21           MR. LEARY:  Your Honor, we still have quite a bit to

22 do.  Not before we could break.

23           THE COURT:  Very well.  Ladies and gentlemen of the

24 jury, we're going to take our noon recess.  You'll be in recess

25 until 1:30.  Remember, do not discuss the case among

1  yourselves; do not permit anyone to discuss it with you.  The

2  jury -- let's let the jury file out to the jury room.

3       (JURY OUT AT 11:59 a.m.)

4          THE COURT:  Okay.  Court will be in recess until

5  1:30.

6       (Lunch recess at 11:59 a.m. until 1:30 p.m.)

7       (CALL TO ORDER OF THE COURT)

8          THE COURT:  Let's see.  Mr. Leary, you wanted to open

9  without the jury?

10          MR. LEARY:  Yes, Your Honor.  We had one -- we wanted

11  to revisit a motion that we had previously filed with the

12  Court.  If it pleases the Court, I can address it right now.

13          THE COURT:  Okay.

14          MR. LEARY:  In opening statement, the defense made

15  several statements to the jury.  One of the statements was

16  "Where is Michael Hudson?"  And the next statement was "There

17  is no body."  And the next statement was "You will hear no

18  evidence connecting Parker to a meth conspiracy."

19          And the reason the Government views that as disturbing is

20  that we have a confession from Mr. Parker where Mr. Parker

21  admitted to Hudson arriving at his house.  He admitted to

22  Hudson being killed at his house.

23          He admitted to Hudson being picked up at his house by

24  Frankie Owens and by Bradley Creel.  And he also admits, in

25  that confession, to trafficking in pounds of methamphetamine

1  every week during the term of this conspiracy, which begins in

2  2009.

3        And, so, the position that the Government is making is

4  that the defendant cannot have it both ways.  He cannot tell us

5  that the man was murdered, tell us what happened to the body,

6  tell us of his meth trafficking activity and then, at the same,

7  time argue to the jury to the contrary, or at least leave them

8  with the idea that we don't know about his meth trafficking,

9  the murder, and the disposal of the body; when we do know.  We

10  know exactly from his mouth.

11       That is the position that we're arguing, Your Honor.  That

12  if he -- I would respectfully argue that he's opening the door.

13  But, if he continues down this path, I'm going to have

14  witnesses on the stand -- for instance, Mr. Douglas.  And, if

15  he asks Mr. Douglas, You have no evidence of Mr. Parker's

16  involvement in this murder?  Mr. Douglas's response, if he's

17  going to be truthful, is, yes, as a matter of fact, I do.

18       That's the problem I see that we're running into, so I

19  would respectfully assert that we've opened the door here in

20  this case already; and, if not, we are getting dangerously

21  close.

22            THE COURT:  Thank you.

23       Mr. Turner?

24            MR. TURNER:  Your Honor, I know that we've briefed

25  this to you already, as far as in our motions, and cited to

1   authority.  There is absolutely no case law that says that

2   argument is evidence.  Those cases that do exist say -- they

3   refer to evidence that's being elicited.

4        And, in those situations, I do understand that certain

5   courts have allowed those confessions to be played at those

6   times.  But there's not any case law decided, though, that

7   deals with argument.  Because we all know it's not evidence.

8   The Court even instructs that, arguments of counsel is not

9   evidence.  And I understand what Mr. Leary is saying; but we're

10  not at that stage right now, according to the case law.

11            THE COURT:  What I'm going to is I'll hold this under

12  advisement, Mr. Leary.  And it's my recollection that you

13  stated that -- you anticipate you would use the confession or

14  statement made by Mr. Parker only for impeachment purposes?

15            MR. LEARY:  That is correct, if he's opening -- yes,

16  Your Honor.

17            THE COURT:  Pretrial, that was the way it was left

18  with the Court.  I tell you, I'll be mindful --

19            MR. LEARY:  Thank you.

20            THE COURT:  -- and observant as to whether or not the

21  door's opened and --

22            MR. LEARY:  Thank you, Judge.

23            THE COURT:  -- cross it when we get to it.

24            MR. TURNER:  Yes, Your Honor.

25            THE COURT:  Okay.  Are we ready for the jury?

1        Let's have the jury, Mr. Marshal.

2        (JURY IN AT 1:37 p.m.)

3          THE COURT:  Let's see.  I believe we had Mr. Hubanks

4   on the stand.  We need the witness back on the stand.

5        Mr. Hubanks, when we took the noon recess, you were on the

6   stand.  I'll remind you, sir, you're still under oath.

7        Mr. Leary, you may continue your examination.

8          MR. LEARY:  Thank you, Your Honor.

9   BY MR. LEARY:

10  Q.   Mr. Hubanks, I believe that you testified that you became

11  an AB member in 2005/2006; is that correct?

12  A.   Yes, sir.

13  Q.   During that time frame, where were you living?

14  A.   I was at -- at Marshall County Correctional Facility.

15  Q.   Mr. Hubanks, have you been part of the free world since

16  you joined the Aryan Brotherhood?

17  A.   No, sir.

18  Q.   Mr. Hubanks, do you know all the Aryan Brotherhood members

19  in the state of Mississippi?

20  A.   No, sir.

21  Q.   How long have you known Mr. Mask, Mr. Hubanks?

22  A.   I knowed (sic) who he was for some time.  We're from the

23  same county.  But, as far as personally knowing him or ever

24  talking with him, the first time, I guess, I talked to him

25  would have been around September or October of 2012 by

HUBANKS -- DIRECT

1  telephone.

2  Q.    Okay.  And I believe you testified you first started

3  talking to Frankie Owens on the telephone about when?

4  A.    Around December of 2012.

5  Q.    And those telephone conversations with Perry Mask and

6  Frankie Owens concerned what, in general?

7  A.    The unification and then my, eventually, taking the state

8  captain's position.

9  Q.    And you eventually rose to the rank of what?

10  A.    Wheel member.

11  Q.    Now, Mr. Hubanks, did you make conference calls to

12  Mr. Mask and Mr. Owens?

13  A.    Yes, sir.

14  Q.    Were those calls intercepted?

15  A.    Yes, sir.

16  Q.    Have you listened to those calls?

17  A.    Yes, sir.

18  Q.    Can you identify the voices on the calls?

19  A.    Yes, sir.

20  Q.    Did you identify Perry Mask's voice?

21  A.    Yes, sir.

22  Q.    Mr. Owens' voice?

23  A.    Yes.

24  Q.    Did you read the transcripts of the calls?

25  A.    Yes, sir.

1              MR. LEARY:  Your Honor, at this time, the Government

2    would like to play Call No. 233 previously entered into

3    evidence as Government's Exhibit 6-A.

4              THE COURT:  Now, the -- the tape is in evidence.

5              MR. LEARY:  Yes, Your Honor.

6              THE COURT:  Do you anticipate exhibiting the

7    transcripts to the jury via the electronic presenter?

8              MR. LEARY:  I do, Your Honor.

9              THE COURT:  Very well.  That being the case, I need

10   to give a cautionary instruction to the jury.  And your exhibit

11   is 6-A?

12             MR. LEARY:  Yes, Your Honor.

13             THE COURT:  The transcript would be 6-B.

14             MR. LEARY:  Yes, Your Honor.

15             THE COURT:  Ladies and gentlemen of the jury,

16   Exhibit 6-B has been identified as a typewritten transcript of

17   an oral conversation which can be heard on the tape recording

18   received into evidence as Government's Exhibit 6.

19        The transcript also purports to identify the speakers

20   engaged in such conversation.  I have admitted the transcript

21   for the limited and secondary purpose of aiding you in

22   following the content of the conversations as you listen to the

23   tape recording and also to aid you in identifying the speakers.

24        You are specifically instructed that whether the

25   transcript correctly or incorrectly reflects the content of the

1    conversation or the identity of the speakers, it is entirely

2    for you to determine, based upon your own evaluation of the

3    testimony you have heard concerning the preparation of

4    transcripts and from your own examination of the transcript in

5    relation to hearing of the tape recording itself as the primary

6    evidence of its contents.

7         And, if you should determine that the transcript is, in

8    any respect, incorrect or unreliable, you should disregard it

9    to that extent.  It is what you hear on the tape that is the

10    evidence, not the transcripts.  Now, with that said to you,

11    ladies and gentlemen, I'll permit the Government to play the

12    tape.

13         MR. LEARY:  Thank you, Your Honor.  I'm going to ask

14    a few questions first.

15         THE COURT:  Wait just a moment.

16         MR. SUMRALL:  For the record, may we have our

17    continuing objection?

18         THE COURT:  Yes.  Yes.  That objection was overruled.

19    The Defendant Owens made an objection at the time these

20    disks -- the tapes were tendered into evidence.  The Court

21    overruled that objection and noted every time the tape or

22    transcript was -- the Court noted every time a disk -- tape

23    recording was introduced into evidence the continuing objection

24    was noted, and it's noted now.

25         Okay.  You may proceed, Mr. Leary.

1              MR. LEARY:  Thank you, Your Honor.

2  BY MR. LEARY:

3  Q.    In 2013, Mr. Hubanks, the Aryan Brotherhood was

4  negotiating unification with which other Aryan Brotherhood

5  entities?

6  A.    Specifically, California and all the other United States.

7  Q.    Who was the Aryan Brotherhood of Mississippi negotiating

8  with from California?

9  A.    Supposedly with counsel from California, mainly someone

10  named Rich; and, who else, I don't know.  I never personally

11  participated in any of those calls.

12  Q.    The person that you were aware of was Rich?

13  A.    Yes, sir.  He was a liaison here in Mississippi known as

14  "Ghost."  What his name is, I do not know.

15  Q.    Okay.  He was referred to as "Ghost"?

16  A.    Yes.

17  Q.    And Ghost's role was a liaison between Mississippi and

18  who?

19  A.    California.

20  Q.    Okay.  What's Frankie Owens' street name?

21  A.    "State Raised."

22  Q.    What's an Android, Mr. Hubanks?

23  A.    It's a smartphone.

24  Q.    What's an ABM roster?

25  A.    It's a roster from each facility or area detailing what

1  brothers is in that area.

2  Q.    And what is the Walnut Grove facility?

3  A.    It's a correctional facility.

4  Q.    Okay.  Who's "Schitzo"?

5  A.    Joseph Gardner.

6  Q.    And what was Schitzo to do to Preston Godwin?

7  A.    Stab him.

8            MR. LEARY:  Call No. 233, please.

9       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

10  BY MR. LEARY:

11  Q.    Right now you've heard, what, three individuals speak;

12  yourself and who else?

