1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF MISSISSIPPI

3

4

5  UNITED STATES OF AMERICA,        )
                                    )
6          Plaintiff,               )        CASE NO. 4:14CR141
                                    )
7          vs.                      )
                                    )
8  FRANK GEORGE OWENS, JR.,         )
   AND ERIC GLENN PARKER,           )
9                                   )
           Defendants.              )
10  _____)

11

12

13                JURY TRIAL - DAY 6 - TESTIMONY
          BEFORE SENIOR DISTRICT JUDGE GLEN H. DAVIDSON
14            MONDAY, APRIL 11, 2016; 9:30 A.M.
                   OXFORD, MISSISSIPPI

15

16

17  FOR THE GOVERNMENT:

18
           United States Attorney's Office
19         SCOTT LEARY, ESQ.
           CLAY DABBS, ESQ.
20         900 Jefferson Avenue
           Oxford, Mississippi  38655-3608

21

22         U.S. Department of Justice
           KELLY KATHLEEN PEARSON, ESQ.
23         1301 New York Avenue, NW
           Suite 49
24         Washington, DC  20005

25

1  **FOR THE DEFENDANT FRANK GEORGE OWENS, JR.:**

2
        Attorney at Law
3       WILLIAM ANDY SUMRALL, ESQ.
        Post Office Box 1068
4       Jackson, Mississippi 39215-1068

5

6
   **FOR THE DEFENDANT ERIC GLENN PARKER:**
7

8       Attorney at Law
        JOSHUA A. TURNER, ESQ.
9       103 North Lamar, Suite 205
        Oxford, Mississippi 38655
10

11

12

13

14

15      Proceedings recorded by mechanical stenography, transcript
    produced by computer.
16   _____

17              **RITA DAVIS YOUNG, FCRR, RPR, CSR #1626**
                   FEDERAL OFFICIAL COURT REPORTER
18              911 JACKSON AVENUE EAST, SUITE 369
                    OXFORD, MISSISSIPPI  38655
19

20

21

22

23

24

25

1                              <u>TABLE OF CONTENTS</u>

2
   Style and Appearances...................................780
3
   Table of Contents......................................782
4

5    <u>WITNESSES FOR GOVERNMENT</u>

6    THOMAS JAMES PARKER
              Direct Examination by Mr. Leary.................785
7             Cross-Examination by Mr. Sumrall...............808
              Cross-Examination by Mr. Turner................816
8             Redirect Examination by Mr. Leary..............822

9    JO KALYN HENDERSON
              Direct Examination by Ms. Pearson..............825
10            Cross-Examination by Mr. Sumrall...............855
              Cross-Examination by Mr. Turner................865
11            Redirect Examination by Ms. Pearson............868

12   DANIEL DEETS
              Direct Examination by Mr. Dabbs................871
13
     MARTY ALLEN MILLER
14            Direct Examination by Mr. Leary.................879
              Cross-Examination by Mr. Sumrall...............893
15            Cross-Examination by Mr. Turner................896
              Redirect Examination by Mr. Leary..............898
16
     CARROLL CARPENTER
17            Direct Examination by Ms. Pearson..............899

18   NEIL CULWELL
              Direct Examination by Ms. Pearson..............907
19            Cross-Examination by Mr. Sumrall...............911

20   BRADLEY BAGWELL
              Direct Examination by Mr. Dabbs................913
21            Voir Dire by Mr. Turner........................918
              Further Direct Examination by Mr. Dabbs........920
22            Cross-Examination by Mr. Turner................922
              Redirect Examination by Mr. Dabbs..............923
23
     JACKSON "JASON" PRICE
24            Direct Examination by Mr. Dabbs................925
              Cross-Examination by Mr. Turner................936
25

1                          <u>EXHIBITS</u>

2    <u>EXHIBITS</u>              <u>DESCRIPTION</u>              <u>MARKED</u>    <u>RECEIVED</u>

3    G-49A   Disc of Phone Call 680 Between    887       890
             Marty Miller & Frankie Owen *
4            Witness # 23

5    G-49B   Transcript of Call 680 *          887
             Witness # 23
6
      G-50   AT&T Cell Site Record *           914       915
7            Witness # 26

8    G-51    AT&T Phone Records * Witness # 26 914       915

9    G-52    Photo of Eric Parker tattoos *    929       941
             Witness # 27
10

11

12   Motion for Acquittal:

13              Mr. Sumrall....................................938
                Mr. Turner.....................................938
14              Mr. Leary......................................942
                Mr. Sumrall....................................947
15              Mr. Turner.....................................948

16
      THE COURT:  Ruling.......................................949
17

18   Defendant Owens rests......................................960

19
      Defendant Parker rests...................................960
20

21
      THE COURT:  Recessed Overnight...........................964
22

23
      Court Reporter's Certificate.............................965
24

25

1  (JURY IN AT 9:27 a.m.)

2      (CALL TO ORDER OF THE COURT)

3          THE COURT:  Let me have counsel up just a moment at

4  the bench.

5      (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

6          THE COURT:  Good morning.  I wanted to tell you Juror

7  No. 3, the gentleman in the blue shirt, had a problem with a

8  kidney stone over the weekend; and he went in the emergency

9  room, brought me a copy of his medications and so forth from

10  the emergency room.

11      He wants to continue as a juror.  But he said that, if he

12  has a problem, he'll just raise his right hand; and I'll excuse

13  him.  And, if that gets to be frequent, we'll have to address

14  that when it happens; but I wanted you to know it.  Okay.  He's

15  Juror No. 198 and No. 3 is the seat there in the box.

16          MR. LEARY:  Okay.

17          THE COURT:  Very well.  We ready to go with your

18  witness?

19          MR. LEARY:  The Government's ready, Your Honor.

20          THE COURT:  Very well.

21      (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

22          THE COURT:  All right.  Call your next witness for

23  the United States.

24          MR. LEARY:  Your Honor, the Government would call

25  Thomas Parker.

1              THE COURT:  Very well.

2        (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

3              THE COURTROOM DEPUTY:  Please take a seat in the

4    witness stand, then state your name for the record.

5              THE WITNESS:  Thomas James Parker.

6         THOMAS JAMES PARKER, GOVERNMENT'S WITNESS, SWORN

7                     DIRECT EXAMINATION

8    BY MR. LEARY:

9    Q.    Good morning, Mr. Parker.

10   A.    Good morning.

11   Q.    Would you scoot up, please, and pull that microphone just

12   kind of -- if you can move it forward -- that's fine.  The

13   court reporter cannot get a nod, so if you can remember to

14   respond verbally so she can get it down.  Okay?

15   A.    Yes, sir.

16   Q.    Mr. Parker, how old are you?

17   A.    Forty-one.

18   Q.    And where were you born?

19   A.    Houston, Texas.

20   Q.    Where were you raised?

21   A.    South Mississippi, Lucedale, George County.

22   Q.    Did you have a mother and father?

23   A.    Yes, sir.

24   Q.    Good family?

25   A.    Yes.

THOMAS PARKER - DIRECT

1  Q.  Did you graduate from high school?

2  A.  No.  GED.

3  Q.  Okay.  When did you drop out?

4  A.  My senior year.

5  Q.  Okay.  Got your GED?

6  A.  Yes, sir.

7  Q.  What did you do after high school?

8  A.  I went to work.

9  Q.  When did you get back to Mississippi?

10 A.  '99.

11 Q.  Mr. Parker, have you ever been addicted to

12 methamphetamine?

13 A.  Yes, sir.

14 Q.  And when did you get addicted to it, about when did that

15 start?

16 A.  Probably when I was about 18, 19 years old.

17 Q.  Has that been your downfall?

18 A.  Oh, yes.

19 Q.  How long were you addicted?

20 A.  A little over 20 years.

21 Q.  Are you clean now?

22 A.  Yes, sir.

23 Q.  How long you been clean?

24 A.  Going on 4 years now, about 3, 3½ years.

25 Q.  Good.  Now, have you been convicted before?

THOMAS PARKER - DIRECT

1  A.    Yes.

2  Q.    And tell the ladies and gentlemen of the jury what you've

3  been convicted of.

4  A.    I've been convicted of possession of marijuana, possession

5  of methamphetamine, possession of a firearm by a convicted

6  felon.

7  Q.    Now, the last time you went to jail, Mr. Parker, was about

8  when?

9  A.    2000 -- well, 2013, January.

10  Q.    January of 2013?

11  A.    (Nodding head).

12  Q.    Okay.  The time before that, when was the last time you

13  went to jail?

14  A.    2010.

15  Q.    2010?  When did you get out of jail?  When you went in, in

16  2010, you get out about when?

17  A.    January 2011.

18  Q.    Did you get out of jail before or after the Hudson

19  incident?

20  A.    After.

21  Q.    Did you know anything about the Hudson incident while you

22  were incarcerated?

23  A.    No.

24  Q.    About when was the first time you learned about the Hudson

25  incident?

THOMAS PARKER - DIRECT

1   A.    About a week, week and a half, after I come home.

2   Q.    Have I talked to you about this case?

3   A.    Yes, sir.

4   Q.    Law enforcement officers talked about this case?

5   A.    Yes, sir.

6   Q.    You here to tell the truth?

7   A.    Yes, sir.

8   Q.    Now, Mr. Parker, tell the ladies and gentlemen of the jury

9   when you became an Aryan Brotherhood member.

10  A.    Started in 2007; and, early 2008, everything was

11  finalized.

12  Q.    And where were you when you patched up?

13  A.    Parchman.

14  Q.    Parchman?

15  A.    Yes, sir.

16  Q.    And -- let's see -- that was 2008?

17  A.    Yes, sir.

18  Q.    What was your first rank when you joined the Aryan

19  Brotherhood.

20  A.    I was just a regular foot soldier.

21  Q.    Are you still patched up today?

22  A.    Yes, sir.

23  Q.    Do you plan on keeping your patch, or are you going to

24  take it off?

25  A.    I'm going to take it off.

1 Q.    And how long were you a foot soldier?

2 A.    Several months.  I don't know.  Probably about six months

3 before I got any rank and went to sergeant of arms.

4 Q.    Went to sergeant of arms next?

5 A.    Yes, sir.

6 Q.    And where were you living during this time?

7 A.    I was in south Mississippi, Lucedale, just south of

8 Lucedale right there.

9 Q.    And what county is Lucedale in?

10 A.    George County.

11 Q.    How far is Lucedale from the gulf coast, from, like,

12 Gulfport?

13 A.    From Gulfport?  About an hour's ride from Gulfport,

14 45 minutes to an hour.

15 Q.    And how far is Lucedale to Hattiesburg, Petal?

16 A.    About an hour, hour and 15 minutes.

17 Q.    Are you situated sort of in between?

18 A.    Yeah, about -- yes, sir.

19 Q.    Now, after you were a sergeant of arms, what ranks did you

20 rise to?

21 A.    Well, I went to -- from there, to a lieutenant; and, from

22 lieutenant, to the zone captain, area captain, state captain.

23 And I was a wheel just a short period of time just before I got

24 locked up --

25 Q.    Okay.

1   A.   -- the last time.

2   Q.   I want to point you to January of 2011 when you got out of

3   jail.  What rank did you assume at that time?

4   A.   Area captain.

5   Q.   And how long after you were an area captain did you move

6   to state captain?

7   A.   I stayed area captain a while because I was area captain

8   prior to.  So it was a couple of years.

9   Q.   Oh, okay.  You were actually state captain before that?

10  A.   I was area captain before I got locked up, yes, sir --

11  Q.   Oh, okay.

12  A.   -- and then I assumed that position when I got back out.

13  Q.   Which was when?

14  A.   That was 2011.

15  Q.   Okay.  What month?

16  A.   January.

17  Q.   Tell me what Green Dot cards are, Mr. Parker.

18  A.   Well, Green Dots, you can load money on it from anywhere,

19  you know, no matter where the card is, you know.  You go get a

20  reload pack and put money on it and get a confirmation number,

21  and it turns your money into -- I can't remember; I think it's

22  a 15-digit number.

23  Q.   Explain to me how Green Dot cards were utilized in prison.

24  A.   Oh, that was your money.  That's how you got anything,

25  whatever you wanted, I mean, or needed; that was your barter

1  system, you know.

2  Q.    Explain whether or not you've ever borrowed money from the

3  Aryan Brotherhood treasury?

4  A.    Yes, I have.

5  Q.    How did you pay it back?

6  A.    Green Dot is how I paid it back.

7  Q.    When did you first meet Frankie Owens, Mr. Parker?

8  A.    I'm going to say it was 2009 when me and Frankie first

9  met.

10  Q.    Was Frankie already an Aryan Brotherhood member, or was he

11  not one yet?

12  A.    He was a brotherhood member.

13  Q.    Describe whether or not Frankie Owens was involved in meth

14  trafficking.

15  A.    Yeah, he was.

16  Q.    Did you ever buy meth together with Frankie Owens?

17  A.    Yes, we did.

18  Q.    Who would you and Frankie buy meth from?

19  A.    From Creel.

20  Q.    Were you ever present when Frankie Owens purchased from

21  Creel?

22  A.    Yes, sir.

23  Q.    When you and Frankie purchased from Creel, about how much

24  would you get?

25  A.    An ounce.

1  Q.   Did you ever lend Frankie Owens money?

2  A.   Yes, sir.

3  Q.   For what?

4  A.   Matter of fact, to buy that first ounce we went up there

5  and got together.

6  Q.   How much did you lend him?

7  A.   It was 600, I believe.

8  Q.   What did Frankie Owens tell you about owing money to

9  Creel?

10 A.   This was way later on.  He got in the hole to him.  I went

11 over there and talked to him.  You know, he said he was going

12 to pay him.  You know, he just needed time.

13 Q.   How much was he in the hole to Creel?

14 A.   At that time, it was three grand, $3,000.

15 Q.   For what?

16 A.   For meth.

17 Q.   Now, who's Eric Parker?

18 A.   He's a brother from up there in Petal, you know.

19 Q.   Do you see him in this courtroom?

20 A.   Yeah, I see him.

21 Q.   Would you identify him, please.

22 A.   That's him sitting right there.  (Indicating)

23 Q.   On the far right or the far left?

24 A.   Far right, right there.

25 Q.   And do you see Frankie Owens?

1  A.    Yeah, I see Frankie.

2  Q.    Where is Frankie sitting?

3  A.    He's to the far left.

4         MR. LEARY:  Okay.  Your Honor, I'd like the Court to

5  let the record reflect that Mr. Parker has identified Eric

6  Parker and Frankie Owens.

7         THE COURT:  It'll so reflect.

8  BY MR. LEARY:

9  Q.    When did you first meet Eric Parker?

10 A.    Eric?  I'm going to say it was 2008.  Yeah, I know it was,

11 over at Creel's.

12 Q.    How did you meet him?

13 A.    Huh?

14 Q.    How did you meet him?

15 A.    Well, we had a meeting over there when I first plugged in;

16 in other words, first met them; we were over there, which is

17 called a meet and greet.  And, you know, Eric was there as well

18 as Creel and me.

19 Q.    Describe Eric Parker's relationship with Brandon Creel.

20 A.    That was his right-hand man.  They were friends.

21 Q.    Who brought Eric Parker into the Aryan Brotherhood?

22 A.    Creel.

23 Q.    Who introduced Eric Parker to the brotherhood on the

24 coast?

25 A.    I did.  I stood good for him down there.

THOMAS PARKER - DIRECT

1  Q.    Okay.  You said you stood good for him.  What does it mean

2  to stand good for Eric Parker on the coast?

3  A.    I vouched for him.  Didn't nobody down there know him.

4  And I stood up for him and told them he'd hoe a solid row.

5  Q.    Okay.  About when was that?

6  A.    I'm going to say it was '09; I'm pretty sure it was.

7  Q.    2009?

8  A.    Yes, sir.

9  Q.    What rank did Eric Parker rise to?

10  A.    Captain.

11  Q.    Where did Eric Parker live?

12  A.    Petal.

13  Q.    What's a thunder warrior?

14  A.    A thunder warrior is the elite of the elite as far as the

15  Aryan Brotherhood; that's your enforcers.

16  Q.    Is Eric Parker a thunder warrior?

17  A.    Yes, sir.

18  Q.    Is Frankie Owens a thunder warrior?

19  A.    Yes, sir.

20  Q.    Who is Michael Hudson?

21  A.    "Skip."

22  Q.    When did you first meet Skip, Mr. Parker?

23  A.    That was '07, down at Jackson County Adult Detention

24  Center; we were in jail together.

25  Q.    Was he a brother?

THOMAS PARKER - DIRECT

1  A.    Yes.

2  Q.    Where did Mr. Hudson live?

3  A.    Over around D'Iberville, right there on the coast.  You

4  know, exactly -- I don't know exactly where his doorstep is,

5  but in that area over there.

6  Q.    Was he a meth user?

7  A.    Yes, sir.

8  Q.    Did you ever talk to Frankie Owens about Michael Hudson?

9  A.    Yes, sir.

10 Q.    Where did Frankie Owens tell you that Michael Hudson got

11 his meth?

12 A.    All the time, I don't know; but I know from Eric.  He got

13 some from Eric; I do know that.

14 Q.    You do know that?

15 A.    Yes, sir.

16 Q.    Who got meth from Eric?

17 A.    Skip, Michael Hudson.

18 Q.    What does *front* mean?

19 A.    Front, you get the dope without paying for it and then

20 sell the dope to pay for it.

21 Q.    How was Michael Hudson getting his dope from Eric Parker?

22 A.    He was on the front at that time.

23        MR. TURNER:  Your Honor, I'm going to object.  If he

24 can lay the predicate on personal knowledge that he witnessed

25 this, I won't say another word; but --

1          THE COURT:  Okay.  Yes.  The objection is well-taken.

2  Tell us how you know that.

3          THE WITNESS:  Well, Frankie and me was talking after

4  I come home in 2011.  He told me, you know, that Skip got in

5  the hole to Eric.  Eric just -- he was running his mouth about

6  what he was going to do, this, that, and the other.  It was an

7  ongoing problem while I was locked up.  That's one of the

8  things that happened while I was locked up.

9  BY MR. LEARY:

10  Q.    So Frankie Owens told you that?

11  A.    Yes, sir.

12          MR. TURNER:  Your Honor, if it happened while he was

13  locked up, he doesn't have personal knowledge of it.

14          MR. LEARY:  Your Honor, the Government's position

15  would be that Frankie Owens made an admission to Thomas Parker.

16          THE COURT:  Okay.  From whom did your information

17  come, Mr. Parker?

18          THE WITNESS:  Frankie.

19          THE COURT:  Frankie Owens?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Very well.  That will be admitted, then.

22  The objection's overruled if the defendant actually told you

23  this.

24  BY MR. LEARY:

25  Q.    According to Frankie Owens, how much money did Michael

1   Hudson owe to Eric Parker?

2   A.   $240.

3   Q.   For what?

4   A.   Dope, methamphetamine.  He had fronted him dope, and he

5   didn't square up with him.

6   Q.   Now, Mr. Parker, you were released from prison in January

7   of what year?

8   A.   2011.

9   Q.   Okay.  At that time, what was Eric Parker's rank?

10  A.   At that time, he'd still been a captain.

11  Q.   What about Frankie Owens' rank?

12  A.   At that time, he was the zone captain of the south --

13  no -- area captain over the south, OIC.  Matter of fact, he was

14  where I got my position back from when I was released.

15  Q.   Okay.  Who first contacted you, as AB captain, about the

16  Michael Hudson incident?

17  A.   Frankie.

18  Q.   How long after you got out of prison did Frankie Owens

19  contact you about the Hudson incident?

20  A.   About a week, week and a half.  I don't -- you know.

21  Q.   Where was Frankie living at that time?

22  A.   He was living at Mitchell Valentine's.  He was living with

23  Mitchell.

24  Q.   Where did you meet with Frankie?

25  A.   At my house.

1  Q.    Where did you talk to him?

2  A.    In the front yard.

3  Q.    Why didn't you just talk to him in your house?

4  A.    Well, at that time, I had a woman -- my girlfriend was

5  living with me.  And family affairs -- you know, we had to get

6  away from her.  She didn't need to hear anything we talked

7  about.

8  Q.    What, if anything, did Frankie Owens tell you about

9  Michael Hudson?

10  A.    Said he killed him.  I don't know why.  He just said he

11  killed him.

12  Q.    Why did Frankie Owens tell you he killed Michael Hudson?

13  A.    What it was, they snatched him out.  And what ended up, on

14  the killing part, is he took him up there to Eric; and he put

15  Eric on the spot about running his mouth, what he was and

16  wasn't going to do over that dope money that was owed to him.

17  Q.    Okay.  Now, stop right there.  Frankie Owens said he did

18  what with Eric Parker?

19  A.    I mean --

20  Q.    He put him on the spot?

21  A.    Yeah, he put him on the spot.

22  Q.    All right.  And why did Frankie put Eric on the spot?

23  A.    Because Eric was running his mouth about what he would and

24  wouldn't do, talking -- what they call "talking tough," you

25  know, what he was going to do to Skip over that money he owed

1  him, you know.

2  Q.    Okay.

3  A.    And Frankie put him on the spot; put your money where your

4  mouth is, you know.  And that's how it came about.

5  Q.    Who did Frankie say he brought up there?

6  A.    Skip.

7  Q.    And what did Frankie say they did to him?

8  A.    They beat him and, you know, killed him when it was said

9  and done.  Both of them put a knife in him, Frankie and then

10  Eric.

11  Q.    Why did Frankie say he made Eric put a knife in him?

12  A.    That put blood on his hands.  That sealed his fate as

13  well, just as guilty.

14  Q.    What did Frankie Owens tell you happened first to Michael

15  Hudson?

16  A.    That he was smashed out.  Those down there in Gautier,

17  they smashed him out.  In other words, they beat him, you know;

18  and just smashed him out.  And then that's what happened first.

19  Q.    Who did Frankie Owens tell you brought Eric Parker to --

20  excuse me.  Who did Frankie say brought Michael Hudson to Eric

21  Parker's house?

22  A.    It was him and Mitchell Valentine and "T-bone."

23  Q.    Who's T-bone?

24  A.    Walter -- Walter Burrus.

25  Q.    Where did Hudson live, Mr. Parker?

1  A.    He lived up in Petal in a camper up there.

2  Q.    About how far of a drive was it from Gautier to Parker's

3  house?

4  A.    I don't know.  It was probably every bit of 90 miles,

5  100 miles, something like that.

6  Q.    What, if anything, did Frankie Owens tell you about

7  Michael Hudson being bound?

8  A.    He was -- well, he was bound with tied wire in the trunk.

9  Q.    He said they put him where?

10  A.    In the trunk.

11  Q.    And bound him with what?

12  A.    Tied wire.

13  Q.    What did Frankie Owens tell you happened to Michael

14  Hudson's body after he was killed?

15  A.    He was burnt.

16  Q.    Who did Frankie Owens say burned Michael Hudson's body?

17  A.    That's Creel.

18  Q.    Did Frankie Owens tell you when Creel arrived to get the

19  body?

20  A.    As far as the exact, you know, date, no, not exact time,

21  no.

22  Q.    Did Creel arrive before he was dead or after he was dead?

23  A.    After.  It was after they killed him.

24  Q.    Why did they call Creel?

25  A.    They needed some help, you know; and he trusted him.

1  Q.   Where did Frankie say they put his body?

2  A.   In a 55-gallon drum in the back of the truck.

3  Q.   Okay.  Who did Frankie say authorized the first violation

4  of Michael Hudson?

5  A.   That was Creel; Creel authorized the smashing.

6  Q.   Who did Frankie Owens say authorized the killing of

7  Michael Hudson?

8  A.   He -- Frankie's the one that decided to kill him, you

9  know.  He made that decision himself.

10 Q.   Now, as an Aryan Brotherhood member, did Frankie Owens

11 have authority to order the KOS of Michael Hudson?

12 A.   No, sir.

13 Q.   When did you first find out the police were investigating

14 Michael Hudson's death?

15 A.   A few weeks after I was released in 2011.  Might have been

16 a month and some change, you know.  It wasn't too long after I

17 come home.

18 Q.   What happened?

19 A.   Frankie called me, said he had something I needed to

20 listen to.  And they come to the house, and --

21 Q.   Who's they?

22 A.   It was Frankie and T-bone, Mitchell.  They come to --

23 James Dean.  That caught me off guard there, you know, him

24 being --

25 Q.   What did they play for you?

1  A.    Frankie played a voice mail on his phone of an

2  investigator.

3  Q.    What did the voice mail say?

4  A.    Word for word, I can't quote it now.  But what it boiled

5  down to, he was wanting to talk to him about somebody missing,

6  Michael Hudson.

7  Q.    What did you tell Frankie Owens he needed to do?

8  A.    Get his -- get his story together and talk to that

9  investigator and tell him something.

10  Q.    What did the group decide to do concerning Hudson's death?

11  A.    Shut up about it.

12  Q.    What did Frankie Owens say, if anything, about standing up

13  for it?

14  A.    He said he'd hold up for it, never -- never go north of

15  I-10.

16  Q.    Never go north of I-10?

17  A.    Matter of fact, that's what he said.

18  Q.    What does that mean, never go north of --

19  A.    Hattiesburg.  You know, he was in south of 10, is what he

20  meant.  He'd keep it there.  He'd hold up for it.  If it ever

21  come down to it, Frankie made it very clear that he would hold

22  up for it; nobody else would get -- you know, nobody else would

23  have to hold up for it or pay for it; he would.

24  Q.    Did he hold up for it?

25  A.    No.  He's sitting right yonder, ain't he?

1  Q.    Now, where did Eric Parker live?

2  A.    He lived in Petal.

3  Q.    What did he live in?

4  A.    It was a camper up there.

5  Q.    What did Frankie Owens tell you happened to Eric Parker's

6  camper?

7  A.    It got burnt.

8  Q.    Why?

9  A.    Because you couldn't get all the blood out of there.

10  Couldn't get it cleaned up good enough.  Had to set it on fire.

11  Q.    Who was Frankie Owens most worried about?

12  A.    He was worried most about Creel, and Eric, matter of fact.

13  Q.    Why was Frankie Owens worried about Eric Parker?

14  A.    Well, because he knew he was one of the ones of the three

15  that -- he was one of the two other ones that knew for a fact

16  what had happened, you know; knew that they could put their

17  finger on him.  That's why.

18  Q.    What did Frankie Owens tell you about Eric Parker being

19  strong or weak?