13  A.    Perry Mask and Frank Owens.

14  Q.    Okay.

15           MR. LEARY:  Continue, please.

16      (EXHIBIT NOS. G-6A AND G-6B PLAYING)

17  BY MR. LEARY:

18  Q.    Now, who just said that the ABs need to set up a call with

19  Rich?

20  A.    That was Frank.

21  Q.    Okay.

22           MR. LEARY:  Continue, please.

23      (EXHIBIT NOS. G-6A AND G-6B PLAYING)

24  BY MR. LEARY:

25  Q.    Mr. Hubanks, tell the ladies and gentlemen of the jury

 1   what the topic of the discussion is right now.

 2   A.    Talking about the unification process, talking about a

 3   conversation with California; we're having trouble with them

 4   and with Ghost concerning the probationary period.  We had to

 5   be on probation before our unification would be complete.

 6   Q.    Okay.  Who's going to be on probation?

 7   A.    The brotherhood of Mississippi would have been on

 8   probation for a probationary period until California was

 9   satisfied that we met their requirements for us to be unified.

10   Q.    How's that going on?

11   A.    It's no longer, as far as I -- well, I don't know.  I've

12   not be in any contact in two years, so.

13   Q.    Were the spokes angry at the time when that was proposed?

14   A.    Yes, sir.

15   Q.    Okay.

16              MR. LEARY:  Continue.

17        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

18   BY MR. LEARY:

19   Q.    Reference to treasury right there is reference to what

20   treasury, Mr. Hubanks?

21   A.    Brotherhood treasury.

22   Q.    Okay.  Thank you.

23        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

24   BY MR. LEARY:

25   Q.    What smash is Frankie Owens talking about right there?

HUBANKS -- DIRECT

1  A.    Oh, I'm not sure.

2  Q.    Okay.  Thank you.

3        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

4  BY MR. LEARY:

5  Q.    What's Frankie Owens talking about right there?

6  A.    We're just talking about Grady.  Somebody can't get him on

7  the phone to collect his money, much less run the state.

8  Q.    Okay.  Is Grady another Aryan Brotherhood member?

9  A.    Yes, sir.

10  Q.    Thank you.

11        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

12  BY MR. LEARY:

13  Q.    When Frankie Owens talks about we're promoting making

14  money and handling business, what's he talking about?

15  A.    He's talking about his way of a brother not being a junkie

16  strung out on dope.

17  Q.    Okay.  How's he making money?

18  A.    By selling drugs.

19  Q.    Okay.

20            MR. LEARY:  Keep going.

21        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

22  BY MR. LEARY:

23  Q.    Who's talking?  Who is Pugh?

24  A.    Mike Pugh.

25  Q.    And what is his position within the organization?

1  A.    He was captain at the time.

2  Q.    Okay.

3        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

4  BY MR. LEARY:

5  Q.    What are you and Mask talking about right there?

6  A.    Field operations officer.

7  Q.    Who's mama --

8  A.    Mama Carson.  She's one of the field operation officers.

9  Q.    At what facility?

10 A.    Parchman.

11 Q.    Had you previously been there?

12 A.    Yeah.  Works in the field like a supervisor.

13 Q.    And you knew her?

14 A.    Yeah.

15 Q.    And, now, who's working with her?

16 A.    Perry.

17 Q.    Okay.  So y'all just talking about it?

18 A.    Yeah.

19 Q.    Okay.

20       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

21 BY MR. LEARY:

22 Q.    Now, when you reference Android right there, Mr. Hubanks,

23 what are you referencing?

24 A.    A smartphone.

25 Q.    And, when you're talking about putting money on a card,

1  what are you referencing right there?

2  A.    A Green Dot card.

3  Q.    Who's Ed Moody?

4  A.    He was a brother.

5  Q.    Okay.

6         MR. LEARY:   Continue, please.

7         (EXHIBIT NOS. G-6A AND G-6B PLAYING)

8  BY MR. LEARY:

9  Q.    Mr. Hubanks, why are you discussing being able to track

10  people's phone numbers and addresses and those type things?

11  A.    Well, we're talking about Ghost and Rich, not knowing who

12  they are; and saying they're somebody, and they really ain't.

13  And, when something comes up like that, we can look and see if

14  that's who they are.

15  Q.    Okay.  Thank you.

16         (EXHIBIT NOS. G-6A AND G-6B PLAYING)

17  BY MR. LEARY:

18  Q.    Are y'all able to do this type stuff you're talking about

19  from contraband prison phones?

20  A.    Yeah.

21  Q.    Okay.

22         (EXHIBIT NOS. G-6A AND G-6B PLAYING)

23  BY MR. LEARY:

24  Q.    What's Perry -- Frank Owens talking about, doing an update

25  on the rosters in the facilities?

HUBANKS -- DIRECT

1  A.    Getting an update on all the rosters in all the

2  facilities.

3  Q.    And the rosters include names of who?

4  A.    All the brothers at each facility.

5  Q.    Thank you.

6        (EXHIBIT NOS. G-6A AND G-6B PLAYING)

7  BY MR. LEARY:

8  Q.    Mr. Hubanks, what's E2 or E building?

9  A.    That's a building at Greene County.

10 Q.    Within the prison?

11 A.    Yes, sir.

12       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

13 BY MR. LEARY:

14 Q.    Mr. Hubanks, you ever heard the name Mitchell Valentine?

15 A.    Yes, sir.

16 Q.    Who's Mitchell Valentine?

17 A.    He's a brother.

18 Q.    Where is he located?

19 A.    Now?

20 Q.    Yeah -- or before.

21 A.    I met him at Greene County.

22 Q.    Okay.  Is that in north Mississippi or south Mississippi?

23 A.    South Mississippi Correctional Facility.

24 Q.    Okay.

25       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

1  BY MR. LEARY:

2  Q.    What are you talking about right now, Mr. Hubanks?

3  A.    Talking about they had took Schitzo's phone at Rankin

4  County.

5  Q.    Okay.

6  A.    And he was trying to get the brothers across the hall to

7  come over there with him.

8       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

9  BY MR. LEARY:

10 Q.    When Schitzo asked if he's the business, what does that

11 mean?

12 A.    That means is he marked and is he going to be smashed out.

13 Q.    And, if you're smashed out, you lose your what?

14 A.    Your brand.

15 Q.    But he also asked -- is he asking to stay in, though?

16 A.    Yeah.

17 Q.    What's that about?

18 A.    He's asking, if he's a mark, then he wants to get it over

19 with; but, if he can, can he redeem himself and prove himself

20 to keep his patch.

21 Q.    Okay.  So Schitzo wants to redeem himself so he can do

22 what?

23 A.    Keep his patch.

24 Q.    Okay.  Thank you.

25      (EXHIBIT NOS. G-6A AND G-6B PLAYING)

1  BY MR. LEARY:

2  Q.   When you said "There's some work to be done in Walnut

3  Grove," what is that work to be done?

4  A.   Well, you had a couple of marks down there at the time.

5  You had Preston Goodwin and Scotty Bowling both were down

6  there, and they were both marks.

7  Q.   And marks mean what?

8  A.   They're marked to be smashed out.

9  Q.   And Schitzo could redeem himself by doing what?

10  A.   By handling the business and smashing them out.

11  Q.   Okay.

12       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

13  BY MR. LEARY:

14  Q.   Mr. Hubanks, when you say "Do you think he'll push that

15  thing," what are you referring to?

16  A.   Talking about stabbing him.

17          MR. LEARY:  All right.  Keep going.

18       (EXHIBIT NOS. G-6A AND G-6B PLAYING)

19  BY MR. LEARY:

20  Q.   Now, Mr. Hubanks, where was Schitzo located?

21  A.   Walnut Grove Correctional Facility.

22  Q.   Where was Preston Godwin located?

23  A.   Walnut Grove Correctional Facility.

24  Q.   What's a thunder dome?

25  A.   It's a -- we go with three brothers for 3 to 5 minutes.

1   Q.    Three brothers -- is it one versus three?  Is that what

2   you mean?

3   A.    (Nodding head).

4   Q.    Thunder dome, that's a heightened form of what?

5   A.    Violation.

6   Q.    Okay.  Now, who is Ricky Jenkins?

7   A.    "Scissorhands."

8   Q.    And who did Ricky Jenkins stab?

9   A.    Jeremy Bailey.

10  Q.    Okay.  Now, tell the ladies and gentlemen of the jury what

11  an RVR is.

12  A.    It's a rule violation report.  If you get in any trouble

13  in the Department of Corrections, they write you an RVR, which

14  is a rule violation report.

15  Q.    How do you accumulate points on an RVR?

16  A.    Depends on whether it's a serious RVR or a major RVR.

17  Some of them carry one point; some carry three; some carries

18  four.  It just depends on the classification of the RVR.

19  Q.    Okay.  If an incident resulted in 11 RVR points, would

20  that be a small incident or be a significant incident?

21  A.    It would be a major RVR.

22  Q.    Was a new brand going to be required if unification was

23  successful?

24  A.    Yes, sir.

25  Q.    Who's "Turbo"?  Do you know who "Turbo" is?

1  A.    I know who he is, but I don't know him.

2  Q.    You never met him?

3  A.    No, sir.

4  Q.    What's the name of the person whose street name was Turbo?

5  A.    Jake Stutsy.

6  Q.    What's a lockbox?

7  A.    It's a PO box used for communication.

8         MR. LEARY:  Your Honor, at this time, the Government

9  would move to play Call No. 235, which was entered into

10  evidence as Government's Exhibit 7A.

11         THE COURT:  Okay.  Do you have a transcript, 7-B?

12         MR. LEARY:  Yes, Your Honor, we do.

13         THE COURT:  Okay.  Now, ladies and gentlemen of the

14  jury, rather than read the cautionary instruction to you again,

15  I remind you that the evidence that you are to consider is the

16  tape, what you hear on the tape.  These transcripts have been

17  prepared to assist you in listening to the tape.  The primary

18  evidence is the tape.

19     Okay.  You may proceed.

20         MR. LEARY:  Thank you, Your Honor.

21         MR. SUMRALL:  Your Honor, for the record, we would

22  note --

23         THE COURT:  Yes, sir.  The continuing objection's

24  noted.

25         MR. LEARY:  Call No. 235.

1              THE COURT:  I might state here, in light of that

2   objection, the Court notes on that Exhibit 6 that Mr. Owens,

3   the defendant in this case, was one of the principle speakers.

4         Okay.  You may proceed, Mr. Leary.

5              MR. LEARY:  Thank you, Your Honor.  Call No. 235,

6   Government's Exhibit 7A.

7         (EXHIBIT NOS. G-7A AND G-7B PLAYING)

8   BY MR. LEARY:

9   Q.    So, again, on this call, we're bringing up, again, Schitzo

10  and the potential smash on who?

11  A.    Preston.

12  Q.    Okay.  Thank you.

13        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

14  BY MR. LEARY:

15  Q.    What does Frankie Owens mean when he says that "he knows

16  that he is the business too"?

17  A.    Means Preston already knows that he's been marked to be

18  smashed.