20  A.    Said he wouldn't hold water, said he was weak.

21  Q.    Why was he worried about Creel?

22  A.    Because Creel and Eric were tight, you know what I mean,

23  been tight.  Like I said, that was his buddy, you know.

24  Q.    Did Frankie Owens want to act on it?

25  A.    Yeah.

1  Q.    What did Frankie Owens want to do?

2  A.    He wanted to kill them both.  We talked about it, matter

3  of fact.  That was one of the reasons for us talking like we

4  did, you know.

5  Q.    Did you agree to the killing of Eric Parker and Brandon

6  Creel, or were you against it?

7  A.    I was against it.  You know, you go to knocking people

8  off, now you've got a problem.  You go to killing people,

9  you're just going to have to keep killing.  Because somebody is

10  going to know about it as long as you've got somebody helping

11  you.

12  Q.    Do you recall when Eric Parker was arrested in Arizona?

13  A.    Yeah.  I mean, as far as actually -- yeah, I remember he

14  was arrested out there, yeah.

15  Q.    Did you talk to him after that?

16  A.    Yes.

17  Q.    What did you talk to him about?

18  A.    He was wanting his rank back.  You know, he was calling

19  me.

20  Q.    What was his rank?

21  A.    Captain.

22  Q.    And he wanted his captain's rank back?

23  A.    Yes, sir.

24  Q.    What did you tell him?

25  A.    He thought he could just have it right on back when he

THOMAS PARKER - DIRECT

1  come home.  I told him, no; no, he couldn't have it back.

2  Q.    Did you take his rank from him?

3  A.    I didn't, but I kept him from getting it back.

4  Q.    After you got out of prison in January of 2011, did you

5  ever see Michael Hudson again?

6  A.    No, sir.

7  Q.    Now, when did you become a wheel?

8  A.    2000 -- the very end of 2012.

9  Q.    How long?

10  A.    Oh, it wasn't just a month and a half, two months.  I got

11  locked up in the beginning of 2013.

12  Q.    Where was Frankie Owens while you were locked up?

13  A.    Frankie?  He was locked up.

14  Q.    Was he?

15  A.    Yeah.  He was in Marshall County there at one time, and he

16  got moved around.

17  Q.    Explain what was going on between Mississippi and

18  California during that time frame.

19  A.    We were trying to -- unification is what we were trying to

20  get going.  We did actually get it going at one time.  And

21  that -- and me saying that, what started all this is this

22  brother over here from WAR --

23  Q.    What's WAR?

24  A.    WAR is White Aryan Resistance.  It seems he got wind of

25  some brothers up there just doing bad things, you know, strung

1  out, breaking in each other's houses, running around with each

2  other's old ladies, just stupid stuff, you know.  Making them

3  look bad, you know.  Got wind of it.  And he called somebody

4  out west, Rich; and they got together and --

5  Q.    Who did he call out west?

6  A.    Rich.  And gave us an ultimatum of what we were and

7  weren't going to do.  Actually, I got wind of that; and I made

8  the call.  I got the number to Ghost and called him.  I told

9  him, I said, "Hey, man, look, we didn't -- you know, we need to

10  figure something out here.  If y'all want to help, y'all can

11  help; but ultimatums are not something we're willing to accept

12  either, you know."

13  Q.    Did you ever talk to Frankie Owens about the unification

14  of California?

15  A.    Yes, sir.

16  Q.    What was Frankie Owens' position on it?

17  A.    He was for it, you know, as long as we got benefits off of

18  it.

19  Q.    What were the benefits of unifying with California?

20  A.    Well, it was contacts, especially contacts on dope.  They

21  had it on a whole different level over there than what we did.

22  And just general help back and forth.

23  Q.    How was better contacts with methamphetamine going to help

24  the Aryan Brotherhood?

25  A.    Money, more dope --

THOMAS PARKER - DIRECT

1  Q.    Money?

2  A.    -- more dope on a larger scale and better money.  You

3  know, we put it in treasury just to help build, you know.

4  Q.    Did you and Frankie actually talk about how it would

5  happen?

6  A.    Yes.

7  Q.    How would it happen; how would you distribute it?

8  A.    Well, what we talked about was it would have to be a

9  controlled thing, you know; you couldn't just let any and

10 everybody do it.  It had to be one per each zone.  Split it up

11 three ways, is what we had talked about.

12 Q.    What are the zones in Mississippi?

13 A.    North, central, and south.  We'd have a go-to guy -- or a

14 man, you know, handling distribution in each one.  As far as

15 overseeing it, one in each area.  And then that would kind of,

16 like, what you call spiderweb, you know, branch out.

17       But one man would be responsible for the receiving and,

18 you know, the money and then controlling, you know -- three men

19 total, but one in each area.  It'd -- we hadn't decided -- you

20 know, set on anything; but, you know, that's what we were

21 doing, discussing how it would work.  And that was what we were

22 talking about then; that would be the way it needed to go, in

23 that order.

24            MR. LEARY:  May I speak to co-counsel briefly, Your

25 Honor?

1              THE COURT:  Yes, sir.

2              MR. LEARY:  Your Honor, no further questions.  We

3  tender the witness.

4              THE COURT:  Okay.  Mr. Sumrall may cross-examine on

5  behalf of Defendant Owens.

6                          CROSS-EXAMINATION

7  BY MR. SUMRALL:

8  Q.   Mr. Parker, good morning.

9  A.   Good morning.

10 Q.   That's quite a story you just told the jury, isn't it?

11 Isn't it?

12 A.   Depends on how you look at it.

13 Q.   Okay.  2011, I believe you said you got out of prison in

14 January; is that correct?

15 A.   Yes, sir.

16 Q.   And that there was a meeting at your house, right?

17 A.   Yes, sir.

18 Q.   And I believe you said Frankie Owens was there, T-bone was

19 there, Mitchell Valentine was there, James Dean was there, and

20 Creel, right?

21 A.   No, I didn't say that.

22 Q.   What did you say?

23 A.   At the meeting we talked about there, it stopped at James

24 Dean.

25 Q.   You talked to James Dean?

1  A.    Do what?

2  Q.    You said you -- to talk to James Dean?

3  A.    No.  I said the meeting that we talked about just a few

4  minutes ago stopped at the name you just named, stopped at

5  James Dean.  I didn't say Creel was there.

6  Q.    Oh, okay.  So Creel was not there?

7  A.    Not at that meeting, no.

8  Q.    If he said he was, then he'd be lying; is that correct?

9  A.    If he's talking about that meeting, he would be.  But he

10  was there for a meeting, but not that one.

11  Q.    Okay.  Was that a regular brotherhood meeting, a church

12  meeting?

13  A.    No, sir.

14  Q.    It was not.  Now, in 2010, while you were in prison, who

15  were the wheels?

16  A.    In 2010?

17  Q.    Yes, sir.

18  A.    It was Barron Goff, Perry Mask.  All right.  You had

19  Creel.  He was a free world wheel.  All right.  And Larry

20  Sneed.

21  Q.    Okay.  So, at that time, there were three; is that

22  correct -- I mean, four?

23  A.    On the inside, there were three; and then one on the

24  outside.

25  Q.    Okay.  And then I believe the state is broken down into

1  zones; is that correct?

2  A.    Yes, sir.

3  Q.    And there's a northern zone, a southern zone, and a

4  central zone, correct?

5  A.    Yes, sir.

6  Q.    And who were the zone captains?

7  A.    In 2010?

8  Q.    Yes, sir.

9  A.    Up north, well, they got -- central kept changing.  It

10 started off with Ed, and then they had CC.  Like I said, it was

11 2010.  It changed when I was locked up.  I mean, they kept

12 changing.  I can't sit here and tell you exactly who, because

13 they couldn't keep one.  Now, the north was -- at one time, was

14 Larry Sneed's brother up there.  Let me think of his name.

15 Gary.

16 Q.    Okay.

17 A.    All right.  He was.  He was that when I got locked up, but

18 it had changed when I got out.  Like I said, they couldn't keep

19 it straight.

20 Q.    Who was the southern zone captain?

21 A.    While I was locked up, it was Frankie.

22 Q.    Frankie?  He wasn't just an area captain, like the

23 district around his home?

24 A.    Well, he started off as zone captain.  All right?  And

25 then he ended up OIC.  Because I didn't leave it directly to

1  Frankie when I left; it was left to someone else.  And then,

2  like I said, they passed it on; and Frankie ended up being --

3  went from zone to area captain.  He was OIC when I was

4  released.

5  Q.   Okay.  OIC -- in January of 2011, he was OIC; is that

6  correct?

7  A.   Yes, sir.

8  Q.   Okay.  And what was Eric Parker in January of 2011 when

9  you were released?

10  A.   He was still a captain as well, but I don't -- I want to

11  say that.

12  Q.   I want to go back to this meeting in January.  This took

13  place at your house; is that correct?

14  A.   Yes, sir.

15  Q.   And that was what -- about what time in 2011 in January,

16  about when?

17  A.   About when?

18  Q.   Yeah.

19  A.   It was in the middle of the night when they called me.  I

20  don't know.  It was a couple of weeks after I come home.  I

21  can't put my finger on the exact date and time, but it was the

22  middle of the night when he called me and wanted to come by the

23  house.  I said, "Come on."

24  Q.   All right.  And is this the time that you met with T-bone,

25  Mitchell, and Dean?

1  A.    No, sir.

2  Q.    This is another meeting?

3  A.    The first one was when Frankie and Mitchell come by my

4  house.  That's about a week, week and a half, something like

5  that, after I'd come home.  That happened in the middle of the

6  night.

7  Q.    Okay.  So it was Frankie and Mitchell?

8  A.    Yes, sir.

9  Q.    Okay.  So the two of them came by.  Was Mitchell present

10  when the conversation took place with Frankie Owens?

11  A.    Yes, sir, Mitchell was there.

12  Q.    Okay.  So it's the three of you this time.  So, actually,

13  there's two different conversations, is what you're telling us

14  now?

15  A.    No, I didn't say that; you did.

16  Q.    Well, you said that they came in the middle of the night;

17  did you not?

18  A.    Yes, sir.  Frankie and Mitchell came by the first meeting.

19  You had the meetings confused.

20  Q.    Okay.  And then you told me another time that there was

21  T-bone, Mitchell Valentine, and James Dean there; is that not

22  right?

23  A.    Yes, sir.

24  Q.    So that's two separate meetings, isn't it?

25  A.    Oh, yes, sir.

1  Q.    Okay.  Okay.  Now, isn't it a fact that you've turned

2  state's evidence; that you're testifying for the Government;

3  are you not?

4  A.    Yes, sir.

5  Q.    And they've given you some benefits because of that; have

6  they not?

7  A.    No, sir, I haven't received a benefit one.

8  Q.    Have you been charged?

9  A.    No, sir.

10 Q.    Okay.  That's a benefit, isn't it?

11 A.    Well, what I was told was I wouldn't be charged with

12 anything I told here.

13 Q.    Okay.  So that's when you concocted this elaborate story

14 that Frankie supposedly told you, correct?

15 A.    No, sir, that's not correct.

16 Q.    And, if anybody else said that none of the facts of this

17 thing were talked about at any one of these two meetings that

18 you talked about, they'd be lying, wouldn't they?

19 A.    Yes, sir.

20 Q.    Now, you said that Frankie told you he was worried about

21 Creel and Parker.  That'd be Eric Parker, not you, right?

22 A.    Yes, sir.

23 Q.    Isn't it a matter of fact that y'all had caught Creel in

24 several lies?

25 A.    Yes, sir.

1  Q.    And he was on the outs with the brothers at that time,

2  wasn't he?

3  A.    Well, when you say *y'all*, let me back up because I

4  wouldn't be telling the truth there.  Because I wasn't there at

5  that time, when all that said, when Frankie told me all that

6  went on about Creel been changing, you know, been lying and --

7  you know, yeah, we talked about that he'd been changing.  You

8  know, he'd done got what they call wishy-washy.  You know, was

9  I there to lay witness to when that went down?  No.  Did we

10 talk about it after I come home?  Yes, sir.

11 Q.    Okay.  You're a thunder warrior also, aren't you?

12 A.    Yes, sir.

13 Q.    When did you get your thunder warrior designation?

14 A.    2009 -- 2008 I received mine in Parchman.

15 Q.    Okay.  Now, you're familiar with the constitution of the

16 brotherhood; are you not?

17 A.    Yes, sir.

18 Q.    And no one has the authority to issue an SOS or a KOS

19 except a wheel; do they not?

20 A.    Yes, sir, that's true.

21 Q.    Okay.  And I believe you stated that Brandon Creel issued

22 an SOS on Michael Hudson, right?

23 A.    Yes, sir.

24 Q.    Do you know if he ordered a KOS on him?

25 A.    No, sir.

THOMAS PARKER - CROSS BY SUMRALL

1  Q.    You don't know?

2  A.    No.  I know he said he didn't.

3  Q.    He said he didn't.  And how -- you said that Frankie

4  Owens, who, at that time, was just a low captain -- OIC, I

5  believe you called him; is that correct?

6  A.    Yes, sir.

7  Q.    He didn't have the authority to order a kill, did he?

8  A.    Technically, no, sir.

9  Q.    Okay.  And the brotherhood's a strict constructionist;

10 they listen to -- they do what they're supposed to do in the

11 brotherhood, don't they?

12 A.    Well, I mean, if they do what they're supposed to on an

13 individual level, that's on each individual.  Are they supposed

14 to do -- go by the laws and guidelines of the brotherhood?

15 Yes.  Does everybody do it?  No.  You wouldn't be having

16 smashings and violations and all that if they did.

17 Q.    The whole crux of this matter is, Mr. Parker, that you'll

18 do whatever you can to make yourself look good in the eyes of

19 the Government, right?

20 A.    Well, no, sir.

21 Q.    And get yourself out of as much trouble as you can by

22 concocting whatever story you need to concoct to do it; isn't

23 that true?

24 A.    No, sir, that's not true.

25 Q.    That's not true.

1          MR. SUMRALL:  Court's indulgence.  (Pause).  No

2  further questions, Your Honor.

3          THE COURT:  Mr. Turner, on behalf of Defendant

4  Parker, you may cross-examine this witness.

5          MR. TURNER:  Thank you, Your Honor.

6                    CROSS-EXAMINATION

7  BY MR. TURNER:

8  Q.    Mr. Parker, my name's Joshua Turner.  Mr. Leary went over

9  some of your past convictions.  You have three, correct?

10  A.    Yes, sir.

11  Q.    And is there an indictment pending right now for your

12  methamphetamine trafficking in the Southern District?

13  A.    No, sir.

14  Q.    Okay.  You understand that if you get another conviction

15  you could be charged as a habitual offender; you'd be a

16  three-time loser, right?

17  A.    Well, it depends on the conviction, the nature of it.

18  Q.    Right.  You understand that's a possibility?

19  A.    Yes, sir.

20  Q.    Okay.  Now, Mr. Sumrall touched on it; but what were you

21  promised for testifying here today from the Government, that

22  they wouldn't do what?

23  A.    That they wouldn't hold any -- they wouldn't charge me for

24  anything that I admitted to in this courtroom.

25  Q.    Okay.  Including your meth trafficking down south, right?

1  A.    Yes, sir, I reckon so.  I mean, I admitted to it.

2  Q.    Okay.

3  A.    But -- never mind.  I'm listening.

4  Q.    Do you remember when Brandon Creel went to prison in 2012?

5  A.    Yes, sir.

6  Q.    Why did he go to prison?

7  A.    Dope.

8  Q.    Dope?

9  A.    Yes, sir.

10  Q.    Was that it?

11  A.    Well, I mean, I don't know each -- you know.  But he went

12  to prison for dope.  I know when they came to his house; he had

13  all kinds of stuff, grenades, guns, several different things

14  when they went through his house.

15  Q.    Was any part of that for threatening a witness?

16  A.    Well, I don't know exactly why they arrested him that day;

17  but I know, yeah, he had threatened a witness down through

18  there somewhere.

19  Q.    Okay.  Now, you've mentioned some things about Mr. Parker

20  involving Michael Hudson --

21  A.    Yes, sir.

22  Q.    -- as far as methamphetamine.  You've never witnessed a

23  transaction between Mr. Parker and Mr. Hudson, correct?

24  A.    No, sir, I did not.

25  Q.    Is that -- I'm sorry.  Is that correct?

THOMAS PARKER - CROSS BY TURNER

1  A.   Yes, sir, it's correct.

2  Q.   Okay.  That was a poor question on my part; I apologize.

3  That's just information you have heard from other people; isn't

4  that right?

5  A.   Yes, sir.

6  Q.   Okay.  And, as far as Mr. Leary asking you about the

7  Hudson incident, everything that you testified to the jury

8  about, those are just things you heard from other people,

9  correct?

10  A.   Well, what I just testified about was what Frankie and me

11  talked about.

12  Q.   Okay.  You said that, as part of your duties in the Aryan

13  Brotherhood, that you had issued smash-on-sight orders?

14  A.   Yes, sir.

15  Q.   You ever issue a kill-on-sight order?

16  A.   No, sir.

17  Q.   You ever been part of killing anyone?

18  A.   No, sir.

19  Q.   Okay.  Have you ever been to Eric Parker's camper trailer?

20  A.   No, sir.

21  Q.   Okay.  So everything you testified to the jury about in

22  regards to that was something you heard from someone else,

23  correct?

24  A.   From Frankie, yes, sir.

25  Q.   Okay.  Well, let me ask you this, do you consider

THOMAS PARKER - CROSS BY TURNER

1  Mr. Owens to be a reliable source of information?

2  A.    Well, there for a little -- yeah, at one time, now,

3  considering family affairs, you know.  Now, back -- yeah, at

4  one time, yeah, I believed what Frankie tells me if another

5  brother was concerned or the family's business, yes.

6  Q.    Okay.  At that time, you were a methamphetamine addict,

7  correct?

8  A.    Well, off and on.  Now, there for a period of time -- yes

9  and no.  Was I strung out the whole time?  No, sir.

10 Q.    Okay.  Will you agree with me that methamphetamine does

11 take its toll on your memory?

12 A.    Well, it takes a toll on everything on a man, each and

13 everybody.

14        MR. TURNER:  The Court's indulgence, Your Honor.  May

15 I have a second with my client, please?

16        THE COURT:  Certainly.

17 BY MR. TURNER:

18 Q.    Mr. Parker, when do you consider yourself as getting out

19 of the Aryan Brotherhood?

20 A.    When do I consider myself getting out of the Aryan

21 Brotherhood?

22 Q.    Yes, sir.

23 A.    I reckon I'm already out, you know.  I haven't been really

24 fooling with them since I come home -- haven't.  I just -- I

25 told them I was unplugging.  That's what I told the wheel after

1 I came home this time.  And, you know, technically, I'm still a

2 brother, you know.

3 Q.   But you wouldn't associate yourself as being an Aryan

4 Brotherhood member now, correct?

5 A.   Well, I mean, by -- by law, yeah, I still am, as far as

6 the Aryan Brotherhood is concerned; I'm still toting the brand.

7 Q.   Well, that's Aryan Brotherhood law.  I'm talking about the

8 rest of the world out here that doesn't believe in that kind of

9 situation.  But the rest -- I understand -- is that -- is that

10 something you still believe in, is my question?

11 A.   No, not the laws and doctrines of the brotherhood, no.

12 Q.   Okay.

13 A.   As far as what it all stood for, the cause, yeah, I

14 believed in it wholeheartedly.  But it has went slap left.  It

15 ain't nothing like what it started out.  What it reads in that

16 paperwork is not what it is.

17 Q.   How often did you see Eric Parker in 2011?

18 A.   Not very often at all.

19 Q.   Okay.  He didn't participate in any Aryan Brotherhood

20 functions in 2011, did he?

21 A.   No.  I didn't see him, not down at the house, not at the

22 meetings down that way, no.

23 Q.   Okay.  He didn't participate in any of the Aryan

24 Brotherhood functions in 2012 either, did he?

25 A.   I didn't see him, no, sir.

THOMAS PARKER - CROSS BY TURNER

1  Q.    Okay.  And he didn't participate in any Aryan Brotherhood

2  functions in 2013 either, did he?

3  A.    I was locked up, so --

4  Q.    I understand.  But to your knowledge?

5  A.    No.

6  Q.    Okay.  And, then, he didn't participate in any Aryan

7  Brotherhood functions in 2014, did he?

8  A.    I wasn't -- I was locked up again there too.  I was locked

9  up the whole time there; I don't know.

10  Q.    Yes, sir.  Okay.

11        MR. TURNER:  Your Honor, I believe that's all the

12  questions I have for Mr. Parker.  Thank you.

13        THE COURT:  Very well.

14    Do we have redirect?

15        MR. LEARY:  Briefly, Your Honor.

16        THE COURT:  Let me ask one question while Mr. Leary

17  is coming up.  Two or three times you've talked about these

18  conversations with the defendant Mr. Owens, and you said you

19  were discussing family business.  What are you talking about?

20        THE WITNESS:  The -- that is the day-to-day

21  happenings with the Aryan Brotherhood as far as what's going

22  on.

23        THE COURT:  Very well.

24    You may proceed, Mr. Leary.

25        MR. LEARY:  Thank you, Your Honor.

1                         REDIRECT EXAMINATION

2   BY MR. LEARY:

3   Q.    Mr. Parker, we talked about two meetings that you had with

4   Frankie Owens.  When was the first one?

5   A.    The first one was right after I come home, a week or so

6   afterwards; that's when him and Mitchell came by the house that

7   night.

8   Q.    Okay.  And who called to set up that meeting?

9   A.    Frankie called me on -- they were on their way through.

10  You know, Frankie called me, wanted to know if he could come

11  over.  I said, "Yeah, come on."

12  Q.    Okay.  Physically, where did that meeting take place?

13  A.    That was at my house in my front yard.

14  Q.    Okay.  And what time?

15  A.    It was in the middle of the night, about nine-thirty or

16  ten o'clock.

17  Q.    Okay.  And when was the second meeting?

18  A.    The second one was when they -- Frankie called me and had

19  the recording on his phone and wanted to come by.  That's when

20  him and -- it was -- I don't know -- a little while later, you

21  know.  I couldn't put the exact day on that and time.

22        But, I mean, it was a few weeks, months later; he had that

23  recording where an investigator had called him, you know.  And

24  then there was another one after that we ain't talked about,

25  but ain't nobody asked me, so --

```
 1              MR. SUMRALL:  Objection, Your Honor.  This was not

 2   gone into, a third meeting.

 3              MR. LEARY:  Okay.

 4   BY MR. LEARY:

 5   Q.   Mr. Parker, did you agree to talk to law enforcement

 6   voluntarily?

 7   A.   Yes, sir.

 8   Q.   Did you have a lawyer present when you agreed to talk with

 9   them?

10   A.   No, sir.

11   Q.   What did law enforcement tell you; that if you came clean

12   and told us everything you knew, were we going to prosecute you

13   for what you confessed to?

14   A.   That's exactly right.  Told me I wouldn't be held

15   accountable for anything I said -- wouldn't be charged for

16   anything I told y'all here.

17   Q.   Did you come clean?

18   A.   Yes, sir.

19   Q.   Did you get out of jail after the Hudson incident?

20   A.   Yes, sir.

21   Q.   Is your life in danger right now?

22   A.   Well, I mean, I don't -- you know, do I feel it on me

23   right this minute?  No.  But is it --

24              MR. SUMRALL:  Your Honor, I object.  It's not proper

25   redirect; it was not gone into on cross.
```

1          THE COURT:  I disagree.  You may ask that question.

2          THE WITNESS:  Do I -- yeah.  Well, heck, yeah.  I'm

3  sitting here testifying against them.  Yes.  Of course, it's

4  going to --

5  BY MR. LEARY:

6  Q.    Why didn't you take witness protection?

7  A.    Why didn't I?

8  Q.    Yeah.

9  A.    Because my daddy's dying of cancer.  And, you know, if I

10  get got before the old man dies, then I'm just going to have to

11  get got.  I'm not going to turn my back on my daddy.

12          MR. LEARY:  Thank you, Your Honor.  No further

13  questions.

14          THE COURT:  Very well.  Mr. Parker, you're fully and

15  finally discharged.  You may go.

16          THE WITNESS:  Thank you, sir.

17          THE COURT:  Call your next witness.

18          MS. PEARSON:  Your Honor, the Government would call

19  Jo Kalyn Henderson.

20          THE COURT:  Very well.

21      (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

22          THE COURTROOM DEPUTY:  Please take a seat in the

23  witness stand, then state your name for the record.

24          THE WITNESS:  My name's Jo Kalyn Henderson.

25          THE COURT:  Just speak a little louder, please,

1  ma'am.

2              THE WITNESS:  I'm sorry.  Jo Kalyn Henderson.

3         JO KALYN HENDERSON, GOVERNMENT'S WITNESS, SWORN

4                    DIRECT EXAMINATION

5  BY MS. PEARSON:

6  Q.   Do you need to move that mike up a little bit?  There you

7  go.  Go ahead and spell your first name for the court reporter.

8  A.   J-o.

9  Q.   And then your middle?

10  A.   K-a-l-y-n.

11  Q.   Thank you.  How old are you, Ms. Henderson?

12  A.   I'm 33.

13  Q.   And did you -- do you still live in Mississippi right now?

14  A.   No, ma'am.

15  Q.   You have an occupation?

16  A.   Yes, ma'am.

17  Q.   What do you do?

18  A.   I'm a clinic administrator for a medical spa.

19  Q.   Now, do you have any sort of criminal record, any felony

20  convictions, ma'am?

21  A.   No, ma'am.

22  Q.   Okay.  In your past, not currently, did you have some sort

23  of drug addiction?

24  A.   Yes, ma'am.

25  Q.   Okay.  What was it?

HENDERSON - DIRECT

1    A.    I was addicted to crystal meth for five or so years.

2    Q.    And can you tell the jury when you had that addiction?

3    A.    Probably back from 2008 to 2011.

4    Q.    Thereabouts?  Okay.  Were you able to come clean off

5    methamphetamine?

6    A.    Yes.

7    Q.    Okay.  How long have you been clean?

8    A.    I've been clean for 4 years.

9    Q.    Okay.  And how long have you maintained your current

10   occupation?

11   A.    For 2½ years.

12   Q.    I'm going to take you back to 2008 and 2009, 2010.  Where

13   did you live during that period of time?

14   A.    I lived in Petal, Mississippi.

15   Q.    Okay.  And I'm going to toss some names out to you.  Did

16   you have an occasion to meet someone by the name of Brandon

17   Creel?

18   A.    Yes.

19   Q.    And do you recall approximately what month or what year

20   you met him?