19  Q.    Okay.  That's what "he's the business" means?

20  A.    Yes.

21  Q.    Thank you.

22        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

23  BY MR. LEARY:

24  Q.    How are you looking up how much time Schitzo has right

25  there?

1  A.    On the internet on MDOC.com.

2  Q.    You're doing that on your --

3  A.    Yeah.  On the Android.

4  Q.    Okay.

5        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

6  BY MR. LEARY:

7  Q.    When Frankie Owens says he's not even going to be able to

8  get to Preston, what does that mean?

9  A.    Talking about him being on PC; that they'd lock the cells

10 so they can't come out, can't get to him no way.

11 Q.    And, if you can't get to him, that means you can't do what

12 to him?

13 A.    You can't get to him to handle him, to smash him, stab

14 him.

15 Q.    Okay.  Thank you.

16       (EXHIBIT NOS. G-7A AND G-7B PLAYING)

17 BY MR. LEARY:

18 Q.    When Frankie Owens says "You get back there, and GD push

19 that steel on him; I guess that would redeem him," what does

20 that mean?

21 A.    That means, if he does it, he can keep his patch.

22 Q.    Who are we talking about right there?

23 A.    Schitzo.

24 Q.    And who made that statement?

25 A.    Frankie.

1          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

2   BY MR. LEARY:

3   Q.    When Perry Mask says "I don't see him pushing no steel; he

4   may take a lock there," what is he referring to?

5   A.    Getting him a lock.

6   Q.    Where do they put a lock, if you're going to hit somebody

7   with a lock?

8   A.    Tie it on a sock or string or something.

9   Q.    Okay.

10          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

11  BY MR. LEARY:

12  Q.    Right there, you're identifying the location of who?

13  A.    Preston.

14  Q.    Okay.  Thank you.

15          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

16  BY MR. LEARY:

17  Q.    When Frankie Owens is referencing sending two brothers in

18  on him for -- three brothers in on him for two minutes, what's

19  that referencing?

20  A.    Being thunder domed.

21  Q.    Okay.

22          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

23  BY MR. LEARY:

24  Q.    Now, we referenced "Scissorhands" previously.  What's his

25  name?

1  A.    Ricky Jenkins.

2  Q.    And "Scissorhands" stabbed who?

3  A.    Jeremy Bailey.

4  Q.    Okay.

5        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

6  BY MR. LEARY:

7  Q.    Now, 11 points on the RVR we previously discussed, is that

8  a lot or a little bit of RVR points?

9  A.    That's the most you can get.

10 Q.    Okay.

11        MR. LEARY:  Keep talking.  Thank you.

12        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

13 BY MR. LEARY:

14 Q.    What are you talking about there?  Why did Scissorhands,

15 or Ricky Jenkins, get 11 RVR points?

16 A.    It's an assaultive RVR.

17 Q.    Who did he assault?

18 A.    Bailey, Jeremy Bailey.

19 Q.    Thank you.

20        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

21 BY MR. LEARY:

22 Q.    Mr. Hubanks, why are they talking about Danny Hardin's

23 brand?

24 A.    Because he was not supposed to be screaming anymore.

25 After he got released from Marshall County, he sent me an

HUBANKS -- DIRECT

1 e-mail saying he was covering up.

2 Q.    And what's Frankie Owens talking about when his iron cross

3 is inside the box?

4 A.    Saying -- tell me to zoom in on it and know for sure,

5 because his iron cross on the inside of his patch was messed

6 up; it wasn't right.

7        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

8 BY MR. LEARY:

9 Q.    Tim Boyles talking about "Country."  Who's "Country"?

10 A.    Danny Hardin.

11 Q.    And who's Danny Hardin's wife?

12 A.    Angie.

13 Q.    Angie Hardin?

14 A.    (Nodding head).

15 Q.    Okay.  Thank you.

16        (EXHIBIT NOS. G-7A AND G-7B PLAYING)

17 BY MR. LEARY:

18 Q.    Why is Frankie Owens concerned about Turbo?

19 A.    Because, at this time, we had reason to believe that Turbo

20 was in federal custody and was working with the Feds.

21 Q.    Did Turbo end up working with the Feds?

22 A.    Yes.

23 Q.    Did that cause y'all concern?

24 A.    Yes, sir.

25 Q.    Thank you.

HUBANKS -- DIRECT

```
 1          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

 2   BY MR. LEARY:

 3   Q.    Do you know who Tony Bone is?

 4   A.    I don't know his reel name.  I just know him as Tony Bone.

 5   Q.    Is he an AB member?

 6   A.    Yes, sir.

 7   Q.    Who is "Bama"?

 8   A.    It's Bernard Brown.

 9   Q.    And what's his rank?

10   A.    He's a captain.

11   Q.    Within what organization?

12   A.    The brotherhood.

13          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

14   BY MR. LEARY:

15   Q.    All right.  Now, when Frankie Owens says, "I'm going to

16   shut it down; they're coming in to count," what does that mean?

17   A.    They coming through doing a security count, security

18   check, head count.

19   Q.    In the prison?

20   A.    Yeah.

21   Q.    Okay.

22          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

23   BY MR. LEARY:

24   Q.    What's Frankie Owens' street name?

25   A.    "State Raised."
```

1          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

2   BY MR. LEARY:

3   Q.    What are you referring to about prospects getting

4   blackballed?

5   A.    That's whenever they get blackballed by another member.

6   They can no longer prospect.

7   Q.    How many members does it take to blackball a prospect?

8   A.    One.

9          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

10  BY MR. LEARY:

11  Q.    Mr. Hubanks, when Mr. Owens is talking about sending a

12  background to a lockbox so that "Toot" can do a background on

13  them, what is going on there?

14  A.    It'd just be the same sort of thing, just checking them

15  out and their prospect compact and their questionnaire.

16  Q.    Who's checking them out?

17  A.    Be "Toot" or -- you know, if I ain't doing it, if you send

18  it to the lockbox, that's something for them to put on record.

19  Q.    Is that in the free world or --

20  A.    Yeah.

21  Q.    And Toot's in the free world or incarcerated?

22  A.    Free world.

23  Q.    Okay.

24          (EXHIBIT NOS. G-7A AND G-7B PLAYING)

25  BY MR. LEARY:

1   Q.    Now, when Frankie asked, "Are you supposed to get back up

2   with Rich, or is he going to get back with you -- now you're

3   talking back about what there?

4   A.    California.

5   Q.    Okay.

6         (EXHIBIT NOS. G-7A AND G-7B PLAYING)

7              THE COURT:  Okay.  Does that conclude the playing of

8   that tape, Mr. Leary?

9              MR. LEARY:  Yes, Your Honor, it does.

10             THE COURT:  Okay.  Ladies and gentlemen of the jury,

11  we're going to take a mid-afternoon recess.  The Court will be

12  in recess until 20 minutes past three.  Okay.  The Court's in

13  recess.

14             (JURY OUT AT 3:00 p.m.)

15  (Recess at 3:01 p.m. until 3:18 p.m.)

16             (JURY IN AT 3:18 p.m.)

17             (CALL TO ORDER OF THE COURT)

18             THE COURT:  Okay.  You may proceed, Mr. Leary.

19             MR. LEARY:  Thank you, Your Honor.  At this time,

20  Your Honor, the Government would move to play Call 597,

21  previously entered into evidence as Government's Exhibit 9A; 9B

22  was marked for identification, Your Honor, that is the

23  transcript.

24             THE COURT:  Okay.  Ladies and gentlemen of the jury,

25  you recall my previous instruction to you relative to these

1    transcripts.  The transcript is not evidence and is only an aid

2    to assist you in understanding the tape.  The tape is the

3    evidence in the case.

4         Let me ask this witness one question.  Mr. Hubanks, the

5    question was asked what position a man named P-u-g-h, Pugh?

6              THE WITNESS:  Yes, sir.

7              THE COURT:  What was your answer?

8              THE WITNESS:  Captain.

9              THE COURT:  Captain?  Okay.  I thought you said

10   chaplain; I was going to say he's not doing a very good job.

11        Okay.  You may proceed, Mr. Leary.

12             MR. SUMRALL:  Your Honor, for the record, a

13   continuing objection.

14             THE COURT:  Sir?

15             MR. SUMRALL:  For the record, a continuing objection.

16             THE COURT:  Oh, yes, sir; on the admissibility of the

17   tapes, yes, sir.

18             MR. LEARY:  Thank you, Your Honor.

19             THE COURT:  You may proceed.

20             MR. LEARY:  Call No. 597.

21        (EXHIBIT NOS. G-9A AND G-9B PLAYING)

22   BY MR. LEARY:

23   Q.   Mr. Owens just said, "I tell you what you do, you put one

24   of them yonkers in that fucking prospect's hand and tell --

25   tell him to go do that motherfucker.  What does that mean?

1  A.    That's meaning to go stab him, I'm assuming.

2  Q.    Okay.  Thank you.

3        (EXHIBIT NOS. G-9A AND G-9B PLAYING)

4  BY MR. LEARY:

5  Q.    Where was Jeremy Bailey stabbed?

6  A.    I believe in church.

7  Q.    Thank you.

8        (EXHIBIT NOS. G-9A AND G-9B PLAYING)

9  BY MR. LEARY:

10 Q.    What are we talking about, "Uh, I fucked some shit up when

11 I did that, man; you know, I apologize"?

12 A.    He's talking about when the incident occurred with Bailey.

13          MR. LEARY:  Keep talking.

14       (EXHIBIT NOS. G-9A AND G-9B PLAYING)

15 BY MR. LEARY:

16 Q.    Okay.  The subject just got changed to calling up Rich

17 man.  What's Frankie mean when he's telling him to call up Rich

18 man?

19 A.    He's talking about Rich.  Set up a call with Rich man.

20 Q.    And that call concerns what?

21 A.    California unification.

22 Q.    Thank you.

23       (EXHIBIT NOS. G-9A AND G-9B PLAYING)

24 BY MR. LEARY:

25 Q.    The end of the call, Mr. Hubanks, "All right.  Bruder,

1  Sinn Fein."  What does that mean?

2  A.    What, Sinn Fein?

3  Q.    Yeah.  "All right, Bruder."  What does that -- what's that

4  term?  What --

5  A.    I'm just saying all right.  He said "Talk to you tomorrow,

6  Bruder," means brother.

7  Q.    Okay.  Sinn Fein, is that just --

8  A.    Ourselves.

9          MR. LEARY:  Your Honor, may I briefly talk to my

10 co-counsel?

11         THE COURT:  Yes.

12         MR. LEARY:  No further questions, Your Honor.

13         THE COURT:  Very well.

14     Okay.  Mr. Sumrall, on behalf of Defendant Owens, you may

15 cross-examine this witness.