21   A.    I'm not sure of the month, but probably 2009 when I was

22   working at -- I was bartending at a bar called "The Grill."

23   Q.    Okay.  And did you meet him at that bar or through some

24   other means?

25   A.    I met him at that bar.

1  Q.   And did you establish some sort of relationship with him?

2  A.   Yes.

3  Q.   How would you characterize that relationship?

4  A.   At first, we were friends.  And then, eventually, it

5  became romantic.

6  Q.   Okay.  And how long do you think you had a romantic

7  relationship with Mr. Creel?

8  A.   On and off for 2 years.

9  Q.   What, if any, gang affiliation were you aware of that

10  Mr. Creel had?

11  A.   He was part of the Aryan Brotherhood.

12  Q.   Okay.  And did you know what that meant?  Did you know

13  what type of gang that was when you were dating Mr. Creel?

14  A.   Generally, not -- I didn't know too much about it.  I just

15  knew I had heard of it.

16  Q.   Okay.  Did you have an occasion to meet other members of

17  that very same gang?

18  A.   Yes.

19  Q.   Okay.  Did you have an occasion to meet an Eric Parker?

20  A.   Yes.

21  Q.   And how did you meet Eric Parker?

22  A.   I was bartending at a bar in Petal called the 42 Club, and

23  he -- that's where I met him at.  He was one of the customers.

24  Q.   And do you recall approximately what year and what month

25  you met Eric Parker?

1  A.    I'm not positive of the time, but probably 2000 -- early

2  2010.

3  Q.    Okay.  And what, if any, relationship did Eric Parker have

4  to Brandon Creel?

5  A.    They were -- they were friends.

6  Q.    Now, at the time -- at the point in time you met Eric

7  Parker, were you still dating Brandon Creel?

8  A.    No, ma'am.

9  Q.    Okay.  Did there come a point in time where you started

10  dating Eric Parker?

11  A.    Yes, ma'am.

12  Q.    Okay.  And do you recall -- can you give the jury just an

13  approximation of when that was?

14  A.    It was shortly after we met, so probably the beginning of

15  2010.

16  Q.    And the person I had referred to as Eric Parker, do you

17  see that person in the courtroom?

18  A.    Yes.

19  Q.    Okay.  Can you just tell the jury and the Court what he's

20  wearing today?

21  A.    A blue and white striped shirt.

22         MS. PEARSON:  Your Honor, if the record could reflect

23  that the witness has identified Eric Parker?

24         THE COURT:  Where is he seated over here, please,

25  ma'am?

HENDERSON - DIRECT

1           THE WITNESS:  Right there.  The fourth down from the

2  left side.

3           THE COURT:  Fourth down at this table?  Okay.  The

4  record will reflect she's identified Mr. Parker.

5  BY MS. PEARSON:

6  Q.    Now, you said you started dating Eric Parker in early

7  2010.  Did there come a point in time where y'all moved in

8  together?

9  A.    Yes, ma'am.

10  Q.    Did that happen months, weeks, days from the point in time

11  you started dating?

12  A.    It was just maybe a week or a couple of weeks whenever we

13  started dating, so it was very quickly.

14  Q.    Okay.  And, if you can, just speak up a little bit.

15  A.    It was very quickly.  It was within a week or two of when

16  we first met and started dating.

17  Q.    So, when I say you moved in together, where did y'all move

18  to; or where did you move to?

19  A.    I moved into a trailer that was his on Batson Road in

20  Petal, Mississippi.

21  Q.    And you said Batson Road?

22  A.    Uh-huh.

23  Q.    And can you just tell the jury were there any other

24  structures on that land or just the trailer?

25  A.    Yes.  His parents' house was on the land; or his trailer

1  was on his parents' land, along with his mother's house.

2  Q.   And in the -- and his mother's house, was that occupied?

3  Did his parents live there?

4  A.   Yes.

5  Q.   And you had occasion to meet them on several occasions?

6  A.   Yes.

7  Q.   Now, you call it a trailer.  Can you just tell the jury

8  kind of what this thing looked like that y'all lived in?

9  A.   It was a camper trailer, an RV; or -- I guess not an RV.

10 It could be -- it had to be attached to something to move it,

11 so I guess it would be a camper trailer.

12 Q.   Okay.

13         MS. PEARSON:  Your Honor, may I just approach our

14 exhibits real quick?

15         THE COURT:  Yeah.

16         MS. PEARSON:  Your Honor, may I approach the witness,

17 please?

18         THE COURT:  Yes, ma'am.

19 BY MS. PEARSON:

20 Q.   I'm going to show you what's been marked as Government's

21 Exhibit 46 and ask you if you can recognize anything in that

22 photograph?  You can take it if you need it.

23 A.   Yes.

24 Q.   Okay.  What do you recognize?

25 A.   The trailer that we lived in.

1 Q.    And, when you say the trailer that you lived in, are you

2 talking about the camper/RV that you and Mr. Parker lived in?

3 A.    Yes, ma'am.

4 Q.    Now, other than you and Mr. Parker, did anyone else live

5 in that trailer?

6 A.    Yes.

7 Q.    Who else lived there?

8 A.    Michael Thrasher.

9 Q.    And, when you say he lived there, did he spend every night

10 there, every other night?

11 A.    Not every night.  It was every other night.  But he stayed

12 there a lot.

13 Q.    Did he have any other names that were -- or a nickname, I

14 guess is what I'm asking you?

15 A.    Yes.  They called him "Zero."

16 Q.    Now, what, if any, gang was Eric Parker a member of?

17 A.    The Aryan Brotherhood.

18 Q.    Okay.  How did you know that?

19 A.    Because he made it obvious and the tattoos, of course, and

20 who he hung around.

21 Q.    Okay.  Let me ask you first about the tattoos.  What, if

22 any, tattoos did Eric Parker have that made it known he was

23 part of that gang?

24 A.    He had the lightening bolts on his neck.

25 Q.    Okay.  Do you recall which side of his neck or --

1  A.    I believe -- I believe it was this side, the left side.

2  Q.    Okay.  And what, if any, other tattoos did he have?

3  A.    He had a swastika.

4  Q.    Okay.  Anything else?

5  A.    I mean, he had some other tattoos.  One that looks like

6  a -- like an A, and it's got some numbers around it.  I'm not

7  sure exactly what it's called.

8  Q.    Okay.  And the tattoos that you've just testified to, did

9  he have those back in 2010 when you-all were dating?

10  A.    Yes.

11  Q.    Okay.  What did he tell you about his membership?  Did he

12  tell you what role he had in the Aryan Brotherhood?

13  A.    He never really specifically told me what role he was;

14  but, from just hearing other people talk about it, he was --

15          MR. TURNER:  Object to the hearsay, Your Honor.

16          THE COURT:  Tell us what he told you, not what other

17  people said.

18  BY MS. PEARSON:

19  Q.    Yeah.  What did he tell you about what position he had in

20  the Aryan Brotherhood?

21  A.    He just said he was Creel's right-hand man, Brandon Creel.

22  Q.    The same Brandon Creel that you knew, correct?

23  A.    Yes.

24  Q.    What kind of demeanor did he have about his membership in

25  the gang?  Was he proud of it; was he say ashamed of it?  How

1  did he hold himself to you?

2          MR. SUMRALL:  Objection, Your Honor, calls for a

3  conclusion.

4          THE COURT:  You can tell us your observations; tell

5  us what you saw.

6  BY MS. PEARSON:

7  Q.    Yeah.  How did he hold himself up?  What did you observe

8  about how he felt about the gang?

9  A.    At first, he was proud of it, kind of, like, show-offy.

10 And then, later on, at times, he seemed ashamed of it, like he

11 was -- his emotions would be wishy-washy towards it.

12 Q.    And, if you could tell the jury, how -- how long,

13 approximately, did you live with Eric Parker; from that early

14 2010, how long did you live with him?

15 A.    Probably -- about 8 or 9 months.

16 Q.    And, before that period of time that you're talking about,

17 what, if any, methamphetamine trafficking did Eric Parker

18 engage in?  By trafficking, I mean drug dealing.

19 A.    Like, how much or --

20 Q.    No.  What, if any.  What, if any, drug dealing did Eric

21 Parker engage in?

22 A.    That's what he did, like, the whole time; that was the

23 occupation.

24 Q.    Okay.  Did he ever have any other kind of employment, like

25 a bartender or waiter or anything like that?

1  A.    He did after -- towards the end of the relationship, he

2  was a directional driller.

3  Q.    Okay.  But, before that, what, if any, legal employment

4  did he have?

5  A.    None that I was aware of -- I mean, that he had during the

6  time that we were together.

7  Q.    And can you approximate for the jury how much meth was

8  Eric Parker moving on a weekly or a monthly basis?

9           MR. TURNER:  Objection, Your Honor.  May we approach,

10  please?

11          THE COURT:  Yes, sir.

12  (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

13          MR. TURNER:  Your Honor, there's no overt acts

14  specifically listed in the indictment that refer to this line

15  of questioning.  There's no -- we -- I don't have any discovery

16  as it pertains to amounts of meth.  I don't have any forensic

17  reports.  This is all just speculation on her behalf.  There's

18  no proof that it's even methamphetamine.

19          MS. PEARSON:  Your Honor, I would submit that I think

20  it's overt act B of the superseding indictment; but I would

21  have to look.  It's in the first five overt acts.

22          THE COURT:  All right.  I know that meth dealing --

23  but I don't know the specific date.  I'm going to permit the

24  question and -- but she would have no way of knowing how much.

25  I mean, would she, the weight?

1          MR. TURNER:  I haven't been given any proof in

2    discovery that would suggest that she does.

3          THE COURT:  Yeah.  Why don't we go with how many

4    transactions did she observe.

5          MS. PEARSON:  Your Honor, may I be heard on that just

6    briefly?  I think I can lay a certainly appropriate foundation

7    for that.  As to discovery, it's specifically in our Jencks

8    production.  Perhaps earlier, we turned over statements

9    associated with this witness's statements associated with

10   Brandon Creel that articulated those weights.  But I could

11   certainly try to lay a more appropriate foundation for how she

12   knew it was meth, what she specifically observed him move --

13          THE COURT:  Okay.  I'll let her testify from personal

14   observations.

15        (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

16   BY MS. PEARSON:

17   Q.   Ms. Henderson, during that period of time you and Eric

18   Parker were dating, were you together almost every day, every

19   other day; how often were you together?

20   A.   Every day.

21          MR. TURNER:  Leading.

22          THE COURT:  Okay.

23   BY MS. PEARSON:

24   Q.   How often were y'all together?

25   A.   Every day.

1   Q.   And did there come a point in time where you had personal

2   observations of meth trafficking occurring in your camper?

3           MR. TURNER:  Object to the leading, Your Honor.

4           MS. PEARSON:  Yeah.

5   BY MS. PEARSON:

6   Q.   What, if anything, did you observe occur in your camper

7   after --

8           THE COURT:  Wait just a minute.  Rephrase your

9   question, please.

10  BY MS. PEARSON:

11  Q.   What, if anything, did you observe occur in your camper as

12  it relates to methamphetamine?

13  A.   There were small sales to multiple brother -- multiple

14  members of the brotherhood.

15  Q.   Okay.  Were you there, were you present, when those sales

16  occurred?

17  A.   I was.

18  Q.   Okay.  And, when you say "sales," what was being sold?

19  Who was selling and who was buying?

20  A.   Eric Parker would sell to others that would come over to

21  purchase methamphetamine.

22  Q.   All right.  And, if you could, just speak up for the jury.

23  A.   I'm sorry.  Eric Parker was the seller.

24  Q.   Okay.  And you said others.  You said the term *brothers*.

25  What did you mean by that?

1  A.    Members of the Aryan Brotherhood, other members.

2  Q.    Okay.  And the meth -- was it methamphetamine or some

3  other drug?

4  A.    It was methamphetamine.

5         MR. TURNER:  Object to leading.

6         THE COURT:  She said what?  Yeah.  Don't -- just ask

7  what was they selling.

8  BY MS. PEARSON:

9  Q.    What was he selling?

10 A.    Methamphetamine.

11 Q.    Okay.  Were you one of his -- I don't want to call you

12 customer.  What, if any, use did you partake in with

13 methamphetamine?  Did you use any of it?

14 A.    I used it every day.

15 Q.    Okay.  If you can, approximate, either per week or per

16 month, how much methamphetamine did you observe Eric Parker

17 deal in?

18         MR. TURNER:  Objection, Your Honor.

19         THE COURT:  Okay.  Overruled.

20 BY MS. PEARSON:

21 Q.    Yeah.  How much methamphetamine did you observe Eric

22 Parker deal in if you can approximate in a week, in a month?

23 A.    It would vary, sometimes maybe 2 to 3 ounces a week;

24 sometimes less.  It just depended on how much money he had at

25 the time to purchase more.

HENDERSON - DIRECT                                    838

1  Q.    And was that methamphetamine dealing sporadic, or was it

2  continuous?

3  A.    Continuous.

4  Q.    I want to bring you to a different time period,

5  December 2010.  Was there an incident that you became aware of

6  that occurred on that property?

7  A.    Yes.

8  Q.    And do you recall the period of time or the days that I'm

9  speaking of?

10  A.    Not the actual days, but, yes, I do remember.

11  Q.    What about the actual incident or series of events; do you

12  recall those pretty clearly?

13  A.    Oh, yes.

14  Q.    I'm going to take you back to the first part of this

15  incident.  Do you recall what you were doing and where you

16  were?

17  A.    Yes.  I was on my way back from Wal-Mart, or we were.

18  Q.    Okay.  And, when you say we, who are you talking about?

19  A.    Me and Eric Parker and Zero.

20  Q.    And when you say you were on your way to Wal-Mart or on

21  your way back to Wal-Mart -- which one was it?

22  A.    On the way back, I believe.

23  Q.    Okay.  And were y'all driving?

24  A.    Yes.  I was driving.

25  Q.    And what happened during that trip back?  When you say

1   "back," where were you going?

2   A.    Back to the camper.

3   Q.    What, if anything, happened that made you realize your day

4   was going to change?

5   A.    He -- Eric Parker received a phone call from one of the --

6   one of his brothers.

7   Q.    Okay.  And were you present when he received his phone

8   call?

9   A.    Yes.

10  Q.    Could you hear what the person on the phone was saying, or

11  could you only hear Eric Parker's side?

12  A.    I could only hear Eric Parker's side.  I could not hear

13  what the other person was saying.

14  Q.    Was it a long or a quick phone call?

15  A.    It was a quick phone call.

16  Q.    What, if anything, did you hear Eric Parker say during

17  that phone call?

18  A.    I just heard him say "Okay."  It was very short.  He

19  didn't really get into any conversation.  He just said "Okay.

20  See you there," something along those lines.  I'm not, you

21  know, too sure of exactly what was said.

22  Q.    Okay.  What's the very next thing that happened once that

23  phone call ended?

24  A.    I asked him what that was about, and he told me that it

25  was Frank Owens; and that he was going to meet him at our

1 trailer. And I got upset about that.

2 Q.    Okay. Well, let me ask you this, were you expecting Eric

3 to have to meet Frank that day at your trailer?

4 A.    No.

5 Q.    Did you know who Frank Owens was?

6 A.    Yes.

7 Q.    Had you met that person before?

8 A.    Yes.

9 Q.    Okay. Had you met him several times before?

10 A.    A few times.

11 Q.    A few times. Okay. Do you see that person in the

12 courtroom?

13 A.    Yes.

14 Q.    Okay. Can you point him out and tell the Judge and the

15 court what he's wearing?

16 A.    He's at the end wearing a blue shirt, blue striped shirt.

17 Q.    When you say "at the end," to the left of the table or the

18 far right?

19 A.    To the left.

20         MS. PEARSON: Your Honor, if the record could reflect

21 the witness has identified Mr. Owens as the person she's

22 speaking of?

23         THE COURT: It'll so reflect.

24 BY MS. PEARSON:

25 Q.    Okay. So you get upset. And what, if anything, do you

1   say to Eric Parker about Frank Owens being at your trailer?

2   A.    I just -- I didn't want to deal with any kind of activity

3   they were going to be participating in.   Which, I didn't know

4   what it would be; but I just was tired of all the brothers

5   being around.   And I just wanted to kind of get somewhat of a

6   normal life.   So that's what I was upset about.

7   Q.    Did you express that to Eric Parker?

8   A.    Yes.

9   Q.    And what did he say when you told him that you were upset;

10  what did he say to you?

11  A.    He had just -- right before the phone call, he had said he

12  wanted to get out of the brotherhood; and he was ready to just

13  lead a normal life and -- like, right before he got the phone

14  call.   And then, so, he just said that he had to take care of

15  whatever, you know, Frankie wanted.

16  Q.    Okay.   And what did you say once Eric Parker told you he

17  had to take care of whatever Frankie wanted him to do; what did

18  you say?

19  A.    I said, "Well, I'm going to go home to my parents' house,"

20  which is back in Laurel, Mississippi, because I wasn't dealing

21  with it.   I was fed up with him.

22  Q.    And did y'all indeed drive back to your trailer?

23  A.    We did.

24  Q.    Did you go in the trailer?

25  A.    I wasn't allowed in the trailer.   I wasn't even allowed to

1  pull up in the driveway.

2  Q.    Who didn't allow you to go into the trailer or even the

3  driveway to it?

4  A.    Eric Parker.

5  Q.    What did you tell him once he said you weren't allowed to

6  go in there?

7  A.    I said, "I'm not allowed to go into my own home?"  I said,

8  "Well, just bring me a bag of my clothes; and I will leave."

9  Q.    What, if anything, did he agree to do once you asked that?

10  A.    He said he would, and he had me pull up in the driveway

11  next to the camper, like another person's driveway.

12  Q.    Could you see the camper from that other driveway?

13  A.    I could -- I could kind of see it, but it was dark.  And

14  it was through a few trees, so I didn't have a very clear

15  picture.

16  Q.    When you say "it was dark," was it twilight; or was it

17  actually absolutely dark?

18  A.    It was -- I would say twilight; I would say.

19  Q.    Okay.  So what's the very next thing that happens, once

20  you ask for your clothes; and you're not allowed to go in that

21  camper?

22  A.    He brought me my -- a bag of my clothes, and I left and

23  went to Laurel to my parents' house.

24  Q.    And when you say "he," who brought you that bag of

25  clothes?

1  A.    Eric Parker.

2  Q.    What happened to -- you referenced Zero being in your car.

3  What happened to him; where did he go?

4  A.    I'm actually not sure where he went.  I know that he

5  wasn't allowed over there either, but I'm not sure where he had

6  went during that time.

7  Q.    And I'm sorry; I missed the last part.  Where did you go

8  once you had your bag of clothes?

9  A.    I went to my parents' house in Laurel, Mississippi.

10  Q.    How far away is that from the camper?

11  A.    Thirty minutes at least.

12  Q.    And did you drive yourself, or did someone else drive you?

13  A.    I drove myself.

14  Q.    Once Eric brought you your bag of clothes, did you see

15  where he went next; or did you not see?

16  A.    He went back over to the camper.

17  Q.    And that evening, did you have an occasion to return to

18  the camper?

19  A.    I -- me?

20  Q.    Yes.  You.

21  A.    I didn't that evening.  I did the next morning.

22  Q.    Where did you spend the night?

23  A.    At my parents' home.

24  Q.    And did there ever come a point in time that morning where

25  you heard from Eric Parker or anyone?

HENDERSON - DIRECT

1  A.    He called me, I want to say, around 5 or 6; I'm not

2  positive on the time -- but I know it was in the morning -- and

3  told me that I could come back home -- or wanted me to come

4  back home.

5  Q.    When you say 5 or 6, you're talking about a.m., correct?

6  A.    Yes, ma'am.

7  Q.    And, when Eric called you, were you asleep or awake?

8  A.    I was sleeping.

9  Q.    What did you do once you received that phone call?

10  A.    I got my stuff together, and I drove back to the camper.

11  Q.    And, when you got to the camper that very next morning,

12  did you go inside?

13  A.    Yes, ma'am.

14  Q.    Who, if anyone, was there?

15  A.    It was just Zero there.

16  Q.    What, if anything, was he doing?

17  A.    He was scrubbing the floor.

18  Q.    What, if anything, did you observe about how the camper

19  had changed, if anything?

20  A.    It was just very clean.  It smelled like bleach.

21  Q.    The day before that morning, was that bleach smell there?

22  A.    No, ma'am.

23  Q.    And the day before that clean appearance that you noticed,

24  what did the camper look like the day before when you last saw

25  it?

HENDERSON - DIRECT

1  A.    It wasn't filthy, but it wasn't clean like that at all.

2  It looked like it had been cleaned from top to bottom.

3  Q.    When you say top to bottom, if you could, just tell the

4  jury what do you mean by that?

5  A.    Just, I guess, everything had been cleaned.  Usually --

6  like, a full clean.  I'm not sure exactly, just --

7  Q.    Well, let me ask you this; how big was that camper?  How

8  many rooms did it have?

9  A.    It had two rooms and a bathroom.

10  Q.    Okay.  Were one of those rooms a bedroom?

11  A.    Yes.

12  Q.    Okay.  And what was the other room?

13  A.    Just the -- it was, like, the living quarters, I guess.

14  It was the little kitchen/living room.

15  Q.    And, with respect to the bathroom, the bedroom, and the

16  living area, had those all been cleaned; or had they not been

17  cleaned?

18  A.    Just the front room.  The bedroom was left untouched.  And

19  the bathroom and the front room had been cleaned.

20  Q.    Both the bathroom and the front room?

21  A.    Yes, ma'am.

22  Q.    And, at this point in time, what's the very next thing

23  that you did once you walk into that camper and you see Zero

24  cleaning it?  What's the very next thing you do?

25  A.    I asked him what happened, and he just shook his head at

1  me.

2          MR. SUMRALL:  Object to what Zero told her, Your

3  Honor; that's hearsay.

4          THE COURT:  She said he said nothing; he just shook

5  his head.

6  BY MS. PEARSON:

7  Q.   What's the very next thing you did?

8  A.   I went to the bedroom and went back to sleep.

9  Q.   And did there come a point in time where you were

10 awakened?

11 A.   Yes, ma'am.

12 Q.   And who woke you up or what woke you up?

13 A.   Eric Parker.

14 Q.   Was he with anyone?

15 A.   He was with Frank Owens.

16 Q.   And I want you to tell the jury and the Court what did

17 their appearance look like?  What did they look like?

18 A.   They had not slept all night.  They -- kind of white, just

19 like pale, and didn't say too much, nervous.

20 Q.   And was that different than when you've saw Eric Parker

21 last?  Was that a different appearance for Eric?

22 A.   Yes.

23 Q.   Now, when you see the two of them, what, if anything, do

24 you ask them about the evening before?

25 A.   I did not ask anything.

HENDERSON - DIRECT

1  Q.   Okay.  Why didn't you ask them anything?

2  A.   Because I -- it wasn't my business to ask, and I was kind

3  of afraid to ask.

4  Q.   What happens next?

5  A.   They -- they asked me -- they said we needed to go get a

6  carpet cleaner, and that they needed me to drive them and to

7  rent the carpet cleaner.

8  Q.   When you say they asked you, was it Frank Owens asked you

9  or Eric Parker?

10 A.   Eric Parker.

11 Q.   Do you agree to go with them?

12 A.   Yes.

13 Q.   Okay.  Where do y'all go?

14 A.   To the Food Tiger, I believe.  It was a grocery store in

15 town.

16 Q.   And who drove?

17 A.   I drove.

18 Q.   Did Zero accompany you-all, or was it just the three of

19 you?

20 A.   Just the three of us.

21 Q.   And, once you get there, what, if anything, does either

22 Frank Owens or Eric Parker ask you to do, once you get to the

23 Food Tiger or the grocery store?

24 A.   He told me I needed to rent a carpet cleaner.

25 Q.   Did you in fact do that?

HENDERSON - DIRECT

1  A.  Yes.

2  Q.  Did you pay for it?

3  A.  They paid for it.

4  Q.  Do you recall who gave you money for that?

5  A.  I believe Eric.

6  Q.  Okay.  Once you got the carpet cleaner, what was the very

7  next thing that happened?

8  A.  I'm not too sure, but I believe we just drove back to the

9  camper.

10  Q.  Now, during that time to the grocery store and back from

11  the grocery store, what, if any, conversation are you having

12  with either Eric Parker or Frank Owens?

13  A.  None.

14  Q.  Was it a silent car ride?

15  A.  Yes.

16  Q.  When you get back to the camper, what's the very next

17  thing that happens?

18  A.  I'm -- it's very fuzzy for me at that point.  I believe

19  that Frank Owens left shortly after that.  I don't -- I'm not

20  sure exactly what was done as soon as we got back.  But I know

21  that Frank left very shortly afterwards.

22  Q.  Okay.  What about that -- what was the carpet cleaner

23  called?  Did it have a name or just a carpet cleaner?

24  A.  I'm not sure.

25  Q.  What about the carpet cleaner, what, if any, use was made

1  of that?

2  A.    I believe Eric used -- Eric Parker used it on the carpet.

3  Q.    Did you use it?

4  A.    No, ma'am.

5  Q.    Okay.  And, when y'all returned, was Zero still at the

6  camper; or was he gone?

7  A.    I am not too sure.  I believe he was still at the camper.

8  Q.    Now, did there come a point in time where you learned what

9  happened that evening when you were not allowed in?

10          MR. TURNER:  Object to leading, Your Honor.

11          THE COURT:  Well, she's got to ask the question

12  somehow.  What did you learn?

13  BY MS. PEARSON:

14  Q.    What did you learn about that evening?

15  A.    What?

16  Q.    What did you learn about that evening in the future?

17  Maybe not that morning, but what did you learn about that

18  evening?

19  A.    I learned that a man was -- was killed.

20          THE COURT:  Let's -- I'm concerned whether the

21  information came from these defendants, or how did you learn

22  it?  Let's stay away from hearsay statements.

23          MS. PEARSON:  Yeah.  That would be my next question

24  I'll ask her.

25          THE COURT:  Okay.

1  BY MS. PEARSON:

2  Q.    How did you learn that?

3  A.    Eric Parker told me.

4  Q.    And, from that evening, can you estimate -- or can you

5  tell the jury and the Court how many days or weeks later you

6  learned what happened in that camper?

7  A.    I'm not sure of the day or -- I know it was within the

8  week or two, within a week or two.