16         MR. SUMRALL:  Please the Court.

17                   CROSS-EXAMINATION

18 BY MR. SUMRALL:

19 Q.    Mr. Hubanks, I believe you said you joined the Aryan

20 Brotherhood in 2005; is that correct?

21 A.    Yes.

22 Q.    Who were the wheel members in 2005?

23 A.    I guess, at that present time, would have been --

24 probably -- I actually prospected in '05 and become a brother

25 in '06.  And then, in 2006, it would have been Chris Parker,

1  Steve May, which is Mackie May; and I'm not sure about the

2  third spoke, if it was "Hobo" or who it was at the time.

3  Q.    Okay.  And how long did they remain as wheel members?

4  A.    I have no idea.

5  Q.    Okay.  When did anybody else -- when was the next time you

6  knew a new wheel member became a wheel member?

7  A.    In 2009 when I was communicating with Barron Goff and

8  Larry Sneed, Mackie May, Chris Craft.

9  Q.    Okay.  Were they all wheel members at this time?

10 A.    2009, it was -- it was Steve May, Barron Goff, and --

11 Steve May, Barron Goff; and I'm not sure who the sixth was at

12 the time.  There was somebody named Mack that was at green -- I

13 mean, at Meridian with Barron at one point in time.  And I'm

14 not exactly sure when Creel come on.  It would have been

15 sometime in 2010 when the fourth wheel member come on.

16 Q.    Now, Brandon Creel, you say he came on in 2010?

17 A.    I'm going to say somewhere around 2010, yes.

18 Q.    Okay.  So, in 2009, it was Barron Goff and Steve May?

19 A.    And I'm not sure who the third one was.

20 Q.    And what was your position at this time?

21 A.    I was just a brother.

22 Q.    Just a brother.  When did you become a captain?

23 A.    In January 2013.

24 Q.    Well, isn't it a fact that when you first went to Marshall

25 County that you became a captain of the Marshall County

1  facility?

2  A.    No, sir.

3  Q.    When did you first get to Marshall County?

4  A.    I got to Marshall County in 2003.

5  Q.    Okay.  And you became a brother in 2006, right?

6  A.    Right.

7  Q.    And how long after that was it before you became captain

8  of Marshall County?

9  A.    I was OIC of Marshall County.

10  Q.    OIC, what is that?

11  A.    I didn't have the requirements to hold a captain's

12  position.

13  Q.    What requirement is that?

14  A.    You have to have an R-E-C -- be a brother with the -- you

15  had to be a brother for at least 5 years and have a recruiter's

16  patch.

17  Q.    Okay.  And did you have a recruiter's patch?

18  A.    Yes, sir.

19  Q.    So what was the OIC; what does that mean?

20  A.    Just officer in charge.

21  Q.    Officer in charge.  So you were the officer in charge of

22  the facility at Marshall County?

23  A.    Yes.

24  Q.    Okay.  Who was over you in the Marshall County facility?

25  A.    The state captain and the wheel.

HUBANKS -- CROSS

1 Q.    Okay.  Who was the state captain at that time?

2 A.    George Hunt.

3 Q.    And who were the wheels at that time?

4 A.    Barron Goff and Mackie May.  I'm not sure who the other

5 one was.

6 Q.    Okay.  Could it have been Brandon Creel?

7 A.    I don't think Creel came on until around 2010.

8 Q.    I believe you said, also, there was a Nelson?

9 A.    A Nelson?  No.

10 Q.    Excuse me.  Not Nelson.  Larry Sneed?

11 A.    Yes.  He became state captain in 2010.

12 Q.    Okay.  Where was he housed?

13 A.    At the time he become state captain, I think he was housed

14 in the Carroll County Correctional Facility in Carrollton,

15 Mississippi.

16 Q.    Okay.  And when did he become a wheel?

17 A.    Sometime in late 2010, beginning of 2011.  I was at Unit

18 29 from May of 2011 until September, October of 2012.  I didn't

19 have any communication.

20 Q.    Okay.

21 A.    I was on C-custody.

22 Q.    When did Chris May become a wheel?

23 A.    Mackie May's been a wheel on and off for years.  It's

24 Mackie May, not Chris.

25 Q.    Okay.  Mackie May.  And you say he's on and off as a

1  wheel?

2  A.    (Nodding head).

3  Q.    Now, isn't it a fact that to be a captain, a state

4  captain, an area captain, or a wheel, that you have to be a

5  thunder warrior?

6  A.    No.

7  Q.    It is not?

8  A.    No.

9  Q.    Does it not say that in your credos?

10  A.    Not to be an area captain or an OIC, it doesn't.

11  Q.    How about a state captain?

12  A.    All those positions are appointed by the wheel.

13  Q.    How about a state captain?

14  A.    State captain, yes.

15  Q.    And how about a facility captain?

16  A.    No.

17  Q.    Are you a thunder warrior?

18  A.    No.

19  Q.    You're not?

20  A.    No.

21  Q.    You have the SS marks, don't you?

22  A.    No.

23  Q.    You do not?

24  A.    No.

25  Q.    You're denying that you have the SS marks?

1  A.    I have no bolts.

2  Q.    Did you ever have any bolts?

3  A.    Yes, I've had bolts --

4  Q.    Okay.  So you, at one time were --

5  A.    -- but not thunder-warrior bolts.

6  Q.    You were a thunder warrior at one time?

7  A.    No.

8  Q.    You had the bolts.  How did you get the bolts without

9  being a thunder warrior?

10  A.    They're not on my neck.  That's thunder-warrior bolts.

11  See, do you see any markings on my neck, sir?

12  Q.    They're on your chest; are they not?

13  A.    No, they're not, sir.

14  Q.    Have you removed them?

15  A.    Yes, I removed them.  There were some on the back of my

16  neck and the back of my arm too.

17  Q.    Okay.  So they were on your neck.

18  A.    But they weren't thunder-warrior bolts.

19  Q.    Well, what kind of bolts were they?

20  A.    They were bolts, lightening bolts, white power.

21  Q.    White power.  Now, you told this Court, when you first

22  took the stand, that at the time in 2013 -- that you and Mask

23  were in control of north Mississippi; isn't that correct?

24  A.    Say what, now?

25  Q.    Were controlling north Mississippi.  I believe that was

1  your statement.

2  A.    No.   I said my duties as a wheel consisted of dealing with

3  the northern part of the state in the correctional facilities.

4  Q.    Okay.

5  A.    I was only a wheel member for two months, from September

6  the 23rd until we were locked down November the 18th.

7  Q.    Okay.  And the only reason you lost that was because you

8  were locked down, correct?

9  A.    Yeah.  And because I came up here and agreed to cooperate

10  with the Government.

11  Q.    Now, you did that to help yourself; did you not?

12  A.    Yes, sir, I did.

13  Q.    Okay.

14  A.    To correct a mistake that I made long ago.

15  Q.    And, at that time when you did that, you swore that your

16  statement was true; did you not?

17  A.    Yes, sir, I did.

18  Q.    And you took an oath; did you not?

19  A.    Yes, sir.

20  Q.    Okay.  And is that the same kind of oath that you took

21  when you joined the Aryan Brotherhood?

22  A.    Yes, sir.

23  Q.    So your oath can mean anything you want it to, can't it?

24  A.    My oath now is I'm on the stand today standing on the

25  truth; I'm not living a lie any longer.

HUBANKS  --  CROSS                                              153

1  Q.    Well, what did your oath mean when you joined the Aryan

2  Brotherhood?

3  A.    It was a lie.

4  Q.    Nothing?

5  A.    It was a mistake that I made, and that's why I'm here

6  today.  I'm trying to correct a mistake that I made that's cost

7  me my family and my life.

8  Q.    And you'll do anything you can to help yourself, won't

9  you?

10 A.    I'm going to stand against the evil for which it stands

11 for.

12 Q.    Which you were a part of; is that not correct?

13 A.    Yes, sir.  I admit my responsibility.

14 Q.    Now, I believe you stated earlier that you've got three

15 prior convictions?  Is that correct?

16 A.    Yes, sir.

17 Q.    And you have pled guilty to this charge; have you not?

18 A.    Yes, sir.

19 Q.    Now, you've also entered into an agreement with the

20 Government; is that right?

21 A.    Yes, sir.

22 Q.    And they're going to do what's called a 5K1 motion for

23 downward departure, are they not, as part of the agreement?

24 A.    Yes, sir.  If the Judge agrees to it.

25 Q.    But they're going to make that motion; are they not?

1  A.    Yes.

2  Q.    And you've agreed to that to help yourself, right?

3  A.    Yes, sir.

4  Q.    And, also, there's a possibility for a Rule 35 for any

5  future help that you might give them.  Is that correct, also?

6  A.    I guess, if that's the way it works.

7  Q.    Okay.  And I believe you stated that the Government agreed

8  to cap --

9  A.    Twenty years.

10  Q.    -- your -- to 20 years.  Now, let me ask you something, if

11  you would, break down this.  You've got three spokes; is that

12  correct?

13  A.    Yes, sir.

14  Q.    They're over everything, right?

15  A.    (Nodding head).

16  Q.    Then you have the northern captain; is that correct?

17  A.    (Nodding head).

18  Q.    And that's what you were when you were in Alcorn County?

19  A.    No.  I was state captain.

20  Q.    You were state captain.  Oh, you were over a whole state?

21  A.    Yes.

22  Q.    So it goes from the wheels to the state captain?

23  A.    To just area captains and lieutenants.

24  Q.    Just area captains.  Okay?

25  A.    Yes.

HUBANKS  --  CROSS

1  Q.    All right.  And you were a state captain what time?

2  A.    From January the 23rd, 2013, until I become a wheel

3  September 2013.

4  Q.    Okay.  Now, I believe you told this Court and the jury

5  that orders came down from the wheels; is that correct?

6  A.    Yes, sir.

7  Q.    And everybody had to obey those orders?

8  A.    Yes, sir.

9  Q.    And that only wheels could order SOS's or KOS's; is that

10 correct?

11 A.    Yes.

12 Q.    And that would come from the wheels to the state

13 captain --

14 A.    On down.

15 Q.    -- on down.  And everybody was bound to follow those

16 orders --

17 A.    Yes.

18 Q.    -- or they would be smashed out or disciplined?

19 A.    Yes.

20 Q.    Now, did you, while you were a wheel or a state captain,

21 ever pass down any KOS's?

22 A.    KOS?  No.

23 Q.    Did you ever pass down any SOS's, smash on sight?

24 A.    Yes.

25 Q.    How many times?

1  A.    At least one time.

2  Q.    And where was that?

3  A.    That was involving Preston Goodwin.

4  Q.    Preston Goodwin.  What about the time about Bailey?

5  A.    What about Bailey?

6  Q.    Didn't you issue an SOS on him?

7  A.    No.  I was state captain.

8  Q.    All right.  As a state captain -- I asked you did you ever

9  pass one down?

10  A.    No.  I didn't pass an order.  The wheel --

11  Q.    Was there originally an order for an SOS?

12  A.    No.  The only order I was involved in was the order

13  pertaining to Preston Goodwin.