9  Q.    Okay.  How did you learn it?  How did Eric Parker tell you

10  what happened in that camper?

11  A.    We were asleep one night, and he woke up because he was

12  having nightmares.  He woke up screaming and sweating and just

13  really upset, and he just -- he blurted it out, said that he

14  killed someone.

15  Q.    Let me ask you this, the night that he told you he killed

16  someone, was that the first time he had nightmares or the

17  second time, third time?

18          THE COURT:  Okay.  Objection to leading is sustained.

19          MR. TURNER:  Thank you, Your Honor.

20  BY MS. PEARSON:

21  Q.    How many nights did he have nightmares?

22  A.    A good three weeks, off and on.  Whenever he slept, he

23  would have nightmares, usually.

24  Q.    This time, when he woke up and he told you this, what did

25  you say to him once he said he killed someone; what, if

1   anything, did you say?

2   A.    I asked him why.

3   Q.    And what, if anything, did he tell you?

4   A.    He told me if he didn't then he would be killed.  If he

5   had not done it, then they would have killed him.

6   Q.    What, if anything, did he tell you about who "they" was?

7   A.    He said Frank Owens.

8   Q.    Okay.  What, if anything, did Eric tell you about how this

9   person was killed?

10  A.    He said that he strangled him until he started bleeding

11  out of his eyes, nose, ears, and mouth.

12  Q.    And what, if anything, did he tell you about if anyone

13  else had been involved in the killing of this individual?

14  A.    He said that the guy was already halfway dead because he

15  had been hit over the head with a baseball bat.

16  Q.    And, when Eric Parker told you he was already halfway dead

17  with the baseball bat, what, if anything, did he tell you about

18  who had done that to this individual that had died?

19  A.    He said Frank Owens.

20  Q.    While Eric Parker is telling you these details, what are

21  you doing or saying to him?

22  A.    I was -- I was in shock.  And, so, I didn't say much,

23  except for that it would be okay, because I was trying to

24  figure out how to even process the information and not to set

25  him off or cause any -- I really didn't know what to think,

HENDERSON - DIRECT

1    honestly.  So I just told him it would be okay and tried to

2    pacify him at the time until I could figure out what I needed

3    to do.

4    Q.    Now, did you-all go to sleep after this incident, after

5    this conversation?

6    A.    I don't recall.

7    Q.    Let me ask you this, did the relationship continue after

8    you learned this?

9    A.    Yes.

10   Q.    Okay.  Why didn't you leave?

11   A.    First of all, he wasn't -- or I did try to leave him on

12   multiple occasions, but he would flatten my tires; or he would,

13   like, take a part out of my engine where I couldn't leave.  He

14   kept me there and would not allow me to leave, always find some

15   way to keep me there.  As well as I was scared almost to leave

16   and not know what would happen to me or -- you know.

17   Q.    Well, why didn't you -- why didn't you call the police and

18   tell them what you had learned?

19   A.    Because I was scared for me and my family.

20   Q.    Why were you scared?  What, if anything, did Eric Parker

21   tell you about telling anyone?

22   A.    He said that -- that he would tell the rest of the

23   brotherhood that I knew, and that they would come after me and

24   my family.

25   Q.    Okay.  And the brotherhood, what was that?  What's the

1  name of that?

2  A.    The Aryan Brotherhood.

3  Q.    Now, did there -- at what point in time after that did

4  Eric Parker make any of these same statements to anyone else in

5  your presence?

6           MR. TURNER:  Object to the leading, Your Honor.

7           THE COURT:  What point in time.  The objection will

8  be overruled.  You may answer that, please, ma'am.

9  BY MS. PEARSON:

10 Q.    What point in time did Eric Parker make statements about

11 this to someone else in your presence?

12          MR. TURNER:  Same objection.

13          THE COURT:  Okay.  Did you discuss this matter later?

14          THE WITNESS:  With?  With someone else?

15          THE COURT:  With Eric Parker.

16          THE WITNESS:  Oh.  Yes.

17          THE COURT:  Okay.  What did he tell you?

18          THE WITNESS:  Not exactly like what happened; but, I

19 mean, he would threaten me with it all the time, like, almost

20 every day.  He would use it to threaten me at least once a day,

21 maybe twice.

22 BY MS. PEARSON:

23 Q.    Okay.  At some point in time, did you end the

24 relationship?

25 A.    Yes.

1  Q.    Okay.  And can you just approximate for the jury either if

2  it was months after these nightmares, weeks, days, whatever?

3  A.    I don't recall the time period.  Maybe two months or so

4  afterwards, if I had to guess.

5  Q.    And, once you ended it, the relationship with Eric Parker,

6  did you ever reinitiate that relationship ever?

7  A.    Yes.

8  Q.    And, then, can you approximate for the jury when you ended

9  things for good with Eric Parker, either a year or a date,

10  anything?

11  A.    I'm not sure of the time at all, maybe 3 or 4 months after

12  that because -- I guess we kind of talked off and on, but we

13  never moved in together -- we never lived together again.

14  Q.    And, since that period of time, have you had any contact

15  with Eric Parker?

16  A.    No, not at all.

17        MS. PEARSON:  Your Honor, may I have one moment with

18  my counsel?

19        THE COURT:  Yes, ma'am.

20        MS. PEARSON:  Thank you.

21  BY MS. PEARSON:

22  Q.    During the entire period of time that we've discussed that

23  you were with Eric Parker, were you addicted to meth,

24  methamphetamine?

25  A.    Yes.

1  Q.   And, when you went back to him after these incidents, were

2  you addicted to methamphetamine?

3  A.   Yes.

4           MS. PEARSON:  That's all the questions I have, Your

5  Honor.

6           THE COURT:  Okay.  Ladies and gentlemen of the jury,

7  we'll take a recess now for -- let's say 15 minutes.  And

8  remember my earlier instructions, do not discuss the case among

9  yourselves; do not permit anyone to discuss it with you.  The

10 jury's excused for 15 minutes.

11        (JURY OUT AT 10:56 a.m.)

12           THE COURT:  Let me ask a question, does that give you

13 enough time?  I want everybody to be able to go to the

14 restroom.  Let's make it 20 minutes.

15        (JURY OUT AT 10:56 a.m.)

16           THE COURT:  Okay.  Court's in recess for 20 minutes.

17 (Recess at 10:56 a.m. until 11:17 a.m.)

18        (JURY IN AT 11:17 a.m.)

19        (CALL TO ORDER OF THE COURT)

20           THE COURT:  Let's see.  Mr. Sumrall, you may

21 cross-examine this witness on behalf of your client.

22           MR. SUMRALL:  Thank you, Your Honor.

23                          CROSS-EXAMINATION

24 BY MR. SUMRALL:

25 Q.   Ms. Henderson, good morning.

1  A.    Morning.

2  Q.    I believe you told this jury that you started using meth

3  about 2008; is that correct?

4  A.    Yes, sir.

5  Q.    And you were a very heavy user; were you not?

6  A.    Yes, sir.

7  Q.    Daily?

8  A.    Yes, sir.

9  Q.    And I believe you said, in 2009, you met Brandon Creel?

10  A.    Yes, sir.

11  Q.    Had a relationship with Mr. Creel; is that correct?

12  A.    Yes, sir.

13  Q.    Now, he was an Aryan Brotherhood member, wasn't he?

14  A.    Yes, sir.

15  Q.    And you knew that, didn't you?

16  A.    Yes, sir.

17  Q.    And it was a steady source of methamphetamine for you; was

18  it not?

19  A.    Yes, sir.

20  Q.    And then I think you said, after about 2 years, you broke

21  up with Mr. Creel, correct?

22  A.    Yes, sir.

23  Q.    And then started dating Eric Parker, right?

24  A.    Yes, sir.

25  Q.    But you didn't meet him until after you had broken up with

HENDERSON - CROSS BY SUMRALL

1  Mr. Creel?

2  A.   Yes, sir.

3  Q.   The fact of the matter is, you said he was his right-hand

4  man; so you really knew Eric Parker prior to that, didn't you?

5  A.   Brandon Creel kept me out of all of his business.

6  Q.   Okay.  But you knew he was an Aryan Brotherhood member?

7  A.   I had heard of him, yes.

8  Q.   Okay.  And, so, when you stopped dating Mr. Creel, I guess

9  he stopped supplying you with methamphetamine?

10  A.   Yes.

11  Q.   So you were looking for another source?

12  A.   I had multiple sources.

13  Q.   Okay.  But then you found Eric Parker; and that was

14  another source, wasn't it?

15  A.   Yes.

16  Q.   And he kept you in methamphetamine the whole time that

17  y'all were together; is that correct?

18  A.   Yes.

19  Q.   Now, you said you used daily.  How much did you use daily?

20  A.   Probably around 3½ grams.

21  Q.   Okay.  That's an awful lot, isn't it?

22  A.   Uh-huh.

23  Q.   So you would classify yourself as a very heavy user?

24  A.   Yes.

25  Q.   Okay.  Did this affect the way you thought and the way you

1  remember things?

2  A.    No.

3  Q.    It does not.  Okay.  Now, you told this jury that on the

4  night in December when you and Eric Parker and, I believe, Zero

5  were with you -- you called him -- were at Wal-Mart coming back

6  home; is that correct?

7  A.    Yes.

8  Q.    And Eric Parker received a phone call?

9  A.    Yes.

10 Q.    And I believe you said, at that time, that you didn't want

11 to be around any Aryan Brotherhood; so you didn't want to go

12 back to the trailer.  Is that right?

13 A.    I wasn't saying I did not want to go back to the trailer;

14 I just didn't want any of their business to interfere with our

15 night of going home and making dinner and going to sleep.

16 Q.    So you never did go back to the trailer that night,

17 correct?

18 A.    No, sir.  I did not go back to the trailer.

19 Q.    And I believe you said y'all pulled up at the adjoining

20 driveway; is that correct?

21 A.    Yes, sir.

22 Q.    And Eric Parker went and got your clothes and brought them

23 to you?

24 A.    Yes, sir.

25 Q.    And you left in your car; is that correct?

1  A.  Yes, sir.

2  Q.  So your car was no longer at the trailer, right?

3  A.  Yes, sir.

4  Q.  It was with you at your parents' house?

5  A.  Yes, sir.

6  Q.  Now, I believe you said, about five o'clock the next

7  morning, you got a phone call and went back to the trailer?

8  A.  Yes, sir.

9  Q.  And I believe you said Eric Parker was there?

10  A.  No.  He was not there.

11  Q.  He was not there.  Who was there?

12  A.  Just Zero.

13  Q.  Zero was there, and he was cleaning the carpet?

14  A.  Uh-huh.

15  Q.  And is that in that front room?

16  A.  Yes, sir.

17  Q.  Okay.  And how long was it after that that you say Frank

18  Owens and Eric Parker came back?

19  A.  I'm not -- the time is a little fuzzy because I went back

20  to sleep once I got there.  I honestly couldn't tell you

21  exactly the time.  Maybe a few hours later, a couple hours

22  later.

23  Q.  Okay.  Now, Zero cleaning your trailer was not unusual,

24  was it?

25  A.  It was fairly unusual, but I didn't ever really ask

1  questions.

2  Q.   Okay.  He claimed he did a lot of things for Eric Parker,

3  didn't he?

4  A.   Uh-huh.

5  Q.   He was kind of his go-to.  You do this; you do that; and

6  he did it?

7  A.   Yes.

8  Q.   Okay.  He did his laundry and stuff like that; did he not?

9  A.   Yes.

10  Q.   So it was not unusual for Zero to be in there.

11  A.   No, sir.

12  Q.   Now, I believe you said that Eric Parker and Frankie Owens

13  came back to your trailer?

14  A.   Yes.

15  Q.   Had you used crystal meth that morning?

16  A.   I'm sure I did.

17  Q.   Okay.  And did you use it that afternoon?

18  A.   I'm sure I did.  I don't recall exactly in the afternoon.

19  Q.   How long did you use it?

20  A.   I used it every day all day.

21  Q.   Okay.  How often -- you say daily.  More than once?

22  A.   All day, pretty much.

23  Q.   All day.

24  A.   Sorry, I don't really recall exactly when or what time I

25  used it; but it was all day every day.

HENDERSON - CROSS BY SUMRALL

1  Q.   Okay.  Now, you said that Frankie Owens and Eric Parker

2  came back; is that correct?

3  A.   Yes.

4  Q.   And then y'all went to a grocery store to get a carpet

5  cleaner?

6  A.   Yes.

7  Q.   And brought it back to clean the carpet, right?

8  A.   Yes.

9  Q.   The fact of the matter, there wasn't any carpet in the

10 front room, was there?

11 A.   Yes.

12 Q.   There was?  You're absolutely sure about that?

13 A.   There's half carpet, half, like, wood flooring.

14 Q.   Okay.  So there was no carpet that had been drug out of

15 there that had not been there the day before?

16 A.   I'm sorry?

17 Q.   The carpet in the front room, you're saying that it was

18 there when you got there that morning, correct?

19 A.   Yes.

20 Q.   It had not been drug out?

21 A.   No.

22 Q.   That's what you remember, correct?

23 A.   Yes.  Also, the stairs leading up to the bathroom and

24 bedroom, those had carpet as well.

25 Q.   Okay.  Carpet was there too?

1  A.    Uh-huh.

2  Q.    And Zero was cleaning the carpet?

3  A.    Yes.

4  Q.    Well, he wasn't cleaning it when you first got there, was

5  he?

6  A.    Yes.  As soon as I got there, I walked in; and he was

7  scrubbing the carpet with a scrub brush.

8  Q.    Oh.  And then you went and got the carpet cleaner?

9  A.    Yeah.  Once I got there, I walked in; and I saw Zero

10  scrubbing the carpet.  I asked him what happened.  He just

11  shook his head.  So I just went -- I went back to my room -- to

12  our room -- our bedroom, and I went to sleep.  And they woke me

13  up a couple of hours later, I believe.

14  Q.    Ms. Henderson, when the prosecution asked you to identify

15  Frankie Owens, you stood up; and you looked around the

16  courtroom.  And you had a hard time picking him out; did you

17  not?

18  A.    Yes, at first.

19  Q.    The truth of the matter is, you had never met Frankie

20  Owens prior to this time, had you?

21  A.    I had met Frankie before.

22  Q.    You had?  When?

23  A.    I met him over at Lori Myers' house before.  I mean, it

24  was only a few times.  And then I've met him at Brandon Creel's

25  house before.

1  Q.   Okay.  Matter of fact, he wasn't even there that next

2  morning, was he?

3  A.   I didn't see him.

4  Q.   And you, in fact, did not go and rent a carpet cleaner,

5  did you?

6  A.   Oh, I'm sorry.  You said the next morning.  Yes.  Yeah, he

7  was with me and Eric Parker --

8  Q.   But you didn't rent a carpet cleaner that morning --

9           MS. PEARSON:  Your Honor, if you could let the

10  witness answer -- finish her answer.

11           THE COURT:  Very well.  Ask the question and let the

12  witness answer.

13  BY MR. SUMRALL:

14  Q.   There was no need for you to rent a carpet cleaner, was

15  there, Ms. Henderson?

16  A.   I was just told to rent the carpet cleaner, so that's what

17  I did.

18  Q.   And I believe Eric Parker paid for that; is that correct?

19  A.   Yes.

20  Q.   Now, you and Eric Parker's relationship lasted a while

21  longer, did it not, after this incident?

22  A.   Yes.

23  Q.   I believe you said it was a couple more months, and you

24  couldn't get away from him; but you finally did?

25  A.   Yes.

1  Q.    But you kept going back, didn't you?

2  A.    Yes.

3  Q.    Was that to get the crystal meth?

4  A.    No, not just that.

5  Q.    What other reason did you have for going back?

6  A.    Because I needed to know where his head was at so I -- it

7  was easier -- more safe for me to know where his head was at

8  and what -- so he wouldn't come after me and my family.  That's

9  what I was worried about.

10  Q.    Okay.  Now, this time that you told this jury that he woke

11  up in the middle of the night screaming -- you remember that?

12  A.    Yes.

13  Q.    And he told you that he strangled Michael Hudson, correct?

14  A.    He didn't say who.  He just said that he killed someone.

15  Q.    Okay.  And was that the night that he was referring to?

16  A.    Yes.

17  Q.    After this incident, did you ever come forward and tell

18  the authorities about what was going on?

19  A.    No, sir.

20  Q.    They finally came to you; is that correct?

21  A.    Yes, sir.

22         MR. SUMRALL:  The Court's indulgence?

23         THE COURT:  Yes, sir.

24         MR. SUMRALL:  No further questions, Your Honor.

25         THE COURT:  Very well.

1      Mr. Turner, you may cross-examine this witness on behalf

2  of your client.

3           MR. TURNER:  Thank you, Your Honor.

4                    CROSS-EXAMINATION

5  BY MR. TURNER:

6  Q.   Ms. Henderson, my name's Joshua Turner; and I represent

7  Eric Parker.  You were interviewed by investigators on more

8  than one occasion in this case, correct?

9  A.   Correct.

10 Q.   All right.  And I have listened to the audio statements

11 that you gave that were recorded; and you were there with your

12 attorney and were being asked questions by, I think --

13          MS. PEARSON:  Your Honor, my objection is to lack of

14 a question.

15          MR. TURNER:  -- Ricky Lott.  Your Honor, I'm on

16 cross-examination.  I'm trying to get my predicate laid.

17          THE COURT:  Yes, sir.  Okay.  Ask a question.

18 BY MR. TURNER:

19 Q.   Were you ever interviewed by Ricky Lott?

20 A.   Yes.

21 Q.   Okay.  How many times?

22 A.   Two or three times.

23 Q.   Do you remember he kept coming back to you because he

24 thought you were being untruthful with him?

25          MS. PEARSON:  Your Honor, I'm going to object to

1   speculation.  How does she know what's going on in his --

2           THE COURT:  Okay.  Yeah.  She wouldn't know what's

3   going on in his mind.  The objection's sustained.

4   BY MR. TURNER:

5   Q.   Did he ever tell you that he didn't believe what you were

6   saying?

7   A.   At first, yes.

8   Q.   All right.  And do you recall telling him that you had

9   been doing meth for 4 or 5 days around the Hudson incident

10  nonstop?

11  A.   Yes.

12  Q.   Okay.  And you've already admitted that you were doing

13  methamphetamine every single day, correct?

14  A.   Yes.

15  Q.   And do you also remember telling him that your brain was

16  fuzzy around that time because you were starting to crash?

17  A.   I didn't say I was starting to crash, but I said that some

18  of the details may be hard for me to remember --

19  Q.   Fuzzy?

20  A.   -- at the time because -- and that was not the reason.

21  Because I block out, you know, things that are traumatic.  I

22  try to block those out.  And then, as it kept going on, I would

23  pick up more and more pieces and remember.

24  Q.   Did the Government ask you to listen to those audio tapes

25  before coming in here today?

1  A.   No.

2  Q.   Okay.  You're going strictly off your memory?

3  A.   Uh-huh.

4  Q.   I'm sorry.  The court reporter needs us to say yes --

5  A.   Oh, I'm sorry.  Yes.

6  Q.   Thank you.  Do you remember the investigators telling you

7  that you would not be charged for any of your methamphetamine

8  crimes if you testify?

9  A.   They just said that they weren't -- they didn't say if I

10  testify.  They just said that they weren't going to charge me

11  because they didn't believe that I had done anything malicious

12  or, like, on purpose.

13  Q.   Okay.  You will agree with me that you never saw a dead

14  body at Eric Parker's house, correct?

15  A.   Yes.

16  Q.   All right.  And you will agree with me that, when you were

17  describing this episode that Mr. Parker was having, he was

18  having a nightmare, correct?

19  A.   Yes.

20  Q.   You've had nightmares before, correct?

21  A.   Yes.

22  Q.   All right.  I'm sure they range in various different types

23  of nightmares, right?

24  A.   Yes.

25  Q.   Did methamphetamine cause you to have nightmares?

1  A.    No.

2  Q.    Okay.

3          MR. TURNER:  The Court's indulgence, Your Honor; I

4  need a moment with my client, please.

5          THE COURT:  Yes, sir.

6  BY MR. TURNER:

7  Q.    Ms. Henderson, you'll agree with me that all nightmares

8  aren't true, right?

9  A.    I'm sorry?  All nightmares are not true?

10  Q.   Right.

11  A.    Yes.

12  Q.   Okay.  Some of them are just figments of your imagination,

13  correct?

14  A.    Yes.

15          MR. TURNER:  Okay.  Thank you.

16          THE COURT:  Do you have redirect, Ms. Pearson?

17          MS. PEARSON:  Very briefly, Your Honor.

18          THE COURT:  Very well.

19                    REDIRECT EXAMINATION

20  BY MS. PEARSON:

21  Q.   Mr. Sumrall asked you about Mr. Creel's business.  What

22  kind of business did Mr. Creel keep you out of?  What weren't

23  you allowed to know about?

24  A.    He kept me out of everything he did, like, in that sense.

25  He never wanted me involved or around it.  Anything to do with

1 the brotherhood, he kept me out of it.  And I, at the time,

2 thought it was just to be mean; but I see now why.

3 Q.    And the brotherhood -- what brotherhood are you talking

4 about?

5 A.    I'm sorry.  The Aryan Brotherhood.

6 Q.    Were you a member of the Aryan Brotherhood?

7 A.    No, ma'am.

8 Q.    And you also testified during cross-examination that, on

9 the evening Parker received that call, you didn't want them to

10 interfere with any -- their business to interfere with your

11 life.  Who is "they"; what is "they"?

12 A.    The Aryan Brotherhood.

13 Q.    Okay.  And the nightmares that you witnessed, do you know

14 whether Eric Parker was awake or asleep when he told you the

15 details about how he killed someone?

16         MR. TURNER:  Objection, Your Honor.  It calls for his

17 state of mind.

18         THE COURT:  Well, she said -- the question was, was

19 he awake or asleep; and I'll permit that.

20 BY MS. PEARSON:

21 Q.    Yeah.  Do you know whether he was awake or asleep?

22 A.    He was awake.

23         MS. PEARSON:  Your Honor, that's all I have on

24 redirect.  Thank you very much.

25         THE COURT:  Very well.

1        Ms. Henderson, you're fully and finally discharged.  You

2  may go.

3              THE WITNESS:  Okay.

4              THE COURT:  What do we want to do, folks?  We've

5  got -- it's twenty of twelve.  I could recess until one, or we

6  could -- I hate to start another witness to break the

7  testimony.  I don't know.  What kind of witness do you have

8  now, Mr. --

9              MR. DABBS:  Your Honor, I believe it would be pretty

10 brief; but whatever the Court wants to do will be fine.  It

11 will be fine either way.

12             THE COURT:  Okay.  Why don't we do this, ladies and

13 gentlemen.  The weather is pretty rough out.  It's twenty of

14 twelve.  We'll be in recess until one o'clock for lunch.

15 Remember, do not discuss the case among yourselves; do not

16 permit anyone to discuss it with you.  The Court's in recess

17 until one o'clock for lunch.

18       (JURY OUT AT 11:38 a.m.)

19             THE COURT:  Court's in recess until one o'clock.

20 (Lunch recess at 11:39 a.m. until 12:56 p.m.)

21       (CALL TO ORDER OF THE COURT)

22       (JURY IN AT 12:56 p.m.)

23             THE COURT:  The United States may call your next

24 witness.

25             MR. DABBS:  Thank you, Your Honor.  The Government

1   calls Daniel Deets.

2          (OATH ADMINISTERED BY THE COURTROOM DEPUTY).

3          THE COURTROOM DEPUTY:  Take a seat in the witness

4   stand, then state your name for the record.

5          THE WITNESS:  My name is Daniel Deets.

6          THE COURTROOM DEPUTY:  Would you spell that last

7   name, please?

8          THE WITNESS:  It's D-e-e-t-s.

9          MR. DABBS:  Your Honor, may I proceed?

10          THE COURT:  Yes, sir.

11          MR. DABBS:  Thank you.

12          DANIEL DEETS, GOVERNMENT'S WITNESS, SWORN

13                    DIRECT EXAMINATION

14   BY MR. DABBS:

15   Q.    Mr. Deets, what do you do for a living?

16   A.    I work for the Navajo County Sheriff's Office in Arizona.

17   Q.    And how long have you done that?

18   A.    I've been there for almost 9½ years.

19   Q.    Okay.  Where is that in Arizona?

20   A.    It's in the northeastern part of the state, about 90 miles

21   east of Flagstaff on I-40.

22   Q.    And -- what interstate did you mention?

23   A.    Interstate 40.

24   Q.    And that goes through the county where you work?

25   A.    Yes, the northern side of the county.

1  Q.    So what are your duties now with the sheriff's department?

2  A.    Right now, I'm assigned to the traffic enforcement K-nine

3  unit; so my duties involve criminal interdiction on I-40.

4  Q.    How long have you done that?

5  A.    Almost 3 years.

6  Q.    What were you doing back in 2010?

7  A.    I had recently been assigned to our -- what's called the

8  Major Crimes Apprehension Team, or MCAT; it's our narcotics

9  task force.

10  Q.   So, in 2010, you were still with the Navajo County

11  Sheriff's Department?

12  A.   Yes.

13  Q.   Okay.  In 2010, did you have an occasion to interview a

14  man by the name of Eric Parker?

15  A.   I sat in on the interview, yes.

16         MR. TURNER:  Your Honor, may we approach, please?  I

17  object at this time.

18         THE COURT:  Yes.  Come up.

19         MR. TURNER:  Thank you.

20     (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

21         THE COURT:  Did you say he was from Arizona?

22         MR. DABBS:  Yes, Your Honor.

23         THE COURT:  Tell the court reporter she --

24         THE COURT REPORTER:  Yes, sir, I know.

25         THE COURT:  Okay.

DEETS - DIRECT

1          What's the problem with it, Mr. Turner?

2               MR. TURNER:  Your Honor, I've got a couple of things.

3     But the first is I filed a motion to keep out any of

4     Mr. Parker's prior convictions and arrests.  And I'm not sure

5     what he's being offered for at the moment, except I do know

6     that none of this is listed in the indictment.  And there's no

7     evidence that this is listed in furtherance of any conspiracy

8     that's been alleged by the Government in the overt acts.

9               THE COURT:  Okay.  We'll be on the lookout for any

10    hearsay.  But, if it's a confession for this defendant --

11    well --

12              MR. TURNER:  There aren't any allegations in the

13    indictment that involve any Arizona matter.