14  Q.    Okay.  Well, what did you tell the jury about the SOS on

15  Jeremy Bailey?

16  A.    What did I tell them about him?

17  Q.    Yes.

18  A.    I said I was on the phone when they voted on it, and then

19  I went back and talked to Perry and Barron about it again; and

20  they changed the order.  And then the night of the order,

21  Frankie told Scissorhands to stab him to earn his bolts.

22  Q.    But you were part of the SOS originally; were you not?

23  A.    As a state captain, I could not issue an SOS.

24  Q.    I understand, but you were part of that conversation; were

25  you not?

1 A.    Yes, I was part of the conversation.  I never denied that.

2 Q.    Now, when you joined the Aryan Brotherhood, part of what

3 you did was give them an oath of a code of silence; did you

4 not?

5 A.    Yes, sir.

6 Q.    And you've broken that, haven't you?

7 A.    Yes, sir.

8 Q.    What other marks do you have on your body signifying that

9 you were a member of the Aryan Brotherhood?

10 A.    None anymore.

11 Q.    What marks did you have at one time?

12 A.    I had my patch and my R-E-C and some bolts, and that was

13 it.

14 Q.    What is the R-E-C?

15 A.    The recruiter's patch.

16 Q.    Would you describe that to us?

17 A.    It was like a swastika with flames on the end of it.

18 Q.    Okay.  Now, Mr. Hubanks, have you ever been addicted to

19 drugs?

20 A.    Yes, sir.

21 Q.    Matter of fact, most of the times you've been incarcerated

22 you were on drugs; were you not?

23 A.    Yes, sir.

24 Q.    And, during the period of time from 2006/2007 all the way

25 up to 2013, you had a drug problem; did you not?

1  A.   No, sir.

2  Q.   No, sir?

3  A.   I was in Bible college from 2006 to 2008.  I earned two

4  degrees at Marshall County.

5  Q.   When did you have your drug problem?

6  A.   After I left the Bible college.

7  Q.   So, from 2008 to 2013, you had a drug problem?

8  A.   Yeah.  Smoking marijuana, yeah.

9  Q.   And other drugs also, didn't you?

10 A.   No, not at that time.

11 Q.   Anytime during that period from 2008 to 2013?

12 A.   Smoking marijuana.

13 Q.   Now, you told the Court that people smuggled drugs in to

14 you; is that correct?

15 A.   Of course.

16 Q.   And was that other brothers?

17 A.   Yes.

18 Q.   Was that your wife also?

19 A.   Yes.

20 Q.   And, during the time of 2013, you were on drugs; were you

21 not?

22 A.   Yes, sir.

23 Q.   Now, you stated that the drugs were controlled by Perry

24 Mask; is that correct?

25 A.   Yes, sir.

1  Q.    Do you ever have any dealings with Frankie Owens in

2  regards to the drugs?

3  A.    No, sir, I did not.

4  Q.    I want to go back to Mr. Jeremy Bailey.  You saw the text

5  messages that he sent out; did you not?

6  A.    Yes, sir.

7  Q.    Would you tell this jury what those text messages said.

8  A.    I can't remember exactly word for word; but, in so many

9  words, Bailey was telling this young lady that once he was

10 released from prison and he got out that he was going to

11 sexually assault her and sodomize her in front of her

12 8-year-old daughter and make her watch.  And then, when he got

13 through with her, he was going to do the same thing to her.

14 Q.    To the daughter?

15 A.    Yes, sir.

16 Q.    And that upset everybody in the brotherhood; did it not?

17 A.    Yes, sir.

18 Q.    Including you?

19 A.    Yes, sir.

20 Q.    And, so, that's why there was a violation on him; is that

21 correct?

22 A.    Yes.

23 Q.    Now, you say you're no longer in the Aryan Brotherhood; is

24 that correct?

25 A.    Yes, sir.

1  Q.   Have you been bled out?

2  A.   No, sir.  I don't have a mark on me.

3  Q.   But you removed them yourself, did not have them removed;

4  is that correct?

5  A.   Right.  Covered them up.

6  Q.   This study guide that you introduced into evidence that

7  has been shown to the jury, did you draw that up?

8  A.   Yes, sir, I did.

9  Q.   Whose instructions was that for you to draw that up?

10  A.   Frankie.  I actually did that when I was state captain,

11  and I was told to do it for the whole state.  That just

12  happened to be the one that I did for our facility.

13  Q.   Okay.

14        MR. SUMRALL:  Court's indulgence.  If I can have a

15  second with my client, Your Honor.  (Pause).  No further

16  questions, Your Honor.

17        THE COURT:  Okay.

18     Mr. Turner, on behalf of Defendant Parker, you may

19  cross-examine this witness.

20                    CROSS-EXAMINATION

21  BY MR. TURNER:

22  Q.   Mr. Hubanks, my name is Joshua Turner.  Do you know Eric

23  Parker?

24  A.   No, sir.

25  Q.   Have you ever met him?

1  A.    No, sir.   Never heard his name until this indictment.

2            MR. TURNER:   Your Honor, I don't have any further

3  questions.

4            THE COURT:   Very well.

5       Any redirect, Mister --

6            MR. LEARY:   Just one question, Your Honor.

7                         REDIRECT EXAMINATION

8  BY MR. LEARY:

9  Q.    Mr. Hubanks --

10  A.    Yes, sir.

11  Q.    -- is 20 years a long or short period of time?

12  A.    It's a long time.

13            MR. LEARY:   No further questions, Your Honor.

14            THE COURT:   Okay.   This witness is excused.   You may

15  take him back into custody.

16       Okay.   The Government may call your next witness.

17            MR. LEARY:   Yes, Your Honor.   The Government would

18  call Don Douglas to the stand.

19            THE COURT:   Very well.

20       (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

21            THE COURTROOM DEPUTY:   Please a seat in the witness

22  stand and state your name for the record.

23            MR. TURNER:   Your Honor, may we have a sidebar?

24            THE COURT:   Yes.

25            MR. TURNER:   Thank you.

```
 1        (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

 2             THE COURT:  Mr. Turner had filed, this morning, a

 3   series of several motions in limine, really, to exclude hearsay

 4   statements made by any of these agents.

 5             MR. LEARY:  Yes, Your Honor.

 6             THE COURT:  And, of course, the Court's going to

 7   exclude any hearsay.

 8             MR. TURNER:  I was just covering my bases, Your

 9   Honor.  And that's what I was wanting to take up.  You

10   projected what I was going to say.

11             THE COURT:  The Court's not going to make all

12   encompassing rulings in limine to try to anticipate all the

13   testimony that might be proffered, but I will exclude any

14   hearsay.

15             MR. TURNER:  Thank you, Your Honor.

16             THE COURT:  Okay.

17        (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

18             DON DOUGLAS, GOVERNMENT'S WITNESS, SWORN

19                      DIRECT EXAMINATION

20   BY MR. LEARY:

21   Q.    Good afternoon, Mr. Douglas.

22   A.    Good afternoon.

23   Q.    Where are you currently employed?

24   A.    I'm a special agent with the Drug Enforcement

25   Administration.
```

DOUGLAS -- DIRECT

1  Q.   And about how long have you been with the DEA?

2  A.   This month will be 25 years.

3  Q.   Where were you assigned in 2013?

4  A.   I was assigned as an enforcement special agent here at the

5  Oxford Resident Office.

6  Q.   And the Oxford Resident Office represents what district in

7  Mississippi?

8  A.   It is the Northern District of Mississippi.

9  Q.   In the Southern District of Mississippi, explain whether

10 or not they have their own separate RAC?

11 A.   Yes, sir, they do.

12 Q.   Okay.  About what year, Mr. Douglas, did you come on with

13 the DEA?

14 A.   That would be 1991.

15 Q.   And, pursuant to your duties with the Drug Enforcement

16 Administration, have you received any specialized training

17 concerning narcotics investigations?

18 A.   Yes, sir, I have.

19 Q.   Just briefly review.

20 A.   In '91, I graduated from the Drug Enforcement

21 Administration Academy in Quantico, Virginia.  Before being

22 hired by DEA, I was a police officer in Senatobia, Mississippi.

23 I graduated from MLEOTA, Mississippi Law Enforcement Training

24 Academy.

25      After serving a couple of years in Senatobia, I got hired

DOUGLAS  --  DIRECT                    164

1   by DEA; graduated from there; went to New Orleans.  Throughout

2   my career, I've had multiple trainings.  I've had asset

3   forfeiture training.  I'm the evidence custodian, drug,

4   nondrug, high-valued seizures, recovered-money custodian here

5   at this office.

6           I've had methamphetamine training.  I've had operation

7   jetway training.  I've had combat shooting training, advanced

8   agent training.  A myriad of trainings throughout -- Title III

9   training.  It's a multitude of courses.

10  Q.    About how many narcotics investigations do you think

11  you've worked on?

12  A.    Since '91?

13  Q.    Too many to count?

14  A.    Yes, sir.

15  Q.    Tell the ladies and gentlemen of the jury the size of this

16  particular investigation of the Aryan Brotherhood.  Where would

17  it rank as far as significant investigations that you have

18  participated in, in the last 25 years?

19  A.    I wouldn't say it was the largest number that I've done in

20  one indictment, but it is the most complex investigation that

21  I've worked.

22  Q.    Now, this investigation is of an enterprise.  What is that

23  enterprise?

24  A.    That's the Aryan Brotherhood of Mississippi.

25           MR. TURNER:  Objection, Your Honor.  That calls for a

1   legal conclusion.

2               THE COURT:  Overruled.

3   BY MR. LEARY:

4   Q.    What enterprise were you investigating?

5   A.    It's the Aryan Brotherhood of Mississippi.

6   Q.    And this particular enterprise is engaged in what unlawful

7   activities?

8   A.    They were involved with drugs, guns, money laundering,

9   assaults, and murder.

10  Q.    Now, this indictment, this enterprise, the conspiracy in

11  this case, begins about what year?

12  A.    Around 2009.

13  Q.    And continues through?

14  A.    2013 is when we did the indictment, the Title III.

15  Q.    So the evidence in this case encompasses the time period

16  from 2009 up through 2013?

17  A.    Yes, sir.

18  Q.    How many Title III investigations have you been involved

19  in, Mr. Douglas?

20  A.    Over a hundred.

21  Q.    And, by Title III, I'm referring to what?

22  A.    That's an intercept, a wire intercept.

23  Q.    Can DEA intercept someone's phone calls just if they

24  decide to do it?

25  A.    No, sir.

DOUGLAS -- DIRECT                                    166

1 Q.    What must be obtained before a wire intercept can be

2 installed?

3 A.    What we do is we petition the court; the U.S. Attorney

4 writes an application for an intercept.   That application

5 identifies the phone number, the target, subject, a brief

6 synopsis; the agents prepare a Title III affidavit, along with

7 the U.S. Attorney.