14              MR. DABBS:  Your Honor, I'm not calling him to talk

15    about a conviction in Arizona.  He made admissions during this

16    interview, and this is why I'm not playing the video.  Because

17    I don't want to ask him about the conviction; I just want to

18    ask him about the admissions related to being in the Aryan

19    Brotherhood and related to -- the time frame of this is in

20    December of 2010, and it is relevant to the -- to this case.

21              THE COURT:  Very well.  Now, he does not mention the

22    co-defendant in this confession?

23              MR. DABBS:  That's correct.

24              THE COURT:  Okay.  We don't want anything to come in

25    with the co-defendant.  But, if it's to establish his

1  membership in the Aryan Brotherhood, I'll permit it in

2  admission on his part.  And we'll stay away from convictions of

3  more than 10 years ago.

4          MR. TURNER:  I would only add that it's cumulative at

5  this point, Your Honor, as far as that goes.

6          THE COURT:  Well, it's kind of like --

7          MR. TURNER:  I understand, Your Honor.

8          THE COURT:  -- what's relevant is not relevant.  If

9  it didn't hurt, it wouldn't be relevant, so.

10          MR. TURNER:  Yes, sir.

11          THE COURT:  Okay.  Cumulative is the same category.

12          MR. DABBS:  Thank you, Your Honor.

13          THE COURT:  Yeah.

14      (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

15          THE COURT:  Okay.  Mr. Dabbs, you may proceed.

16          MR. DABBS:  Thank you.

17          THE COURT:  Let's see.  Sir, you're in Navajo County,

18  Arizona?

19          THE WITNESS:  Yes.

20          THE COURT:  Very well.  You may proceed.

21          MR. DABBS:  Thank you, Your Honor.

22  BY MR. DABBS:

23  Q.  In 2010, did you have an occasion to sit in on an

24  interview -- participate in an interview with a man by the name

25  of Eric Parker?

1  A.   Yes, I did.

2  Q.   And when did that interview occur?

3  A.   Occurred on December 29th, 2010.

4  Q.   Okay.  December the 29th of 2010?

5  A.   Yes.

6  Q.   And when -- was that a result -- where did it occur?

7  A.   It occurred at the sheriff's office in Holbrook, Arizona.

8  Q.   At the sheriff's office.  Okay.  Was that a result --

9  without going into the details, was that a result of a traffic

10 stop?

11 A.   It was.

12 Q.   Okay.  When you have someone like that that's, as a result

13 of a traffic stop, ends up being interviewed, do you identify

14 them with vitals, like birthday, social security number, that

15 kind of thing?

16 A.   Yes.

17 Q.   As well as driver's license?

18 A.   Yes.

19 Q.   And was that done in this case?

20 A.   It was.

21 Q.   Okay.  Did Mr. Parker agree to talk to you?

22 A.   Yes.

23 Q.   Okay.  And did you -- was the interview recorded?

24 A.   It was.

25 Q.   But you were actually present for the interview?

DEETS - DIRECT

1   A.    I was.

2   Q.    Okay.  What, if any, did you ask Mr. Parker about tattoos?

3   A.    We asked him if he had any tattoos, and he said he did.

4   Q.    And what did -- did he show you any tattoos?

5   A.    He did.

6   Q.    What did he show you?

7   A.    He showed us -- well, we could see on his neck two S

8   bolts, on his neck; and then he showed us the Aryan Brotherhood

9   patch on his chest, as well as a brand on his back.

10  Q.    And what did you ask him, if anything, about membership in

11  a gang?

12  A.    Well, he was asked if he was a member of a gang; and he

13  said he was.

14  Q.    And what gang was he a member of?

15  A.    The Aryan Brotherhood.

16  Q.    And, then, after he told you he was a member of the Aryan

17  Brotherhood, did you look at the tattoo again?

18  A.    Detective Rush did.

19  Q.    And who is Detective Rush?

20  A.    Detective Rush was the case agent on that case.  He's a

21  member of the Arizona Department of Public Safety or task

22  force.  It's a regional task force, so it's made up of

23  different agencies.

24  Q.    And were you both in the room with him?

25  A.    Yes.

DEETS - DIRECT

1  Q.    Okay.  Where was Mr. Parker from?

2  A.    From Mississippi.

3  Q.    Okay.  And what did he say, if anything -- what did you

4  ask him, if anything, about trouble he might have in

5  Mississippi?

6  A.    He was asked if he was in trouble with anybody over in

7  Mississippi.

8  Q.    And how did he respond to that?

9  A.    He said that -- not that he knew of.

10  Q.    What did he say, if anything, about a girlfriend?

11  A.    He said that he was having girlfriend problems.

12  Q.    Did he mention a name?

13  A.    He did.

14  Q.    What name?

15  A.    He said something to the effect of Kalyn or Kayla.

16  Q.    Okay.  And, at any point in the interview, what, if

17  anything, did Mr. Parker say about how he'd been doing in the

18  last few weeks?

19  A.    He said he was -- he wasn't doing well; he'd had thoughts

20  of suicide.

21  Q.    And what else did he say about that?

22  A.    He said that he'd actually had a shotgun in his mouth.

23  Q.    Okay.  Did he say why?

24        MR. TURNER:  Object to the relevance, Your Honor.  I

25  don't know how this has anything to do with the Government's

1  case as far as the conspiracy that we talked about.

2          THE COURT:  Okay.  Overruled.

3  BY MR. DABBS:

4  Q.    Did he say anything as to why?

5  A.    He didn't.  He was very general.

6  Q.    Okay.

7          MR. DABBS:  Your Honor, that's all the questions I

8  have at this time.

9          THE COURT:  Okay.

10      Mr. Sumrall, do you have any questions of this man?

11         MR. SUMRALL:  I do not, Your Honor.

12         THE COURT:  Okay.

13      Mr. Turner?

14         MR. TURNER:  Your Honor, we don't have any questions

15  for this witness, just renew our objection.  Thank you.

16         THE COURT:  Okay.

17      Officer, you are fully and finally discharged.  You may

18  go.

19         THE WITNESS:  Thank you, Your Honor.

20         THE COURT:  You may call your next witness for the

21  Government.

22         MR. LEARY:  Your Honor the Government would call

23  Marty Miller.

24      (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

25         THE COURTROOM DEPUTY:  Please take a seat on the

1  witness stand and state your name for the record.

2          THE WITNESS:  Marty Allen Miller.

3          MR. LEARY:  May I proceed, Your Honor?

4          THE COURT:  Yes.

5          MARTY ALLEN MILLER, GOVERNMENT'S WITNESS, SWORN

6                    DIRECT EXAMINATION

7  BY MR. LEARY:

8  Q.    Good afternoon, Mr. Miller.

9  A.    Good afternoon.

10 Q.    I want to ask you to scoot forward just a little bit; and,

11 if you can, pull that microphone back, if it'll move.  That'll

12 be fine.  The court reporter can't see a head nod, so would you

13 speak loud to whatever answer you would have?

14 A.    Yes, sir.

15 Q.    Thank you.  Mr. Miller, how old are you?

16 A.    Forty-five.

17 Q.    Where were you born?

18 A.    Forrest County, Mississippi.

19 Q.    Where were you raised?

20 A.    Hattiesburg, Mississippi.

21 Q.    How old were you when your mother died?

22 A.    Eleven.

23 Q.    Who raised you?

24 A.    My brothers.

25 Q.    Where was your father during this time?

1  A.   He moved out of town and had a bar.

2  Q.   When's the first time you tried alcohol?

3  A.   I was 11.

4  Q.   When did you start smoking marijuana?

5  A.   When I was 12.

6  Q.   What about methamphetamine?

7  A.   About 16.

8  Q.   Have you had a meth problem during your life?

9  A.   Yes, sir.

10 Q.   About how long?

11 A.   Until just a few years back.

12 Q.   Are you clean?

13 A.   Yes, sir.

14 Q.   How long you been clean?

15 A.   Four years.

16 Q.   Good.  Good.  I want to point you back to the 2000s.  Have

17 you been convicted of any crimes?

18 A.   Yes, sir.

19 Q.   What would that be?

20 A.   Possession of meth.

21 Q.   Okay.  When you were convicted of possession of meth, did

22 you serve any time in prison?

23 A.   Yes, sir.

24 Q.   Where did you serve?

25 A.   Parchman.

MILLER - DIRECT

1  Q.   When did you get out?

2  A.   2007.

3  Q.   Mr. Miller, when did you join the Aryan Brotherhood?

4  A.   2007.

5  Q.   And where were you when you joined the Aryan Brotherhood?

6  A.   Parchman.

7  Q.   And where were you when you received your patch?

8  A.   In Parchman.

9  Q.   And tell me again when you got out of Parchman?

10 A.   2007, November.

11 Q.   Were you patched up at that time?

12 A.   Yes, sir.

13 Q.   Now, when you left Parchman in late 2007, where did you

14 go?

15 A.   Hattiesburg.

16 Q.   Did you immediately hook up with the Aryan Brotherhood

17 free world?

18 A.   No, I did not.

19 Q.   How long did it take you to hook up with the free world?

20 A.   About 2 years.

21 Q.   Tell the ladies and gentlemen of the jury how you hooked

22 back up to the free world?

23 A.   I ran across a guy, Kevin Spears; and he told me that I

24 was to contact Eric Parker because he was a captain.

25 Q.   Okay.  You ran across who?

MILLER - DIRECT

1  A.   Eric Parker.

2  Q.   Okay.   Who's Kevin Spears?

3  A.   He's just another -- I guess he's an AB member now.

4  Q.   He's a brother?

5  A.   Yeah.

6  Q.   And he told you to contact who?

7  A.   Eric Parker.

8  Q.   Were you taken -- when you got out of prison in 2007, were

9  you taking meth?

10  A.   No.

11  Q.   Did you contact Eric Parker?

12  A.   Yes.

13  Q.   How long after you contacted Eric Parker did you get back

14  on meth?

15  A.   It wasn't long.

16  Q.   Who supplied you, your meth?

17  A.   I bought from Eric Parker.   I bought from several

18  different members.

19  Q.   AB members?

20  A.   Yes.

21  Q.   What was Eric Parker's rank when he was supplying you with

22  methamphetamine?

23  A.   Captain.

24  Q.   Now, Mr. Miller, when was it that you obtained your first

25  rank?

MILLER - DIRECT

1  A.   About 2013, thereabout.

2  Q.   Now, what was your rank when you got a rank?

3  A.   At first, it was SOA; and then it moved up to OIC and a

4  captain's position.

5  Q.   Okay.  Tell the ladies and gentlemen of the jury what SOA

6  is.

7  A.   Sergeant of arms.

8  Q.   Okay.  And you moved up from SOA to what?

9  A.   To OIC and a captain's position.

10  Q.   Okay.  And you received your captain's position about

11  when?

12  A.   Late 2013.

13  Q.   Uh-huh.  Where was Eric Parker living when you were

14  acquiring meth from him?

15  A.   Petal, Mississippi.

16  Q.   What was he living in?

17  A.   A camper trailer.

18  Q.   Who appointed you to the SOA rank?

19  A.   "Lobo."

20  Q.   And who appointed you to the captain rank?

21  A.   Lobo.

22  Q.   Now, during the course of your Aryan Brotherhood

23  experience, did you ever cooperate with law enforcement?

24  A.   Yes, I did.

25  Q.   Why did you cooperate with law enforcement?

1  A.   They had a charge on me.

2  Q.   How did you cooperate with law enforcement?

3  A.   Intel and phone calls.

4  Q.   What criminal organization were you cooperating against?

5  A.   Aryan Brotherhood.

6  Q.   Did you make calls for law enforcement?

7  A.   Yes, I did.

8  Q.   Explain how the calls were recorded, if you would.

9  A.   It was through a consensual TIII.

10  Q.   Did you sign a consent?

11  A.   Yes, I did.

12  Q.   Were all your calls recorded?

13  A.   Yes, they were.

14  Q.   How many calls did you record for law enforcement?

15  A.   Countless.

16  Q.   Did you listen to those calls, Mr. Miller?

17  A.   Yes, I have.

18  Q.   How many calls have you listened to?

19  A.   Numerous.

20  Q.   Who played the calls for you?

21  A.   Agent Quaka.

22  Q.   Did FBI Agent Quaka replay the calls for you?

23  A.   Yes, he did.

24  Q.   How long did you listen to calls?

25  A.   A while on several different occasions.

1   Q.    Were the calls that you listened to accurate recordings of

2   calls that you had with other AB members?

3   A.    Yes, they were.

4   Q.    Were all the calls you listened to accurate, Mr. Miller?

5   A.    Yes, they were.

6   Q.    Were all the calls you listened to complete?

7   A.    Yes, sir.

8   Q.    Could you recognize the participants' voices in the calls

9   you listened to?

10  A.    Yes, I could.

11  Q.    In all the calls you listened to, Mr. Miller, was there

12  any evidence of deletions?

13  A.    No.

14  Q.    In all the calls you listened to, Mr. Miller, were there

15  any evidence of alterations?

16  A.    No.

17  Q.    Who did you record, Mr. Miller?

18  A.    Everybody from Frankie Owens to Toot to Lobo to just

19  everybody.

20  Q.    Do you see Frankie Owens in the courtroom?

21  A.    Yes, he is.

22  Q.    Would you please point him out for the ladies and

23  gentlemen of the jury.

24  A.    He's right over here.

25  Q.    Is he on the end?  And, if so, which side?

1  A.    He is on the left side.

2  Q.    Okay.  The end?

3  A.    Yeah.

4  Q.    What color shirt is he wearing?

5  A.    Seems to be blue from here.

6           MR. LEARY:  Your Honor, let the record reflect, if it

7  pleases the Court, that this witness has identified Frankie

8  Owens.

9           THE COURT:  It will so reflect.

10  BY MR. LEARY:

11  Q.    Do you know Frankie Owens?

12  A.    Yes.

13  Q.    When did you first meet him, Mr. Miller?

14  A.    Around 2013.

15  Q.    How many times did you talk to him?

16  A.    Numerous.

17  Q.    Can you identify his voice?

18  A.    Yes.

19  Q.    Where was Mr. Owens located when you were talking to him

20  on the telephone?

21  A.    In -- incarcerated.

22  Q.    Where was he located when you were recording him on the

23  telephone?

24  A.    He was incarcerated.

25  Q.    How were you talking to Mr. Owens in 2013?

1  A.    Via telephone.

2  Q.    What was Frankie Owens' rank when you recorded him?

3  A.    Wheel.

4         MR. LEARY:  Your Honor, at this time, I would like to

5  mark, for identification purposes only, Call No. 680.

6         THE COURT:  Okay.  What would be the exhibit

7  number --

8         THE COURTROOM DEPUTY:  Forty-nine.

9         MR. LEARY:  Your Honor, we would also like to mark

10 the transcript for identification purposes only.  We would

11 respectfully request that we mark the CD -- is what number,

12 ma'am?

13        THE COURTROOM DEPUTY:  Forty-nine.

14        MR. LEARY:  Forty-nine A for the CD and 49B for the

15 transcript.

16        THE COURT:  Very well.

17 (EXHIBIT NOS. G-49A AND G-49B WERE MARKED FOR IDENTIFICATION)

18        MR. LEARY:  May I approach the witness, Your Honor?

19        THE COURT:  Yes, sir.

20 BY MR. LEARY:

21 Q.    Take a look at that, please, Mr. Miller.  Can you identify

22 the CD that I just handed you?

23 A.    Yes, sir, I can.

24 Q.    Are your initials on that CD?

25 A.    Yes, sir, they are.

MILLER - DIRECT

1  Q.    What's the reporting number on that CD?

2  A.    680.

3  Q.    What's the exact date of that CD?

4  A.    July 26th, 2013.

5  Q.    And who is that CD between?

6  A.    Me and Frankie Owens.

7  Q.    On July 26th of 2013, did you have a conversation with

8  Mr. Owens?

9  A.    Yes, I did.

10  Q.    Have you listened to that recording?

11  A.    Yes, I have.

12  Q.    Is that recording a true and complete accurate

13  conversation between you and Mr. Owens?

14  A.    Yes, it is.

15  Q.    Is it the whole conversation?

16  A.    Yes, it is.

17  Q.    Are there any evidence of deletions or alterations on that

18  CD?

19  A.    No, sir.

20  Q.    Is that one of the many CDs that you've listened to

21  pursuant to your cooperation?

22  A.    Yes, sir.

23  Q.    Is that CD accurate, as were the other recordings you

24  listened to?

25  A.    Yes, sir.

1  Q.   Were you able to recognize your voice in the recording?

2  A.   Yes, sir.

3  Q.   Were you able to recognize Mr. Frankie Owens' voice on the

4  recording?

5  A.   Yes, sir.

6  Q.   Did you read the transcript?

7  A.   Yes, sir.

8  Q.   Did you read the transcript while listening to the

9  recording, Mr. Miller?

10  A.   Yes, sir.

11  Q.   Did the words on the transcript accurately reflect the

12  conversation between you and Frankie Owens?

13  A.   Yes, they did.

14  Q.   Any evidence of alterations?

15  A.   No, sir.

16  Q.   Does that recording accurately and completely reflect the

17  conversation that you had with Frankie Owens?

18  A.   Yes, sir.

19          MR. LEARY:  Your Honor, at this time, the Government

20  would move to enter Call 680 in as evidence, just 49A for the

21  call.  We would move to have 49B just marked for

22  identification, Your Honor.

23          THE COURT:  Very well.  Ladies and gentlemen of the

24  jury, you recall my previous instructions relative to these

25  tapes.  What you hear on the tape recordings is the evidence.

1 The written transcript was prepared to assist you as you listen

2 to the recording.  The transcript is not evidence.  The

3 recording is.

4      Okay.  You may proceed, Mr. Leary.

5           MR. LEARY:  Thank you, Your Honor.

6      (EXHIBIT NO. G-49A WAS RECEIVED INTO EVIDENCE)

7 BY MR. LEARY:

8 Q.   Mr. Miller, what does Sinn Fein mean?

9 A.   Us alone or we ourselves.

10 Q.   In July of 2013, who was the Aryan Brotherhood attempting

11 to unify with?

12 A.   All the rest of the brotherhood in California, Texas.

13 Q.   When a brother lays back, what does that mean?

14 A.   It means he goes into some sort of retirement, but it

15 doesn't really exist.

16 Q.   Does the term *laid back* exist in any of the Aryan

17 Brotherhood documents?

18 A.   No.

19 Q.   What does covering up a brand mean?

20 A.   It means to get tattooed over.

21 Q.   How else are brands removed?

22 A.   Burned, cut off, either one.

23 Q.   Mr. Miller, who is "Moto"?

24 A.   He's just a soldier in the Aryan Brotherhood.

25 Q.   What is a direct order, Mr. Miller?

MILLER - DIRECT

1  A.    Just, at a direct order, you have to follow it --

2  Q.    Do you have to follow them?

3  A.    -- or consequences.

4        MR. LEARY:  Your Honor, at this time, we'd like to

5  play Call 680.

6        THE COURT:  Very well.  Government's Exhibit 49A may

7  be played to the jury.

8      (EXHIBIT G-49A PLAYING)

9        THE COURT:  Let's turn it louder, please.

10        THE COURTROOM DEPUTY:  I'm trying to.

11  BY MR. LEARY:

12  Q.    Can you identify your voice and Frankie Owens' voice on

13  this tape?

14  A.    Yes, sir.

15      (EXHIBIT G-49A PLAYING)

16  BY MR. LEARY:

17  Q.    What does blackballed mean?

18  A.    It means that you will not be allowed to enter into the

19  Aryan Brotherhood.

20  Q.    Thank you.

21      (EXHIBIT G-49A PLAYING)

22  BY MR. LEARY:

23  Q.    The paid hit was on who?

24  A.    Eric Parker.

25  Q.    Thank you.

MILLER - DIRECT

```
 1        (EXHIBIT G-49A PLAYING)

 2  BY MR. LEARY:

 3  Q.    When Frankie says "We're plugged in with everybody now,"

 4  what does that mean?

 5  A.    We are in together with.

 6  Q.    Was a unification taking place at this time?

 7  A.    Right.  Right.

 8        (EXHIBIT G-49A PLAYING)

 9  BY MR. LEARY:

10  Q.    Okay.  Who's supposed to be going up north?

11  A.    "Pure Bred."

12  Q.    Okay.  And who's Moto right here?

13  A.    He is a -- just a soldier.

14  Q.    And what's Moto saying about being laid back?

15  A.    He's saying that he was given permission to lay back,

16  which he never was.

17  Q.    Okay.

18        MR. LEARY:  Keep going.

19        (EXHIBIT G-49A PLAYING)

20        MR. LEARY:  Stop there.

21  BY MR. LEARY:

22  Q.    What does "slip his GD ass" mean?

23  A.    It means to beat him up and take his brand.

24  Q.    Burn that shit off him?

25  A.    Right.
```

1          (EXHIBIT G-49A PLAYING)

2    BY MR. LEARY:

3    Q.   The only laid back brother is a what?  Covered up and

4    what?

5    A.   Burned up.

6          (EXHIBIT G-49A PLAYING)

7               MR. LEARY:  Tender the witness, Your Honor.

8               THE COURT:  Mr. Sumrall, you may cross-examine this

9    witness.

10              MR. SUMRALL:  Court's indulgence just one moment.

11              THE COURT:  Yes, sir.

12                         CROSS-EXAMINATION

13   BY MR. SUMRALL:

14   Q.   Good afternoon, Mr. Miller.

15   A.   Good afternoon.

16   Q.   What did the Government promise you if you testified here

17   today?

18   A.   I had a charge over my head, and I get to be free.

19   Q.   So they're not holding you accountable for anything,

20   correct?

21   A.   Correct.

22   Q.   So that's why you're here today, right?

23   A.   Yes, sir.

24   Q.   Now, you said you started using alcohol when you were 11,

25   right?

MILLER - CROSS BY SUMRALL

1  A.    Yes, sir.

2  Q.    And marijuana when you were 12?

3  A.    Yes, sir.

4  Q.    And meth -- when did you start using meth?

5  A.    Around 16.

6  Q.    And when did you stop using meth?

7  A.    I stopped for a while in 2007.  And then, when I got back

8  up plugged in with them, I started back around 2009 for just a

9  couple of years; and then I've quit.

10  Q.    Okay.  And when was it you started cooperating with the

11  Government?

12  A.    2012.

13  Q.    Okay.  Were you still using meth then?

14  A.    Yes.

15  Q.    Okay.  And how often did you use?

16  A.    Not very.

17  Q.    What do you mean by not frequently?  Once a day?

18  A.    No.  No.  Maybe twice a month.

19  Q.    In the tape we just listened to, the phone conversation,

20  Frankie was asking you about a hit on Eric Parker; is that

21  correct?

22  A.    Yes.

23  Q.    He didn't know anything about it, did he?  He was asking

24  you that question, wasn't he?

25  A.    No, sir.  I didn't know anything about it.  He was telling

MILLER - CROSS BY SUMRALL

1  me about it.

2  Q.   Wasn't he questioning whether there was one?

3  A.   No, sir.  He was questioning why did T.J. Knight not tell

4  us that.

5  Q.   So he was questioning T.J. talking to the detective?

6  A.   Yes.

7  Q.   And did you ever talk to T.J. about that?

8  A.   I never got a chance.

9  Q.   Now, at this time, what was your official duty with the

10 Aryan Brotherhood?

11 A.   I do not understand.

12 Q.   At the time you made this conversation, this phone call to

13 Frank Owens, what was your position in the Aryan Brotherhood?

14 A.   I was OIC and the captain's position and also still

15 retained the SOA.

16 Q.   Okay.  Sergeant-at-arms and OIC; is that correct?

17 A.   Yes, sir.

18 Q.   For what district, what zone?

19 A.   Southern.

20 Q.   Southern?  Who was over you at that time?

21 A.   At that time, Toot was over me.

22 Q.   Toot?  And I believe you said, during this period of time,

23 Frank Owens was in prison; is that correct?

24 A.   That's correct.

25 Q.   Now, when you talked about burning up, that basically

1  means burn the patch off, right?

2  A.    Yes.

3  Q.    And I believe you said that you were doing intelligence

4  and phone calls for the FBI, is that correct, or the

5  Government?

6  A.    Yes.

7  Q.    And you started doing that in 2012?

8  A.    Yes, I believe it was.

9  Q.    Okay.  So, since 2012, you, basically, were a confidential

10  informant for the Government?

11  A.    That's correct.

12  Q.    Huh?

13  A.    Yes.

14  Q.    Okay.

15         MR. SUMRALL:  Court's indulgence.

16         THE COURT:  Mr. Turner, do you wish to

17  cross-examine -- oh, excuse me.  I'm sorry.  I'm sorry.

18         MR. SUMRALL:  No further questions.

19         THE COURT:  Mr. Turner may proceed.

20         MR. TURNER:  Thank you, Your Honor.

21                      CROSS-EXAMINATION

22  BY MR. TURNER:

23  Q.    Mr. Miller, my name's Joshua Turner.  I represent Eric

24  Parker.  Were you active in the Aryan Brotherhood in 2011?

25  A.    Yes, I was.

1  Q.    Would you agree with me that you did not see Eric Parker

2  at any of your Aryan Brotherhood meetings during that year?

3  A.    I can't -- I can't really answer that because I'm not sure

4  exactly when he disappeared.

5  Q.    Okay.  Would you agree with me that you didn't see him at

6  any Aryan Brotherhood meetings in 2012?

7  A.    Yes.

8  Q.    Okay.  Would you agree with me that you didn't see him at

9  any Aryan Brotherhood meetings in 2013?

10  A.    Yes.

11  Q.    Would you agree with me that you didn't see him at any

12  Aryan Brotherhood meetings in 2014?

13  A.    Uh-huh.  Yes.

14  Q.    The reason I do that is the court reporter has to take

15  down words.  Will you agree with me that you haven't seen him

16  at any Aryan Brotherhood meetings in 2015?

17  A.    That's correct.

18  Q.    Do you still associate with the Aryan Brotherhood?

19  A.    No, I do not.

20  Q.    Do you still have your patch?

21  A.    Yes, I do.

22  Q.    Have you covered it up?

23  A.    No, I have not.

24        MR. TURNER:  Your Honor, those are all the questions

25  I have for Mr. Miller.  Thank you.

1          THE COURT:  Does the Government have any redirect?

2          MR. LEARY:  Just a few questions, Your Honor.

3          THE COURT:  Yes, sir.

4                    REDIRECT EXAMINATION

5  BY MR. LEARY:

6  Q.    About when did Frankie -- excuse me -- Eric Parker

7  disappear?