8      That affidavit is more detailed.   It goes anywhere from 50

9 to 100 pages.   And you write the more detailed events that

10 happened that identify how the case began, what makes the phone

11 dirty, what makes the individual dirty.   It identifies the

12 target interceptees.   It identifies what we've done up to this

13 point, what we've tried, what's failed, so on.

14      We petition the Court with that.   It goes through -- it's

15 a long process.   It clears our office, goes to DC to the Office

16 of Enforcement Operations.   They have a supervisor that reviews

17 it.   They send it back for corrections.   That might happen 2 or

18 3 times back and forth.

19 Q.    And, ultimately, if the wire -- if the intercept's going

20 to be installed, who has to sign off on it?

21 A.    The judge.

22 Q.    Now, this particular enterprise under investigation in

23 this case was what?

24 A.    The Aryan Brotherhood of Mississippi.

25 Q.    Okay.   Now, I want to step through the origin of this

1  investigation.  Now, this particular investigation began about

2  when, Mr. Douglas?

3  A.    Mid-2013.

4  Q.    Okay.  And this case originated through what type of

5  investigation?

6  A.    A methamphetamine investigation.

7  Q.    And, after a period of time, your investigation revealed

8  that at least part of it was being orchestrated from where?

9  A.    Marshall County from prison.

10 Q.    Was that unique or was that common place in your

11 experience as a narcotics investigator?

12 A.    It was unique.

13 Q.    Why is that?

14 A.    We never done -- as far as I haven't.  I've never done an

15 intercept inside a prison.  Now, I've had prisoners, while I'm

16 on a Title III, call in to a phone, request a three-way or call

17 the person we're up on to find out what's going on in the

18 street or ask for money, but never had one -- a phone that was

19 actually inside the facility to go up on.

20 Q.    Now, as this case proceeded, what law enforcement

21 agents -- agencies ultimately became involved in this

22 investigation?

23 A.    It was the North Mississippi Narcotics unit, Mississippi

24 Bureau of Narcotics, Alcohol, Tobacco, and Firearms; the

25 Federal Bureau of Investigation.  We used the United States

1  Marshals Service.  A myriad of state and locals assisted with

2  us as well.

3  Q.    Now, the ultimate goal of this investigation was to

4  dismantle what?

5  A.    The Aryan Brotherhood.

6  Q.    Has it been successful?

7  A.    It has.

8  Q.    Based on your investigation, the drug-trafficking

9  component of this investigation was orchestrated by which

10 spoke?

11 A.    Perry Mask.

12 Q.    And, through the course of your investigation, you learned

13 that Perry Mask was initially housed where?

14 A.    Before we went up on the Title III, Perry Mask was housed

15 in the Marshall County Correctional Facility.

16 Q.    And about when was he moved to Parchman State

17 Penitentiary?

18 A.    He was moved after the stabbing of Jeremy Bailey, which I

19 believe occurred on August the 27th.

20 Q.    And Marshall County Correctional Facility, is that

21 located -- in what county?

22 A.    Marshall County.

23 Q.    And Parchman's located in Sunflower?

24 A.    Correct.

25 Q.    Were methamphetamine transactions originating from those

1 institutions?

2 A.    Yes.

3          MR. LEARY:  Your Honor, at this time, the Government

4 would move that -- just the Court to recognize that Mr. Douglas

5 has identified Marshall County and Sunflower County as being

6 involved in this investigation -- as being the origins of the

7 criminal misconduct in this investigation.

8 BY MR. LEARY:

9 Q.    Are they within the Northern District of Mississippi?

10 A.    Yes, sir.

11 Q.    Thank you.

12          THE COURT:  Okay.  The Court takes judicial notice

13 that Marshall County and Sunflower County are situated in the

14 Northern Federal Court District of Mississippi.

15 BY MR. LEARY:

16 Q.    Explain the leadership of the Aryan Brotherhood when you

17 began the investigation in Marshall County, Alcorn County, and

18 Sunflower County in September of 2013.

19 A.    In September of 2013, there was Perry Mask, who was a

20 wheel member; Frankie Owens, who was a wheel member; and

21 Stephen Hubanks, who had just recently taken the position from

22 Barron Goff.

23 Q.    And this was what month?

24 A.    September of 2013.

25 Q.    Now, in September, Perry Mask had been moved to what

DOUGLAS -- DIRECT

170

1   facility?

2   A.    He had been moved to Parchman.

3   Q.    Prior to being moved to Parchman, Perry Mask was located

4   in what facility?

5   A.    Marshall County's.

6   Q.    And who was located in Marshall County with Perry Mask?

7   A.    Frankie Owens.

8   Q.    During the course of your investigation, were any

9   undercover buys made?

10  A.    We had controlled purchases.

11  Q.    Yes.  Pursuant to this investigation?

12  A.    Yes.

13  Q.    Explain how you became aware of the gun burglaries in this

14  particular case.

15  A.    There was an individual stopped.  I believe it happened an

16  August the 3rd, Christopher Jake Stutsky; they called him

17  Turbo.  He was stopped in the Lee County area, was arrested.

18  His hotel room was searched where a weapon was found.  That

19  weapon was later ran, discovered it had been stolen from an FFL

20  burglary.

21  Q.    And did Christopher Stutsky cooperate with law

22  enforcement?

23  A.    He did.

24  Q.    And, thereafter, law enforcement was able to determine

25  that the guns that were stolen from the FFLs, or Federal

DOUGLAS -- DIRECT                    171

1  Firearms Licensees, were trafficked thereafter by members of

2  what organization?

3  A.    The Aryan Brotherhood of Mississippi.

4  Q.    What two pawnshops were robbed during -- in April of

5  2013 -- I mean -- I'm sorry -- August?

6  A.    That would have been -- the first one was in Corinth,

7  Barry's Trading Post.  The other was in Coldwater at a

8  pawnshop.

9  Q.    About how many guns are we talking about here?

10 A.    The one out of Corinth, I believe there were eight

11 weapons, long rifles and pistols.  I believe the one in

12 Coldwater was over 30, shotguns, pistols, rifles.

13 Q.    After the gun burglaries were identified, were search

14 warrants conducted?

15 A.    Yes, sir, they were.

16 Q.    And, Mr. Douglas, where were these search warrants

17 conducted?

18 A.    With the information we received, we were able to identify

19 who assisted in the burglaries of those two locations.  We were

20 able to obtain federal search warrants on them.  One was

21 "Tennessee," Timothy Deshazier's residence.  That was where the

22 weapons went to after the burglaries.

23       We had David "Leprechaun" Willis, who assisted in one of

24 the burglaries.  You have Stephen "Stevo" Williams, who

25 assisted in the burglaries.  Those three residences of those

DOUGLAS -- DIRECT                                    172

1  three individuals were searched.

2  Q.    Now, in this particular case, David Willis -- what was his

3  rank in the Aryan Brotherhood?

4  A.    He was the free world northern region captain.

5  Q.    The free world northern region captain?

6  A.    Yes, sir.

7  Q.    And his street name was?

8  A.    Leprechaun.

9  Q.    And about when was the search warrant conducted on his

10 residence?

11 A.    I believe that was on August the 12th.

12 Q.    Were you present at the search warrant?

13 A.    Yes, sir, I was.

14 Q.    Were items seized from David Willis's residence?

15 A.    Yes, there was.

16          THE COURT:  August 12th of what year?

17          THE WITNESS:  2013, sir.

18          THE COURT:  Very well.

19 BY MR. LEARY:

20 Q.    Those items that were seized from his residence, did they

21 pertain to the Aryan Brotherhood?

22 A.    Yes, sir, they did.

23 Q.    Based on your investigation of this case, the Aryan

24 Brotherhood encompasses what parts of the state of Mississippi?

25 A.    The free world has a northern region, a central region,

1  and a southern region.

2  Q.    And, at the time of this search warrant, who was the free

3  world captain for the northern region?

4  A.    That was David Willis, Leprechaun.

5  Q.    During the -- during your search warrant of David Willis's

6  house, what type documents were seized from his house?

7  A.    There was a safe that contained multiple Aryan Brotherhood

8  of Mississippi documents.  It had constitutions; it had a

9  ledger.  It had northern region members with phone numbers.  It

10 had the wheels identified.  There were Green Dot cards.

11 Q.    Would you please identify the document that I've just

12 handed you.

13 A.    (Perusing document).  This is one of the constitutions

14 that was taken from his residence.

15 Q.    Now, the top document is an original.  I want you to look

16 to the attached document and tell me whether or not the

17 attached document is identical to the original that was seized

18 from his residence?

19 A.    (Perusing document).  Yes, sir, it is.

20 Q.    Thank you.

21        MR. LEARY:  Your Honor, at this time, the Government

22 would move to have the constitution seized from the northern

23 area captain, David Willis's, house entered into evidence as

24 the next numbered Government exhibit.

25        MR. TURNER:  Your Honor, I'm going to object, again,

1    for relevance; just, we've already gotten one of these in.  I

2    could understand if he's trying to introduce something against

3    my client that had his name on it; but, at this time, I don't

4    understand why it's relevant.

5            MR. SUMRALL:  Your Honor, we'd object on the

6    authenticity of it.  There's no signatures or anything on it,

7    and we object to it on that basis.

8            THE COURT:  Okay.  Well, you ladies and gentlemen of

9    the jury have heard the testimony where this document came

10   from.  Again, given the parameters of Count 1 of the indictment

11   in this cause, the conspiracy count, the court is of the

12   opinion that it is in fact relevant; and the objections are

13   overruled.

14           MR. LEARY:  Thank you, Your Honor.

15           THE COURTROOM DEPUTY:  The next number is 22.

16           MR. LEARY:  Your Honor, we have marked this evidence

17   as cumulative Exhibit No. 22.  It contains the original

18   constitution seized, as well as a copy thereof.

19           THE COURT:  What do you need a copy for?

20           MR. LEARY:  When I read it out to the jury later on,

21   I have to follow the Bates-stamp numbers as they were produced;

22   and it's the only way --

23           THE COURT:  Very well.  Very well.  The document --

24   Government's Exhibit 22 is admitted into evidence.

25           (EXHIBIT NO. G-22 WAS RECEIVED INTO EVIDENCE)

1 BY MR. LEARY:

2 Q.   Now, Mr. Douglas, will you please identify the documents

3 that I just handed you here.

4 A.   (Perusing document).  Yes, sir.  This is an e-mail that

5 had the constitution attached to it.

6 Q.   Okay.  And would you please look at the constitution and

7 compare the copy of it with the original?

8 A.   Yes, sir, it's the same.

9 Q.   And where was this -- where were these documents seized

10 from in David Willis's house?