8  A.    Seems like it was around the end of 2011.  He got into

9  some trouble, and then he just disappeared.

10  Q.    Defense counsel asked you promises the Government made to

11  you.

12  A.    Uh-huh.

13  Q.    We tried to help you out for protection?

14  A.    I've been relocated.

15  Q.    You and who?

16  A.    Me and my whole family.

17          MR. LEARY:  No further questions.

18          THE COURT:  Okay, sir.  You and -- Mr. Miller, you're

19  fully and finally discharged.  You may go.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  The Government may call your next

22  witness.

23          MS. PEARSON:  Your Honor, the Government would call

24  Neil Cole -- not Neil Cole -- sorry -- Carroll Carpenter.

25      (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

CARPENTER - DIRECT

1                THE COURTROOM DEPUTY:  Please take a seat in the

2   witness stand and state your name and address for the record --

3   I'm sorry -- not your address, just your name.

4                THE WITNESS:  Carroll Carpenter.

5            CARROLL CARPENTER, GOVERNMENT'S WITNESS, SWORN

6                       DIRECT EXAMINATION

7   BY MS. PEARSON:

8   Q.   Good afternoon, ma'am.  I'm going to ask you, where do you

9   currently live?  What town do you live in?

10  A.   D'Iberville, Mississippi.

11  Q.   And what street do you lived in?

12  A.   Dobson Road.

13  Q.   Okay.  And are you working right now?

14  A.   No.  I'm retired.

15  Q.   What did you used to do?

16  A.   Driving.

17  Q.   Excuse me.  What did you used to do?

18  A.   Driving.

19  Q.   Okay.  Where did you do that?

20  A.   I drove the large buses for Hotard, and then I drove the

21  city buses until -- in Biloxi until I had my last two

22  surgeries.  Now I'm retired.

23  Q.   Okay.  And, prior to that occupation, what kind of

24  occupation did you have?

25  A.   I worked offshore quite a few years ago.  And, after that,

1  it was different driving jobs.  That was really my only skill.

2  Q.  And you say you worked offshore.  Was that drilling?

3  A.  Yes.  I was a wire line operator out on the rigs.

4  Q.  And how many children do you have?

5  A.  I did have one.

6  Q.  And what was his name?

7  A.  Michael James Hudson.

8  Q.  Okay.  And did you have any nicknames you used with him or

9  his friends used with him?

10  A.  Some of his friends called him Skip.

11  Q.  Okay.  And are you married, ma'am?

12  A.  Yes.

13  Q.  And how long have you been married?

14  A.  Thirty years in June.

15  Q.  And is that Mr. Hudson's father that you're married to?

16  A.  No.

17  Q.  Were you married to his father at some point in time way

18  back in the day?

19  A.  Yes.

20  Q.  Okay.  And, with respect to Michael, when he was a child,

21  before he was 18, did he live with you or his dad?

22  A.  Always with me.

23  Q.  And do you recall when he was born?

24  A.  March 25th, 1979.

25  Q.  And, with respect to Michael's childhood, did you always

1 live in what I'm going to call the Gulf area; or did y'all move

2 around?

3 A.    We always lived in Biloxi or Patterson, Louisiana.

4 Q.    Okay.  Bringing you back to 2010, where were you and

5 Michael living?

6 A.    I -- Michael was on and off living with me at Dobson Road,

7 my current address.

8 Q.    Okay.  And when you say he was on and off living with you,

9 was there a reason for that?

10 A.    Yes.

11 Q.    What was the reason?

12 A.    Michael developed a serious cocaine or crack addiction,

13 and he went through cycles where he wanted to get his life

14 together and do better.  And, at those times, he had a home

15 with me.  When he hit the bottom part of the cycle and the

16 drugs were causing problems, he became homeless because he

17 refused to live by the rules in the house; and he stole things.

18 Q.    Okay.  When you say "he stole things," who was he steeling

19 from?

20 A.    Me.

21 Q.    And you said cycles plural?

22 A.    Oh, yes.  For 15 years.

23 Q.    Fifteen years?  Okay.  Was Michael also having run-ins

24 with the law?

25 A.    Oh, yes.

1  Q.    And, when I say run-ins, more than one?

2  A.    Yes.

3  Q.    Okay.  When he was -- when Michael was not allowed to live

4  with you -- this is kind of obvious -- how did you let him know

5  that?

6  A.    Oftentimes, face-to-face.  And, other times, when he would

7  call me asking for help.  Because I was the only person who

8  would help him.  I was always there for Michael.  He knew that.

9  Even if I was angry with him for what he was doing, he always

10  had a roof as long as he would come in and mind his manners and

11  not steal and not do drugs under my roof.

12  Q.    Those times that he was not allowed to live with you,

13  would he maintain contact with you, or would he get angry and

14  not talk to you at all?

15  A.    Oh, no.  He was never angry.  He understood why I handled

16  it the way I did.  In the beginning, I tried different tactics.

17  And, over the span of 15 years, I learned that I -- I had to

18  have it at a set point, and he understood it.

19        We went through these problems together.  He did not go

20  through this on his own.  And he was never angry with me for

21  it.  He understood that these were his decisions and his alone.

22  Q.    Okay.

23  A.    So we were always in contact.  I never went a week without

24  at least a phone call.

25  Q.    Okay.  And that's during the course of his entire

1   addiction, the cycles that you're talking about?

2   A.    Yes, it is.

3   Q.    During this period of time when Michael was addicted or on

4   and off drugs, did there ever come a point in time where you

5   learned he had affiliated himself with a gang or something?

6   A.    Yes.

7   Q.    Okay.  Did you become aware of what that was?

8   A.    Yes.

9         MR. SUMRALL:  Your Honor, we would object.  It calls

10  for hearsay testimony unless she has personal knowledge of any

11  affiliation.

12        THE COURT:  Okay.  If she has personal knowledge, she

13  may answer.

14  BY MS. PEARSON:

15  Q.    Was there something that you personally observed that put

16  you on notice that Michael had become part of a gang?

17  A.    Yes.

18  Q.    What was it?

19  A.    A tattoo of the Aryan Brotherhood.

20  Q.    Now, with respect to his membership in the gang, who, if

21  anyone, from that gang, did you meet?

22  A.    I never met anyone.

23  Q.    And, at what point in time -- what, if anytime, did

24  Michael try to introduce you to his people?

25  A.    He never did.

1  Q.    Did there come a point in time where you no longer heard

2  from your son?

3  A.    Yes.

4  Q.    Prior to that and the months or the weeks before that,

5  were you loaning him money; or what, if any, money transactions

6  did you have with your son, if any?

7  A.    At the very last few weeks, I would give him 5 or 10

8  dollars or maybe $20.  Because he could not find a job, and I

9  wanted him to have a little bit of pocket money.

10         But coming to me and, again -- which he done previously --

11 asking me for money to cover -- what he told me, a short in

12 his -- the drugs that had been fronted to him, he had done too

13 much of instead of selling.  And this is what I came to

14 believe, that he needed money because he said these -- these

15 people are scary --

16              MR. SUMRALL:  Objection.

17              THE COURT:  Okay.  The hearsay objection, it'll be

18 sustained.

19              MS. PEARSON:  I'll ask a different question.

20 BY MS. PEARSON:

21 Q.    Did you give him money?

22 A.    No.

23 Q.    And did you ever see your son again after that?

24 A.    No.

25 Q.    Did there come a point in time when you reported him

1    missing to law enforcement?

2    A.    Yes.

3    Q.    Do you recall who you contacted?

4    A.    Neil Culwell.

5    Q.    And, when you spoke to Mr. Culwell, did you have an

6    opportunity to give him, kind of, personal identifiers about

7    your son, like his name, his date of birth?

8    A.    Yes.

9    Q.    And was Mr. Culwell taking notes while you were doing

10   that, or writing a report of some sort?

11   A.    I'd have to stop and think.  I spoke with him numerous

12   times.  I'm trying to remember the first time.  It was in the

13   detention center, and I'm sure he did take notes the very first

14   visit.

15   Q.    Okay.  Was one of the things you furnished Mr. Culwell --

16   or Detective Culwell a phone number for your son?

17   A.    Yes.  Michael had one at the time.  As far as I knew, he

18   had one at the time.

19   Q.    And the number you gave Detective Culwell, would that have

20   been the number you contacted Michael at?

21   A.    Yes.

22   Q.    And, just to clarify, when you said you had regular

23   contact with your son, was that by phone or in person or a

24   combination thereof?

25   A.    A combination.

1  Q.    And have you ever heard from your son since that last time

2  that you spoke to him?  Have you ever seen or heard from him

3  since?

4  A.    No.

5  Q.    And, today -- I just have one more question.  Today, you

6  haven't heard from Michael?

7  A.    No.

8  Q.    Thank you.

9         MS. PEARSON:  Your Honor, I don't have any further

10 questions of this witness.  I tender her to the defense.

11        THE COURT:  Very well.

12    Mr. Sumrall, any questions?

13        MR. SUMRALL:  No, Your Honor.

14        THE COURT:  Mr. Turner?

15        MR. TURNER:  No, Your Honor.

16        THE COURT:  Very well.

17    Please, ma'am, you're fully and finally discharged.  You

18 may go.

19    Call your next witness.

20        MS. PEARSON:  Your Honor, the Government would call

21 Detective Neil Culwell -- or lieutenant.

22        THE COURT:  Very well.

23    (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

24        THE COURTROOM DEPUTY:  Please take a seat in the

25 witness stand and state your name for the record.

1          THE WITNESS:  My name is Neil, N-e-i-l; last name is

2   Culwell, C-u-l-w-e-l-l.

3          NEIL CULWELL, GOVERNMENT'S WITNESS, SWORN

4                  DIRECT EXAMINATION

5   BY MS. PEARSON:

6   Q.   Good afternoon, sir.

7   A.   Good afternoon.

8   Q.   How are you employed?

9   A.   I'm an investigator with the Harrison County Sheriff's

10  Office.

11  Q.   And where is Harrison County located?

12  A.   Gulfport, Mississippi.

13  Q.   And how long have you been there?

14  A.   About 20 years.

15  Q.   What's your current position with the Harrison County

16  Sheriff's Office?

17  A.   I'm a lieutenant over internal affairs.

18  Q.   And, back in 2010, did you hold a different position?

19  A.   I did.  I was a criminal investigator.

20  Q.   Can you just briefly tell the jury some of your duties and

21  responsibilities associated with that position?

22  A.   As a criminal investigator, duties included investigating

23  crimes ranging from larcenies all the way up to murders,

24  aggravated assaults, things like that.

25  Q.   Does it also include missing persons' reports?

1  A.    Yes.

2  Q.    I'm going to direct you back to December of 2010.  Did

3  there come a point in time where you became involved in the

4  investigation of a missing person by the name of Michael

5  Hudson?

6  A.    Yes.

7  Q.    And do you recall when you initiated your investigation,

8  sir?

9  A.    I believe that was on December 28th.  And -- yeah,

10 December 28th, 2010, at eleven o'clock a.m., Carroll Carpenter

11 came in and filed a missing person's report on her son, Michael

12 Hudson.

13 Q.    And what kind of information, can you just briefly

14 describe, did she give you about her son?

15       MR. SUMRALL:  Your Honor, that's going to call for

16 hearsay testimony; and we object.

17       THE COURT:  Well, is that part of your police report,

18 what she asked you about?

19       THE WITNESS:  Yes, sir, it is.

20       THE COURT:  Maintained in the ordinary and usual

21 course of business?

22       THE WITNESS:  Yes, sir.

23       THE COURT:  Very well.  I'll let it be in under the

24 business records exception.

25 BY MS. PEARSON:

CULWELL - DIRECT

1  Q.    What type of information did she give you?

2  A.    She provided me with description, height, weight, when he

3  was last seen.  We also obtained his -- a phone number for him

4  as well.

5  Q.    Okay.  And were you also able to identify, like, an actual

6  picture of Mr. Hudson?

7  A.    Yes.

8  Q.    Okay.

9         MS. PEARSON:  Your Honor, may I just approach our

10 exhibits and then the witness?

11        THE COURT:  Yes.

12 BY MS. PEARSON:

13 Q.    Sir, I'm going to show you what's been marked as

14 Government's Exhibit 44.  Do you recognize that person in the

15 photograph?

16 A.    Yes, I do.

17 Q.    And what, if any, relation does it have to the

18 investigation of a one Michael Hudson?

19 A.    This is Michael Hudson.

20 Q.    Okay.  Now, you referenced a phone number she gave you.

21 What was that?

22 A.    The phone number she provided was 228-243-6030.

23 Q.    That was for Mr. Hudson?

24 A.    Yes.

25 Q.    Okay.  Now, at some point in time, did your investigation

1  get transferred to a different county?

2  A.    Yes.

3  Q.    Okay.  And which county was that, and who did you transfer

4  it to?

5  A.    Initially, it was to Ricky Lott with MBI when it was --

6  information was developed that it occurred outside of Harrison

7  County in other agencies' jurisdiction.

8  Q.    Now, before that transfer, did you have any indication to

9  conduct your own investigation into Mr. Hudson's disappearance?

10  A.    Yes.

11  Q.    Did there come a point in time where you were contacting

12  individuals you believed associated with the case?

13  A.    Yes.

14  Q.    Was one of those individuals Frank Owens?

15  A.    Yes.

16  Q.    Did there come a point in time where you left him a voice

17  mail?

18  A.    I did.

19  Q.    Do you recall, approximately, when that was?

20  A.    Yes.  On my notes, that would have been February 23rd,

21  2011, at ten o'clock a.m.

22  Q.    And, in that voice mail, did you identify who you were?

23  A.    Yes.

24  Q.    Okay.  Using your name, Neil Culwell?

25  A.    Yes.

1  Q.    And did you identify why you were calling?

2  A.    I would have probably identified myself as Investigator

3  Culwell.  And I don't recall if I indicated, in the voice mail,

4  the subject of the call.

5  Q.    Okay.

6            MS. PEARSON:  May I just speak to my co-counsel?

7            THE COURT:  Yes, ma'am.

8            MS. PEARSON:  Your Honor, I don't have any further

9  questions for this witness.  I tenderer him to the defense.

10           THE COURT:  Very well.

11      Mr. Sumrall?

12                        CROSS-EXAMINATION

13 BY MR. SUMRALL:

14 Q.    Detective, the picture that they showed you, do you still

15 got that?

16 A.    Yes, sir, I do.

17 Q.    Okay.  You never met Michael Hudson, had you?

18 A.    No.  I don't think I've personally met him.

19 Q.    So the only way you knew that was Michael Hudson is

20 because somebody told you that was, right?

21 A.    Well, I've seen pictures of Michael Hudson in --

22 Q.    You've seen pictures that somebody else has told you was

23 Michael Hudson, right?

24 A.    It would be within our own department's identification

25 system where he's been brought in and incarcerated.

```
 1    Q.    Okay.  And I believe you said that you contacted Frank

 2    Owens on February the 23rd at 11:00 a.m. and left him a

 3    message?

 4    A.    Yes.

 5    Q.    He called you back, didn't he?

 6    A.    Yes, he did.

 7    Q.    Thank you.

 8          MR. SUMRALL:  No further questions, Your Honor.

 9          THE COURT:  Mr. Turner.

10          MR. TURNER:  Your Honor, we don't have any questions

11    of this witness.

12          THE COURT:  Very well.

13    Officer, you're fully -- well, no.  Redirect.  Excuse me.

14    Any redirect?

15          MS. PEARSON:  No, Your Honor.  Thank you very much.

16          THE COURT:  Very well.

17    Officer, you're fully and finally discharged; you may go.

18          THE WITNESS:  Thank you, sir.

19          THE COURT:  You have a long drive.

20          THE WITNESS:  Thank you.

21          THE COURT:  Next witness.

22          MR. DABBS:  Your Honor, the Government would call

23    Bradley Bagwell.

24          THE COURT:  Very well.

25          (OATH ADMINISTERED BY THE COURTROOM DEPUTY)
```

1          THE COURTROOM DEPUTY:  Please take a seat in the

2    witness stand, then state your name for the record.

3          THE WITNESS:  Bradley Bagwell.

4          MR. DABBS:  May I proceed, Your Honor?

5          THE COURT:  Yes, sir.

6          BRADLEY BAGWELL, GOVERNMENT'S WITNESS, SWORN

7                    DIRECT EXAMINATION

8    BY MR. DABBS:

9    Q.    Mr. Bagwell, we're going to ask you to speak up and scoot

10   up as close to that microphone as you can.  Okay?

11   A.    Okay.

12   Q.    Mr. Bagwell, good afternoon.  What do you do for a living?

13   A.    I'm an optimization engineer for AT&T mobilities.

14   Q.    How long have you worked for AT&T?

15   A.    Twenty years.

16   Q.    Okay.  As part of your duties with AT&T, are you familiar

17   with how AT&T keeps its regularly kept business records?

18   A.    Yes.

19   Q.    And are you familiar with how AT&T keeps phone call detail

20   records and cell site location records?

21   A.    Yes, I am.

22   Q.    Okay.

23          MR. DABBS:  Your Honor, may -- I'd like, at this

24   time, to have records marked for identification only, the next

25   two Government exhibit numbers.

1           THE COURTROOM DEPUTY:  G-50.

2     (EXHIBIT NOS. G-50 AND G-51 WERE MARKED FOR IDENTIFICATION)

3           MR. DABBS:  Your Honor, may I approach?

4           THE COURT:  Yes, sir.

5     BY MR. DABBS:

6     Q.    I'm going to hand you these records and ask -- these

7     records have been identified as G-50 and G-51.  Do you

8     recognize those records?

9     A.    Yes, I do.

10    Q.    Are those records -- well, first of all, what are those

11    records?

12    A.    They're call records from back in 2010, 2011.

13    Q.    And have you reviewed those records prior to testifying

14    today?

15    A.    Yes, I have.

16    Q.    Okay.  Are those records the types of records that are

17    kept in the course of the regular business of AT&T?

18    A.    Yes, they are.

19    Q.    And does that mean that they were made at or near the time

20    that the information was transmitted and made by someone with

21    knowledge?

22    A.    Yes, they were.

23    Q.    Okay.  And is that record a record of a regular practice

24    of this activity?

25    A.    Yes.

BAGWELL - DIRECT

1  Q.    Okay.  And is that a true and accurate copy of the records

2  from AT&T?

3  A.    It is.

4  Q.    What -- what's the name on the subscriber information for

5  those records?

6  A.    It was Michael -- Michael Hudson.

7  Q.    And what's the phone number?

8  A.    It is 228-243-6030.

9  Q.    Okay.

10        MR. DABBS:  Your Honor, at this time, the Government

11 would move to admit Exhibit 50 and 51 into evidence.

12        THE COURT:  Any objection?

13        MR. SUMRALL:  No objection, Your Honor.

14        MR. TURNER:  No, Your Honor.

15        THE COURT:  No objection, they'll be admitted by

16 regularly maintained and conducted business records.  They may

17 be received into evidence.

18        MR. DABBS:  Thank you, Your Honor.

19    (EXHIBIT NOS. G-50 AND G-51 WERE RECEIVED INTO EVIDENCE)

20 BY MR. DABBS:

21 Q.    Mr. Bagwell, what do you do again for AT&T?

22 A.    It's called RAM optimization for radio access network,

23 kind of network quality on the cellular side.

24 Q.    Do you have a college degree?

25 A.    Yes.

BAGWELL - DIRECT

1  Q.   And what is it in?

2  A.   Electronics engineering technology.

3  Q.   And did you say a radio access network engineer?

4  A.   Yes.

5  Q.   Okay.  What is that?

6  A.   Or most people would say RF engineer.

7  Q.   RF engineer?

8  A.   Radio frequency, yeah.

9  Q.   How long have you been an RF engineer?

10 A.   About 15 years.

11 Q.   So have you had any training related to cell site towers

12 and cell site location data?

13 A.   Yes.

14 Q.   What kind of training?

15 A.   All kinds.  We've been through several technologies since

16 I've been there.  So all the way from analog to present day

17 LTE, all kinds of training.

18 Q.   And do you work with cell towers now?

19 A.   Not directly physically, but yes.

20 Q.   What do you do related to cellular towers?

21 A.   Look at dropped call rates and call statistics and things

22 of that nature.

23 Q.   Are you familiar with how to interpret these records that

24 we've just submitted into evidence in terms of what they say

25 about cell site tower data?

1  A.    Yes.

2  Q.    And cell site locations?

3  A.    Yes.

4  Q.    Okay.

5         MR. DABBS:  Your Honor, may I publish these records

6  to the jury?

7         THE COURT:  Okay.  They're in evidence; you may do

8  so.

9  BY MR. DABBS:

10  Q.   Mr. Bagwell, I want to point you to -- I want to put this

11  up on the ELMO.  You tell me if you can see it.

12  A.    Yes, I see it.

13  Q.    Okay.

14        THE COURT:  Let me interrupt you just a moment.

15  Apparently, he's going to give expert testimony.  Do either of

16  the defendants want to voir dire on his expertise?

17        MR. SUMRALL:  I do not, Your Honor.

18        THE COURT:  Mr. Turner?

19        MR. TURNER:  Just a couple of questions, Your Honor.

20        THE COURT:  Okay.  You may ask him a couple of

21  questions.

22        MR. TURNER:  I assume he's being tendered?

23        THE COURT:  I assume.

24     Mr. Dabbs, is that correct?

25        MR. DABBS:  I'm not going to ask him for an opinion,

BAGWELL - VOIR DIRE

1    Your Honor.  But his interpretation of these records will

2    require something more than what a layperson --

3              THE COURT:  Okay.

4         Okay.  Mr. Turner, you may ask a couple of questions.

5                     VOIR DIRE EXAMINATION

6    BY MR. TURNER:

7    Q.    Good afternoon.  Have you testified in court before?

8    A.    No.

9    Q.    This is your first time?

10   A.    First time.

11   Q.    Okay.  And you've not been characterized as an expert

12   before any judge before; is that true?

13   A.    No.  I have not.

14   Q.    The information that the Government is asking you to

15   interpret today, is that something that you have done before?

16   A.    Yes.  I've looked at call records before.

17   Q.    I'm sorry?

18   A.    Yes.  Yes.

19   Q.    All right.  For whom?

20   A.    I just -- in the course of work, just as part of my job

21   sometimes looking at call records to -- as a part of

22   troubleshooting in the network, not for anything like this,

23   but.

24   Q.    Okay.  Does it have some indicia of reliability associated

25   with it?

1 A.    Yes.

2            MR. TURNER:  The Court's indulgence, Your Honor?

3            THE COURT:  Yes, sir.

4 BY MR. TURNER:

5 Q.   Is this the first time that you've prepared any

6 documentation for a project like this?

7 A.   I didn't actually prepare the documentation.

8 Q.   Okay.  You're just being asked to interpret it?

9 A.   Correct.

10            MR. TURNER:  Your Honor, at this time, we would

11 object to this man as being an expert on behalf of --

12            THE COURT:  Very well.  As I understand the

13 Government, he's not going to be asked opinions.

14            MR. DABBS:  That's correct, Your Honor.

15            THE COURT:  Okay.  I'll permit this engineer to

16 interpret what these records reflect.

17            MR. SUMRALL:  Your Honor, if I may, an interpretation

18 is an opinion.  If he's going to give an interpretation, that's

19 an opinion; and, if he's not admitted as an expert, how can he

20 give -- even if -- an opinion?

21            THE COURT:  I'm going to let him interpret these

22 records, explain those records, what it means within his

23 expertise.

24       You may proceed, Mr. Dabbs.

25            MR. DABBS:  Thank you, Your Honor.

1                    FURTHER DIRECT EXAMINATION

2  BY MR. DABBS:

3  Q.   Mr. Bagwell, what are we looking at right here?

4  A.   It's just a document showing he's financially liable for

5  the phone number.

6  Q.   Financially liable for the phone number?  Now, this

7  information -- is this a prepaid phone?

8  A.   Yes, it is.

9  Q.   Okay.  Is this information verified?

10 A.   No.

11 Q.   Okay.  And, again, is this the phone number?

12 A.   Correct.  That is the phone number.

13 Q.   I want to call your attention to this -- this last line --

14 this line -- you see where my pen is pointing?

15 A.   Yes.

16          MR. SUMRALL:  Your Honor, if you would tell us what

17 page he's on.  He's flipped through.  We'd just like to know

18 what page.

19          MR. DABBS:  This is page 43.

20          MR. SUMRALL:  Thank you.

21          MR. DABBS:  Page 43 of Exhibit 50.

22 BY MR. DABBS:

23 Q.   What does this date mean?

24 A.   That'll be the date that the phone call was placed.

25 Q.   What about the time?

BAGWELL - FURTHER DIRECT

1  A.    And the time the phone call was placed.

2  Q.    Okay.  And what about this first number, is that a phone

3  number?

4  A.    Yes.  That's the number that originated the call or text

5  or whatever this is.

6  Q.    Okay.  As we move across this line, what does this "in"

7  mean?

8  A.    Means it's an inbound call to the 6030 number.

9  Q.    Okay.  What is this information at the end right here?

10 A.    The first part of that is location, area code.  And then

11 slash, and then the cell site ID number.  And then you got the

12 latitude/longitude of the cell site of the actual tower.  And

13 then the very last number is the azimuth or the direction in

14 degrees that the antenna is pointing from the tower.

15 Q.    Okay.  Now, you mentioned latitude and longitude

16 coordinates?

17 A.    Yes.

18 Q.    What are those for?

19 A.    That's the actual location of the tower.

20 Q.    So this is not telling you where the phone is; this is

21 telling you where a tower is?

22 A.    Where the tower is, correct.

23 Q.    And what is that 270?

24 A.    That would be in degrees, with 0 being north, 180 being

25 south, 270 being due west.  So that antenna was pointing due

1  west from that tower.

2  Q.    Okay.

3         MR. DABBS:  Your Honor, that's all the questions I

4  have at this time.

5         THE COURT:  Okay.

6     Mr. Sumrall, do you wish to cross-examine?

7         MR. SUMRALL:  No questions, Your Honor.

8         THE COURT:  Mr. Turner?

9         MR. TURNER:  Just a couple, Your Honor.

10        THE COURT:  Yes.

11                    CROSS-EXAMINATION

12  BY MR. TURNER:

13  Q.    Mr. Bagwell, you will agree with me that that data that

14  you were referring to is indicia of where the phone is,

15  correct?