11 A.   The safe.

12 Q.   The safe?  Which is located where?

13 A.   In David Willis's residence.

14        MR. LEARY:  Your Honor, at this time, the Government

15 would move to have the second constitution that was seized from

16 David Willis's safe entered into evidence as Government's

17 Exhibit 23.

18        MR. TURNER:  Same objection, Your Honor, I have to

19 relevancy.  And, at some point, this is becoming cumulative;

20 and I don't understand why we need another one, but --

21        THE COURT:  Is it the same document as 22?

22        MR. LEARY:  No, it's not, Your Honor.  It's a

23 different document.  In fact, there's an address on the top --

24 on the front of it --

25 BY MR. LEARY:

1   Q.    I'll hand this back to you.  The address on the e-mail,

2   who is it?

3   A.    It's from Frank Owens at stateraised13@yahoo.com.

4   Q.    Thank you.

5           MR. SUMRALL:  Your Honor, to which we would object on

6   the ground it has not been authenticated and is not proper to

7   be admitted into evidence.

8           THE COURT:  Okay.  The objection's overruled.

9           MR. LEARY:  Thank you, Your Honor.  At this time, the

10  Government would move to have the document entered into

11  evidence as Government's Exhibit 23.

12      (EXHIBIT NO. G-23 WAS RECEIVED INTO EVIDENCE)

13  BY MR. LEARY:

14  Q.    Now, Mr. Douglas, were photos taken of Mr. David Willis at

15  the time of the search warrant?

16  A.    Yes, sir.

17  Q.    Can you identify those pictures for me?

18  A.    (Perusing document).  This is David Willis, Leprechaun.

19  Q.    And what do you see there tattooed on his chest?

20  A.    It's an Aryan Brotherhood brand, the old brand.

21  Q.    The old Aryan Brotherhood brand?

22  A.    Yes, sir.

23          MR. LEARY:  Your Honor, at this time, the Government

24  would move to have the picture of David Willis with the Aryan

25  Brotherhood brand entered into evidence, the two pictures as

1 the next numbered Government exhibit.

2          MR. TURNER:  I'm sorry, Your Honor.  I certainly

3 don't understand the relevance of this.  It doesn't apply to

4 either defendant that I can tell.

5          THE COURT:  I just can't understand you.

6          MR. TURNER:  I'm sorry, Your Honor.  I don't

7 understand how this is relevant at all to either defendant, and

8 it's definitely more prejudicial than probative.

9          THE COURT:  Okay.  Let's come up to the sidebar.

10     (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

11          MR. LEARY:  Your Honor, that's a picture of David

12 Willis; but what's probative is the picture of the Aryan

13 Brotherhood tattoo or brand on his chest.  There's been a lot

14 of talk about what the brand is.  I was going to show a

15 picture.

16     Also, Your Honor, Mr. Josh Turner keeps making speaking

17 objections in this case; and I would just respectfully assert

18 that this is a conspiracy case.  We have over a dozen people

19 charged in this case who have all pled guilty.  They're the

20 last two standing, so evidence of the conspiracy is relevant to

21 the last two standing.  And I would object to the speaking

22 objections that are continuing.

23          MR. SUMRALL:  Your Honor, on behalf of Mr. Owens, I

24 would join in the relevance of this.  This has no probative

25 value as regards to these two defendants whatsoever, whether or

DOUGLAS -- DIRECT                                               178

1  not this man was a member of the Aryan Brotherhood or not.

2  There is no relevance connecting this to the charges that are

3  against either defendant.

4           MR. TURNER:  That was my point, Your Honor.

5           THE COURT:  Yeah.  There again, given this conspiracy

6  charge and the enterprise being named as the Aryan Brotherhood,

7  the Court's of the opinion that this is in fact relevant.  The

8  objection's overruled.

9           MR. LEARY:  Thank you, Your Honor.

10          (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

11          MR. LEARY:  Your Honor, at this time, the Government

12  would move to have the picture of David Willis and his brand

13  entered into evidence as Government's Exhibit 24.

14          THE COURT:  Very well.

15          MR. LEARY:  It's a cumulative exhibit, Your Honor.

16  There were two pictures here.  One's a close-up of the Aryan

17  Brotherhood tattoo.  May I publish it?

18          THE COURT:  Yes.  It's admitted into evidence.

19          (EXHIBIT NO. G-24 WAS RECEIVED INTO EVIDENCE)

20  BY MR. LEARY:

21  Q.   Who's that a picture of, Mr. Douglas?

22  A.   That's David Willis.

23  Q.   And what am I publishing right there?

24  A.   That's an Aryan Brotherhood brand.

25  Q.   And what is that right there?

DOUGLAS -- DIRECT

179

1  A.    A swastika.

2  Q.    And can you tell what that number is?

3  A.    Thirteen.

4  Q.    And right here?

5  A.    Six.

6  Q.    And right here?

7  A.    Lightening bolts.

8  Q.    Based on your experience in this investigation, is that

9  what the old AB brand looked like?

10 A.    Yes, sir.

11 Q.    Now, during the course of this investigation, Mr. Douglas,

12 did you become aware of an assault that took place in Marshall

13 County?

14 A.    Yes, sir.

15 Q.    And who was the victim of that assault?

16 A.    Jeremy Bailey.

17 Q.    Now, as a result of that assault, did it affect your

18 investigation?

19 A.    Yes, sir.  It -- in essence, Perry Mask was relocated from

20 there, Marshall County, to Parchman due to this event.

21 Q.    Okay.  So Perry Mask got moved?

22 A.    Yes, sir.

23 Q.    And, after Perry Mask was moved from Marshall County, he

24 was moved to where?

25 A.    Parchman Penitentiary.

DOUGLAS -- DIRECT                                        180

1  Q.   And, at that time, when Perry Mask was moved, how did that

2  affect the investigation?

3  A.   We had started looking at the number he had in Marshall

4  County.  So, whenever they moved him, we knew that he wasn't

5  going to carry the phone with him.  So, whenever he got

6  transferred to Marshall -- I mean, to Parchman, we had to

7  establish the new number.

8  Q.   Now, after Perry Mask was moved to Marshall County, were

9  you able to determine his phone number?

10 A.   His new number in Parchman?

11 Q.   Yes.

12 A.   Yes, sir, we were.

13 Q.   And were you able to obtain a court-authorized wire

14 intercept on that number?

15 A.   Yes, sir, we were.

16 Q.   And the first court-authorized wire intercept of Perry

17 Mask lasted for about how long?

18 A.   About ten days.

19 Q.   Okay.  And, after that period, was a second

20 court-authorized wire intercept obtained?

21 A.   After the first phone was dropped, we had to identify the

22 new number.  Once we identified that, we wrote again; got the

23 second line.

24 Q.   About how long did it take you to identify the new number?

25 A.   I guess it was about 3 or 4 days before we were able to

1  identify it.

2  Q.    And, thereafter, you were able to obtain a subsequent wire

3  intercept order?

4  A.    Yes, sir.

5  Q.    And the target of that wire intercept was who?

6  A.    Perry Mask.

7  Q.    Was the wire intercept successful?

8  A.    Yes, sir, it was.

9  Q.    Now, after -- on the second court-authorized wire

10  intercept, did that particular intercept lead to arrest?

11  A.    Yes, sir, it did.

12  Q.    Okay.  Based on listening to the court-authorized wire

13  intercept, you determined that Perry Mask was picking up

14  methamphetamine from where?

15  A.    It was in El Cajon, California.

16  Q.    And, pursuant to that determination, explain to the ladies

17  and gentlemen of the jury whether or not you were able to track

18  that phone?

19  A.    We tracked -- well, Perry's phone was in Parchman; it

20  wasn't going anywhere.  We had -- he had an associate, Tim

21  Deshazier, who we had done the warrant on.  He went to

22  California for Mr. Mask, along with an individual -- Mike Smith

23  and Mike McPherson.  They traveled to El Cajon in the

24  original -- the first Title III intercept.

25        Perry was trying to get drugs from the Mexico area.  And

DOUGLAS -- DIRECT                                    182

1  we knew, from that, that he was going to use "Tennessee."  So

2  whenever we were up on that line, we knew who he would be using

3  to go make a trip.

4        So what we did was petition the court to ping Tim

5  Deshazier's phone, Tennessee; and that's what we did, we pinged

6  his phone.  That gave us a GPS location of that phone, where it

7  was at.  So we tracked it on the way back and was able to stop

8  it in Arkansas.

9  Q.   So you tracked the phone from where to where?

10 A.   California back to Arkansas.

11 Q.   Okay.  And, so, after -- were you listening to the

12 intercepted calls while this was taking place?

13 A.   Yes, sir.

14 Q.   Were the parties discussing this methamphetamine

15 transaction?

16 A.   Yes, sir.

17 Q.   And you were able to track the phone back from California

18 through where?

19 A.   All the way across the country to Arkansas.

20 Q.   And in Arkansas is where you decided to do what?

21 A.   We took it down.

22 Q.   Okay.  And was the car stopped?

23 A.   It was a van.  Yes, sir, it was.

24 Q.   And who was in the van?

25 A.   It was Tim Deshazier, Mike Smith, Mike McPherson.

1  Q.    And how much money were you expecting -- excuse me -- how

2  much methamphetamine were you expecting Mask to purchase in

3  California?

4  A.    Five pounds.

5  Q.    And how much meth was actually seized from the van?

6  A.    Approximately 5 pounds.

7  Q.    Is that a lot of meth or a little bit?

8  A.    That's a lot for Mississippi.

9  Q.    Now, after the 5-pound meth seizure, did the three

10  continue; or did it stop at that point?

11  A.    We made a determination, once we hit the package, to take

12  down the Title III.  We knew, from the intercepts, that Perry

13  had been talking about getting more phones.  The one he was up

14  on, he was having trouble with the jammer, cell phone jammer

15  that they have inside the facility; so he was talking about

16  getting another phone.

17       So, even though he was making conversations about going

18  back out there -- coming here and selling the dope, going back

19  for more, in a short period of time, we decided to hit this

20  because he could drop the line; and we not know anything that's

21  happening.  So we went ahead and -- we didn't want the 5 pounds

22  to hit the street.

23  Q.    Why didn't you want the 5 pounds to hit the street?

24  A.    Well, just like we attempted to recover the guns.  Guns,

25  drugs, Aryan Brotherhood violence, that's just a recipe for

DOUGLAS -- DIRECT

1 disaster. So what's --

2          THE COURT: What's a kilo of meth? How much -- two

3 point what?

4          THE WITNESS: That's -- 2.2 pounds is a kilo, Your

5 Honor.

6          THE COURT: Okay. So 5 pounds is more than two

7 kilos?

8          THE WITNESS: Yes, sir.

9          THE COURT: Very well. Excuse me.

10 BY MR. LEARY:

11 Q.   Based on your experience, about how much is an ounce of

12 meth worth purchased wholesale?