16  A.    Say that again, now.

17  Q.    It's an indicia of a cell tower that's close to the phone,

18  correct?

19  A.    Yeah.  You would have had to have been close enough to it

20  to be on that tower, right.

21  Q.    Right.  But it has no indicia of where the person is,

22  correct?

23  A.    Just the device, right.

24  Q.    Right.  So, if I've got a phone and I've got my phone and

25  I said, you know, what, tired of being at work today; and I

1  throw it in the back of this truck that's going down the road;

2  and people keep calling it; it's going to show up at different

3  towers, right?

4  A.    It would, yes.

5  Q.    Okay.  So it's not an indicia of where the owner of the

6  phone is, correct?

7  A.    Correct.

8  Q.    Okay.

9          MR. TURNER:  Thank you, Your Honor.  That's all I

10  have.

11          THE COURT:  Any redirect, Mr. Dabbs?

12          MR. DABBS:  Just briefly, Your Honor.

13                  REDIRECT EXAMINATION

14  BY MR. DABBS:

15  Q.    This is still page 43.  Now, he asked you about whether

16  this is the location of a person or of a device.  If these

17  coordinates show up in these records, is that -- that's the

18  location of a device; is that right?

19  A.    The coordinates are the location of the tower.

20  Q.    It's the location of a tower.  What does that mean about

21  the actual phone?

22  A.    It would have had to have been in close enough proximity

23  to that tower to, you know, access --

24  Q.    What if the phone is off?

25  A.    Then you're not going to get anything from that phone as

1  far as location because no tower would see the phone.

2  Q.    So, if the phone is on and it receives a call, these

3  records will show up; is that right?

4  A.    That's right.

5  Q.    Okay.

6            MR. DABBS:  That's all I have, Your Honor.

7            THE COURT:  Okay.  Very well.  The Court has

8  previously ruled that this man's testimony is admissible, and

9  I've heard the testimony now and am further -- I am of the

10  opinion that, pursuant to Rule 702 and 703 of the Federal Rules

11  of Evidence, that this gentleman, who has an electrical

12  engineering degree and has been employed by AT&T for 15 years

13  in the capacity of an engineer -- that his testimony was

14  properly received into evidence.

15      Okay.  You're excused, please, sir; you may go,

16  Mr. Bagwell.

17      You may call your next witness.

18            MR. DABBS:  Your Honor, the Government calls Jason

19  Price.

20            THE COURT:  Let's take a 15-minute recess, ladies and

21  gentlemen of the jury.  All of my previous instructions apply

22  during this recess.

23  (Recess at 2:19 p.m. until 2:35 p.m.)

24      (CALL TO ORDER OF THE COURT)

25            THE COURT:  Let's see.  Mr. Turner, you had -- wanted

1  to discuss something out of the presence of the jury?

2         MR. TURNER:  Yes, Your Honor.  I'm withdrawing that

3  at this time, and we can proceed forward.  I'm sorry I took up

4  the Court's time.  I apologize.

5         THE COURT:  Very well.

6      Let's have the jury, then, Mr. Marshal.

7      (JURY IN AT 2:39 p.m.)

8         THE COURT:  Okay.  You may be seated, people.

9  Let's -- the Government may call your next witness.

10        MR. DABBS:  Thank you, Your Honor.  The Government

11 calls Jason Price.

12     (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

13        THE COURTROOM DEPUTY:  Please take the seat in the

14 witness stand and state your name for the record.

15        THE WITNESS:  My name is Jackson Price, and some

16 people call me Jason.

17        MR. DABBS:  Your Honor, may I proceed?

18        THE COURT:  Yes, sir.

19        MR. DABBS:  Thank you.

20        JACKSON "JASON" PRICE, GOVERNMENT'S WITNESS, SWORN

21                    DIRECT EXAMINATION

22 BY MR. DABBS:

23 Q.   Agent Price, what do you do for a living?

24 A.   I'm a special agent with the Bureau of Alcohol, Tobacco,

25 Firearms, & Explosives, commonly referred to as ATF.

1  Q.    How long have you been with the ATF?

2  A.    I've been employed with ATF for over 14 years.

3  Q.    What did you do before that?

4  A.    I was an attorney practicing law in the Northern District

5  of Mississippi.

6  Q.    Where are you currently assigned?

7  A.    I'm currently assigned to the Oxford, Mississippi, field

8  office here in Oxford, Mississippi.

9  Q.    And what do you do with the ATF?

10 A.    Special agent, primarily focus on investigating violations

11 of federal firearms laws, explosives laws, alcohol/tobacco

12 diversion, investigate criminal street gangs and organized

13 criminal gangs in our district.

14 Q.    How many wiretap investigations do you think you've

15 participated in?

16 A.    In excess of five.

17 Q.    Have you ever been involved in methamphetamine

18 investigations?

19 A.    Yes, sir.

20 Q.    What about gang investigations?

21 A.    Yes, sir.

22 Q.    And have you had a good bit of specialized training?

23 A.    I have.

24 Q.    Training in investigating narcotics?

25 A.    I have.

PRICE - DIRECT

1  Q.    Firearms?

2  A.    Yes, sir.

3  Q.    Okay.  What about mapping and using maps, particularly GPS

4  coordinates; have you done that in your career as an ATF agent?

5  A.    Absolutely.

6  Q.    Okay.  Were you involved in this case?

7  A.    Yes.

8  Q.    Would you say you were heavily involved in this -- from

9  the federal side in this investigation?

10 A.    Yes, sir.  I was one of the co-case agents on this

11 investigation.

12 Q.    Did you participate in search warrants?

13 A.    Yes, sir.

14 Q.    Did you participate in the wiretap in this case?

15 A.    I did.

16 Q.    Now, how many phone numbers did -- did -- were actually

17 wiretapped in this case related to Perry Mask?

18 A.    Two individual and separate phones were intercepted with

19 regard to Perry Mask.

20 Q.    And total between the two phones, how many days were

21 captured?

22 A.    Total, between the two phones, was 17 days.

23 Q.    Okay.  Did you participate in search warrants in this case

24 in the Northern District of Mississippi?

25 A.    Yes, multiple search warrants.

PRICE - DIRECT

1  Q.    Okay.  And did you seize Aryan Brotherhood paperwork, such

2  as constitutions?

3  A.    Yes, sir.

4  Q.    Okay.  The constitutions that have been admitted into

5  evidence, are those the only constitutions that were found?

6  A.    No, sir.  We found a lot more than that.

7  Q.    Did you have an opportunity to compare paperwork that was

8  found in northern Mississippi to paperwork that was found at

9  Brandon Creel's house?

10  A.    Yes, sir.

11  Q.    Were there any similarities?

12  A.    Yes.  The documents were not only similar, there were

13  certain portions of the documents found in Brandon Creel's

14  residence in south Mississippi that were identical to documents

15  found in the north at -- in search warrants that we conducted

16  up here in the north.

17  Q.    On these intercepted calls, the wiretap on Perry Mask's

18  phone, are federal agents able to listen to those calls in real

19  time?

20  A.    Yes, sir.

21  Q.    Okay.  When federal agents heard the calls related to

22  Preston Goodwin, how did the federal agents respond?

23  A.    When we heard the intercepted call regarding the threats

24  made towards Preston Goodwin, who was an inmate incarcerated at

25  Walnut Grove Correctional Facility, we had an obligation to try

1  to protect that man's life.

2      So we contacted the Department of Corrections; and, of

3  course, at the time, we were monitoring intercepted electronic

4  communications.  That information is not for public knowledge.

5  It's supposed to be kept under wraps.  We're not supposed to

6  explain to anyone outside of that realm of the investigation

7  what we're doing.

8      So we had to convey to the Mississippi Department of

9  Corrections a dire need to move Preston Goodwin to safety for

10  his own safety, without disclosing why it was that he needed to

11  be moved in detail, but simply to advise them that his life was

12  in danger; that we had received a credible threat against his

13  life.  And, to that degree, he needed to be moved to safety.

14  So Preston Goodwin was moved to what they call administrative

15  segregation where he was segregated from the remainder of the

16  population at Walnut Grove.

17      MR. DABBS:  Your Honor, I'd like to have this photo

18  marked for identification as the next numbered Government

19  exhibit.

20      THE COURTROOM DEPUTY:  Fifty-two.

21      THE COURT:  Very well.  It will be so marked for

22  identification.

23      MR. DABBS:  Thank you, Your Honor.

24   (EXHIBIT NO. G-52 WAS MARKED FOR IDENTIFICATION)

25      MR. DABBS:  Your Honor, may I approach the witness?

1              THE COURT:  Yes, sir.

2   BY MR. DABBS:

3   Q.    Agent Price, I'm going to hand you two photos.  One has

4   been marked previously as Exhibit 43, and one is Exhibit 42 --

5   52.  Excuse me.  Forty-two and fifty -- 43 and 52.  Do you

6   recognize those photos?

7   A.    Yes, I do.

8   Q.    Were you present when those photos were taken?

9   A.    Yes, I was.

10  Q.    And who -- Government Exhibit 43, who is that a picture

11  of?

12  A.    That is a photograph of Frank Owens, the defendant in this

13  case.

14  Q.    And Exhibit 52?

15  A.    And Exhibit 52 is defendant Eric Parker in this case.

16  Q.    And when were these photos taken?

17  A.    Last week.

18  Q.    Okay.  Are they a true and accurate representation of

19  Mr. Owens and Mr. Parker at that time?

20  A.    Yes, they are.

21              MR. DABBS:  Your Honor, at this time, we'd move to

22  admit Exhibit 43 and Exhibit 52 into evidence?

23              THE COURT:  Okay.  Any objection?

24              MR. TURNER:  No, Your Honor.

25              MR. SUMRALL:  Just the one we raised at the initial

1    authorizing of the phones -- I mean, of the pictures, Your

2    Honor.  We raise that same issue now.

3              THE COURT:  As I recall that issue, there was not a

4    time stated.  What was your objection?

5              MR. SUMRALL:  Your Honor, that it was in violation of

6    his 5th and 6th amendments, testifying against himself.

7              THE COURT:  Okay.  In the opinion of the Court, these

8    photographs are non-testimonial exhibits.  The objection's

9    overruled, and the two exhibits are admitted.

10             (EXHIBIT NOS. G-43 AND G-52 WERE RECEIVED INTO EVIDENCE)

11             MR. DABBS:  Thank you, Your Honor.

12   BY MR. DABBS:

13   Q.   Agent Price, as you said, have you been heavily involved

14   in this case?

15   A.   Yes, sir.

16   Q.   Have you become familiar with tattoos that are synonymous

17   with membership in the Aryan Brotherhood?

18   A.   Yes, sir, I have.

19             MR. DABBS:  Your Honor, may I publish these photos?

20             THE COURT:  Yes, sir.

21   BY MR. DABBS:

22   Q.   Now, again, who is this a picture of?

23   A.   This is a picture of Defendant Frank Owens.

24   Q.   And when was it taken?

25   A.   Last week.

1  Q.    Okay.  What tattoos do you recognize in this photo that

2  would indicate membership in the Aryan Brotherhood?

3  A.    Where I circled in blue, surrounded by a shield, is what

4  is considered the old Aryan Brotherhood tattoo, pre-2013.  What

5  I've circled in blue on the neck, the No. 13, which is symbolic

6  with the Aryan Brotherhood for the 13th letter of the alphabet,

7  which is M, contemporaneous with the state of Mississippi.

8       The SS lightening bolts also depicted on Mr. Owens' neck,

9  synonymous with the rank, or honorary rank, of thunder warrior;

10  which has been testified to here in this investigation and is

11  contained in their documentation.

12      Circled in blue, swastika on the right shoulder.  Circled

13  in blue, depicted with a red background, is a right-turning

14  swastika, along with other tattoos on the right arm, double SS

15  lightening bolts on the right arm, synonymous with symbols used

16  by the Aryan Brotherhood of Mississippi.

17  Q.    Now, Agent Price, have you also seen tattoos -- again, you

18  were present when these photos were taken?

19  A.    Yes, I was.

20  Q.    Have you seen other tattoos that aren't actually present

21  in these photos?

22  A.    Yes.

23  Q.    What about a recruiter patch?

24  A.    Yes.  Mr. Owens does have a recruiter patch tattoo.

25  Q.    And is there another Aryan Brotherhood brand?

PRICE - DIRECT

1  A.    Yes.  Mr. Owens also has the new brand or post-2013 Aryan

2  Brotherhood brand on his body.

3  Q.    Exhibit 52, who's pictured in this picture?

4  A.    Defendant Eric Parker is depicted in this picture.

5  Q.    And do you recognize any tattoos that would signify

6  membership in the Aryan Brotherhood?

7  A.    Yes, I do.

8  Q.    Would you please point those out to the jury.

9  A.    Most importantly, Mr. Parker's Aryan Brotherhood original

10  brand, pre-2013, is depicted on his right chest.  Mr. Parker

11  has the SS lightening bolts on his neck, symbolic with the

12  thunder warrior rank, or honorary rank, in the Aryan

13  Brotherhood; and the right-facing swastika on his right arm.

14  Q.    Thank you, Agent Price.  Agent Price, you testified

15  earlier that you were familiar with mapping and determining GPS

16  coordinates.  Is that hard to do?

17  A.    No, sir.

18  Q.    How do you do that?  If you have GPS coordinates, how do

19  you find out where they are?

20  A.    Well, nowadays, it's easier with the invent of internet

21  computer and data software.  Plug in GPS coordinates, and it

22  overlays those coordinates on a map.  It's very commonly used

23  by myself and other agents in my agency.

24        Prior to that, we learned, in elementary school, how to

25  use latitude and longitude to read a map or in the Boy Scouts,

1  how to read a map; and they'll look at latitude and longitude

2  to determine where a particular point is in location.

3  Q.    I want to show you what's been marked as -- what's been

4  admitted as Government Exhibit 50 on page 43.  Have you been

5  able to review these cell site records?

6  A.    I have.

7  Q.    Okay.  Were you able to find the last set of GPS

8  coordinates on these records, printed on these records?

9  A.    Yes, sir.

10  Q.    Okay.  What was the date related to those records, those

11  last GPS coordinates?

12  A.    December 2, 2010.

13  Q.    And what was the time?

14  A.    7:37 p.m.

15  Q.    On December 2nd, 2010?

16  A.    Yes, sir.

17  Q.    Now, are there any GPS coordinates for cell towers after

18  that date?

19  A.    No, sir.

20  Q.    Are there any calls listed as outgoing calls after that

21  date?

22  A.    No, sir.

23  Q.    Were you able to determine the location of the cell tower

24  based on the GPS coordinates printed in these records related

25  to Michael Hudson's phone on December the 2nd, 2010, at

PRICE - DIRECT

1  7:37 p.m.?

2  A.    Yes, I was able to do that.

3  Q.    Where was it located?

4  A.    That tower location with those GPS coordinates is located

5  off of Bonita Road in Gautier, Mississippi.

6  Q.    Agent Price, I'm going to show you what's been admitted as

7  Government's Exhibit 45.  Recognize that picture?

8  A.    Yes, I do.

9  Q.    What is that a picture of?

10  A.    That is a picture of the residence that Wendell Eaves

11  occupied in December of 2000 -- excuse me -- December of 2010.

12  Q.    Were you able to determine the address of that house?

13  A.    Yes, sir.

14  Q.    What is it?

15  A.    3624 Bonita Road, Gautier, Mississippi.

16  Q.    The cell tower identified on the last call, Michael

17  Hudson's cell phone, how far is it from that house?

18        MR. SUMRALL:  Your Honor, I'm going to object unless

19  he has actual knowledge of the location of that cell tower and

20  actual knowledge of the location of this house.

21        THE COURT:  The objection's well-taken.

22  And do you have such knowledge, agent?

23        THE WITNESS:  Yes, sir.

24        THE COURT:  Okay.  If you have personal knowledge,

25  you've been at both the house and the cell tower, you may

1  answer.

2              THE WITNESS:  No, sir.  I've used my mapping software

3  and my maps, as we do in the normal course of business with

4  ATF.  And I have determined that that residence is within less

5  than 1 mile from that cellular tower that is depicted in the

6  latitude and longitude of those records.

7  BY MR. DABBS:

8  Q.    Less than a mile from Wendell Eaves' house?

9  A.    Yes, sir.

10             MR. DABBS:  Your Honor, may I have a moment to confer

11 with counsel?

12             THE COURT:  Yes, sir.

13             MR. DABBS:  That's all I have, Your Honor.

14             THE COURT:  Very well.

15        Mr. Sumrall, you may cross-examine this witness.

16             MR. SUMRALL:  May I have a second, Your Honor?

17             THE COURT:  Yes, sir.  Take -- take what time you

18 need.  I'm not rushing you.  Take your time.

19             MR. SUMRALL:  Okay.  (Pause).  No questions, Your

20 Honor.

21             THE COURT:  Okay.

22        Mr. Turner?

23                     CROSS-EXAMINATION

24 BY MR. TURNER:

25 Q.    Agent Price, you don't have any proof that that cell phone

1  was in Michael Hudson's possession on December 2nd, do you?

2  A.    In his hand?  No, sir, not as phrased.

3  Q.    All right.

4        MR. TURNER:  Thank you, Your Honor.  That's all I

5  have.

6        THE COURT:  Redirect?

7        MR. DABBS:  No, Your Honor.

8        THE COURT:  Any redirect?

9        MR. DABBS:  No, Your Honor.

10       THE COURT:  Okay.  Very well.

11    Officer, you're fully and finally discharged.  You may go.

12    Okay.  You may call your next witness.

13       MR. LEARY:  Your Honor, at this time, the Government

14  rests.

15       THE COURT:  Very well.

16    Ladies and gentlemen of the jury, it will be necessary for

17  me to take up certain matters out of your presence now.  I'll

18  ask that you go to the jury room, please; and we'll notify you

19  when we're ready to proceed.

20    (JURY OUT AT 2:58 p.m.)

21       THE COURT:  Okay.  You may be seated.  I'm sure

22  defense counsel has motions?

23       MR. SUMRALL:  Yes, Your Honor.

24       THE COURT:  Very well.  I'll hear you first,

25  Mr. Sumrall.

 1          MR. SUMRALL:  Your Honor, comes now the defendant,

 2  Frank Owens, by and through counsel, and moves this Court for a

 3  directed verdict of acquittal and would show unto this

 4  Honorable Court that the Government has failed to prove each

 5  and every element necessary to go forward on this indictment

 6  with these various counts.

 7          That the Government has failed to prove that there was in

 8  fact a murder; that the Government has failed to prove each and

 9  every element in regards to a conspiracy that was furthered by

10  the overt acts that they allege; that the Government has failed

11  to prove that, in fact, this defendant was part of that

12  conspiracy.  And, on that basis, Your Honor, we ask the Court

13  to direct a verdict in favor of acquittal for Frank Owens.

14          THE COURT:  Thank you.

15      Mr. Turner?

16          MR. TURNER:  Your Honor, may I walk with my laptop?

17          THE COURT:  Yes.

18          MR. TURNER:  I was starting to write the motion I was

19  going to file.  I can do it ore tenus.  Your Honor,

20  Mr. Parker's position is unique.  I'm just going to read my

21  motion at this point.

22          THE COURT:  Yes.

23          MR. TURNER:  Comes now Eric Glenn Parker, by and

24  through counsel, and files this motion to grant an acquittal or

25  directed verdict and would show unto this Court the following:

 1  Eric Glenn Parker is currently on trial in this case, and the

 2  Government has now rested after presenting its case in chief.

 3  Mr. Parker now moves this Court for an acquittal in this case

 4  on the basis of Federal Rule of Criminal Procedure 29.

 5      The Government has not produced sufficient evidence to

 6  meet the elements of a conspiracy in Count 1, a conspiracy to

 7  distribute methamphetamine in Count 2, or murder in Count 4.  A

 8  glaring problem with the trial of Mr. Parker is venue.

 9      In all criminal prosecutions, the accused shall enjoy the

10  right to a speedy public trial by an impartial jury of the

11  state and in the district wherein the crime shall have been

12  committed.  That's a citation of the U.S. Constitution

13  Amendment VI.

14      The following is a quote:  "Venue may properly be laid in

15  one district with respect to one count of an indictment but

16  still be improper with respect to the other counts."  That's

17  *United States v. Davis*, 666 F.2d 195 Fifth Circuit 1982.

18  Additionally, this deprives this Court of personal and subject

19  matter jurisdiction over Mr. Parker and the alleged crimes in

20  the indictment.

21      Due to lack of venue and jurisdiction, which this -- which

22  I have raised several times pretrial and during this trial,

23  Mr. Parker's charges should be dismissed with prejudice.  As to

24  Count 1, the conspiracy to commit RICO, the Government has not

25  shown that Mr. Parker entered into a conspiracy with any person

1    in the Northern District of Mississippi, nor has the Government

2    proven that Mr. Parker made any overt act in furtherance of the

3    conspiracy in the Northern District of Mississippi.

4         This is a quote, "In cases involving conspiracy offenses,

5    venue is proper in any district where the agreement was formed

6    or an overt act occurred." *United States v. Caldwell* -- I

7    believe it came from this Court, Your Honor -- 16 F.3d 623 and

8    624, Fifth Circuit, 1994; citing *United States v. Winship*, 724

9    F.2d 1116 at 1125, Fifth Circuit, 1984; and *United States v.*

10   *Pozos* 697 F2d 1238 at 1244, Fifth Circuit, 1983.

11        Witness after witness testified about shipments of

12   amphetamines, stolen guns, an attempted murder of Jeremy

13   Bailey, and plans to obtain more amphetamines within the prison

14   system in the Northern District of Mississippi and districts of

15   Arkansas.

16        No witness testified that Mr. Parker had anything at all

17   to do with these acts that occurred in the fall of 2012 until

18   early 2014.  The wheel leaders that testified were Perry Mask

19   and Michael Hubanks.  Michael Hubanks testified that he did not

20   know who Mr. Parker was, and Mr. Mask testified that he did not

21   know who Mr. Parker was; and he had nothing to do with the

22   conspiracies that were on the audio tapes that were presented

23   by the DEA.

24        Presently, there's not even a scintilla of circumstantial

25   evidence to provide to the jury with anything for them to even

1   weigh regarding the Northern District of Mississippi as it

2   pertains to Mr. Parker.  I said "see *Davis* holding."  There's a

3   general rule that a jury's inferences must be supported by some

4   evidence in the record as a whole.

5        As to Count 2, which involves the conspiracy to possess,

6   with intent to distribute, methamphetamine in the Northern

7   District, the Government put forth no proof to support this

8   count in the indictment; and it is wholly insufficient because

9   Mr. Mask clearly said that Mr. Parker had nothing to do with

10  that -- that incident.

11       And any kind of crimes that may have even been considered,

12  the Government might -- the Court might have found them to be

13  sufficient, would belong in the Southern District of

14  Mississippi.

15       But none of them had anything to do -- they don't even

16  have Mr. Parker traveling into the Northern District of

17  Mississippi, let alone any overt act or coming to any agreement

18  with anyone in the Northern District.

19       There is no evidence for the jury to weigh about a

20  conspiracy that Eric Parker entered into with any of the

21  individuals in Count 2.  Indeed, the only ones that testified

22  against Mr. Parker in this count admitted that they did not

23  know him; and they had nothing to do with the methamphetamine

24  conspiracy -- that he had nothing to do with the

25  methamphetamine conspiracy involving Perry Mask's fiasco in

1   Marshall County.

2         Count 4 involves the murder, Your Honor.  And, quite

3   frankly, there's conflicting testimony that the Court might

4   would find to be sufficient; but we move that the elements were

5   not met in that case; that there's no body.  And there's no

6   forensic evidence to support that case.

7         Even if there were, it should have been tried in the

8   Southern District of Mississippi.  It was -- there's testimony

9   that none of the methamphetamine trafficking had anything to

10  do -- had anything to do with Mr. Parker, had anything to do

11  with the Aryan Brotherhood.  And there's no testimony, no

12  proof, that anything involving the kidnapping and the murder

13  situation had anything to do with the Aryan Brotherhood.

14        Even if -- at the outstretches of it, that's only one

15  predicate act.  The Government needs two to make their RICO

16  count, and they are insufficient.  Thank you, Your Honor.

17            THE COURT:  Yes, sir.

18        I'll hear from the Government.

19            MR. LEARY:  Your Honor, the crimes charged in this

20  case concern a conspiracy that began in 2009 in that the

21  defendant Mr. Owens and Mr. Parker conspired to participate in

22  that enterprise through a pattern of racketeering activity.

23  The pattern of racketeering activity existed from -- in 2009

24  until 2014.  The pattern of racketeering activity included

25  overt acts such as methamphetamine trafficking, money

1    laundering, kidnapping, and murder.

2         Your Honor, the evidence in this case, the Government

3    would respectfully argue, is significant; that the enterprise

4    in this case was the Aryan Brotherhood of Mississippi; that the

5    Aryan Brotherhood of Mississippi was intimately involved in the

6    trafficking of methamphetamine in that the Aryan Brotherhood

7    members actually threw methamphetamine over the fence in prison

8    facilities.

9         They facilitated the introduction of members of the

10   conspiracy in the Northern District of Mississippi,

11   specifically, Perry Mask, to members -- to suppliers in the

12   Southern District of Mississippi through the utilization of

13   Barron Goff, CC, and an individual referred to as "Butter

14   Bean."

15        That that CC facilitation in the Northern District -- in

16   the Southern District of Mississippi is what precipitated the

17   methamphetamine trafficking attempt and the 5 pounds of

18   methamphetamine that was seized coming back from California;

19   that ex-wheel Larry Sneed facilitated the introduction to

20   methamphetamine traffickers in Texas.

21        We also know that Brandon Creel was intimately involved in

22   methamphetamine trafficking, together with Eric Parker.  Your

23   Honor, what we have proved is that they participated in the

24   affairs of the enterprise through a pattern of racketeering

25   activity.

1    Now, Mr. Parker, in this case, the Government would

2 respectfully argue that the evidence is significant that he was

3 involved in methamphetamine trafficking.  You have heard

4 numerous witnesses testify that he specifically supplied

5 methamphetamine to a fellow Aryan Brotherhood, Michael Hudson.

6    And, when Michael Hudson did not pay his debt, it was the

7 Aryan Brotherhood that stepped in.  The Aryan Brotherhood

8 initially ordered Michael Hudson to have minutes with Eric

9 Parker.  That was not a challenge by Eric Parker; that was an

10 order by the Aryan Brotherhood.