13 A.   Well, he was paying -- Perry was paying -- I believe the

14 final price was $425 an ounce in California, and that doesn't

15 count what he paid for the van and the guys going back and

16 forth. The Mexican guys, Padro Alvarez and his brother, was

17 around $1,000 an ounce.

18      And the dis -- well, we discovered Jackson, too, was a

19 source. Michael McLemore with Stephen Ochoa. He was getting

20 methamphetamine from Jackson as well. He was paying

21 anywhere -- I think he paid 16,000 a pound to 23,000 a pound.

22 Q.   He was paying for it, 16 to 23,000 dollars a pound?

23 A.   Correct.

24 Q.   And, based on your experience and training, how much could

25 he sell that for?

DOUGLAS -- DIRECT

1  A.    Inside the facility, Perry Mask told me he could make

2  approximately 4,000 an ounce.

3  Q.    And Mask was obtaining his methamphetamine in the free

4  world on a significant basis from -- did you say Jackson,

5  Mississippi?

6  A.    That is correct.

7  Q.    And who was that in Jackson, Mississippi?

8  A.    It was a guy by the name of Michael McLemore.  He was

9  getting his narcotics from a guy by the name of Stephen Ochoa.

10 Q.    And have they been convicted in this case?

11 A.    They have been.

12 Q.    And where else was he getting his methamphetamine?

13 A.    It was from Padro Alvarez, who happened to be in the

14 Marshall County facility with -- in another pod with Frank

15 Owens and Perry Mask.  His brother, I believe, was Hector

16 Alvarez, who was on the Mexican/U.S. border.

17 Q.    And the final location where Mask was obtaining his

18 methamphetamine was where?

19 A.    California.

20 Q.    The last place?

21 A.    California.

22 Q.    California?  And that's when you took it down?

23 A.    Correct.

24 Q.    Is 5 pounds too much to let go on the street?

25 A.    It is.

DOUGLAS -- DIRECT                                      186

1  Q.   Now, who was William Carroll?

2  A.   William Carroll is "CC."  He is the central region

3  captain.

4  Q.   So we've just talked about the northern region captain in

5  2013 was who?

6  A.   That's David Willis, Leprechaun.

7  Q.   And the central region captain was who?

8  A.   Carroll, CC.

9  Q.   William Carroll?  Street name?

10 A.   CC.

11 Q.   And how was CC participating with Perry Mask in

12 methamphetamine trafficking?

13 A.   CC was originally out in the free world.  He was arrested

14 in the Jackson area.  They tried to perform a traffic stop on

15 him; he took off running.  He eventually had an accident.  They

16 seized several ounces of methamphetamine from him, as well as a

17 weapon after a standoff.  They locked him up in Jackson.  And,

18 once he got in the facility in Jackson, he got a phone; and he

19 started talking to Perry.

20 Q.   Is that what led to the California seizure?

21 A.   That's what led to the California seizure.

22 Q.   Now, has Mr. William Carroll -- he been convicted in this

23 case?

24 A.   He has.

25 Q.   Now, you said Stephen Ochoa and Michael McLemore were the

1  meth suppliers from Jackson, Mississippi.  Correct?

2  A.    Correct.

3  Q.    And they've been convicted in this case?

4  A.    In a case connected in the Jackson area.

5  Q.    And about how much meth was seized from them?

6  A.    Approximately 20 pounds of meth.

7  Q.    Now, Mister -- I'm just going to ask you questions about

8  where the investigation went.  Did the investigation end in

9  November of 2013 with the seizure of the methamphetamine from

10 the "Tennessee" seizure in Arkansas?

11 A.    No, sir.

12 Q.    Well, why didn't you just stop it right there, because you

13 already had a successful investigation?

14 A.    We had -- once the investigation started, and we were

15 pursuing the weapons, and we knew about the drugs from Jackson

16 coming up to Mask, we started having statewide meetings.  The

17 prosecution team, along with agents with DEA, ATF, state, and

18 locals joined in Jackson, Mississippi, to discuss the Aryan

19 Brotherhood.

20       We were identified that the coast had been looking at a

21 homicide that happened down there, a murder.  And that that

22 case --

23       MR. SUMRALL:  Your Honor, I would object to this line

24 of questioning.  This is calling for hearsay testimony from him

25 that he's received from other agents.

1          THE COURT:  Yes, sir.  I think that's correct.  I

2 believe -- if it's based on something he was told by other

3 agents, the objection's well-taken.

4          MR. LEARY:  Thank you, Your Honor.

5 BY MR. LEARY:

6 Q.    Did the investigation expand after that point?

7 A.    Yes, sir, it did.

8 Q.    Let's see.  About how much methamphetamine did your

9 investigation reveal that Mask was receiving from Mexico or

10 Texas?

11 A.    He was getting -- I believe he got a pound the first time,

12 a pound the second, and then --

13 Q.    About how much was he getting from the Jackson area?

14 A.    It started off at low amounts and then went to pounds.  He

15 was getting pounds from the Jackson area.

16 Q.    Thank you.

17          MR. LEARY:  May I approach co-counsel, Your Honor?

18          THE COURT:  Yes.

19     (Off-the-record discussion)

20 BY MR. LEARY:

21 Q.    Mr. Douglas, based on your investigation, at any time from

22 2009 through 2000 -- the end of 2013, are you aware of the

23 Aryan Brotherhood ever ceasing operations?

24          MR. TURNER:  Object to the leading.

25 BY MR. LEARY:

1  Q.    Are you aware of whether --

2             THE COURT:  Wait a minute.  Okay.  You -- when did

3  the -- just ask when.

4             MR. LEARY:  Yes, Your Honor.

5  BY MR. LEARY:

6  Q.    When, if ever, did the Aryan Brotherhood cease operations

7  between 2009 --

8  A.    They have not.

9             MR. LEARY:  No more questions, Your Honor.

10             THE COURT:  The answer was I don't know?

11             THE WITNESS:  They have not stopped.

12             THE COURT:  Oh, they have not.  Okay.  Have not

13  ceased now.

14        Okay.  Mr. Sumrall.

15             MR. SUMRALL:  May I approach the witness, Your Honor?

16             THE COURT:  Yes, sir.

17                        CROSS-EXAMINATION

18  BY MR. SUMRALL:

19  Q.    Mr. Douglas, I hand you what's been marked as Exhibit

20  No. 23.

21  A.    Yes, sir.

22  Q.    And you said that that had come from Frank Owens; is that

23  correct?

24  A.    The e-mail?

25  Q.    The e-mail, yes, sir.

1  A.    It says from Frank Owens, stateraised13@yahoo.com.

2  Q.    Did you verify that in any way or just simply rely on what

3  it said on that?

4  A.    I know that the Government did contact Yahoo, and I'm not

5  sure if we did warrants on Yahoo or whether or not they came

6  back.  Another agent was involved with that, so I don't know

7  what that answer is.

8  Q.    So you don't know anything about that?

9  A.    No, sir.

10 Q.    You don't know whether that was verified at all, do you?

11 A.    I do not.

12 Q.    Okay.

13       MR. SUMRALL:  Nothing further, Your Honor.

14       THE COURT:  Mr. Turner -- wait just a minute.  Let's

15 let Mr. Sumrall go back to counsel table.

16       Mr. Turner.

17                   CROSS-EXAMINATION

18 BY MR. TURNER:

19 Q.    Agent Douglas, as part of your training, which seems very

20 extensive, was any of that study done on the effects of

21 methamphetamine on the human brain?

22 A.    I haven't -- I don't -- I've never had it where they sit

23 there and tell you what the -- a doctor, what its effects are,

24 no, sir.

25 Q.    Would you agree with me that you did not witness

DOUGLAS -- CROSS

1  Mr. Parker commit any crime that you were just discussing?

2  A.    No, sir, I did not.

3  Q.    Okay.  Thank you.

4         MR. TURNER:  That's all I have, Your Honor.

5         THE COURT:  Any redirect, Mr. --

6         MR. LEARY:  No redirect, Your Honor.

7         THE COURT:  Okay.  Ladies and gentlemen of the jury,

8  it's 20 minutes of five.  I think we'll recess for the day.

9  Remember, do not discuss the case among yourselves, do not

10 permit anyone to discuss it with you.  Have a pleasant drive;

11 we've got some daylight left.  The jury's excused.  I ask

12 everybody else to remain in the courtroom.

13        (JURY OUT AT 4:35 p.m.)

14        THE COURT:  Okay.  If you'll have a seat, please.

15 The Court wants to speak briefly to the exhibits 22, 23, and

16 24, being the exhibits seized from the residence of one David

17 Ladrone Willis, also known as Leprechaun's residence, I

18 believe, up in -- was it in Tennessee?  That's correct, isn't

19 it?

20        MR. LEARY:  Yes, Your Honor.

21        THE COURT:  Yes.  Okay.  In reviewing the indictment,

22 Count 1 of the indictment, this David Willis, Leprechaun, is

23 named in Count 1 of the indictment, the conspiracy count; and,

24 also, the dealing in firearms, particularly stolen firearms,

25 and also methamphetamine are listed as overt acts committed in

1  furtherance of the conspiracy.

2       The Court admitted copies of this constitution,

3  purportedly the Aryan Brotherhood constitution, also a

4  photograph of Mr. Willis depicting the Aryan Brotherhood patch,

5  tattoo, on his chest.

6       The Court is of the opinion that given the allegations in

7  Count 1 of the indictment in this cause the fact that this man,

8  Willis, is named as a coconspirator and the fact that

9  methamphetamine dealing and dealing in stolen firearms are

10  listed overt acts in the conspiracy -- the Court is of the

11  opinion that evidence pertaining to methamphetamine and

12  firearms and identification of the Aryan Brotherhood are items

13  that are relevant to the conspiracy; that the acts were

14  committed in furtherance of the conspiracy.

15       And the Court is of the opinion that, pursuant to Federal

16  Rule of Evidence 104, the exhibits are relevant; and, also, in

17  applying the balancing test of Federal Rule of Evidence 403,

18  the Court is of the opinion that the admitting of these

19  exhibits, No. 22, 23 and 24, into evidence -- that the

20  probative value, given the charge, the conspiracy --

21  racketeering conspiracies specified in Count 1, that the

22  probative value outweighs any unfair prejudice.

23       Therefore, the Court supplements its previous ruling as to

24  relevancy of these exhibits.  Now, with that said, ladies and

25  gentlemen, we'll be in recess until nine o'clock in the

1  morning.

2       (Proceedings recessed overnight at 4:39 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Rita Davis Young, Federal Official Realtime

5    Court Reporter, in and for the United States District Court for

6    the Northern District of Mississippi, do hereby certify that

7    pursuant to Section 753, Title 28, United States Code that the

8    foregoing is a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter; and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13

14

15              Dated this 29th day of August, 2016.

16

17

18

19              /s/ Rita Davis Young
                RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
20              Federal Official Court Reporter

21

22

23

24

25