11    When Michael Hudson did not respond to the order, he was

12 ordered to be smashed.  It was not Eric Parker that smashed

13 Michael Hudson; it was members of the Aryan Brotherhood that

14 smashed Michael Hudson for two reasons, for not paying a drug

15 debt to this man right here, as well as for not responding to

16 an order.

17    Michael Hudson was ultimately murdered by members of the

18 Aryan Brotherhood for not paying a drug debt to this man right

19 here.  So that what we know is, if he argues that his

20 methamphetamine trafficking was somehow not related to the

21 Aryan Brotherhood, I would respectfully argue that that's

22 wrong.

23    Because not only -- well, excuse me.  That debt -- that

24 drug debt was -- the ramifications for not paying that drug

25 debt were dealt with not by this man but by his brothers in the

1 Aryan Brotherhood.  It was an Aryan Brotherhood enterprise.

2  We have listened to numerous examples.  We listened to

3 examples of how, if you borrow money from the treasury to pay

4 for drug debts, you have to pay a certain interest rate for

5 that.  The defendant in this case does not like VCAR charges,

6 which are violent crimes in aid of racketeering.

7  You see, Your Honor, this is not just a murder charge;

8 this is a VCAR charge.  And a VCAR charge charges that these

9 men murdered Michael Hudson in order to advance their position

10 within the Aryan Brotherhood.

11  Well, of course, they did; they had no choice.  He was

12 murdered for not paying a drug debt to an Aryan Brotherhood

13 member and also for not obeying an Aryan Brotherhood order.  So

14 the murder in this case and the kidnapping were intimately

15 connected to the Aryan Brotherhood enterprise.

16  And we've seen that the Aryan Brotherhood enterprise is a

17 statewide enterprise that exists all the way from the top of

18 the state to all the way to the bottom of the state.  And, when

19 one enters into a conspiracy, all that is required is for an

20 overt act of that conspiracy to occur in the Northern District.

21  And we have numerous acts of this overt -- numerous overt

22 acts which occurred in the Northern District.  So, once that

23 happens, we have jurisdiction in the Northern District; and we

24 can try those crimes that occurred, other overt acts,

25 regardless of where they occurred; so long as we have

1  jurisdiction over this particular enterprise, which is the

2  Aryan Brotherhood.

3      So I would respectfully assert that -- that the Aryan

4  Brotherhood is a statewide organization; that both these

5  defendants participated in a pattern of racketeering activity.

6  Frankie Owens did so while being a wheel member and before;

7  starting in 2009 in the Southern District of Mississippi

8  through enforcing Aryan Brotherhood laws in the smashing and

9  ultimate killing of Michael Hudson, as well as obtaining and

10  selling methamphetamine from other Aryan Brotherhood members,

11  specifically Brandon Creel.

12      And that Eric Parker, likewise, participated in the

13  affairs of this statewide enterprise through a pattern of

14  racketeering activity, that is, selling drugs with Brandon

15  Creel; the testimony being somewhere between 10 pounds and

16  20 pounds of methamphetamine, selling those drugs together

17  knowing full well that if a drug dealer did not pay his debt to

18  Brandon Creel that that drug -- I mean, to Eric Parker, that

19  that drug dealer would not be dealt with just by Eric Parker.

20      If a drug dealer didn't pay his debt to Eric Parker, the

21  Aryan Brotherhood would collect that debt for him.  So I would

22  respectfully assert that the pattern of racketeering activity

23  includes not only the numerous instances where he was selling

24  methamphetamine with Brandon Creel, but also in the events that

25  led to the ultimate -- the smashing and ultimate murder of

1   Michael Hudson, Your Honor.

2        Do you have any questions for the Government?

3             THE COURT:  I think not.

4             MR. SUMRALL:  Your Honor, may I respond?

5             THE COURT:  Yes, briefly.

6             MR. SUMRALL:  First and foremost, Your Honor, the

7   Government has failed to prove, as Mr. Leary would say, that it

8   was a murder.  There's been absolutely no proof of a murder or

9   anything along that line.  They have failed to meet that burden

10  totally.  There's been no proof of murder; there's been no

11  forensic evidence; there's been no proof of anything that

12  happened to Michael Hudson.

13       Secondly, Your Honor, that the Government has failed in

14  that all of these enterprises that they allege, the drug sales

15  and stuff, they didn't benefit the Aryan Brotherhood; they

16  benefitted the individuals, who happened to be brothers of the

17  brotherhood.

18       But they were not -- money did not go from the sale of

19  drugs into an account for the Aryan Brotherhood; it went into

20  those individual accounts.  So they have failed to prove that

21  that part of the enterprise was involving the Aryan

22  Brotherhood, Your Honor.  And we ask that a directed verdict

23  be --

24            THE COURT:  Very well.

25       Mr. Turner?

1          MR. TURNER:  Yes, Your Honor.  The Government is duty

2  bound to put forth sufficient proof before Your Honor to be

3  able to submit it to a jury; and Mr. Leary has talked about

4  criminal acts that they do not have anything -- various other

5  acts that occurred in the Northern District of Mississippi that

6  do not have anything to do with Mr. Parker.

7          Mr. Creel that testified is the only -- the only proof of

8  any kind, when I asked him about the money, the money that was

9  obtained from the methamphetamines.  And he said that had

10  nothing to do with the Aryan Brotherhood.

11          So I would submit that that absolutely strikes the

12  methamphetamine portion of the conspiracy to be in furtherance

13  of the Aryan Brotherhood, because there was no proof that was

14  submitted otherwise.  Nobody said the money was going for this,

15  or that Mr. Parker was putting money into that treasury or

16  benefitting from it, for that matter.

17          Second, Your Honor, I join in the discussion about the

18  murder.  We don't have a coroner's report.  We don't have a

19  body.  Mr. Hudson may turn up next week in Florida.

20          Lastly, Your Honor, I would renew my objections as far as

21  my -- our discussion more along the lines -- or, should I say,

22  about the *Bourjaily* case and how it relates to the *Crawford*

23  case.

24          I fully believe that *Crawford*, after it abrogated *Ohio v.*

25  *Roberts*, cast serious doubt on these co-conspirators; and I

1   would -- I would ask the Court to take that into consideration

2   also, as far as the indicia of reliability that was absent from

3   the witnesses that were clearly drug users and criminals

4   themselves.  Thank you, Your Honor.  I would ask for a

5   dismissal at this time.

6           THE COURT:  Very well.  Gentlemen, I'm going to be in

7   recess until ten minutes of four as I take up the matters

8   presented in these arguments.  I'll be in recess until ten

9   minutes of four.

10      I may be in recess until four o'clock.  Let's see,

11  Mr. Marshal.  If some of you people will inform the jury we'll

12  be in recess a little bit longer.

13          THE COURT SECURITY OFFICER:  Yes, sir.

14  (Recess at 3:18 p.m. until 3:55 p.m.)

15          THE COURT:  Okay.  At the conclusion of the

16  Government's proof in the case sub judice, the defendant has

17  made the motion for judgement of acquittal pursuant to the

18  Federal Rules of Criminal Procedure.  The Court addresses that

19  motion and issue at this juncture.  Initially, the Court,

20  pursuant to the seminal case of *Bourjaily v. United States* --

21  let's see, Gina -- off the record.

22      (Off-the-record discussion)

23          THE COURT:  The Court takes up the matter of the

24  co-conspirators' hearsay statements, if any, in this case.  And

25  it's my recollection, and my review of the evidence reveals,

 1  that the most likely statements that would be concerned at this

 2  time are discussions between one Sonny Todd Maxwell and James

 3  Milton Dean in an automobile and all -- as they rode in an

 4  automobile, and, also, a conversation between Walter Burrus,

 5  also known as T-bone, and one Mitchell Burnell Valentine.  They

 6  had some discussion concerning what other members of this

 7  alleged -- of this conspiracy stated.

 8       In considering the matter before the Court, and pursuant

 9  to Federal Rule of Evidence 801(d)(2)(E) and the seminal case

10  of *Bourjaily v. United States*, 483 U.S. page 171, United States

11  Supreme Court, 1987, and a new -- relatively new Fifth Circuit

12  case, *United States v. Shoemaker*, 746 F.3d page 614, Fifth

13  Circuit, 2014, the Court finds, by a preponderance of the

14  evidence, that a conspiracy existed of which both the declarant

15  and the defendants in this case were members.

16       Two, that the declarants made the statements in the course

17  of that conspiracy; and, No. 3, that the declarants made the

18  statement in furtherance of the conspiracy.  Given the case sub

19  judice, there were so many co-defendants who testified as to

20  actual knowledge that the hearsay statements were at a very

21  minimum in this case.  Most of these people testified as to

22  their personal observations.

23       Then the Court moves to the judgment of acquittal as moved

24  for by the defendants in the case sub judice.  The Court's

25  guided by the seminal cases of *Glasser v. United States*, 315

1  U.S. page 60, United States Supreme Court, 1942.  It's an old

2  case, but it's still good law.

3      "If a reasonable trier of fact could find the defendants

4  guilty beyond a reasonable doubt based on the evidence in the

5  case, then the motion should be denied."  This case was cited

6  en banc, Fifth Circuit case, *U.S. v. Bell*, 678 F.2d page 547,

7  Fifth Circuit, 1982.  Also, in an en banc decision, *U.S. v.*

8  *Pierre*, 958 F.2d page 1304, Fifth Circuit, 1992.

9      The query before the Court is could reasonable jurors,

10  based on the evidence in the case, find the defendants guilty

11  beyond a reasonable doubt?  The Court looks to the authorities

12  in both the United States Supreme Court and in, particularly,

13  the Fifth Circuit.

14      Eighteen, United States Code, Section 1962(c) makes it

15  unlawful for any person employed by or associated with any

16  enterprise engaged in, or the activities of which affect,

17  interstate commerce, to conduct or participate, directly or

18  indirectly, in the conduct of such enterprise's affairs through

19  a pattern of racketeering.

20      *Hemi Group, LLC, v. City of New York*, 559 U.S. page 1,

21  United States Supreme Court, 2010.  A defendant may be

22  convicted despite a challenge to venue if, viewing the evidence

23  in the light most favorable to the Government, a rational jury

24  could find that the Government established venue by a

25  preponderance of the evidence.  *United States v. Ramirez*, 555

1  F. App'x 315, Fifth Circuit, 2014, citing *United States v.*

2  *Garcia Mendoza*, 587 F.3d page 682.

3      By a preponderance of the evidence can be entirely

4  circumstantial, that is, the venue question may be found by a

5  preponderance of the evidence; and it may be based entirely on

6  circumstantial evidence.  *United States v. Gonzales*, 236 F.

7  App'x page 962, Fifth Circuit, 2007.  Per curiam citing *U.S. v.*

8  *Solis*, 299 F.3d page 420, Fifth Circuit, 2002.

9      Along that line, venue in a conspiracy case is proper in

10  any district where the agreement was formed or where an overt

11  act in furtherance of the conspiracy is formed.  Citing

12  *Gonzales* again, quoting the United States Supreme Court of *U.S.*

13  *v. Pomranz*, 43 F.3d page 156.

14      Now, in the case sub judice, the Court, going back to the

15  seminal cases of *Glasser, Bell, Pierre,* is of the opinion that

16  there's evidence in this record that a reasonable jury could

17  find the defendants guilty beyond a reasonable doubt of the

18  counts that the defendants are charged in.

19      Now, this Mr. Creel's testimony about this not being an --

20  the Aryan Brotherhood not having a dog in this hunt, in the

21  opinion of the Court, you can't turn the activities -- the

22  involvement of the Aryan Brotherhood on and off like a water

23  faucet.  And the testimony of Mr. Creel in this regard was

24  contrary to the overwhelming direct and circumstantial evidence

25  testified to by the other witnesses in the case.

1     The superseding indictment charges the defendant Parker

2  and others were members of the Aryan Brotherhood, a RICO

3  conspiracy, a RICO enterprise; and that the Aryan Brotherhood

4  committed racketeering activity in both the Northern and

5  Southern Districts of Mississippi.

6     Because the overt acts were committed as part of an

7  alleged RICO conspiracy which took place in both districts, the

8  Court is of the opinion that these defendants can be tried in

9  either the Northern Or Southern Districts, in that there's

10  evidence in the record that overt acts were committed in both

11  districts.  And this is the citation to *U.S. v. Davis*, 666 F.2d

12  page 195.

13     That's the ruling of the Court.  The motions for judgment

14  of acquittal are not well-taken and are overruled.  Now, let me

15  confer with counsel.  Well, first, let me ask, Mr. Sumrall, and

16  Mr. Turner, will you have proof on behalf of these defendants?

17          MR. SUMRALL:  On behalf of Mr. Owens, Your Honor, no,

18  sir; we will not.

19          THE COURT:  Sir?

20          MR. SUMRALL:  No, sir, we will not.

21          THE COURT:  Mr. Turner?

22          MR. TURNER:  No, Your Honor, we will not.

23          THE COURT:  Very well.  If I could have the defendant

24  Owens stand, please.  If you would stand, Mr. Owens.  You stand

25  with him, Mr. Sumrall.  Now, Mr. Owens, under federal law and

1  pursuant to the Constitution of the United States, you have a

2  constitutional right to present witnesses on your behalf.

3      You have a constitutional right to testify, if you elect

4  to do so.  You may waive that right.  You may elect not to

5  testify and no inference or suggestion of guilt can be drawn

6  from the fact that you did not testify.  But it's an election

7  solely up to you as to whether or not you'll testify in the

8  case.  Do you understand that, sir?

9        DEFENDANT OWENS:  Yes, sir.

10        THE COURT:  Very well.

11    Mr. Sumrall?

12        MR. SUMRALL:  Yes, sir.

13        THE COURT:  Very well.  Thank you.

14    Mr. Turner, if you and Mr. Parker would stand.

15  Mr. Parker, I give you the same admonition.  You have every

16  right to testify, to present witnesses in your behalf, if you

17  elect to do so.

18      By the same token, under the federal statutes and the

19  Constitution of the United States, you have a constitutional

20  right not to testify, if you elect to exercise that right; and

21  I will instruct the jury that they're to draw no inference of

22  guilt from the fact that you elect not to testify .

23      Now, this is a decision solely up to you.  And you have a

24  very fine attorney there to advise you.  But I want to give you

25  that constitutional advice before you make this election.

1          DEFENDANT PARKER:  Yes, sir.

2      (Off-the-record discussion).

3          DEFENDANT PARKER:  Yes, sir.  It's my choice not to

4  testify.

5          THE COURT:  Very well.  Okay.  You may be seated.

6          MR. TURNER:  Thank you, Your Honor.

7          THE COURT:  Now, let me confer with counsel here at

8  the bench, all counsel.

9      (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

10         THE COURT:  Okay.  I've been hauling the proposed

11  jury instructions around in a wheelbarrow.

12         MR. TURNER:  Have you gotten any stronger?

13         THE COURT:  Made my back stronger.  What I have in

14  mind is to recess this jury until 1:30 tomorrow and for me to

15  meet with you folks at ten o'clock in the morning.  Now, you

16  think that gives us ample time?

17     I hate to have the jury sitting back there in a room not

18  knowing what's going on.  I sure don't want to undertake this

19  now this late in the day.  Do y'all want to discuss that a

20  minute and see what you prefer?

21         MR. TURNER:  Yes, Your Honor.  I haven't talked to

22  these guys about it, but I don't know -- I'm ignorant to your

23  procedure, and I apologize for that.  I don't know how long it

24  usually takes y'all to get instructions together, but it

25  usually doesn't take too terribly long.

1              MR. LEARY:  I think that's a pretty good plan, Judge.

2              MR. TURNER:  If anything, I would say earlier than

3  1:30; but that's just me.

4              THE COURT:  Well, I think that will give ample time.

5  Just to -- I mean, just the sheer number of your instructions.

6  I'd say at least two-thirds of them are generic instructions

7  that the Court usually gives.  But let's do that.  Ten o'clock

8  in the morning have you be here and be ready to go over the

9  jury charge.

10             MR. LEARY:  Yes, Your Honor.

11             MR. SUMRALL:  I think that's a very good idea, Your

12  Honor, because that gives us time to get the jury done; and we

13  won't try to get into closing arguments and -- with the jury

14  sitting back there and have to close for lunch.  So I think

15  that's very good.

16             THE COURT:  Any idea about closings; you have any

17  idea how much time?

18             MR. TURNER:  You need a couple of hours, don't you?

19             MR. LEARY:  No.  We'll bring it --

20             MR. DABBS:  I think between the two of us maybe an

21  hour, hour and 15.

22             THE COURT:  How about an hour?

23             MR. SUMRALL:  I don't think I'm going to take

24  anywhere near close to an hour.

25             THE COURT:  I'm talking about giving you 30 minutes.

1          MR. TURNER:  I was going to ask for 30.

2          THE COURT:  Yeah.

3          MR. SUMRALL:  I think I can do it in 30 minutes.

4          THE COURT:  Now, it's going to take a long time to

5 read that jury charge.

6          MS. PEARSON:  Your Honor, might I ask, if the

7 Government is going to withdraw some instructions --

8          THE COURT:  Yeah.  Yeah.

9          MS. PEARSON:  -- or fix a couple typos, should we

10 resubmit to the whole group or just bring corrected copies with

11 us?

12          THE COURT:  Just tell me.  I would appreciate you

13 withdrawing about half of them.  And the same thing,

14 Mr. Turner, you submitted -- well --

15          MR. TURNER:  Some of them are duplicative.

16          THE COURT:  Yeah.

17          MR. TURNER:  But I do that in the event -- sometimes

18 the Government withdraws some I want to use.

19          THE COURT:  I'm not criticizing anybody.  I like

20 Mr. Sumrall's instructions best.

21          MR. TURNER:  Your Honor --

22          MR. SUMRALL:  If you wanted me to expound on that, I

23 would; but I think I better not.

24          THE COURT:  I think you've covered everything, is

25 what I think.

1          MR. SUMRALL:  I think everything has been covered,

2  yes, sir.

3          MR. TURNER:  At this time, I would like to renew all

4  of our pretrial motions for appellate purposes, Your Honor; and

5  that goes to -- you've addressed the venue issue, and then the

6  issue regarding my client getting a psychological evaluation;

7  and my motion for severance.  At this time, I would renew those

8  just for appellate purposes, Your Honor.

9          THE COURT:  Very well.  For the record, the Court

10  renews all previously entered orders and motions denied.

11          MS. PEARSON:  And should the Government submit our

12  verdict form?

13          MR. TURNER:  Yeah.

14          THE COURT:  You can give me a proposed one, but my

15  clerk -- well, I haven't looked at them.  Let me look at them.

16  And, ordinarily, our clerk prepares that.

17          MS. PEARSON:  Oh, gosh.  Okay.

18          MR. TURNER:  Is there one we can take with us?  I

19  didn't know if you have a general one.

20          THE COURT:  Uh-uh.  Well, let's send the jury home,

21  and then we can talk.

22      (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

23          THE COURT:  Let's have the jury, Mr. Marshal.

24      (JURY IN AT 4:15 p.m.)

25          THE COURT:  Everyone may be seated.  Ladies and

1  gentlemen of the jury, you've heard all of the proof in this

2  case.  There'll be no further witnesses or testimony in the

3  case.  Now, the matters left for presentation to you are the

4  final arguments of the attorneys and my instructions to you on

5  the law that you should apply in deciding this case.

6      That's going to necessitate me working with these

7  attorneys for a good period of time out of your presence.

8  Rather than hold you here late until the evening, I'm going to

9  recess the jury until 1:30 tomorrow afternoon, 1:30.

10        MR. TURNER:  Your Honor, may we approach?

11        MR. SUMRALL:  May we approach, Your Honor?

12        THE COURT:  Yes.

13     (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

14        MR. TURNER:  I think we need to rest in front of

15  them, unless you're wanting us to do it tomorrow.

16        THE COURT:  Do what, now?

17        MR. SUMRALL:  I think the defense needs to rest in

18  front of the jury.

19        THE COURT:  Oh, yeah.  Yeah.  You want to do that

20  now?

21        MR. SUMRALL:  I would think that would be the best

22  time to do it.

23        THE COURT:  I'm sorry.

24        MR. SUMRALL:  I didn't want us to overlook that.

25        THE COURT:  Right.  Right.  Okay.

1    (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

2         THE COURT:  Ladies and gentlemen of the jury, I spoke

3    too soon.  Mr. Sumrall, the United States has rested their case

4    and the case sub judice, the case for trial.  What says the

5    defendant?

6         MR. SUMRALL:  Defendant also rests, Your Honor.

7         THE COURT:  Defendant Owens rests?

8         MR. SUMRALL:  Yes, sir.

9         THE COURT:  Mr. Turner?

10        MR. TURNER:  Your Honor, at this time, Defendant

11   Parker rests.

12        THE COURT:  Defendant Parker rests.  Now I'll tell

13   you what you do.  You can go home and come back in the morning

14   at 1:30.  Wait just a minute.  Remember my instructions are

15   more important to you now that you've heard all the evidence in

16   the case.  So, please, do not discuss the case among yourselves

17   or with anyone else.

18        You people have been mighty prompt in your attendance, and

19   I think -- I think we may have set a land speed record in this

20   case for the number of witnesses that you've heard.  See, we

21   didn't hear any witnesses Monday.  That was taken up with jury

22   selection and opening statements.

23        So, really, we've just been in session for five days.  And

24   you've heard an awful lot of testimony.  Now, with that said,

25   the jury will be excused until 1:30 tomorrow.  Be in the jury

1   room at 1:30.

2       (JURY OUT AT 4:18 p.m.)

3           THE COURT:  Okay.  The jury's out.

4       Now, Mr. Leary said this case will take a month.  You just

5   haven't been in my court before.

6           MR. LEARY:  Your Honor -- this was a land speed

7   record, Your Honor.

8           THE COURT:  I pushed them through pretty good.  Have

9   a seat.  And I'll tell you, let me have counsel back up at the

10  bench here a minute.

11      (DISCUSSION AT SIDEBAR OUTSIDE THE HEARING OF THE JURY)

12          THE COURT:  I'll just instruct them to write the

13  words either *guilty* or *not guilty* in each blank.

14          MR. SUMRALL:  (Perusing document).

15          MR. TURNER: (Perusing document).  I like simple.  I

16  like that.

17          MS. PEARSON:  Your Honor, may the Government reserve

18  it's position on this just for this evening?

19          THE COURT: (Nodding head).

20          MS. PEARSON:  Thank you.

21          MR. LEARY:  Well, now, we don't think we have any

22  issues.  I just want to look at it closer.

23          THE COURT:  Well, look at it closer.  I've used it

24  about 700 times.

25          MR. SUMRALL:  Is that all, Judge?

1            MR. LEARY:  Thanks, Judge.

2            MS. PEARSON:  Do you mind if we keep this?

3            THE COURT:  Yes.  We can print out another copy.

4            MR. LEARY:  Thanks, Judge.

5            THE COURT:  And listen, we -- before you leave, we've

6    got another little matter that you can give some thought to.

7    We have to give the jury a copy of the indictment.  Now, what I

8    usually do -- what I've done in the past where there's

9    defendants who are no longer in the case is just mark through

10   their names and have only the names of the defendant that's

11   charged in that count in the indictment.

12           Now, it may -- since there are so many people -- see,

13   we'll have -- like, Count 1, there'll be 15 names marked

14   through and two -- it may be that you people would prefer that

15   we just hand the indictment without redactions.  But --

16           MR. LEARY:  Yes.

17           THE COURT:  You know, that gives the jury a way to

18   focus on what's before them.  But, now, that's the thing I

19   want -- yeah, this is kind of my usual thing.  Of course, we

20   take out the counts they're not charged with.  But give that

21   some thought.

22           MR. SUMRALL:  Your Honor, I'd also move that the

23   overt acts be redacted because that's not proof; that's just an

24   allegation.  And I'd ask that the overt acts be redacted from

25   the indictment because the proof has to come from the witness

1  stand.

2            THE COURT:  No.  I won't do that.  You'll have to let

3  the jury know what they're charged with.

4            MR. TURNER:  You talking about just the overt acts?

5            MR. SUMRALL:  Not the ones listed in the indictment,

6  but I'm talking about the overt acts that have nothing to do

7  with our clients.

8            MR. TURNER:  Like, just say it had to do with

9  Mr. Jenkins --

10           THE COURT:  No.  That's not the law.  Any member of

11  the conspiracy commits an overt act.  Yes, that motion will be

12  denied.  You can make it on the record.  But give that some

13  thought.

14           MR. LEARY:  Okay.

15           THE COURT:  What form you want the indictment to go

16  to the jury?  They've got to know what the charges are.

17           MR. LEARY:  Yes, Your Honor.  Thank you, Judge.

18           MS. PEARSON:  Thank you.

19           THE COURT:  Okay.  Now, I'll see you folks in

20  chambers at ten o'clock in the morning.

21           MR. LEARY:  Yes, sir.

22      (END OF DISCUSSION AT SIDEBAR OUT OF HEARING OF THE JURY)

23           THE COURT:  Okay.  Court's adjourned.  Oh, let's see.

24  The marshals know this; in the morning, we've got an

25  instruction conference in chambers.  Now, the defendants have a

1  constitutional right to be present during that conference.  So

2  talk with your clients and see what their election is insofar

3  as attending that conference.

4          MR. TURNER:  Yes, Your Honor.

5          THE COURT:  And the marshals take what steps you've

6  got to do to secure the chambers.

7          MR. SUMRALL:  Your Honor, I have discussed it with my

8  client; and he would like to be present.

9          MR. TURNER:  Mine would also like to be present.

10         THE COURT:  Very well.  Very well.  We'll meet in

11 chambers at ten in the morning.

12         MR. LEARY:  Thank you, Judge.

13         (Proceedings recessed overnight at 4:24 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4              I, Rita Davis Young, Federal Official Realtime

5    Court Reporter, in and for the United States District Court for

6    the Northern District of Mississippi, do hereby certify that

7    pursuant to Section 753, Title 28, United States Code that the

8    foregoing is a true and correct transcript of the

9    stenographically reported proceedings held in the

10   above-entitled matter; and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13

14

15              Dated this 29th day of August, 2016.

16

17

18

19              /s/ Rita Davis Young
                RITA DAVIS YOUNG, FCRR, RPR, CSR #1626
20              Federal Official Court Reporter

21

22

23

24

25